**Volume 3**

**Pages 383 - 532**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| VS. | ) | **NO. CR 21-00429-YGR** |
| RAY J. GARCIA, | ) | |
| Defendant. | ) | |

Oakland, California
Tuesday, November 29, 2022

**TRANSCRIPT OF TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:

> **STEPHANIE M. HINDS**
> United States Attorney
> 1301 Clay Street, Suite 340S
> Oakland, CA  94612
> BY: **MOLLY PRIEDEMAN**
> **ANDREW PAULSON**
> **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:

> SUMMIT DEFENSE, APLC
> 4040 Civic Center Drive, Suite 200
> San Rafael, CA  94903
> BY: **JAMES T. REILLY, ESQUIRE**

Also Present:        Conchita Lozano, Spanish Interpreter

Reported By:  Pamela Batalo-Hebel, CSR No. 3953, RMR, FCRR
            Official Reporter

# I N D E X

Tuesday, November 29, 2022 - Volume 3

| GOVERNMENT'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **H., MELISSA (RECALLED)** | | |
| (PREVIOUSLY SWORN) | 391 | 3 |
| Cross-Examination resumed by Mr. Reilly | 391 | 3 |
| Redirect Examination by Ms. Priedeman | 404 | 3 |
| | | |
| **MILLIKIN, STEPHANIE** | | |
| (SWORN) | 411 | 3 |
| Direct Examination by Mr. Paulson | 412 | 3 |
| Cross-Examination by Mr. Reilly | 440 | 3 |
| Redirect Examination by Mr. Paulson | 466 | 3 |
| | | |
| **L., MARIA** | | |
| (SWORN) | 468 | 3 |
| Direct Examination by Mr. Paulson | 469 | 3 |
| Cross-Examination by Mr. Reilly | 504 | 3 |
| Redirect Examination by Mr. Paulson | 511 | 3 |
| Recross-Examination by Mr. Reilly | 513 | 3 |
| | | |
| **M. PACHECO, AURELIA** | | |
| (SWORN) | 514 | 3 |
| Direct Examination by Ms. Priedeman | 515 | 3 |
| Cross-Examination by Mr. Reilly | 525 | 3 |

# E X H I B I T S

| GOVERNMENT'S EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1 | | 478 | 3 |
| 60 | | 438 | 3 |
| 214 | | 470 | 3 |
| 219 | | 516 | 3 |
| 273 | | 481 | 3 |
| 287 | | 511 | 3 |
| 320 | | 520 | 3 |

## I N D E X

### E X H I B I T S

| GOVERNMENT'S EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 327 | | 487 | 3 |
| 328 | | 487 | 3 |
| 337 | | 487 | 3 |
| 341 | | 428 | 3 |
| 342 | | 428 | 3 |
| 343 | | 428 | 3 |
| 344 | | 428 | 3 |

### E X H I B I T S

| DEFENDANT'S EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 58 | | 451 | 3 |
| 59 | | 451 | 3 |

**Tuesday - November 29, 2022**                                    **8:00 a.m.**

## P R O C E E D I N G S

**---oOo---**

(Proceedings were heard out of presence of the jury:)

THE CLERK:  Calling Criminal Case 21-429-YGR, USA vs. Ray J. Garcia.

Counsel, please state your appearances.

MS. PRIEDEMAN:  Good morning, Your Honor.  Molly Priedeman and Andrew Paulson for the United States.

THE COURT:  Good morning.

MR. REILLY:  Good morning, Your Honor.  Jim Reilly of Summit Defense, appearing with Mr. Garcia, who is present also in court.

THE COURT:  Good morning.

Okay.  What do we have to do this morning?

MS. PRIEDEMAN:  We just have one additional witness to swear in, Your Honor, and then Mr. Paulson had one issue to address that he wished to address first before we do that.

THE COURT:  All right.  Let me hear from Mr. Reilly.

Anything from your side, Mr. Reilly?

MR. REILLY:  No, Your Honor.  Thank you.

THE COURT:  Okay.

MR. PAULSON:  Your Honor, I just wanted to inform the Court that one of the witnesses that we plan to call today is a Spanish speaker and will be talking through an interpreter.

One of the documents that I plan to put in front of her is Exhibit 59, which is her request for compassionate release, and she wrote it in Spanish.  Exhibit 273 is the translation of that.  And so I plan to show the witness Exhibit 59 and then read the stipulation that we have saying Exhibit 273 is the English translation and then admit 273.

And just to clarify, I'll only show her the first two pages of Exhibit 59.

**THE COURT:**  All right.  So a couple of questions.

One is is there any need to have both admitted, given that 59 is in her own handwriting?

**MR. PAULSON:**  I -- I mean, I guess I could admit both.

**THE COURT:**  You could move to admit.

**MR. PAULSON:**  But the instruction is, obviously, the --

**THE COURT:**  Mr. Paulson, I admit, you move.

**MR. PAULSON:**  Yes, Your Honor.  Yes, Your Honor.

**THE COURT:**  Just trying to get you to be precise.

Go ahead.

**MR. PAULSON:**  Yes.  I could move to admit both, but, obviously, the instruction that Your Honor would give the jurors at the end would say that the English language would control as far as what's said in the document.  Right?

**THE COURT:**  True.  But for what purpose are you offering the document?

**MR. PAULSON:** To show that she applied for compassionate release pursuant to the defendant's instruction to have her apply for compassionate release.

**THE COURT:** Okay. So it's the application -- the existence of the application, not the actual words in any event.

**MR. PAULSON:** Not -- not necessarily, no.

**THE COURT:** Okay.

Mr. Reilly, any perspectives?

**MR. REILLY:** I -- I have received both copies of the -- excuse me -- both copies of the document. I have no objection to the English version coming in. I actually have no objection to the Spanish version coming in either, although I don't think it's really necessary for the jury.

**THE COURT:** Okay. Well, I can do it either way, so you think about it.

I take it that you're only offering -- you're not offering the entire exhibit, then; you're offering just the first two pages?

**MR. PAULSON:** Of Exhibit 59, yes, Your Honor. But Exhibit 273 is just the two pages, so we would offer the entire exhibit of 273.

**THE COURT:** Okay. All right. That's fine.

**MR. PAULSON:** Thank you, Your Honor.

**THE COURT:** And do we have the other witness available

to be sworn in?

MS. PRIEDEMAN:  Yes.  We'll go get her.

I think the interpreter needs to be sworn in as well.

THE CLERK:  She was sworn in yesterday.

MS. PRIEDEMAN:  Oh.  Great.

THE COURT:  And have you provided Ms. Collins with all the exhibits that were admitted yesterday, including the ones that are under seal?

MS. PRIEDEMAN:  Yes.

THE CLERK:  I have them all, yes.

(The following proceedings were held under seal:)

(The following proceedings were heard in open court, out of the presence of the jury:)

**THE COURT:** Okay. Then if that is all, then we'll stand in recess until the jury arrives. Then --

**MS. PRIEDEMAN:** Thank you, Your Honor.

**MR. PAULSON:** Thank you, Your Honor.

**THE COURT:** -- we'll get started.

Thank you.

(Recess taken at 8:07 a.m.)

(Proceedings resumed at 8:33 a.m.)

**THE COURT:** Let's call in the jury.

Melissa, I'll remind you, you're still under oath.

**THE WITNESS:** Okay.

(Proceedings were heard in the presence of the jury:)

**THE COURT:** We are back in session. The record will reflect that the jury is back.

Good morning, everyone. Good to see you all.

One of the things I failed to mention yesterday because I wanted us to get started is in your binder, as -- and someone

called this morning -- there is a phone number for us.  I encourage you to give that phone number to any of your loved ones so that if there's an emergency, all they have to do is call that number.  I don't want you to worry that something's happening and you're not going to hear about it because you don't have your cell phones with you and stuff.

My CRD and I, we communicate electronically up here, and if there is -- if they call that number, someone is going to pick it up and they're going to let me know that they need to contact you, and I'll stop the trial and we'll stop and we'll get you that message.  Okay?  So I don't want you to worry about that.  Please give out that number as an emergency contact, and I will stop the trial to make sure that you get any message that you need.  Okay?  All right.

We will continue with yesterday's cross-examination by Mr. Reilly.

As soon as you're ready, sir, you may proceed.

MR. REILLY:  Thank you, Your Honor.

**MELISSA H.**,

called as a witness for the Government, having been previously duly sworn, testified further as follows:

**CROSS-EXAMINATION**   (resumed)

BY MR. REILLY:

Q.   Good morning, Ms. -- Melissa.

A.   Good morning.

**Q.** So to pick up where we left off yesterday, you indicated that you had talked to your sister about this situation, Janessa?

**A.** Yes.

**Q.** And that after you talked to her, you never talked to Mr. Garcia again; is that right?

**A.** I can't remember if I talked to him after that.

**Q.** Well, you told us yesterday that you made a specific effort to avoid having contact with him.

Is that true?

**A.** Yes.

**Q.** Okay. And the reason that you brought this up with the FBI was in the hopes that you would be able to gain some benefit with respect to your own incarceration; is that right?

**A.** No.

**Q.** You did expect to gain some benefit from revealing this information, did you not?

**A.** No.

**Q.** Did you realize that that was a possibility?

**A.** No. It was never mentioned to me.

**Q.** All right. Whether it was mentioned by someone else or not, in your own mind, you knew that if you made a complaint, that that might be a basis upon which you could gain some benefit for yourself; correct?

**A.** No.

Q.   You didn't know that you might be able to use it to gain a more favorable response on compassionate release?

A.   No.

Q.   Or to be moved to another facility?

A.   No.

Q.   Those things never entered your mind?

A.   No.

Q.   All right.  You know an inmate named Michelle West?

A.   I don't know her.  I've heard -- I've heard that name.

Q.   Have you talked to her at some point?

A.   I don't know if I've ever talked to her.

Q.   Do you remember during the interview conducted just a couple of days ago, on November 26th, saying that you had talked to her on one occasion?

A.   I believe that was her in the dental office.

Q.   This is a person you knew as Ms. West?

A.   Yes.

Q.   I want to try to clarify something else.

     Can you tell us exactly how many times, to the best of your recollection, you say that Mr. Garcia penetrated your vagina total?

A.   Five times.

Q.   And is that -- that's your best recollection as you sit here right now?

A.   Yes.

Q.   Do you remember during that same interview that I just referred to saying that it happened four to six times?

A.   I don't remember that.

Q.   And going back to the candy cane incident for a minute, was that an occasion in which -- or during which Mr. Garcia penetrated your vagina with his finger?

A.   Yes.

Q.   And do you remember previously saying that he did not do it on that occasion?

A.   There was two incidents in Andrea's cell that he did that to me.

Q.   Both times?

A.   Yes.

Q.   All right.  But during one of your interviews with the FBI, you told them he did not penetrate your vagina on the date on which the candy cane incident happened; is that right?

A.   I don't remember that.

Q.   The -- between the last time that you claim that Mr. Garcia touched you in any way and this conversation that you had with your sister, did you have -- continue to have contact, non-physical contact, with Mr. Garcia?

A.   After I talked to my sister?

Q.   No, between the time that you say the last physical contact occurred and the date on which you talked to your sister, during that interval.

**A.**    Yes, he's touched me.

**Q.**    He touched you during that time?

**A.**    There was a time when I was in the drug building and I was walking up the steps, and I kind of tripped a little bit and I remember him grabbing me from behind.

And there was an incident where -- in the warehouse where he grabbed my butt.

**Q.**    All right.  And that's -- that's one of the allegations in the case, right, that you say he touched you inappropriately on that occasion?

**A.**    Yes, he touched me.

**Q.**    Okay.  I guess I didn't make myself clear enough.

From the last time that you had physical contact with him or -- strike that.  Let me ask you this first.

Was that occasion in the warehouse when you say that he touched you on the rear end the last time that he had physical contact with you?

**A.**    You have to specify what -- what month that was and what year that was.

**Q.**    No, you have to specify that, not me.

**A.**    There's two incidents in the warehouse, one where he stuck his finger inside of my vagina, and the second time he was with an officer and I was with my roommate.

And he took us to the warehouse to look at a safe, and he told me that he pulled us out and he wanted to show us a safe.

And I can remember it was just us in that big warehouse, and he told me he just wanted to spend time with me and talk to me, and he grabbed my butt on that occasion.

Q.   And when was that?

A.   That was during the COVID.

Q.   Do you remember what month?

A.   I believe it was in -- I don't -- I don't remember if it was in 2020 or 2021.

Q.   And was that the last time he ever touched you?

A.   I believe so.

Q.   All right.  Between that date and the date on which you had this conversation with your sister, did you continue to have non-physical contact with Mr. Garcia, that is, talk to him, see him?

A.   Oh, I saw him.

Q.   And where did you see him?

A.   He worked in the prison, so I'd see him every day.

Q.   On any of those occasions, did you ever take your clothes off for him?

A.   After I talked to my sister, no.

Q.   No, I'm talking about the time between what you just told us about the warehouse, where he touched you on your posterior, and the date on which you talked to your sister, during that period of time.

A.   Did I take my clothes off for him?

Q.    Yes, so that he could take pictures.

A.    I took my clothes off for him, yes.

Q.    All right.  And did he take pictures?

A.    I don't know the exact dates.

Q.    I didn't ask you for dates.  I asked you if he took pictures of you --

A.    The last time --

Q.    -- when you took your clothes off --

A.    The last --

Q.    -- during those times.

A.    The last time he took a picture that I remember was during the COVID lockdown and I was in my cell.  And I explained it yesterday where there was two inmates over here and he was on his phone talking.

And I was waiting for him and I had a robe on, and he came to my cell and he was kind of nervous, and he stuck his phone inside of my cell.  That's the last time.

Q.    And was that the only time, then, after he touched you in the warehouse that he actually -- that you think he took pictures of you?

A.    I believe so.

Q.    And you remember during that same conversation with the FBI that I referred to earlier making the statement that even after your physical relationship ended, that he continued to come around, show you pictures of his penis, and take pictures

of you in your own cell or in Ms. Zambrano's cell?

A.    Yes.

Q.    You told us -- you told the FBI that?

A.    I just said that.

Q.    And was that true?

A.    I believe so, yes.

Q.    So it would have been more than one occasion.

A.    Can you please repeat that?

Q.    Yes.  You just told us a minute ago this morning that the time that he took this photograph of you during COVID was the only time that he took a picture of you between the date on which he touched you in the warehouse on the butt and the date that you had this conversation with your sister.

This statement that you gave the FBI suggests that there was more than one such occasion, and you just confirmed that for us.  And what I'm asking you now is to clarify that.

Are you saying, to the best of your recollection, that this happened only once after the incident in the warehouse or more than once?

A.    I believe, to the best of my knowledge -- I can't remember the exact dates, but after the warehouse with my roommate and him touching my butt, I -- I only remember him with his cell phone in my cell that one time.

Q.    Do you have any recollection as to how long any of these incidents in which you say that Mr. Garcia penetrated your

vagina, how long they took, how long they lasted?

A.   I really don't know the times.  I don't know.

Q.   Do you recall during your interview with the FBI saying that the candy cane incident lasted less than five minutes?

A.   I can remember that whole incident lasted probably less than five minutes.

Q.   How about any of the others in which you make these allegations?  Did any of them last longer than five minutes?

A.   No.

Q.   All right.  Can you give us any better indication that you have -- than you have so far as to the exact dates on which any of these events that you've described took place?

A.   It's been years.  I -- I honestly -- I don't know the exact dates.  I don't know the exact times.

Q.   Do you remember any of them being shortly before or shortly after Christmas?

A.   Yes.

Q.   Which event was that?

A.   The time that I got undressed for him -- I remember the first time and the time in Andrea's cells [sic] I believe was before Christmas.

Q.   I'm sorry.  That -- both of those were before Christmas?

A.   No.  I know one of them, I believe, is when -- I don't know the exact dates.  I know there was an incident that took place in December.

**Q.**   Okay.  So was that the first time?

**A.**   The first time was in the visiting room.

**Q.**   And was that in December?

**A.**   I believe so, yes.

**Q.**   And was it --

**A.**   Yes.

**Q.**   -- before or after Christmas?

**A.**   It was before.

**Q.**   And the incident that you described in your -- in Andrea's cell, was that in December also?

**A.**   Honestly, I don't remember.

**Q.**   Do you remember if it was before or after Christmas?

**A.**   No.

**Q.**   You're familiar with the process for accomplishing a transfer to another facility?

**A.**   When you transfer from another facility, the requirements are usually you have to be disciplinary free and 18 months -- if you go to another facility, you usually have to wait 18 months.

But since the COVID hit, some of the staff was saying it could happen before that.

**Q.**   And do you know to whom that -- to whom a request for a transfer to a new facility has to be made?

**A.**   So when you do a transfer, it goes to your unit team, and then they submit it to region and region makes that decision,

what -- where you go.  That's what I was always told.

Q.    All right.  So that's not something that the warden makes the final decision on?

A.    To my knowledge, in prison, when you -- you have a piece of paper, and it gets routed throughout the whole prison and they sign off on that, and the warden makes the last call.  And I believe region just picks the place where you go.

Q.    But it's your understanding that that's -- that approval, if it's going to be approved, the decision -- initial decision to make that or not make it is made by someone other than the warden?

