**Volume 4**

**Pages 533 - 729**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

UNITED STATES OF AMERICA,      )
                               )
        Plaintiff,            )
                               )
  VS.                          )      **NO. CR 21-00429-YGR**
                               )
RAY J. GARCIA,                 )
                               )
        Defendant.            )
_____)

                    Oakland, California
                    Wednesday, November 30, 2022

**TRANSCRIPT OF TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                  **STEPHANIE M. HINDS**
                  United States Attorney
                  1301 Clay Street, Suite 340S
                  Oakland, CA  94612
           **BY:**  **MOLLY PRIEDEMAN**
                  **ANDREW PAULSON**
                  **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:
                  SUMMIT DEFENSE, APLC
                  4040 Civic Center Drive, Suite 200
                  San Rafael, CA  94903
           **BY:**  **JAMES T. REILLY, ESQUIRE**

Reported By:  Pamela Batalo-Hebel, CSR No. 3953, RMR, FCRR
             Official Reporter

## I N D E X

Wednesday, November 30, 2022 - Volume 4

**GOVERNMENT'S WITNESSES**                              **PAGE**  **VOL.**

**S., SHINDOZJANAE**
(SWORN)                                                  544     4
Direct Examination by Mr. Paulson                        544     4
Cross-Examination by Mr. Reilly                          552     4
Redirect Examination by Mr. Paulson                      570     4

**TOWNSEND, CYNTHIA**
(SWORN)                                                  571     4
Direct Examination by Ms. Townsend                       572     4
Cross-Examination by Mr. Reilly                          577     4

**R., RACHEL**
(SWORN)                                                  587     4
Direct Examination by Ms. Priedeman                      587     4
Cross-Examination by Mr. Reilly                          623     4

**MALESPINI, MAEGAN**
(SWORN)                                                  654     4
Direct Examination by Mr. Paulson                        654     4
Cross-Examination by Mr. Reilly                          678     4
Redirect Examination by Mr. Paulson                      688     4

**M., MONICA**
(SWORN)                                                  691     4
Direct Examination by Ms. Priedeman                      693     4

**V., CHRISTINA**
(SWORN)                                                  695     4
Direct Examination by Mr. Paulson                        696     4
Cross-Examination by Mr. Reilly                          709     4

## E X H I B I T S

**GOVERNMENT'S EXHIBITS**                          **IDEN**  **EVID**  **VOL.**

 6                                                            707     4

 65                                                           618     4

 67                                                           619     4

**I N D E X**

**E X H I B I T S**

| GOVERNMENT'S EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 83 | | 620 | 4 |
| 125 | | 708 | 4 |
| 201 | | 667 | 4 |
| 220 | | 588 | 4 |
| 224 | | 697 | 4 |
| 227 | | 598 | 4 |
| 228 | | 599 | 4 |
| 229 | | 600 | 4 |
| 308 | | 546 | 4 |
| 346 | | 664 | 4 |

**Wednesday - November 30, 2022**                    **8:00 a.m.**

                         **P R O C E E D I N G S**

                              ---oOo---

     (Proceedings were heard out of presence of the jury:)

          THE CLERK:  Calling Criminal Case 21-429-YGR, USA vs. Ray J. Garcia.

     Counsel, please state your appearances.

          MS. PRIEDEMAN:  Good morning, Your Honor.  Molly Priedeman and Andrew Paulson for the United States.

          THE COURT:  Good morning.

          MR. REILLY:  Good morning, Your Honor.  Jim Reilly of Summit Defense appearing with Mr. Garcia, who is also present in court.

          THE COURT:  Good morning.

     Okay?  What do we have to do this morning before the jury arrives.

          MS. PRIEDEMAN:  We have three additional witnesses to swear in, Your Honor, two out-of-custody witnesses and one in-custody witness.

          THE COURT:  Okay.  And who are they?

          MS. PRIEDEMAN:  Christina and Monica are the two out-of-custody witnesses, and then -- sorry, Christina and Rachel are the two out-of-custody witnesses and Monica is the in-custody witness.

          THE COURT:  Okay.  And do we have them here so we can

swear them in?

MS. PRIEDEMAN:  Yes.  We'll go get them.

THE COURT:  And how about the -- Kelly, does the marshal have Monica available so we can swear her in?

THE CLERK:  I will check with them.

THE COURT:  Okay.

(The following proceedings were held under seal:)

(The following proceedings were heard in open court, out of the presence of the jury:)

THE COURT:  Okay.  While we are waiting for the marshal, Mr. Reilly, do you have any issues?

MR. REILLY:  I do not, Your Honor.  Excuse me.

MS. PRIEDEMAN:  Your Honor, just a few additional

issues.

We do have one 413 witness and two 404(b) witnesses potentially.

**THE COURT:** Hold on. Hold on. You have one -- go ahead.

**MS. PRIEDEMAN:** 413 witness.

**THE COURT:** You will have to remind me, Ms. Priedeman.

**MS. PRIEDEMAN:** No problem. We just need to have the instructions related to the fact that their -- it's not charged conduct in this case, but it's a similar offense of sexual assault. So that's for Christina.

**THE COURT:** Hold on.

Okay. So these are the instructions you filed; right?

**MS. PRIEDEMAN:** Yes, Your Honor.

**THE COURT:** And we're talking about Instruction -- is it Instruction No. 18 that you want me to give?

**MS. PRIEDEMAN:** Yes, Your Honor, that instruction would be appropriate for Christina's testimony.

**THE COURT:** Okay. And what next?

**MS. PRIEDEMAN:** And then Instruction No. 19 for Monica's testimony.

**THE COURT:** Okay.

**MS. PRIEDEMAN:** Monica is not here yet. She has not been transported yet, so --

**THE COURT:** Okay.

**MS. PRIEDEMAN:** -- I think we will just have to swear her in later. We're working on it, Your Honor.

**THE COURT:** Okay. Any -- anything else?

**MS. PRIEDEMAN:** Just one other thing, Your Honor.

We flagged for Mr. Reilly that we have, I believe, eight -- we believe eight witnesses left. Some of them may move pretty quickly, so it is possible that the Government may rest its case tomorrow.

**THE COURT:** Okay. Do you expect -- well, with eight witnesses, probably at the end of the day tomorrow you think?

**MS. PRIEDEMAN:** I would -- it just depends how much we get through today, so I think we will have a lot better sense at the end of today.

**THE COURT:** All right. Well, we'll -- are you -- give me the eight so that I know which ones you're bringing in.

So I have the three that you've identified, then who else?

**MS. PRIEDEMAN:** So we have Dr. Townsend, Dr. Malespini, and then Katrina is another inmate, Special Agent Barclay, and that's it, yes. And then Shindozjanae, who was already sworn in.

**THE COURT:** What was the last thing you said?

**MS. PRIEDEMAN:** Sorry. Shindozjanae, who is also a -- is in custody and was previously sworn in on Monday.

**THE COURT:** Okay.

Mr. Reilly, are you anticipating any motions at the close

of the prosecution's case?

MR. REILLY:  I'm not certain of that yet, Your Honor.

THE COURT:  Okay.

MR. REILLY:  Probably not.

THE COURT:  All right.  To the extent that you are considering those, so that we do not lose trial time, all you have to do is indicate to me that you have a motion and I will note that, but we'll continue with the testimony and we'll indicate that your motion was timely noticed.

MR. REILLY:  That's fine, Your Honor.  Thank you.

THE COURT:  I think in light of the evidence, it would be -- I would allow this kind of case to go to the jury.

And then we would proceed, I take it, with Mr. Garcia, or do you anticipate some other witness before Mr. Garcia?

MR. REILLY:  No, Your Honor, Mr. Garcia would be...

THE COURT:  And do you anticipate any other witnesses?

MR. REILLY:  Not at the moment.

THE COURT:  Okay.

All right.  Anything else, then?

MS. PRIEDEMAN:  Just one question, Your Honor.

On the day that the testimony has concluded, would closings follow immediately after that or would we be able to do closings the next day?

THE COURT:  Well, it depends when they close.  We -- I suspect probably the next day.  I still have to make sure that

we have -- we have to make sure that we have the instructions -- that there are no issues with the instructions.

So given what you're saying, let me check my calendar.

Once Mr. Garcia gets on the stand, how long are you anticipating, Mr. Reilly?

**MR. REILLY:**  I think he will probably take close to a full day --

**THE COURT:**  Okay.

**MR. REILLY:**  -- perhaps longer.

**THE COURT:**  And what about a rebuttal case?

**MS. PRIEDEMAN:**  We may have a rebuttal case, Your Honor.

**THE COURT:**  Yeah.

Okay.  Let me go back, and I'll take a look at the instructions and see if I have any issues.  I do have sentencings and changes of plea on Thursday, so I need to figure out when I can meet with you.  It could just be -- if there are no issues, then we might be able to just do it in the morning and make sure that we have it all done so that we can move straight into closings.

Again, we might take an hour, but it really depends. We're -- you know, if we finish evidence at 10:00 a.m., yeah, you'll be doing -- you'll be starting closings that day.  If we don't finish until 12:30 or 1:00, then I wouldn't make you do it.

Plus I've told the jurors that once we move into closings, I do like to go the full day, so they may have to make arrangements. All right?

**MS. PRIEDEMAN:** Understood, Your Honor.

**THE COURT:** Okay. Anything else?

I think we're still waiting on the marshal, but we can stand in recess until the marshal arrives.

**MS. PRIEDEMAN:** Thank you, Your Honor.

**MR. REILLY:** Thank you, Your Honor.

(Recess taken at 8:11 a.m.)

(Proceedings resumed at 8:27 a.m.)

**THE COURT:** Okay. You can bring him out. Just have him sit there, and let's get the jurors. We'll swear him in in a moment.

(Proceedings were heard in the presence of the jury:)

**THE COURT:** Okay. Everyone can be seated.

Good morning. We are back in session. Welcome back, everyone.

How is everybody doing? Okay? We appreciate you coming in promptly so we can get started promptly.

I'm feeling better. I hope you can tell I have a little more color. My law clerks told me I looked gray on Monday. They said, "We do that -- we say that in the most loving of way, but you did not look very well." So, anyhow, everything is getting better.

So I'm glad you're all here.  We will have another full day of testimony today, and let's get started.  Thank you.

THE CLERK:  Can you please raise your right hand.

**SHINDOZJANAE S.**,

called as a witness for the Government, having been duly sworn, testified as follows:

THE WITNESS:  Yes.

THE CLERK:  Thank you.  You can be seated.

Please get close to the microphone and please state your first name and spell it for the record.

THE WITNESS:  Shindozjanae, S-H-I-N-D-O-Z-J-A-N-A-E.

THE COURT:  Good morning.

So let's put that mic in front of you so that you can sit comfortably.

THE WITNESS:  Okay.

THE COURT:  Okay.  Mr. Paulson, you may proceed.

MR. PAULSON:  Thank you, Your Honor.

**DIRECT EXAMINATION**

Q.   Good morning, Shindozjanae.

A.   Good morning.

Q.   Are you currently an inmate at FCI Dublin?

A.   No.

Q.   Where are you currently in prison?

A.   FDC SeaTac.

Q.   Were you previously an inmate at FCI Dublin?

A.    Yes.

Q.    When were you there?

A.    From November of 2020 to about March of 2022.

Q.    Are you biologically a female?

A.    Yes.

Q.    Do you identify as a male?

A.    Yes.

Q.    In 2013, were you convicted of robbery?

A.    Yes.

Q.    In 2015, were you convicted of being an accessory?

A.    Yes.

Q.    In 2018, were you convicted of carrying a loaded firearm in public?

A.    Yes.

Q.    In 2020, were you convicted of conspiracy to commit robbery of mail, money, or other property of the United States?

A.    Yes.

Q.    Are those all felony convictions?

A.    Yes.

        MR. PAULSON:  Ms. Slattery, I would like to pull up Exhibit 308.

    And, Your Honor, this is a stipulated exhibit, so I would move to admit it.

        THE COURT:  No objection?

        MR. REILLY:  No objection, Your Honor.

THE COURT:  It's granted.

(Government Exhibit 308 received in evidence)

MR. PAULSON:  Your Honor, may I publish this to the jury?

THE COURT:  You may.

BY MR. PAULSON:

Q.  Shindozjanae, do you see what's on your screen?

A.  Yes.

Q.  What is that?

A.  A photo of myself.

Q.  Okay.

MR. PAULSON:  Thank you, Ms. Slattery.  You can take that down.

Q.  When you were at FCI Dublin, did you have a job?

A.  Multiple jobs.

Q.  Where did you work?

A.  For the most part, I worked for CMS, which is a maintenance, like, company for the prison.

Q.  What did you do with CMS?

A.  My main job was electrician.  I also worked as a -- mechanical maintenance or general maintenance and plumbing.

Q.  What did that job require you to do?

A.  Move around on the compound, maintenance any issues that they had in rooms, offices, throughout the whole prison.

Q.  When did you start working at CMS?

**A.** About -- I would say about late January, early February of 2021.

**Q.** When you were out going to the various places in the prison, did you ever see the defendant?

**A.** Yes.

**Q.** How often?

**A.** I can't be exact, but almost every day.

**Q.** When you saw the defendant, was he carrying anything?

**A.** I mean, his phone.

**Q.** How -- how often did he have his phone out?

**A.** Almost all the time.

**Q.** In April or May of 2021, did you fix a light outside of F-Unit in front of the dental unit?

**A.** Yes.

**Q.** What time of day was it?

**A.** It would be morning, so between the hours of 9:00 and 11:00.

          **MR. PAULSON:** Ms. Slattery, can you please pull up Exhibit 314.

     Your Honor, this has already been admitted, so I would like to publish this to the jury.

          **THE COURT:** Go ahead.

**BY MR. PAULSON:**

**Q.** Shindozjanae, can you point out where you were -- where you were fixing the light on that day?

**A.**   (Indicating).

**Q.**   Okay.  So the record can reflect you've circled an area between the dental building and the building labeled "Housing Unit F."

**THE COURT:**  So reflected.

**MR. PAULSON:**  Circled.  Yes, Your Honor.  Thank you.

**THE COURT:**  I said "so reflected."

**MR. PAULSON:**  Oh, sorry.

**Q.**   What happened on that day?

**A.**   So we went out to fix the -- well, actually, we went out because there was some birds stuck in the light pole and there was a light out.

When we have to maintenance those lights specifically, we have to go with our supervisor, which would be the foreman. There's a specific tool that we have to use to maintenance this light.

We came down the fire road to the light.  We were already set up.  The machine that we were utilizing was missing the pin to get it started, so he asked -- my boss asked me to go back, because there's two of them and he thought maybe I got the wrong tool.  So I went backwards to go grab this tool.  Still no pin.

So he met me on the side of the fire road, which would be behind the housing unit, and told me he was going to go find it himself with my other co-worker.  So he told me to go watch the

tools, which would have been right in front of that dental building next to the light pole.

As I was walking, I was taking my ear plug out because I'm not supposed to listen to music while I'm on the job but I was, and I happened to hear, like, some shuffling or something of that nature in the dirt to my right.

And I happened to see the warden, Mr. Garcia, like, in -- bent towards a window, an open window, fumbling with him -- his pants or zipper area.  He kind of looked over.  I don't know if he -- I mean, I seen the recognition, but I kind of kept doing what I was doing, which was trying to walk towards that area. He bent down as if he was picking up some trash.  I don't know what he had in his hand.  It could have been a piece of paper, a tissue, I don't know.  And then he proceeded to walk towards the -- I guess that would be the chapel area where the medical is behind that building.

After my boss and my co-worker reemerged momentarily, he came back to that area and proceeded to talk with my supervisor, the foreman, and kind of just asked random questions as if nothing ever happened.

Q.   Where was the defendant when you saw him near F-Unit?  You can use Exhibit 314 there in front of you.

A.   He would have been right there (indicating).  So it's a couple of windows right there, so he would have been, like, closer towards the edge, but almost midway to the edge.

**Q.** And just for the record, that's the side of the building that's marked "Housing Unit F" that's facing the dental building.

**A.** Right.

**Q.** And you marked sort of on the left side of the building; is that right?

**A.** Yes.

**Q.** Did you see the defendant in front of those same windows on other occasions?

**A.** Yes.

**Q.** About how many times?

**A.** At least three times.

**Q.** What was he doing when you saw him there?

**A.** Talking to, like, women in the windows.

        **MR. PAULSON:** You can take that down, Ms. Slattery.

**Q.** In April or May of 2021, were you working inside of the F-Unit?

**A.** Yes.

**Q.** What were you doing?

**A.** Changing lights in the rooms, as we do every day.

**Q.** What time of day were you there?

**A.** It's usually always mornings, so sometime before main line, lunch, which lunch would be like 11:30, -40ish.  So always before that time.  So usually about -- I want to say about 10:00.

**Q.**   What did you see that day?

**A.**   It was like my first couple days as an electrician, so I had my -- my cart.  I pushed it under the staircase.  I was inventorying what I needed to maintenance some of these lights in the room.  There -- there was a lot of running around.

On my right, which would be down a hallway closer to a laundry room and a shower, I happened to notice that the warden was present, so I had to make sure, like, you know, all my stuff was accounted for, make sure I was doing what I was supposed to be doing.

But as I was paying attention to what he was doing, I noticed he was in the doorway of a cell and there was a woman in the cell that was improperly dressed.  So she didn't have any clothes except for a robe.  He was standing in the doorway. He was partially blocking her, but not as much as I guess he should have been or whatever.  And --

**MR. REILLY:**  Excuse me, Your Honor.  I'm going to object to any further testimony at this point --

**THE COURT:**  It's narrative.

**MR. REILLY:**  -- narrative.

**THE COURT:**  Next question.

**BY MR. PAULSON:**

**Q.**   What did you see next?

**A.**   I saw her -- I just -- I saw her body and I saw them communicating.

**Q.**    When you say you saw her body, what do you mean?

**A.**    Her full naked body.

**Q.**    Where was this cell located in relation to the laundry room?

**A.**    Almost directly across.

**Q.**    Did you know the inmate that you saw in the cell naked?

**A.**    No.

**Q.**    Had you ever spoken with her before?

**A.**    No.

**Q.**    Did you know her name?

**A.**    No.

        **MR. PAULSON:**  Can you please, Ms. Slattery, pull up Exhibit 214.

    Your Honor, this is an admitted exhibit.

**Q.**    Is that the woman that was in the cell naked while the defendant was in the doorway?

**A.**    Yes.

        **MR. PAULSON:**  Okay.  Thank you.  I have no further questions.

        **THE COURT:**  Mr. Reilly, cross?

        **MR. REILLY:**  Thank you, Your Honor.

                        **CROSS-EXAMINATION**

**BY MR. REILLY:**

**Q.**    All right.  Good morning, sir.

**A.**    Good morning.

**Q.**   You indicated that you saw Mr. Garcia almost every day while you were at Dublin; is that right?

**A.**   Yeah.

**Q.**   And where -- where would you normally see him?

**A.**   Throughout various parts of the compound.  Sometimes at main line, sometimes in the warden's complex, recreation yard, walking around, picking up trash.

**Q.**   He was picking up trash?

**A.**   He does it frequently.

**Q.**   I'm sorry?

**A.**   He did it frequently.

**Q.**   And this occasion when you saw him bent toward an open window, what window were you referring to?

**A.**   I mean, I don't know the exact number, but it would have been closer to the edge, probably two, maybe three windows from the actual end of that --

**Q.**   Unit F?

**A.**   Yeah.

**Q.**   From which end, the left or right as you're looking at it?

**A.**   From directly in front of that wall, it would have been the left side.

**Q.**   Could you see anything else that was taking place at that point?

**A.**   No.

**Q.**   I think you said you saw him bend down?

**A.**    For the most part.

**Q.**    As though he was picking up trash?

**A.**    Yeah, he did.

**Q.**    Did you hear anything on that occasion?

**A.**    I could not.

**Q.**    Did you see whether he had a phone with him at that time?

**A.**    I could not see that.

**Q.**    So you didn't see him using the phone in any way?

**A.**    Not at that time.

**Q.**    And you also mentioned that you saw him by those -- that same set of windows on that same unit at three other times; is that right?

**A.**    Yes.

**Q.**    And over how long a period of time are we talking about?

**A.**    Within a couple months.  So I had only been there very briefly with him, so just on different occasions walking by, I would see him speaking to various women in those windows on that side of the building often.

**Q.**    Now, you say you saw him speaking to someone.

Could you hear him?

**A.**    Absolutely.

**Q.**    Could you hear what was being said back to him?

**A.**    No.  There is too many people talking at one time.

**Q.**    When you heard him talking to these inmates, what was the nature of the conversation?

**A.**   I can't recall that.

**Q.**   Nothing extraordinary from your perspective?

**A.**   No.

**Q.**   In particular, did you ever hear Mr. Garcia make any sexually suggestive remarks during those conversations?

**A.**   No.

**Q.**   Or did you ever hear any of the inmates respond to him with anything that was sexually suggestive?

**A.**   No.

**Q.**   Could you see the inmates yourself?

**A.**   Not all the time.

**Q.**   It's kind of hard to see into those windows, isn't it?

**A.**   Yeah.  They're not very large.  They're rectangular.

**Q.**   And do you have to be close to them in order to see inside?

**A.**   Close to the windows?

**Q.**   Yes.

**A.**   Yes.

**Q.**   They're kind of at an angle; right?

**A.**   They're -- they're just rectangular, so --

**Q.**   When you open them, they open up at an angle?

**A.**   No.  When you open them, you can open them all the way up. The windows come up --

**Q.**   But they come up like this (indicating).  From the bottom, they rotate up?

A.    Yeah, they go up, but they can't go all the way open.

Q.    On these occasions when you said you saw Mr. Garcia speaking with any of these other inmates, do you know who they were?

A.    No.

Q.    And on these three or four occasions that you've described already, could you tell whether he was talking to the same person or a different person each time?

A.    I could not tell that.  Like I say, he was talking to multiple people.

Q.    Are we talking about more than one window, then?

A.    More than one --

Q.    It wasn't always at the same window?

A.    Same area.  Don't know if it's the exact same window.

Q.    Right.  So we're still -- you're talking about Unit F --

A.    Absolutely.

Q.    -- right?

      And -- but you're not sure whether it was one window on Unit F or more than one window?

A.    Not sure.

Q.    Did you ever see Mr. Garcia with an inmate?

A.    As I described for the second incident, I saw him with that one inmate.

Q.    All right.  Other than that -- we'll talk about that in a minute.  But other than that, did you ever see him with any

inmates?

A.    In what way?

Q.    Say walking down a hallway together.

A.    Well, he has a -- a clerk in the warden's complex.  I've seen him multiple times with her.

Q.    Okay.  But that's not an inmate?

A.    That is an inmate.

Q.    An inmate.  Okay.

And who was that, do you know?

A.    I don't know her name.

Q.    And where did you see him with her?

A.    In the warden's complex.

Q.    All right.  This other incident that you described for us, where again did that take place?

A.    In F-Unit.

Q.    Inside the building?

A.    Inside the building.

Q.    And you mentioned that you were in there working?

A.    Yes.

Q.    Can you be more specific about where you were inside the building at that point?

A.    When you enter the building, you would -- I would have been on the right side of the building, away from the -- on the opposite side of where the officers' station would be located.  I was under the staircase with my tools.