A.    The warden has the final say in everything.

Q.    So you think he could override a decision by someone else?

A.    Yes.

Q.    Or he could confirm it?

A.    He can override, yeah, a decision.  He can say yes or no.

Q.    And you are familiar with PREA; correct?

A.    PREA?

Q.    You know what that is, PREA?

A.    That really doesn't exist in Dublin, but, yes, I know what it means.

Q.    What do you mean it doesn't exist in Dublin?

A.    PREA is -- we were never -- in unit teams is talked about, or in prison.

Q.    Well, you were trained in PREA, were you not?

**A.**    No.

**Q.**    Didn't go to classes?

**A.**    No.

**Q.**    No one ever came around and told you what that program was and how it might affect you?

**A.**    I have never heard of a PREA program or class in prison in the 11 years that I've been there.

**Q.**    So you've never been involved in a PREA review of any kind?

**A.**    I don't understand.  What do -- what do you mean, a PREA review?

**Q.**    Say a claim that someone made that involved some kind of inappropriate conduct.

**A.**    Yes, I know what PREA is.  It's the Prison Rape Elimination Act.  I understand that.

**Q.**    Okay.

**A.**    And any time there's an allegation made in prison, you have to go to Mr. Putnam.

And there was a lot of PREA in Dublin, I've seen it firsthand for years and years, and nothing happened.

**Q.**    Say that again?

**A.**    I've seen inmates -- I've seen inmates sit in the SHU forever.  I've seen the harassment.  I've seen stuff you couldn't even imagine in prison.  So that's what I mean when PREA does not exist in Dublin.

**Q.**   So help me understand this.  Are you suggesting that no one in authority in Dublin ever trained or explained or brought to the attention of yourself or any other inmates the PREA program?

**A.**   I've never heard of a PREA program.

**Q.**   Then how do you know that there's PREA actions being taken that are being ignored by staff?

**A.**   I -- I don't -- can you please say that again.

**Q.**   Yes.  I'm confused here.

You've said there's no PREA program in Dublin, but you've also said that PREA claims have been made in Dublin.

So if there's no PREA program, how are these claims being made?

**A.**   So a program, to me, is like a mental health program, a class on stress, a class on psychology.  So there's -- there's not a PREA class or program.

**Q.**   So no one ever trained you on what PREA is, what the guidelines are, what the purpose of it is?

**A.**   Nobody has ever trained me in that.

**Q.**   And to your knowledge, in Dublin, no one has ever trained any of the other inmates either?

**A.**   No, not to my knowledge.

        **MR. REILLY:**  Thank you.  That's all I have at this time, Your Honor.

        **THE COURT:**  Redirect?

**REDIRECT EXAMINATION**

**BY MS. PRIEDEMAN:**

Q.    Just a few follow-up questions, Melissa.

Mr. Reilly asked you a lot about surveillance cameras yesterday at FCI Dublin, where they're located.

Do you know how many of the cameras at FCI Dublin worked?

A.    No.

Q.    You testified to a sexual incident that occurred in a warehouse.

Was there a camera that you knew of in that warehouse?

A.    No.

Q.    Can you describe to the jury how big that warehouse was?

A.    The warehouse is -- it's like an old, huge building, like 20 of these.  And there's different kind of like rooms, maybe like the size where you guys are, where there's -- it's like a little building, like, with a door where there's old furniture. And there's a few of those.

But in general, that warehouse has massive amounts of furniture.  It's enormous.  It's huge.  There's different parts of the warehouse.  It's very open.  You have walls, and it's just like a warehouse with old stuff in it that they would keep there.

Q.    You also told Mr. Reilly that I think there was a few inmates and maybe staff in the warehouse when that incident with Mr. Garcia occurred.

When Mr. Garcia took you back to look in the cabinet, how far away were the other inmates and staff members at that time?

A.   I just remember when we walked in, you kind of walk up a little bit into a door.  And I remember Ms. Schwartz and Ms. -- I remember Ms. Schwartz and Mr. Martinez and there was a few inmates.

But when me and Mr. Garcia walked in the back, there wasn't anybody around.  I didn't see anybody.

Q.   Mr. Reilly asked -- also asked you about your civil suit yesterday.

Do you remember when you filed that?

A.   No.  I don't know the exact dates.

Q.   Was it this year?

A.   Yes.

Q.   All right.  And then you testified yesterday to several sexual incidents that occurred in the visitation bathrooms.

Did Mr. Garcia tell you why he took you to the visitation bathrooms?

A.   He told me that -- that there was four places that didn't have cameras, and I remember saying, "Where?"  And he said, "Well, pick which one.  There's four bathrooms in the visitation room."  So he said that to me.

     MS. PRIEDEMAN:  Ms. Slattery, can you please pull up Exhibit 42.

This has been previously admitted, Your Honor.

THE COURT:  Yes.

MS. PRIEDEMAN:  Can we publish it to the jury as well?

THE COURT:  You may.

MS. PRIEDEMAN:  Thank you.

Q.   All right, Melissa.  I want to talk about the sexual incident you testified to that took place in one of these -- I think you called it cubbyholes.

Can you explain again where you were standing with Mr. Garcia when that occurred?

A.   Can I stand up and show you?  It would be better.  Like --

THE COURT:  That's fine.

THE WITNESS:  On the screen, this door right here opens (indicating), and we walked right here against this wall like this (indicating).

BY MS. PRIEDEMAN:

Q.   Were you inside the --

A.   My back -- my face was facing this (indicating).  My eyes looked right there.  So my back was against this wall (indicating).

And the camera is, like, right around here (indicating), right up here, a big bubble, and this door opens this way (indicating).  That's where I was standing.

Q.   So were you inside the cubbyhole?

A.   Yes.  There's a wall there.

Q.   Okay.

MS. PRIEDEMAN: Ms. Slattery, can we take a look at Exhibit 44, please.

Your Honor --

THE COURT: You can publish it.

MS. PRIEDEMAN: Great.

Q. So, Melissa, can you point out -- this is a closer-up of the cubbyhole; right? Can you point --

A. So this right here is my back like this (indicating). My eyes are looking right there like this (indicating). So it's like this (indicating). This is my back right here (indicating), inside.

MS. PRIEDEMAN: Ms. Slattery, can you pull up Exhibit 39, please.

Q. Melissa, do you see the camera that you were talking about earlier in this picture?

A. So it's this big bubble right here (indicating).

Q. And do you see the door you mentioned earlier as well?

A. So the door is right there (indicating), and it opened like this (indicating). The door opened.

So we walked, the door went open, so it was facing here (indicating). And then we walked back against the wall right here (indicating), so my eyes were facing this way (indicating).

Q. Did the defendant say anything about the cameras during this incident?

**A.**    When he ran across the -- the officers' station -- he, like, ran across the officers' station, and I remember saying -- because the two officers left because -- to go get the keys.

We wanted to -- he wanted to go in there to find that SDS binder, and he ran across the -- the podium and we went into the hall right there.  And I said, "There's a camera right there."  And he goes, "Where?"  Like -- he did that.  He goes, "Where?"  And I said, "The big bubble."

And so I could remember I grabbed the door like this (indicating).  And those curtains weren't there at the time. Those -- those walls were being built.  It was already built, but the other ones on the side, they just were dividers, so the curtains weren't right there.  And that's where we went against the wall.

**Q.**    Thank you.

Melissa, why did you come forward about what happened with the defendant?

**A.**    After I saw how he interacted with this inmate, I didn't want him -- I didn't want her to be hurt like I did.  I -- I saw how he still came to me and told me everything I wanted to hear and how he wanted to be with me, he still showed me pictures, and -- but he was doing this with this inmate.  And I felt sorry for her.  I did.

And -- and -- and then, you know, being in prison for so

long, like, finally I got a visit with my sister.  And I asked her -- I confided in her and I said, "Janessa, like -- like, I don't know what to do," I told her, you know.

And Janessa just started talking to me and telling me that -- like how dare him do this to me.  And she told me that, like, he manipulated me and he doesn't love me, and -- you know.

And -- and I still -- like, I still couldn't believe, like -- like, he -- he protected me.  He loved me.  He -- he did everything for me, you know?  I had a hard time there, like, with my case.  I had case managers.  I had people always say bad things to me, you know?

And I did everything in my power in prison to prove that people do change.  I am that statistic.  I know that.  I took classes.  I bettered myself, you know?  I have never had an incident report.  I've never had a shot.  I've never got in trouble ever in 11 years.

MR. REILLY:  Excuse me, Your Honor.  I'm going to object at this point as no question pending.

THE COURT:  Ask another question.  It's a narrative at this point.

MS. PRIEDEMAN:  I have no further questions, Your Honor.  Thank you.

THE COURT:  Any recross limited to the scope of the redirect?

MR. REILLY:  No, Your Honor.  Thank you.

THE COURT:  All right.  Then, Melissa, you are now excused.

Any need for recall or not?  Can she be excused?

MR. REILLY:  Your Honor, I would ask that she be subject to recall.

THE COURT:  Okay.  She is subject to recall then. She's done for the day.  Thank you.

Next witness, Ms. Priedeman.

MR. PAULSON:  Your Honor, before the Government calls its next witness, I would like to read a few factual stipulations into the record, with Your Honor's permission.

THE COURT:  You may.

Members of the jury, as I explained to you before, the parties have agreed to certain facts, and Mr. Paulson will read them to you.  This helps streamline the trial so they don't have to bring in witnesses or evidence.  You need to treat these facts as having been proved.  Okay?

Go ahead, Mr. Paulson.

MR. PAULSON:  Thank you, Your Honor.

Factual Stipulation No. 1, FCI Dublin is a low-security all-female federal correctional institution with an adjacent minimum-security satellite camp.  Both FCI Dublin and the satellite camp are located in the Northern District of California.

Factual Stipulation No. 2, the defendant became the associate warden at FCI Dublin on December 9, 2018.  He became the warden at FCI Dublin on November 22nd, 2020.

Factual Stipulation No. 7, Inmate Andrea Zambrano was assigned to Cell BO3-272L from approximately March 23rd, 2018, to December 21st, 2020.

Your Honor, at this time, the Government calls Correctional Officer Stephanie Millikin.

**THE CLERK:**  Please remain standing.  Please raise your right hand.

**STEPHANIE MILLIKIN**,

called as a witness for the Government, having been duly sworn, testified as follows:

**THE WITNESS:**  Yes.

**THE CLERK:**  Thank you.  Please have a seat.  Please speak clearly into the microphone.

**THE WITNESS:**  Okay.

**THE CLERK:**  Please state your full name and spell your name for the record.

**THE WITNESS:**  Stephanie Millikin, S-T-E-P-H-A-N-I-E, Millikin, M-I-L-L-I-K-I-N.

**THE COURT:**  Good morning.

**THE WITNESS:**  Good morning.

**THE COURT:**  You may proceed.

**MR. PAULSON:**  Thank you, Your Honor.

**DIRECT EXAMINATION**

**BY MR. PAULSON:**

Q.   Good morning, Ms. Millikin.

A.   Good morning.

Q.   Where do you currently work?

A.   United States Penitentiary Beaumont.

Q.   Is that a Bureau of Prisons facility?

A.   It is.

Q.   How long have you worked for the Bureau of Prisons?

A.   Since September 2003.

Q.   What is your current position at Beaumont?

A.   I'm a unit manager.

Q.   Prior to working at Beaumont, did you ever work at FCI Dublin?

A.   I did.

Q.   When were you there?

A.   I was there twice.  I started in Dublin in 2003.  I left in 2012.  I returned at the end of 2019, beginning of 2020, and I was reassigned in August of 2022.

Q.   What were your positions while you were at FCI Dublin?

A.   I started as a correctional officer.  Then I became a correctional counselor.  And when I returned back to Dublin, I became back as a unit manager.

Q.   What were your duties as a correctional officer at FCI Dublin?

**A.**    To oversee the custody of the inmates and ensure that they were abiding by rules and they were safe and secure.

**Q.**    How about as a counselor?  What were your duties as a counselor at FCI Dublin?

**A.**    As a counselor, I am a first line of communication for the inmate population.  As a counselor, I would help them with their day-to-day living inside of a prison, to include their housing assignments, job assignments, visiting, and any other day-to-day assignments.

**Q.**    What were your duties as a unit manager?

**A.**    As a unit manager, my job was to oversee the running of the housing unit.

**Q.**    Did you supervise anyone in that position as a unit manager?

**A.**    Yes.  I supervised two case managers, a counselor, and a secretary.

**Q.**    Do all of the correctional officers at FCI Dublin have custodial supervisory or disciplinary authority over all of the inmates?

**A.**    They do.

**Q.**    Does that include the associate warden and warden?

**A.**    Yes.

**Q.**    Can you please take a moment and just describe for the jury the chain of command at FCI Dublin.

**A.**    The head of the chain of command is the warden, who is the

one that has final decision-making in all aspects of the daily running of a prison.

Below the warden is the associate wardens, and they oversee directly the various departments of the institution. They also have the same decision-making skills. However, the warden can override an associate warden.

And then below the associate warden, you have the department supervisors and the captain, who is over the correctional officers.

Q. How many wardens are at FCI Dublin?

A. One.

Q. And who reports to the warden?

A. Essentially, everybody.

Q. Everyone at the facility?

A. Correct.

Q. What types of powers does the warden have over the inmates who are assigned to the prison?

A. The warden has powers as far as sending inmates to special housing, putting inmates under investigation, having staff placed under investigation, the day-to-day decisions over the various departments, to include repairs of the institution, and all other functions within the prison.

Q. Does the warden have the power to transfer prisoners --

A. Yes.

Q. -- from FCI Dublin?

A.   Yes.

Q.   How about searches?  What powers does the warden have related to searches of prisoners?

A.   The warden can arrange mass searches or direct individual searches.

Q.   Does a warden have any power over the phone or video chat privileges of the inmates?

A.   Yes.

Q.   What power does the warden have in that respect?

A.   They can -- the warden can restrict inmates' phone privileges, email privileges.  The warden has authority to restrict any type of privileges that an inmate has within a federal prison.

Q.   What about discipline?  Can the warden discipline a prisoner assigned to FCI Dublin?

A.   The warden can have input into the discipline of an inmate.

Q.   But if a warden sees something, can a warden discipline an inmate on the spot?

A.   Yes.

Q.   Can the warden give disciplinary paperwork to a prisoner?

A.   That's done through the unit disciplinary committee or the disciplinary hearing officer.

Q.   Could the warden instruct that committee to discipline an inmate?

**A.** Yes. The captain also has powers to discipline. The captain can encumber an inmate, which basically means that inmate has to pay a fine, and the warden can direct the captain to do that.

**Q.** What about compassionate release? What authorities does the warden have with respect to compassionate release?

**A.** The warden has the final decision-making in whether or not an inmate is approved or disapproved for compassionate release.

**Q.** What about job assignments? Does the warden have any role in the job assignments of the prisoners at FCI Dublin?

**A.** Yes.

**Q.** What is his or her role?

**A.** We have a committee that meets and there is a decision made about how many -- how many inmates are needed per work detail, and the warden has supervision over that.

**Q.** Could the warden direct that an inmate be transferred from one job to another?

**A.** He can.

**Q.** What is a shot?

**A.** That's an incident report, basically an infraction, a violation of -- a disciplinary issue in the correctional system.

**Q.** Is that something that's given to prisoners --

**A.** Yes.

**Q.** -- if they misbehave?

A.   Yes.

Q.   What are the consequences -- or what are the possible consequences of getting a shot?

A.   There is a range of consequences.  It can range anything from making them work some extra hours, cleaning around the institution.  It can range restricting their commissary, their visiting.  It can -- they can restrict -- they can fine them. They can place them in special housing.  Good conduct time can be taken, which means they will stay in prison longer.

Q.   You mentioned special housing.  What is that?

A.   That's where inmates are in solitary confinement, and they are in solitary confinement 23 hours a day during the weekdays. On the weekends, it's 24 hours a day.

Q.   How many associate wardens are assigned to FCI Dublin?

A.   When I was there, there was two.  However, there is currently three.

Q.   What do the associate wardens oversee?

A.   They are -- there is -- there is approximately -- I don't -- I don't have the exact number.  Let's say there's 10 or 12 departments within the prison.  They are essentially split and are -- have -- assigned to particular departments to supervise.

Q.   And when you talk about departments, are you talking about like the kitchen, the recycling, things like that?

A.   Yes.

Q.   So the things that kind of make the prison run?

A.   Correct.

Q.   What types of powers does the associate warden have over prisoners at FCI Dublin?

A.   They essentially have the same powers as the warden.

Q.   What positions did the defendant hold at FCI Dublin when you were there?

A.   The associate warden and the warden.

Q.   When the defendant was an associate warden, did the staff nevertheless treat him as if he was the warden?

A.   Staff know that he has been in the Bureau a long time and that he is connected to and knows people in central office, including the director of the Bureau of Prisons.  So he was more looked at as being the person in charge.

Q.   How did the staff know this?

A.   Because of knowing his background and just hearing each other talk about and people coming to Dublin that had worked with him at other institutions.

Q.   Did the defendant ever make any statements to that effect?

A.   Yes.

Q.   What did he say?

A.   He would often say that he knew people and he can make phone calls and make things happen.

Q.   What is SIS?

A.   That's the special investigation unit that conducts

investigations within the prison.

Q.    Did FCI Dublin have security cameras?

A.    They did.

Q.    When you were there from 2019 to 2022, were there areas at the prison that were not covered by the security cameras?

A.    Yes.

Q.    What would some of those areas be?

A.    Some of those areas were UNICOR, food service, facilities department, outside recreation.  There was several areas of the institution that lacked cameras.

Q.    Did any of the cameras show inside the prisoners' cells?

A.    No.

Q.    Who knew where the cameras were placed at FCI Dublin?

A.    The warden would know, the associate warden, the captain, the SIS lieutenant, and also the individuals who install the cameras.