Q.   And the cell that we're talking about, how far away was that?  Excuse me.

A.   It would have been probably like 6 feet at least.

Q.   I'm sorry.  Did you say 6 feet?

A.   At least.

Q.   So it was a cell that was at the same end of the building, then.

A.   Absolutely.

Q.   And the inmate that you saw the photograph of and you said that was the inmate that was there, do you know who she was? Do you know her name?

A.   No.

Q.   Had you ever seen her before?

A.   Prior to this incident?

Q.   Yes.

A.   No.

Q.   Have you seen her since then?

A.   Yes.

Q.   And where did that take place?

A.   I lived in F -- EF-Unit.  I was in E unit at first at the time of the incident.  After that incident occurred, some -- couple months down the line, I moved to F-Unit for COVID precautions.

Q.   And did you get to know her at that point?

A.   Absolutely not.

**Q.** But you saw her around occasionally?

**A.** Yeah, as you would.

**Q.** For how long a period of time on this particular occasion were you in that unit working under that staircase?

**A.** I didn't work specifically under the staircase; that's where my tools were stationed. That's where I started, to make sure that my stuff would be secure. So I was in the building for at least 40 minutes.

**Q.** And for how long of that 40 minutes was Mr. Garcia there?

**A.** I'm not sure.

**Q.** All right. Let me phrase it this way.

For how long of that 40 minutes did you see him there?

**A.** After I saw him for a few minutes, I decided to move on to what I was doing, because I'm not going to stand right there -- and that's the warden -- standing over his shoulder.

**Q.** So how far away from him were you at this point?

**A.** The same distance.

**Q.** Six feet?

**A.** At least 6 to 8 feet, sir.

**Q.** Did you talk to him at all on that occasion?

**A.** On that day?

**Q.** Yes.

**A.** Yes, I did speak to him.

**Q.** While you were there under the stairs?

**A.** No.

Q.    Where -- where did this conversation take place?

A.    I met him at the top of the stairs near the visiting booth.

Q.    And was that before or after this event that you've described for us?

A.    After.

Q.    While you were 6 to 8 feet away from him and he was by this cell, was he facing toward you or away from you?

A.    Away.

Q.    Did you say anything to him then?

A.    Absolutely not.

Q.    Did you hear him say anything?

A.    Not that I heard.

Q.    And could you see into the cell?

A.    Partially.

Q.    From -- how far were you from the door to the cell?

A.    I didn't measure the distance, sir, but I was at least 6 to 8 feet behind them.

Q.    So was he between you and the cell door?

A.    Yes.

Q.    And I take it you were looking at the cell door at somewhat of an angle.

A.    Yes.

Q.    In other words, you were not standing directly facing the door looking at it to your front.

**A.**   No.

**Q.**   Can you estimate for us how much of an angle we're talking about?

**A.**   I'm not sure.

**Q.**   How wide is that hallway?

**A.**   I'm not sure.

**Q.**   Roughly.

**A.**   I mean, it could fit at least three people or more side by side.

**Q.**   So it was probably 6 to 8 feet wide also, then, I take it?

**A.**   I would assume.

**Q.**   And was the door to the cell, from the perspective that you were standing on, to your right or your left?

**A.**   My right.

**Q.**   And so if -- if we're standing in the hallway, were you closer to the wall on the right or the wall on the left?

**A.**   Can you clarify?  I don't understand.

**Q.**   Yes.  You said -- you said you were in this hallway under the stairs.

**A.**   I was not in the hallway.

**Q.**   You were under the stairs.

**A.**   I was under the staircase.  That's not the hallway. That's through the dayroom.

**Q.**   So the hallway starts right up within, say, a foot or so of where you were standing; right?

**A.**   Yeah.  So I would have had to come down the staircase, because there's another set of stairs, to be in the hallway.  I did not come down those stairs.

**Q.**   So you were at a different level than --

**A.**   Yes.

**Q.**   -- Mr. Garcia at that point?

**A.**   Yes.

**Q.**   How much higher up were you?

**A.**   I'm not sure how high those stairs are, but I would imagine about a couple inches.  More than three.

**Q.**   Okay.  I'm confused, then.

The -- you say a couple of inches, maybe three?

**A.**   Yeah.

**Q.**   And that's all the stairway is higher than the hall?

**A.**   Yes.  There's two set of staircases.

**Q.**   Okay.  And at what angle were you looking at Mr. Garcia?

**A.**   From behind him.

**Q.**   And how was he -- how was he facing that doorway?

**A.**   He was partially blocking the doorway, but I could still see into it.

**Q.**   And you indicated that you could see this inmate that you've identified for us in the photograph?

**A.**   Yes.

**Q.**   And how much of her could you see?

**A.**   Most of her.  She was shorter than him, but the angle that

she was standing at, I could see.

Q.   Was she fully inside the cell?

A.   No.

Q.   She was in the hallway?

A.   No.  She was not in the hallway, but she wasn't all the way into the cell either.

Q.   Well, was some part of her in the hallway?

A.   No.  I could just see her from the angle that I was standing at.

Q.   All right.  So -- so her body, her entire body, was inside the cell, then.

A.   Yes.

Q.   Was she standing?

A.   She was standing.

Q.   Was she moving around?

A.   No.

Q.   Did she do anything at all that you could see?

A.   Do anything as what -- as in what?

Q.   Anything at all.  Did you see her make any motions?

A.   Hand movement.

Q.   Anything else?

A.   No.

Q.   Did you see -- strike that.

     You indicated that she was fully naked when you saw her?

A.   She had a robe on.

**Q.** Okay. So she wasn't fully naked.

**A.** The robe was open.

**Q.** That wasn't my question, sir. The question was she was not fully naked, was she?

**A.** She had the robe on.

**Q.** And this robe, was it something that covered her shoulders?

**A.** Only her shoulders.

**Q.** So sort of like the way my suit jacket is?

**A.** Sort of.

**Q.** Arms through the sleeves, shoulders of the robe over her shoulders?

**A.** Yes.

**Q.** And did you see at any point her to -- do anything with that robe?

**A.** As in what?

**Q.** Did you see her open it?

**A.** It was already open.

**Q.** When you saw her?

**A.** Yes.

**Q.** And for how long was Mr. Garcia standing by that door?

**A.** Sir, I do not know. For the time that I was standing there, he was in front of the doorway.

**Q.** Okay. Can you estimate for us how long that was?

**A.** I was there for at least five minutes before I even looked

up and saw him.

Q.   All right.  But you don't know if he was there then for the -- during those five minutes?

A.   While I was standing there, I stood there for about three minutes.  I didn't count, wasn't looking at my watch to estimate.  I saw it, took the things I needed off my cart, and went the other way.

Q.   All right.  Let me ask it this way.  For how long a period of time did you observe Mr. Garcia to be standing by this door?

A.   It wouldn't have been for a long time, because I didn't want to be caught staring at him in this doorway with this naked woman.

Q.   So are we talking a minute?  Two minutes?

A.   It could have been at least two minutes.

Q.   Did you see whether or not he had his phone in his hands at that time?

A.   From the angle that I saw, he usually has it in his left hand.  So that's what I assumed that was in his hand.

Q.   All right.  So you said you assumed it.

Does that mean you didn't actually see it?

A.   Well, I mean, it looked like his phone.  I mean, when I saw him the few minutes later and I approached him, he had his phone.

Q.   All right.  I'm talking about during this minute or two that you saw him standing in front of the door where you're

standing behind him 5, 6 feet away, at that time, could you see whether or not he had his phone in his hand?

A.   I believe it was his phone.

Q.   All right, sir.  I don't care what you believe.

          MR. REILLY:  I ask that that answer be stricken as nonresponsive.

          THE COURT:  Denied.

BY MR. REILLY:

Q.   You say you believed it.  What I'm asking you is did you see it?

A.   From what I saw, I saw the phone, sir.

Q.   In his hand during that one to two minutes?

A.   Yes.

Q.   And what, if anything, did you see him do with it?

A.   I couldn't see what he was actually doing with the phone.

Q.   Was he holding it up in any way or was it down by his side?

A.   Closer to where his belt buckle would be.

Q.   And was it in that position the entire time that you were watching him?

A.   Yes.

Q.   So you did not ever see him lift the phone up like this (indicating) to his face as though he was taking a picture of this person inside the cell?

A.   I've never saw him lift the phone up like that.

**Q.** On any of the other occasions when you saw him with a cell phone, did you ever see him using it in such a way that it appeared to you that he was taking pictures?

**A.** I can't be sure of that, sir, but I've seen him utilizing the phone.

**Q.** By "utilizing," you mean he was talking on it?

**A.** Talking on it, texting, or whatever. Using the phone.

**Q.** And that was on other occasions, not this day we're talking about?

**A.** Yes.

**Q.** When he was by that cell, you didn't see him pick the phone up as though he were using it?

**A.** No.

**Q.** After you moved into Unit F yourself, did you ever have any conversation with this other inmate?

**A.** No.

**Q.** Never asked her about what had happened that day --

**A.** No.

**Q.** -- or discussed it in any way?

**A.** No.

**Q.** And when you -- you said you also saw him with this other inmate in the warden's complex, a different inmate that was -- was, I guess, a cleaner or someone who cleaned up in the warden's complex?

**A.** Yes.

Q. And on the times when you saw him with this other inmate, did he have his phone in his hand?

A. For the most part, sir, he always has his phone in his hand when I see him.

Q. Did you ever see him using the phone in such a way that it looked like he was taking a picture of that inmate?

A. I can't be sure what he's doing with his phone, sir. I can't look over his shoulder. I cannot even stand behind him. He is the warden.

Q. Did you ever see him from the front, or were you always seeing him from behind?

A. I seen him from the front. Most of the time we're supposed to approach them from the front.

Q. That's for safety reasons; right?

A. His safety, yes.

Q. Did you ever see him have any conversation with this other inmate?

A. Yes.

Q. Could you hear what they were saying?

A. Not -- I can't recall their conversations.

Q. So I take it that there was nothing unusual about those conversations that would cause it to stick in your mind, then?

A. Most of the time that we were working in the warden's complex, she's in that office privately.

Q. Okay. Could you see her at those times?

A.   No.

Q.   Could you hear her?

A.   No.

Q.   And where was Mr. Garcia when this was taking place?

A.   In his office with her.

Q.   Could you see him?

A.   There is an angle to how his office is.

Q.   Okay.  The question was could you see him?

A.   No.  I mean, I just know that he's in there.  You have to wait until he comes out.

Q.   How do you know that if you couldn't see him?

A.   How do I know that he's in his office?

Q.   Yes.

A.   There's one way in and one way out, and I worked in the office.

Q.   All right.  On any of those occasions, did you ever hear him to make any sexually inappropriate remarks to this other inmate?

A.   Not that I know of.

Q.   Did she ever make such remarks to him?

A.   I couldn't hear the conversation, sir.

Q.   Did you ever -- were you able to actually see her at some point during any of these occasions?

A.   See her in what way?

Q.   Just see that she was there, actually see her.

**A.**    As if I'm in the room with him?

**Q.**    Or looking through the doorway or in any way, were you able to ever see her while she was there in the warden's complex?

**A.**    Yeah.

**Q.**    And at any time that you ever saw her while she was there, was she ever undressed in any way?

**A.**    No.

**Q.**    Or did you ever see Mr. Garcia do anything inappropriate with her?

**A.**    No.

**Q.**    Or her do anything inappropriate with him?

**A.**    No.

        **MR. REILLY:**  Thank you.  I have nothing further at this time, Your Honor.

        **THE COURT:**  Redirect?

        **MR. PAULSON:**  Yes, Your Honor.

                    **REDIRECT EXAMINATION**

**BY MR. PAULSON:**

**Q.**    Shindozjanae, after you saw the defendant in front of the cell with the prisoner naked in the cell, did you feel like you could report what you saw?

**A.**    Absolutely not.

**Q.**    Why not?

**A.**    Um, number one, he's the warden.  Um, I don't -- at the

time, I didn't know how the process worked with trying to report something, and once I did find out a little while down the line after I figured, you know, something was at hand that I should report, it was made clear to me that whether I reported or not, it was going nowhere.

**MR. PAULSON:** Thank you. No further questions, Your Honor.

**MR. REILLY:** No recross, Your Honor. Thank you.

**THE COURT:** Okay. Any need for recall?

**MR. REILLY:** No.

**MR. PAULSON:** No, Your Honor.

**THE COURT:** Sir, you're excused. Thank you.

**THE WITNESS:** Thank you.

**THE COURT:** Next witness.

**MS. PRIEDEMAN:** The Government calls Cynthia Townsend.

**THE CLERK:** Please remain standing. Please raise your right hand.

**CYNTHIA TOWNSEND**,

called as a witness for the Government, having been duly sworn, testified as follows:

**THE WITNESS:** I do.

**THE CLERK:** Thank you.

Please be seated. Speak clearly into the microphone.

Please state and spell your first and last name for the record.

THE WITNESS:  Cynthia Townsend, C-Y-N-T-H-I-A, T-O-W-N-S-E-N-D.

THE COURT:  Good morning.

THE WITNESS:  Good morning.

THE COURT:  Are you comfortable removing your mask while you testify?

THE WITNESS:  Yes.

THE COURT:  Okay.

Go ahead.

**DIRECT EXAMINATION**

**BY MS. PRIEDEMAN:**

**Q.**   Good morning.

**A.**   Good morning.

**Q.**   Where do you currently work?

**A.**   At the Federal Correctional Institution in Phoenix, Arizona.

**Q.**   How long have you worked there?

**A.**   Since February of 2022.

**Q.**   What is your current position?

**A.**   I'm a clinical psychologist there.  I run the medication-assisted treatment program.

**Q.**   How long have you been a BOP employee?

**A.**   For 15 years.

**Q.**   Prior to your current position, did you work at FCI Dublin?

**A.**    Yes.

**Q.**    When did you work at FCI Dublin?

**A.**    I transferred there in July of 2011 and I remained there until February of 2022.

**Q.**    What was your position at FCI Dublin?

**A.**    I was a clinical psychologist there.  When I left, I was the Resolve program coordinator, which is the trauma treatment program.

**Q.**    What is your educational background?

**A.**    I have a doctorate in clinical psychology, as well as a master's in Christian leadership and a master's -- post-doc master's in clinical psychopharmacology.

**Q.**    Are you familiar with an inmate named Melissa from FCI Dublin?

**A.**    Yes.

**Q.**    How did you know her?

**A.**    I completed her psychology intake screening, which we conduct on all inmates designated to the institution, when she arrived in January of 2015.

**Q.**    What were your general impressions of Melissa?

**A.**    Given her circumstances, she was typical in terms of an inmate with a lengthy sentence for FCI Dublin, separation from a child, you know, some anxiety, which is to be expected.  But there were no mental health concerns.

**Q.**    Did you interact with Melissa the day of the education

graduation in 2021?

A.    Yes.

Q.    Can you describe that interaction, please.

A.    The psychology services office had no bathroom, so I walked out of the area to use a restroom in the adjacent building.

And Melissa approached me.  She was setting up for the graduation ceremony, which was being held outdoors right next to our building.  And she asked me to stand next to her and talk to her, because she saw Warden Garcia approaching.  And so I stood there and spoke with her.

Q.    What was her general demeanor?

A.    She appeared anxious, slightly pressured or rushed speech, and seemed just agitated and nervous.

Q.    Did Melissa tell you anything about Mr. Garcia?

A.    She said something to the effect that he was a -- a bad man, that she had a lot of, quote, dirt on him.

Q.    What did you tell her?

A.    I explained the limits of confidentiality, that anything she would tell me, I would have to report.

Q.    How did she respond to that?

A.    She stated she did not want anything reported because she was concerned about retaliation.  She said he had told her he was buddies with the person in charge of internal investigations and that when she would go to lunch, she would

observe the warden putting his arm around the SIS lieutenant, who was the person in charge of investigations.

**Q.**  Who was the SIS lieutenant?

**A.**  Lieutenant Putnam.

**Q.**  What did you tell Melissa?

**A.**  I told her if she was concerned about a report not being investigated or being retaliated against, which was what she had stated, that -- well, I asked her if she still had contact with her attorney.

**Q.**  Why did you ask her if she still had contact with her attorney?

**A.**  I had had her in two of my treatment groups, and I knew she had maintained a relationship with her attorney during her incarceration.  And I suggested she might want to speak to her attorney.

She stated she was uncomfortable talking on the phone because she knew the phones were monitored, and she didn't want to write because of mail and emails being monitored.

So I asked if there was any other way she could get in touch with her attorney, and she said she had a family friend nearby that could come to the institution and visit her, and that person could contact the attorney.  So she had a plan.

**Q.**  Why did you tell her to report it to her attorney versus reporting it through BOP?

**A.**  I was concerned that adverse action might be taken, which

is what she was concerned about, in terms of her being placed in the Special Housing Unit, where she wouldn't have contact with her family -- I knew her family was a big source of support for her -- or she could be transferred further away from her family or something like that could happen.

Q. Why did you think those types of adverse actions might happen?

A. There had recently been an inmate that had been placed in the Special Housing Unit due to an investigation into staff misconduct, and she was there over 11 months and then transferred far away. And so I thought that there was a possibility that it wouldn't be -- that her concerns would be valid.

Q. Do you have an understanding of whose decision -- who has the decision-making power at FCI Dublin to put an inmate in SHU for allegations based on staff misconduct?

A. I -- my understanding is it's the SIS lieutenant, along with the warden.

Q. In your roles at BOP, have you received training on PREA?

A. I have, yes.

Q. What is your understanding of who within a BOP facility is notified of allegations of staff misconduct?

A. The operations lieutenant is to notify -- is to be notified immediately.

They then notify the PREA compliance manager, who makes a

determination whether or not to initiate the PREA protocol.

Also, the head of correctional services and the warden have to be notified.

Q.   Based on your understanding, is there a way for an inmate to report staff misconduct without the warden being notified?

A.   There are two other methods.

One, there's a telephone number posted in the housing units.  I've heard that that goes internally and that it's -- it has to be on the inmate's contact list, so I'm not sure whether or not that would trigger the warden being notified or not.

The other way is they can write to the OIG, but, again, I don't know if that mail is monitored like all outgoing mail is. So I don't know whether or not the warden would be notified or not.

MS. PRIEDEMAN:  No further questions, Your Honor.

THE COURT:  Cross?

**CROSS-EXAMINATION**

BY MR. REILLY:

Q.   Good morning, Ms. Townsend.

A.   Good morning.

Q.   You indicated that you had done the initial psych intake for Melissa --

A.   Yes.

Q.   -- in January of 2015?

A.    Yes.

Q.    And I think you said at that point, she exhibited no mental health concerns?

A.    There was no reason to do a diagnostic interview or to provide ongoing mental health services.  She met the criteria for Care 1 mental health assignment.

Q.    What does that mean?

A.    That means there's no impairment in functioning or other reason to provide individual counseling.

      I believe I referred her to the non-residential drug abuse program and the trauma treatment program, but a Care 1 inmate does not require ongoing mental health services due to a serious mental illness.

Q.    And after that initial intake evaluation, did you have occasion to have any further evaluations of Melissa?

A.    I did not, no.

Q.    Did you refer her to anyone else for such evaluations?

A.    I referred her to the non-residential drug abuse program, and I believe a psychosocial assessment is conducted as a part of that program.  And I referred her to the trauma treatment program, which requires an assessment.

Q.    And as part of your function, did you follow up with her to see if she had acted on either of those recommendations?

A.    She participated in two of my treatment groups voluntarily.  One was a transitions group, and so -- and then a

mindfulness-based cognitive therapy group.

And, no, I did not follow up with her after those groups.

Q.   All right.  Is that -- is that -- would that normally be part of your function, to follow up with her to see if she took your recommendations and acted on them?

A.   No.

Q.   Did you check with either of those two referral organizations to see if she had made contact with them?

A.   They're voluntary programs, so I would have no reason to do that, no.

Q.   Well, you had reason enough to be concerned to make that recommendation to begin with, correct --

A.   Yes.

Q.   -- in each case, with respect to each of these two possible things for her to do?

A.   Yes.

Q.   But nothing about it was serious enough for you to consider following up with her?

A.   When she requested services, I saw her for individual sessions.  So I did have, I believe, two additional meetings with her upon her request.

Q.   All right.  And in either of those two meetings, did you ever ask her, "Hey, did you go for these other recommendations that I made?"

A.   I don't recall.

Q.    Do you recall if she said anything about, "Hey, I went and that was a great idea," anything like that?

A.    I believe in one of my clinical contact notes, I referenced that she was a participant in seeking safety, which is Phase 1 of the trauma treatment program.  So, actually, yes, I was aware that she was following up with that recommendation.

Q.    And that -- is that part of the PREA program?

A.    No.

Q.    And then you mentioned this -- strike that for the moment.

      Other than those two occasions when you saw her again and between January of 2015 and July of 2021, did you otherwise have occasion to see her at all, like just in the building or --

A.    Yes.

Q.    -- to talk to, as opposed to a session?

A.    Yes.

Q.    How often did that happen?

A.    Not very often.  Occasionally.

Q.    Did you have any conversations with her when those meetings took place?

A.    I would imagine we would say hello.  I don't recall any specific details, no.

Q.    And this incident in July of 2021, what was the occasion again?

A.    There was a graduation ceremony for education.  They had

an outdoor area where they were holding a graduation.

Q. And what -- graduation from what?

A. GED class, college graduation, vocational training programs. I don't recall if there's others.

Q. And how was it that you came to have contact with her on that day?

A. As I stated, there's no restroom in the psychology services building, so I left my office to use a restroom in the adjacent building. And Melissa was outside of the psychology services area setting up for the graduation, from what I recall.

Q. So the ceremony hadn't started yet?

A. Correct.

Q. And you said Melissa asked you to stand next to her when Mr. Garcia was coming?

A. Yes.

Q. And you indicated that she said the reason was that he was a bad man and she had dirt on him, or something to that effect?

A. Something to that effect.

Q. Did you report that conversation --

A. No.

Q. -- to anyone?

A. I mentioned it to my boss.

Q. Okay. Is that an official report or did you just, like, in passing in a conversation say something about it?

**A.**    It was not an official report, no.

**Q.**    Weren't you obligated to make such a report?

**A.**    There was no information provided in terms of misconduct or any other information to report.

**Q.**    Well, maybe not anything specific, but she said he was a bad man and she had dirt on him.

Isn't that exactly the kind of thing that should have been checked into and that you should have reported on?

**A.**    I advised my supervisor what she had said and what I had responded.

And I followed up with Melissa to make sure she had, in fact, spoken to her attorney, and she indicated that she had.

**Q.**    Okay.

**A.**    Had she not, I probably would have made a formal report.

**Q.**    Okay.  Is your obligation to make a formal report when an inmate tells you something that comes within the reporting requirements to make that report yourself or to just say, "Hey, I'll wait and see whether the inmate reports it, and even if -- and then only if she doesn't, I'll do something about it myself"?