Q.    While you were at FCI Dublin, was there a general lack of cameras throughout -- throughout the prison?

A.    Yes.

Q.    Was that generally known by the staff?

A.    Yes.

Q.    Was there ever any discussion regarding the installation of more cameras at the prison?

A.    Yes.

Q.    Tell the jury about that.

A.    There was a time -- there has been talk about installing cameras for some time at Dublin, and I do recall that there was a time when the warden walked through with the captain into my housing unit looking at areas of where they needed to install additional cameras.

Q.    What housing unit were you assigned to at that time?

A.    I was in EF.

Q.    Did all of the cameras that were installed at the prison work?

A.    No.

Q.    Did you know which ones worked and which ones didn't?

A.    No.

Q.    Who did know which ones worked and which ones didn't?

A.    The warden, the associate warden, the captain, and the person who's installing them.

Q.    Were the security cameras that were installed and that were working, were they monitored 24/7?

A.    Generally, cameras are not monitored 24/7.

Q.    When would the footage be reviewed?

A.    When there was an alleged incident, that would spark a reason to review cameras for a particular time.

Q.    So if there was no alleged incident, the footage wouldn't be reviewed?

A.    Generally.

Q.    At some point, is the security footage from those cameras

deleted?

**A.** Yes.

**Q.** Do you know how long it's kept?

**A.** I don't know for sure.

**Q.** Are the prisoners at FCI Dublin, are their phone calls recorded?

**A.** Yes.

**Q.** Can any guard at FCI Dublin monitor an inmate's calls realtime?

**A.** Yes.

**Q.** How would a prison guard go about doing that?

**A.** There is a computerized system at each of our work stations and -- each of the staff members' work stations in the prison, and we're able to log in to the system and look at those -- or listen to those phone calls.

**Q.** So is this something you could just do at your desk?

**A.** Yes.

**Q.** What about video chats? Are those recorded?

**A.** Yes.

**Q.** Can the inmates' video chats also be monitored in realtime?

**A.** Yes.

**Q.** How would a guard go about doing that?

**A.** In the same manner that they'd monitor telephone calls.

**Q.** Are the prisoners' emails monitored?

**A.** Yes.

**Q.** How would a guard go about reviewing a prisoner's emails?

**A.** The same as phone calls.

**Q.** From -- from their desk?

**A.** Yes.

**Q.** Are the prisoners' mail monitored?

**A.** Yes.

**Q.** How?

**A.** So the officers on morning watch, they can monitor the mail.

Another way is if -- if there is a reason for the inmates to be put on an alert list, then that particular mail would be sent to the mailroom, which would, in turn, go to SIS to be reviewed before it's mailed out.

**Q.** If an associate warden or warden wanted to monitor a particular prisoner's mail, could they?

**A.** Yes.

**Q.** How would they go about doing that?

**A.** Putting them on that alert list.

**Q.** And what would happen once they're -- once the AW or the warden puts them on this alert list?

**A.** Then the mail would be sent to whomever their -- has been directed to -- whether it goes to SIS or whether it's something that they would be monitoring themselves.

**Q.** So if the warden said, "I want to see a particular

prisoner's mail," he could get that mail directly?

**A.** Yes.

**Q.** What is a presentence investigation report or a PSR?

**A.** That's a report that is put together by probation when an inmate is convicted, and that, essentially, has all of their background information. It has their current crime and the information about their current -- the details of their current crime. It has their family upbringing. It has their education, their mental health, their drug history, their financial history, and their work history.

**Q.** Who has access to that?

**A.** Everybody within unit team, which would be the unit manager, the case manager, the counselor, the case management coordinator, the associate warden, and the wardens.

**Q.** I want to switch gears here a little bit.

When COVID hit, did anything change at FCI Dublin?

**A.** Yes.

**Q.** What changed?

**A.** So, basically, within the prison, we followed along what the community was doing. So when the community was told to, basically, just maintain contact with the people within your household, that's the same thing that we tried to do within the prison. So we kept inmates in their cells and -- and not intermingle with anybody outside of their cells.

**Q.** So could inmates in one housing unit interact with inmates

in another housing unit?

**A.**    It -- not during the most restrictive time.  It depended on what the current guidance was.

**Q.**    When did FCI Dublin originally go into this COVID lockdown?

**A.**    It was approximately March 2020.

**Q.**    Did FCI Dublin's COVID protocols change over time?

**A.**    It did.

**Q.**    How did it change?

**A.**    As it loosened within the community, it also loosened within the prison.  So once people were able to intermingle again, then that's the same thing that we did within the prison system.

**Q.**    During your time at FCI Dublin, how many prisoners were there?

**A.**    When I first started there, there was approximately, I would say, about a thousand.  And it dwindled down through various mission changes.

**Q.**    By the time you left, approximately how many inmates were there?

**A.**    There was approximately -- within the FCI, approximately 600 inmates.

**Q.**    What is compassionate release?

**A.**    Compassionate release is a way that inmates can make a request to -- for early release.

**Q.**    Based on the various positions you held at FCI Dublin, are you familiar with how the prison handled requests for compassionate release?

**A.**    Yes.

**Q.**    Were you personally involved in that process?

**A.**    Yes.

**Q.**    How are compassionate release requests at FCI Dublin processed?

**A.**    The inmates were directed to submit their request to the warden.

And then the warden's office would disseminate that to the case management coordinator, because she was the oversight person for those to ensure that we responded timely.

And then it would be given to the case manager to review and respond to.

**Q.**    Beyond referring it to the unit team, what was -- what was the warden's role in the compassionate release request process?

**A.**    The warden had the final review and the final decision.

**Q.**    So could the warden grant or deny a request for compassionate release?

**A.**    Yes.

**Q.**    Did anyone else at FCI Dublin have the power to grant or deny a compassionate release request?

**A.**    No.

**Q.**    What happens to a prisoner who gets granted compassionate

release?

**A.**   Then we prepare them for release.

**Q.**   How often were these compassionate release requests granted?

**A.**   During COVID, they increased substantially.  But outside of COVID, seldom do -- inmates are granted compassionate release.

**Q.**   Are you familiar with a former FCI Dublin prisoner named Melissa?

**A.**   Yes.

**Q.**   How did you know her?

**A.**   She was in my housing unit that I was assigned to work.

**Q.**   When were -- so were you her unit manager?

**A.**   I was.

**Q.**   When were you her unit manager?

**A.**   When I first got to Dublin, I was her unit manager, up until November of 2020.

**Q.**   While you were her unit manager, did Melissa ever receive any disciplinary paperwork?

**A.**   No.

**Q.**   If she had received disciplinary paperwork, would that have been something that you would have known about as her unit manager?

**A.**   Yes.

**Q.**   Are inmate disciplinary records maintained in a central

BOP database?

A.    Yes.

Q.    Tell the jury about that database.

A.    Initially, we used to keep it in the inmate's central file.  And within the last two years, approximately, we went to a computerized database.

Q.    What is SENTRY?

A.    SENTRY is a computerized database that we use within the prison.

Q.    What does it show?

A.    It shows -- in SENTRY, you can look at an inmate's background history, you can look at their crime, their release date, their date of birth, their Social Security number, their mental health levels, their health levels.  It shows a significant amount.  Their job assignments, their disciplinary.

Q.    Does it contain completed discipline for the prisoner?

A.    It does.

Q.    What is a PD15 pending?

A.    A PD15 pending, that's a function that you look at within SENTRY.  And that's incident reports that an inmate has received that has not yet been heard.

Q.    So still-pending disciplinary issues?

A.    Right.

Q.    What about a PD15 special?

A.    A PD15 special is incident reports that were expunged.

Q.   So an inmate got discipline at one point, but then it was later expunged?

A.   Correct.

Q.   What is DARTS?

A.   DARTS is the new computerized system that I was referring to just a couple minutes ago.  That is our new database for disciplinary.

Q.   Do you have access to those databases?

A.   Yes.

        MR. PAULSON:  Your Honor, I'm going to hand the witness what's been marked as Exhibits 341 through 344.

        THE COURT:  All right.

BY MR. PAULSON:

Q.   Ms. Millikin, can you take a look at Exhibits 341 to 344?

A.   Yes.

Q.   Do you recognize those?

A.   Yes.

Q.   What are they?

A.   This is the PD15.

        MR. PAULSON:  Okay.  Your Honor, I move to admit Exhibits 341 to 344.

        MR. REILLY:  No objection, Your Honor.

        THE COURT:  They're admitted.

     (Government Exhibits 341 through 344 received in evidence)

        MR. PAULSON:  Ms. Slattery, can you please pull up

Exhibit 341.  Can you zoom in a little bit on the top of the screen.

Q.   Ms. Millikin, what is -- what is this?  Explain this to the jury.

A.   This is a SENTRY transaction.  This is a PD15, which is the inmate's disciplinary.

Q.   So this is -- is this a log of completed discipline?

A.   Yes.

Q.   What does the document show?

A.   It doesn't show any discipline.

     MR. PAULSON:  Ms. Slattery, if you could open Exhibit 342.

Q.   What is this document?

A.   This is also a PD15.

     MR. PAULSON:  Can you zoom in on the top.

Q.   So right there in the middle, you see it says "Format: Special"?

A.   Correct.

Q.   Is this the PD15 special?

A.   Yes.

Q.   So this is what would display expunged disciplinary records; is that right?

A.   Correct.

Q.   What does this document show?

A.   It doesn't show that there's any.

MR. PAULSON:  Ms. Slattery, can you please pull up Exhibit 343.

Q.   What is this document?

A.   This is a PD15 pending.  This is any incident reports that have not yet been heard.

Q.   What does this document show?

A.   That there's none.

MR. PAULSON:  Ms. Slattery, can you please pull up Exhibit 344.

Q.   What is this document?

A.   This is a search of incident reports in DARTS.

Q.   What does this show?

A.   None.

MR. PAULSON:  Thank you.  You can set that to the side.

THE WITNESS:  Okay.

BY MR. PAULSON:

Q.   During the time you were Melissa's unit manager, did the defendant ever make rounds?

A.   Yes.

Q.   What are rounds?

A.   Rounds are when, basically, the executive staff come through the housing unit to address any inmate issues and just to see the overall running of the unit.

Q.   How often did the defendant make rounds in your unit?

A.    Almost daily.

Q.    In your experience, was it normal for an associate warden or warden to make rounds that frequently?

A.    No.

Q.    How often would an associate warden or warden make rounds normally?

A.    Once a week.

Q.    When the defendant came in to do his rounds, would he do them alone or with other people?

A.    Alone.

Q.    In your experience, is that normal?

A.    No.

Q.    What would normally happen when an associate warden or warden came to do rounds in a housing unit?

A.    Normally, associate -- associate warden -- whenever rounds are made, it's normally the warden, both associate wardens, and the captain.

      Sometimes if they're looking at maybe repairs within the institution, they might bring somebody from facilities to make rounds in the housing unit.

      But those are generally the people that would come in, and the unit manager would generally walk with them.

Q.    Did you ever accompany the defendant on his rounds in your housing unit?

A.    When I first got there, I attempted to come out and walk

with him because that's normal protocol, and he said that he didn't need me to make rounds.

Q.   What was your reaction to that?

A.   I was a little shocked.

Q.   Why?

A.   Because that's not the normal protocol.

Q.   When the defendant did rounds in your housing unit, did you ever see him stop at Melissa's cell?

A.   Yes.

Q.   How often?

A.   Just about every time that he came to the unit.

Q.   How long would you see him stop at Melissa's cell?

A.   He would stand there for a good period of time, 10 minutes, 15 minutes.  It depends on what their conversation was about.  But he normally would stay at her cell for a good period of time.

Q.   Again, in your experience, is that normal?

A.   No.

Q.   Did you ever see the defendant and Melissa together outside of your housing unit?

A.   Yes.

Q.   Where?

A.   He -- he would come and pick her up and escort her over to the visiting room.

Q.   How often would he escort her to the visiting room?

**A.** I didn't necessarily always see. I wasn't always at my desk to see or in the housing unit. But I would see them, and it would seem at least two or three times a week.

**Q.** Again, was it normal for an associate warden or warden to escort a prisoner to their job?

**A.** No.

**Q.** Did you ever see them anywhere else together on the prison grounds?

**A.** That was primarily where they would go.

**Q.** Did you ever see them in main line?

**A.** She rarely would have long -- have any conversations with him at main line.

**Q.** Based on the various positions you've held at FCI Dublin, are you familiar with how the prison handles transfer requests?

**A.** Yes.

**Q.** Were you personally involved in that process?

**A.** Yes.

**Q.** What factors are considered when determining whether an inmate is eligible for a transfer?

**A.** We first look at their inmate custody level, their points. We put various information into the computerized system, and it will give us a score and tell us the inmate's security level. That's one thing that we consider.

We also look at an inmate's discipline, inmate's sentence length, and criminal history background and escape history.

Q.    With respect to the points, is there sort of a threshold of eligibility, if they're below or above a certain point level?

A.    Yes.

Q.    Explain that for the jury.

A.    So you have camp-eligible inmates and then you have inmates that would be assigned to somewhere like FCI Dublin, which is a medium-security facility.  And so a camp is an institution that does not have a fence around it and is less secure.

So if an inmate scores at a camp level and they're at a higher security level, we would transfer them to the lower-security institution.

Q.    What is a management variable?

A.    A management variable is an inmate may score at a lower security level but not appropriate, so we put a management variable on them, which is saying, yes, they're at a lower -- they're scored at a lower security level, but they're not appropriate for that, so we're going to put this management variable on them to keep them at their current security level.

Q.    And that would essentially keep them at the prison that they're at at the time; right?

A.    Correct.

Q.    Who's responsible for placing or removing management variables on prisoners?

**A.** The case manager.

**Q.** Even if a case manager thought that a management variable should be placed on a prisoner, could the associate warden or warden direct that the management variable be lifted?

**A.** Yes.

**Q.** If a prisoner wanted to request a transfer to a lower-security camp, for example, how would they go about doing that?

**A.** When they go to team, they could ask their case manager.

**Q.** What would happen after they asked the case manager?

**A.** The case manager would review them, and if the inmate is appropriate, then they would start the paperwork to transfer the inmate.

**Q.** What happens with the paperwork after it's started?

**A.** It would then go through a routing process, which would go to the unit manager, the case management coordinator, the associate wardens, and then the warden.

**Q.** Did the warden have final sign-off on whether a transfer would occur or not?

**A.** Yes.

**Q.** Could the warden grant unilaterally a request to transfer from the prison to the FCI Dublin camp?

**A.** Yes.

**Q.** What would happen if the transfer was -- transfer request was for a different prison?

A.    Then it would go to what is known as DSCC, which is in Grand Prairie, Texas.  And that's our designation unit, and they're responsible for designating inmates.

Q.    So once the warden granted or denied -- I guess once the warden granted the transfer, at that point it would go to Grand Prairie just for assignment; is that accurate?

A.    If it's -- yes, if it's another institution besides our own camp.

Q.    While you were Melissa's unit manager, did she ever request to transfer to the Victorville camp?

A.    She did.

Q.    Approximately when was that?

A.    It was -- I was her unit manager from approximately January 2020 until November 2020, so it was somewhere within that time frame.  I would probably guess it was around August or September of 2020.

Q.    When she brought up a possible transfer to the Victorville camp, how did you respond?

A.    I told her that she was not appropriate, and as long as I was her unit manager, I would never sign off on a request for her to go to a camp.

Q.    Did you ever talk about Melissa's request to transfer to a camp with anyone else?

A.    Yes.

Q.    Who did you speak with about it?

**A.**   The defendant.

**Q.**   When did that conversation occur?

**A.**   We were standing at main line.

**Q.**   How close in time was it to when you had spoken with Melissa about the transfer?

**A.**   Within the same week.

**Q.**   Was it after you spoke with Melissa?

**A.**   Yes.

**Q.**   What happened during that conversation?

**A.**   He -- the defendant said to me that Melissa was wanting to go to Victorville camp, and I told him -- I said, "I had this conversation with Melissa already.  She's not appropriate, and as long as I'm her unit manager, I will not sign off on a request for her to go to a camp."

**Q.**   How did the defendant respond?

**A.**   He said, "Okay.  I just wanted to relay the information to you."

**Q.**   What happened after that?

**A.**   In -- after that, in November, I got moved and reassigned to a different housing unit.

**Q.**   What was the reason you were reassigned to a different housing unit?

**A.**   I was told that I was going to go over to do a PIP on a staff member.

**Q.**   What is a PIP?

Case 4:21-cr-00429-YGR    Document 88    Filed 11/29/22    Page 56 of 151    438

**A.**    It's a performance improvement plan for, basically, a staff member that's not up to par with their work.

**Q.**    After you were moved to a different housing unit, were you no longer Melissa's unit manager?

**A.**    Correct.

**Q.**    After you were moved, was Melissa transferred to the FCI Dublin camp?

**A.**    She was.

        **MR. PAULSON:**  Your Honor, I'm going to provide the witness what's been marked as Exhibit 60.

        **THE COURT:**  Okay.

**BY MR. PAULSON:**

**Q.**    Ms. Millikin, do you recognize this?

**A.**    Yes.

**Q.**    What is this?

**A.**    This is a transfer request.

        **MR. PAULSON:**  Your Honor, I move that Exhibit 60 be admitted into evidence.

        **MR. REILLY:**  No objection.

        **THE COURT:**  Admitted.

         (Government Exhibit 60 received in evidence)

        **MR. PAULSON:**  Your Honor, at this time I would like to publish this to the jury.

        **THE COURT:**  You may.

        **MR. PAULSON:**  If Ms. Slattery could pull up

Exhibit 60.

Q.   Can you please just describe this form for the jury in general terms?

A.   Yes.  At -- at the top is the warden's signature and then, of course, the inmate's name, and then we put in there the reason for the transfer.

MR. PAULSON:  Ms. Slattery, can you zoom in on the top portion where the signature is.