**A.**    Well, I'm to report it to the operations lieutenant, who reports it to the warden.  And given the fact that this was an allegation against the warden, I had no precedent.  Policy states the warden is then to notify the regional director and the OIA.

**Q.**   Did you check with anyone to see, "Hey, I'm in this situation where I feel like I'm in a -- I have information that needs to be reported, but I'm concerned about the reporting process because the individual involved is in the middle of that process.  What do I do?  Who do I go to?"

**A.**   If I would have spoken to the PREA compliance manager, that's the associate warden.  That person reports directly to the warden.

The warden also supervises my supervisor, as well as the captain and the lieutenants.  There's -- they all report to the warden.

**Q.**   Well, pretty much everybody in the institution reports to the warden in some way, don't they?

**A.**   Yes.

**Q.**   Okay.  So what is your understanding, if any, of how the process should work when the information that you have constitutes a complaint against the warden?

**A.**   It's not clear in policy.

**Q.**   Did you check with someone outside the facility to find out what you should do?

**A.**   No.

**Q.**   Didn't talk to anyone else about it at all?

**A.**   No.

**Q.**   Could you have reported it to OIG?

**A.**   I don't know.

**Q.** Should have reported it to OIG, shouldn't you?

**A.** I had nothing to report.

**Q.** You had an inmate telling you that the warden was a bad man and she had dirt on him.

That's not reportable?

**A.** Statements -- there was no specific details, no allegation -- specific allegation of staff misconduct to report.

**Q.** Isn't that what OIG is for, to investigate incidents like that where additional information needs to be determined?

**A.** I don't know.

**Q.** What is OIG's function, to your understanding?

**A.** I don't know.

**Q.** Have you ever had any contact with them?

**A.** Not that I'm aware of.

**Q.** Isn't the -- doesn't the reporting requirement also require the institution to have some means for an inmate to make a report to someone other than the agency itself?

**A.** The OIG, they have an address they can write a letter to, which I don't know if that's monitored by staff, as all outgoing mail is.

**Q.** Did you suggest to Melissa that she contact that -- OIG?

**A.** No.

**Q.** Or that she take advantage of this reporting requirement in paragraph 115.51 that requires the agency to have some means

by which an inmate can make a report that goes to someone other than the agency itself?

**A.** No, because she had contact with her attorney.

**Q.** So as far as you were concerned, your obligation in this situation was to do nothing except to tell your supervisor?

**A.** I was concerned about retaliation.

**Q.** That wasn't my question.

My question was did you believe in your own mind that your only obligation in this situation was to report it to your supervisor?

**A.** I didn't believe we could protect her or that action would be taken if it were to be reported internally.

**Q.** Still didn't answer my question.

The question is in your own mind, did you think that was your only obligation, to report it to your immediate supervisor?

**A.** Yes, because I followed up and she did, in fact, speak to her attorney. Had she not spoken to her attorney, I would have taken further action.

**Q.** Now, you said you were concerned about retaliation.

Are you referring to a concern about retaliation against Melissa or against you?

**A.** Against Melissa.

**Q.** Why was it that you left Dublin?

**A.** My mother has dementia. She lives in Phoenix. I wanted

to go help provide care for my mother.

Q.   Were you forced by the agency to move from Dublin --

A.   No, sir.

Q.   Did you have particularly ill feelings toward the administration in Dublin?

A.   No, sir.

Q.   Including Mr. Garcia?

A.   No, sir.  I was promoted while Mr. Garcia was at Dublin.

Q.   What -- what were you promoted to?

A.   The Resolve program coordinator.

Q.   At any point while you were at Dublin, were you demoted in any way?

A.   Yes, sir.

Q.   Was Mr. Garcia the warden at that time?

A.   No, sir.

Q.   Was that before he was the warden or after?

A.   Before.

Q.   And as a result of that, were you concerned about getting involved in anything that might cause a problem for you personally?

A.   No, sir.

Q.   What does the term "white shirt" mean?

A.   I've never heard that term before.

        MR. REILLY:   Thank you.   I have nothing further at this time, Your Honor.

THE COURT:  Mr. Paulson, any redirect?

MS. PRIEDEMAN:  No redirect, Your Honor.

THE COURT:  Any need to make subject to recall?

MR. REILLY:  Not on my behalf, Your Honor.

MS. PRIEDEMAN:  No, Your Honor.

THE COURT:  All right.  Thank you.  You're excused.

Next witness.

MS. PRIEDEMAN:  The Government calls Rachel.

Your Honor, may I place this binder on the...

THE CLERK:  Please raise your right hand.

**RACHEL R.**,

called as a witness for the Government, having been duly sworn, testified as follows:

THE WITNESS:  I do.

THE CLERK:  Thank you.  Please be seated.

Speak clearly into the microphone.  Please state your full name and spell it for the record.

THE WITNESS:  Rachel, R-A-C-H-E-L.

THE COURT:  Ms. Priedeman, you may proceed.

Good morning.

**DIRECT EXAMINATION**

BY MS. PRIEDEMAN:

Q.   Good morning, Rachel.

A.   Good morning.

Q.   Are you currently incarcerated?

**A.**    I am not.

**Q.**    Were you formerly an inmate at FCI Dublin?

**A.**    I was.

**Q.**    When were you at FCI Dublin?

**A.**    From December of 2016 until September of 2020.

**Q.**    In 2016, were you convicted of conspiracy to distribute heroin?

**A.**    I was.

**Q.**    Was that a felony conviction?

**A.**    It is.

    **MS. PRIEDEMAN:**  Ms. Slattery, can you please pull up Exhibit 220.

    Your Honor, the Government moves to admit Exhibit 220. It's a stipulated exhibit.

    **THE COURT:**  No objection?

    **MR. REILLY:**  So stipulated.

    **THE COURT:**  Admitted.

    (Government Exhibit 220 received in evidence)

    **MS. PRIEDEMAN:**  May we publish to the jury, Your Honor?

    **THE COURT:**  You may.

**BY MS. PRIEDEMAN:**

**Q.**    Rachel, do you recognize this picture?

**A.**    I do.

**Q.**    What is it?

**A.** That was my booking photo when I arrived at FCI Dublin.

**MS. PRIEDEMAN:** Ms. Slattery, you can take that down, please.

**Q.** What job were you assigned at FCI Dublin, Rachel?

**A.** I was assigned to the electrical crew.

**Q.** Was that part of --

**THE COURT:** Could you, Rachel, move closer to that microphone, please.

**THE WITNESS:** Yes, ma'am.

**THE COURT:** All right. Let's try that again, and we may have to increase her volume.

Go ahead.

**BY MS. PRIEDEMAN:**

**Q.** Was that -- did you work as an electrician as part of CMS?

**A.** I did.

**Q.** What is CMS?

**A.** CMS is responsible for maintaining FCI Dublin, making any repairs or amendments or anything that needs to be done to the institution.

**Q.** What did your job as an electrician entail?

**A.** We were responsible for maintaining lights, installing new light fixtures. While I was there, we changed all the existing bulbs out to LED bulbs and that type of stuff.

**Q.** Do you know Ray Garcia?

**A.** I do.

Q.   How do you know him?

A.   He was the associate warden when I was there.

Q.   When you were at FCI Dublin?

A.   Uh-huh.

Q.   Can you describe your first interaction with the defendant?

A.   The first interaction that I had with Mr. Garcia, I was going to lunch with CMS.  CMS eats first because we need to get back to work.

    And in the cafeteria, the manager -- unit managers, the administrative staff, will stand what they call main line, which is where they stand at the end of the food service line so that if you have an issue, you can talk to them about it.

    I was coming through the food service line, and he approached me and said that earlier that day, he had been at the camp, which is right next door, and saw somebody that looked exactly like me.

Q.   When was that, approximately?

A.   May of 2019.

Q.   And what did you understand his comment to mean?

A.   He was talking about my best friend, Bailey, who had recently been transferred to the camp.  And when she was transferred to the camp, it affected me severely because I lived with her.  She was my best friend.  I didn't have any other friends there.  We did everything together, and then she

was transferred.  And I was very depressed and very lonely and alone.

Q.   What did you understand him to mean when he said he saw someone at the camp who looked just like you?

A.   That he had seen Bailey, and I knew that she was feeling the exact same way that I was.

Q.   How did it make you feel when the defendant made that comment?

A.   It made me happy because he had seen my best friend, you know, and I knew that she missed me as much as I missed her.

Q.   After that first interaction with the defendant, did he speak with you again?

A.   He did.

Q.   What did he say to you?

A.   At first, he would just say, "Good morning," ask me how I was.  It was pretty simple, basic conversation.  There really wasn't much to it -- much substance to it.

Q.   At some point, did the nature of the comments change?

A.   Yes.

Q.   How did they change?

A.   They just started to get more personal and pointed.  You know, we would -- we would -- he would just mention things, you know, like he told me that his dad was an electrician and he would tell me that he valued my work ethic and that was, you know, honorable and things like that.

**Q.** Did the defendant ever comment on your body?

**A.** He did.

**Q.** Can you describe the first time he commented on your body?

**A.** The first time, my crew was working on a light outside of food service, and I had sent them back multiple times to get a specific part that they did not get. And so I went across the compound by myself to get the part, and when I was walking out of CMS, he had come out behind me.

I always kept work gloves -- obviously, I was an electrician -- and I kept them in my back pocket, in my back left pocket, so my pocket was ripped. And he had come out of CMS behind me and I was walking by myself, and he said, "Your pocket's ripped." And I turned around and I said, "I know."

And at that point, we had gotten to the part of the compound where if you go straight, you get to the warden's complex, and if you go to the right, you get to the kitchen. So I went my way and he went his way.

**Q.** How did you interpret the defendant's comment?

**A.** That he was looking at my butt.

**Q.** Did the defendant make other comments about your appearance?

**A.** Yes.

**Q.** What types of things did he say to you?

**A.** I mean, at first it was pretty simple. He would just tell me, "You look great," or, you know, "You spend a lot of time

working out in the common or working out," and stuff like that.

Q.   Did he ever make sexual remarks to you?

A.   Yes.

Q.   What type of remarks did he make?

A.   He made a lot of different sexual remarks.  He would say things about my boobs and how he thought they would look when I was naked.  He would say things about my nipples and what he thought they might look like.  He made comments about my butt.

Q.   Did he ever make sexual remarks about the type of things he would like to do to you?

A.   Yes.

Q.   What did he say?

A.   He would tell me things -- he would just tell me that he -- he would just -- like one time, he told me that his tongue would touch me for hours before his penis ever did.  And he told me things that he wanted to do to my boobs and my nipples and kiss them and stuff like that.

Q.   You said you interacted with the defendant at main line.

     Did you interact with him anywhere else other than main line?

A.   Yes, everywhere.  He was everywhere.

Q.   Where?  Can you give examples of where you would interact with him?

A.   A lot of interaction happened at CMS.  He came through CMS multiple times a day.  He would come through my unit.

He would come to rec.  I taught workout classes and I was always out there working out with my workout group.  He would come out there.

Every day after I got off work, I would go run.  He would come there.

Q.   Did the defendant tell you personal details about his life?

A.   He did.

Q.   What did he tell you?

A.   We talked about -- he told me about his son and how his son had special needs.

He told me about his family's cabin in the mountains or their home in the mountains.  Like when he would be gone for periods of time, he would tell me, you know, "I'm going here to visit and take my son to the mountains."

Like I said, he told me about his dad and how he was an electrician, and so that's why he liked to come around our jobs.

Q.   Did he ever make comments about your family?

A.   Yes.

Q.   What did he say?

A.   He had just -- one day when I had walked outside to breakfast, he was normally standing there at that time or standing outside main line.  And we had just started talking about -- he made a comment about kids with special needs, and

it kind of had caught me off guard because my son has special needs.

Q.   Did he say anything about your son?

A.   Not specifically.

Q.   Had you told him about your son?

A.   No.

Q.   What was your understanding of how he knew that information?

MR. REILLY:   Objection.   Assumes facts not in evidence.

BY MS. PRIEDEMAN:

Q.   What was your understanding of why he made that comment?

A.   I felt like he had made that comment because just previously, I had been talking to my adopted mother about issues that she was having with my son.  And it was not uncommon for people to listen to phone conversations or read emails, "people" being officers.

Q.   How did it make you feel when he mentioned kids with special needs?

A.   It made me feel like I had a connection to somebody, you know.  When you have a child that has special needs, you can say that, "Oh, I understand how difficult that could be," but you can only really understand it if you've been in that position as a -- somebody else with a child with special needs.

Q.   Did the defendant talk about what would happen when you

were released from prison?

A.    Yes.

Q.    What did he say?

A.    He told me that he was going to come to Alaska.  He had asked for my travel plans.  He was going to meet me at the airport.  He was unclear if he was going to come, like, with me at that point in time.

      You know, we had talked about, like, him retiring so that I wouldn't get in trouble and he wouldn't get in trouble, and he said that he was going to.  And then COVID happened and he said, "I can't retire right now because of all this," and he also had told me that he couldn't retire because he needed his medical and stuff for his son.

Q.    Did he tell you why he wanted to meet you at the airport?

A.    Yes, because he wanted to have sex with me.

      And he later told me that he had a blanket and a pillow in his truck when he was going to -- when he thought I was at the airport.

Q.    Did you have feelings for the defendant?

A.    I did.

Q.    When you were at FCI Dublin, did the defendant ever make comments about not getting in trouble?

A.    Yes.

Q.    What did he say?

A.    He had just told me that he would know if something was

coming down the line as far as an investigation goes because he was friends with Lieutenant Putnam, who was responsible for disciplinary action in the prison.

Q.   Did your relationship with the defendant ever turn physical?

A.   Yes.

Q.   What happened?

A.   I was at CMS.  It was after COVID had happened, and there wasn't a lot of people around.  There was maybe four of us that would go to work each day, just the Grade 1s, the leads, so there was even fewer officers there.  CMS has no cameras in it anywhere or leading up to it, so it's unmonitored.

I was at work.  I was in the electrical shop organizing wire, and I didn't hear anybody.  He didn't have a large set of keys on him like the other officers did.  He had a small set of keys that you couldn't hear.

And he apparently had made his rounds in the background to the electrical shop.  And I had my back to the door and when he came in, he said, "Hello," and it scared me because I wasn't expecting anybody to be there.

So I had turned around and he was there.  We talked for a moment, and then he said, "You look -- you look fucking great." And then he walked towards me and I was pushed up against the wall and the shelf, and he grabbed my butt when he kissed me.

Q.   Did he grab your butt over your clothes or under your

clothes?

A.    He put his hands in my pockets.

MS. PRIEDEMAN:  Ms. Slattery, can you please pull up Exhibit 227.

Your Honor, the Government would move to admit Exhibit 227.  I believe there is a stipulation to admit this exhibit.

MR. REILLY:  No objection.

THE COURT:  Admitted.

(Government Exhibit 227 received in evidence)

MS. PRIEDEMAN:  May we publish to the jury?

THE COURT:  You may.

BY MS. PRIEDEMAN:

Q.    Rachel, do you recognize this picture?

A.    I do.

Q.    What is it?

A.    That is the electrical shop.

Q.    Can you explain kind of what angle this is?

A.    So when you first walk into CMS, there's a door on your right, which is the administrative offices.  There's like a window on the left, which is where you would check out tools, and then immediately past the administrative offices, there is a long hallway and this door is the only door in that hallway. So this is looking into the electrical shop from the hallway.

Q.    Is this where you were when the defendant kissed you and

grabbed your butt?

A.   It was.

MS. PRIEDEMAN:  Ms. Slattery, can you please pull up Exhibit 228.

Your Honor, again, this is another stipulated exhibit the Government would move to admit at this time.

MR. REILLY:  No objection.

THE COURT:  Admitted.

(Government Exhibit 228 received in evidence)

MS. PRIEDEMAN:  May we publish to the jury?

THE COURT:  You may.

BY MS. PRIEDEMAN:

Q.   Rachel, do you recognize this picture?

A.   I do.

Q.   What is it?

A.   That is the interior of the electrical shop.

Q.   Can you orient the jury a little bit what we're looking at compared to the picture we just looked at?

A.   So if you enter the door of the electrical shop and you have your back up against the wall, you're looking down the room to the left of the door.

MS. PRIEDEMAN:  Ms. Slattery, can you please pull up Exhibit 229.

Your Honor, again, this is another stipulated exhibit the Government would move to admit.

THE COURT:  Admitted.

(Government Exhibit 229 received in evidence)

MS. PRIEDEMAN:  May we publish to the jury?

THE COURT:  You may.

BY MS. PRIEDEMAN:

Q.   Rachel, do you recognize this picture?

A.   I do.

Q.   What is it?

A.   That's standing from the angle that we were just looking at in the electrical shop looking towards the door.

Q.   Where were you standing when the defendant kissed you and grabbed your butt?

A.   To the left of the 4-foot lights in front of the shelf over where that chair is.

Q.   So is it to the right of the chair, kind of in between the chair and the door; is that right?

A.   Uh-huh.  Like my back was in that corner where the mirror is.

Q.   Was the door open or closed when the defendant kissed you and grabbed your butt?

A.   It was like three-quarters of the way closed.  He closed it behind him when he came in a little bit, but not all the way.

MS. PRIEDEMAN:  Ms. Slattery, you can take that down.

Q.   How did you feel when the defendant kissed you and grabbed

your butt?

**A.**   I liked it.  I didn't mind it.  We had been talking and building a relationship for an extended period of time at that point, and I had been in jail since 2015.

**Q.**   Did the defendant ever say anything to you about the visitation room?

**A.**   Yes.

**Q.**   What did he say?

**A.**   He had just said that he wanted to take me to the visitation room.  We had made plans on numerous occasions to try to go there, but he had to get it unlocked by the yard officers, who didn't trust him.

And then COVID happened --

**MR. REILLY:**  Your Honor, I'm going to object to that comment as being a conclusion on the part of the witness.

**THE COURT:**  Well, it's stricken.  If you can get foundation for it.  But the particular piece about the officers who didn't like him at this point is stricken.

**BY MS. PRIEDEMAN:**

**Q.**   Did the defendant tell you why he wanted to take you to the visitation room?

**A.**   So that we could be alone and off camera.

**Q.**   Did he elaborate -- did he tell you he wanted to be off camera?

**A.**   No.

**Q.** How -- what makes you think that -- did you know if there were cameras in the visitation room?

**A.** Yes, and I also knew that they were broken.

**Q.** Did the defendant tell you that?

**MR. REILLY:** Excuse me. That also was a conclusion on the part of the witness.

**THE COURT:** Well, let me see.

What's the foundation?

**BY MS. PRIEDEMAN:**

**Q.** Did the defendant tell you anything about the cameras in the visitation room?

**A.** He told me they weren't working.

**THE COURT:** The objection is overruled.

**BY MS. PRIEDEMAN:**

**Q.** Rachel, if you had wanted to report what had happened with the defendant in the electrical shop, do you feel like you could have reported it?

**A.** No.

**Q.** Why not?

**A.** Because who are you going to report it to? If you report it to psych, they have to report it, and I had previously been told that he's friends with the lead investigator. So you can't report it to psych because they're a mandatory reporter.

There's a thing on the email that says it's linked to the office of the Inspector General for PREA reporting, but who's

to say that the officers aren't monitoring that.  Nobody believes that they don't monitor that, because they monitor everything else.  So there's nobody to tell.

Q.   What did you think would happen if you had reported it?

A.   That --

MR. REILLY:  Objection.  Calls for speculation.

THE COURT:  Overruled.  She can tell them what she thinks.

THE WITNESS:  I thought I would get in trouble and that I would get shipped and sent to the Special Housing Unit in segregation, be further away from my family, lose my phone privileges, commissary, my job that I had worked hard for.

BY MS. PRIEDEMAN:

Q.   Why did you think that?

A.   Because I had watched it happen.

THE COURT:  Is this a good time for a break, Ms. Priedeman?

MS. PRIEDEMAN:  This is a perfect time for a break, Your Honor.

THE COURT:  Okay.  Let's go ahead and take the first of our two breaks.  Members of the Jury, we'll stand in recess for 20 minutes with you.

(Proceedings were heard out of presence of the jury:)

THE COURT:  All right.  The record will reflect that the jury has left the courtroom.

Is there anything we need to discuss?

MR. REILLY:  Not on my behalf, Your Honor.

MS. PRIEDEMAN:  Your Honor, the third witness that we needed to swear in is here if we wanted to do that now.

THE COURT:  Okay.  You can -- oh, she did step down.  Okay.

Do we have the witness out of custody?  In custody?

MS. PRIEDEMAN:  In custody.

THE COURT:  Okay.  Why don't we have -- I don't know if she's right there, so let's go ahead and take a 15-minute break and then we'll swear her in.

MS. PRIEDEMAN:  Thank you, Your Honor.

THE COURT:  Meanwhile, we'll have the marshals bring her up.

(Recess taken at 10:00 a.m.)

(Proceedings resumed at 10:12 a.m.)

(The following proceedings were held under seal:)

(Recess taken at 10:13 a.m.)

(Proceedings resumed at 10:20 a.m.).

**THE COURT:**  Okay.  Do we have our witness?  Get the witness back on the stand.

Okay.  Let's call in the jury.

(Proceedings were heard in the presence of the jury:)

**THE COURT:**  Okay.  You may all be seated.  The record will reflect that the jury is back.  The witness is on the stand.

Ms. Priedeman, you may continue.

**BY MS. PRIEDEMAN:**

**Q.** Rachel, while you were at FCI Dublin, did the defendant ever tell you about investigations into other correctional officers?

**A.** He did.

**Q.** What did he tell you?

**A.** He had told me that there was an ongoing investigation with Officer Klinger, who had just recently transferred to a different institution.

**Q.** Did the defendant ever ask you to take pictures?

**A.** He did.

**Q.** Can you describe to the jury what happened?

**A.** I was at work. It was after COVID had happened, so there -- like I said, there wasn't very many people there.

When you walk into CMS, there is that door like I described, the tool room. And then instead of going down the hall, if you continue straight, you will get to a wide, open area where there is benches. Along that entryway, there's floor-to-ceiling cabinets that are full of wire. It's the first thing you see when you walk in. It's a straight line of shot.

And I was sitting there. I had everything pulled out of them because I was organizing and cleaning, and he walked in. I was sitting on the floor and he walked in, and he just handed me a digital camera. And I had no idea what he gave it to me

for, because he didn't say anything, he just kept walking, making his round around CMS.

So I got up and I went into the electrical shop and I started going through the camera, and it was staff photos from banquets and some type of award ceremony that they had had. I recognized the head of CMS, Mr. Morales. Like, it was a government camera, and I didn't understand.

He had come around to the electrical shop and stopped there, and I was like, "What is this for? There's pictures on here." And he was like, "For you to take pictures." And I said, "I'm not fucking taking pictures of myself for you." Like, "What?" Like, I got really mad and very offended, because I don't think that taking naked pictures of yourself is appropriate because of things that have happened to me in my past. And I was disgusted and just beyond offended that he had asked me to do that.

And I got mad and I told him, "I don't know" -- I cussed at him a lot and I said, "I don't know who the fuck you think I am or what I did to make you think that I was that girl, but I'm not," and I gave him back the camera.