Q.   Whose signature is there on that form?

A.   The defendant.

Q.   And what's the date of this transfer request?

A.   5/25/21.

MR. PAULSON:  Okay.  If you could zoom out, Ms. Slattery.

Q.   Just to clarify, this is Melissa's -- the granting of Melissa's transfer request to FCI Dublin camp; is that right?

A.   Yes.

Q.   Okay.  And we previously went through Exhibits 341 to 344.

Were those the disciplinary records for Melissa?

A.   Yes.

MR. PAULSON:  Thank you, Your Honor.  I have no further questions at this time.

THE COURT:  All right.  Cross-exam.

**CROSS-EXAMINATION**

BY MR. REILLY:

Q.   Good morning, Ms. Millikin.

A.   Good morning.

Q.   Let's start by covering that last subject that you talked about.

        MR. REILLY:  Ms. Slattery, could we have Exhibit 60 back up.  And if you could zoom in on the top.

Q.   Looking at the top of this form, which is dated 5/25/2021, it has Mr. Garcia's name on it, but the initials are not his, are they?

A.   No.

Q.   That form is actually signed by someone other than Mr. Garcia, wasn't it?

A.   It appears to be.

Q.   Do you know whose initials those are?

A.   I -- I don't.  I mean, I would -- I would -- only could guess.

Q.   What would your guess be?

A.   It looks like it's an "M," and so we had an associate warden by the name of Mary Lou Comer, so that might be her signature.

Q.   Have you ever seen her signature or initials before?

A.   I have.

Q.   Did it look like that?

**A.**    I don't necessarily remember her signature.

**Q.**    Okay.  So when you said that Mr. Garcia signed off on this form, you were wrong, weren't you?

**A.**    That's correct.

**Q.**    Do you recall where Mr. Garcia was during the time period involved?

**A.**    Not necessarily.

**Q.**    Did you know he was actually on vacation on May 25th, 2021?

**A.**    I don't keep track of his vacation.

**Q.**    Didn't much care either, did you?

**A.**    That's not within my responsibilities to know that.

**Q.**    I meant in terms of evaluating this form for your testimony today.

**A.**    What's your question?

**Q.**    My question is you didn't much care whether he actually signed this form or not, did you?

**A.**    I don't know that "care" is a correct statement or use of words.

**Q.**    Did you look at this document before you came to court today?

**A.**    I did.

**Q.**    When did you do that?

**A.**    It was shown to me through VTS.

**Q.**    What is a VTS?

**A.** Video teleconference.

**Q.** And that was with who?

**A.** The AUSA.

**Q.** Ms. Priedeman?

**A.** Yes.

**Q.** Mr. Paulson?

**A.** Uh-huh.

**Q.** Anyone else participating in that conversation?

**A.** Yes.

**Q.** Who else?

**A.** Ms. Crowe.

**Q.** And when that conversation took place, did you confirm for them that this was Mr. Garcia's signature on this form?

**A.** I -- I -- I believe that I did mistakenly.

**Q.** Did you actually look at it to see if you could tell whether it was his signature or not?

**A.** I was on VTS, so it was a little hard for me to see on that day.

**Q.** You've seen his signature lots of times, haven't you?

**A.** I've seen his signature, yes.

**Q.** Frequently.

**A.** Uh-huh.

**Q.** Maybe even every day something would come to you that he signed.

**A.** Uh-huh.

Q.    So you've seen his signature hundreds of times.

A.    Uh-huh.

Q.    And you know what it looks like, don't you?

A.    Uh-huh.

Q.    And you can tell instantly by looking at that that that's not Mr. Garcia's signature.

A.    Correct.

Q.    All right.  Let's go back to disciplinary powers that the wardens and the associate wardens have.

You indicated that the warden has the ultimate control of the disciplinary process; is that right?

A.    He has control over orchestrating disciplinary over the inmates.

Q.    The process.

A.    Correct.

Q.    And there is a requirement, is there not, that that process provide what we refer to as due process to the inmates.

A.    Correct.

Q.    So there are pretty stringent requirements that have to be met in terms of the process by which discipline is imposed on an inmate, isn't there?

A.    There are.

Q.    And during the time that you were at Dublin, did you see or have occasion to see discipline imposed on any inmates?

A.    I did.

**Q.** And were those disciplinary processes appropriately followed?

**A.** There's -- there's been mistakes made in following the disciplinary process.

**Q.** All right. Everybody makes mistakes at one time or another, don't they?

**A.** Absolutely.

**Q.** Okay. Did you ever have reason to believe that anyone on the staff at Dublin was intentionally violating the due process rights of any inmate that you saw being disciplined?

**A.** Yes.

**Q.** And who was that?

**A.** There was a -- an inmate by the name of Joyner. She was frequently put in special housing for pending investigations.

**Q.** And who was putting her in the SHU?

**A.** I -- I'm not -- I wasn't there to make those decisions. That's usually between the captain, SIS, and the warden.

**Q.** When you say you weren't involved in the -- or you weren't there for that process, then how did you know that it was not appropriate discipline for her?

**A.** She was in special housing for long periods of time, and there was never any findings of guilt for anything for the duration of times that she was constantly being put in special housing.

**Q.** The process provides for that, doesn't it, to be placed in

SHU while that process is pending?

A.   It does, but not an abuse of the process.

Q.   Did you report that abuse to anyone?

A.   I was -- I did not have firsthand knowledge of what the investigations were supposed to have been.

Q.   Well, then how did you know that they were not appropriate punishments for her?

A.   The current policy of the Bureau of Prisons is to not keep inmates in special housing for prolonged periods of time.

Q.   Is there a specific definition of what constitutes a prolonged period of time?

A.   There is requirements by the regional office that after an inmate's in special housing for so many days, that they're required to report to the regional director and substantiate why they're in there.

Q.   And how many days is that?

A.   It's changed, so I don't know the current number.

Q.   And with respect to this particular inmate, were you personally aware of whether or not any such report was ever submitted?

A.   I don't know, because I'm not involved in that reporting process.

Q.   You're not in that process, are you?

A.   No, sir.

Q.   So you have absolutely no way of knowing whether or not

any of those punishments imposed on that person were appropriate or not, do you?

**A.**   Correct.

          **THE COURT:**  Is now a good time for a break, Mr. Reilly?

          **MR. REILLY:**  I'm sorry?

          **THE COURT:**  Is now a good transition for a break before you start?

          **MR. REILLY:**  Yes, Your Honor.  That would be fine.

          **THE COURT:**  Okay.  Let's go ahead and take our first break.  We'll stand in recess for 20 minutes.

     (Proceedings were heard out of presence of the jury:)

          **THE COURT:**  All right.  Ms. Millikin, you're in the middle of cross-examination.  You are ordered not to talk to the prosecutors during the break.  All right?

          **THE WITNESS:**  Okay.

          **THE COURT:**  We'll stand in recess for 20 minutes.

          **MR. PAULSON:**  Your Honor, before we go on recess, can we address one issue?

          **THE COURT:**  Go ahead.  To the mic.

          **MR. PAULSON:**  So we were discussing previously before we started today admission of Exhibit 59.  And Ms. -- sure.

     Should we have Ms. Millikin leave the court or --

          **THE COURT:**  I don't know.  So I can have her leave the courtroom.  That's fine.

MR. PAULSON:  That may be appropriate.

THE COURT:  Okay.

(Whereupon, the witness left the courtroom.)

MR. PAULSON:  So, Your Honor, Exhibit 59, my original plan was to move to admit just the first two pages, but Mr. Reilly indicated that he would like the entire document admitted, which is fine with us.

However, the subsequent pages contain medical records and sensitive details about certain individuals, and so we would request that Exhibit 59 be sealed, or at least the pages 3 through 8.

THE COURT:  Okay.

MR. REILLY:  Your Honor, I have no problem with that.

On the other hand, something else has come up since I discussed this with Mr. Paulson and while we were doing other testimony, so I haven't had a chance to address it with him.

It appears to me that Exhibit 58 is identical with Exhibit 59 except for the fact that it has the recommendation document --

THE COURT:  So my 58 only has one page.

MR. REILLY:  Oh, maybe I --

THE COURT:  My 58 is the response --

MR. REILLY:  Mine has nine pages, Your Honor.

THE COURT:  Mine does not.  Mine's a single-page document.

MR. REILLY:  And they are numbered 58 --

THE COURT:  Just Bates No. 15292.  That's all I have for Exhibit 58.

MR. REILLY:  That's the cover sheet.  That's the only difference between 58 and 59.

THE COURT:  58 is just the one page.  59 is then the application.

MR. REILLY:  I understand that's what the Court has. However, the document that I have identified as Exhibit 58 has nine pages --

THE COURT:  Okay.  Well --

MR. REILLY:  -- and the other eight besides that cover sheet are the same eight pages that are in Exhibit 59.

So my point is that I would like to have either 58 admitted in lieu of 59 or -- that is, the full 58 -- or to include 58, the one page that the Court has, along with 59 and admit both of those documents.

THE COURT:  Okay.  Lots of different issues going on here.

MR. REILLY:  Yes.  I apologize for that, but it just came up.

THE COURT:  So 58, 59, and -- 58 and 59 have been stipulated for admission, so I can admit them.

In terms of medical information -- so I haven't studied this.  These medical records are for a Macias.  The request is

for a Flores.

MR. PAULSON:  Yes, Your Honor.  My understanding is that that is a relative of Maria, and these records were submitted in support of the compassionate release request.

THE COURT:  Okay.

MR. PAULSON:  And so they're medical records of a relative.

THE COURT:  So why don't we just redact the name of the relative.

MR. PAULSON:  Your Honor, I'd probably request to redact -- if we're going to redact things, I think we'll need to redact, you know, addresses, other -- home phone numbers --

THE COURT:  It seems to me that's -- the personal identifying information is what's important to redact, and it's not necessary to the trial.  The medical records themselves, I suspect, are support for what the request is.

MR. PAULSON:  Yes, Your Honor, that's my understanding.

THE COURT:  Okay.  So any objection to having the personal information, names, address, redacted?

MR. REILLY:  No, Your Honor.  That would be fine.

THE COURT:  I think that's the appropriate approach to take.

MR. PAULSON:  Yes, Your Honor.  So after court, we will do the redactions and provide the Court with the redacted

version of this.

THE COURT:  Okay.  That's fine.

MR. REILLY:  Thank you, Your Honor.

THE COURT:  Figure out the difference between 58 and 59, but like I said, they've all been stipulated to, so I think we can get what people are asking for in the record.

MR. PAULSON:  Thank you, Your Honor.

THE COURT:  All right.  We'll stand in recess now for another 15 minutes.

(Recess taken at 10:04 a.m.)

(Proceedings resumed at 10:21 a.m.)

(Proceedings were heard in the presence of the jury:)

THE COURT:  All right.  You may be seated.

We are back on the record.  The record will reflect that the jury is back, the witness is back.

Mr. Reilly.

BY MR. REILLY:

Q.  All right.  Ms. Millikin, you indicated during your direct examination that the warden has the final say on compassionate releases; correct?

A.  Uh-huh.

Q.  Typically, the process, however, would be that some other staff member would review the request for compassionate release and prepare a recommendation for the warden; is that right?

A.  That is correct.

**Q.** And, in fact, that was one of your functions, wasn't it --

**A.** Yes.

**Q.** -- for part of the time that you were at Dublin --

**A.** Correct.

**Q.** -- when you were the unit manager?

**A.** Yes.

**MR. REILLY:** Ms. Slattery, if we could have Exhibit 58, please.

**THE CLERK:** So 58 is not admitted, correct?

**THE COURT:** It's not in evidence yet.

**MR. REILLY:** I'm sorry?

**THE CLERK:** 58 is not admitted.

**MR. REILLY:** Oh, I thought we had already done that. I'm sorry, Your Honor.

**THE COURT:** No.  Would you like to offer?

**MR. REILLY:** At this time, I would offer both Exhibits 58 and 59 into evidence.

**THE COURT:** Okay.  It's a stipulated exhibit.  It's admitted.

I take it the Government's providing that on the screen?

**MS. PRIEDEMAN:** Yes, Your Honor.

(Defense Exhibits 58 and 59 received in evidence)

**THE COURT:** Have the proper redactions been made at this point or do you need that at this point?

**MR. REILLY:** That's in 59, Your Honor.  I'm not going

to show that one.

THE COURT:  Okay.  Go ahead.

MR. REILLY:  Actually, some of the redactions have been made.

Q.   If we could -- it's a little hard to see, but perhaps, Ms. Millikin, can you read it well enough to tell what that is?

A.   Yes.

Q.   And is that a document that you prepared?

A.   I don't know necessarily that I prepared this.

Q.   You don't recognize it as something that you wrote on behalf of an inmate that we're referring to as Maria?

A.   Not necessarily.

Q.   In any event --

MR. REILLY:  Ms. Slattery, if you could enlarge the signature block.

Q.   -- that document appears to have been signed by Mr. Garcia; correct?

A.   Yes, sir.

Q.   And do you recognize that as his signature?

A.   Yes.

Q.   Significantly different than the signature we saw in the other document, isn't it?

A.   Yes, sir.

MR. REILLY:  Thank you.  You can turn that off now, Ms. Slattery.  Thank you.

Q.    Regarding the cameras at Dublin, do you know how many there were when you were there?

A.    I don't know the number.

Q.    Does 198 sound about right?

A.    I don't know the number.

Q.    And you didn't have any personal responsibility for maintenance of the cameras, did you?

A.    No, sir.

Q.    And did you have access on a regular basis to the videos that were recorded by those cameras?

A.    No.

Q.    And did you have any personal knowledge as to whether any particular camera or cameras were non-functional?

A.    No.

Q.    Now, you've been to a couple of other facilities in your career?

A.    I have.

Q.    How many altogether?

A.    I've been to -- prisons, I've been to Aliceville, I've been to Atlanta, and I'm at Beaumont, and Dublin.

Q.    So four altogether then.

A.    Yes, sir.

Q.    And were the number of cameras at Dublin significantly fewer than at the other facilities you've been at?

A.    I -- that's not something that was a topic of discussion

at the other prisons, so I did not have information about the cameras at other facilities.

Q. All right. But just walking around the facility, it appeared to you, did it not, that the cameras were about as frequent or as common as they were at the other facilities?

A. Yes.

Q. They pretty much cover all the hallways, all the main buildings. They don't look into the cells; right?

A. Correct.

Q. Don't look into the bathrooms?

A. Correct.

Q. But if a prisoner is otherwise just walking around the facility, he's going to be on camera, isn't he or she?

A. If the cameras work.

Q. And you had no way of knowing whether any particular camera was working or not at any given time, did you?

A. No.

Q. You mentioned that, generally speaking, the videos were not monitored, meaning that there wasn't someone -- excuse me -- there was not a correctional officer sitting at a desk somewhere looking at 198 monitors of all the cameras at Dublin; right?

A. Correct.

Q. But if there was an incident, whoever was required to do so could go and look at the video for that particular camera

that might show it.

**A.** Yes.

**Q.** Did you ever do that?

**A.** No.

**Q.** And you mentioned that at some point they get deleted, but you don't know when that is?

**A.** Correct.

**Q.** Do they get recorded over -- is that what you mean by "deleted" -- or do they -- is this an electronic record?

**A.** I'm not in the SIS department, so I don't know their exact process.

I know that when there's been times when we needed to review something maybe for disciplinary, if it's been too long, like if an inmate is trying to -- to challenge their incident report, the video is not always available.

**Q.** The -- the question of Mr. Garcia making rounds around the facility --

**A.** Uh-huh.

**Q.** -- you indicated that it wasn't normal for someone of his position, either associate warden or warden, to make rounds as often as he did?

**A.** Correct.

**Q.** And that's based on your experience at these four facilities you've been at?

**A.** Correct.

**Q.** How many federal institutions are there altogether, do you know?

**A.** I -- I don't recall exactly how many.  A hundred and --

**Q.** 125 or thereabouts sound right?

**A.** Uh-huh.

**Q.** And each one of those facilities has a warden?

**A.** Correct.

**Q.** And each one of them has at least two associate wardens; right?

**A.** Correct.

**Q.** So that's 375, at least, people who hold the position of warden or associate warden.

**A.** Uh-huh.

**Q.** About 360 of whom you've never seen making rounds, whether they do it or not, correct?

**A.** Whether or not they do them daily?

**Q.** Yes.

**A.** Correct.

**Q.** You have no way of knowing that, do you?

**A.** No, not -- not firsthand knowledge.

**Q.** You knew Warden Jenkins?

**A.** Yes.

**Q.** And he was Mr. Garcia's predecessor as the warden at Dublin?

**A.** Correct.

**Q.** He made rounds by himself, didn't he?

**A.** He did make rounds, correct.

**Q.** By himself?

**A.** Sometimes, yes.

**Q.** Now, you mentioned that you would see Mr. Garcia stop at Melissa's cell sometimes for 10 or 15 minutes?

**A.** Uh-huh.

**Q.** It's true, is it not, that you can't even see that cell from your office?

**A.** Her cell is to the left of my office, so although it's not in my direct supervision, any communication that's going on in that cell, I can hear it from my office.

**Q.** Okay. That didn't really answer my question.

The question was, you can't see the cell from your office, can you?

**A.** Correct.

**Q.** So you couldn't see what, if anything, was taking place other than perhaps hearing some conversation.

**A.** Correct.

**Q.** Regarding transfer requests, you mentioned that the inmate's status is reviewed to determine how many points they have for their -- for a determination of whether they can be transferred or not; correct?

**A.** That's part of it, yes.

**Q.** Who makes that initial review?

**A.**    The case manager.

**Q.**    And does the process then go through several levels of management before it gets to the warden for a final decision?