And he said, "I put my SIM card in there or my memory card in there," like that should mean something to me. I said, "This is a government camera." And he left.

And I was so mad that I literally just walked right past him when he would stand main line or come to CMS, like -- like

he was dead.  I was so mad and so offended that he would think that I would do something like that.

Q.   Did the defendant ever ask you to undress for him?

A.   Yes.

Q.   What happened?

A.   He would just make comments about how he would like to see if what he thought about my body was accurate.  He told me that I should be at my room at a certain time, and I had told him no.

     And then he -- I was like -- he said, "You're never there."  I said, "I know, because I'm working."  And...

Q.   Did you ever undress for him?

A.   No.

Q.   Why not?

A.   Because I'm not going to.

Q.   How many times did he ask you to undress for him?

A.   Multiple.

Q.   Did he tell you when he wanted to see you naked?

A.   I'm not sure what you mean.

Q.   Did he specify when he wanted you to be naked for him?

A.   When he was making his rounds around the institution.

Q.   Did the defendant ever show you anything?

A.   Yes.

Q.   What did he show you?

A.   Pictures of his penis.

**Q.** How did he show you those pictures?

**A.** When I was -- the -- the first one I saw -- and, actually, both of them were in my unit, and I was standing outside my room and the door was open. He was making his rounds, and he had his phone in his hand and flashed it to me real quick.

**Q.** Approximately how many pictures of his penis did he show you?

**A.** Two.

**Q.** Did you notice anything about his phone?

**A.** Yeah. His phone -- he always had his phone in his hand or he was always, like, on his phone. It was a black phone. It had like a -- like a bar code thing on the back, a -- maybe like an inch and a half or so, on the back of his phone. I think it was like an iPhone.

**Q.** Did you recognize anything about the backgrounds of the photographs that he showed you?

**A.** I recognized right away that they were taken in the warden's complex in the bathroom, because we had recently -- like I mentioned, we were changing all the lights out to LEDs. That was across the whole institution, and we had just done the warden's complex.

**MS. PRIEDEMAN:** Ms. Slattery, can you please pull up Exhibit 127.

Your Honor, this exhibit has been previously admitted, and I would ask that we publish it just to the jury and not to the

gallery.

THE COURT:  Granted.  So just to the jury.

BY MS. PRIEDEMAN:

Q.    Rachel, do you recognize this picture?

A.    I do.

Q.    What is it?

A.    That's Mr. Garcia's penis.

Q.    Did the defendant show you pictures like this?

A.    He did.

Q.    Do you recognize the background in this picture?

A.    It's the bathroom of the warden's complex.

MS. PRIEDEMAN:  Ms. Slattery, can you please put up Exhibit 288, please.

Your Honor, this is another exhibit that has been previously admitted, and we ask -- we would ask that it be published just to the jury.

THE COURT:  Granted.

BY MS. PRIEDEMAN:

Q.    Rachel, do you recognize this picture?

A.    I do.

Q.    What is it?

A.    It's Mr. Garcia's penis.

Q.    Do you recognize where it was taken?

A.    In the warden's complex.

Q.    Did the defendant show you a picture like this?

**A.** He did.

**Q.** Did he make any comments when he showed you a picture like this?

**A.** He told me that that was what I did to him.

**Q.** Do you recognize the clothing that's in the background of this picture as well?

**A.** Uh-huh.

**Q.** What is it?

**A.** That is the white shirt that he wore almost every day and his black slacks.

        **MS. PRIEDEMAN:** Ms. Slattery, you can take that down, please.

**Q.** Did you notice the defendant interacting frequently with any other inmates while you were at FCI Dublin?

**A.** I did.

**Q.** Who?

**A.** With Melissa.

**Q.** Did you ever ask the defendant about her?

**A.** I did.

**Q.** What did he say?

**A.** He said that he was just helping her get transferred to a different institution so she could be closer to her child.

**Q.** Did you know Melissa at FCI Dublin?

**A.** Not really.  We had both been there and so, like, I knew who she was.  She spent a lot of time at rec working out as

well, and her at one point roommate was in my running group. But I didn't know her personally.

Q.    Did you ever speak with her?

A.    Once or twice.

Q.    What did you talk to her about?

A.    Our kids have the same name and it's a very unique name, so we talked about that.  Her roommate had told me her son's name, and so we were talking about how ironic it was that our kids had the same name.

Q.    Were you friends with her?

A.    No.

        MS. PRIEDEMAN:  Ms. Slattery, can you please pull up Exhibit 214.

        Your Honor, this exhibit has been previously admitted. May we publish it to the jury, please?

        THE COURT:  You may.

        THE CLERK:  The gallery as well?

        MS. PRIEDEMAN:  Yes.

        THE COURT:  The gallery is fine.

        MS. PRIEDEMAN:  Yes.

Q.    Rachel, do you recognize the individual in this picture?

A.    No.

Q.    Have you ever spoken to her?

A.    I don't think so.

        MS. PRIEDEMAN:  Ms. Slattery, you can take that down,

please.

Q.   Rachel, did you file a tort claim related to what happened with the defendant at FCI Dublin?

A.   I did.

Q.   Is that like a civil claim?

A.   Yeah.

Q.   When did you file it?

A.   I believe in August.

Q.   Of this year?

A.   Uh-huh.

Q.   What are you asking for with the civil claim?

A.   I'm not sure.  I'm leaving that up to my civil attorney.

Q.   Are you asking for money?

A.   Yes.

Q.   Is the -- is your civil claim affecting your testimony here today?

A.   No.

Q.   Are you testifying today because you hope to get a benefit from the Government?

A.   No.

Q.   Does the Government promise you any benefit?

A.   Nope.

Q.   At some point, did FBI agents call you about this investigation?

A.   Yeah, they did.

Q.    Did you want to talk to them?

A.    Not in any way, shape, or form, and I told them that about six times.  Because I was a hundred percent certain that they could not make me, because I was certain that they could not get a subpoena to prove I had anything to do with this.

Q.    Why didn't you want to talk to them?

A.    I've never been in trouble before I got my felony conviction.  I have two kids.  One of them is special needs.  I work full time.  I go to school full time.  I have a lot going on in my life.

     And everything that happened at Dublin is -- is past.  It's gone.  I did what I was supposed to do.  I did my time.  I did it exactly the way I was supposed to.  I never got in trouble when I was there.  I wasn't in the drama.  I just wanted to do my time and go home to my kids, and I did that.  And I have my kids and I have a home, and I -- and I'm doing everything I'm supposed to do.

     The last thing I wanted to do was get wrapped up in this mess, in all of this.  I just want -- I just wanted to be left alone.

Q.    Eventually, did you talk to agents?

A.    I was made to.  They subpoenaed me.

Q.    Did you ask for a proffer agreement?

A.    I did.

Q.    What is your understanding of the purpose of a proffer

agreement?

**A.**   Basically, I asked for the proffer agreement because I was under the impression that I could ask them that whatever I said could not be used against me so I couldn't get in trouble.

**Q.**   Why did you -- why did you want a proffer agreement?

**A.**   Because I didn't want to get in trouble for having this relationship.

**Q.**   Why were you afraid of getting in trouble?

**A.**   Because Mr. Garcia told me that I could get in trouble for having a relationship with him.

**Q.**   You were released from FCI Dublin in September of 2020; is that right?

**A.**   I was.

**Q.**   Where did you go when you were released?

**A.**   To the Cordova Center in Anchorage.  It's a federal halfway house.

**Q.**   Prior to your release, did the defendant make any comments about wanting to see you after your release?

**A.**   He did.

**Q.**   What did he say?

**A.**   He asked for my travel plans so that he could meet me at the airport.

Back when COVID had started, I guess he was, like, on some special committee or something for, like, infection control and was traveling a lot during COVID.

And after the initial lockdowns, they started to do -- I guess you could call it compassionate releases. They were trying to get people out of prison that met certain specifications.

And in that first group of people, I was on it and I didn't -- I didn't know that. They didn't tell us that. But he did tell me that. I was not able to be released in that group of people because you had to have an address. I did not.

But since he was about to go out of town for an unknown amount of time, he gave me an email address and asked me to contact him; if he wasn't back by the time I left, to email him at that email address.

Q.   What was that email address?

A.   Rememberpockets@gmail.com.

Q.   So when, approximately, did he give you that email address?

A.   We got locked down in March, I think, so it would have been like April, May, maybe.

Q.   After you were released in September, did you email the defendant using that email address?

A.   I did.

Q.   Did the name of the email have any significance to you?

A.   Yes.

Q.   What was it?

A.   Because the first time he had ever made a comment to me

that was, you know, just outside of casual conversation was about my ripped pocket.

Q.   Did you communicate with the defendant after your release in any other fashion?

A.   Yes.

Q.   How did you communicate with him?

A.   We texted, we talked on the phone a couple of times, and we had video chats.

Q.   Did the defendant tell you what kind of phone he was using to communicate with you?

A.   It was a prepaid phone.

Q.   Did he tell you why he used a prepaid phone?

A.   He said that the only phone that he had ever had was a government-issued phone, and he didn't want to talk to me on that so they couldn't trace my number.

Q.   Did you use your phone number to communicate with him?

A.   Eventually I did, but when I first got out, I used my roommate's phone.

Q.   What was your roommate's phone?  Or, I'm sorry, what was your roommate's name?

A.   Dorothy.

Q.   And that was your roommate at the halfway house?

A.   Yeah.

Q.   You said you video chatted with the defendant.

     What happened during those video chats?

**A.**    During the video chats, he had asked me to undress, and while I undressed, he also undressed.  And then he had asked me to touch myself and show him while I was touching myself, and at the same time, he was doing the same.

MS. PRIEDEMAN:  Ms. Slattery, can you please pull up Exhibit 65.

Your Honor, I believe there is a stipulation to admit this exhibit.

THE COURT:  There is.  It will be admitted, but only to the jury can it be published.

(Government Exhibit 65 received in evidence)

**BY MS. PRIEDEMAN:**

**Q.**    Rachel, do you recognize this picture?

**A.**    I do.

**Q.**    What is it?

**A.**    That's me.

**Q.**    Do you see anyone else in the photograph?

**A.**    Mr. Garcia.

**Q.**    When was this photograph taken?

**A.**    During the video chats.

**Q.**    The video chats you just described?

**A.**    Yes, ma'am.

MS. PRIEDEMAN:  Ms. Slattery, can you please pull up Exhibit 67.

THE COURT:  All right.  Is there an objection to 67?

MR. REILLY:  May I have just a moment, Your Honor?

MS. PRIEDEMAN:  Ms. Slattery, can you take it down just for a second while...

MR. REILLY:  Yes, Your Honor, I would be objecting to 67.

THE COURT:  All right.  Let me get some foundation and then I can hear the objection.

BY MS. PRIEDEMAN:

Q.  Rachel, did you recognize that photograph?

A.  Uh-huh.

Q.  What is it?

A.  That's me and Mr. Garcia in the top corner.

Q.  When was that picture taken?

A.  During the video chats.

THE COURT:  What's the objection?

MR. REILLY:  Cumulative.

THE COURT:  Overruled.  It's admitted.

You can show it just to the jury.

(Government Exhibit 67 received in evidence)

MS. PRIEDEMAN:  Ms. Slattery, can you please pull it up and publish it to the jury.

Q.  Rachel, just to confirm, this is a photograph -- this is you pictured in the photograph with Mr. Garcia in the upper right-hand corner?

A.  It is.

**Q.**   And he's naked in the upper right-hand corner?

**A.**   He is.

        **MS. PRIEDEMAN:**  Ms. Slattery, can you please pull up Exhibit 83.

        **THE COURT:**  I'll get foundation on this one as well.

**BY MS. PRIEDEMAN:**

**Q.**   Rachel, do you recognize this photograph?

**A.**   I do.

**Q.**   What is it?

**A.**   It is the same video chats.

**Q.**   Are you in the picture?

**A.**   I am.

**Q.**   Who else do you see in the photograph?

**A.**   Mr. Garcia.

        **MS. PRIEDEMAN:**  Move to admit, Your Honor.

        **THE COURT:**  Any objection?

        **MR. REILLY:**  Same objection.

        **THE COURT:**  Overruled.  Admitted.

          (Government Exhibit 83 received in evidence)

        **MS. PRIEDEMAN:**  May we publish just to the jury, Your Honor?

        **THE COURT:**  You may.

**BY MS. PRIEDEMAN:**

**Q.**   Rachel, is this you in this photograph?

**A.**   It is.

Q.    Is that the defendant in the upper right-hand corner?

A.    It is.

Q.    Is this during one of the video chats that you just discussed?

A.    Yes, ma'am.

        MS. PRIEDEMAN:  Ms. Slattery, can you please take down the photograph.

Q.    Rachel, did the defendant ask you if he could record these conversations?

A.    No.

Q.    Were you aware if he was recording these conversations?

A.    No.

Q.    Would you have allowed him to record these conversations?

A.    Not ever.

Q.    Why not?

A.    Because that's -- I had already previously said no.  If I previously said no, I damn sure wouldn't allow him to record those video chats.  The first time I saw those pictures was under subpoena.  I had no idea they existed.

Q.    When you say that you had previously said no, what are you referring to?

A.    When he brought the camera to CMS and asked me to take pictures and I flipped out on him.  I'm pretty sure the "fuck you" should have been enough, and I specifically said no.

Q.    At some point, did you stop communicating with the

defendant?

A.    I did.

Q.    And just to clarify, these -- the photographs that we just looked at, were those taken when you were still at the halfway house?

A.    Yes, ma'am.

Q.    Why did you stop communicating with the defendant?

A.    He had told me that -- he had told me that he was concerned because the investigation -- people were asking a lot of questions, and he had told me that he could never live with himself if I had gotten in trouble.

He said that I had a really bright future ahead of me, he was really proud of me for getting into the IBEW, and he didn't want to do anything to jeopardize my future, and if something happened, how would he take care of his son, and so on and so forth.

And he said, "We can still be friends."  And I said, "I'm not getting in trouble.  Like, I'm not getting in trouble for anybody.  I don't know what the fuck you're talking about, but I don't need any more friends.  Fuck you."  And I hung up the phone and then I threw the phone in a trash compactor.

Q.    Did the defendant tell you about another former inmate that had gotten in trouble?

A.    Yes.

Q.    What did he tell you?

**A.** He had told me about the girl that Officer Klinger had transferred for. And he told me that she was in the halfway house and they found photos of Officer Klinger on her phone and that they violated her probation for that, and that she was, at that moment, on her way back to Dublin.

**Q.** How did that make you feel when he told you that?

**A.** It scared me. It terrified me.

**Q.** What were you scared of?

**A.** Going back to jail.

**Q.** Rachel, do you see the man that kissed you and grabbed your butt at FCI Dublin and who you had the naked video chat with in this courtroom?

**A.** I do.

**Q.** Can you please identify him?

**A.** He's sitting over there at the defendant's table.

        **MS. PRIEDEMAN:** We ask that the record reflect that the witness has identified the defendant.

        **THE COURT:** So reflected.

        **MS. PRIEDEMAN:** No further questions, Your Honor.

        **THE COURT:** Okay. Cross-examination.

                    **CROSS-EXAMINATION**

BY MR. REILLY:

**Q.** All right. Good morning, Rachel.

**A.** Good morning.

**Q.** I also will refer to you by your first name. Not meaning

to be impolite, but it's to protect your privacy.

A.    Yes, sir.

Q.    You -- you indicated that you were at Dublin from 2016 to 2020?

A.    I was.

Q.    And when was it that you first met Mr. Garcia?

A.    First met him or first interacted with him?

Q.    First met him.

A.    The first time I met him -- I mean, I lived at FCI Dublin, he was transferred there, and I never had any communication with him until May of 2019.  He was there, but I never spoke to him.

Q.    Okay.  And then you had this conversation in which you talked about your friend Bailene [sic]?

A.    Bailey.

Q.    Bailey?

A.    Yes, sir.

Q.    I'm sorry.  I misunderstood what you said.

      And that made you happy that he had had that conversation?

A.    It made me happy that he had a message for me from my friend.

Q.    And, in fact, throughout most of your contact with Mr. Garcia, the interchange -- interactions between yourselves were pleasant?

A.    Yes.

Q.    Friendly?

A.    Uh-huh.

Q.    Made you happy?

A.    Yes.

Q.    And then this time when you were working at CMS and he mentioned your pockets being ripped, when did that take place?

A.    I couldn't tell you specifically.

Q.    Approximate?

A.    I have no idea, sir.

Q.    Certainly sometime after May of 2019.

A.    That is correct.

Q.    Would it have been still in 2019 at some point?

A.    I'm not sure, sir.

Q.    So it could have been in 2020 early?

A.    Quite possibly.

Q.    And then after that particular comment, you said that he began making other comments about your appearance?

A.    That is correct.

Q.    And did you tell him not to do that?

A.    No, sir.

Q.    Or take exception in any way?

A.    I'm not sure what you mean.

Q.    Were you offended by those comments?

A.    No, sir.

Q.    Actually, you kind of enjoyed them; right?

**A.** I did. Like I said, I had been in jail since 2015. Male attention makes women feel good.

**Q.** And then you said that you felt like you had a connection based on those kinds of conversations and conversations about your children?

**A.** I believe I just said about our children.

**Q.** Okay. Did you feel that these other comments created a connection of any kind?

**A.** I'm not sure.

**Q.** Has your perception of those initial contacts changed over time?

**A.** What do you mean?

**Q.** You described several occasions subsequently where you reacted angrily to things that he said or did.

**A.** Correct.

**Q.** Did those subsequent events that made you angry affect the way you felt about your earlier conversations and contacts?

**A.** Not particularly.

**Q.** You're still angry with him now; right?

**A.** Oh, I am absolutely angry with him now. I wasn't, really, until I saw the photos that he took without my permission, and then I got angry again, like I feel like I have the right to, being as I didn't know those photos were being taken.

**Q.** Those video chats, how often did that happen?

**A.** I'm not sure.

Q.   More than a couple?

A.   I don't believe so.

Q.   Were you able to see the inset video of him while those were taking place?

A.   I could see him, yes.

Q.   And were you -- did you appear in an inset on your phone the way he appears on his?

A.   Yes.

Q.   And I take it that the fact that you were engaging in these video chats, in and of itself, you did not find that offensive?

A.   No.  I found it uncomfortable, but not offensive.

Q.   These video chats were uncomfortable for you?

A.   Uh-huh.  And I told him that, too, in those video chats when he was asking me to do those things, that it made me uncomfortable.

Q.   You otherwise enjoyed them, though, did you not?

A.   Is that relevant?

Q.   Did you?

A.   Is it relevant?

Q.   I don't hear any objection, so did you?

        MS. PRIEDEMAN:  Objection, Your Honor.  Relevance.

        THE COURT:  Mr. Reilly, relevance?

        MR. REILLY:  I'll withdraw the question.

Q.   You were smiling in a lot of those pictures, weren't you?

A.    I'm not sure.  I looked at a couple of them, and then I slammed the computer shut.

Q.    And then you did what?

A.    I looked at a couple of them when I was shown the photos, and then I slammed the computer shut.  And I don't believe my face is in all of them.

Q.    At the time that those video chats were taking place, were you still feeling as though the two of you might get together at some point?

A.    Uh-huh.

Q.    And you were at this halfway house then?

A.    I was.

Q.    And that was in Alaska?

A.    Yes.

Q.    Did you ever ask or encourage him to visit with you up there?

A.    Yeah.

Q.    All right.  We'll come back to that.

      When you were at CMS during the COVID lockdown, you said there were fewer inmates who were participating in the activities at CMS?

A.    Working at CMS?

Q.    Working, yes.

A.    Correct.

Q.    But the number of staff people didn't change, did it?

**A.** It did change, because, as opposed to a normal day at CMS, inmates were not free to move around the compound with a work pass. They had to be accompanied by their foreman.

And so the people that were there could not move freely around the compound, they had to be escorted, which decreased the number of officers at CMS because they were out with that crew.

**Q.** Going -- for the work purposes.

**A.** Correct.

**Q.** But the number of staff assigned to CMS was still the same.

**A.** It was not. They also had to pool CMS officers. Every officer did a shift in a housing unit weekly, so there would be multiple officers gone from CMS at a time assigned to a housing unit or other work detail.

**Q.** Do you know how many staff personnel there were assigned to CMS?

**A.** No. I mean, I could count them if you wanted me to.

**Q.** Okay. Quite a few, though, weren't there?

**A.** No.

**Q.** No? Fifteen?

**A.** Not even close.

**Q.** You never saw 15?

**A.** 15 CMS officers?

**Q.** Yes.

**A.**   No.

**Q.**   Would it surprise you to know that there were 15 assigned to that particular function?

**A.**   Yeah, it would.

**Q.**   And that there were also four administrative staff members there?

**A.**   That would definitely surprise me.

**Q.**   You didn't ever see administrative staff members there?

**A.**   I absolutely saw administrative staff members there.

**Q.**   You did?

**A.**   Yes, sir.

**Q.**   Okay.  As many as four?

**A.**   I can count three, and I can name them for you, too, if you would like.

**Q.**   This incident that you described where you were at CMS and Mr. Garcia made contact with you, you referred to as -- the situation then as being unmonitored.

**A.**   I don't know which time you're referring to.

          **MS. PRIEDEMAN:**  Objection, Your Honor.  Relevance.

          **MR. REILLY:**  It's her testimony.

          **MS. PRIEDEMAN:**  And misstates the witness' testimony.

          **THE COURT:**  Okay.  I didn't hear what you said, Mr. Reilly.

          **MR. REILLY:**  What I said was I'm referring to her testimony today.

THE COURT:  Hold on.

Why don't you rephrase it so that there's some clarity.

MR. REILLY:  All right.  All right.

Q.  You indicated that CMS has no cameras --

A.  That is correct.

Q.  -- correct?

And the word you used to describe that situation then was "unmonitored"; is that right?

A.  I don't believe I used the word "unmonitored."

Q.  Did you feel as though it was unmonitored?

A.  No.

Q.  And why was that?

A.  Because there were still people coming in and out.

Q.  The CMS staff?

A.  Uh-huh.

Q.  Administrative staff?

A.  Correct.

Q.  And even after COVID, a few other inmates, not too many.

A.  Correct.

MR. REILLY:  Ms. Slattery, if we could have Exhibit 227, please.

Q.  This is the electrical shop --

A.  It is.

Q.  -- where you said this incident took place?

A.  Which incident?

Q.    Where he touched you on your butt.

A.    That is correct.

Q.    Okay.  And the door has a window in it?

A.    It does.

Q.    And -- and I think you said he kind of pushed the door closed three-quarters of the way, and so that means someone walking by could still see through the part of the door that was not closed yet, could also see into the room through the window in the door; right?

A.    That is correct, uh-huh.

Q.    And then at the back of the room, there are some other windows, aren't there?

A.    There is.

Q.    Do you know what's on the other side of those windows?

A.    My boss' office.

Q.    CMS supervisors or --

A.    Yes, officers.

Q.    COs --

A.    Yes.

Q.    -- correctional officers.

       And how many people work in that particular office, do you know?