**A.**    It does.

**Q.**    And who would that go through?

**A.**    To the unit manager, the case manager coordinator, the associate warden, and then the warden.

**Q.**    So there's five people, then, that are making input into whether this is going to be granted or not.

**A.**    Correct.

**Q.**    And, ultimately, you said if it -- if it's for a transfer to a different prison, it gets submitted to Grand Prairie?

**A.**    Correct.

**Q.**    And, in fact, the decision, if there's going to be one, as to what institution an individual is going to be transferred to, that's made in Grand Prairie, isn't it?

**A.**    Correct.

**Q.**    Not at the facility that's submitting the request.

**A.**    Correct.

**Q.**    Now, the warden presumably could make a recommendation?

**A.**    Yes.

**Q.**    But Grand Prairie is not required to follow that, are they?

**A.**    Correct.

**Q.**    Now, you mentioned that Melissa requested a transfer to

Victorville?

**A.** Correct.

**Q.** And that was sometime during the time period January through November of 2020?

**A.** Yeah, towards the latter part.

**Q.** And you -- let me go back first.  Strike that.

In this process of requesting a transfer, if any of the lower individuals in the list, the ones who are looking at it first as you go down through, say, the unit manager, if that person makes the decision not to recommend the transfer, does that end the process?

**A.** No.

**Q.** Does that recommendation then still go on to the warden?

**A.** The inmate can then go to the warden and complain and request the transfer.

**Q.** But it's not part of the process that automatically you, when you reject a request for transfer, submit it to a higher person in the chain of command?

**A.** Correct.

**Q.** And with respect to Melissa, that was the case.  You told her, "No, you're not going, you're not appropriate," presumably because of the nature of her conviction?

**A.** Correct.

**Q.** And you did not refer that denial anywhere up the chain of command; right?

**A.**   Correct.

**Q.**   And -- but you did discuss it with Mr. Garcia.

**A.**   Correct.

**Q.**   Told him, "I don't think she's appropriate for a transfer," and he said, "Yep, that's fine with me" --

**A.**   Uh-huh.

**Q.**   -- right?

**A.**   Correct.

**Q.**   And then you were reassigned in November, and you said Melissa was transferred to the Dublin camp after you were no longer in that position as her unit manager.

**A.**   Yes.

**Q.**   Now, that's a different place than she had requested --

**A.**   Correct.

**Q.**   -- Dublin rather than Victorville.

**A.**   Uh-huh.

**Q.**   Were you involved in the process at all of her -- of her request for a transfer to the Dublin camp?

**A.**   No, because I was no longer her unit manager.

**Q.**   And do you know whether or not the unit manager who took your place recommended that she be transferred to Dublin?

**A.**   He's the one that completed the transfer request, according to the exhibit that we reviewed earlier.

**Q.**   Uh-huh.  So he recommended the transfer.

**A.**   I don't know that he recommended it or he was directed to

transfer her.

Q. Does this process not require documentation as each level reviews the request?

A. There's the unit manager's signature on it and there's a routing slip on the front of the packet. And, basically, the only two signatures on the transfer request is the unit manager and the warden, whoever may be acting in his or her capacity.

Q. Okay. So in this particular case, have you looked at Melissa's request?

A. Yes.

Q. And it shows the unit manager recommended that she be transferred, doesn't it?

A. It shows his signature on there.

Q. And the document recommends that she be transferred, doesn't it?

A. Well, he told me he was directed to transfer --

Q. Excuse me.

A. Yes.

        MR. REILLY: Move to strike the answer as nonresponsive.

        THE COURT: It's granted. The answer is stricken.

BY MR. REILLY:

Q. Okay. The question was the document shows that he recommended the transfer, doesn't it?

A. He completed the transfer.

**Q.** A number of the other procedures that take place that ultimately the warden has final say on involve decision-making by members of his staff that, essentially, he can look at and say yes or no --

**A.** Correct.

**Q.** -- correct?

That would include things like disciplinary hearings?

**A.** Uh-huh.

**Q.** Who would be the person who conducts the disciplinary hearing?

**A.** For the inmates?

**Q.** Yes.

**A.** It depends on the level of the incident as to who conducts it. It's either the unit team or, if it's a greater security incident, then it would be the detention hearing officer.

**Q.** And in any event, an investigation of that nature is conducted by someone other than the warden initially; correct?

**A.** Correct. Yes, sir.

**Q.** And then, ultimately, either the team or the disciplinary hearing officer will write up a report about the incident, submit it to the warden?

**A.** The -- no, all those do not necessarily get submitted to the warden.

**Q.** Okay. How about the work committee meetings? Who manages those?

**A.**    The work committee meetings is usually the case management coordinator or one of the associate wardens.

**Q.**    And that's something the warden doesn't actually get involved in at all, isn't it?

**A.**    It depends on the wardens.

**Q.**    Typically, in your experience, did Mr. Garcia get involved in those matters?

**A.**    There was -- I'm sure that at some point, at some level, that he's -- because of the structure of -- and the money and how we manage the facility, there -- he has some say in what transpires.

**Q.**    You weren't directly involved in that, I take it?

**A.**    Correct.

**Q.**    Does the associate warden have access to the central files?

**A.**    They can request to review a central file, yes.

**Q.**    And who has to authorize that review?

**A.**    They can just request it from the unit team, and the unit team staff would take it to them.

**Q.**    Does it require approval from the warden, for example?

**A.**    No.

**Q.**    But the -- the associate warden can't just go and look at any of these records any time he wants.

**A.**    The central files, pretty much everything that's included in the central file is now located in a computerized database

called -- referred to as Insight, so the associate wardens and the warden have direct access to that information.

Q.   And was that the case in -- when you were in Dublin?

A.   Yes.

Q.   And you had a -- well, let me ask it this way.

Why was it that you were transferred to Dublin?

A.   I got to Dublin on a -- out of a settlement.

Q.   That was the result of a complaint that you filed; right?

A.   That was the result of being a whistleblower.

Q.   And while you were at Dublin, Associate Warden Comer gave you an evaluation that was less than ideal, from your point of view, didn't he?

A.   She did.

Q.   She did.  Excuse me.

And Mr. Garcia signed off on that; right?

A.   He did.

Q.   And that resulted in you both losing a bonus and not having an opportunity to be promoted.

A.   It impacts -- it can impact that, but not necessarily directly.

Q.   You weren't happy about that, were you?

A.   Any time you work hard, you would like for your evaluation to reflect your work.

Q.   One final thing.  Are you familiar with the DOJ policy on informal contact between institution administrators and

Q. inmates? Do you know what that is?

A. Uh-huh.

Q. You do?

A. The -- say it again. Let me --

Q. It's called a policy on the informal contact between institution administrators and inmates.

A. Yes.

Q. You're familiar with that?

A. Yes.

Q. And so you know that it says, among other things, that the warden, the associate warden, administrative duty officers, and department heads shall regularly visit all areas of the institution, including, but not limited to, housing units, work areas, education and recreational training areas, and vocational areas; correct?

A. Correct.

Q. So when -- when Mr. Garcia was making these rounds that you characterized as unusual, he was actually just complying with this directive from the Department of Justice, wasn't he?

A. His -- he was not within -- he didn't follow the -- the standard of -- of what I observed in my 19 years in the Bureau of Prisons of how associate wardens and/or wardens conduct rounds.

Q. Okay. This is your experience in these 4 institutions out of 125?

**A.**   In 19 years.

        **MR. REILLY:**  Thank you.  I have nothing further of this witness, Your Honor.

        **THE COURT:**  Redirect?

        **MR. PAULSON:**  Yes, Your Honor.

### REDIRECT EXAMINATION

BY MR. PAULSON:

**Q.**   Ms. Millikin, did the evaluation that you received while you were at FCI Dublin that the defendant signed off on, did that influence your testimony today at all?

**A.**   No.

**Q.**   You discussed with Mr. Reilly times when the defendant would come by Melissa's cell.

**A.**   Uh-huh.

**Q.**   Where were you when you saw the defendant at Melissa's cell?

**A.**   I would sometimes be walking through the unit.  A lot of times, though, I was in my office, and I -- I could hear him. And I would come out sometimes to verify who all was in my housing unit.

**Q.**   Could a prisoner be transferred from FCI Dublin, the prison, to the camp or to another prison without the warden's knowledge?

**A.**   No.

**Q.**   Could a prisoner be transferred to the camp or to another

prison without the warden's approval?

**A.**    Repeat that, please.

**Q.**    Could a prisoner be transferred to the camp from the prison -- FCI prison to the camp or another prison without the warden's approval?

**A.**    No.

**MR. PAULSON:**  Thank you, Your Honor.  That's all I have.

**THE COURT:**  Any redirect on those two topics?

**MR. REILLY:**  No recross, Your Honor.  Thank you.

**THE COURT:**  Or recross.  I'm sorry.

Okay.  Any need for recall?

**MR. REILLY:**  No, Your Honor.

**MR. PAULSON:**  No, Your Honor.

**THE COURT:**  All right.  Then you're excused.

**THE WITNESS:**  Okay.  Thank you.

**THE COURT:**  Thank you.

Next witness.

**MR. PAULSON:**  Your Honor, the Government calls Maria.

And if you'd like at this time, Your Honor, I have redacted copies of Exhibit 59 that I can provide to the Court and the Defense.

**THE CLERK:**  Step up on the stand.  Please raise your right hand.

**MARIA L.**,

called as a witness for the Government, having been duly sworn, testified as follows:

      **THE WITNESS:**  Before God, I do affirm that I'm going to tell the truth.

      **THE CLERK:**  Please have a seat.  Please speak clearly into the microphone.  Please state your first name for the record.

      **THE COURT:**  Would you like a chair?

      **THE INTERPRETER:**  I would love a chair, Your Honor. Maybe I could sit on this side so they can look at her.

      **THE COURT:**  Can we move the microphone in front of the interpreter.  It may be better for Maria to stand.

      **THE CLERK:**  She can have the handheld mic.

      **THE COURT:**  No, no, no.  Let's switch the chairs.

      **THE INTERPRETER:**  You want me here?

      **THE COURT:**  No, I want you out here, but that chair has arms.

      **THE INTERPRETER:**  Oh.

      **THE COURT:**  And that way she can scoot in and you can go inside.

      **THE INTERPRETER:**  Okay.  Do you have a smaller chair?

      **THE COURT:**  No.  Just pull it over.

   Can you put the mic up here so --

      **THE INTERPRETER:**  Yeah.

THE COURT:  Maria, you move forward.  Okay.  Does that work?

You may proceed.

MR. PAULSON:  Thank you, Your Honor.

**DIRECT EXAMINATION**

BY MR. PAULSON:

Q.   Good morning, Maria.

A.   Good morning.

Q.   Are you currently an inmate at FCI Dublin?

A.   No.

Q.   Were you formerly an inmate at FCI Dublin?

A.   Yes.

Q.   When were you at FCI Dublin?

A.   End of November of 2019.

Q.   And when were you released from FCI Dublin?

A.   July the 22nd of 2021 -- no, 2022.

Q.   In 2019, were you convicted of unlawful use of a communications facility?

A.   That's right.

Q.   Was that a felony conviction?

A.   Yes.

MR. PAULSON:  Ms. Slattery, can you please pull up Exhibit 214.

THE COURT:  214 is stipulated.  No objection, Mr. Reilly?

MR. REILLY:  No objection, Your Honor.

THE COURT:  It's admitted.

(Government Exhibit 214 received in evidence)

MR. PAULSON:  Thank you, Your Honor.  May I publish this to the jury?

THE COURT:  You may.

BY MR. PAULSON:

Q.   Maria, what is this on the screen?

A.   My photograph.

Q.   Thank you.

MR. PAULSON:  Ms. Slattery, you can take that down.

Q.   Maria, do you currently have legal status in the United States?

A.   No.

Q.   In connection with this case, did the Government request that your removal from the United States be paused?

A.   That's right.

Q.   Did you apply for a U visa?

A.   Yes.

Q.   What is a U visa?

A.   I didn't know what a U visa was, but it was explained to me that it is when you suffer abuse or from a crime.

Q.   What is the status of your U visa application?

A.   I truly don't know.

Q.   Does the outcome of your U visa application depend on your

testimony here today?

**A.**    No, of course not.

**Q.**    Has the Government promised you anything in return for your testimony today?

**A.**    No.

**Q.**    When did you first meet the defendant?

**A.**    When I arrived in Dublin, I started working in the kitchen in the first week when I arrived, and that's where I met him.

**Q.**    Describe your initial interactions with the defendant.

**A.**    I was working early in the kitchen and preparing the coffee and the milk and putting everything in order for my cellmates or companions, and that's where I met him.

**Q.**    What happened when you first met him?

**A.**    He was just kind and courteous and he greeted me with a smile.

**Q.**    During the first few times you spoke with him, did he tell you -- what did he say to you?

**A.**    First times, he would always come to me because he always arrived early during breakfast time, that -- it was very early.

The first time, he gave me a compliment was that I was very beautiful.  On a different day, he would say that he liked how I had -- I did my hair.

Then after that, he would come to me every time during the morning when I was preparing the milk and all the things, and he would come near me dand he would compliment me.

**Q.** Did he say anything to you about what would happen after you got out of prison?

**A.** That was much later.

**Q.** What -- sorry. Go ahead.

**A.** It was much later, when we were more -- he was more -- I was more trusting in him. He said that later on, we will get to know each other better.

**Q.** Meaning you will get to know each other better once you're out of prison?

**A.** Yes, when I got out of prison.

**Q.** I know you're testifying here today with the assistance of a Spanish interpreter.

Were your conversations with the defendant in English or Spanish?

**A.** Only in English.

**Q.** Are you able to understand enough English to understand what the defendant was saying to you?

**A.** Yes, of course.

**Q.** What was going through your mind when the defendant complimented you?

**A.** The truth, it was something pretty. It felt good being there. Time was going fast and -- the time went by fast.

**Q.** When you were around the defendant, did you feel like you had to be careful?

**A.** The truth is I really did try to be careful.

Q.   Why is that?

A.   Because when I was under their custody and in detention, they always told us that we couldn't turn around to look at the officers.

Q.   Were you concerned you were going to get in trouble?

A.   Yes, I worried.

Q.   You mentioned that some of these conversations with the defendant would happen in the kitchen.

Would you talk to him anywhere else?

A.   In the unit.  He started going to the unit.  And then I would see him at the recreation area.

Q.   And by "unit," are you referring to the building where you lived?

A.   Yes, that's right.

Q.   Did the defendant ever tell you any personal details about his life?

A.   He just told me that he was divorced and he had a child.

Q.   Did he ever ask you to give him anything?

A.   Told me to give him a picture.

Q.   Tell the jury about that.

A.   He asked me for a photograph, and I gave it to him in the kitchen.

Q.   What was the photograph?  What was on the photograph?

A.   My photograph was a picture that my daughter sent me.

Q.   Was it of you?

A.    Yes.   I was wearing white pants and a black blouse.

Q.    Did you ever give him any other photographs of yourself?

A.    Yes.   I gave him another one through the window in my cell.

Q.    What was on that photograph?

A.    That photograph was one of those that we took in the prison.

Q.    Why did you give it to him?

A.    One time when we were at the rec area -- recreation area taking pictures of each other -- of each other, he went by and asked me to give him one of the pictures.

Q.    And by "each other," are you referring to prisoners taking pictures of other prisoners?

A.    There's a special day there where they take pictures every month.   We bought tickets for a dollar, and we take all the pictures we want.

Q.    And it was one of those photos that was taken of you?

A.    Yes.

Q.    Did the defendant ever show you pictures of himself?

A.    Yes.

Q.    What did he show you?

A.    On three occasions, he showed me a photograph of his penis.   Well, on one -- on two occasions, it was his penis; on another occasion, it was his torso.

Q.    When he showed you his penis, was -- was it erect in the

photos?

A.   Yes.

Q.   Describe what happened when he showed you these photos.

A.   That was in the kitchen.  I would get very nervous because there were people there that could be seeing that, and he would show them to me on his cell phone.

Q.   Did he show you photos of his penis anywhere other than the kitchen?

A.   No.  The three times where he showed me pictures, it was there, just in the kitchen.

Q.   Tell the jury about the third time that he showed you pictures of his penis.

A.   The last time he showed me the photos, that picture, the truth is I didn't pay too much attention because I was always worried or taking care that the officers that were in the kitchen didn't see anything strange going on and the workers that were my prisonmates and working from other places.

And that last photograph, I didn't see, and he elbowed me to show me that he had the cell phone showing it to me.  And I got very nervous because there was an officer passing by from CMS, and he -- he had that phone and I felt the officer had seen the phone.

Q.   What happened when the officer walked by?

A.   Mr. Garcia told me in a loud voice that he already had the papers, that he would give them to me afterwards.

Q.   Did he do anything with his phone?

A.   No.  He just kept it, and I left.

Q.   At some point, were you put in the SHU?

A.   Yes.

Q.   Why?

A.   It was because they were investigating a prisonmate of mine.  Well, she was my roommate.  There were three of us in that room, and the lieutenant -- is it lieutenant?  Yes -- told us that my other cellmate and I were not in trouble.  It was that -- it was just one of my cellmates, not us, that was under investigation that was in trouble.

Q.   What was she under investigation for?

A.   Because she was being accused of going around with an officer.

Q.   What do you mean, "going around with an officer"?

A.   They were accusing her that she had had a relationship with an officer that was not there anymore.

Q.   When were you put in the SHU?

A.   May the 13th of 2020.

Q.   How long were you in the SHU?

A.   Close to 14, 15 days, more or less.

Q.   After you got out of the SHU, did the defendant make any comments about the status of your relationship with him?

A.   Yes, because I was -- I got out the end of May.  I got out more or less on the 27th or 28th of May.  He was going by the

unit, and he started saying to me, "Well" -- started complimenting me the same.