A.    One.

Q.    And is that office manned at all times?

A.    No.

Q.   Do you know whether or not there was someone in there on the date that this took place?

A.   There was nobody in there.

Q.   You saw that for sure?

A.   That is correct.

MR. REILLY:  And then could we have, Ms. Slattery, 228, please.

Q.   Now, you indicated that -- or strike that.

Tell me where in this photo you were standing when Mr. -- Mr. Garcia made contact with you.

A.   I wasn't standing anywhere in this photo when he made contact with me.

Q.   You were not in this part of the office at all?

A.   I was not.

Q.   And where, with respect to this photo, were you?

A.   Behind the full -- behind where the person taking the photo is standing.

MR. REILLY:  Okay.  Can we see 229.

Q.   Does this show the area where you were standing?

A.   It does.

Q.   And so this photo -- the previous photo was taken by someone standing perhaps by that doorway; is that what you're saying?

A.   Yes, sir.

Q.   Okay.  And the window to the CMS supervisor's office is to

the left of this photo along the wall where that bookcase is; correct?

**A.**   Correct.

**Q.**   And you said you were backed up at which part of this photo?

**A.**   On the left-hand side of the photo where that chair is in front of the mirror.

**Q.**   And were you touching the chair?  Was -- well, strike that.

Was the chair there at the time?

**A.**   No.

**Q.**   No?  So were you backed up against the bookcase?

**A.**   Uh-huh.

**Q.**   Is that what you're saying?

And the door in this photograph is the same door that we were talking about in the original photo that we looked at; correct?

**A.**   It is still the same door.

**Q.**   The one you come into.  It's the only door to that --

**A.**   It's the only one, uh-huh.

**Q.**   You have to wait until I finish the question, because the court reporter has to take down both my questions and your answers.  Okay?

And as I recall, I think you said you liked it when this happened; correct?

**A.** Is that relevant?

**Q.** You answered the question for the prosecutor. Do you not want to answer it for me?

**A.** Do you need me to answer it again?

**Q.** I want to confirm what you said.

**A.** I did say that.

**Q.** Okay. And you also mentioned something else about the visitation room.

**A.** I did.

**Q.** And the fact that you're aware that even Mr. Garcia could not get into that room without being granted access by a staff member, correct --

**A.** Correct.

**Q.** -- a guard.

When -- when did that conversation about the visitation room take place? Was that before or after the --

**MR. REILLY:** I'm sorry. You can turn off the photograph, Ms. Slattery.

**Q.** Was that before or after the incident that took place in that CMS room?

**A.** Before.

**Q.** And you said that Mr. Garcia told you that the cameras were not working?

**A.** That is correct.

**Q.** When did that take place?

A.    I'm not sure.

Q.    Was that before or after this incident in the CMS room?

A.    Before.

Q.    Did you have conversations about the visitation room after that happened?

A.    No.

Q.    Did you ever go to the visitation room with him?

A.    I did not.

Q.    When -- strike that.

      After the incident in the CMS room, did you feel as though you wanted to report that?

A.    No.

Q.    Now, you told us on direct examination that there's no one to report to that you thought you could do without getting in trouble yourself; correct?

A.    That is correct.

Q.    That if you made a report of some kind, that you would either get shipped to the SHU or maybe transferred to another facility?

A.    That is correct.

Q.    Okay.  Was that a concern for you at the time -- excuse me -- at the time that you were having these conversations with Mr. Garcia?

A.    I'm not sure what your question is, what you mean by that.

Q.    Okay.  What I -- what I'm trying to get at is your concern

about being shipped to the SHU or perhaps transferred, was that a result of your having these conversations with Mr. Garcia and then, ultimately, as you say, him touching you in the CMS room?

A.   That is correct.

Q.   And why was that a concern for you?

A.   Because that's what happens there.  When you have a relationship with an officer, the inmate gets shipped, not the officer.

Q.   All right.  Did you have some reason to believe that there was a danger that this would be reported by someone else and that you would get in trouble for it?

A.   I did.

Q.   Did you think Mr. Garcia was going to report you?

A.   No, I did not, but I had multiple comments made to me by inmates and officers about the amount of time that he spent coming around CMS, about the amount of time he spent actually working with the electrical crew.  People thought it was weird that the associate warden was up on scaffolding helping us change lights, because that's not something executive staff typically does.  And multiple people had asked me if there was a relationship there.  So I absolutely was afraid of that.

Q.   The -- the hallway in the CMS area that is just outside that room, the equipment room that you were in, is that hallway open to any of the inmates who happen to be working at CMS at that time?

**A.**    It is not.  There are red lines, which means you are not supposed to use that hallway unless you are authorized to.

**Q.**    And so when you went into that room, you had specific authorization to go there?

**A.**    I am authorized to be in that room.

**Q.**    Is that a blanket authorization?

**A.**    It is.

**Q.**    And are there others who have a blanket authorization as well?

**A.**    The electrical crew.

**Q.**    Okay.  So I guess I wasn't clear enough.

Any member of the electrical crew, then, who happens to be working in that building could walk down that hallway at any time.

**A.**    If there had been other members of the electrical crew working at that time, they could have.  However, I was the only one working.

**Q.**    I thought you said there were three or four others besides yourself who were working at that time?

**A.**    At the time that he kissed me and grabbed my butt?

**Q.**    Yes.

**A.**    Three or four other inmates not on my crew.  There was only one person from each crew.  I was the only electrician that was working during COVID.

**Q.**    And so these other inmates who were working, would they

have access to that room as well?

A.   Sure.

Q.   Okay.  So there was a -- there was no reason that anyone who happened to have authorization to be there could not have just walked into the room, then.

A.   So the issue there is that it was a locked compound. Nobody was free to -- to move around the compound.

So, no, no other electrician could have walked in at that time, because the compound was closed.  My boss had to come pick me up and escort me to CMS.  The other CMS workers that were there had to be picked up by their bosses and escorted to CMS every day.

Q.   Okay.  But once you were brought to that building by your boss --

A.   Uh-huh.

Q.   -- then you were free to move about the building as you normally would; correct?

A.   Correct.

Q.   And that would be true of anyone else who happened to be -- even if they weren't electricians, if they were brought to that facility for some reason by their boss, could do the same thing.

A.   Yes, if they were allowed to go down that hallway, which they're not.

Q.   But they could be authorized to do that, couldn't they?

**A.**   They are not authorized to do that because they are not on the electrical crew.

**Q.**   Their bosses couldn't say, "Go get me something from that room"?

**A.**   If it's a direct order, of course they can do it.

**Q.**   Okay.

**A.**   But their bosses wouldn't do that.

**Q.**   How do you know that?

**A.**   Because you don't go into another shop and take items without them knowing about it.  That's not how that works. They wouldn't just send them back there.

**Q.**   The occasions on which he asked you to undress while you were still there at Dublin, you said no --

**A.**   Uh-huh.

**Q.**   -- correct?

And yet once you were at the halfway house, you were willing to do that.

        **MS. PRIEDEMAN:**  Objection, Your Honor.  Relevance.

        **THE COURT:**  Overruled.  He's allowed to cross-examine on a topic that you opened.

        **THE WITNESS:**  That is correct.

BY MR. REILLY:

**Q.**   Okay.  And how often did that happen?

**A.**   How often did what happen?

**Q.**   That you engaged in a video chat with him in which you

were undressed.

A.    I believe I already stated that I was unsure how many times we had video chats.

Q.    Okay.  I'm trying to clarify that for us.

You said more than once; correct?

A.    Yes.

Q.    Several times?

A.    I'm not sure.  I'm still not sure.

Q.    More than five?

A.    It doesn't matter how many times you ask me, I'm still not sure.

Q.    You said that he showed you some photos that you recognized as having been taken in the warden's complex?

A.    That is correct.

Q.    And what was it that caused you to think that that was the case?

A.    Because I had just recently changed out all the lights in the warden's complex and I've seen the bathroom in the warden's complex.

Q.    Okay.  And what was it about the bathroom that made you think that those photos were taken there?

A.    The floor, the baseboard, trim, and the fact that it's right outside of his office.

Q.    Okay.  And that -- so that's an assumption on your part about it being close to his office.

A.    It is not.  I've been there.  I've been in his office and changed the lights in his office, and it is literally right outside his door.

Q.    I didn't answer that question very well -- or ask it, rather.

What I meant was it's an assumption on your part that that's where it was taken.

A.    It is not.

Q.    It is not.

A.    There is not other places in the institution like that that have that baseboard trim, that tile.

Q.    Uh-huh.  That tile is actually fairly common, isn't it?

A.    It is, yeah.

Q.    And so are the baseboards.

A.    No, that color baseboard is not.

Q.    Not common anywhere in the world?

A.    We weren't anywhere in the world.  We were locked inside FCI Dublin.

Q.    You were, but he wasn't.

A.    Correct.

Q.    So he could have taken that picture anywhere that happened to have that same floor and those same baseboards, couldn't he?

A.    He sure could have.

Q.    So the conclusion that you drew that it was taken in the warden's complex was an assumption on your part.

**A.**   Sure.   I guess I'm not sure why it matters where he took the photo, but it is an assumption on my part.

**Q.**   Okay.   And I think you said he showed you those pictures a couple of times very quickly?

**A.**   Uh-huh.   I said he showed me two photos very quickly.   I didn't say that he showed them to me a couple of times.

**Q.**   Was that two photos in the same incident --

**A.**   No, sir.

**Q.**   -- at the same time?   Two separate times?

**A.**   Uh-huh.

**Q.**   And was that before or after this incident that you claim happened at the CMS office?

**A.**   Before.

**Q.**   You mentioned that he wore a white shirt most days.

**A.**   Yep.

**Q.**   Is that a characterization that you used with others?   In other words, did you ever say to someone, "Hey, Mr. Garcia's like a white shirt guy"?

**A.**   No.

**Q.**   And then you said you had some brief conversations with the inmate Melissa?

**A.**   I did.

**Q.**   But you did not consider yourself to be a friend of hers.

**A.**   We were not friends.

**Q.**   Did you ever have any conversation while you were talking

with her about Mr. Garcia?

A.   No.

Q.   About when did those conversations with Melissa take place?

A.   I have not the slightest clue.

Q.   Do you know if it was before or after the event that you described at CMS?

A.   No.   There was nothing eventful about the conversations.

Q.   And did you at some point become aware that Melissa was making accusations against Mr. Garcia?

A.   No, not until it came out in the newspapers and I started reading it and I put two and two together.

Because I had previously talked to Mr. Garcia about his interactions with Melissa and told him that I thought he was in a relationship with her.

Q.   When did that conversation take place?

A.   I'm not sure.

Q.   But, obviously, while you were still at Dublin?

A.   Correct.

Q.   Not after you had already gone to the halfway house?

A.   No.

Q.   You indicated that there are a couple of considerations involved in this case as far as you're concerned, one being that you filed a tort claim?

A.   I'm not sure what you mean.

Q.    Okay.  Let me just rephrase it this way.

You filed a tort claim; correct?

A.    I did.

Q.    And it's your understanding, is it not, that the likelihood that your tort claim will succeed and/or that you will get an award of damages of some kind could be affected by both your testimony in this case and the result as far as Mr. Garcia's concerned.

A.    Can it?

Q.    Have you discussed that at all with anyone?

A.    I have not.

Q.    So you don't have any idea whether or not your cooperation here could affect your civil case?

A.    I wouldn't call what I'm doing here cooperation.  I'm here under a subpoena.  This is my second one.  Because I didn't ask to be here, I don't want to be here, and I told the feds to leave me alone about a half dozen times before they subpoenaed me to be here.  So I wouldn't necessarily call it cooperation.

Q.    Okay.  Let me rephrase the question, then.

Do you understand that your participation in this case as a witness could have some effect on the results of your tort claim?

A.    I do not.

Q.    And do you have any -- you're still on supervised release; right?

A.   I am.

Q.   And it's your understanding that if you violate the terms of your release in some way, you could be returned to custody?

A.   That is correct.

Q.   Is it your understanding that by testifying in this case, you also reduce the likelihood that that would happen?

A.   I'm not sure what you mean.

Q.   That by cooperating, it makes it less likely that you're going to be returned to custody for some reason?

A.   I won't be returned to custody for any reason, regardless of my testimony in this case.

Q.   And how do you know that?

A.   Because I don't do anything wrong.

Q.   Okay.  You could --

A.   I could not.

Q.   Let me finish the question.  Okay?

You could be returned to custody based on your conduct with Mr. Garcia, could you not?

A.   No, I cannot.

Q.   That was a violation of your rules, wasn't it?

A.   It is not.

Q.   You were not supposed to have contact with any members of the BOP staff at Dublin after you were released to the halfway house, were you?

A.   I have never read that in my conditions of release,

actually.

Q.   And you knew it was -- strike that.

Is it your understanding that refusing to cooperate in this situation could be a basis for you to be returned to custody?

A.   It is not.  Refusing to cooperate before I was under a subpoena would not violate me.  Because when the feds first called me, I told them, "I'm not going to talk to you.  I need to call my probation officer."

The next call I made was to my probation officer, who said, "You are absolutely not obligated to talk to them just because you're on probation.  If you want to talk to them, you can; if you don't want to, you have the free choice to tell them no," which I then did --

Q.   Okay.

A.   -- six times.

Q.   Then when you went to the halfway house, Mr. Garcia gave you this email address to contact him?

A.   He did.

Q.   And you did that; right?

A.   I did.

Q.   Do you have any idea how often you contacted him by email there?

A.   I'm pretty sure it was just the once, and then we exchanged phone numbers and we texted and talked on the phone

and video chatted.

Q.   You never used that email address to send him photos of yourself?

A.   Photos of myself naked?  What kind of photos?

Q.   Any photos of yourself.

A.   I'm not sure.

Q.   Well, if you only used it once, did you send him photos in that one email?

A.   I don't know.  I don't know.

Q.   Did you send that email from an email account that you still have?

A.   I did.

Q.   Did you review the past emails that you sent out of that account to him before coming to court to testify?

A.   No.

Q.   Would it be fair to say that you never used that account to send him naked photos of yourself?

A.   That would be fair to say.

Q.   And you said also that you texted with him?

A.   Uh-huh.

Q.   And was that using that same email address?

A.   You don't use an email address when you text.

Q.   Okay.  What are you using to text with him?  Phone number?

A.   That's how you send a text message.

Q.   And was that phone number one that he gave to you?

A.    I'm not sure what you mean.

Q.    How did you make contact with him by text message?

A.    I'm not sure what you mean.  What --

Q.    Well, you sent him text messages.

A.    I did.  I sent him text messages.

Q.    How did you accomplish that?

A.    He gave me his phone number.

Q.    Okay.  And was that the same phone number that you used to do the video chats?

A.    The video chats were done over an app.

Q.    What app was that?

A.    I'm not sure.

Q.    Was that an app that you put in specifically for that purpose on your phone?

A.    I don't know.  I don't know what app it was.

Q.    In order to do that, you both have to have the app; right?

A.    That is correct.

Q.    Okay.  So you must have the app on either your phone or your computer?

A.    I didn't have a computer.

Q.    All right.  So you had it on your phone.

A.    Uh-huh.

Q.    Did you put the app on your phone?

A.    I don't remember.  Some phones come preloaded with certain apps.

Q. And you don't remember what app this was?

A. (Witness shakes head.)

Q. During these video chats, how often did those occur where you were undressed?

A. I don't understand what you mean.

Q. Well, you had at least one video chat in which you were undressed, and we saw pictures that were screenshots from that; right?

A. Okay.

Q. How often did that happen?

A. I still don't know how many video chats I had with him.

Q. Over how long a period of time did they take place?

A. I have no idea.

Q. And the -- at the -- at some point, Mr. Garcia suggested to you that you stopped having contact; correct?

A. That is correct.

Q. And I think you said he -- he told you he wanted to do that so that you would -- it would not jeopardize your future.

A. He actually told me he wanted to be friends.

Q. Okay.

A. I don't know if that's the same thing as stopping contact.

Q. In any event, he did tell you that he wanted to do that because he didn't want to jeopardize your future?

A. That is correct.

Q. And you threw away the phone at that point?

**A.**   Uh-huh.

**Q.**   Did you throw the phone away because you were angry with him?

**A.**   No.

**Q.**   Why did you throw it away?

**A.**   Because I was afraid if somebody found the phone, that I would get in trouble.  Because he had just got done telling me that the halfway house staff went through the phone of the inmate, found the evidence that she was having a relationship with an officer, and violated her and sent her back to prison.

**Q.**   And that was the reason he was saying that he didn't want to jeopardize your future, then, I take it; is that right?

**A.**   I can't tell you what he was thinking.

**Q.**   He didn't tell you?

**A.**   Just what I already told you.

**Q.**   He told you this other thing had happened and, "Hey, maybe we better stop, too, so you don't get in trouble"?

**A.**   No.  He said, "We can be friends."

**Q.**   I understand that, but stop doing these --

**A.**   He never --

**Q.**   -- video chats.

**A.**   -- told me that.  He said we could be friends.

**Q.**   He didn't tell you he wanted to stop doing video chats?

**A.**   No, not ever.

**Q.**   Did you tell him you wanted to stop?

**A.**   I said, "I don't need any more friends."

**Q.**   All right.   That really doesn't answer the question.

Did you tell him you wanted to stop doing the video chats?

**A.**   At what point?

**Q.**   At any point.

**A.**   No.

**Q.**   Before Mr. Garcia told you about it, were you aware of the investigation into Correctional Officer Klinger?

**A.**   No.

**Q.**   Did you know the inmate that he was associated with that got him in trouble?

**A.**   Well, there's several.

**Q.**   I'm sorry?

**A.**   There's multiple.

**Q.**   Did you know any of them?

**A.**   I did.

**Q.**   Did you ever have conversations with them about Mr. Klinger?

**A.**   No.   I wasn't friends with her.

**Q.**   Have you, since your release to the halfway house, had contact with any of the other inmates that are still in custody?

**A.**   Yes.

**Q.**   And how have you accomplished that?

**A.**   Through email.   Sometimes they would call.

MR. REILLY:  Thank you.  That's all I have at this time, Your Honor.

THE COURT:  Redirect?

MS. PRIEDEMAN:  No redirect, Your Honor.

THE COURT:  Okay.  Is there any need for recall?

MS. PRIEDEMAN:  No, Your Honor.

MR. REILLY:  Your Honor, I would ask that this witness be -- remain on call.

THE COURT:  All right.

Rachel, you may step down, but you are subject to recall.

THE WITNESS:  Yes, ma'am.

THE COURT:  Next witness.

MR. PAULSON:  Your Honor, the Government calls Dr. Maegan Malespini.

THE COURT:  Okay.  While we are waiting, let me just let the jury know something.

In criminal trials -- I just learned that the binders you were given contain a form in it that I use in civil trials.  I don't ever use those in criminal trials.  It's just a different kind of case, so I don't let jurors ask questions during criminal trials.  So we're going to pick up those forms from you, and I'll just really leave it at that.  So you can't ask questions in a criminal trial.  Okay?

Kelly, if you will just go and grab the extra forms.

And I apologize for that.  My -- Judge Jensen had a

courtroom deputy who had been his courtroom deputy for 25 years and she was my courtroom deputy for 10 years, and I got a brand-new courtroom deputy who had never done a criminal trial and so he just automatically put the form in that we always use for civil trials.  So I apologize for that.

Okay.  Go ahead.  Let's...

THE CLERK:  Please raise your right hand.

**MAEGAN MALESPINI**,

called as a witness for the Government, having been duly sworn, testified as follows:

THE WITNESS:  I do.

THE CLERK:  Thank you.  Please be seated.

Please speak clearly into the microphone.  Please state your first and last name and spell it for the record.

THE WITNESS:  Yep.  Maegan Malespini.  That's M-A-E-G-A-N, last name M-A-L-E-S-P-I-N-I.

THE COURT:  Good morning.

THE WITNESS:  Good morning.

THE COURT:  You may proceed.

MR. PAULSON:  Thank you, Your Honor.

**DIRECT EXAMINATION**

BY MR. PAULSON:

Q.   Good morning, Dr. Malespini.

A.   Good morning.

Q.   Where do you currently work?

**A.**    I'm a clinical psychologist for the Federal Bureau of
Prisons, and I work out of the Southeast Regional Office.

**Q.**    How long have you worked for the Bureau of Prisons?

**A.**    For 12 years.

**Q.**    When did you start there?

**A.**    I started in October of 2010.

**Q.**    What is your current position?

**A.**    So currently, I am the southeast regional psychology
treatment program coordinator and the acting national PREA
coordinator.

**Q.**    How long have you been the acting national PREA
coordinator?

**A.**    Since December of 2020.

**Q.**    And just to clarify, by "PREA," are you referring to the
Prison Rape Elimination Act?

**A.**    Yes.

**Q.**    What are your duties as the acting national PREA
coordinator?

**A.**    So I serve as the subject matter expert for all
PREA-related matters for the agency.  So that means serving as
like a point of contact for local institution PREA compliance
managers, regional PREA compliance managers, developing
training guides for institutions to use, and really just being
that person that people can reach out to when they have
PREA-related questions.

Q.   Are you involved in policy?

A.   Yes.

Q.   How are you involved in policy?

A.   So I interpret policy for audits and program reviews, so if people have questions about that.  I also keep track of any updates that need to be made to policy to have them submitted for revision.

Q.   Prior to your current position, what -- what positions did you hold within the Bureau of Prisons?

A.   So I started in the Bureau of Prisons as a psychology intern, so in 2010 in Tallahassee.  I then was a staff psychologist at FCI McKean; a drug program coordinator, also at FCI McKean in Pennsylvania.

I then served as a restrictive housing unit psychologist at USP Lewisburg.  I was a specialty program coordinator at USP Allenwood.  I was then the chief psychologist at the Federal Correctional Complex in Florence, Colorado and then the chief of risk reduction programs, which is how I became the acting national PREA coordinator, because in that role, I supervised the national PREA coordinator.

Q.   It seems like you've been to quite a few BOP --

A.   I have, yes.

Q.   -- prisons.

How many?

A.   I worked at five institutions plus headquarters and now

the regional office.

Q.   Just at a high level, what is the Prison Rape Elimination Act?

A.   So the Prison Rape Elimination Act of 2003 was bipartisan legislature passed to guide prisons and all correctional facilities in the prevention of prison sexual abuse.

Q.   Are BOP prisons required to have PREA policies and procedures?

A.   Yes.

Q.   Does that include FCI Dublin?

A.   It does.

Q.   What's the role of the associate warden in formulating and implementing those policies and procedures?

A.   So at every institution, one associate warden is designated as the PREA compliance manager.  And so that associate warden is responsible for oversight of PREA policies within that institution, ensuring that allegations are investigated, that trainings occur, that policies are being followed.

Q.   What about the -- if there are more than one associate warden assigned to a prison, what about the other associate warden?  What's that person's involvement?

A.   So the other associate warden, like all BOP staff, would still have responsibility in ensuring that PREA policies are followed.  They would really support that associate warden

that's serving as the PREA compliance manager.  If that associate warden is out, then the other one typically would serve in that role.