And days went by, and he would go every morning, every morning. And one day he told me, "Do not forget that we are in a relationship."

Q. How did you interpret that?

A. He told me that he would go every day to see me, and I interpreted that like -- like that it was a relationship.

Q. Like a boyfriend/girlfriend-type relationship?

A. Yes.

Q. After he told you that you were in a relationship, did he give you anything?

A. Yes. I had asked him for something, a pencil, a mechanical pencil, and he didn't give it to me. He took a rose. He gave me a rose.

Q. Tell the jury about what happened when the defendant gave you the rose.

A. It was just that one morning, he was going to do his rounds. And he had it here (indicating), and he said, "I'm going to leave it for you at the laundry."

And because he was going to go to the laundry room, I crossed through the lobby and I went there, and I went fast in order to get it fast and so no one else could see that.

And he passed, and then he went up the same staircase, and then I went and picked the rose.

**Q.**   What did you do with the rose after you got it from the laundry room?

**A.**   I kept it on a board that we had in the room on the side of the bed.

**Q.**   Did you dry it out?

**A.**   Yes.   When it was already dried, I hid it and I put it in a locker that we had.

        **MR. PAULSON:**   Your Honor, I have what has been designated as Exhibit 1.

        **THE COURT:**   There is a stipulation on Exhibit 1.

        **MR. REILLY:**   Yes, Your Honor.

        **THE COURT:**   No objection?   It's admitted.

           (Government Exhibit 1 received in evidence)

        **MR. PAULSON:**   Thank you, Your Honor.

**Q.**   Maria, take a look at what I've just handed you.
     What is that?

**A.**   The rose.

**Q.**   Is that the rose that the defendant gave to you?

**A.**   Yes.

        **MR. PAULSON:**   Your Honor, at this time I would like permission to publish this to the jury, to show the jury.

        **THE COURT:**   You may.   You can just pass it down very quickly.

**BY MR. PAULSON:**

**Q.**   Did you and the defendant ever exchange notes?

**A.** Yes.

**Q.** How often?

**A.** Two or three times.  I gave him more than what he gave me.

**Q.** What are some of the things that the defendant would say to you in these notes?

**A.** Nothing more important, just that I was pretty, that I looked good.  One of the notes said to -- we could meet at the rec.

**Q.** I want to switch gears here a little bit.

Did you apply for compassionate release?

**A.** Yes, that's right.

**Q.** Why did you apply for compassionate release?

**A.** He told me I qualified for that because I had more than 80 percent in prison and that he could submit it, that he could sign the compassionate release so I could be out sooner.

**Q.** When you say "he," who are you referring to?

**A.** Mr. Garcia.

**Q.** Why did he want you to apply?

**A.** Because at that time, everything was more advanced.  I felt more trust in him.  And he said that he wanted to get to know me better when I was out, that we will get to know each other better.

And he said that he wanted to be with me, but it was not possible there the way we wanted to.  And he suggested that I could request the case manager from my unit the form to apply.

Q.    You said there that it was "advanced."

What did you mean by that?

A.    Because at the beginning, there were compliments and -- and he began telling me that he liked me, that he wanted to get to know me better, but it was not possible to do that there.

He said that he desired me.  When I was exercising, he said that he liked look -- seeing me sweaty.  And the truth is I allowed him to feel that trust.

MR. PAULSON:  Your Honor, I have what's been admitted as Exhibit 59 that I'd like to hand to the witness.

Q.    Maria, do you recognize that?

A.    Yes, because when I went to the case manager of the unit and I told him or told her that I wanted to apply for compassionate release, he told me that I had to fill out this form and submit it first.

Q.    Is that the form that you completed and then submitted for compassionate release?

A.    Yes.

MR. PAULSON:  Your Honor, at this time I would like to read the parties' stipulation regarding Exhibit 273.

THE COURT:  Okay.

MR. PAULSON:  Exhibit 273 is an English --

THE COURT:  What stipulation number is it?

MR. PAULSON:  Sixteen.  It's in the evidentiary stipulations.

THE COURT:  I just needed to know the number.

MR. PAULSON:  Yes, Your Honor.

Exhibit 273 is an English translation of an April 21, 2021, request for compassionate release, the original of which is Exhibit 59.  Exhibit 273 is an accurate translation of Exhibit 59 from the Spanish language to the English language.

At this time, Your Honor, I would move that Exhibit 273 be admitted into evidence.

MR. REILLY:  No objection.

THE COURT:  273 is admitted.

(Government Exhibit 273 received in evidence)

MR. PAULSON:  Ms. Slattery, can you please display Exhibit 273.

Q.   Maria, do you see that on your screen?

A.   Yes.

Q.   Is that the compassionate release request you submitted?

A.   Yes, that's right.

Q.   What is the date on this document?

A.   April 21st of '21.

Q.   When did the defendant tell you that he would approve your compassionate release request?

A.   Well, in March, he told me to submit the application, and I made the application on April the 21st.

And then days went by, more or less 30 days.  I asked him if he had seen the -- received the application because the case

manager didn't want to give it to me, and he told him to give it to me.

He said -- one day that I was going to breakfast, he stopped me and he said that he was going to sign it, and it was the month number 6 of the date 21st, the 21st day.

Q.    Is that June 21st, 2021?

A.    Yes.

Q.    Did the defendant end up granting your compassionate release?

A.    No, he -- no.  He kept me waiting and waiting, and he said that the documents had not arrived yet.

Q.    When did you find out that he had denied your compassionate release request?

A.    After -- it was after he was caught, that they took him away because they found things on him.  I don't remember exactly the day that the case manager called me and told me that he had the -- that they were refusing my compassionate release.

MR. PAULSON:  Your Honor, I have what's previously been marked as Exhibit 58.  I believe this has also been admitted.

THE COURT:  Yes, I show it as being admitted.

MR. PAULSON:  Ms. Slattery, can you please display Exhibit No. 58.

Q.    Maria, do you recognize this?

**A.**   That's the paper, yes, that the case manager gave me saying that they had denied the compassionate release.

**MR. PAULSON:**  Ms. Slattery, can you please focus in on the signature block and the date.

**THE WITNESS:**  Yes.

**BY MR. PAULSON:**

**Q.**   Is that the defendant's signature on this form?

**A.**   Yes.  When they gave me this paper and I saw the signature, I tried to look at it and I said perhaps it's not his signature.

And I went to a computer where he was always -- through which he was always sending notes to all the units, because I still had the hopes that perhaps he didn't sign that, that it was someone else.

**Q.**   What's the date on this document?

**A.**   June the 21st of 2021.

**MR. PAULSON:**  All right, Ms. Slattery.  You can please take that down.

**Q.**   Maria, where did you work at FCI Dublin?

**A.**   At that time when I was denied the compassionate release?

**Q.**   No, just while you were at FCI Dublin, where did you work?

**A.**   When I arrived, I started working in the kitchen.

And then after COVID hit, they stopped us, and then many of us were sent to prepare bags to send to the other -- to all the units.

And I stayed there working, and then when they started opening up again, that COVID had gone down a little bit, I continued working there. But I was also a volunteer at the unit.

Q.   What did you volunteer in the unit doing?

A.   At the laundry.

Q.   When did you start volunteering doing the laundry in the unit?

A.   Around March, more or less.

Q.   Of what year?

A.   2021.

Q.   Were you eventually transferred into the -- officially working in the laundry unit?

A.   I wanted to be transferred, but the officers in the kitchen told me no because I was already stuck there in the kitchen. And I -- they didn't want to sign the paper for me to be transferred, so I continued working in the kitchen and being a volunteer in the laundry room.

And one day, the man told me that what was I doing in the laundry when he was doing his rounds. I told him I was a volunteer. And then after that, he said it was okay, and he told me was better off for me to be there because he could see me better in there.

Because, in fact, when he went by, it was after all the workers for CMS had gone to work outside. And, in fact, he

asked me if I was being paid, and I told him no.  And he suggested that I should tell them that I should be paid, and I told him they cannot do -- pay me because I'm already working at the kitchen.  They cannot give me two payments.

And he told me, "Stay just with the laundry room."  And I told him they don't want to sign the paper for me to get out of the kitchen, and when I told him, he went and they signed the paper and I just kept the laundry work job.

Q.   I think you referred to "the man."

Who were you referring to?

A.   Mr. Garcia.

Q.   Did he tell you why he wanted you to work in the laundry room?

A.   Because it was easier there to see me.

Q.   Did you ever touch the defendant while you were in the laundry room?

A.   I didn't touch him, but one time he came in to give me some bed sheets that my cellmates use as curtains.  In fact, they were the bed sheets of my cellmate that was next to me, and he saw that the room was dark and he opened it and he tore the curtain down.

I was in the laundry room, and he took it to me.  And it was just that time that I was by the washing machine that he came -- gave me the bed sheets, and he grabbed my hand and put it down there and he said, "All this is yours."

Q.   When you say "down there," what do you mean?

A.   His intimate parts.

Q.   His penis?

A.   Yes.

Q.   Was his penis erect when you touched it?

A.   It felt hard because it was really fast.  As soon as he did that, he grabbed the curtain and left.

Q.   When did this incident occur?

A.   Like around June, like mid June.

Q.   Of what year?

A.   2021.

Q.   Was this after you had submitted your request for compassionate release?

A.   Yes.

        MR. PAULSON:  Your Honor, I have Exhibits 327, 328, and 337 that I'd like to provide to the witness.

        THE COURT:  All right.

BY MR. PAULSON:

Q.   Maria, take a look at those.

     What do these photos show?

A.   You could see there part of the wing where I used to live --

        THE COURT:  So these are all stipulated exhibits. They're admitted.

        MR. REILLY:  Yes.

MR. PAULSON:  Okay.  Your Honor, I will go ahead and put them on the screen, then.  I will move to admit and put them on the screen.

MR. REILLY:  That's fine, Your Honor.

THE COURT:  Yeah.  They're admitted.  It will make more sense to the jury if they can see what she's talking about.

MR. PAULSON:  Yes, Your Honor.

(Government Exhibits 327, 328, and 337 received in evidence)

MR. PAULSON:  Ms. Slattery, can you please pull up Exhibit 327.

Q.   Maria, do you see that on your screen?

A.   Yes.

Q.   Can you describe what this photo shows?

A.   In the front, in this part, there's the room going forward and going into my room, which is this one (indicating).

Q.   So let me pause you right there.

I think you identified your room as on the left side of the photo, on the wall running along the left side.

A.   Yes.

Q.   Not the first door in the foreground, but the door right after that?

A.   No.  It's this one that's here (indicating).  Right here in front is the bathroom (indicating), and here is the laundry room where I used to work (indicating).

Q.    So the laundry room is that door frame right on the right side of the photo; is that right?

A.    Yes, this one (indicating).

MR. PAULSON:  Okay.  Ms. Slattery, can you please pull up Exhibit 238.

Q.    Maria, can you please describe what's shown in this photo?

A.    This is the laundry room (indicating).

Q.    Okay.  Right there in the center of the picture?

A.    Yes.

MR. PAULSON:  Okay.  Ms. Slattery, can you pull up Exhibit 337?

Q.    Maria, what is shown here?

A.    These are the washers, these two (indicating).

Q.    Are those the washers that were inside the laundry room we just saw in the previous photo?

A.    Yes.

Q.    When the defendant came into the laundry room -- well, is this the laundry room where the defendant took your hand and put it on his erect penis?

A.    Yes.

Q.    Where were you standing when he did that?

A.    Here in this -- by this washer (indicating).

Q.    So in front of the washer on the left side of the frame?

A.    Yes.

Q.    I think you said that he -- when he put your hand on his

penis, he told you something to the effect of, "This is all yours"; is that right?

A.    Yes, that's how he told me.

Q.    How did you interpret that comment?

A.    Well, because he had already told me that he desired me, I said he wants to have sex.

Q.    How did you react when he grabbed your hand and put it on his erect penis?

A.    I don't know how to explain that.  It's something that -- the truth is I feel guilty, because I know that I could have stopped everything.  But I -- it was already out -- it was already late.

Q.    But how did you feel at the time?

A.    I was very nervous.  I felt -- I'm not going to deny that I got excited.

Q.    What did -- go ahead.

A.    But I was also scared.  And the truth is that he knows that I took care of him.  I always thought he wanted something serious with me.

Q.    What did you think would happen if you said no or pulled your hand away?

A.    Well, many things.  I said he gets angry and then -- I really thought that if he got angry, I wouldn't be able to continue with my documents.  And my children knew about that.

Q.    By "documents," what do you mean?

**A.** With my compassionate release.

**Q.** Were you afraid he was going to deny your compassionate release?

**A.** Well, that he was going to get angry and he wouldn't sign anything.

**Q.** I want to pause for a second and talk about your prior conversations with law enforcement.

How did you first become involved in this case?

**A.** Well, they called me. The truth is I realized that they were going to call me before I was actually called, because an officer that was working there told me that the girl that was going with Mr. Garcia was upset because she had found out that he was going with someone in Unit F and they were investigating, and she gave them my name. I don't know if that's true, but he went to my room and he told me I was going to be called.

**Q.** So law enforcement reached out to you, you didn't reach out to law enforcement?

**A.** No. Because the first time they called me, they caught me by surprise because Mr. Putnam -- he's a lieutenant there -- he called me and he brought me to ask things from me.

**Q.** Did you meet with law enforcement in September of 2021?

**A.** Yes.

**Q.** At that time, were you still an inmate at FCI Dublin?

**A.** Yes.

Q.    During that meeting, did you tell the agents who you spoke with about your relationship with the defendant?

A.    No.  I denied everything.  I told them that -- I told him that he was a very good person, that he was very kind.  In fact, I had promised him that I wasn't going to get him in trouble.

Q.    Why did you tell the agents that?

A.    The truth is I was scared, because they had already taken him.  I was scared.  Many things.

In fact, my friend, my only friend that I had there, counseled me as to -- because I couldn't tell anyone anything because if they took me to the SHU that day -- we were scared because they would -- probably were going to take me to the SHU and also they were going to take her, because she knew.  She knew many things.  And she counseled me as to not say anything.

And then besides, in reality, I didn't want to get in trouble -- get in trouble, because they had already taken him.  Because that day when they took him away, the same prisonmates started pointing at me.  And what I wanted was to keep everything that nobody knew anything about it.

Q.    Did you speak with law enforcement again about a month later?

A.    Yes.

Q.    At the time of that meeting, were you still an inmate at FCI Dublin?

**A.** Yes.

**Q.** At that time, did you tell them that you had a physical relationship with the defendant?

**A.** Yes, yes, I did tell them.

**Q.** Did you tell them that you had -- he had taken your hand and put it on his erect penis?

**A.** No.

**THE INTERPRETER:** One moment. Excuse me, Your Honor.

(Interpreter confers with the witness in Spanish.)

**THE WITNESS:** No, that time I didn't say anything.

**BY MR. PAULSON:**

**Q.** Why not?

**A.** Because that's embarrassing. And then --

**Q.** Were you scared?

**A.** A lot.

**Q.** I want to shift gears --

**THE COURT:** If you are going to shift gears, then this would be a good time --

**MR. PAULSON:** Yes, Your Honor, it would be a great time.

**THE COURT:** All right. Now, Ladies and Gentlemen, Members of the Jury, we will stand in our recess for our second break, 20 minutes.

(Proceedings were heard out of presence of the jury:)

**THE COURT:** All right. The record will reflect that

the jury has left.

Anything to discuss?

**MR. PAULSON:**  Nothing from the Government, Your Honor.

**MR. REILLY:**  Nothing, Your Honor.

**THE COURT:**  All right.  We will stand in recess for 20 minutes.

(Recess taken at 11:51 a.m.)

(Proceedings resumed at 12:11 p.m.

(Proceedings were heard in the presence of the jury:)

**THE COURT:**  We're back on the record.  The record will reflect that the parties are present.  The jury is back with us.  The witness is on the stand.

Mr. Paulson, you may proceed.

**MR. PAULSON:**  Thank you, Your Honor.

**Q.**   Maria, did the defendant ever tell you to be naked for him?

**A.**   Yes, that's right.

**Q.**   How many times did he instruct you to be naked?

**A.**   Three times.

**Q.**   Let's focus on that first time.

What happened when the defendant told you to be naked?

**A.**   The first time was in the morning.  He told me to get naked so when he passed by early.  He arrived early in the morning before all the workers arrived.

**Q.**   Where were you when he told you to be naked for him later?

A.   In the unit.

Q.   Did he tell you a specific time that he was going to come by to see you?

A.   In the morning.  He said before -- in fact, that day was like 5:20 when he arrived.

Q.   Did he tell you to be ready for him -- naked for him at a specific time?

A.   Yes.  On that occasion, he passed by before all the workers arrived.

Q.   What was the tone of his voice when he told you to be naked for him?

A.   Because he would only tell me slowly so no one could hear him.  And he would just pass and tell me, and he didn't give me time to respond to him.

Q.   Was he asking you or was he ordering you?

A.   He just told me that "tomorrow, I'm going to go by," just to be there for him.

Q.   How did you respond?

A.   I didn't get to respond.

Q.   What did you think would happen if you told him no or you weren't naked for him the following morning when he said he would come by?

A.   That he was going to get annoyed.

Q.   Why would that matter?

A.   In fact, it scared me.  And he had already told me

about -- he was already -- he had told me already about my compassionate release.

The truth, everything was beautiful in the beginning, but then what happened afterwards, that was more forceful, that I felt like I was against the wall.  That happened very fast, because things happened very fast.