Q.   What's the role of the warden in formulating and implementing these policies and procedures?

A.   So the warden really has high-level oversight of all of those things.  And so the warden is the associate warden's supervisor, and so it would be the warden's responsibility to ensure that policies are current and up to date; when their institutions supplement, which is the local supplement to the national policy, ensuring that that has been approved -- the warden would be the person to sign that -- to oversee any audits, to ensure that the associate warden is following all the policies that are there for a PREA compliance manager.

Q.   You mentioned audits just now in your answer.

What are those?

A.   So PREA law requires that all correctional facilities undergo audits from an external auditor, and those external auditors come in and look at the institution's records and make sure that PREA policies are being followed.

Q.   How often are the prisons audited?

A.   Those occur on a three-year cycle.

Q.   Did FCI Dublin ever undergo PREA audits?

A.   Yes.

Q.   What happens during these audits?

**A.** So the audits consist of -- there is an on-site visit, so the external auditors come to the institution. They tour the facility. They look at all areas of the facility, and they're checking for things like are cameras in the right places, are there potential blind spots where sexual abuse could occur that's not being caught on camera. They review documentation.

They interview staff and inmates about PREA policies. They look for records of inmates who are found to be either at risk of predation or victimization. They interview those inmates as well.

They really have a comprehensive list of steps that they have to cover when they come for those audits.

**Q.** How long would an audit at a prison the size of FCI Dublin take?

**A.** Typically, two days of on-site visitation.

**Q.** What's the role of the associate warden in preparing for and conducting these audits?

**A.** So the associate warden serving as the PREA compliance manager would prepare all of the documentation that is requested by the auditors.

They would ensure that staff and inmates are aware of the upcoming audit, so in the weeks or months leading up to the audit, they would have to make sure that there were signs posted at the institution just letting everyone know that this audit was coming, to be prepared to be interviewed.

They really gather all the documentation, write the assurance memos talking about how each policy is being followed at their local facility.  They really serve as that kind of main point of contact for the auditor.

Q.   What happens when the auditors actually come to the prison?

A.   Yeah, so when the auditor gets to the prison, they have specific steps that they have to follow and a checklist of policies and procedures that they're looking for.

And so, typically, they start off with that tour, and so they're going to ask to see all areas of the institution.  That associate warden would escort them around, open any doors that they would like to see opened.  If they want to see specific cells or housing units, they would show them those areas.

They would then provide documentation for the auditor to review and provide people to participate in interviews.  And so if the auditor says, you know, "I need to talk to one inmate from every housing unit," then that associate warden would coordinate getting those inmates to an interview room to speak with the auditor.

And then same for staff.  So they might say, you know, "I want to talk to one medical staff member and one psychologist and one counselor," and then they would get those staff together.

Q.   What's the role of the warden in these audits?

**A.** So, again, the warden -- the warden oversees all of this, and so the warden is ultimately responsible for, at the highest level, making sure that everything that the associate warden is doing in that process is being done correctly and followed and making sure that all of those policies are -- are in place and being followed.

**Q.** It sounds like these audits are pretty rigorous, but in your experience, are they effective at preventing sexual abuse in prisons?

**A.** No.

**Q.** Why not?

**A.** So the audit -- the process is really looking at ensuring that the facility is complying with the policy. So things like if there was an allegation of sexual abuse, did they have the right documentation, were timelines followed, things like that.

And so institutions are not getting dinged on, like, how many incidents of sexual abuse are occurring, but instead, like, what did that response look like. And so to me, that makes it -- it's effective in terms of, like, a documentation audit, but potentially not effective in reducing the numbers of sexual abuse incidents.

**Q.** Are these audits surprises or do the prisons get advance notice?

**A.** They get advance notice.

**Q.** Who pays these auditors?

**A.**    The Bureau of Prisons.

**Q.**    Have you ever seen a prison fail a PREA inspection or audit?

**A.**    I have not.

**Q.**    Does the Bureau of Prisons have a PREA training program?

**A.**    We do.

**Q.**    Is that standardized across the entire Bureau?

**A.**    It is.

**Q.**    How often do Bureau of Prisons employees receive that training?

**A.**    So all employees, volunteers, and contractors have to receive PREA training at the very beginning of their time working in prison.  So for staff, that means within their first two weeks, they go through an initial two-week training, and PREA is a part of that training.

Contractors and volunteers have to go through that training before they ever have contact with an inmate, and then everyone also has to go through annual PREA refresher training as well.

And then there are other positions that would receive additional training when people get into those.

**Q.**    Tell the jury about that.

**A.**    So certain positions have different responsibilities when it comes to PREA, and so each person has a different role in that.

So like for a psychologist, we would go through victim advocacy training.  If you get promoted to be a lieutenant, you would go through training as being like the first responder and what your responsibilities are in terms of PREA as that responding lieutenant.  A captain.

An associate warden gets additional training in PREA when they get promoted to associate warden, again because now they have a different level of role in implementing PREA policies, and then again at the warden level.  When they go through warden familiarization training, there is a PREA component there, too.

Q.   Is there someone at the prisons who is responsible for administering these trainings?

A.   Yeah, so the associate warden who is designated as the PREA compliance manager is also responsible for those trainings.

Q.   What do those trainings involve?

A.   So, typically, they are in-person trainings that have a standard guide that is put out by my office, so I oversee that -- the PREA training program.

So every year for annual training, we put out a slide show that goes to every institution, and that's the slide show that they are required to present to all of their staff.

Q.   Do those trainings address sexual relationships between prison guards and inmates?

**A.**   They do.

**Q.**   What do the trainings say about that?

**A.**   That it's not okay, not to do that pretty explicitly, we don't engage in inappropriate relationships with inmates.

        **MR. PAULSON:**  Ms. Slattery, can you pull up Exhibit 346?

    And, Your Honor, this is a stipulated exhibit, so I'd move to admit it.

        **THE COURT:**  It's stipulated.

    No objection?

        **MR. REILLY:**  So stipulated.

        **THE COURT:**  All right.  It's admitted.

        (Government Exhibit 346 received in evidence)

        **MR. PAULSON:**  Your Honor, may I publish this to the jury?

        **THE COURT:**  You may.  It can be published to everyone.

**BY MR. PAULSON:**

**Q.**   Dr. Malespini, do you see that on your screen?

**A.**   I do.

**Q.**   What is this?

**A.**   This is the cover slide of the annual training from 2020 for PREA training.

**Q.**   Is this the training in 2020 that your office was responsible for putting together and disseminating?

**A.**   It is.

**MR. PAULSON:**  Ms. Slattery, can you go to the next page of the exhibit.

**Q.**  Dr. Malespini, can you please explain this slide to the jury.

**A.**  Yeah.  This slide is -- again, like I just said, we cover inappropriate relationships between staff and inmates, and this slide is designed to specifically say in no uncertain terms that sex between staff and inmates just cannot happen.  It cannot be considered consensual.

**MR. PAULSON:**  Ms. Slattery, can you go to page 4.

**Q.**  Dr. Malespini, can you please explain this slide to the jury.

**A.**  I can.

So one of the areas of focus for our training every year talks about boundaries between staff and inmates, and so the purpose of this slide was to talk about the different types of boundaries that staff can exhibit with inmates and what would be considered acceptable or unacceptable.

And so that "overinvolved" -- so the first bullet point that you see there -- is really giving examples of what would be considered inappropriate policy-breaking-type behavior that staff would demonstrate with inmates.

So like it says there, any type of boundary crossing, dual relationships, sharing personal information with inmates from staff, favoritism, and any type of sexualized conversation, and

just pointing out to staff that, again, none of that is considered okay.

MR. PAULSON:  Ms. Slattery, can you go to the last page, page 5.

Q.   Please explain this slide for the jury.

A.   So this slide is a requirement in policy.  And if you see there where it says "PS 5324.12," that is Bureau of Prisons' PREA policy.

And so in there, we're required to make sure that staff are aware that it is their duty to report any incidents of sexually abusive behavior that they become aware of and that they have a right to be free of retaliation for reporting that behavior.

Q.   Thank you.

MR. PAULSON:  Ms. Slattery, you can take that exhibit down.

Q.   Does the Bureau of Prisons maintain training records for all of its employees?

A.   We do.

MR. PAULSON:  Your Honor, at this time, I would like to pull up Exhibit 201.  That's also a stipulated exhibit, and I would move to admit it.

THE COURT:  Okay.

MR. REILLY:  So stipulated.

THE COURT:  It's admitted.

(Government Exhibit 201 received in evidence)

**MR. PAULSON:** May I publish this for the jury?

**THE COURT:** You may.

BY MR. PAULSON:

Q. Okay. Dr. Malespini, what is this?

A. This is an employee electronic training record.

Q. Is this the type of training records that the Bureau of Prisons keeps for each of its employees?

A. Yes.

Q. Whose training record is this?

A. This is Ray Garcia's training record.

**MR. PAULSON:** Ms. Slattery, can you bring the exhibit back up?

Q. On the first page there in the column the second from the right that says "Delivery Type," there -- there are three letters that say "ILT."

What does that mean?

A. That means that it was instructor-led training. So those would have been live, in-person trainings.

Q. Starting with this first page, can you point the jury to the instances when the defendant would have received training in PREA and/or sexually abusive behavior?

A. Yes. On page 1, the first one that stands out to me would be "Ethics." So ethics training covers sexually inappropriate relationships.

And then also "Addressing Inmate Sexual Misconduct," which is a few lines below that one, that also addresses inappropriate relationships.

MR. PAULSON: All right. Ms. Slattery, if you could go to the second page.

Q. Same question here. Do you see any instances here where the defendant received training in PREA and/or sexually abusive behavior?

A. I don't see any on this page.

Q. All right.

MR. PAULSON: Let's go to page 3.

Q. Don't worry, I'm not going to go through this whole document with you.

A. Thank you.

Q. Same question here.

A. Yeah, so the very first one would have been instructor-led PREA training, specific PREA training. That one, again, "Addressing Inmate Sexual Misconduct," appears again on this page and "Ethics" appears again on this page.

MR. PAULSON: Can you go to the next page, Ms. Slattery.

Q. Last time. Do you see any instances here where the defendant received training in PREA and/or sexually abusive behavior?

A. On this page, within the instructor-led associate warden

national training, there would have been PREA training involved within that one.  I think that's the only one on this page, though.

**Q.**    Is that the one dated June 13, 2019?

**A.**    Yes.

**Q.**    Who teaches the ethics trainings?

**A.**    Typically, wardens.

**Q.**    Wardens at the institutions where the training's given?

**A.**    Correct.

        **MR. PAULSON:**  You can take that down, Ms. Slattery.

**Q.**    When was PREA passed?

**A.**    The actual law was passed in 2003.

**Q.**    Prior to that, did Bureau of Prisons employees receive training on sexual relationships with inmates?

**A.**    I believe so.

**Q.**    What did that training say about those types of relationships?

**A.**    My understanding is that the training has always said that there are no circumstances where it is acceptable for a staff member to engage in a sexual relationship with an inmate.

**Q.**    I want to switch gears here just a little bit.

        Are prison guards trained to do -- are trained on what to do if they see an inmate naked?

**A.**    Yes.

**Q.**    Did you conduct -- did you yourself conduct training on

this subject?

A.    I have.

Q.    When?

A.    During annual trainings every year since I started up until it became a web-based training.  And I believe that was two or three years ago.

Q.    How often are prison guards trained on this?

A.    It's part of annual training.

Q.    What is the training called?

A.    "Addressing Inmate Sexual Misconduct."

        MR. PAULSON:  Ms. Slattery, I'm sorry, if you could once again pull up Exhibit 201, page 1.

Q.    Can you tell here where -- if -- if the defendant was trained on what to do in those types of situations?

A.    The training record shows a completion of "Addressing Inmate Sexual Misconduct" on April 30th of 2021.

        MR. PAULSON:  Ms. Slattery, can you go to page 3 of that same exhibit.

Q.    Same question here.

A.    So, again, on January 6th of 2020, there shows a completion of that same course, "Addressing Inmate Sexual Misconduct."

        MR. PAULSON:  All right, Ms. Slattery, you can take that down.

Q.    What are the guards trained to do if they come upon a

prisoner who's naked?

**A.** So indecent exposure is considered a disciplinary infraction, and so the training would tell you that you need to address it on the spot, tell the inmate that that is unacceptable behavior, walk away, and as soon as possible, write an incident report.

**Q.** Are the prison guards trained to take a photo of the inmate?

**A.** No.

**Q.** Is there any reason why a photo of a naked prisoner should be on a guard's personal computer?

**A.** No.

**Q.** Are you familiar with the Bureau of Prisons' policies regarding the reporting of sexual abuse?

**A.** Yes.

**Q.** If an inmate wants to report that they've been sexually abused by a prison guard, how would they go about doing that?

**A.** So there are a number of ways that they can do that.

When inmates arrive to any institution, they go through what's called the admission and orientation process. And so during that, staff teach them about different subjects within the prison, and so one of them is sexual abuse and they are told their reporting methods.

They are also given an actual paper handbook that talks about their rights under PREA and reporting methods, and then

every institution is also required to hang posters in every inmate area that lists the different ways that they can report sexual abuse.  And so all of those posters are standardized throughout the entire prison system and gives inmates at least four reporting methods.

Q.   What are those reporting methods?

A.   So they are able to tell any staff member the allegation, they can write directly to OIG to report that allegation, they can file an administrative remedy that discusses their allegation, or they can send an email through our electronic email system directly to OIG.

Q.   Is there a hotline they can call?

A.   At some institutions, yes, and some, no.

Q.   Why wouldn't they be able to call the hotline?

A.   So as an agency, the main issue right now with the hotline is that all inmate phone numbers have to be approved on their phone list before they're actually able to dial out to that.

And so right now, we have some institutions who have done the work to put that number on all inmate phone lists, making it so that they can make that phone call, but there is also issues with it being monitored versus not monitored.  And so there is not like a standard answer to a hotline right now.

Q.   Once a report is made -- once a report of sexual abuse is made, how would a prison go about investigating that?

A.   Yeah, so every allegation of sexual abuse goes through the

same process at the beginning. And so the operations lieutenant, who is like the supervisor on shift for day-to-day things that happen within the prison, they would be the person that organizes that initial response to the allegation.

And every single allegation is met with at least three things that happen immediately, the first being an interview -- they can happen in any order, but there's three things that have to happen: They do an interview with our SIS staff, which is special investigative services; they are seen for a psychological evaluation; and they're seen for a medical assessment after any allegation.

Q. What happens after they go through those first initial steps?

A. So --

THE COURT: Is this going to be -- is this going to go on for a while, I take it?

MR. PAULSON: It's not, but I think we can take a break here, Your Honor, if you like.

THE COURT: Why don't we go ahead and take our second break, and that way the jury can hear it all fresh when they get back.

(Proceedings were heard out of presence of the jury:)

THE COURT: Okay. The record will reflect that the jury has left the courtroom.

You can step down. We will take a 20-minute break.

So I learned that these blank sheets for juror questions existed because one of the jurors provided a question.  So I can destroy it or, if the lawyers want, you can come and look at it and I can give you a copy.

As I told them, their questions aren't going to be asked.  So I think I nipped it in the bud, but if you want to have the information from that juror, as long as both sides agree, I will give it to you.  If not --

Mr. Reilly.

**MR. REILLY:**  I think we should look at it, Your Honor.

**THE COURT:**  Okay.

**MS. PRIEDEMAN:**  Agree, Your Honor.

**THE COURT:**  All right.  You can come to sidebar.  I'll let you -- I'll show it to you and then we'll make a copy for you.

(Recess taken at 11:53 a.m.)

(Proceedings resumed at 12:11 p.m.)

(Proceedings were heard in the presence of the jury:)

**THE COURT:**  You may all be seated.

The record will reflect that the jury has returned.  The witness is on the stand.

Mr. Paulson, you may continue.

**MR. PAULSON:**  Thank you, Your Honor.

**Q.**   Dr. Malespini, I think we left off where you were describing the initial steps that occur when a prisoner reports

an allegation of sexual abuse.

Correct me if I'm wrong.  I think you said it goes to the operations lieutenant and then there's an interview with SIS, and then the prisoner is offered psychological and medical assessments; is that right?

A.    Yes.

Q.    Okay.  What happens after that?

A.    After those three initial steps, all of the results of those interviews, so the SIS interview plus the psychological evaluation and the medical assessment, are submitted to the associate warden, who serves as the PREA compliance manager.

At that point, the associate warden reviews all the facts of the case and makes a determination as to whether or not to initiate what we call full PREA protocol, and so that would mean that the associate warden believes that this is a case that should be further investigated versus being stopped at that point.

Q.    What happens if the associate warden decides that it should be investigated further?

A.    So at that point, that's what we would call full PREA protocol, and when that happens, there is a committee that is convened.  So the same people that we talked about doing those interviews and assessments, they get together.  If additional interviews are needed, that would happen at that point.

The committee meets.  They talk about the evidence in the

case, they determine if anything else needs to happen to gather more evidence, and everything gets entered into our electronic investigation system.  So it's called TrueIntel, is where it all gets entered into as a case, an investigative case, into that system.

The associate warden then makes a determination about the outcome of the case, and so there's three different potential outcomes that can happen from an allegation.  And so the associate warden can say that the allegation is considered substantiated, which means the evidence points to it's more than likely that this incident happened; unsubstantiated, which means that the evidence -- there isn't enough evidence to say that it definitively happened or not; or unfounded, which means that there's no way that the allegation could have happened.

**Q.**   What happens if the associate warden finds that it's substantiated?

**A.**   So substantiated cases get referred for prosecution.

**Q.**   Who does that referral?

**A.**   The warden.

**Q.**   Anyone else at the prison have the ability to refer a case for prosecution other than the warden?

**A.**   No.

**Q.**   Is the associate warden informed of all PREA complaints?

**A.**   Yes.

**Q.**   Is that pursuant to a Bureau of Prisons policy?

**A.**   Yes.

**Q.**   Is the warden notified of all PREA complaints?

**A.**   It depends.

**Q.**   What would it depend on?

**A.**   So it depends on each warden.  So policy doesn't say that the warden has to be notified of every allegation.  Only the PREA compliance manager has to be notified.  But some wardens want to be notified of all cases, and so local procedures would dictate.

**Q.**   So the warden has the power to be notified if he wants to?

**A.**   Yes.

**Q.**   What is the warden's involvement in this process that you just described, other than being the final gatekeeper for a referral for criminal prosecution?

**A.**   Yeah, so any investigation that gets entered into that TrueIntel system goes through a routing path, so different reviewers have to look at the case.  And in those cases, the warden is the final sign-off for that case to become finalized within the system.

**Q.**   So regardless of whether the case is substantiated or unsubstantiated, the warden signs off for final disposition?

**A.**   Correct.

**Q.**   Are prisoners ever placed in the SHU when they report that they're victims of sexual abuse?

**A.**   It happens, yes.

Q.   Why would that happen?

A.   So policy says that we -- we make all efforts to not put an inmate into the Special Housing Unit after an allegation, but there are times when, for safeguarding reasons, the only option is to place them in SHU.

Q.   Is there paperwork that goes along with the decision to put a prisoner in SHU?

A.   There is a form that has to be completed.  Again, it's a safeguarding process.  Safeguarding form is what has to be filled out, and so that's just the institution's way of documenting all of the efforts that were made to avoid that placement.

Q.   Who signs that form?

A.   The warden signs it.

Q.   If a prisoner wanted to report being sexually abused by the warden, how would they do that?

A.   The same reporting methods are available regardless of the assailant.

     MR. PAULSON:  Thank you, Your Honor.  I have no further questions.

     THE COURT:  Cross.

                    **CROSS-EXAMINATION**

BY MR. REILLY:

Q.   Good afternoon, Dr. Malespini.

A.   Good afternoon.

**Q.** The PREA process is designed to address sexual abuse by guards on inmates; correct?

**A.** It's all types of sexual abuse by -- by staff or other inmates.

**Q.** So it could be, say, an inmate sexually abusing a staff member?

**A.** It's actually -- so an inmate abusing another inmate.

**Q.** But not a staff member.

**A.** So policy addresses that in minor details, but the focus of PREA is on the sexual abuse of inmates, so either by staff or by other inmates.

**Q.** All right. I take it, though, that PREA does not address the disciplinary process of sexual misconduct by inmates that does not constitute abuse of some kind?

**A.** I'm not sure I understand the question.

**Q.** Okay. So there are certain rules. Let's say a simple one is an inmate has to be dressed after a certain time in the morning, you can't be naked in your cell all day long.

**A.** Correct.

**Q.** Okay. If an inmate violates that particular provision of the disciplinary rules but does not otherwise engage in any conduct that would constitute abuse of another inmate or of a staff member, that conduct would not come within the purview of PREA, would it?

**A.** It would fall under inmate disciplinary code.

Q.   Right.   And you had mentioned that part of the training with respect to PREA was that guards are not trained to take photographs of naked inmates; correct?

A.   Correct.

Q.   But that -- well, let me ask you this first.

Is there a specific prohibition in the PREA guidelines against taking photographs of an inmate who is naked?

A.   To my knowledge, photographs are addressed in terms of privacy matters.   So we have things like cross-gender staff aren't supposed to be there for strip searches and things like that that address when an inmate is naked in terms of their privacy, but not -- to my knowledge, specifically photographs are not addressed.

Q.   Okay.   So there's nothing in the PREA training that would tell a guard or another staff member if you see a -- an inmate committing a disciplinary violation which is sexual in nature, there is nothing in PREA that would prohibit that guard or that official from taking a photograph to document the disciplinary violation.

A.   I -- I don't think I agree with that just, again, for the privacy reasons.   If we can't have cross-gender supervision in terms of videotaping, to me that falls under the same kind of scope as taking photographs.

Q.   Okay.   But that's not -- we're not talking about PREA now; right?

**A.**    We are talking about PREA.

**Q.**    That privacy concern?

**A.**    Privacy concerns with PREA, yes.

**Q.**    Okay.  So it's your interpretation of the PREA guidelines that if a guard or a staff official sees a disciplinary violation that happens to include nudity, they're prohibited, under this training, from taking photographs of that to document it so that when the disciplinary proceeding goes forward, the guard or the other official can say, "Hey, I took a picture of it to prove that it happened"?

**A.**    I don't think the word "prohibited" would appear in policy about that specific situation, but also most -- the majority of staff don't have cameras on them.

**Q.**    Okay.  I mean, that's fair.

But if a senior staff member, like a warden or an associate warden, is going around doing rounds and has a cell phone with photographic capability and they see a disciplinary violation being committed, whether it's sexually related or not, it would be appropriate for them to take a photograph to document that disciplinary violation so that when the disciplinary proceedings go forward, it can be proved.

**A.**    I do not agree with that.

**Q.**    You don't agree, then.

**A.**    I don't.

**Q.**    Logically speaking, from an investigative point of view,

if you want to prove something happened, isn't it better to have a photograph of it than your simple claim that you saw it take place?

**A.** My area of expertise is PREA, and that policy focuses on inmate privacy. Having naked pictures of an inmate violates their privacy. We have disciplinary infractions written the majority of the time with no photographic evidence.