It was already the month of March or April when he said he was going to sign so I could be released.  Then he got more intense to start requesting things out of the ordinary.

Q.   Like having you be naked at a specific time?

A.   Yes.

MR. PAULSON:  Ms. Slattery, can you please pull up Exhibit 321.

Your Honor, I believe this one has already been admitted.

THE COURT:  321 is admitted.

MR. PAULSON:  I'd like to publish this to the jury, Your Honor.

Q.   Maria, where is your room in this photo?

A.   Let's see if I can -- it's the first one on the -- this one (indicating).

Q.   So you've circled there the first two windows on the bottom floor on the left side of the photo; is that right?

A.   Yes.  That was my room.

Q.   What happened the next morning at the time that the defendant told you to be naked?

**A.**    The third time?

**Q.**    The first time.

**A.**    The first time, it was that day that he went by like -- what time would it be?  Like 12:00.  In the room, the upper -- on the second floor lived a girl that he got along with her really well.  He would go around there when I was naked, but he had not come that close to the window.  He was already looking at me.  He was on the path.

Then the girl yell at him, and he had the opportunity to get closer to my window because that made it look like he was talking to the girl upstairs.  He got close to it, but he wasn't paying too much attention to her because he was already looking at me.

**Q.**    How far away from your window was the defendant on this occasion?

**A.**    It was very close, because it was -- I would think he was like 3 feet apart.

**Q.**    Were you naked inside your room at that time?

**A.**    That's right.

**Q.**    What was going through your mind while you were standing there naked as the defendant looked at you through your windows?

**A.**    Well, many things.  I don't know how to explain it either.  I felt bad for him -- I was embarrassed for he was looking at me.  But he had already told me that he wanted something

serious with me, and I said to myself I have to get rid of the embarrassment of him looking at me.  At that time, I still had hopes that he would want something serious with me, because he promised me that he was not playing with me.

Q.  Did you have hope that he would sign your compassionate release?

A.  I was almost sure that he would.

Q.  Did the defendant ever instruct you to be naked for him at a specific time again?

A.  After that, it was -- that was the first one.

And the second one was in the morning.  That day I felt very uncomfortable, but I said -- on that day, I don't know if he took a video of me or a picture.  Because I saw that he was kneeling down on one knee on the floor, and he had a -- and -- and I thought I wish he doesn't want those photographs to put them on -- you know, to expose me.

Q.  So let's focus on this instance when you think the defendant took a picture of you.

Was that another occasion than the one we just spoke about?

A.  You mean that -- the one when he was talking to the girl on the second floor?  This was another occasion.

Q.  Tell the jury what happened on that occasion.

A.  On that occasion, he went by really early.  It was like 5:20.  I know the time more or less because at 5:00 in the

morning, I am already up, and I had already bathed myself to start my work -- to start working at 6:00, because I was working in the laundry room.

And on that day, he arrived around that time. And at that time -- and truth is I feel bad, because I know I contributed too.

He passed by, and I saw he was taking pictures or videos, I don't know what, but yes. In fact, I was going to ask him what he was doing, but I didn't dare to ask because I thought he's going to get angry. So I didn't ask.

Q. What led you to believe that he was taking pictures of you?

A. Because he had the phone and he kneeled down and he put the phone like he was taking a picture. He was on one knee.

Q. And when he took that picture, were you naked inside your cell?

A. Yes.

Q. Did the defendant ever ask you if he could take a picture of you?

A. No, he never asked.

Q. Did you ever tell him he could take a picture of you?

A. No.

Q. So on this occasion, he was outside your housing unit; is that right?

A. Yes.

Q.   Was there ever an instance when he saw you naked inside --
when he was inside your housing unit?

A.   Yes.   That was the last one.

Q.   Tell the jury about what happened that time.

A.   That time, I went to breakfast as usual, because that's
what we had agreed with him -- with him.   But that day, he did
not arrive.

But when I was almost arriving at my unit and -- I saw him
coming from his office, and I was able to see that he was
coming really fast in order to reach me.   And right there next
to some rooms -- trees by my unit, he said, "Go there and get
naked, I'm coming right now."

And he went to the other unit that's close to mine.   I
went into my room nervous, because I had never done that with
him being inside the room.   I didn't get totally naked; I just
took off -- he came by and he saw that I was not totally naked,
and he said he was going to go by again.

He went by, like, doing the rounds that he usually does,
and then he came back immediately to the wing.   And he came by
and he opened the door, and he put, like, half his body inside
and he left the door like this (indicating), and he touched me
and he told me that I was very beautiful.

Q.   Where did he touch you?

A.   My breasts.

Q.   How did he touch your breasts?

**A.**   It was just something very fast, because he immediately left.

**Q.**   You said that he came by your cell originally and then told you that he was going to come by again.

What was going through your mind when he told you he was going to come by again?

**A.**   I was undecided, because it was something risky.  He was inside the unit.  I didn't know what he was going to do, if he was going to come inside or not.

**Q.**   Did you feel like you could say no?

**A.**   For one moment I thought so, but then I was scared to say no to him.

**Q.**   When he touched your breasts, did you have any clothes on?

**THE INTERPRETER:**  Did you have what?

**MR. PAULSON:**  Clothes on.

**THE WITNESS:**  No.

BY MR. PAULSON:

**Q.**   When did this occur?

**A.**   It was in June.  Everything happened too fast.  Everything that I considered that was out of the ordinary happened very fast.

**Q.**   Go ahead.

**A.**   Because he came and told me one thing and then another every day, every day.

**Q.**   What -- sorry.  Go ahead.

**A.**    All that happened very fast from the time that he got
arrested.  It was like between June, he was on top of me all
the time.

In fact, when I got naked and he opened the door, that was
in June.  And I had already asked him if he had already signed
the compassionate release and he would tell me, "No.  As soon
as I receive them, I will let you know."

**Q.**    When you say June, what year?

**A.**    2021.

**Q.**    After the defendant grabbed your breasts, what did you do?

**A.**    I quickly got dressed, because it was during my time of
work.

**Q.**    Did you leave your cell?

**A.**    I exited very quickly after that.  I got dressed very
quickly.  I didn't even put anything else on, and I left.

**Q.**    Did you see the defendant in your housing unit after you
left your cell?

**A.**    He was already leaving.

**Q.**    What happened when you saw him?

**A.**    I was going towards the other laundry -- laundry room.  He
was already by the door to go out.  I -- he looked at me, I
looked at him, and then he left.

**Q.**    Did he tell you to look at his penis?

**A.**    He didn't tell me that, but with his look, he did like
this (indicating), and then he left.

Q.   When you mean [sic] "like this," what do you mean?

A.   He made me understand -- tried to make me understand for me to look at his -- his...

Q.   How did he do that?

A.   When we were looking at each other, he made signs to me like he was looking at himself.  But then he was quickly -- he left.

Q.   Did you look at his penis?

A.   It looked erect.

Q.   In July of 2021, did you have a conversation with the defendant in the pill line?

            THE INTERPRETER:  Where?

            MR. PAULSON:  The pill line.

            THE WITNESS:  (In English:)  I'm sorry.  I understand a lot of English.

            MR. PAULSON:  That's okay.

            THE WITNESS:  Yes.

BY MR. PAULSON:

Q.   What is the pill line?

A.   The pill line is the line that people get into when they take pills.

Q.   Tell the jury about the conversation that you had with the defendant in the pill line.

A.   That was on one of those days -- the last days he was there.  He got close, because I was taking pills.  It was early

during breakfast.  He got close to me, and he told me, "Be very careful," because people are talking about him and me -- about him and myself.  And he told me that he had -- if I had something, to get rid of any evidence I had because we could be in trouble.

Q.   Did he tell you not to talk to anyone about your relationship?

A.   He -- in fact, he told me to be very careful not to talk about -- with anyone about us.

And, in fact, on March the 21st, my daughter went to visit me, and I told him that I had talked to my daughter about him.  And I felt that he got upset, and then he got a little lighter and he said that it was because the officers could listen and the cameras were there.

Q.   After that conversation with the defendant in the pill line where he told you to get rid of anything that could implicate your relationship, what did you do?

A.   I went, I told my friend.  I asked her, "What do I do?"  And she said, "Go quickly and get rid of anything that they could find."

I got rid of a calendar where I wrote notes that I had written, and I put them in the toilet, and some notes that I was translating, because I would write them first in Spanish because I don't know how to write in English that well, and I also put them in the toilet.

**Q.**   Do you see the man in court today that touched you and told you to be naked?

**A.**   Yes.

**Q.**   Can you please point to him and state where he's sitting.

**A.**   It's him (indicating).

　　　**MR. PAULSON:**  Your Honor, may the record reflect that Maria has identified the defendant?

　　　**THE COURT:**  So reflected.

　　　**MR. PAULSON:**  Thank you.  I have no further questions.

　　　**THE COURT:**  Mr. Reilly, cross-examination.

**CROSS-EXAMINATION**

BY MR. REILLY:

**Q.**   Good afternoon, Maria.

**A.**   Good afternoon.

**Q.**   So you've had several conversations with people about these allegations that Mr. Garcia had done things to you and other inmates; right?

**A.**   That's right.

**Q.**   And one of those conversations was with the Dublin staff psychologist, Dr. Halverson?

**A.**   That's right.

**Q.**   And you remember talking to her?

**A.**   Yes, of course.

**Q.**   And at one point, you -- you were distressed, I guess is a good word for it, because you had lied about something to do

with this; is that right?

A.    Yes, of course.

Q.    And when you had that conversation with Dr. Halverson, one of the things you told her was that there had never been any physical or sexual contact between Mr. Garcia and yourself.

A.    Yes, I did tell her.

Q.    And that was in October of last year?

A.    Yes.

Q.    And then you also had a conversation with the FBI and Ms. Priedeman, the prosecutor that's here in the courtroom, and some other folks in September of 2021.

      Do you recall that?

A.    Yes, I do remember.

Q.    And during that conversation, you also told them that you and Mr. Garcia had a cordial relationship, but that he never did anything to you that was inappropriate.

A.    Yes, I did tell them that.

Q.    In fact, part of what you told them at that time was that the two of you were never alone together; is that right?

A.    Yes.

Q.    And also that you would not have accepted anything in the way of physical advances from him.

A.    Yes, I did tell them.

Q.    And that you never exchanged notes or gifts of any kind with him.

**A.**   Yes.   In fact, I denied everything at the beginning.

**Q.**   And you also told them that no one had ever told you what to say if anyone asked you about Mr. Garcia; is that right?

**A.**   I didn't understand the question.

**Q.**   Okay.   Basically, the question was did Mr. Garcia ever tell you not to say anything about what was going on?   And you said, "No one ever told me not to say what was going on with Mr. Garcia."

**A.**   I don't remember that, but...

**Q.**   Okay.   And then after you did that interview, about a week later, eight days later, you had a telephone conversation with Mr. Putnam; is that right?

**THE INTERPRETER:**   With?

**MR. REILLY:**   Mr. Putnam or Lieutenant Putnam.

**THE WITNESS:**   With him?   I don't understand how.

**BY MR. REILLY:**

**Q.**   Did you call in order to reaffirm what you had said at that meeting, that nothing had happened between yourself and Mr. Garcia?

**A.**   In fact, I didn't call him or talk to him on the phone.

**Q.**   I misspoke.

Mr. Putnam was with you while you were on the telephone with Serino.

**A.**   Yes.   He told me to call.

**Q.**   Right.   And sorry for the confusion.

And --

A.   That's fine.

Q.   -- in that telephone conversation, you once again said that nothing inappropriate had ever happened between yourself and Mr. Garcia; is that right?

A.   Yes.  They had already brought me over here, and, in fact, I got close to him when we were going to breakfast.

Because I was scared, I told him, "Isn't it true that you don't believe that I'm going with Mr. Garcia?"  And he said to me, "I don't believe you.  I think you are going with him."  And that's why he made that call with that person you mentioned.

Q.   And it was only after you became aware that other people were making allegations about Mr. Garcia that you said anything untoward had happened with him; is that right?

A.   In fact, we knew everything that was going on there.  We knew everything.  I don't know why.

Q.   Okay.  But it was after you found out about that that you said that Mr. Garcia had asked you to get naked and then on one occasion touched you?

A.   I don't understand the question.

Q.   All right.  Let me rephrase it.

You became aware at some point that some people were making allegations about Mr. Garcia; right?

A.   Yes.

Q.   Before you became aware of that, had you ever told anyone that anything inappropriate had happened between yourself and Mr. Garcia?

A.   No, not before that.

Q.   All right.  So all of your statements about this took place after you were already aware that someone else was making allegations about him.

A.   Yes, because I got disappointed.  I didn't think that he was -- that he was doing things like that.

Q.   And you mentioned that at one point, you were put in the SHU because your cellmate was under some kind of investigation?

A.   Yes.

Q.   And that didn't have anything to do with Mr. Garcia, did it?

A.   No.

Q.   That was Correctional Officer Klinger?

A.   No.  They were investigating because of someone who didn't work there anymore.

Q.   You mentioned that at some -- for some period of time, that you and Mr. Garcia exchanged notes of some kind?

A.   Yes.

Q.   And that you gave him more notes than he gave you.

A.   Yes.

Q.   What happened to those notes that he gave you?

A.   When he told me, I threw away everything that they could

find in my room.

Q.   Everything except the rose?

A.   Yeah.   The rose was in my locker, and it was in a place that was secluded.   And one day I was cleaning it and it fell out, and it got destroyed.

Q.   The request for compassionate release that you submitted, that was actually processed by someone other than Mr. Garcia; is that right?

A.   Yes, the unit's case manager.

Q.   And who was that?

A.   It's Mr. Villanueva.

Q.   And was it your understanding that he would be the person to make the decision or that Mr. Garcia would be the person to make the decision?

A.   No.   In fact, he told me that that was in his hands.

Q.   I'm sorry.   He told you what?

A.   That that was in his hands.

Q.   And do you have a request for a compassionate release pending right now?

A.   Now?   No.   I'm already outside.   I don't need it.

Q.   And at some point, you said that Mr. Garcia told you that you should get rid of everything that had anything to do with what went on between the two of you?

A.   Yes.   It was during the last week or the last weeks -- I don't remember the exact date -- when he was already in

trouble.

**Q.**   And, in fact, he had told you that you could get in trouble if you didn't get rid of that stuff and someone found it?

**A.**   Yes.

**Q.**   Now, you mentioned that you had a calendar with some notes.

**A.**   Yes.   I tore the pages also and I threw them away.

**Q.**   And what kind of notes did you have?

**A.**   Like, you know, when sometimes we would agree to meet at the rec or if I was sad.   But I would put his name and it was there.

**Q.**   Did you ever show that to him?

**A.**   Yes, I showed him the calendar.

**Q.**   When did you do that?

**A.**   I don't remember it well, but it was almost when my daughter sent it to me.   Because it was a calendar that had motorcycles, and he likes that, the Harley Davidson.

        **MR. REILLY:**   Thank you.   I have nothing further of this witness, Your Honor.

        **THE COURT:**   Redirect, Mr. Paulson?

        **MR. PAULSON:**   Yes, Your Honor.

    Your Honor, I have what is marked as Exhibit 287.   I would like to provide this to Maria.

<u>**REDIRECT EXAMINATION**</u>

**BY MR. PAULSON:**

Q.   Maria, do you recognize that?

A.   Yes.

Q.   What is that?

A.   It's the calendar, the planner that my daughter sent me.

Q.   Is that the calendar that you ripped pages out of?

A.   Yes.

Q.   Can you point to the pages in there that are ripped out?

        **MR. PAULSON:**  Actually, before you do, Your Honor, I would move to admit Exhibit 287.

        **THE COURT:**  Any objection?

        **MR. REILLY:**  No, Your Honor.

        **THE COURT:**  It's admitted.

        (Government Exhibit 287 received in evidence)

**BY MR. PAULSON:**

Q.   Maria, can you please point to the pages that you ripped out?

A.   Yes.  These are the ones here, between April and May.

Q.   Any others?

A.   No, I just tore those, like three pages.

Q.   Are there page numbers?

A.   Only missing is May 7.

        It's written here also that I -- when I talked to him, when he was telling me that he had not received the papers yet,

but more than 60 days had already passed.

Q.   Any other pages in there that you ripped out?

A.   No.  I just tore those down.  On this one, I wrote -- he was very desperate and I put "desperate" here.  I don't know what's happening.

THE INTERPRETER:  Wait.  Excuse me.  Not "desperate; "waiting."

THE WITNESS:  That's all.

BY MR. PAULSON:

Q.   Before you learned of the other allegations against the defendant, did you tell an inmate named Aurelia what had happened between you and the defendant?

A.   Yes.  In fact, she knew about everything and she would see everything through the window.

Q.   Why did you come forward eventually?

A.   Everything that was happening between him and I was under water.  It was heathen.

But she asked -- also, my mate at the laundromat would tell me many times that they were seeing strange things.  And I did tell her everything, and she told me, "I already knew."

MR. PAULSON:  Thank you.  I have no further questions.

THE COURT:  Any recross limited to the scope of the redirect?

MR. REILLY:  I have one -- one issue that I neglected to ask her about, a quick one.

## RECROSS-EXAMINATION

BY MR. REILLY:

Q.   Maria, you have submitted an application for a U visa; is that right?

MR. PAULSON:  Your Honor, I would object at this point.  This is outside the scope of the redirect.

THE COURT:  I understand it is outside the scope, and typically I wouldn't, but I'm going to allow this one question.

THE WITNESS:  Yes, that's right.

BY MR. REILLY:

Q.   And the Government is cooperating with you in that regard?

A.   I don't understand.  What do you mean, "cooperating"?

Q.   Okay.  They signed a certification on your behalf with respect to that application.

A.   My attorney filed the application for the visa, but I don't know how those documents are going.

MR. REILLY:  All right.  Thank you.  That's all I have, Your Honor.  Thank you.