**Q.** In which case we have a he said/she said, which is a very difficult situation to prove.

**A.** Yeah.

**Q.** Okay. Is that perception on your part delineated anywhere in the PREA guidelines or the legislation?

**A.** I would have to look. I'm not sure.

**Q.** The -- the PREA training for 2020 -- the in-person PREA training for 2020 did not take place, did it, because of COVID?

**A.** At some institutions, it did.

**Q.** Okay. And specifically at Dublin, do you know whether it happened or not?

**A.** I can only go based on the training record.

**Q.** Okay. And that's the records that we looked at a little while ago.

**A.** Right. So if it said "instructor-led training," it would have been an in-person training.

**Q.** Right. And if it says -- "WBT," I think it is, for web-based training?

**A.**    Uh-huh.

**Q.**    So if the 2020 entries are all "WBT," then we'll know that there was no in-person training; is that what you're saying?

**A.**    Right.    They would have been web-based trainings, yes.

**Q.**    Okay.    The -- obviously, one of the concerns that probably most inmates have about making reports of sexual abuse by guards or other officials is a fear of retribution.

Is that a common concern?

**A.**    Yes.

**Q.**    And specifically how is that addressed in the PREA guidelines?

**A.**    So there's a section of policy about retaliation monitoring, and so policy says that staff do not retaliate against inmates for reports of sexual abuse allegations.

There is also a process there that talks about a form that has to be filled out to ensure that inmates were following up with them and checking to see if they believe that any retaliation has occurred.    And so that's -- again, part of those case files would be retaliation monitoring.

**Q.**    And I think you said that all reports of sexual abuse go to the PREA associate warden?

**A.**    Correct.

**Q.**    Which means that -- strike that.

Does that mean that there is no process available to inmates by which they could make a claim of sexual abuse

without it becoming known to the staff at the institution involved?

A.   Not to my knowledge.

Q.   There is no independent means of contacting OIG without going through staff?

A.   So the email system does go directly to OIG.

Q.   And if an inmate submits an email to OIG alleging that a sexual abuse has occurred, is the -- is the OIG required to report that to the associate warden for the PREA program at that institution?

A.   OIG reports those claims to my office.

Q.   And is your office required to report them to the associate warden for PREA at the institution involved --

A.   Yes.

Q.   -- or the warden or some --

A.   We send it to the warden's mailbox.

Q.   Okay.  So even if an inmate were to use this process that you just described, it would still become known relatively quickly to the institutional staff.

A.   So my office receives those allegations and forwards them to the warden's box.

I have not seen a situation where the allegation involved the warden.  In those cases, I don't believe I would have sent that allegation to the warden's box for the reasons that you're talking about.

Q.   Okay.  Did you have the discretion to not do that under the legislation?

A.   I think there would be a conflict there.  If the allegation was against the warden, I would send it to the regional level.

Q.   Okay.

A.   Just common sense.

Q.   And at the regional level, that would also still result in it being made known to the warden or the associate warden for the PREA program.

A.   Not necessarily.  Again, based on the allegation, if I were to send an allegation against a warden to the regional level, I would expect that the person who was -- it was being alleged against would not be the receiving party of that allegation.

Q.   Okay.  Obviously, at some point, they would have to become aware of it, because if you're doing the investigation, you're going to want to talk to them; right?

A.   Correct.

Q.   And the reality is that there is an incidence of retaliation for making accusations against staff members, isn't there?

A.   Did you say there is?

Q.   Yes.

A.   I'm sure it happens.  I can't think of any specifically.

**Q.** So there has never been a -- well, strike that.

Is part of the process -- does it include a means by which an inmate who feels that he or she has been retaliated against for making a complaint of this nature to file an additional complaint about the retaliation?

**A.** They can.

**Q.** And would that follow the same process?

**A.** It would follow the same investigative process, yes.

**Q.** And you mentioned that inmates can be transferred to the SHU after an allegation for safeguarding?

**A.** Correct.

**Q.** And is there -- is it -- is there any provision in the legislation which addresses reassigning an inmate who has made such a complaint to the SHU even if there is no safeguarding issue involved?

**A.** Can you -- I'm not sure I understand what you're asking.

**Q.** Okay. Let me rephrase it. It's kind of a complicated question.

What I'm driving at is if an inmate feels that there's no safety issue involved but gets assigned to the SHU anyway, is that a basis for -- upon which the inmate can make a complaint through the PREA program?

**A.** They can file a complaint about that if they believe they did not have to go to SHU, yes.

**Q.** Okay. And is there anything in the legislation or the

guidelines that addresses the specifics of what constitutes inmate safety in this regard?

**A.** So the safeguarding form has specific questions that it asks like about those attempts to avoid sending that inmate to SHU.

**Q.** Okay. And when an inmate makes a complaint about this, are they made aware of all of these details that you've talked about, including the opportunity to complain if they do get sent to the SHU?

**A.** They're made aware in their initial admission and orientation process, but I wouldn't be able to say that in every allegation they are reminded of all of those things.

**Q.** Okay.

Is there -- other than what you just mentioned, the intake training when an inmate is first incarcerated, is there ongoing training regarding PREA for the inmates, in addition to the staff?

**A.** There is not ongoing training, just like posters and reminders, and they have their handbook.

**Q.** Is each -- each inmate is given an individual handbook --

**A.** Correct.

**Q.** -- PREA handbook?

**A.** Yes.

**Q.** And is that something that they're permitted to keep in their cells?

**A.**   Yes.

**Q.**   The posters that you mentioned, do they include things like how to file a complaint for retaliation?

**A.**   They are -- they address how to report allegations.  The posters don't say "retaliation" on there.

**Q.**   And is retaliation specifically mentioned in the handbook?

**A.**   I believe so.

**Q.**   And how -- how to go about filing a complaint, for example, that you've been reassigned to the SHU, is that addressed in the handbook?

**A.**   Yeah, in the administrative remedy part.

          **MR. REILLY:**  Thank you.  That's all I have, Your Honor.

          **THE COURT:**  Any redirect?

          **MR. PAULSON:**  Yes, Your Honor.

                         **REDIRECT EXAMINATION**

BY MR. PAULSON:

**Q.**   Dr. Malespini, are prisoners trained that if they're sexually abused by the warden and they report that, that the warden won't be told about their complaint?

**A.**   I'm not sure.

**Q.**   Are they trained at all that if they file a complaint with OIG against the warden, that your office has the discretion not to give that to the warden?

**A.**   That is not part of any training.

MR. PAULSON:  That's all I have, Your Honor.  Thank you.

THE COURT:  Anything on that one question?

MR. REILLY:  No, Your Honor.  Thank you.

THE COURT:  All right.  Any need for recall?

MR. REILLY:  No, Your Honor.

MR. PAULSON:  Yes, Your Honor.

THE COURT:  Yes for her?

MR. PAULSON:  Yes.

THE COURT:  All right.  You're subject to recall.

THE WITNESS:  Okay.

THE COURT:  Next witness.

MR. PAULSON:  Your Honor, at this time, I would like to read a few of the factual stipulations into the record.

THE COURT:  Okay.  And if you will identify for me which ones you are going to read.

MR. PAULSON:  Yes, Your Honor.  Factual Stipulation 3 --

THE COURT:  Go ahead.

MR. PAULSON:  -- 4 --

THE COURT:  Do them one at a time.

MR. PAULSON:  Oh.  Yes, Your Honor.

Factual Stipulation No. 3, FCI Dublin was regularly inspected and audited by outside inspectors to ensure that the facility was in compliance with the requirements set forth in

the Prison Rape Elimination Act (PREA).  An agency auditor visited FCI Dublin during the week of February 10, 2020, to conduct a PREA pre-inspection of FCI Dublin prior to a formal PREA audit.

Factual Stipulation No. 4, Between April 1, 2019, and March 31, 2020, the defendant conducted the Prison Rape Elimination Act (PREA) annual training twice for the Bureau of Prisons regional staff for the 2019 annual training cycle. During that period, the defendant also trained newly arriving or promoting supervisors at FCI Dublin on PREA requirements. He also taught all of the PREA courses at FCI Dublin during the fiscal year 2020 annual training and prepared the preaudit binder for inspectors who were scheduled to conduct the April 2020 PREA inspection.

Factual Stipulation No. 5, Between April 1, 2019, and March 31, 2020, the defendant showed a video to FCI Dublin inmates that informed them of the ways to report PREA violations.

Factual Stipulation No. 8, In accordance with PREA, in 2019, 2020, and 2021, the defendant received annual training regarding the Bureau of Prisons' sexual abuse and sexual harassment policies and procedures.

That's all I have, Your Honor.

THE COURT:  All right.  Next witness.

MS. PRIEDEMAN:  The Government calls Monica.

Your Honor, just a reminder that I believe a limiting instruction would be appropriate for this witness.

THE CLERK:  You can go ahead and step up.

Please remain standing.  Please remain standing.

THE WITNESS:  Oh.

THE CLERK:  Please raise your right hand.

**MONICA M.**,

called as a witness for the Government, having been duly sworn, testified as follows:

THE WITNESS:  Yes.

THE CLERK:  Thank you.  Please be seated.

Speak clearly into the microphone.

Please state your first name and spell it for the record.

THE WITNESS:  I'm sorry?

THE CLERK:  Please state your first name --

THE WITNESS:  Oh.

THE CLERK:  -- and spell it for the record.

THE WITNESS:  Monica, M-O-N-I-C-A.

THE COURT:  Okay.  If you'll move closer to the mic, Monica.

Members of the Jury, you are about to hear testimony about the defendant's alleged conduct towards FCI Dublin inmate Monica.  This evidence of other acts will be admitted only for a limited purpose.  You may use this evidence to decide whether the defendant made false statements as charged in Count 8.

You may also consider this evidence as to Counts 1 through 7. You may consider this evidence for Counts 1 through 7 only for the purpose of deciding whether the defendant had the state of mind, knowledge, or intent necessary to commit the crimes charged in the indictment; had a motive or opportunity to commit the acts charged in the indictment; or acted with a method of operation as evidenced by a unique pattern or did not commit the acts for which the defendant is on trial by accident or mistake.

Do not consider this evidence for any purpose other than the purposes specified in this instruction. Of course, it is for you to determine whether you believe this evidence and, if you do believe it, whether you accept it for the purpose offered. You may give it such weight as you feel it deserves, but only for the limited purposes that I described to you.

The defendant is not on trial for committing these other acts. You may not consider the evidence of these other acts as a substitute for proof that the defendant committed the acts charged in Counts 1 through 7.

You may not consider this evidence as proof that the defendant has a bad character or any propensity to commit crimes. Specifically, you may not use this evidence to conclude that because the defendant may have committed the other acts, he must have committed the acts charged in the indictment.

Remember that the defendant is on trial here only for the crimes charged, not for these other acts, and you'll be instructed not to return a guilty verdict unless the Government proves the crimes charged in the indictment beyond a reasonable doubt.

All right.  You may proceed.

### DIRECT EXAMINATION

BY MS. PRIEDEMAN:

Q.    Good afternoon, Monica.

A.    Hi.

Q.    Are you currently incarcerated?

A.    I would like to plead for the Fifth Amendment.  I don't -- I decline this.

THE COURT:  Okay.  Well, let's do this.  Can we take a short break with the jury.  If you'll go into the jury room for a moment.

THE CLERK:  All rise for the jury.

(Proceedings were heard out of presence of the jury:)

THE COURT:  Okay.  I take it this was not anticipated.

MS. PRIEDEMAN:  No, Your Honor.

THE COURT:  Mr. Kalar, I see you in the audience.  Might I be able to appoint you as counsel for this witness?

MR. KALAR:  Your Honor, I would be glad to.  I do represent another defendant who has been charged in this --

THE COURT:  Oh, you do?

MR. KALAR:  -- conduct, but I don't think that this witness has anything to do with my client.

THE COURT:  Do I have any other -- I'm not seeing any other CJA attorney in the audience.

MR. KALAR:  If Government counsel has -- doesn't believe there is a conflict, I'm happy to assist.

MS. PRIEDEMAN:  I don't think there's a conflict, Your Honor.

THE COURT:  Okay.  Could you take her down to one of the attorney rooms.

Mr. Kalar, if you will consult with her.

MR. KALAR:  Be glad to, Your Honor.  Thank you.

THE COURT:  Thank you so much.

All right.  Do you have another witness?

MS. PRIEDEMAN:  Yes, Your Honor.

MR. PAULSON:  Yes, Your Honor.  The Government calls Christina -- or I guess we will call Christina once the jury comes back in.

THE COURT:  Okay.  Let's get her up here.

Thank you, Mr. Kalar.

MR. KALAR:  My pleasure, Your Honor.

(Proceedings were heard in the presence of the jury:)

THE COURT:  Let's get another witness.

MR. PAULSON:  Your Honor, the Government calls Christina.

THE CLERK:  Will you please stand.

**CHRISTINA V.**,

called as a witness for the Government, having been duly sworn,

testified as follows:

THE WITNESS:  Yes.

THE CLERK:  Thank you.  You can be seated.

Please speak clearly into the microphone.

Please state your first name and spell it for the record.

THE WITNESS:  Christina, C-H-R-I-S-T-I-N-A.

THE COURT:  Okay.  Good afternoon.

You may proceed.

MR. PAULSON:  Your Honor, I think this is another witness that would require both of the instructions.

THE COURT:  Okay.

All right.  So Members of the Jury, with respect to this witness, the instruction that I just read to you applies again. And that is --

MR. PAULSON:  Your Honor, I think -- I think maybe I misspoke.  I think it's only the --

THE COURT:  Okay.

MR. PAULSON:  -- 413 instruction.

THE COURT:  All right.

MR. PAULSON:  I apologize.

THE COURT:  So strike that.

So with respect to this witness, then, the following

instruction only applies -- that is, additional instruction.

You're about to hear evidence that the defendant may have committed a similar offense of sexual assault.  You may use this evidence to decide whether the defendant committed the act charged in the indictment.  You may not convict the defendant simply because he may have committed other unlawful acts.  You may give this evidence such weight as you think it should receive or no weight.

Go ahead.

**MR. PAULSON:**  Thank you, Your Honor.

### DIRECT EXAMINATION

**BY MR. PAULSON:**

**Q.**  Good afternoon, Christina.

**A.**  Good afternoon.

**Q.**  Can you pull the microphone just a little closer to your mouth.  Thank you.

Are you currently a prisoner at FCI Dublin?

**A.**  No.

**Q.**  Were you formerly a prisoner at FCI Dublin?

**A.**  Yes.

**Q.**  When were you there?

**A.**  I was there from April 2019 up until March 2022.

**Q.**  In 2019, were you convicted of conspiracy to commit theft of government property?

**A.**  Yes.

Q.   Was that a felony conviction?

A.   Yes.

Q.   In 2016, were you convicted of unlawful use of identifying information?

A.   Yes.

Q.   Was that a misdemeanor conviction?

A.   Yes.

MR. PAULSON:  Ms. Slattery, can you please pull up Exhibit 224.

Your Honor, this is a stipulated exhibit, so I'd move to admit.

MR. REILLY:  So stipulated.

THE COURT:  Admitted.

(Government Exhibit 224 received in evidence)

MR. PAULSON:  May I publish to the jury?

THE COURT:  You may.

BY MR. PAULSON:

Q.   Christina, what is this?

A.   That was my picture for FCI Dublin's ID.

MR. PAULSON:  Ms. Slattery, you can take that down.

Q.   When did you -- when did you first arrive at FCI Dublin?

A.   April 2019.

Q.   When did you first see the defendant?

A.   April 2019.

Q.   What happened during your initial interactions with him?

**A.**    It was regular, walking around the compound.  He was greeting everyone.

**Q.**    So just pleasantries?

**A.**    Yes.

**Q.**    Did you ever interact with the defendant at the rec yard?

**A.**    Yes.

**Q.**    What happened the first time you interacted with him there?

**A.**    The first time, it was summer 2019.  I was at the rec pile.  I was at the rec underneath the weight pile.  I was facing towards the mountains.  And I was squatting down, lifting weights, when he approached from behind and he touched my left butt cheek.

There were a few people at rec, probably like five.  They were all spread.  It was right before yard recall, which is 10:00.

**Q.**    How did he touch your butt?

**A.**    He came from behind me and he touched it.  It was less than 3 seconds.

**Q.**    What do you mean by "touched"?  Did he grab it?  Did he --

**A.**    Grab it.

**Q.**    Did he say anything to you when he did this?

**A.**    I turned around, looked surprised -- I was shocked, and I laughed.  He said, "I'm sorry, I couldn't help myself."

**Q.**    Why did you laugh?

**A.**    I was shocked, nervous when I seen it was him.

**Q.**    Why were you nervous?

**A.**    That's the assistant warden at the time.

**Q.**    Sorry.  Say that again?

**A.**    That was the assistant warden at the time.

**Q.**    Why did that make you nervous?

**A.**    I knew it wasn't right.

**Q.**    What happened after that?

**A.**    He walked away.

**Q.**    What did you do?

**A.**    I continued my workout.  I put the weights back when they announced yard recall.

        **MR. PAULSON:**  Ms. Slattery, can you pull up Exhibit 314, which has already been admitted.

        **THE COURT:**  You can publish.

        **MR. PAULSON:**  Thank you, Your Honor.

**Q.**    Christina, can you please indicate on this map where you were when the defendant came up behind you and grabbed your butt.

**A.**    (Indicating).

**Q.**    So you've marked by the building that says "Weight Pile"; is that right?

**A.**    Yes.

        **MR. PAULSON:**  Ms. Slattery, can you please pull up Exhibit 242.

And, again, this has already been admitted, Your Honor.

THE COURT:  Oh, okay.

BY MR. PAULSON:

Q.   What is this --

THE COURT:  You can publish.

BY MR. PAULSON:

Q.   What is this, Christina?

A.   That's underneath the rec -- the weight pile.

Q.   Where were you when the defendant grabbed your butt?

A.   (Indicating).

Q.   So you circled an area sort of at the front of the picture but on the left side; is that right?

A.   Yes.

Q.   From which direction did the defendant come when he was approaching you?

A.   (Indicating).

Q.   So you drew a line -- I guess is that towards -- from the prison towards you?

A.   Yes.

Q.   Is the prison in the background?

A.   Yes.

Q.   Did you ever tell the defendant he could touch your butt?

A.   No.

Q.   Is there any way that he would have thought that you had consented to him grabbing your butt?

**A.** No.

**Q.** After --

         **MR. PAULSON:**  You can take that down, Ms. Slattery.

**Q.** After that incident, what did you do when you saw the defendant?

**A.** I would try to avoid and take the long way, go around him.

**Q.** Why is that?

**A.** I didn't feel comfortable.

**Q.** Were there cameras in the rec yard at that time?

**A.** Not that I'm aware of.

**Q.** Were there --

**A.** I don't know.

**Q.** Sorry.  I'm sorry.  What did you --

**A.** I don't know.

**Q.** Were there other places at FCI Dublin that didn't have cameras?

**A.** I don't know.

**Q.** At some point, did FCI Dublin start installing more cameras?

**A.** Yes.

**Q.** When was that?

**A.** After he got walked off the campus.

**Q.** What do you mean when you say "walked off"?

**A.** The sex scandal broke out and he got walked out.

**Q.** So after he was no longer the warden?

**A.**    Correct.

**Q.**    When was the next time that you interacted with the defendant?

**A.**    Two to three weeks after that incident.

**Q.**    Where were you?

**A.**    I was on the track running.

**Q.**    What happened?

**A.**    He was out there with his cell phone walking the track. So when I'm -- when I walked -- when I ran past him -- jogged past him, he said, "When you -- when you go past me, slow down. I like to see it jiggle, wiggle."  I turned back, I laughed, and I shook my head.

**Q.**    When you turned back and looked at him, did he -- what was his facial expression?

**A.**    A serious flirting manner.

**Q.**    How did you interpret the comment that the defendant liked to see it jiggle or wiggle?

**A.**    In my head, I know he was talking about my butt.

**Q.**    After you sort of laughed, what happened after that?

**A.**    That was it.

**Q.**    What did you do?

**A.**    I continued to work out.  I continued to jog.

            **MR. PAULSON:**  Ms. Slattery, can you pull up Exhibit 314, please.

        Again, this has been admitted.

THE COURT:  Yes.

MR. PAULSON:  May I publish?

THE COURT:  Yes.

MR. PAULSON:  Thank you, Your Honor.

Q.  Christina, can you please show the jurors on this exhibit where you were when the defendant told you that he liked to see it jiggle or wiggle?

A.  (Indicating).

Q.  So it looks like you circled an area that's on the track above where the label is "Rec Yard"; is that right?

A.  Yes.

Q.  Was there anyone else around you when the defendant made this comment?

A.  No.

MR. PAULSON:  You can take that down, Ms. Slattery.

Q.  When was the next time that you interacted with the defendant?

A.  The next time was in fall 2019.

Q.  How close in time was that to when he told you that he liked to see your butt jiggle or wiggle?

A.  I would say it was October.

Q.  Where were you when you interacted with him on this occasion?

A.  I was on the compound walking from C side.  So I'm passing CMS, in between CMS and Unit E and F, on my way to rec, and

he's walking the opposite way, so we're crossing.

And he asked how was I doing, and I said, "I'm fine."  He said, "Are you having any issues?"  I said, "No."  "Where are you heading?"  "To rec."  That was it.

Q.    Did you -- did you see him later that day?

A.    Yes.

Q.    Where at?

A.    He appeared at rec.

Q.    What happened when he appeared at rec?

A.    He was talking to other inmates.

Q.    And then what happened?  Did you talk to him?

A.    Yes.

Q.    Tell the jury about that.

A.    So we're on the bigger track and he's walking.  He's walking, and he asks me again, "How are you doing?"  I said, "I'm doing fine."  He asked me, "Do you have any questions?"  I said, "No."  "Is everything okay?"  "Yes."

Then he started asking me personal questions as far as what I was doing before prison, and I told him that I do music and I was also dancing.  I was strip dancing before I came to prison.

Q.    What happened after that, after you told him that?

A.    He then said, "I'd like to see your moves," and suggested to get a two-piece bikini made.  And I said, "How and where?"  He said, "There's a lot of people that crochet."  And I said,

"Okay.  I can pay them with commissary."

Then he looked down and was moving his penis, so I looked down automatically as well, and I laughed and I shook my head and I walked away.

Q.   What was going through your mind when he sort of motioned for you to look down at his penis?

A.   This man is serious.

Q.   How did that conversation end?

A.   I shook my head and I walked away.

Q.   After that, did you interact with the defendant?

A.   No.

Q.   Did you try and avoid him?

A.   Yes.

Q.   Why?

A.   It's very uncomfortable.

Q.   What is?

A.   How he's been approaching me.

Q.   Did you attempt to get a crochet bikini or outfit for the defendant --

A.   I did.

Q.   Sorry.  Just wait until I'm done.

You did try and get a crochet outfit?

A.   Yes.

Q.   Why?

A.   Out of curiosity.

Q.   Any other reasons?

A.   And also because he asked to.

Q.   What did you think would happen if you didn't do that?

A.   Retaliation.

Q.   Like what?

A.   My room getting hit; getting a shot, which is an incident report; getting moved; going to the SHU.

Q.   How did you go about getting this crochet outfit?

A.   I walked to a lady that was crocheting socks and scarves, and I asked to get a bikini made.

Q.   Did you pay her for it?

A.   Yes.

Q.   What did she make for you?

A.   She made a two-piece bikini.  It was baby blue and gray. And then I had another one.  It was cornmeal and gray, which is baby yellow.