THE COURT:  Any redirect on that issue?

MR. PAULSON:  No, Your Honor.

THE COURT:  Could you please pick -- get the exhibit for me, please.

MR. PAULSON:  Yes, Your Honor.

THE COURT:  If you'd retrieve it from her.

All right.  Any need for recall?

MR. REILLY:  No, Your Honor.

THE COURT:  Mr. Paulson?

MR. PAULSON:  Oh, no, Your Honor.

THE COURT:  Okay.  You're excused.

Next witness.

MS. PRIEDEMAN:  The Government calls Aurelia.

THE COURT:  Mr. Paulson, let me have that exhibit, please.

MR. PAULSON:  Your Honor, you're asking for the calendar, 287?  Would Your Honor also like the rose or not?

THE COURT:  Not now.

THE CLERK:  Please raise your right hand.

**AURELIA M.** ,

called as a witness for the Government, having been duly sworn, testified as follows:

THE WITNESS:  Yes, I do.

THE CLERK:  Can you state your name and spell your name for the record.

MS. PRIEDEMAN:  Just her first name.

THE WITNESS:  Aurelia [redacted].

THE INTERPRETER:  Oh.  Sorry, Your Honor.

THE COURT:  Okay.  We can strike that last name, please.

Proceed.

**DIRECT EXAMINATION**

BY MS. PRIEDEMAN:

Q.   Good afternoon, Aurelia.

A.   Good afternoon.

Q.   Are you currently incarcerated?

A.   No.

Q.   Were you previously an inmate at FCI Dublin?

A.   Yes.

Q.   When were you at FCI Dublin?

A.   I arrived in August of 2016 until May of 2022.

Q.   Were you convicted of illegal reentry and conspiracy to distribute methamphetamine?

A.   Yes.

Q.   Were those felony convictions?

A.   Yes.

Q.   Were you previously convicted of immigration fraud and illegal reentry?

A.   Yes.

Q.   Do you currently have legal status in the United States?

A.   No.

Q.   And in connection with this case, did the Government temporarily pause your deportation?

A.   Yes.

Q.   Has the Government made you any promises in connection with your testimony here today?

**A.**   No.

        **MS. PRIEDEMAN:**  Ms. Slattery, can you please pull up Exhibit 219.

    Your Honor, I believe this is a stipulated exhibit.  The Government would move to admit Exhibit 219.

        **MR. REILLY:**  It is.

        **THE COURT:**  All right.  219 is admitted.

        (Government Exhibit 219 received in evidence)

        **MS. PRIEDEMAN:**  Can we publish to the jury, please?

        **THE COURT:**  You may.

**BY MS. PRIEDEMAN:**

**Q.**   Aurelia, do you recognize this picture?

**A.**   Yes.

**Q.**   What is it?

**A.**   It's me.

**Q.**   When you were at FCI Dublin, did you know an inmate named Maria?

**A.**   Yes.

**Q.**   How did you know Maria?

**A.**   We became friends.  She worked washing our clothes.

**Q.**   Did you live in the same housing unit as Maria?

**A.**   Yes.

**Q.**   What unit was that?

**A.**   F.

**Q.**   Where was your cell in relation to Maria's cell?

**A.**   Two cells apart in order to reach her cell.

**Q.**   Did you know a Mr. Garcia at FCI Dublin?

**A.**   Yes.

**Q.**   How did you know him?

**A.**   He was the warden of the prison.

**Q.**   Did Maria tell you anything about her interactions with Mr. Garcia?

**A.**   Yes.

**Q.**   What did she tell you?

        **MR. REILLY:**  Objection.  Calls for hearsay.

        **THE COURT:**  Response?

        **MS. PRIEDEMAN:**  It's a prior consistent statement.

        **THE COURT:**  Mr. Reilly?

        **MR. REILLY:**  Submitted.

        **THE COURT:**  Overruled.

**BY MS. PRIEDEMAN:**

**Q.**   Aurelia, do you want me to answer the -- ask the question again?

**A.**   Yes, please.

**Q.**   What did Maria tell you about her interactions with Mr. Garcia?

**A.**   She had a sentimental relationship with him.

**Q.**   Did she tell you anything else?

**A.**   She would write letters to him.  He always would tell her, "You're very beautiful, you're very pretty, I want to be with

you."

Q.   Did she tell you if he asked her to do things for him?

A.   Yes.

Q.   What did she tell you?

A.   To take off her clothes.  He wanted to see her naked.

Q.   Did she tell you where he wanted to see her naked?

A.   Yes.

Q.   Where?

A.   In her cell.

Q.   Did she tell you where the defendant would be when he requested that she be naked?

A.   Yes.

Q.   Where?

A.   He would go and see her through the window.  He was going to be on the outside.

Q.   Did Maria tell you if she was naked for Mr. Garcia?

A.   Yes.

Q.   And what did she tell you?

A.   She was making these tangas.  He wanted to see her with a tanga, and she was making them.

Q.   What is a tanga?

A.   It's like underwear, like a panty.

Q.   When did Maria tell you about her relationship with the defendant?

A.   Like around February of 2021.

Q.   Did Maria tell you if the defendant showed her anything?

A.   Yes.

Q.   What did she tell you?

A.   A picture of a naked man.

Q.   Did she say who the naked man was?

A.   It -- it didn't have a face.

Q.   Did Maria tell you whether she ever touched the defendant?

A.   She didn't tell me that she touched him, but she would go to my cell and would do with her hands like this and she would say, "I touched him, I touched him."

Q.   What did you understand her to be referencing when she said she touched him?

        MR. REILLY:  Objection.  Calls for a conclusion or speculation.

        THE COURT:  She can testify as to her understanding.

BY MS. PRIEDEMAN:

Q.   Do you want me to ask the question again?

A.   Yes, please.

Q.   What did you understand her to be referencing when she said she had touched the defendant?

A.   Because of the expression on her face and also because I'm a woman, too, I understood that she had touched his private parts.

        MS. PRIEDEMAN:  Ms. Slattery, can you please pull up Exhibit 320.

Your Honor, there is a stipulation to admit Exhibit 320, and the Government would move to admit Exhibit 320 at this time.

MR. REILLY:  So stipulated.

THE COURT:  It's admitted.

(Government Exhibit 320 received in evidence)

MS. PRIEDEMAN:  May we publish to the jury as well?

Q.   Aurelia, do you recognize what's shown in this picture?

A.   Yes.

Q.   What is it?

A.   The unit where I lived.

Q.   Is it the F-Unit?

A.   Yes.

Q.   Can you point out on the screen where Maria's window is? You can actually touch the screen.

A.   Maria lived here (indicating).

Q.   So that's the first -- is it the first two windows on the bottom left?

A.   Yes.

Q.   And where did you live, Aurelia?

A.   Here (indicating).

Q.   So it's the fourth cell over on the bottom going from the right?

A.   Cells have two windows.  Two windows are one room only.

Q.   Okay.  So it's the -- if I can -- it's the fourth cell

from the left, is that right, on the bottom?

A.   Yes.

Q.   From your cell window facing outside, what could you see?

A.   I was able to see all the people that went by there.

Q.   Could you see the outside of Maria's cell?

A.   Yes, up to a distance, you can see it.

Q.   Did you ever observe anyone standing outside Maria's cell?

A.   Yes.

Q.   Who?

A.   Mr. Warden.

Q.   Mr. Garcia?

A.   Yes, Mr. Garcia.

Q.   Approximately how many times did you see Mr. Garcia outside Maria's window?

A.   Two.

Q.   When, approximately, did you observe Mr. Garcia outside Maria's window?

A.   Like in the month of -- between May and June.

Q.   What year?

A.   2021.

Q.   What was Mr. Garcia doing when you saw him outside of Maria's window?

A.   He was picking up a bag that the girls who were cleaning the yard use.

Q.   How far away was he standing from Maria's window?

**A.**   Like 2 or 3 feet.

**Q.**   Had you ever seen any other correctional officers standing outside the F-Unit?

>    **MR. REILLY:**  Objection.  Irrelevant.

>    **THE COURT:**  Sustained.

**BY MS. PRIEDEMAN:**

**Q.**   Did you ever see the defendant inside the F-Unit?

**A.**   Yes.

**Q.**   When would you see him?

**A.**   He used to do rounds every day in the morning between 9:00 and 10:00.

**Q.**   Did you ever see the defendant interact with Maria when he did his rounds?

**A.**   Yes.

**Q.**   What did you see?

**A.**   They were very close.  Twice, Mr. Garcia was inside the laundry room.  Another time, I saw him when he opened the door to the cell and he put half of his body inside.

**Q.**   I want to talk first about the time you saw Mr. Garcia stop at Maria's cell and put half his body inside.

Where was he -- scratch that.

Did you see how long he was standing at her cell like that?

**A.**   I don't know exactly how long it was.

**Q.**   What part of his body was inside of her cell?

A.   From waist up.

Q.   Okay.   And you mentioned that you saw the defendant in the laundry room.

Who else was in the laundry room when you saw the defendant in the laundry room?

A.   Maria and him.

Q.   Was there anyone else in the laundry room?

A.   No.

Q.   How close were Maria and the defendant standing when you saw -- standing together when you saw them in the laundry room?

A.   It could be more or less like a foot apart.

Q.   When was that?

A.   It was also in May, between May and June.

Q.   What year?

A.   2021.

Q.   Did you see Maria and the defendant in the laundry room together more than once?

A.   Yes.

Q.   How many times did you see them together in the laundry room?

A.   Two.

Q.   The second time you saw them together in the laundry room, how close were they standing together?

A.   Like 3 or 4 feet apart.

Q.   Did you ever see Maria undressed?

**A.**  Yes.

**Q.**  Can you tell the jury what happened when you saw Maria undressed?

**A.**  Yes.

**Q.**  Can you describe what happened?

**A.**  It was like 6:00 in the morning.  I was ready to go to work.  My shower robe was drying.  It was the time for me to leave, and I was to knock the door -- to knock on the door of Maria's cell to tell her to pick up my robe and put it in my cell.

When I arrived there and I knock on the door, she opened it quickly and she was naked.  And I told her, "What happened?" She told me she was waiting for Mr. Garcia.  And I told her she -- he already left, because I was always at the lobby in the mornings.  I had my coffee there.  I saw him when he was coming and when he was leaving.  But that day, he didn't come in.

What hurts me is the situation she was in, waiting for a man that was just playing with her feelings.

**MR. REILLY:**  Your Honor, I'm going to object at this point to the narrative.

**THE COURT:**  Next question.

**BY MS. PRIEDEMAN:**

**Q.**  Did you feel like you could report what you had seen with Maria and the defendant?

**A.**   No.

**Q.**   Why not?

**A.**   Because of fear.

**Q.**   What were you afraid of?

**A.**   To be moved from the prison.

**Q.**   Why did you think you would be moved from the prison?

**A.**   Because I saw three people that were moved out of the prison when they discovered that they were going around with officers.

**Q.**   What did you think would happen to Maria if you reported what was happening?

**A.**   It was going to go bad for both of us.

      **MS. PRIEDEMAN:**  No further questions, Your Honor.

      **THE COURT:**  Mr. Reilly, cross.  And we have about ten minutes.

      **MR. REILLY:**  That will be more than enough, Your Honor.

CROSS-EXAMINATION

**BY MR. REILLY:**

**Q.**   Aurelia, good afternoon.

**A.**   Good afternoon.

**Q.**   The times that you saw Mr. Garcia and Maria in the laundry room, did you ever see her touch him?

**A.**   No.

**Q.**   Did you ever see him touch her?

**A.** No.

**Q.** Did you ever see them at any other time besides those two occasions in the laundry room where they were together in the same location?

**A.** Yes.

**Q.** How often did that happen?

**A.** Almost daily.

**Q.** And on any of those occasions, did you ever see her touch him?

**A.** No.

**Q.** Did you ever see him touch her?

**A.** No.

**Q.** You mentioned that Maria had -- or excuse me -- that Mr. Garcia had shown Marine -- Maria a picture of a naked man with no face?

**A.** Yes.

**Q.** Did you ever see that picture?

**A.** No.

**Q.** When you saw Mr. Garcia outside the -- outside the unit, what was the closest you ever saw him come to the building?

**A.** I don't know exactly, but he was very close to the window.

**Q.** All right. When you say "very close," do you mean like a foot? Could he reach out and touch it?

**A.** Yes.

**Q.** And how often did that happen?

**A.**   I saw him twice.

**Q.**   And were you making these observations from inside your own cell?

**A.**   I already knew about their relationship, and when he was going over there, I was looking out.

**Q.**   All right.   That really didn't answer my question.

In the times when you said you saw him close enough to touch the window, were you seeing him from inside your own cell?

**A.**   I would see him outside the window, but I couldn't see if they were touching each other.

**Q.**   These windows, could you open them so that they were -- you could put your hand outside?

**A.**   Yes.

**Q.**   Or that someone on the outside could put their hand to the inside?

**A.**   Yes.

**Q.**   And could you, like, lean your head out in order to look all the way down the side of the building?

**A.**   No.

**Q.**   So were you able to actually see the window of Maria's cell from your cell?

**A.**   Not the window, but if someone was standing there, I was able to see.

**Q.**   And you said there were occasions when you saw Mr. Garcia

inside F-Unit?

**A.** Yes.

**Q.** And that would be the two times that you saw him in the laundry room?

**A.** Yes.

**Q.** Were there any other occasions where you saw him inside the unit?

**A.** Yes. He would normally go in in order to talk to people to see if they needed some type of help.

**Q.** Now, this one time when you mentioned that you saw him put half his body inside Maria's cell, where were you when you made that observation?

**A.** In my cell standing on the door.

**Q.** And your door was open?

**A.** Yes.

**Q.** And could you see where Maria was at that time?

**A.** No.

**Q.** And you mentioned that you were afraid to say anything about this because you thought you might be moved?

**A.** Yes.

**Q.** Where were you afraid you'd be moved to?

**A.** To another prison.

        **MR. REILLY:** Thank you. That's all I have at this time, Your Honor.

        **THE COURT:** Is there any redirect?

MS. PRIEDEMAN:  No, Your Honor.

THE COURT:  All right.  Any need to recall?

MR. REILLY:  No, Your Honor.

MS. PRIEDEMAN:  No, Your Honor.

THE COURT:  All right.  You're excused.

All right.  Members of the Jury, that concludes this day of trial evidence.  Just a couple of quick notes.

I checked the weather, and it may rain on Thursday.  We're not going to complain about rain in the Bay Area; right?  But I know it makes it a little more complicated.  So here is my thought.

One is that I'm assuming you're all parking in the big garage, right, and I'm assuming you come through the rotunda to get to the courthouse.  When you're in the rotunda, you can take one of the elevators as you come in, you can clear security in the left tower, and go to the fourth floor.  And then when you go to the fourth floor, that's where the clerk's office is, and if you just go around the hall, that's where the jury office is and you'll be right here.  You don't have to cross outside.

THE CLERK:  There is no security there, so those elevators don't work.

THE COURT:  They don't?  No, I thought they did, because I -- there's --

THE CLERK:  South tower you need a key card to use the

elevator to get to the fourth floor.

THE COURT:  To the fourth floor you need a key card?

THE CLERK:  Yes.  It only goes from the fourth to the first.  It doesn't go from the first to the fourth.

THE COURT:  Huh.  Can we double-check that tomorrow?

THE CLERK:  Yes.  I definitely will.

THE COURT:  Okay.  So we will see if we can double-check that.

In any event, even if you have got your umbrellas, I know that room is small.  Leave your umbrellas as you enter -- as you exit the hallway here, you'll see a quilt.  That's a handmade quilt by the wife of Judge Jensen, whose picture is up there.  And that way you don't have to take them into the jury room and take up space.  So put them there, and we'll figure out whether we can -- I thought you could access it, but I guess I'm wrong.  I know.  All right.  So you'll have to dash across the -- dash across the way.  Okay.  Well, so much for that.

Anyway, reminders about my admonishments from before.  Do you want me to reread them?  Everybody has got them in mind.  No talking, no discussing, no news.

I think the U.S. plays today, or did they already play?  World Cup?  Did we win or lose?

A JUROR:  Win.

THE COURT:  We won?  Oh, yay, we won.  Okay.

Well, enjoy your evening, have a good meal, and we'll see you tomorrow.

(Proceedings were heard out of presence of the jury:)

**THE COURT:**  Okay.  The record will reflect that the jury has left the courtroom.

With respect to the objection on the prior consistent statement, I allowed the evidence to come in under Rule 801(d)(1)(B), consistent with the elements set forth in United States vs. Chang Da Liu, L-I-U, 538 F.3d 1078, Ninth Circuit case, 2008, in light of the nature of the cross-examination and the inferences that were being made with respect to Maria's testimony.

To the extent that the defense or the prosecution is -- wants a limiting instruction with respect to that, I will consider that at 8:00 a.m. tomorrow and can give it first thing.  It's up to you to make that determination.  Her testimony is concluded today, but an instruction first thing in the morning I think will be sufficient.  I did not want to raise this issue while we were in the midst of the testimony.

Okay.  That's all I had for today.  Anything else?

**MR. REILLY:**  Not on behalf of the Defense, Your Honor.

**MS. PRIEDEMAN:**  Nothing from the Government.  Thank you, Your Honor.

**THE COURT:**  All right.  We will stand adjourned until 8:00 a.m.

(Proceedings adjourned at 1:43 p.m.)

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Tuesday, November 29, 2022

*Pamela Batalo Hebel*

_____

Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
U.S. Court Reporter