Q.   What did you do with those?

A.   I tried them on and I stored them in my locker.

Q.   Do you still have them?

A.   No.

Q.   Why not?

A.   My room eventually got hit and a lot of things were confiscated.  They went to hot trash.  I never got a report for it.

Q.   What's hot trash?

**A.**   Hot trash is when the officer takes it straight to the garbage compressor.

**MR. PAULSON:**  Your Honor, I have what's been marked as Exhibit 6.  And this is a stipulated exhibit, so I would move that it be admitted.

**MR. REILLY:**  So stipulated, Your Honor.

**THE COURT:**  I couldn't hear you, Mr. Reilly.

**MR. REILLY:**  I'm sorry?

**THE COURT:**  I couldn't hear you.

**MR. REILLY:**  I said so stipulated.  I'm sorry.

**THE COURT:**  All right.  It's admitted.

(Government Exhibit 6 received in evidence)

**MR. PAULSON:**  I'm handing Exhibit 6 to the witness.

**Q.**   Christina, what is -- what is that?

**A.**   This is a crocheted thong --

**Q.**   Is that one of the ones that you had made for yourself?

**A.**   -- and a crocheted bra.

**Q.**   Sorry.  Is that one of the ones you had made for yourself?

**A.**   This is not mine, but, yes, it's similar.

**MR. PAULSON:**  Your Honor, I would like permission to show this to the jury.

**THE COURT:**  Okay.

**MR. PAULSON:**  I'm taking the exhibit back from the witness.

Ms. Slattery, can you pull up Exhibit 125.

Your Honor, this is another stipulated exhibit.

THE COURT:  125 is admitted.

(Government Exhibit 125 received in evidence)

MR. PAULSON:  Thank you.

May I publish this to the jury?

THE COURT:  You may.

BY MR. PAULSON:

Q.  Christina, what is this?

A.  A crocheted thong and bra.

Q.  Is this like the ones that you had made for yourself?

A.  Yes.

MR. PAULSON:  You can take that down, Ms. Slattery.

Q.  Did you know an inmate named Maria?

A.  Yes.

Q.  How?

A.  She was the laundry orderly in Unit F.

Q.  Did you live in Unit F?

A.  Yes.

Q.  How close were you and Maria?

A.  Well, my bunkie at the time worked CMS, so she was able to wash every day.  So she'd come and pick up our laundry, and we would talk.  She said I reminded her of her daughter.  So it was always pleasant.  It was no...

Q.  Do you speak Spanish?

A.  Yes.

**Q.** Did you ever see the defendant and Maria interact?

**A.** Yes.

**Q.** Describe that for the jury.

**A.** Well, he would come, like other staff, to the unit and make rounds for questions, concerns, paperwork. And he would stop at her door and stay there longer than other doors, but I don't know what was being said. I was top tier, she was bottom tier, but I can see from the rail down that he would stand there for minutes.

**MR. PAULSON:** I have no further questions at this time, Your Honor.

**THE COURT:** Okay. Cross?

**MR. REILLY:** Thank you, Your Honor.

**CROSS-EXAMINATION**

BY MR. REILLY:

**Q.** All right. Good afternoon, Christina.

**A.** Good afternoon.

**Q.** I'm going to call you by your first name in order to preserve your privacy. Not meaning to be too personal. Okay?

**A.** Okay.

**Q.** That last subject you were discussing about Maria's cell, I think you indicated you were in the top level?

**A.** Yes.

**Q.** And she was in the bottom level?

**A.** Yes.

**Q.** And were you making these observations from when you were inside your own cell?

**A.** Yes, and outside my cell as well.

**Q.** Okay. So sometimes you might be out on the landing?

**A.** Yes.

**Q.** When you were inside your cell, could you actually see into her cell?

**A.** No.

**Q.** But you could see someone who was standing outside of her cell, I take it.

**A.** Yes.

**Q.** The -- the crocheted bikini that you had made, was it just one?

**A.** Two.

**Q.** Two?

Did you make those specifically for Mr. Garcia to see?

**A.** Yes.

**Q.** And did you ever do that, model them for him?

**A.** No.

**Q.** Did he ever ask you to model them for you [sic]?

**A.** In other words --

**Q.** He -- let me ask you this first. Did you show them to him --

**A.** No.

**Q.** Did you ever tell him that you'd had them made?

**A.**   No.

**Q.**   Okay.  So the specific items that you had made, he was not aware that you had, at least --

**A.**   No.

**Q.**   -- as far as you know.

And he never asked you to model specifically those items.

**A.**   He said, "Get bikini made.  Find someone that crochets and get a thong and a bra made."

**Q.**   All right.  But that was, obviously, before you had that done.

**A.**   Correct.

**Q.**   And then once you had it done, you never told him about it.

**A.**   No.

**Q.**   Okay.  And I think you said that this -- I'm assuming -- was another inmate that you had make this for you?

**A.**   Yes.

**Q.**   Do you remember who that was?

**A.**   No.

**Q.**   Was she in your unit?

**A.**   Yes.

**Q.**   So you were able to just make contact with her fairly easily?

**A.**   Yes.

**Q.**   When you were out in the rec area, that -- that yard is

visible from a lot of the other buildings in the facility; correct?

A.   Correct.

Q.   And are there -- are there guards stationed in the rec yard when the inmates are there?

A.   Inside the rec, not outside rec.

Q.   Okay.  So there's a rec area --

A.   There's indoor --

Q.   -- inside the building and then there's one outside?

A.   Correct.

Q.   So the guards are inside but not outside.

A.   They're both.  But the actual office is inside, and that's where they stay most of the time.

Q.   Is there ever a time when there's no guard outside at all?

A.   Yes.

Q.   Do you recall, on the day that you said Mr. Garcia touched you, whether there were guards outside at that time?

A.   There was not.

Q.   How about other inmates?

A.   There is a few scattered.  I would say max, five.  It was a total of five of us.

Q.   And I think you told us pretty much that you were kind of to one end of the outdoor rec area?

A.   Yes.

Q.   Kind of an open space?

A.   Yes.

Q.   And what was it that you were doing?

A.   I was squatting with weights.

Q.   How much can you squat, how much weight?

A.   I would do five pounds.

Q.   Prior to that day, had you ever had any conversation with Mr. Garcia that was sexual in nature?

A.   No.

Q.   So you had these pleasantries, I think was the word you used, conversation, but nothing sexual?

A.   No.

Q.   And then after that incident, you mentioned that he said to you, "I like to watch you jiggle"?

A.   Yes.

Q.   And other than that, did you have any specific sexual conversation with him?

A.   No.

Q.   And then I think -- going back to the bikini for a minute, you said you had them stored in your locker?

A.   Yes.

Q.   And then -- but they were seized somehow?

A.   Yes.

Q.   And who was it that did that?  A guard?

A.   Yes, a CO.

Q.   And to the best of your knowledge, he did what you called

hot trash, which was just to throw them away?

A.    Yes.

Q.    So the picture that we saw was not actually one of your --

A.    No.

Q.    -- items either?

A.    No.

Q.    But it's similar.

A.    Yes.

Q.    When you observed Mr. Garcia at the cell of the inmate named Maria, were you ever able to hear any of their conversation?

A.    No.

Q.    Even one-sided, for example, his because he was outside?

A.    No.  I'm top tier.

Q.    Okay.  You can't hear what's going on on the lower tier?

A.    No.

Q.    And at any point when you were either in your own cell or just out on the tier, were you able to see Maria inside the cell at a time when Mr. Garcia was there?

A.    Repeat.

Q.    At any time when you were observing the cell that Maria was in, even if you were out of your own cell -- you said you could see into hers if you were out on the walkway?

A.    Yes.

Q.    Did you ever actually see her in her cell at a time when

Mr. Garcia was standing outside of it?

**A.** Yes.

**Q.** And on those occasions when you saw that, did you ever see her to be undressed?

**A.** No.

**Q.** Did you ever see Mr. Garcia taking photographs of her with a cell phone?

**A.** No.

**Q.** Did you ever see him with a cell phone while he was walking around?

**A.** All the time.

**Q.** Okay. Did you ever see him take photographs of anything?

**A.** No.

**Q.** Now, on the day that you said he made this contact with you at the rec yard, did he have his cell phone with him?

**A.** Yes.

**Q.** But he didn't take a picture of you either, I take it.

**A.** No, not that I'm aware of.

**Q.** You didn't see him do it, in any event.

**A.** No.

        **MR. REILLY:** Thank you. That's all I have, Your Honor.

        **THE COURT:** Any redirect?

        **MR. PAULSON:** No, Your Honor.

        **THE COURT:** Any need to recall?

**MR. PAULSON:**  No, Your Honor.

**MR. REILLY:**  Not on my behalf, Your Honor.  Thank you.

**THE COURT:**  All right.  You're excused.

Let me have a sidebar with counsel and Mr. Kalar.  The court reporter can stay there.

(Sidebar conference held without the reporter.)

**THE COURT:**  Okay.  Members of the Jury, I'm going to let you go a little early today, so we will resume again tomorrow.

As I've said to you many times, remember, do not discuss the case with each other or anybody.  Do not go and do any research.  Do not listen to any news reports.  Make sure that you try to keep an open mind until all of the evidence is in.

I told you -- I used the analogy of a puzzle box, right?  We now have three days worth of pieces, but it's not over yet.  So we have to wait, right, until we get all of those pieces of the puzzle in the box.  Then each side will give you their arguments about what that picture looks like, and then you're going to be able to go back and decide that for yourselves.  But we're not done, so remember to keep an open mind.  Okay?

All right.  Any questions?

**A JUROR:**  You mentioned yesterday the route to come in the building.

**THE COURT:**  Yeah.  No, that was my total mistake.  That's what I get for trying to be creative.  It's always a

problem when federal judges try to be creative.

Okay. So good luck tomorrow. Bring umbrellas. You can leave them in the hall, like I said, and we will stand in recess with you until 8:30 tomorrow morning.

(Proceedings were heard out of presence of the jury:)

**THE COURT:** All right. The record will reflect that the jury is gone.

Let's put on the record the conversation at sidebar, and we can -- I also think that there is an objection being made by Rachel's counsel, which I'll get to next.

Okay. Mr. Kalar, as I said to you, that's what happens for being curious when you come into the courtroom. I appreciate you not running out of the courtroom when I asked you to come up.

All right. So could you give me an update, please.

**MR. KALAR:** Yes, Your Honor. As you recall, you appointed me to represent Ms. Monica [redacted], I believe it is.

**THE COURT:** We are not saying last names. That will be stricken.

**MR. KALAR:** The witness. And I spoke with her, and it's my understanding that she will not be asserting the Fifth if she is recalled to testimony. It's my understanding that she will respectfully decline to testify, and we had a discussion about the possible ramifications of that decision.

And it's my understanding that despite those possible ramifications, she still will respectfully decline to testify.

THE COURT: Okay. Ms. Priedeman.

MS. PRIEDEMAN: Your Honor, I'd like to just have a conversation with Mr. Kalar after court. I think it's unlikely we will call her at this point, but I can let the Court know for sure tomorrow.

THE COURT: Okay. Well, she's being housed at Dublin? Okay. So let's make sure the prosecutor knows who to contact. I'll order that she be returned here at -- in the morning unless the prosecutors aren't going to call her. But they'll have to let you know, because they'll know before I will.

THE DEPUTY MARSHAL: Do you know what time that will be, Your Honor? Because we need to get notification over before a certain time because there might not be people there and there will be an issue bringing her over in the morning.

MS. PRIEDEMAN: We'll let you know as soon as we can.

THE DEPUTY MARSHAL: Okay.

THE COURT: So the default is that she comes in the morning.

THE DEPUTY MARSHAL: Okay.

THE COURT: All right? If we can call it off, we will, but that's the default.

THE DEPUTY MARSHAL: Okay.

THE COURT: Okay. All right. Thank you so much,

Mr. Kalar.

MR. KALAR:  Thank you.

THE COURT:  Okay.  Do I have counsel for Rachel?

MS. PRIEDEMAN:  Yes, Your Honor.

MS. IMHOLTE:  Good afternoon, Judge.

THE COURT:  Good afternoon.  Just in front of any of the mics is fine.

MS. IMHOLTE:  Thank you.

THE COURT:  And if you will state your appearance, please.

MS. IMHOLTE:  I will.  Jane Imholte, I-M-H-O-L-T-E.  I was appointed to represent Rachel.

THE COURT:  Appointed by whom?

MS. IMHOLTE:  I'm with the Alaska Federal Defender's Office.

THE COURT:  Okay.  And you're an AFPD?

MS. IMHOLTE:  Correct.

THE COURT:  Okay.  Well, welcome to the warmer weather of San Francisco.

MS. IMHOLTE:  We are all enjoying it immensely.

THE COURT:  Good.  Okay.  Go ahead.

MS. IMHOLTE:  Judge, I'm asking that Rachel be released from the Government's subpoena.  She has a flight back to Alaska tomorrow morning.

And as I understand it, the reason that the defendant

wishes to call her is purely for impeachment purposes that can be accomplished by the defendant himself, and as I understand, he intends to testify.

Moreover, there appears to be unauthenticated discovery that the defendant intends to introduce. Whether or not this Court will allow that is a separate issue, given that it's discovery -- its origin is dubious and the fact that the Government thoroughly searched the defendant's home, computer, and phones and did not find the -- the photo that they intend to introduce that allegedly will impeach my client's credibility.

**THE COURT:** Okay. I --

**MS. IMHOLTE:** There are a number of issues here.

**THE COURT:** So, Mr. Reilly, I'm going to, at this point, ask you for a proffer. Because under Rule of -- Federal Rule of Evidence 611, I have the authority to exercise reasonable control over these proceedings, including proceedings necessary to determine, you know, obviously, effective determination of the truth, but also to protect witnesses from harassment or undue embarrassment, especially in this particular kind of case.

So I need specifics. I need -- I need specifics. Otherwise -- well, I need specifics.

**MR. REILLY:** Yes, Your Honor. Understood.

During Rachel's testimony this afternoon, Mr. Garcia

leaned over and advised me that her answer to the question of whether she had ever sent sexually explicit photos to the email address that he gave her was false; that she had sent such photographs; that he has them, they were not seized by law enforcement when they did the search warrant. I don't know the reason for that at this point.

And he indicated to me that these photographs are timestamped, so --

**THE COURT:** Do you have them?

**MR. REILLY:** I do not, and he does not have them with him today. I told him to bring them with him tomorrow.

**THE COURT:** All right. What are they photos of?

**MR. REILLY:** Photos of Rachel.

**THE COURT:** What specifically? We've talked about penises and vaginas in this courtroom enough for the last three days.

**MR. REILLY:** Right. I --

**THE COURT:** Let's not be coy about it.

**MR. REILLY:** -- don't know the answer to that question. If I could have a moment.

Mr. Garcia advised me that most of them are pictures of her in lingerie and one is a picture of her completely topless.

**THE COURT:** Okay. So he's going to get on the stand and -- and we'll get to whether or not and the extent to which this is admissible, but let's assume for purposes of argument

that it is admitted.

Why do you want to call her back?  What would be the point?  I mean, maybe the prosecutors want to call her back, but why would you want to call her back?

MR. REILLY:  The point would be to have her admit to the jury that she lied during her earlier testimony.

THE COURT:  All right.  A response.

MS. IMHOLTE:  Judge, the rules of impeachment and the way impeachment works is that a person can be impeached and shown to be lying through another witness.  It is not required that the original declarant be on the stand and admit.  And I can assure you my client is very unlikely to admit that she lied.

But the fact of the testimony of Mr. Garcia is enough to impeach Rachel's testimony should the jury decide to believe Mr. Garcia on this point.  So I don't see any other reason to call her to do that other than to harass and intimidate her.

THE COURT:  What about the prosecutors?  If this information comes in, are you going to want to recall Rachel?

MS. PRIEDEMAN:  No, Your Honor.

THE COURT:  All right.  Anything else?

MR. REILLY:  Not on my part, Your Honor.

MS. IMHOLTE:  Nothing from me, thank you.

MS. PRIEDEMAN:  Nothing.

THE COURT:  Does anybody have any case law for me?

**MS. IMHOLTE:** I was reviewing the rules on this, Judge, not the case law.

But I -- I do note that the defendant did file a discovery demand from the Government, and with that demand is a reciprocal obligation to provide their own discovery and their own witness list, which they have failed to do. This is late discovery, and it is in -- it's within your purview, under the rules, to deny its admission altogether. I would encourage the Court to do that.

In addition to -- frankly, while it is a question of -- there are questions of authenticity, you are still allowed -- if you find it to be relevant, you're still allowed to exclude it for purposes of unfair prejudice -- that is Rule 403 -- if you're concerned that the jury might be making a determination on an emotional basis, rather than on the facts.

I think the jury got a good sense of Rachel and can take everything that she said into consideration when making their determination, but the defense had a duty to provide this information to the Government under the rules. Actually, the amendments in 1974 were designed to have greater disclosure by both parties, and I -- I submit to you that this late-filed discovery, just on the basis of it being late filed, is -- should be barred from the jury.

I would also like to add, if I may, that the question at issue with my client is whether or not Mr. Garcia engaged in

inappropriate sexual contact. Whether or not, under the law, my client consented to any of it, sent photos of anything, is irrelevant to whether or not Mr. Garcia is guilty or not guilty of the sexual contact.

I am seeing a line of questioning here that suggests a nullification defense, which is obviously not permitted. And so my concern is that calling her back serves no purpose other than to just continually harass her and further this line of inquiry and this defense that is not permitted.

**THE COURT:** Any response?

**MR. REILLY:** Yes, Your Honor. I couldn't disagree more with that characterization.

There is no corroborating evidence whatsoever that either of the two offenses that Mr. Garcia is charged with with respect to Ms. -- Rachel took place other than her own testimony. Therefore, her credibility is of paramount importance in the jury making a determination of whether he committed those two crimes.

For them to be able to see not only that she lied, but also to see her demeanor and her response to being confronted with that falsity, could be significant in them making a determination as to her credibility.

**THE COURT:** I agree that the issue is one of credibility more than -- well, that is the only issue, frankly. Obviously, she can't consent as a matter of law.

**MR. REILLY:** Correct.

**THE COURT:** So it's -- and, frankly, I'm still not -- I'm not exactly sure how you're going to argue this.

Even if it is true that she sent photos to him, that corroborates that he gave her an email address to send it to and that he, in fact, received it, which corroborates that he engaged in contact with her while she was still at the halfway house and corroborates the images and the video chats and pictures of that that are in evidence. So I'm not sure exactly where you're taking this.

And I haven't heard a response on the reciprocal obligations to disclose.

**MR. REILLY:** Well, Your Honor, as I indicated earlier, I only found out about this this afternoon while that testimony was taking place.

**THE COURT:** It's not just your obligation, it's his obligation.

**MR. REILLY:** Understood.

**THE COURT:** So what's the response from him, not just you?

**MR. REILLY:** I have not discussed that with him, so I can't give the Court an answer to that.

But I can tell you that --

**THE COURT:** Well, I'll wait a minute. Go discuss it with him.

**MR. REILLY:**  Okay.

**THE COURT:**  He's sitting right there.

(Counsel confers with defendant off the record.)

**MR. REILLY:**  Your Honor, Mr. Garcia has advised me that he did not understand that he had any obligation to give the police officers anything they didn't find.  They gave him a receipt indicating that they had everything that -- that they had seized everything that they thought was pertinent to the case.

He advised me that -- excuse me.  He advised me that he did send me an email indicating that he had some photographs.  I don't recall getting that.  I'll have to look at my emails to see exactly what he said, so I can't give you a specific answer about that at this point.  So I'd have to do that probably tomorrow.

**THE COURT:**  Well, you can do it tonight as soon as you get back to your office.

**MR. REILLY:**  I can do that.

**THE COURT:**  And I can have that evidence sent to me by email.

**MR. REILLY:**  I can do that, too, although Mr. Garcia -- takes him about two and a half to three hours to get home to have access to it.  So I'm not sure we'll have it by 5:00.

**THE COURT:**  Mr. Reilly, I work well after 5:00.

MR. REILLY:  I'll send it as soon as I have it.

THE COURT:  What time is the flight?

MS. IMHOLTE:  10:00 a.m.

THE COURT:  Well, Mr. Reilly, you were going to say something else before I had you go talk to your client.

MR. REILLY:  Don't recall now what that was.

THE COURT:  Well, I was indicating that the only thing that is really at issue is her credibility.

MR. REILLY:  Oh, I do remember now, Your Honor.

There's not going to be any issue with respect to the authenticity of, for example, the photographs of the video chat.  Mr. Garcia's going to say he participated in that video chat and the photographs and exhibits that have already been put into evidence regarding that are real and that conversation really took place.

THE COURT:  No, that's -- that's not the issue, right? What you're suggesting -- well, I thought that the photos you were talking about were separate and apart from the video chat.

MR. REILLY:  They are.

THE COURT:  Okay.

MR. REILLY:  Or at least that's my understanding.  I haven't seen them, but --

THE COURT:  And I don't know how there is going to be an authentication problem if it looks like her.

MS. IMHOLTE:  We could get into that, but if it is

self-authenticating, for example, the email appears to be correct, the date and timestamp matches up, I still don't see why my client is needed.  The defense is free to call her a liar in their summations.  If the jury wishes to make that determination on her credibility, they're free to do so.  It's sort of the nature of impeachment, is other witnesses impeach other witnesses' testimony without --

**THE COURT:**  Calling them back.

**MS. IMHOLTE:**  -- calling them back and asking them to admit that they're a liar.

**THE COURT:**  Yes.

And that would be the only question you'd be asking, Mr. Reilly?

**MR. REILLY:**  That would be the only subject of further examination, yes.

**THE COURT:**  I think in light of the proffer, in light of the late information, in light of the Court's discretion under Rule 611, I am going to release her.

It does seem to me that there is no harm or any significant prejudice to the defense.  He can get on the stand, impeach her himself.  The arguments with respect to her credibility can be made.  And the only reason, it seems to me, to be -- to put her back on the stand, in light of the fact that the Government doesn't want to call her back, is to -- you know, to grandstand on the topic of that she potentially lied

on the stand.  And that, in light of these circumstances, seems to me to be undue harassment and unnecessary embarrassment.

The Court -- or the jury can make a determination about whether or not her -- her statements on the stand were as explicit about not sending things back or if it was just a failure of memory.  So the jury will have to be able to -- the jury can make that determination, I think, without the additional couple of questions that would be required to have her do it and just deny it on herself.  So the request for release is granted.

**MS. IMHOLTE:**  Thank you, Judge.

**THE COURT:**  All right.  We will stand in recess until 8:00 a.m. tomorrow.

**MS. PRIEDEMAN:**  Thank you, Your Honor.

**MR. REILLY:**  Thank you, Your Honor.

(Proceedings adjourned at 1:37 p.m.)

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Wednesday, November 30, 2022

_____
Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
U.S. Court Reporter