**Volume 5**

**Pages 730 - 911**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )
                               )
  VS.                          )      **NO. CR 21-00429-YGR**
                               )
RAY J. GARCIA,                 )
                               )
          Defendant.           )
_____)

                         Oakland, California
                         Thursday, December 1, 2022

                **TRANSCRIPT OF TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                    **STEPHANIE M. HINDS**
                    United States Attorney
                    1301 Clay Street, Suite 340S
                    Oakland, CA  94612
              BY:   **MOLLY PRIEDEMAN**
                    **ANDREW PAULSON**
                    **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:
                    SUMMIT DEFENSE, APLC
                    4040 Civic Center Drive, Suite 200
                    San Rafael, CA  94903
              BY:   **JAMES T. REILLY, ESQUIRE**

Reported By:  Pamela Batalo-Hebel, CSR No. 3953, RMR, FCRR
              Official Reporter

## I N D E X

Thursday, December 1, 2022 - Volume 5

| | PAGE | VOL. |
|---|---|---|
| Government Rests | 880 | 5 |

| **GOVERNMENT'S WITNESSES** | PAGE | VOL. |
|---|---|---|
| **D., KATRINA** | | |
| Direct Examination by Mr. Paulson | 740 | 5 |
| Cross-Examination by Mr. Reilly | 758 | 5 |
| | | |
| **BARCLAY, KATHERINE** | | |
| (SWORN) | 800 | 5 |
| Direct Examination by Ms. Priedeman | 800 | 5 |
| Cross-Examination by Mr. Reilly | 831 | 5 |
| Redirect Examination by Ms. Priedeman | 879 | 5 |

| **DEFENDANT'S WITNESSES** | PAGE | VOL. |
|---|---|---|
| **GARCIA, RAY** | | |
| (SWORN) | 881 | 5 |
| Direct Examination by Mr. Reilly | 881 | 5 |

## E X H I B I T S

| **GOVERNMENT'S EXHIBITS** | IDEN | EVID | VOL. |
|---|---|---|---|
| 15 | | 827 | 5 |
| 116 | | 819 | 5 |
| 120 | | 822 | 5 |
| 121 | | 824 | 5 |
| 165 | | 807 | 5 |
| 212 | | 741 | 5 |

Monday - November 28, 2022                                    8:00 a.m.

PROCEEDINGS

---oOo---

(Proceedings were heard out of presence of the jury:)

THE CLERK:  Calling Criminal Case 21-429-YGR, USA vs. Ray J. Garcia.

Counsel, please state your appearances.

MS. PRIEDEMAN:  Good morning, Your Honor.  Molly Priedeman and Andrew Paulson for the United States.

THE COURT:  Good morning.

MR. REILLY:  Good morning, Your Honor.  Jim Reilly of Summit Defense appearing on behalf of Mr. Garcia, who is also present in court.

THE COURT:  Good morning.

All right.  Where do we stand on issues?

MS. PRIEDEMAN:  Your Honor, I think the one issue is the photographs that were sent by the defense counsel last night.

THE COURT:  And what else do we have?

MS. PRIEDEMAN:  We need to swear in one additional in-custody witness.

THE COURT:  Okay.  Do we have her?  Let's do that first.

Are there any other issues?

MS. PRIEDEMAN:  Not from the Government, Your Honor.

**MR. REILLY:**  Not on my part, Your Honor.

(The following proceedings were held under seal:)

(The following proceedings were heard in open court, out of the presence of the jury:)

**THE COURT:**  Okay.  With respect to the second issue, I did receive an email last night from Mr. Reilly, but what I received was a compilation of photos.  I did not receive the emails.

**MR. REILLY:**  Your Honor, Mr. Garcia no longer has the emails.

**THE COURT:**  Well, he better --

**MR. REILLY:**  He only has the photographs.

**THE COURT:**  -- find them.  I don't know what you mean by that, Mr. Reilly.  If he doesn't have the emails, how am I to know anything about these?  He's -- he's compiled them in a nice, pretty packet and destroyed the emails?

**MR. REILLY:**  No.  I put the photographs into the PDF format so that they would all be together.

**THE COURT:**  Where are the emails?

**MR. REILLY:**  Mr. Garcia received those on an email account that he no longer has, so those are no longer accessible.

**THE COURT:**  So what did he do?  He received the emails --

MR. REILLY:  Yes.

THE COURT:  -- and what did he do?

MR. REILLY:  Took the pictures off the emails, stored them on his computer, and then after some period of time when he was no longer in contact with the witness, he closed that email account.  And the emails are no longer accessible because that account no longer exists.

THE COURT:  Where's the computer?

(Counsel confers with defendant off the record.)

MR. REILLY:  Mr. Garcia thinks he still has the computer itself.

THE COURT:  Well, bring the computer in tomorrow.

I think with respect to -- if I can get some -- some assurance on these documents, that they seem to be sufficient for purposes of impeachment.  I don't like the fact that Mr. Garcia is destroying evidence, but we'll see.  Bring that computer in.

MR. REILLY:  Yes, ma'am.

THE COURT:  Does the Government have anything to say?

MS. PRIEDEMAN:  Nothing -- nothing, Your Honor.

THE COURT:  All right.  What is in store for today?

MS. PRIEDEMAN:  The Government has two more witnesses, Your Honor, and then anticipates resting its affirmative case.

THE COURT:  And who are they?

MS. PRIEDEMAN:  Katrina and Special Agent Barclay.

THE COURT:  How long do you anticipate their testimony?

MS. PRIEDEMAN:  I believe Katrina's direct will be about a half an hour and Special Agent Barclay's testimony is probably about 45 minutes, I would anticipate.

THE COURT:  All right.  Then Mr. Garcia should plan on testifying -- starting his testimony today.

MR. REILLY:  Understood.

THE COURT:  All right.  We will stand in recess until the jury arrives.

(Recess taken at 8:05 a.m.)

(Proceedings resumed at 8:30 a.m.)

(Proceedings were heard out of presence of the jury:)

THE COURT:  All right.  We have a great group of jurors.  They're all here on time, despite the rain, so let's call them in.

(Proceedings were heard in the presence of the jury:)

THE COURT:  Okay.  Good morning.  You may all be seated.  We're back in session.

Thank you for braving the rain.  You're really terrific.  This happens periodically in December.  I was in an Apple trial in December, and I thought, okay, I'll stop and, you know, grab some bagels for the jury.  I did grab you all something, but not bagels.  And I'm thinking, you know, it's pouring rain outside.  No one will -- like just running in, right?  So left

the doors open because I was going to have bags.

And sure enough if my car doesn't get broken in like in the five minutes that I'm in the bagel shop, and I have got a hundred-pound dog in the back. Like, that dog -- I don't know if they throw him meat or what, but he was like -- you know, what kind of guard dog are you? You're a hundred pounds and you let them take my laptop. Crazy.

Anyway, so it is cold and wet, so for your next break, I brought you in some spiced cider from Trader Joe's, and you can warm it up in the microwave, and some little mini donuts, because donut holes don't have calories because they're holes.

The other thing, you know, as you know, I've not been feeling great, so I just grabbed -- grabbed a scarf to wear this morning, but it's an important one and I'm going to share it with you. It's this scarf. I'll show it to you here.

If you can see, it's got like little squares. So I don't know if any of you have been to the 911 Memorial in New York, but if you ever are in New York and you have the opportunity, I'd encourage you to go. It's such an amazing story of Americans and all of us coming together to work on that tragedy.

And downstairs, they have this wall of tiles. They're squares and they're all blue, different shades of blue. And this scarf is kind of a replica of those different shades of blue, and in the middle, there is a -- a quote from Virgil. It

says, "No day shall erase you from the memory of time," and it is one square for each of the people who lost their lives during that tragedy.  It's really quite -- I was really taken aback at how well they did that memorial.  So if you ever have a chance, go and relive part of our history, right, that we'll never want to forget.

So, again, this is all about being American, and I do appreciate you all.  Like A plus for getting here on time with the rain, really.  Really appreciate all of the attention you're giving.

Okay.  We'll get restarted with testimony today, and we're moving at a good pace.

All right, Ms. Priedeman or Mr. Paulson.

**MR. PAULSON:**  Your Honor, the Government calls Katrina.

**THE COURT:**  Okay.  You have an instruction on this one, right?

**MR. PAULSON:**  Yes, Your Honor, No. 19.

**THE CLERK:**  Please remain standing.  Please raise your right hand.

                          **KATRINA D.**,

called as a witness for the Government, having been duly sworn, testified as follows:

**THE WITNESS:**  I do.

**THE CLERK:**  Thank you.  Please be seated.

Speak clearly into the microphone and please state your first name and spell it for the record.

THE WITNESS:  My first name and what?

THE CLERK:  And spell it for the record.

THE WITNESS:  Oh.  Katrina, K-A-T-R-I-N-A.

THE COURT:  All right.  Members of the Jury, with respect to the testimony you're about to hear, this is about the defendant's alleged conduct toward FCI Dublin inmate Katrina.  This evidence of other acts will be admitted, again, only for a limited purpose.  You may use this evidence to decide whether the defendant made false statements as charged in Count 8 of the indictment.

You may also consider this evidence as to Counts 1 through 7 of the indictment.  You may consider this evidence for Counts 1 through 7 only for the purpose of deciding whether the defendant had the state of mind, knowledge, or intent necessary to commit the crimes charged in the indictment, had a motive or opportunity to commit the charged acts in the indictment, or acted with a method of operation as evidenced by a unique pattern or did not commit the acts for which the defendant is on trial by accident or mistake.

Do not consider this evidence for any purpose other than the purposes specified in this instruction I'm giving you.  Of course, it is for you to determine whether you believe this evidence and, if you do believe it, whether you accept it for

the purpose offered.  You may give it such weight as you feel it deserves, but only for the limited purpose that I described to you.

The defendant is not on trial for committing these other acts.  You may not consider the evidence of these other acts as a substitute for proof that the defendant committed the crimes charged in Counts 1 through 7.

You may not consider this evidence as proof that the defendant has a bad character or any propensity to commit crimes.  Specifically, you may not use this evidence to conclude that because the defendant may have committed the other acts, he must have also committed the acts charged in the indictment.

Remember, the defendant is on trial here only for the crimes charged, not for these other acts.  Do not return a guilty verdict unless the Government proves the crimes charged in the indictment beyond a reasonable doubt.

You may proceed.

            MR. PAULSON:  Thank you, Your Honor.

                    **DIRECT EXAMINATION**

BY MR. PAULSON:

Q.   Good morning, Katrina.

A.   Good morning.

Q.   Are you currently an inmate at FCI Dublin?

A.   Yes, I am.

Q.   When did you arrive at FCI Dublin?

A.   March 25th of 2020.

Q.   In 2019, were you convicted of use of an interstate commerce facility in the commission of murder for hire?

A.   Yes, I was.

Q.   Was that a felony conviction?

A.   Yes, it was.

     MR. PAULSON:  Ms. Slattery, can you please pull up Exhibit 212.

     Your Honor, this is a stipulated exhibit, so I would move to admit it.

     THE COURT:  Stipulated, Mr. Reilly?

     MR. REILLY:  Yes, Your Honor.  I'm sorry.

     THE COURT:  All right.  It's admitted.

     (Government Exhibit 212 received in evidence)

     MR. PAULSON:  May I publish to the jury?

     THE COURT:  You may.

BY MR. PAULSON:

Q.   Katrina, what is this?

A.   That would be my booking photo from FCI Dublin.

Q.   Okay.

     MR. PAULSON:  Thank you, Ms. Slattery.  You can take that down.

Q.   When did you first meet the defendant?

A.   Sometime in July of 2020.

**Q.**   What happened during your first interactions?

**A.**   Our first interaction, I believe I was on my way to breakfast or lunch, all bundled up because it was cold that morning --

**THE COURT:**   Katrina, I'm going to have you move up just a little so we can catch your voice better.

**THE WITNESS:**   Is this better?

**THE COURT:**   Can we increase her volume just a little bit, please?

**THE CLERK:**   Okay.

**THE COURT:**   Okay.   Can you repeat yourself, please.   Thank you.

**THE WITNESS:**   Yes.

The first morning or afternoon we met, sometime in mid July, I would say, it was very cold that morning or early afternoon.   And I was either on my way to lunch or breakfast when I was rudely stopped by the defendant in this case.   He had alleged that I had a hickey on my neck and was trying to hide it.   I had just recently been released from the SHU, which is the Special Housing Unit, for being assaulted by another inmate and had scars and still scratches on my neck.

After I proceeded to show him what was on my neck per request, then he became much more friendly and just tried to make up for it at first and being overly flirtatious and things of that nature.

BY MR. PAULSON:

Q.   So after this first encounter with the defendant, how did your interactions go with him after that?

A.   After that, it was, again, just very flirtatious, very -- not on my behalf, but on his -- but I just felt like he was trying to overaccommodate for making a scene when it was, in fact, not my fault and not a hickey on my neck.

Q.   Where did you talk to the defendant?

A.   During that exchange and most exchanges was on the -- the compound -- I'm not sure if they know what that is, but on the compound walkway, either on the way to or from the housing units to food service or CMS.

Q.   During these conversations, did the defendant ever make comments about your body?

A.   Yes, quite often.

Q.   What did he say?

A.   Multiple things.  There -- sorry.

Q.   Take your time.

A.   Thank you.

There was multiple occasions where he would inquire about my breasts to the extent of what size they were or if I had them done for pleasure or personal reasons versus business reasons.  There was other comments made to other body parts as well.

Q.   Like what?

**A.**   He -- I'm sorry.  May I have just a moment?

**Q.**   Absolutely.

**A.**   Thank you.

(Pause in proceedings.)

**THE WITNESS:**  He would also inquire about not just my breasts, but the rest of my body and -- I'm sorry, I don't really know how to answer that one.  Can we skip over that?

**BY MR. PAULSON:**

**Q.**   Did he ever ask to see your breasts?

**A.**   Yes.

**Q.**   What did he say?

**A.**   That he would love to see them and that they looked great and that he would like to see them uncovered and -- or see me topless.  Or on other occasions, he would request to see me nude in my room when he made rounds.

**Q.**   About how many times did he ask to see your breasts?

**A.**   Before seeing them, I would say at least seven to ten.

**Q.**   How would you respond when he would ask to see your breasts?

**A.**   For a long time, I would say roughly, like, three or four months, I would just laugh it off or just think he was joking, not really take him too seriously on it.

It wasn't until one day when, I don't know, it just became more clear, I guess, with the attitude of which it was said and the demeanor.

Q.   What was going through your mind when he asked to see your breasts?

A.   No offense to the men in the room, but I think men are disgusting and that they're just curious by nature, so -- I mean, I don't -- I don't know how to explain.  Sorry.  Just men are curious, and I get that and I understand it, but it's not the situation of which it should have ever been brought up in.

Q.   Did you feel like you could just not talk about this with the defendant?

A.   No, I never felt like we couldn't discuss it because at the time, whether he was the AW or the warden, that's the one person or two people on the compound you can't really piss off.

Q.   Why is that?

A.   They have control over everything.  They have control over your housing units, over your jobs, over how you interact on the compound, whether you can be on the compound or if you have to be in Special Housing Units.

I guess another good example would be that they also have control over if you have a management variable or if you can transfer.  Or even if you do transfer, they can call over to that warden or AW and make your life a living hell at that institution as well.

Q.   At the end of 2020, did you have a conversation with the defendant about going to breakfast?

A.   Yes.

**Q.**   Tell the jury about that.

**A.**   So I usually don't wake up for breakfast.  I don't really eat breakfast.  I like to sleep in, especially on days that I don't work and I can sleep in.

The defendant requested that I go to breakfast so I would be more easily accessible to him, with less staff around to see the interactions or to overhear them, per se.

He had asked a few times prior to.  However, on this day, he pulled his mask down -- because we all had COVID masks on -- and looked me directly in the eye and told me that I will be going to breakfast.  And that was kind of the -- just of how I had to start going to breakfast every day.

**Q.**   How did you interpret that order?

**A.**   As a direct order.  Again, you just -- you never feel like you can say no to a warden or an AW.  And at this time, I believe he was the warden.

**Q.**   After that, did you obey his order to go to breakfast?

**A.**   I did.

**Q.**   What happened when you went to breakfast?

**A.**   Every morning if he was working, which was usually Monday through Friday, I was instructed to go to breakfast.  And whether he was there or not, that's besides the point, I guess, or not.

Usually, he would be there if he was able to be there, and he would ask me all sorts of stuff, ranging from stuff about

the unit or about me or my body or seeing me during his rounds. If he knew roughly what time he'd be around for his rounds, he would tell me, things like that.

Q.   Did he make any comments about dressing time?

A.   Yes.

Q.   What did he say?

A.   He would ask constantly when my dressing times were.  I didn't really know what that meant when he was asking.  My roommate at the time had medical things that needed dressing changes, and I misinterpreted that for a little while.  But he would constantly inquire when it's dressing changing or when might the dressing time be and things like that.

Q.   Did you eventually clarify with the defendant what he meant?

A.   Yes.  He --

Q.   Tell the jury about that.

A.   Actually, it was during a town hall, which is when all the inmates are required to go out and listen to what our unit managers have to say.

And I believe Ms. Korth was in the middle of making an announcement for the unit and just things that are going on, and he stormed across the compound with a very red face and came to the door and just motioned me down like -- I'm not sure -- I don't know how to put it in the minutes, but this was like really abruptly.

And I came down from the top tier down to the bottom, and he spoke to me right in front of all the other inmates, just not very loud. And I'm not even sure why he was upset that day, actually. And that was the day that he made it very clear on what dressing changes meant and inquired when I would be dressing, rather than thinking it was of a medical reason.

Q. What was your reaction?

A. Aside from being distraught that it was in front of a lot of other people and not off to the side somewhere where it would usually happen, I just kind of took it with a grain of salt and proceeded back up to my room, where my roommate, of course, asked me what happened. I said I didn't want to talk about it and we left it at that for some time.

Q. Did you feel you could tell the defendant no?

A. Again, no, I definitely did not.

Q. Why not?

A. Because, again, that's the one person that can ruin anything for me during my time.

Q. I want to turn your attention to April 13, 2021.

What happened on that day?

A. That day was one of the days I was required to go to breakfast. I went to breakfast, and he told me that it was a good day to be ready for him when he made his rounds and that -- he requested I be topless, putting on lotion.

Q. Did he tell you a specific time when he was going to be

doing his rounds?

**A.** He did. He told me that he would be making his rounds between 8:05 and 8:20, which I thought was odd time, so it stood out in my mind.

**Q.** What happened between 8:05 and 8:20 that morning?

**A.** Roughly around 8:15 or so, Ms. Korth, my unit manager, called me to her office for me to go over to laundry to finally be fitted for a bra, and she sent me to laundry.

**Q.** What happened at laundry?

**A.** At laundry, it took about two hours for them to fit me.

And during that time frame, I'd say about 8:35 or so, I just had this rush of relief, like, oh, thank goodness, I missed it. I didn't have to be there. I didn't have to go through that.

And then sure enough, the warden or defendant in this case, along with the other two AWs and the PREA group that were doing a walk-through tour that day, walked into laundry. And he actually left the group to come over to the dressing room area, where I was just standing outside the dressing room, and proceeded to tell me that he left his entire tour to come see me today and I wasn't there. And I told him I couldn't be there because I was here, and then he just proceeded to tell me that he was sorry he missed me and that he'd see me at lunch.

**Q.** What tour was he referring to?

**A.** They were doing a PREA tour. So that is the Prison Rape

Elimination Act, where they come through possibly more, but minimum every two years, for an accreditation thing. And this one was previous to that, but right around the same time.

They came through, and that's when they're looking for things -- because they had me step away from the dressing room area and laundry just so they could inspect how the dressing rooms looked, how they worked; made sure that the dome up on the top -- the dome is like -- well, we don't really have one in here, but it's just like a mirrored dome so you can see if anybody is over in that section. They were really concerned on if you could see into the dressing room at the time and things like that.

Q. How did you respond when the defendant said he had left his group?

A. I'm not sure heartbroken is the right word, but I was definitely, like, devastated and just -- I was so relieved to know that I missed that and I didn't have to go through that. And then just to hear that just kind of took the breath out of me or the wind out of me.

Q. Let's go to two days later on April 15th of 2021.

What happened that day?

A. Well, that day I went to breakfast and he made the same request. And given the fact I didn't feel like I could say no, I obliged.

And he came through right around the right time he said,

between 8:05 and 8:20, and at 8:10, he was at my door.

And rather than just walking -- like walking past the door looking in through the window, as he usually would on rounds to every cell, not just mine, but rather than just walking by, he stopped, looked in the window, knocked on the door, opened it, proceeded to stand in my doorway, and talked to me for roughly 20 to 30 seconds with the door open and inmates sitting below.

Q.   When you said "same request," what -- what did you mean by that?

A.   Oh, I'm sorry.  The same request as in he asked me to be topless putting on lotion that day.

Q.   Did you see the defendant later that day?

A.   I did.  I saw him at lunch.  And during that encounter, he told me that I looked incredible and I believe the other word was spectacular or something like that with an S.

Q.   What did you understand him to be referring to?

A.   Well, shortly thereafter, he told me again as I was walking through food service that I looked incredible earlier, and then proceeded to ask me again if I had my breasts done for work purposes, for business, or for personal -- for personal reasons.

Q.   After that first time you got naked for the defendant at his direction, did he ever tell you to be naked for him again?

A.   Yes.  There was about six other times that it was a good day for him or whatever that means.  But there was about six

other times when I was to be ready and dressing when he came through.

Q.   Where was your cellmate during these instances?

A.   Most of the time, my cellmate was either on a video visit or at a call-out.

Q.   So not in the cell?

A.   No.  There was a time she was home in -- well, not in the cell, but right outside the door.  And she came into the room and she saw that I was getting dressed or, in this case, undressed, and then she heard that he was coming and, like, walked outside and tried to block the door with her head. She's quite tall.  But she was, like, moving all over the place to block it so he couldn't see when he came through.

     And then he proceeded to talk to her for probably three to five minutes outside the door, hoping to -- I'm assuming hoping to, like, let her move on and pass through, and then still tried to look in the door before he went on.  And she blocked him then as well.

Q.   How would you know on these instances that you had to be naked for the defendant at a specific time later that day?

A.   He would tell me at breakfast when I would go to breakfast.

Q.   What would he say to you?

A.   He would -- I mean, he would tell me all sorts of things at breakfast.  But he would tell me if he had a meeting that

morning or if he was going to be making his rounds; if he was making his rounds, what time it might be at or in that time frame; and then would proceed to tell me that I should be ready for him, which meant in a state of undress.

And that would differentiate between each time that it was a good day for him, per se. And he would tell me if he preferred to see me nude, topless, putting lotion on, just getting out of the shower in a robe, if he wanted me to spin, things of that nature.

Q. On these occasions when the defendant told you to be naked for him at specific times, did you ever try to get out of doing it?

A. I did try for quite some time. I would tell him I was busy or I had a video visit, I had to help someone with legal paperwork. And he would tell me to rearrange my schedule.

Q. What was your reaction when he would tell you to rearrange your schedule for him?

A. There was a few times I was adamant and I was like, "No, I'm not changing it," like, "My kids and my family come first. I'm not changing my video visit for somebody."

But other times, he would just request that I change my schedule, and whether I said no or not, he would then tell me a little more sternly to change my schedule, and I would indeed change my schedule.

Q. In July of 2021, did you speak with an agent from the

Department of Justice Office of Inspector General about another investigation?

A.   I did.

Q.   After that interview, did you speak with the defendant?

A.   I did.

Q.   Tell the jury about that conversation.

A.   So that afternoon at lunch, he was a bit more standoffish. And, like, I had stopped to talk to somebody else in line -- I believe it was medical -- and then he had hovered around and just kept giving me this weird look, and I just got a weird vibe.

And eventually he came over and asked me how my meeting went earlier that morning. And I told him it went fine, and then he just kind of like looked at me like, "And?" And I said, "And don't stress. I didn't tell them about you."

And that's when he took a sigh of relief and just relaxed and went back into the usual demeanor he speaks to me in.

Q.   Did you tell the agent during that interview that the defendant had instructed you to be naked when he came by on his rounds?

A.   No.

Q.   Why not?

A.   I didn't feel -- one, I know that whenever they come, they always come through SIS and -- SIS is the special investigation whatever they are. And with doing that, all of those end up

going through the same executive staff, whether it's the AW, the wardens, whatever.

I didn't feel like I had the choice or opportunity to tell her about that going on because, one, it was still happening and he was still there, and I didn't feel comfortable speaking about it until after he was gone.

Q.   Did you ever discuss with the defendant being transferred to the FCI Dublin camp?

A.   I was coming up on my 18 months in the Bureau at FCI Dublin, which is how long they make you wait before you can transfer.  I was discussing transferring to either Waseca if I had to stay at an FCI or to West Virginia if I could go to a camp if my management variable would drop.

When my management variable did drop --

Q.   Katrina, I'm sorry.  Can I pause you right there just for a second?  I think the court reporter --

THE COURT REPORTER:  I need to grab my power cord.

BY MR. PAULSON:

Q.   Okay.  Go ahead.

A.   I don't recall where I was, so sorry if I repeat.

Oh, I was asking to be transferred to Waseca if my management variable got dropped.  When it dropped on its own, my unit team had put in for another two-year management variable.

The warden actually -- or the defendant, I'm sorry,

actually ended up having them drop that so that I could transfer to a camp. And then he requested that rather than I go halfway across the country or all the way across the country, he requested that I go to the camp at FCI Dublin, because he didn't want me to leave and he wanted me more accessible for him.

Q.   Was your management variable lifted?

A.   It was lifted, and then about three weeks later, they put another one on.

Q.   When was the last time that you had to strip naked for the defendant?

A.   The day before he was questioned and walked off our compound, I believe the 21st of July of '21.

Q.   What happened that day?

A.   That day, I went to breakfast. He told me he wanted to see me naked. I was at home in my cell ready. I don't believe he actually made it through at the time he said he was going to, and -- but I was still ready, as I was instructed to be ready.

And then other than that, he had made some comments at lunch and it made me angry, and I don't remember what it was or why, other than it just being really inconvenient for my morning. And then I refused to go to breakfast the next day, and by lunch, he was gone.

Q.   So on July 21st, 2021, did you actually strip naked in

your cell for the defendant?

A.   I did, but I don't recall him being able to be there.  But I was there and ready.

Q.   What happened after you missed breakfast the next morning?

A.   Well, I slept in.  That was a lovely change.

And other than that, sometime before lunch, the defendant in the case apparently had been questioned by the FBI, had his office searched and vehicle, from my understanding, and then he was gone by lunchtime.  We were on a lockdown while that took place.

Q.   What was your reaction when you found out about that?

A.   Really relieved, actually.  Really relieved.

Q.   Why is that?

A.   To just not have to be humiliated or targeted for that sort of abuse.  It's just a lot emotionally and psychologically to deal with every day, and I don't feel like anybody should ever have to go through that.

Q.   When did you report what the defendant had done to you?

A.   The first time I spoke with someone about it, I spoke with psychology in my unit.  And that was the week after, so on the 29th of July.

He filed a formal PREA complaint on the 30th.  I went to medical for the head-to-toe strip-down and search, and then the -- within the next week on my birthday, August 4th, is when I spoke to the captain about it and he asked me to put it in --

put my request in writing.

And I put that through, explaining why I didn't feel comfortable for my safety and how I shouldn't have to be abused sexually by staff and have staff-on-inmate PREA abuse, because there's apparently a difference in the PREA handbook, along with the staff misconduct and the misuse of power and just...

Q.   Why didn't you report it earlier?

A.   Again, I didn't feel like I had the choice or option to without it having to go through his desk.

MR. PAULSON:   Thank you, Your Honor.   I have no further questions.

THE COURT:   Cross-examination.

**CROSS-EXAMINATION**

**BY MR. REILLY:**

Q.   Good morning, Katrina.

A.   Good morning.

Q.   I will call you by your first name not to be overly personal, but in order to protect your privacy.

A.   Thank you.

Q.   Is that okay with you?

A.   Uh-huh.

Q.   So the -- the first time you met with Mr. Garcia, where did that take place?

A.   Somewhere -- well, I don't know if you have a photo of the compound, like an overview that I could point to for you, but

on the walkway.

Q.   So outside the building?

A.   Correct.

Q.   And I wasn't entirely clear on what it was that you were saying about why he stopped you or why he addressed you at that point.

A.   That's okay.

Not that you can see them now, but I have scars on my neck from being assaulted by a different inmate.  And at the time before they scarred over beautifully, they were really dark purple and there was still red and bruising in the area.  So he assumed I had a hickey, not an injury.

Q.   When did that injury take place with respect to this meeting you had with him?

A.   I would need to see my calendar for the exact date, but sometime late June or early July.

Q.   All right.  So it was relatively short period of time before this --

A.   Correct.

Q.   Would it be correct to characterize your contact with Mr. Garcia that day as just being kind of a chance encounter?

A.   A chance encounter, yes.  But how he handled it midway through and after, I would say it was still of an inappropriate nature.

Q.   I'm sorry.  I couldn't understand the last thing you said.

**A.**    I said halfway to midway through the conversation, I would put it more on the scale of -- give -- let me put it this way. Of the flirtatious section that he moved it to, from the chance encounter to more flirtatious, I would still say it was inappropriate.  But at the beginning, yes.

**Q.**    And the -- during that first meeting after you said he became flirtatious, he had some comments about your body; is that what you're saying?

**A.**    Correct.

**Q.**    So this -- this came up within how long a period of time after you'd first had contact with him?

**A.**    Aside from the same day, that continued --

**Q.**    I'm sorry.  Let me interrupt you.  I don't think I made myself clear.

**A.**    Okay.

**Q.**    What I was asking about was how long into this conversation are we talking about?

**A.**    Oh, I would say after about the first 45 seconds of just inquiring why I was all bundled and what was on my neck and things of that nature, then to segue into the flirtatious part and then the remaining conversation for roughly two to three more minutes is why I would put it more on the other scale.

**Q.**    So the -- this entire conversation only lasted slightly more than three minutes perhaps?

**A.**    Sure, three to five probably.

**Q.** And did you then go on about your business?

**A.** I did. Then I proceeded to go to lunch or breakfast, whichever one it was.

**Q.** I'm sorry. I couldn't understand. You're speaking a little quickly, so if you could just slow down a little bit.

**A.** No worries.

Then I proceeded to go to lunch or breakfast, whichever one it was.

**Q.** You indicated that you had some concerns about, as you put it, pissing off an associate warden or a warden?

**A.** Yes.

**Q.** Were you trained in any way as to how you should handle situations where you had a complaint about a senior official, such as an associate warden or a warden, at the facility you were at?

**A.** Training, no.

**Q.** Any kind of guidance during, say, your initial conversation and orientation to the facility?

**A.** I actually didn't have my orientation until roughly the beginning of 2022 for Dublin. Somehow they missed giving me that.

However, if you're inquiring on if I've been trained in PREA, SeaTac did that. And whether or not I complain about it -- because I've complained about other staff members as well there -- you complain about them and nothing gets done.

Q.   All right.  Whether, to your perception, something gets done or not, there is a process that's described, correct, that you can follow?

A.   A process within the institution, yes.

You can also -- so there's multiple ways you can report PREA.  You can send an email to staff, which goes to SIS, which is in the lieutenant's office.  That wouldn't help me here because he's above them.

You could do an outside reporting, but in order for me to outside report it, I would have to speak to someone over the phone or the computer.  So that option is out as well, because all of those are monitored in and out.

Q.   All of those are what?

A.   Monitored.  So then he would still be alerted.

Q.   So if you want to exercise your -- an opportunity to contact OIG, for example, and -- about a complaint that you want to make about a member of the staff --

A.   Uh-huh.

Q.   -- it's your understanding that that phone call would be monitored by someone?

A.   There is no way to call the 1-800 number that they have listed.  You can't call 1-800 numbers from prison.

You can, however, send OIG an email, and it's -- to my understanding, it does run through SIS before going to OIG.

Q.   And from where did you have that understanding?

A.    From staff.

Q.    And do you recall who it was on the staff that told you that?

A.    No.  It was one of the lieutenants that are no longer there.

Q.    The incident in which you indicated that you had -- I think the first time that you say Mr. Garcia asked you to go to breakfast, do you recall exactly when that was?

A.    Not off the top of my head, no.

Q.    Was that something that you marked on your calendar?

A.    Sorry.  Give me one moment.  I'm thinking of what's on my calendar.

      I don't know if I marked the official date of it, because that would have been in my 2020 calendar and I only have my '21 calendar here.

Q.    So this -- this first conversation about breakfast is not in the calendar that you've provided to the Government?

A.    No.

Q.    What happened to the 2020 calendar?  Do you remember?

A.    It's in my belongings.  Nobody has ever asked for it.

Q.    And are those belongings that you have there at the facility?

A.    Yes.

Q.    So it's something that you could get out easily?

A.    Easily, no.

Q.    Okay.

A.    Potentially get out, yes.

Q.    All right.  When you say it's in your belongings, are the belongings something that are maintained in your cell or some other place?

A.    In my cell.

Q.    And what would be the difficulty in getting that out?

A.    They would be -- we've moved many times, but they would -- just -- for instance, I was just moved again yesterday.  So it would be somewhere either in my stack of paperwork for BOP, which is roughly 30 inches high, or in my legal box, which is 14 inches high and has two stacks on each side.

Q.    Okay.  So the difficulty you're describing is just an issue of having to go through a bunch of paperwork to find the right thing; is that --

A.    Correct.

Q.    -- what you're saying?

A.    You would be --

Q.    It's not like you would have to go through a locked facility of some kind to get to a storage area?

A.    No.  I don't have to leave the facility; I'd have to get back to the facility and then go through all of my things.  You'd be asking me to find six pages of paper, double-sided, and --

Q.    The -- the calendar that you're referring to, is it just

individual pages printed out on paper, as opposed to, say, what you might buy in a store, a desk calendar or --

A.   The 2020 calendar?

Q.   Yes.

A.   Is a calendar from religious services.  It's a normal calendar that you would buy in a store, I guess, if that answers your question.  The 2021 is printed on pages.

Q.   All right.  And the -- you mentioned that there was some confusion, I guess is a good word for it, about the word "dressing."

A.   At the beginning, yes.

Q.   And can you explain how that came to be that there was this confusion?

A.   I believe I slightly covered that earlier for you; however, my roommate at the time was dealing with some medical things.  For -- I mean, for the sake of her privacy, I would rather not discuss her name or anything like that, but she was dealing with a MRSA boil outbreak and would have anywhere from 1 to 21 boils at a time that would require dressing changes.

Q.   All right.  And that was something you were doing?

A.   I was her medical companion, so if she needed assistance for, like, the ones on her back or anything of that nature, yes, I may have to have -- help her with that.  But if she could reach them, she would change them herself.  She used to have to go to medical multiple times a day to get them changed

otherwise.

Q.    And how exactly did the use of the term "dressing" come up with respect to Mr. Garcia?

A.    He brought it up.

Q.    And how did he bring it up?  What did he say?

A.    He asked me when the dressing change was.

Q.    And when exactly did that conversation take place?  Do you recall?

A.    If I had my calendar, I could recall, yes.  But I would say --

Q.    Is that in your 2020 calendar as well?

A.    No, in the 2021.

Q.    So did you make a notation in that calendar at that time about --

A.    I want to say it was between the 24th and the 4th or 7th of -- end of July, Jan- -- or --

Q.    I'm sorry.  The 24th of what?

A.    I'm trying to remember the month now.  I'm sorry.

       I'm sorry.  No, I don't recall the month.  I'd have to see.  Sorry.

Q.    What, at that point, was your understanding of what he was referring to?

A.    That day, I thought he was referring to my roommate's literal dressing changes.

Q.    Had you had some conversation with him about the fact that

your roommate had this medical condition for which you were changing her dressing?

A.    I did not, no, but I was there while she did.  She has many medical issues and would constantly speak about them and inquire about.

Q.    How long had you been roommates with her at that point -- or cellmates?

A.    Other than little times when we were not together, I was her bunkie in SeaTac, as well as in FCI Dublin.  So I would say by that time, her and I had been roommates for over two years.

Q.    All right.  So I'm only concerned here with what happened in Dublin --

A.    Uh-huh.

Q.    -- not in SeaTac.

During the time that you were cellmates with her prior to this conversation with -- that you had with Mr. Garcia, had you ever seen her have a conversation with him?

A.    Multiple occasions, yes.

Q.    And were you able to hear what was being said during those conversations?

A.    For the most part, yes.

Q.    Okay.  So they were taking place like right at the cell?

A.    You could either speak to him during his rounds in the housing unit or you could see them at lunchtime.  They're supposed to be standing out for us to be able to address our

questions.

Q.   And did -- to your perception, did Mr. Garcia and your cellmate discuss the fact that she had this medical issue that required these dressings to be changed?

A.   Yes.

Q.   Then you -- you mentioned that there was an occasion where he confronted you in front of other people?

A.   Correct.

Q.   Do you recall when that happened?

A.   That's the same day as the dressing change discussion.

Q.   Separate conversation, though?

A.   No.

Q.   All part of the same conversation?

A.   Correct.

Q.   And, ultimately, at the end of that conversation, did you understand what he was asking you about?

A.   No.

Q.   Then on April 13th, you said he made some comment to you about it being a good day to go topless?

A.   I'm not sure if he said it like that, but something along the lines of it's a good day for me to be ready and dressing for him, and then requested that I be topless.

Q.   And how long after that previous conversation was this?

A.   That was prior to that conversation.

Q.   Okay.  I'm -- I'm sorry.  I've got the dates confused, I

guess.

So this conversation that you had about the dressing took place after April 13th?

A.    Correct.  Because he was no longer asking me -- he was still asking me every morning if it was an adequate day, if he didn't have meetings.

However, the dressing change time that he was referring to later came about that he meant, in general, when it was -- so if he made a round not on a day I went to breakfast, per se, he would be able to know.

Because my initial response to him on his dressing change question was not that -- not that it was dressing time; I said it was going to be nap time.

Q.    It was going to be what?

A.    Nap time.

Q.    And this -- on April the 13th, something else was going on that day also?

A.    For him or for me?

Q.    Well, for both of you, actually.  Is that right?

A.    Well --

Q.    A PREA inspection?

A.    Correct, was going on.

Q.    Did that involve you directly in some way?

A.    Only for the sake that they asked me to move out of the dressing room area I was in so they could inspect it and for

the comments he made.

Q.    I'm sorry.  I couldn't understand the last thing you said.

A.    And for the comments he made.

Q.    Now, his -- strike that.

When this PREA inspection group came by, was Mr. Garcia with them?

A.    Yes.

Q.    And it's your testimony that he left the group to speak to you separately; is that correct?

A.    My testimony for here, yes.  That's what he told me that morning.

Q.    Okay.  You said for your testimony here.

Is it different for some other place at other time?

A.    No.  What -- I'm reiterating that, yes, I said that he told me that he left the group.

Q.    You didn't actually see that happen?

A.    No, because I was in laundry.  But I take his word for it.

Q.    Well, when he was talking to you at that point, obviously, he was not with the group; right?

A.    The group was still in the room.  I don't know if you guys have a photo of laundry facility, but when you walk into the doors into laundry, you have roughly a 20-by-30, possibly 20-by-40 area where it's just tables and the laundry machines, and then you have a row of clothing and blankets and then another row of clothing and blankets.  And if you wrap around,

like come in the door and around by the laundry, that's where the dressing area is.

And then it's in that little section that he walked away from the group to come over and tell me before he then went back to join the group.

Q.   All right.   So the group was still in the room, though.

A.   Correct.

Q.   And about how far apart were you from the rest of the group?

A.   I would say between me here and the last juror in the green sweater.

MR. REILLY:   Does the Court have dimensions for that distance?

THE COURT:   So from the -- from the witness stand -- so from the end of the witness stand to the end of the jury box is just over 25 feet.

MR. REILLY:   Thank you, Your Honor.

THE COURT:   So that's approximate.

BY MR. REILLY:

Q.   So that would mean pretty close to being all the way on opposite sides of the room, I take it?

A.   No.   I'm sorry.   So your 20-by-40 section is on the one side of the aisle of the laundry, and then on the other side, you have about another 15 feet.

But, yes, still like opposite corners for the sake of the

room.

Q.   And during that time, were the members of this -- the other group that he had separated from -- could you hear them talking?

A.   They were talking amongst each other about other areas of the room.

Q.   And you could understand that conversation or you could hear what they were saying?

A.   I could hear what they were saying; I just wasn't listening to what exactly they were saying.  It didn't register in my mind as much as his comments had.

Q.   And when Mr. Garcia spoke to you, did he do that in a normal tone of voice?

A.   I would -- he had his mask on, but I would still say it was maybe slightly hushed versus his usual tone.  But it definitely wasn't made quiet.

Q.   It was definitely what?

A.   Wasn't made quietly.  He didn't move his mask to speak in hushed -- more so hushed tones.  And he was walking as he said it to me, so...

Q.   And were you moving at that time also or were you standing still?

A.   Nope, I was standing still right next to the dressing area, as I was instructed to do.

Q.   So you're saying, basically, he just walked by you and

made a comment as he was doing that; is that fair?

**A.** I wouldn't say necessarily walked. Perhaps strolled is a better example, because it was at a much more leisurely pace. So he just looked like he was looking around looking at things when he was, in fact, having a conversation with me.

**Q.** When you had this conversation with Mr. Garcia on April the 15th, you said, early in the morning -- or I guess it's early depending on who you are -- shortly after 8:00?

**A.** Given that breakfast is usually called between 6:00 and 6:30, it's no longer early when he says he will be around between 8:05 and 8:20.

**Q.** Okay. So just to be clear about it, in the context that you're talking about, if you were to just use the phrase "early in the morning," you would be talking about something around 6:00 or thereabouts?

**A.** Correct.

**Q.** And you said he talked to you for 20 to 30 seconds that day?

**A.** In my doorway, yes.

**Q.** And --

**A.** Prior to that morning at breakfast was more -- a much more substantial amount of time.

**Q.** All right. So I wanted to clarify that.

You said that he came by about 8:10?

**A.** Uh-huh.

**Q.** And when did you go to breakfast?

**A.** Breakfast was probably around 6:15, 6:30 that day.

**Q.** All right. So when he stopped to see you, you had already been to breakfast that morning.

**A.** Correct.

**Q.** Okay.

**A.** That's how I find out to be ready and what time and what he wanted.

**Q.** I'm sorry. I couldn't understand the last thing you said. You are speaking a little quickly and I'm having trouble picking up some of what you're saying.

**A.** At breakfast is when I find out if he wants me to do something; if he does, what it is; and what time he'll be there.

**Q.** All right. So did you have a conversation with Mr. Garcia at breakfast on the morning of April the 15th?

**A.** Yes, I did.

**Q.** And what was it that he told you at that time?

**A.** That he did not have a meeting, he would likely be making his rounds between 8:05 and 8:20, and that he would love to see me and that I should be ready, as he would like to see me topless putting on lotion.

**Q.** He would like to see you topless and what?

**A.** Putting on lotion.

**Q.** And then when he came to your cell, your door was closed?

**A.**    Yes.

**Q.**    And you said he opened it?

**A.**    He did, after briefly knocking.  Not like a full knock, but just kind of knock and open.

**Q.**    I take it these cell doors are not normally locked?

**A.**    No.

**Q.**    Are they capable of being locked?

**A.**    Some.  They're --

**Q.**    Was yours?

**A.**    -- working on that now.

**Q.**    I'm sorry?

**A.**    I said they're working on that now.  I'm not sure if my door was able to be locked then.

**Q.**    When you say they're working on it now, are you talking about them putting locks on doors that didn't previously have them?

**A.**    Dublin is not in the greatest of conditions.  Some doors have no doorknob at all; some doors have no lock at all or the lock is broken; some, the section of the door where it latches is on backwards and it opens itself.

**Q.**    All right.  So you're saying they're fixing them, I guess, is a better way to --

**A.**    They are fixing them.

**Q.**    Okay.  And on that particular day, April the 15th, did you, in fact, comply with his request that you be undressed?

A.   Yes.

Q.   Did he take pictures?

A.   Not that I am aware of.

I did notice it was strange to me that in his breast pocket on the outside of his shirt, rather than the phone that he usually carries, which is usually face out, it was turned towards him and the camera lens was facing out, which I found awkward just because that's not usually how it is on him.  But I don't know if it was on or anything like that.  It's not like the flash was on.

Q.   All right.  So he didn't, like, pick --

A.   No.

Q.   -- the phone up and make a motion as though he was taking a picture?

A.   No, not at all.

Q.   Did you ever see him do that to you?

A.   Take pictures of me?

Q.   Yes.

A.   Not that I'm aware.

Q.   Did he ever ask you if he could take pictures?

A.   No, but he had mentioned that he had seen my work.

Q.   That he had seen your what?

A.   My work.

Q.   Your work?

A.   My previous employment work, yes.

**Q.** And what's -- what was the significance of that?

**MR. PAULSON:** Objection, Your Honor. 412.

**THE COURT:** Well, she can't testify as to his intentions, so I certainly need a reframing of the question.

**MR. REILLY:** All right, Your Honor. Thank you.

**Q.** You mentioned that typically when Mr. Garcia would come by your cell, that your cellmate was not there?

**A.** Correct.

**Q.** And that was because she was working or otherwise out of the cell for some authorized reason?

**A.** No. She's medically unassigned, so she was not working. She would either be in a video visit, on the computer, or just standing right in the hallway outside our door. She can't do prolonged standing and she's confined to the cell aside from meals, computer, phone time, or pill line.

**Q.** But she was never out of the cell as a result of a request by Mr. Garcia --

**A.** No.

**Q.** -- or him having ordered her to do something?

**A.** No. But he had mentioned to me on multiple occasions that he needed time to speak to me away from her because she's overprotective of me.

**Q.** Was that before or after this incident where you said she blocked him at the door?

**A.** Bless you.

Q.    I'm sorry?

A.    I said bless you --

Q.    Thank you.

A.    -- for coughing.

I would say that discussion was after the initial time that he saw me on April 15th, but before she blocked me at the door.

Q.    Do you recall what day that happened?

A.    No.

Q.    Can you estimate for us?  Was it like a few days, a couple weeks, months after the 15th of April?

A.    It was one of the four dates he requested in June.  I'm just not sure as to which one.

Q.    All right.  Let me go to that for a minute.

You indicated "one of the four dates he requested."

What did you mean by that?

A.    In June, there was four different days when he requested that I be in a form of undress when he came by for his rounds.

Q.    And did you comply with that request on each of those occasions?

A.    Yes.

Q.    On any of those dates, was your cellmate present?

A.    Just the one where she was trying to block him at the door.  And she was only there that day because her video visit didn't have good connection, so they got off early.

Q.   And do you recall which of those dates that was?

A.   I would need to see my calendar.  Sorry.

Q.   Did you make a note about that in your calendar?

A.   I'm not necessarily sure if you would entitle it to be a note.  I just -- I can tell from my handwriting which one she completed or not, because I write things differently.  I make little marks here and there.  It's intricate and it works in my mind, but I'm not sure you, not in my frame of mind, would understand my indications on my calendar.

Q.   Other than that one occasion, did you comply with this request on each of the other three dates in June?

A.   Yes.

Q.   I'm sorry?

A.   Yes.

Q.   And on any of those occasions, did Mr. Garcia appear to take photographs of you?

A.   Not that I'm aware of.

     And I did -- you kind of made it sound a little weird, so I just want to be sure to reframe my answer.  I did comply on the day she blocked me at the door as well.  So I complied on all four days he asked me in June.

Q.   Okay.  And when she was blocking the door on that one occasion, where exactly were you?

A.   In the middle of the room where I was supposed to be.

Q.   Could you see him?

**A.**    I could hear -- I saw his head walk by while she had him, quote/unquote, distracted looking at her the other direction. And then after that, when she turned around and saw that I was still undressed, she stood in front of the door to block.

**Q.**    And while she was doing that, could you see him?

**A.**    No, because she was blocking him.

**Q.**    And for how long a period of time did that standoff last?

**A.**    I would say a little more than five minutes, which is an incredibly long time to be standing naked in your room.

**Q.**    Were your roommate and Mr. Garcia having a conversation during that time?

**A.**    Yes, they were.

**Q.**    Could you hear what they were saying?

**A.**    Yes, but I'm not at liberty to discuss what they were speaking about.

**Q.**    I'm sorry.  I couldn't understand that.

**A.**    Yes, but I'm not at liberty to discuss what they were speaking about because it was not intended for me to hear.

**Q.**    Okay.  I'm not sure I understand why you think you can't tell us what they were talking about.

**A.**    Well, I could, but just out of respect for her, I just don't feel it's my place.  It wasn't a conversation intended for me to hear, and it's not my story to tell.

**Q.**    Was that conversation about you and what was going on?

**A.**    No.

**Q.**    All right.  You mentioned that there was this issue over management variables --

**A.**    Uh-huh.

**Q.**    -- with respect to your incarceration.

**A.**    Correct.

**Q.**    When you first arrived at Dublin, was there a -- a management variable assigned to you at that time?

**A.**    Yes.  Grand Prairie had placed a one-year management variable on me.

**Q.**    And was -- that happened when you were at SeaTac?

**A.**    No.  That just happened when I got sentenced.

**Q.**    Okay.

**A.**    It's not uncommon for Grand Prairie, who does all of the designations, to put a one-year management variable on you, which a management variable just holds you one step higher.  So even though my points say I'm camp eligible the whole time I've been in custody, it holds me at an FCI, at a low facility instead of a minimum.

**Q.**    All right.  So let me clarify, then.

When exactly were you at SeaTac?

**A.**    On pretrial.

**Q.**    Okay.  So you were not incarcerated at a -- as a sentenced inmate when you were at SeaTac?

**A.**    The first time I was at SeaTac, no.  I was there for about seven or eight months on pretrial and then went back for

sentencing, and then was there for, I believe, 8 to 14 days and then sent to the transfer facility to come to Dublin.

Q.   Okay.  And so just to be -- to make sure the record is clear, when you refer to "SeaTac," you are referring to Seattle/Tacoma?

A.   Correct.

Q.   So, basically, the Dublin assignment was the first permanent assignment for you as a convicted inmate.

A.   Correct.  And has remained such, even though I've asked for multiple transfers.

Q.   Okay.  And then you said this one-year variable, that it was your understanding that Mr. Garcia had it dropped from your record or dropped from your calculation?

A.   Yeah -- well, yes, but not in the -- I don't believe you understand how they work.

So the one-year one still applied until that one fell off, because that was done through Grand Prairie.

Once that fell off, our unit team in Dublin asked Grand Prairie to put on an additional one.  When that happens, I had put in an 8-1/2, which is an administrative remedy, and then a 9 as well, when that came back as a denial to take it off.  And when you put in a 9, that goes to the warden, and he denied it as well.  And I could tell you the dates.  That's on my calendar as well.  And then when that came back, I still did my 10 and my 11 on it, even though by then it was already on.

In that interim time of doing the 10 and 11, Garcia had instructed our unit managers to drop the management variables if they were putting them on if we had no shots and no anything like that to indicate that we required to have one.  And in doing that, they ended up dropping mine as well.

Q.   So it was your understanding that he did do that, though, he asked that that be dropped?

A.   Yes.  He asked that that be dropped, and then --

Q.   How -- excuse me.  How did you know that that -- that he had done that?

A.   He told me he was going to tell them to drop it and to give inmates a chance to go to camp if they're eligible and the only thing that's holding them back is the management variable.

That said, I also feel it's important for you to know he also told me that if I do transfer to camp -- because I had asked if I could put in for a furlough, because if you're going to a more so minimum facility than you're already at, you can put in for a furlough so I could go unescorted.  Instead of taking forever to go across the U.S. and the transfer stations, I could just pay my own expense for a plane ticket to take me directly over there on a furlough and go straight to the new designation.

That said, he said he would approve my furlough if I requested it if I got the approval for camp and that he wanted to see me at the airport and that he would say he had some

meeting at his children's school.

Q.   And then I think you said that nevertheless, another variable was added even after he had asked that that one be taken off?

A.   Right.  That one had got dropped, but because they had already put in the request, Grand Prairie still ended up putting the management variable on.

Q.   Okay.  So that one that was added back on, that came at the direction of Grand Prairie, not --

A.   Correct.

Q.   -- Dublin.

A.   Correct.  It was requested by Dublin, and it was already requested by the time he asked them to drop it.  So they had dropped the one they put on, but Grand Prairie still ended up putting one on.  I think it was just because it happened in such a short amount of time that they overlapped each other.

     Because there's no, really, discussion between Dublin and Grand Prairie.  Once it's sent, there is not really a way to get it back, from my understanding.

Q.   You were in more than one unit at Dublin at one time or another; is that right?

A.   Yes.  I have now lived in all six units at Dublin.

Q.   And when you were first there, you were in the C-Unit?

A.   No.  When I first arrived at Dublin, I was in E-Unit.  It goes A through F and then we have the Special Housing Unit as

well.

But I was first in E-Unit.  I got moved over to A-Unit for my job at UNICOR.  When I ended up working in the kitchen, they moved me to B-Unit.  And then from B-Unit, I was moved to C-Unit as her medical companion, because they required her to move over to C-Unit to the medical unit.

Q.   And when you were having these conversations with Mr. Garcia by yourself, was that when you were at the C-Unit or not?

A.   They started when I was still in B side.  They continued while I was in C side and then lasted from when they arbitrarily moved me from C side to F side.

Q.   So part of the time you were in F-Unit?

A.   Part of the time I was in B, C, and F.

Q.   I meant part of the time when you were having these conversations with Mr. Garcia.

A.   Yes.  But most conversations, rather than just walking through the unit, also happened at breakfast, lunch, or in the unit during his rounds.

Q.   I understand that.

But what I mean is during the time period when these conversations were taking place, part of that time you were in the C-Unit and part of the time you were in the F-Unit?

A.   As well as the B-Unit.

Q.   And when you were moved to the F-Unit, was the -- was your

cellmate still the same person that you'd been cellies with in C?

**A.**    No.    They left her in C and moved me to F side, which resulted in her breaking out in a head-to-toe rash for over two weeks.

**Q.**    And when you were in the F-Unit, did you know an inmate named Maria?

**A.**    I assume you can't give me the last name, but there is multiple Marias in that unit.

**Q.**    I'm sorry.    There are what?

**A.**    There are multiple Marias in that unit.

**Q.**    Was one of them in the cell next to yours?

**A.**    Not that I recall.

**Q.**    Did you ever see, during the time you were in the F-Unit, Mr. Garcia speaking with any of the inmates named Maria?

**A.**    Yes.

**Q.**    And where was that inmate housed?

**A.**    I'm not sure of her room number.    If it's the one you're inquiring about, she used to do our laundry and they would have their discussions downstairs between, like, the two, three stairs to go up to the lobby, down in front of her house, and the laun- -- one of the laundry areas, because there is actually two laundries per each unit.

**Q.**    And this particular person who did the laundry, was she -- what cell was she in with respect to yours?    How far apart were

they?

**A.**    Well, that depends.  They move us often.

So I lived in roughly three to four cells in F-Unit.  At the time, I have no idea which cell I lived in, but it could have been anywhere from four or five cells away to the other half of the unit or just right above her -- not right above her cell, but roughly above her cell on the same side of the unit or...

**Q.**    Do you remember when it was that you were moved to the F-Unit?

**A.**    That is noted on my calendar.

**Q.**    But you don't recall it off the top of your head?

**A.**    No.  I want -- well, I mean, July sometime, I believe.

**Q.**    Are we talking 2020 or 2021?

**A.**    2021.

**Q.**    So this would have been -- you would have been in the F-Unit only for a very short period of time, then, before you had your last contact with Mr. Garcia?

**A.**    If you consider that to be a short period of time, then yes.

**Q.**    Less than a month.

**A.**    Less than a month, yes.

**Q.**    As part of the process of trying to have that management variable removed from your record, did you agree to cooperate with the officials at the facility about anything?

**A.**    I don't believe I understand what you're asking.  Can you --

**Q.**    Did you agree to give them information about other inmates?

**A.**    No, not in the sense that you're referring to.

**Q.**    Not what?

**A.**    Not in the sense you're referring to.

**Q.**    Okay.

**A.**    There's no reward for speaking about other inmates at the facility.  There's no reward for coming to court today.  There's just justice that needs to be held and accountability that should be taken for.

**Q.**    So are you saying you think that cooperating with the authorities would never have any benefit for yourself?

**A.**    From my understanding, no.

**Q.**    Did --

**A.**    Although may I continue on that?  From my understanding, no.

There are, however, multiple repercussions from me being here today and from me speaking up in the past about other people, staff members, inmates, the like.

**Q.**    And what would those repercussions be?

**A.**    I have dealt with multiple times of retaliation and multiple forms of retaliation.  So it's not exactly something I look forward to going back to FCI Dublin for and it's not

something that I'm excited to be here for today.

**Q.** So at one point, other inmates considered you to be a snitch, for example?

**A.** Yes.

**Q.** Because you were giving information to the authorities?

**A.** No. They considered me to be a snitch and my roommate at the time, the same one that I was medically caring for, to be the snitch and her bitch.

And that was after I was assaulted for the second time at FCI Dublin by an inmate that decided to smack me twice on the face on camera.

**Q.** And I assume that this confrontation with this inmate did not have anything to do with Mr. Garcia.

**A.** Not that they knew of, no. I was on the law library when that happened looking up staff misconduct, how to report it without going through the facility itself and retaliation and discrimination.

**Q.** All right. What I meant by that was you have no reason to believe that this inmate attacked you because of anything that had -- was related to Mr. Garcia?

**A.** Honestly, I believe that inmate attacked me because they were high on drugs, because their eyes were very glossed over, and because they made it known that they were upset that I was on the law library.

And despite the fact I told them I'd be done in less than

three minutes, they still came over and smacked me once.  And when they got no rise out of me and I just kept doing what I was doing on the computer, they came over and smacked me on the face again.

Q.   All right.  You said "they."  Are you referring to more than one person or are you using that in the sense of meaning just one individual?

A.   No, it's just one individual.  Her girlfriend was there as well, and then there was other multiple inmates.

And the girlfriend didn't care what she was doing.  The other inmates were trying to pull her back from hitting me again and stuff of that nature, and yet she did it anyways.

Q.   And then you indicated that you ultimately made a report about Mr. Garcia to the staff psychologist?

A.   Yes, I did.

Q.   Do you remember who that was?

A.   Dr. Hung.  He's our C-side unit psychologist.

Q.   And when you did that, did -- was it your understanding that he was obligated to report that --

A.   Yes.

Q.   -- to other authorities at the facility?

A.   Correct.

Q.   And to your understanding, he did that; correct?

A.   From my understanding, yes.  From our discussion just this last week, he said he filed the paperwork for that, which I

assume is why I saw medical the next day for the PREA assessment.

However, he has never heard anything coming back on it, but I also had my friend report this incident and many other forms as well.

Q.   Okay.  I'm not sure I'm clear on that.  Who is this friend you're talking about?

A.   My friend, Mr. Hewsman.

Q.   Is this a staff member?

A.   No.  This is my friend from home.

Q.   Okay.  Someone outside the facility?

A.   Yes.  Because FCI Dublin couldn't get me the PREA hand -- I'm sorry, the PREA standards and handbook, and so I required -- requested my friend to do so, which got there roughly a week later after being sent around in circles at FCI Dublin for over a month.

Q.   And then you -- you also indicated that on August the 4th of 2021, that someone spoke to a captain about this?

A.   I spoke to the captain.

Q.   That was you that did that?

A.   Uh-huh.

And then eight months later, I did it again to a different captain that was there, because nothing had happened and I still didn't feel safe for myself from staff or inmates.

Q.   So even months after Mr. Garcia left, you still had

concerns about your safety?

A.    Yes.

Q.    So, obviously, they were not related in any way to him, those concerns.

A.    Oh, no, those concerns were definitely related to him.

Q.    Did you think he still had the influence over someone that could cause you a problem?

A.    I was still dealing with lots of retaliation at that point from reporting him, so yes.

Q.    Did you have any specific reason from anything that anyone said to you that indicated that any of this retaliation was being motivated directly by Mr. Garcia?

A.    I had another staff member ask me during their evening watch, which is the -- I'm not even sure if they consider it evening or graveyard, but the watch from 10:00 p.m. to 6:00 a.m.  One of them asked me if I would play for them, as in play with myself, be naked playing when they came around for their round.  I said no.

And he specifically told me, "Well, you did it for him," as in your defendant.  They just called him by name.  "You did it for him, so you can do it for me."  So, yes, I would say the retaliation did stem from your defendant.

Q.    All right.  But the point I'm making is you didn't have any reason to believe that Mr. Garcia told this particular staff member to approach you for that purpose.

**A.**    I'm not at liberty to say if he told him or not.  I wasn't there for the discussion if they did have it, and I couldn't tell you if they did or didn't have it.

**Q.**    Okay.  So --

**A.**    But there should be no other reason why that staff member would know that anything like that would ever happen if it wasn't from him.

Does that answer your question?

**Q.**    I'm not sure I understand what you mean.

Are you saying you think that he knew about the contact between yourself and Mr. Garcia because Mr. Garcia told him about it?

**A.**    Well, I certainly did not tell him about it.

**Q.**    Okay.  But -- but you don't have any specific knowledge from which you could say that Mr. Garcia, after leaving the facility on the 21st of July, contacted some other staff member and said, "Hey, go approach Katrina about some kind of sexual conduct"?

**A.**    After he left?

**Q.**    Yes.

**A.**    Not necessarily.  While he was still there, it's quite possible.

**Q.**    Do you have any reason to -- any specific information that that ever happened?

**A.**    Specific information that it happened?  No.  But, again,

that staff member, who at the time was my boss in the kitchen, would have had --

Q.   What was his name?

A.   Something or other Chavez, E. Chavez, I guess.

He would have had no knowledge of the matter going on.

Q.   Okay.  So I'm going to ask the question again.

A.   Okay.

Q.   Do you have any specific information to indicate that Mr. Garcia ever told Mr. Chavez that he should address with you the possibility of some kind of sexual conduct?

A.   Considering that he said -- as in Chavez said that Garcia -- or that if I could do it for Garcia, then I can do it for Chavez, just so you don't misinterpret their names, I would have to assume that Mr. Garcia at some point likely told Chavez something.  Because I sure didn't tell Chavez anything.  I didn't feel comfortable talking about it with anybody at the compound staff-wise.

Q.   All right.  I'm going to ask it one more time.

Do you have any specific information to indicate that Mr. Garcia told Mr. Chavez that he should approach you about this sexual conduct?  Other than your own assumptions about what you think may have happened, did you hear such a conversation?  Did someone tell you that such a conversation took place?

A.   Again, none of those conversations happened in my

presence.

Q.   Okay.

A.   There would be no reason for him to have knowledge of anything if a conversation didn't take place.

Q.   And there would be no reason for you to have any knowledge as to what motivated him to approach you either, would there?

A.   Other than that he said if I could do it for Garcia, I could do it for him, no.

THE COURT:   Is this a good breaking point?

MR. REILLY:   Your Honor, I'm about maybe two minutes away from finishing.

THE COURT:   Is there going to be redirect?

MR. PAULSON:   Well, depending on these two minutes, I do not believe so, Your Honor.

THE COURT:   Okay.  All right.  Go ahead.  Two minutes.

MR. REILLY:   All right.  Thank you, Your Honor.

Q.   Subsequent to these conversations with Correctional Officer Chavez, have you had any other conversations with anyone who desired to have some contact with you?

MR. PAULSON:   Objection, Your Honor.  Relevance.

THE COURT:   Relevance?

MR. REILLY:   I'll rephrase it, Your Honor.

Q.   Do you have any reason to believe that any other correctional officer acted as a result of conduct by Mr. Garcia with respect to contacting you?

**A.**   Contacting me, no.  Retaliation-wise, yes.

**Q.**   So you think some other correctional officers have retaliated against you because of what happened to Mr. Garcia?

**A.**   Absolutely, yes.

**Q.**   Is that what you're saying?

And who would those correctional officers be?

**A.**   There's been multiple.  Sorry.  I only know their last names.

Pryor is one.  He would -- I'm not sure how to put it in the best, like, condensed area for the two minutes, but he would come search our room.  He would destroy it.  They're supposed to put it back in the relatively state that they found it in.

He would take it as far as to dump out our oatmeal and our honey and lay it on the floor, lock us out of the room for roughly two hours or so, go back in, open it, and tell us to clean that shit up, which I've never had issues with him prior to reporting Garcia.

There's also been Bilbo, who --

**Q.**   I'm sorry, what was that name?

**A.**   Bilbo, also known as -- it's not Cardenas.  Canales, I believe.  He has two last names.

**Q.**   But none of these individuals ever approached you for any kind of sexual contact?

**MR. PAULSON:**  Objection, Your Honor.  412, relevance.

THE COURT:  Response.

MR. REILLY:  The accusation is that Officer Chavez made a sexual approach to her on the basis of conversation with Mr. Garcia.  I just want to make sure that didn't happen with anyone else.

THE COURT:  I'm still not seeing the actual relevance to the elements or defense.

MR. REILLY:  All right.  In that case, Your Honor, I have nothing further at this time.

THE COURT:  All right.  Any redirect?

MR. PAULSON:  No, Your Honor.

THE COURT:  Any need to recall?

MR. REILLY:  No, Your Honor.

MR. PAULSON:  No, Your Honor.

THE COURT:  All right.  Katrina, you're excused.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Members of the Jury, at this time we will take our 20-minute break, so we'll stand in recess for 20 minutes.  Okay?

(Proceedings were heard out of presence of the jury:)

THE COURT:  Okay.  The record will reflect that the jury has left the courtroom.

You're excused.  Thank you.

Anything to do?  Otherwise, we'll stand in recess for 20 minutes.

MS. PRIEDEMAN: Your Honor, just one thing. For the next witness, we'll be playing the audio of the interview with the transcript. So we would ask that -- I believe it's Instruction No. 16 be read either before or after.

THE COURT: Okay. Mr. Reilly, anything?

MR. REILLY: That's fine, Your Honor.

THE COURT: Anything from your side?

MR. REILLY: I'm sorry?

THE COURT: Anything from your side?

MR. REILLY: No.

THE COURT: All right. We'll stand in recess for 20 minutes.

(Recess taken at 10:08 a.m.)

(Proceedings resumed at 10:27 a.m.)

THE COURT: Okay. Mr. Bera, who is one of the jurors, asked the -- my CRD about the counts. He says he's having a hard time keeping them -- keeping them straight in his head. So I'm going to make just a little comment about what they will be given before they have to deliberate so they'll know that we have all of that information. And the other thing I can do is I can repeat these instructions to them at the end. All right?

Let's call in the jury.

(Proceedings were heard in the presence of the jury:)

THE COURT: Okay. We are back on the record. The record will reflect that the jury is back.

And there was a question about the counts, and let -- so let me just give you a little bit of a preview of what's going to happen at the end.

At the end of all the evidence, I will give you a final set of instructions.  You'll actually have a copy of those instructions that I'll provide to you, and then I will also repeat the instructions -- the limiting instructions that I've been giving with respect to certain witnesses.

And it is the attorneys' job to make sure you're clear about everything in terms of what each count is and what your decision is meant to be with -- or the evidence related to it.

In general, right -- and this was said during the openings -- Counts 1 through 4 relate to Melissa, Counts 5 and 6 relate to Maria, Count 7 relates to Rachel, and Count 8, which is the count that has been separated sometimes, that's the allegation of lying to the FBI.  Okay?  So that's the basic breakdown, but we will give you everything that you need.  Okay?

All right.  Let's call the next witness.

MS. PRIEDEMAN:  The Government calls Special Agent Katherine Barclay.

THE CLERK:  Please remain standing.

Please raise your right hand.

**KATHERINE BARCLAY**,

called as a witness for the Government, having been duly sworn, testified as follows:

THE WITNESS:  Yes, I do.

THE CLERK:  Thank you.  Please be seated.

Speak clearly into the microphone.  Please state and spell your full name for the record.

THE WITNESS:  Yes.  My name is Katherine Barclay, spelled K-A-T-H-E-R-I-N-E, B-A-R-C-L-A-Y.

THE COURT:  Good morning.

THE WITNESS:  Good morning.

THE COURT:  You may proceed.

**DIRECT EXAMINATION**

BY MS. PRIEDEMAN:

Q.   Good morning, Special Agent Barclay.

A.   Good morning.

Q.   How are you employed?

A.   I'm a special agent for the Federal Bureau of Investigation.

Q.   How long have you been a special agent with the FBI?

A.   Since August of 2016.

Q.   What squad are you assigned to?

A.   I'm assigned to a squad that investigates public corruption of the East Bay and civil rights.

Q.   What did you do prior to becoming an FBI agent?

**A.**    I was a software engineer for three years prior to being with the FBI.

**Q.**    Were you involved in the investigation into the defendant, Ray Garcia?

**A.**    Yes.

**Q.**    Prior to initiating the investigation of the defendant, had you previously interacted with the defendant?

**A.**    Yes.

**Q.**    In what capacity?

**A.**    We were doing a search at FCI Dublin, and part of the search required consent to search from the warden.  So he signed off on that.

**Q.**    What did the search relate to at FCI Dublin?

**A.**    It related to an investigation of sexual abuse by correctional officers there.

**Q.**    Was the defendant notified about that investigation?

**A.**    Yes.

**Q.**    When did that occur?

**A.**    That was April of 2021.

**Q.**    How did you become involved in the investigation into the defendant?

**A.**    The U.S. Attorney's Office called our office and OIG after Melissa's attorneys had contacted the attorney's office.

**Q.**    Did you open an investigation at that point?

**A.**    Yes, we did, along with OIG.

Q.    What types of cases does DOJ OIG investigate?

A.    DOJ OIG investigates federal employees.

Q.    What happened after you opened the investigation into the defendant?

A.    We interviewed Melissa and we worked to corroborate the things that she told us.

Q.    When did you speak with Melissa for that first time, approximately?

A.    We spoke to her July 15th of 2021.

Q.    How did you speak with her?

A.    We had to speak with her on -- over the phone.  And it was an attorney call, so it was not monitored through the BOP phone system.

Q.    Where was Melissa when that call took place?

A.    Melissa was at FCI Dublin at the camp.

Q.    You said that you worked to corroborate information that Melissa had provided.

    What types of information were you able to corroborate?

A.    We were able to corroborate that Mr. Garcia made phone calls to Vegas regarding her -- that he told her that he had a timeshare in Vegas.

    I can't remember right now what other details we corroborated.  There were a couple things, though.

Q.    Any personal information about the defendant?

A.    His birthday.

Q.    What happened after that?

A.    After that, we -- we did the search warrant at FCI Dublin and at Mr. Garcia's residence.

Q.    Did you request surveillance footage from FCI Dublin?

A.    Yes, we did.

Q.    When did you request the surveillance footage?

A.    We requested it on the day we executed the search warrants.  Well, we requested it be preserved on the day of the search warrants.  And then we followed up with an email later ensuring it was preserved, and then we received some surveillance footage later.

Q.    What did you request from FCI Dublin?

A.    We requested footage around Melissa's cell and around Katrina's cell and then in the visitation area, but they told us there was no more footage from the visitation area for -- going back to 2020.

Q.    Why did you request footage for Katrina's cell?

A.    So Lieutenant Putnam told me and another agent that he had received information from an inmate that Katrina was undressing for Garcia during his rounds.

Q.    You said you received some surveillance videos.

      What did you receive in response to your request for footage?

A.    We received a subset of footage that Lieutenant Putnam had reviewed.  So we received the results of his review.

Q.    And where was the surveillance footage from?

A.    It was from cameras around Katrina's cell and Melissa's cell, and they only went back to June 7th.

Q.    So what was the date range that the surveillance footage covered?

A.    We received surveillance footage from June 7th to July 19th, 2021.

Q.    So you weren't able to -- you weren't able to get any footage prior to June 7th, 2021?

A.    Correct.

Q.    You said that Lieutenant Putnam had reviewed some of the footage and given you select footage.

      What did you mean by that?

A.    He reviewed footage of just when he saw Garcia in the housing unit around those -- around Melissa's cell and around Katrina's cell.

Q.    So you didn't get footage from every day from those --

A.    We did not have footage from every day.

Q.    Did you request footage for Maria -- around Maria's cell?

A.    No.

Q.    Why not?

A.    We didn't know about Maria.

Q.    Did you request it later?

A.    I can't remember if we requested it later, but by the time -- I believe November, when she said that she was

undressing for him, based on the prior footage they gave us, there was just no way it would have gone back that far.

Q.   So you never were able to receive footage around Maria's cell.

A.   No.

Q.   What about around the laundry areas?

A.   I'm sorry.  We do have a few days from around Maria's cell because there are a few days in July when Katrina's cell was close to hers.

Q.   But other than those few days, you don't have --

A.   Correct.

Q.   -- comprehensive --

     Sorry.  Just wait until I ask the question before you answer so the court reporter can get down everything.

     And do you have any footage from the laundry room?

A.   They are -- in two of the videos, there's a few minutes from a camera that looks -- one of the cameras looks in the hallway that has the laundry room.  The other one looks -- you can see the doorway of the laundry room, but it's for a very short period of time, around like just a few days in July of 2021.

Q.   Did you request footage for the conduct related to Rachel's -- what Rachel had told you about what happened with the defendant?

A.   I do not think we did.

Q.   Why not?

A.   Because Rachel's -- the conduct surrounding Rachel was -- we talked to her May 2021 and the conduct around Rachel would have been in 2020.  So based on our, you know, past conversations for them, they wouldn't have had the footage.

Q.   You said you received some footage from June and July 2021 outside of Katrina's and Melissa's cells.

     Did you review that footage?

A.   I did.

Q.   What did you see?

A.   I saw Mr. Garcia making rounds.  I saw him talking to inmates, talking to Katrina.

     There was one day where he was making rounds that he did kind of a double-take in Katrina's cell.  It was pretty quick.

     And then there was another day that he was talking with Katrina's cellmate in their doorway.

Q.   How long was he talking to Katrina's cellmate in the doorway for?

A.   It was for a few minutes.

Q.   When was that, approximately?

A.   That was in June of 2021.

Q.   You mentioned FBI executed search warrants.

     When did the FBI execute search warrants?

A.   We executed the search warrants on July 22, 2021.

Q.   Did you interview the defendant the same day that you

executed the search warrants?

A.   Yes, we did.

Q.   Have you had the opportunity to review Exhibit 165?

A.   Yes.

Q.   Is it an accurate recording of the interview that the defendant conducted on -- that you conducted with the defendant on July 22nd, 2021?

A.   Yes, it is.

        MS. PRIEDEMAN:  Your Honor, at this time, the Government would move to admit Exhibit 165 and play it with the transcript.

        MR. REILLY:  No objection.

        THE COURT:  165 is admitted.

        (Government Exhibit 165 received in evidence)

        THE COURT:  And it may be played to the jury.

    Let me give you another instruction with respect to this recording.

    Is there a video as well?  Is there video as well?

        MS. PRIEDEMAN:  No, Your Honor.

        THE COURT:  All right.

    You are about to hear -- oh, hold on.  Hold on.  Hold on.  Thank you.

    You're about to hear a recording that has been received into evidence.  Please listen to it carefully.  A transcript -- which you can see the start of it -- a transcript will be

played with the recording to help you identify speakers and as a guide to help you listen to the recording.  However, bear in mind that the recording itself is the evidence, not the transcript.  If you hear something different from what appears in the transcript, what you hear is what controls.

After the recording has been played, you will have it with you in the jury room, but you will not have the transcript.  Okay?

You may proceed.

**MS. PRIEDEMAN:**  Thank you, Your Honor.

Ms. Slattery, can you please press "Play."

(Whereupon, the recording was played for the jury.)

**MS. PRIEDEMAN:**  Thank you.  You can take that down, Ms. Slattery.

**Q.**  Special Agent Barclay, did the defendant's statements that the defendant hadn't asked inmates to strip at particular times and that he hadn't touched inmates inappropriately affect FBI's investigation?

**A.**  Yes, it did.

**Q.**  How so?

**A.**  Well, if he -- if we had known about that, we would have been able to speed up the investigation, talk to the alleged victims much more quicker than we were able to.  We would have been able to get more surveillance footage, like, for example, at Maria's cell that would have been relevant.  Things like

that.

Q.   At that point, you didn't know about Maria; right?

A.   Did not know about Maria at that point.

Q.   Did you know about Rachel?

A.   We did not know about Rachel at that point.

Q.   How did Maria become part of the investigation?

A.   I think -- so Melissa originally gave us Maria's name, but, as she testified, she had an officer look up a Maria [redacted] in that unit, and he looked up the wrong inmate.  So we actually had the wrong name originally.  And so we had talked to her and that was not the inmate.

So I believe there were other people that said that they had seen Maria talking to him, and we interviewed her.

MS. PRIEDEMAN:  Your Honor, can we strike that last name from the record, please.

THE WITNESS:  I apologize.

THE COURT:  Yes.  The last name is stricken at 11:03.

BY MS. PRIEDEMAN:

Q.   Did agents interview Maria once they had identified her?

A.   Yes.

Q.   At that point, were you aware of whether Maria had made any reports to BOP about the defendant?

A.   No.

Q.   Had Maria requested to speak with agents?

A.   No.

**Q.** All right. I want to return -- you mentioned that FBI executed search warrants on the same day of the defendant's interview.

Where did FBI execute search warrants?

**A.** We executed search warrants at the -- at FCI Dublin for his office and his vehicle and at his residence.

**Q.** As part of the execution of the search warrants, did agents seize electronic devices from the defendant?

**A.** Yes.

**Q.** Which devices did agents recover that were relevant to this investigation?

**A.** We recovered a laptop from his residence and we recovered his work phone and his personal phone from the facility.

**Q.** Was the laptop from his residence a BOP computer or a personal computer?

**A.** It was a personal computer.

**Q.** You said that the FBI searched the defendant's car pursuant to a search warrant.

Did agents find anything of significance in the vehicle?

**A.** There was a lot of candy in the vehicle.

**Q.** Where was the candy located?

**A.** It was in the trunk. It was under the floorboard of the trunk. It was in the center console. It was kind of everywhere.

**Q.** Was the fact that the defendant had candy relevant to this

investigation?

**A.** Yes.

**Q.** How so?

**A.** Melissa told us that he would give her candy on occasions.

**Q.** All right. I want to talk about the personal computer now.

Where was the personal computer found in the defendant's residence?

**A.** It was found in an office in his residence.

**Q.** Did you review the defendant's personal computer?

**A.** Yes, I did.

**Q.** What did you recover from the personal computer that was relevant to this investigation?

**A.** I recovered the pictures of Melissa in the cell, I recovered the pictures of Rachel and Mr. Garcia in their video chats, and I recovered a few dozen pictures of Mr. Garcia's naked body and penis.

**Q.** I want to talk about each of those categories of photographs. I'm going to start with the pictures of Melissa first.

**MS. PRIEDEMAN:** Ms. Slattery, can you please pull up Exhibit 55.

And, Your Honor, this has been previously admitted, and I would ask that we publish it just to the jury, not to the gallery.

THE COURT: The request is granted.

BY MS. PRIEDEMAN:

Q. Special Agent Barclay, do you recognize this photograph?

A. Yes, I do.

Q. What is it?

A. It's a picture of Melissa in inmate Andrea's cell.

Q. Where did you -- did you seize this photograph from one of the defendant's devices?

A. Yes. This was one of the pictures I found on the personal laptop.

Q. Was this picture significant to your investigation?

A. Yes.

Q. How so?

A. It's -- pretty much shows exactly what Melissa told us happened, you know.

Q. Looking at the furniture on the left-hand side of this picture, were you able to determine the significance of the letters and numbers on that piece of furniture?

A. Yes.

Q. What -- what's the significance?

A. Well, that's the cell number for Andrea, Melissa's friend's, cell that she went into.

Q. Did you find other versions of this photograph on the defendant's personal computer?

A. Yes.

MS. PRIEDEMAN:  Ms. Slattery, can you please pull up Exhibit 52.

Again, Your Honor, this has been previously admitted and we would publish it just to the jury, please.

THE COURT:  You may.

BY MS. PRIEDEMAN:

Q.   Special Agent Barclay, do you recognize this photograph?

A.   Yes, I do.

Q.   What is it?

A.   It's an up-close picture of Melissa on the bed.

Q.   Where did you find this photograph?

A.   On Mr. Garcia's personal laptop.

Q.   Was this a separate photograph from the photograph we just looked at?

A.   Yes.

MS. PRIEDEMAN:  Ms. Slattery, can you please pull up Exhibit 53?

Your Honor, same request as the previous pictures.

THE COURT:  Granted.

BY MS. PRIEDEMAN:

Q.   Special Agent Barclay, do you recognize this photograph?

A.   Yes, I do.

Q.   What is it?

A.   This is another one of the pictures of Melissa I found on the personal laptop.

Q.    And, again, is this a different photograph?

A.    It's a different photograph.

MS. PRIEDEMAN:  Special -- or sorry.  Ms. Slattery, can you please pull up Exhibit 54.

Your Honor, same request as previously.

THE COURT:  Granted.

BY MS. PRIEDEMAN:

Q.    Special Agent Barclay, do you recognize this photograph?

A.    Yes, I do.

Q.    What is it?

A.    This is one of the pictures I found on Garcia's personal laptop.

Q.    Is this another version of the same photographs we just looked at?

A.    Yes.  It's just a closer -- closeup of it.

Q.    And it's a separate picture?

A.    It's a separate picture from the rest.

MS. PRIEDEMAN:  You can take that down, Ms. Slattery, please.

Q.    Special Agent Barclay, did you find other photographs of Melissa on the defendant's computer?

A.    Of Melissa?

Q.    Yes.

A.    Yes.

MS. PRIEDEMAN:  Ms. Slattery, can you please pull up

Exhibit 51.

Your Honor, same request as previously.

THE COURT:  The request is granted.

BY MS. PRIEDEMAN:

Q.   Special Agent Barclay, do you recognize this photograph?

A.   Yes.

Q.   What is it?

A.   That's Melissa.

Q.   And where did you find this photograph?

A.   On Garcia's personal laptop.

Q.   Do you recognize where this photograph was taken?

A.   Yes.

Q.   Where?

A.   In a cell at FCI Dublin.

MS. PRIEDEMAN:  Ms. Slattery, can you please pull up
Exhibit 56.

Your Honor, same request, please.

THE COURT:  Granted.

BY MS. PRIEDEMAN:

Q.   Do you recognize this photograph, Special Agent Barclay?

A.   Yes.

Q.   What is it?

A.   That is Melissa.

Q.   Is this a different version of the same picture we just
looked at?

**A.**    Yes, this is a different picture from the one we just looked at.

**Q.**    And where did you find it?

**A.**    We found it on Garcia's personal laptop.

        **MS. PRIEDEMAN:**  Okay.  Ms. Slattery, you can take that down, please.

**Q.**    All right.  I want to turn to the photographs of Rachel next.

        **MS. PRIEDEMAN:**  Ms. Slattery, can you please pull up Exhibit 65.

     Your Honor, same request as the previous photographs.

        **THE COURT:**  Granted.

**BY MS. PRIEDEMAN:**

**Q.**    Special Agent Barclay, do you recognize this photograph?

**A.**    Yes, I do.

**Q.**    What is it?

**A.**    It was one of the pictures I found on Garcia's personal laptop of Rachel and Mr. Garcia's video chat.

**Q.**    Do you see that icon and the letters on the bottom right of the screen?

**A.**    Yes.

**Q.**    What does that say?

**A.**    It says "vRecorder."

**Q.**    Do you have an understanding of what the significance of that is?

**A.**    From what I understand, it's an application that you can install to record your screen on your phone.

        **MS. PRIEDEMAN:**  Ms. Slattery, can you please pull up Exhibit 67.

        Your Honor, same request as previously.

        **THE COURT:**  Granted.

**BY MS. PRIEDEMAN:**

**Q.**    Special Agent Barclay, do you recognize this photograph?

**A.**    Yes, I do.

**Q.**    What is it?

**A.**    It's one of the pictures I found of Rachel and Mr. Garcia's video chat from his personal laptop.

**Q.**    All right.  Last one.

        **MS. PRIEDEMAN:**  Ms. Slattery, can you please pull up Exhibit 83.

        Your Honor, same request.

        **THE COURT:**  Granted.

**BY MS. PRIEDEMAN:**

**Q.**    Special Agent Barclay, do you recognize this photograph?

**A.**    Yes, I do.

**Q.**    What is it?

**A.**    It is one of the pictures of Rachel and Mr. Garcia's video chats that I found on Mr. Garcia's personal laptop.

        **MS. PRIEDEMAN:**  Okay.  Ms. Slattery, can you take that down, please.

**Q.**   These three photographs that we just looked at, are these all of the photographs you recovered of Rachel and the defendant from the defendant's personal computer?

**A.**   No.

**Q.**   Approximately how many photographs of Rachel and the defendant did you recover from the defendant's personal laptop?

**A.**   There was around 90 of them.

**Q.**   And what do those other photographs depict?

**A.**   They appeared to be of -- the same as the three we saw. They're video chats, Rachel and Mr. Garcia.

**Q.**   Were Rachel and the defendant in different positions?

**A.**   Yes.

**Q.**   Did it look like it was from -- different positions from the video chat?

**A.**   Yes.

**Q.**   When you reviewed the pictures of Rachel from the defendant's laptop, had you spoken to her yet?

**A.**   No.

**Q.**   Did you reach out to her?

**A.**   We did.

**Q.**   Did she initially want to talk to you?

**A.**   No, she did not.

**Q.**   I think previously you said that FBI spoke with Rachel in May of 2021.

Was it 2021 or 2022?

A.   It was 2022.  Sorry.  This year.

Q.   Rachel testified that the defendant provided her with an email address.

Were you able to corroborate that communication?

A.   Yes.

Q.   How?

A.   We received records from Google for the email address, rememberpockets@gmail.com, and the name listed on the account was R. Garcia and Mr. Garcia's personal cell phone number was listed as the recovery phone, and the IP address came back to the Merced/Atwater kind of area in California.

MS. PRIEDEMAN:  Ms. Slattery, can you please pull up Exhibit 116.

Your Honor, there is a stipulation to admit this exhibit. I would move to admit it at this time.

MR. REILLY:  So stipulated.

THE COURT:  It's admitted.

(Government Exhibit 116 received in evidence)

MS. PRIEDEMAN:  May we publish to the jury?

THE COURT:  You may.

BY MS. PRIEDEMAN:

Q.   Special Agent Barclay, do you recognize this document?

A.   Yes, I do.

Q.   What is it?

A.   That's the subscriber information for the

rememberpockets@gmail.com email account.

MS. PRIEDEMAN:  Ms. Slattery, can you zoom in on the name.  I think it's the second line down.

Q.   Special Agent Barclay, can you read what that says?

A.   It says "R. Garcia."

Q.   Okay.

MS. PRIEDEMAN:  And, Ms. Slattery, can you go back to the document, please.

Q.   And, Special Agent Barclay, can you also read the date that the account was created?

A.   It was created February 16th, 2020.

MS. PRIEDEMAN:  Ms. Slattery, you can take that down, please.

Q.   Did you obtain any other evidence to connect the defendant to the rememberpockets@gmail.com account?

A.   I'm sorry.  Could you repeat the question for me?

Q.   Did you obtain any other evidence to connect the defendant to the rememberpockets@gmail.com account?

A.   Yes.

Q.   What did you obtain?

A.   There -- on his work phone, there was evidence indicating he had logged on to that email address from his work phone.

And then there were the -- like the records from the phone company that we ended up retrieving.

Q.   Were you able to obtain emails from the rememberpockets

Gmail account?

A.    Yes.

Q.    Did you see any emails between the defendant and Rachel?

A.    No.

Q.    Does that mean that no emails were sent?

A.    It means either no emails were sent or they were deleted.

Q.    Did you -- did you obtain the emails for the rememberpockets@gmail.com account after you had spoken to Rachel?

A.    Yes.

Q.    So sometime after May 2022?

A.    Yes.

Q.    Did -- were you able to obtain any emails from the rememberpockets account?

A.    Yes.  There were still emails in there.

Q.    Was there anything significant to your investigation?

A.    Yes.  There were emails from a cellular phone company, Total Wireless.

Q.    And why was that significant?

A.    Rachel told us that Garcia contacted her using a burner phone.

Q.    What's a burner phone?

A.    A burner phone is like a temporary phone that wouldn't be your normal phone you use day-to-day.

Q.    What did you do after you saw that email?

**A.**    We retrieved records for the phone account relating to that email address.

    **MS. PRIEDEMAN:**  Ms. Slattery, can you please pull up Exhibit 120.

    Your Honor, this is a stipulated exhibit that we would move to admit at this time.

    **MR. REILLY:**  So stipulated.

    **THE COURT:**  It's admitted.

    (Government Exhibit 120 received in evidence)

    **MS. PRIEDEMAN:**  May we publish to the jury?

    **THE COURT:**  You may.

**BY MS. PRIEDEMAN:**

**Q.**    Special Agent Barclay, do you recognize this document?

**A.**    Yes, I do.

**Q.**    What is it?

**A.**    That is the subscriber information for the phone account registered to the rememberpockets email address.

**Q.**    I think you said Total Wireless earlier.

    What's the difference between Total Wireless and TracFone?

**A.**    TracFone owns the brand Total Wireless, so we ended up having to basically request TracFone for the records.

**Q.**    And can you read what it says next to "Subscriber Information" at the very top?

**A.**    "Rememberpockets@gmail.com - sbrayjoe1@gmail.com."

**Q.**    Can you read the phone activation date as well?

A.   Yes.  Activated on September 24th, 2020.

Q.   Was that date significant to your investigation?

A.   Yes.

Q.   Why?

A.   That's around the time Rachel got to the halfway house.

Q.   Can you read the deactivation date as well?

A.   Deactivation date, it was October 25th, 2020.

Q.   Were you able to obtain call records for the TracFone number associated with these records?

A.   Yes.

     MS. PRIEDEMAN:  Ms. Slattery, can you please pull up Exhibit 121.

     THE WITNESS:  Ms. Priedeman --

     MS. PRIEDEMAN:  Yes?

     THE WITNESS:  -- if I could clarify something on this sheet.

     So in the subscriber information, when it lists "rememberpockets" and the "sbrayjoe1" --

     MS. PRIEDEMAN:  I'm sorry.  Can you bring that back up?

     THE WITNESS:  I just wanted to clarify for the jury that we requested information relating to those two email addresses.  They did not have any records relating to the sbrayjoe1 email address; they only had records relating to the rememberpockets.  So that first line is just basically

indicating the search that they did.  Yeah.

MS. PRIEDEMAN:  Thank you, Special Agent Barclay.

You can take that down, Ms. Slattery.

Ms. Slattery, can you please pull up Exhibit 121.

Your Honor, again this is another stipulated exhibit that we would move to admit at this time.

MR. REILLY:  So stipulated.

THE COURT:  I already admitted that one.

MS. PRIEDEMAN:  Oh, sorry.

THE COURT:  121 is admitted.  Sorry.

(Government Exhibit 121 received in evidence)

MS. PRIEDEMAN:  Thank you, Your Honor.

THE COURT:  You can publish.

BY MS. PRIEDEMAN:

Q.   Special Agent Barclay, do you recognize this document?

A.   Yes, I do.

Q.   What is it?

A.   These are the phone records for the phone account registered to the rememberpockets email address.

Q.   Based on your review of the call logs, did you find anything significant to the investigation?

A.   Yes.

Q.   What did you see?

A.   The only contact it had was basically with Rachel and one other phone number initially.

**Q.** And what was the other phone number?

**A.** The other phone number was for an inmate at FCI Dublin that was also at the halfway house with Rachel.

**MS. PRIEDEMAN:** You can take that down, Ms. Slattery. Thank you.

**Q.** Special Agent Barclay, during the course of this investigation, did you review the housing records for Melissa?

**A.** Yes.

**Q.** Did you review the housing records for Maria?

**A.** Yes.

**Q.** And the "housing records," I'm referring to the FCI Dublin housing records.

Did you review the FCI Dublin housing records for Rachel?

**A.** Yes.

**Q.** Were you able to determine whether Rachel, Melissa, or Maria ever lived in the same housing unit at the same time?

**A.** They never lived in the same housing unit.

**Q.** All right. Now I want to turn to your search of the defendant's work phone.

What did you find that was relevant to the investigation on the defendant's work phone?

**A.** We found pictures of Mr. Garcia's penis and other pictures of his naked body.

**Q.** Approximately how many pictures of the defendant's penis did you recover from his work phone?

A.   Hundreds.

MS. PRIEDEMAN:  Ms. Slattery, can you please pull up Exhibit 127.

Your Honor, this is a previously admitted exhibit, and I would ask to publish it just to the jury.

THE COURT:  You may.

BY MS. PRIEDEMAN:

Q.   Do you recognize this photograph, Special Agent Barclay?

A.   Yes.

Q.   What is it?

A.   That is Mr. Garcia's penis.

Q.   Where did you find this photograph?

A.   On his work phone.

Q.   Do you recognize the location where this photograph appears to be taken?

A.   Yes.

Q.   What -- where does it appear to have been taken?

A.   It appears to have been taken in the warden's complex bathroom.

MS. PRIEDEMAN:  Ms. Slattery, you can take that down.

Ms. Slattery, can you please pull up Exhibit 15.

Q.   Special Agent Barclay, do you recognize this photograph?

A.   Yes.

Q.   What is it?

A.   That's the warden's complex bathroom.

MS. PRIEDEMAN:  Your Honor, the Government would move to admit Exhibit 15.

MR. REILLY:  No objection.

THE COURT:  No objection.  It's admitted.

(Government Exhibit 15 received in evidence)

MS. PRIEDEMAN:  May we publish to the jury?

THE COURT:  You may.

BY MS. PRIEDEMAN:

Q.  Special Agent Barclay, is this the bathroom at the warden complex?

A.  Yes.

MS. PRIEDEMAN:  You can take this down.

Ms. Slattery, can you please pull up Exhibit 288.

Again, Your Honor, this has been previously admitted, and we would ask that it be published just to the jury.

THE COURT:  You may.

BY MS. PRIEDEMAN:

Q.  Special Agent Barclay, do you recognize this photograph?

A.  Yes, I do.

Q.  What is it?

A.  That is Mr. Garcia's penis.

Q.  Where did you find this photograph?

A.  On his work phone.

Q.  Do you recognize where it was taken?

A.  It appears to have been taken in the warden's complex

bathroom.

Q.   Was the fact that you found photographs of the defendant's penis taken in the warden's complex relevant to your investigation?

A.   Yes.

Q.   Why?

A.   Because Melissa and Rachel both told us that in some of the -- or at least one of the penis pictures that he showed them, that they recognized the flooring from the warden's complex bathroom.

        MS. PRIEDEMAN:   Ms. Slattery, you can take that down, please.

Q.   Did you find other pictures of the defendant's penis in the warden's complex bathroom during your search of the defendant's work phone?

A.   Yes.

        MS. PRIEDEMAN:   Ms. Slattery, can you please pull up Exhibit 295.

     Your Honor, again, this has been previously admitted, and I would ask that it be published just to the jury.

        THE COURT:   You may.

BY MS. PRIEDEMAN:

Q.   Special Agent Barclay, do you recognize this photograph?

A.   Yes, I do.

Q.   What is it?

A.   It was one of the pictures we found from Mr. Garcia's work phone.

MS. PRIEDEMAN:   Ms. Slattery, you can take that down.

Q.   Special Agent Barclay, you mentioned that you found hundreds of photographs of the defendant's penis on his work phone.

Other than the photographs that I just showed you, were there other photographs that were particularly significant to your investigation?

A.   Yes.

Q.   What -- can you describe those photographs for the jury.

A.   Some of them had semen coming out of the penis.

Q.   And why was that significant to your investigation?

A.   Melissa told us in one of the pictures that Mr. Garcia showed her there was semen coming out of the penis.

Q.   Did you review the search history on the defendant's work phone?

A.   Yes, I did.

Q.   Did you find anything relevant to this investigation?

A.   Yes.

Q.   What did you find?

A.   On July 2nd, he searched the Google Play store for "hide pictures" or "hide photos," one of those.

Q.   Are you familiar with what the Google Play store is?

A.   Yes, I am.

Q.    What is it?

A.    It's an application used on the Android phones that -- it's basically the platform used to install applications on -- on the phone.

Q.    Were you able to determine whether he was able to successfully download an application to hide photos?

A.    Yes.

Q.    What were you able to determine?

A.    On July 2nd, 2021, he installed an app called "Calculator Vault" to hide pictures and videos.

Q.    And what is that app designed for?

A.    Hiding pictures and videos.

Q.    Was there anything significant to you about the timing of the download of that application?

A.    That was around the time that we had charged Officer Klinger.

Q.    And is that the same officer that the search was related to that you spoke about in April of 2021?

A.    Yes, one of them.

Q.    That the defendant was notified of?

A.    Yes.

Q.    You identified several naked photographs that were taken of Melissa that were found on the defendant's personal computer.

Did you find any of those photographs on his work phone?

**A.**   No, I did not.

        **MS. PRIEDEMAN:**  I have no further questions, Your Honor.

        **THE COURT:**  Cross-examination.

                            **CROSS-EXAMINATION**

**BY MR. REILLY:**

**Q.**   Good morning, Special Agent Barclay.

**A.**   Good morning.

**Q.**   The search warrants that you obtained for Mr. Garcia's office, car, and home --

**A.**   Yes.

**Q.**   Is that right, those were the three?

**A.**   Yes.

**Q.**   And were those obtained as a result of the report by Melissa?

**A.**   Yes, in addition to another report we received as well.

**Q.**   Who was that from?

**A.**   Lieutenant Putnam.

**Q.**   And what was the nature of that report?

**A.**   He -- the nature of the report was that Katrina was -- undressed for Mr. Garcia during his rounds.

**Q.**   The -- let me go to this thing you mentioned last.  I think you said it was called the Calculator Vault?

**A.**   Yes, I believe so.

**Q.**   And you said that's an application that enables someone

to, I guess, hide photos?

**A.**    That's what it says.

**Q.**    And exactly how does that happen?

**A.**    I do not know.

**Q.**    Are the photos still on the computer or cell phone or whatever piece of equipment the program is downloaded to?

**A.**    I'm not sure.

**Q.**    Did you make any effort to determine whether or not that Calculator Vault was still present at the time that you seized these computers and cell phones?

**A.**    So I believe it was installed on the phone when we did the search, because it -- it appears on the "Installed Applications" list and it appears that it was downloaded on July 2nd, 2021.

**Q.**    And did you subsequently access that Vault to see what's in it?

**A.**    No, I did not.

**Q.**    Why is that?

**A.**    I mean, so we basically do a -- we basically do, like, a forensic image of the phone and that's what we review, so that's what I reviewed, if that makes sense.

**Q.**    Okay.  I guess I'm confused.

If there was something on the cell phone that's pertinent to your investigation and Mr. Garcia did something to hide it in this Calculator Vault, would that not be a subject that you

would say "Hey, we should go look at this Vault and see what he put in it"?

A.    So the way we do our review is we -- we only really access a phone if absolutely necessary.  Otherwise, we do an -- we use a program that removes the data off the phone and puts it in a form -- a format for us to review, and that's what we review.  So that's what I reviewed.

Q.    Okay.  But that doesn't really answer my question.

Did you consider -- strike that.  Let me ask you this first.

This mirror image that you create, I assume that it reflects the fact that this Calculator Vault is present on the phone.

A.    Yes.

Q.    But in and of itself doesn't access the -- the Calculator Vault.

A.    The program that takes the data from the phone, some applications it can, some it can't.  I'm not -- I'm not entirely sure whether it did that or not in this case.

But regardless, there were photos we found from the program in our review.

Q.    From which program?

A.    The program that we use to review the phone, the data.

Q.    Okay.  So when you downloaded the data --

A.    Yeah.

**Q.** -- it showed some pictures.

**A.** Yes.

**Q.** How many of those were there?

**A.** Many.

**Q.** Hundreds?

**A.** Multiple thousands.

**Q.** Multiple thousands.

**A.** Yes.

**Q.** Okay. We'll talk about those before we finish, but I want to go back now to this Calculator Vault thing.

I take it that you could not tell from your review of this mirror image what pictures, if any, were in the Calculator Vault; is that right?

**A.** That's correct.

**Q.** And you did not make any request of any kind to do whatever would be necessary for you to be able to look at what's in that Calculator Vault, did you?

**A.** So what we reviewed was a program that takes the data from the phone so we can review it, so that's what I reviewed.

Whether some of the photos that we found in the pictures were from that, I -- I'm not entirely sure, but they could have been.

**Q.** Okay. That doesn't answer my question, so let me ask it again.

**A.** Okay.

Q.   Once you got this information off of this mirror image and you determined that this Calculator Vault thing was there, did you make any effort, whatever it would take, to gain access to the Calculator Vault to see what was in it?

A.   No.

Q.   And why was that?

A.   Because we had taken the data from the phone.

Q.   Okay.  I'm -- I'm confused again.

A.   So we ran a program on the phone that removed data from the phone --

Q.   Right.

A.   -- and it puts in a review -- in a reviewable format for us so we can mark things as evidence or not evidence.  And that's what we reviewed.

     As far as whether it was able to completely get everything off that app, I'm not sure.

Q.   Okay.  So --

A.   But it could have.

Q.   Could have, but maybe not, and you don't know.

A.   I'm not sure.

Q.   So you have no way of knowing, as you sit here today, whether there was anything in this Calculator Vault that was not retrieved in such a way by your mirror image program that it would enable you to look at it; is that right?

A.   That's correct.

Q.   Okay.  So as far as you know, there could be other pictures in the Calculator Vault that you've never seen.

A.   Potentially.

Q.   Wouldn't that make sense, to ask for that?

A.   I'm not sure what you mean.

Q.   To -- to -- to try to get whatever might have been in that Calculator Vault that you were not otherwise seeing.

A.   Based on the data that the program pulled from the phone, it was pretty comprehensive.

Q.   Okay.

     The search warrants that you executed -- or the search warrant, I should say, that you executed at Mr. Garcia's home, what items of evidence did you seize pursuant to that search warrant?

A.   At the home?

Q.   Yes.

A.   We seized various electronic devices.

Q.   Did that include a laptop computer?

A.   Yes.

Q.   A desktop computer?

A.   I cannot recall if there was a desktop computer seized from the house.  If there was, you know, I can't -- I can't remember exactly.

Q.   Okay.  Did you write a report in which you indicated what items were seized --

A.    Yes.

Q.    -- under the search -- excuse me -- under the search warrant?

A.    Yes.

Q.    All right.  Anything else besides the laptop and possibly the desktop computer?

A.    Yes.  We seized thumb drives, yeah, storage media.

Q.    Quite a few items of storage media; correct?

A.    I think so.

Q.    Did you leave any of those kinds of items behind?

A.    Yes.

Q.    And what -- what did you leave behind?

A.    On the day we were searching the residence, the agents on scene called me and said there appeared to be some very old devices.  And I indicated if they look really old, then they're probably not necessary to take.

Q.    How about storage media, thumb drives or disk drives or CDs or anything on which computer information could have been stored?  Did you leave any of that behind?

A.    I don't know.  I was not on scene.  I really only know about the things we did take and that one phone call I received.

Q.    So you were not personally present when the warrant was executed?

A.    I was at the facility interviewing Mr. Garcia.

Q.   Were you present, personally present, during the execution of any part of the search warrant?

A.   I was present for a part of the vehicle search, but not for very much of it.

Q.   How about the house?

A.   No.

Q.   Were you aware that Mr. Garcia had a safe in his house?

A.   Yes.

Q.   Were items seized from the safe?

A.   I do not know.

Q.   Were any items left in the safe?

A.   I do not know.

Q.   Who prepared the report which indicated what items were seized pursuant to the search warrant of the home?

A.   It would be the -- one of the special agents on site.

Q.   And did you review that report?

A.   Yes.

Q.   When did that take place?  When did you review it?

A.   Shortly after it was in the system.

Q.   Do you remember who that was that prepared that report?

A.   I do not.

Q.   Did you speak with that special agent after seeing the report to ask him whether or not there was anything he'd left behind --

A.   No.

Q.    -- other than what you had talked about on the phone?

A.    No.

Q.    Was he the person you talked to about the, quote, old devices?

A.    I'd have to make sure I saw the name on the report, but I think so.

Q.    All right.  You said you were there for part of -- excuse me -- part of the search of the car?

A.    Yes.

Q.    Were there any electronic devices seized from the car?

A.    Yes.

Q.    What was seized from the car?

A.    I'd prefer to double-check the report before I say that.

Q.    Okay.  Do you have a copy of the report available?

A.    I don't -- I don't have it right here with me.

Q.    Do you know who prepared that report?

A.    I can't think off the top of my head who wrote that report.

Q.    How many people were present during the -- strike that.

      How many law enforcement personnel were present during the execution of the search warrant of the home?

A.    The exact number, I do not know that off the top of my head.

Q.    How about the car?

A.    I do not know that at the top of my head.

Q.   And I think you said you also got a search warrant for his office at the -- at the Dublin facility?

A.   Yes.

Q.   Do you know how many people were present for that?

A.   I do not know that off the top of my head.

Q.   Were you the supervising agent of the search warrants?

A.   No.

Q.   Who was that?

A.   That would have been our supervisor at the time.

Q.   Okay.  So there is one person who kind of oversees all this stuff.  Who was that?  What's his name?

A.   Well, I just want to make sure I give you the correct supervisor.  It would have been my supervisor, Dave Andish.

Q.   Who prepared -- who prepared the affidavits in support of the search warrant?

A.   I did.

Q.   Okay.  Just so we make this clear how this procedurally happens, when you try to get a search warrant, you write up a proposed warrant and then you write an affidavit in support of that warrant.  And in that affidavit, you put in all the information that you have or reasonably can include that would provide the court that's going to review the search warrant application sufficient information to make a determination whether there is probable cause for the issuance of the warrant; is that right?

**A.**    Yes.

**Q.**    And did you write the affidavits for all three of these warrants, the house, the car, and the residence -- excuse me -- and the office in Dublin?

**A.**    Yes.

**Q.**    And were you involved in the determination of who would actually execute the warrants?

**A.**    Yes.

**Q.**    In other words, did you get to say, "Hey, I would like Special Agent Jones to do this one and someone else to do this one and someone else to do the third one"?

**A.**    So -- I mean, it's not quite like that.  I mean, basically, we request for volunteers.  So we use people from our squad as much as possible, but people from other squads can come and help on search warrants as well.  So it's not like I hand picked all the agents or anything like that, I guess.

**Q.**    And then, ultimately, because this is a search warrant that you wrote the affidavit for and requested, you -- I would assume you get all of the reports that are generated as a result of the searches?

**A.**    Yes.  They're in the system.

And if you have the reports, they could help refresh my memory on some of these things, like the number of agents that were there and stuff like that, the exact items we took.

**Q.**    Okay.

You mentioned on direct examination that you requested Melissa's and Katrina's cells as part of this process?

A.   We --

Q.   What did you mean by that?

A.   Sorry.  Could you repeat that?

Q.   Were you asking to search their cells, Melissa and --

A.   No.

Q.   -- and Katrina?

A.   No.  We do not do that.

Q.   What was the nature of your request regarding their cells?

A.   We requested video footage around their cells for as far back as it could go.

Q.   Okay.  And I think you said it only went back to June 7th?

A.   That's correct.

Q.   And was that true for both of those two cells?

A.   As far as both of them being from June 7th, like both cells, I'm not entirely sure about that.

Q.   Did you also request an -- or review of an analysis of the other videos that might have been involved in, say, someone walking to Melissa's or Katrina's cells?  Not just focused on the cells themselves, but the hallways and passageways that you would use to get to them?

A.   Yes.  We requested video footage surveillance around their cells.

Q.   And on what date was that request made?

**A.**   Well, we originally asked them to preserve it.  We asked them to preserve it verbally on the day of the search warrant. Then the next week, we sent an email just ensuring they had preserved it.

**Q.**   That was July 22nd, then?

**A.**   July 22nd was the first --

**Q.**   Was the initial request?

**A.**   Yes.

**Q.**   And at some point, you said in response to that request, I guess, that Lieutenant Putnam gave you some footage --

**A.**   Yes.

**Q.**   -- from the videos?

Was that selected footage that he picked out or did he just give you, like, everything that was on the video between June 7th and July 19th?

**A.**   It was selected footage that he picked out.

**Q.**   Did anyone other than Lieutenant Putnam review the entire video?

**A.**   I do not know the answer to that.

**Q.**   All right.  Let me ask it this way.

Since you only got this -- the portions of these videos --

**A.**   Yes.

**Q.**   -- did you go and review the entire set of all the videos that were available?

**A.**   No.  I only had access to what Lieutenant Putnam provided

me.

**Q.** Did you ask him, "Hey, can I come and look at the whole thing?"

**A.** I did not ask him that.

**Q.** To your knowledge, did any other agent of the FBI review the entirety of these videos?

**A.** To my knowledge, no.

**Q.** You didn't ask anyone else to do that?

**A.** No.

**Q.** Or direct them to?

**A.** No.

**Q.** Do you have the authority to direct another agent to do something like that?

**A.** I can politely ask them to do things.

**Q.** And I think you said you actually got that -- that video footage from Lieutenant Putnam about the week after the search warrants were issued?

**A.** No.  We didn't get it until November.

**Q.** Oh, you didn't get any of the video until November?

**A.** That's correct.

**Q.** I misunderstood your answer about that.

**A.** I meant we followed up with a second request that it be preserved the next week after the search warrant.

**Q.** Ah.

**A.** Yeah.

Q.   So between July and November, no one from -- conducting this investigation looked at these videos?

A.   We requested it be preserved and provided to us, and it was provided in November.  I believe we requested multiple times for it.

Q.   Okay.  So clarify for me, if you would --

A.   Uh-huh.

Q.   -- why it wasn't provided to you earlier than November.

Did it take Lieutenant Putnam that long to look at them all?  Is that --

A.   I don't know why.

Q.   Did you ask him why?

A.   No, I did not, but he had reviewed them.

Q.   How about Maria's cell?  When did you first become aware that that might be of some interest?

A.   In her interview with us in November of 2021.

Q.   And had no one prior to that time ever mentioned that Maria might somehow be involved in this?

A.   Yeah -- yes.  There were, I mean, people that told us that he saw her -- him talking to her a lot, but there were no direct allegations of -- well -- I -- we may have had people tell -- give us information about her.  I'm not exactly sure the extent of the information.  But she had previously denied that.

Q.   When did you first talk to Maria?

**A.**    I believe investigators first talked to her in September of 2021.

**Q.**    And that was based on information that was provided by other people of some kind?

**A.**    Yes.

**Q.**    Are we talking other inmates, staff people, or what?

**A.**    Other inmates.

**Q.**    And even though these other inmates were saying, "Hey, he seemed particularly interested in Maria," you didn't request right away, as soon as you knew that, that the institution maintain those videos?

**A.**    No.

And the information about Maria kind of came out in little bits and pieces, so it's -- until we talked to her in September, there was really no reason to even do that. And by the time -- even by September, by the time we talked to her, it was very unlikely that they would have footage going back to before Mr. Garcia left the facility.

**Q.**    Okay. Did you --

**A.**    If Mr. Garcia had told us about Maria before, we could have pulled the footage.

**Q.**    Okay. Did you confirm with Lieutenant Putnam that by the time you had this information in November, that there was no video that would be applicable to her?

**A.**    I -- I don't remember if we specifically clarified that

with him, but based on all the other video footage we had received, it only went back about -- less than two months.

Q. Okay. So you assumed that there wasn't going to be any other evidence related to Maria.

A. I don't remember if we asked him for it or not.

Q. And who are these other individuals, other inmates, that gave you information in September about Mr. Garcia's interest in Maria?

A. I don't remember. We've done about 100 interviews in this case and I've done even more for the other cases at FCI Dublin, so I just -- off the top of my head, I cannot remember who gave us information on that.

Q. Well, let me ask this.

A. Yeah.

Q. When you're doing an investigation into what you believe to be a serious, significant case -- which you did feel that way about this; right?

A. Yes.

Q. I mean, we're talking about the warden of a federal prison that you're investigating. It can hardly get any more serious than that; right?

A. Yes.

Q. And yet you get information from someone, from some people, that suggests, at least, that there may be other individuals that you should be looking at -- Maria in this

case -- but you didn't bother making sure that whatever evidence might have been there got preserved immediately, the day her name first came up?

A.   So the information about Maria, like I said, came in little bits and pieces, and we didn't have, really, a lot to go on.  So there wouldn't be the reason to do that unless we had something to go off of.

In addition to that, it was -- the video footage they had already given us was for a very short period of time.

Q.   I understand --

A.   September, we talked to her --

Q.   I understand --

A.   It just -- it wasn't --

Q.   Excuse me, Special Agent Barclay.

A.   Right.  Right.

Q.   I understand all that.

A.   Okay.

Q.   What I'm driving at is logically speaking, to me, the minute I hear he has an untoward or unusual interest in another inmate, I'm going to say, "Lieutenant Putnam, keep any video you have with respect to Maria, in addition to whatever you have with respect to Melissa and Katrina, and any other name that comes up, keep those, too."

You didn't do that; right?

A.   That's not right.  What I said was I can't remember if we

did that.

Q.   So -- so it's possible that you asked Lieutenant Putnam in -- some time prior to November to keep whatever video there was relating to Maria's cell?

A.   It's possible.

THE COURT:   Okay.  Is this a good time for a break?

MR. REILLY:   That's fine, Your Honor.

THE COURT:   All right.  We'll go ahead and stand in recess for 20 minutes.

(Proceedings were heard out of presence of the jury:)

THE COURT:   Okay.  The record will reflect that the jury has left the courtroom.

Anything to discuss?

MS. PRIEDEMAN:   No, Your Honor.

MR. REILLY:   Not on my behalf, Your Honor.  Thank you.

THE COURT:   Okay.  One housekeeping issue.

Is the Government providing a -- do you need a laptop or do you need a tape recorder or something for -- what is the physical evidence you're giving me on that recording?

MS. PRIEDEMAN:   Your Honor, it will be a disk just with the audio.

THE COURT:   Okay.  So it runs off of a laptop?

MS. PRIEDEMAN:   Yes.

THE COURT:   Okay.  The Court will then reserve the stripped-down laptop that we have for evidentiary purposes for

jurors.  You're welcome to look on the website that explains to you the specifics of that laptop so we disclose the technical requirements there.  Thank you.

MR. REILLY:  Thank you, Your Honor.

MS. PRIEDEMAN:  Thank you, Your Honor.

(Recess taken at 11:53 a.m.)

(Proceedings resumed at 12:13 p.m.)

THE COURT:  Okay.  Let's call in the jury.

(Proceedings were heard in the presence of the jury:)

THE COURT:  Okay.  You may all be seated.

The record will reflect that the jury is back.  They all seem to be ready to go.  Yeah?  All right.

Mr. Reilly, you may continue your cross.

MR. REILLY:  Thank you, Your Honor.

Q.  All right.  Agent Barclay, you also indicated that you did not ask for anything having to do with Rachel's cell?

A.  That's correct.

Q.  And that was based on your assumption that there wouldn't be anything there because of the age, how long it had been since the allegations she was making?

A.  Is that a question?

Q.  Yes.  Is that the reason?

A.  Yes, that's the reason.

Q.  Did you discuss with Lieutenant Putnam at all how they store these videos?

**A.**    Yes.

**Q.**    What did he tell you about that?

**A.**    He told me that each camera is written to a server and servers receive feed from multiple cameras, and that the data gets overwritten after the server becomes full.

**Q.**    Okay.  And did it -- did you ever consider asking to have all of those videos maintained from the first minute that you knew that there was a problem at the facility or you thought there was a problem at the facility, to say, "Hey, just keep everything until we have a chance to sort this out"?

**A.**    For all of the camera footage?

**Q.**    Yes.

**A.**    No, we did not do that.

**Q.**    And once you realized that some of it was no longer available, did you consider having a forensic analysis of the servers done to see if any of the deleted videos could be recovered?

**A.**    No, we did not do that.

**Q.**    You did that with Mr. Garcia's computer; right?

**A.**    We had Mr. Garcia's computer and did a forensic exam of it, yes.

**Q.**    Yes.  And a forensic examination of the servers of the Dublin facility's computers could have been done as well, couldn't it?

**A.**    I'm not an expert on how forensics for servers work, so I

really can't discuss that.

Q.   Did you consider asking someone, "Hey, is that a possibility we could do a forensic analysis of their servers and see if we can recover stuff that's older than June 7th?"

A.   No, we did not do that.

Q.   Do you know whether or not the -- the videos that were provided to you by Lieutenant Putnam show all of Mr. Garcia's activities that were available on those computers -- or on those videos?

A.   I do not know that.

Q.   So you didn't tell him, for example, up front, "Hey, I want to see everything that he did during the -- whatever time period you have available on these videos, I want to see everything that Mr. Garcia was doing"?  You didn't do that?

A.   No.  We asked for -- we asked for it all and that's what we got.

Q.   By "all," how did you specify that?

A.   All of the footage.  We asked for the footage -- as much footage as could go back to -- as far as it could go back.

Q.   But he didn't actually give you that, did he?

A.   No, he didn't.

Q.   Okay.  And did you ask him, "We asked for everything, but you didn't give us everything.  Can we have the rest of it?"

A.   I did not do that.

Q.   So you have no way of knowing whether there's something

that was available as of whenever Lieutenant Putnam did his review of these videos that he did not include to -- or give to you?  You have no idea of knowing whether there is anything that shows Mr. Garcia doing anything during that time in the portions of the videos that he didn't give you -- that Lieutenant Putnam didn't give you?

A.   Is that a question?

Q.   Yes.

A.   Okay.  Can you repeat the question?

Q.   Yes.  So you have no way of knowing, do you, whether there is anything that shows Mr. Garcia doing anything during those periods of time that Lieutenant Putnam chose not to give you.

A.   That's correct.

Q.   In particular, how Mr. Garcia went about doing his rounds.

If you had looked at the whole sequence of everything they had from June 7th to July 19th, wouldn't that have given you a better understanding of how Mr. Garcia conducted himself while he was doing his rounds?

A.   I don't know.  I don't have that footage.

Q.   At least it's a possibility, isn't it?

A.   It's a possibility.

Q.   Something you should have done?

A.   We asked for the footage.

Q.   That wasn't my question.  My question was you should have done that, shouldn't you?

**A.** Should have done what?

**Q.** Gotten all of it, not let Lieutenant Putnam cherrypick whatever he wanted to take out of the videos to give to you.

**A.** [Inaudible], yeah.

**Q.** Okay. But my question is -- I'm sorry.

**THE COURT REPORTER:** I'm sorry. I didn't understand the answer.

**BY MR. REILLY:**

**Q.** You are going to have to repeat your answer for --

**A.** We did ask for all the footage.

**Q.** When was it that you became aware that you didn't get all of the footage?

**A.** Initially, it was not in a viewable format for me. It had to go to OIG for -- to be in a viewable format. So it was later.

**Q.** How much later?

**A.** I don't remember.

**Q.** Did you discuss with Lieutenant Putnam how he had gone about -- or what portions of the video that he had provided to you?

**A.** Yes.

**Q.** And did he tell you that he was only giving you selected portions of the videos and not the whole thing?

**A.** Yes, he did.

**Q.** And when did that conversation take place?

**A.**    That was when we received it in November.

**Q.**    So between --

**A.**    Yes.

**Q.**    -- July the 22nd and November --

**A.**    Yes.

**Q.**    -- you had no conversation with Lieutenant Putnam about these videos and what he was doing with them or what he was going to give you?

**A.**    Between July and November?

**Q.**    Yes.

**A.**    No -- I remember telling him that he did not need to go through them, that we could do that.  That's the only conversation I remember having.

**Q.**    That would have made good sense, wouldn't it?

**A.**    Yes.

**Q.**    Didn't insist on it, did you?

**A.**    That's the conversation I had with him.

**Q.**    Is there any particular reason why you didn't say, "Look, Lieutenant Putnam, we want to see the whole thing.  Just let us look at it"?

**A.**    We asked for all the footage, and I had a conversation with him saying, "You don't have to look through it, we can do that," and we got what we got.

**Q.**    Okay.  That didn't answer my question.

**A.**    Okay.

Q.   My question is why did you not insist on being able to view all of the video?

A.   I didn't think to do that, I guess.  Yeah.

Q.   That would have been a good investigative technique, wouldn't it?

A.   It would have been good.

Q.   Now, you mentioned that at least part of the video showed Mr. Garcia having a conversation with Katrina's cellmate?

A.   Yeah, some of the videos did.  Oh, her cellmate.  I'm sorry.  I misheard.

Q.   Is that --

A.   Yes --

Q.   That's correct?

A.   -- that's correct.

Q.   Okay.  Did any of them show him having conversations with Katrina?

A.   Yes.

Q.   In those videos, could you see Katrina in any of them?

A.   Yes.

Q.   Did you ever at any point see anything untoward taking place between Mr. Garcia and Katrina?

A.   No.  They were walking and talking.

Q.   Never any video showing her exposing herself?

A.   No.  It only shows the hallway.

Q.   How about the cellmate?  Did you see the cellmate during

the time he was talking with her?

**A.**   Yes.

**Q.**   And I take it that was when she was outside the cell also, then.

**A.**   Yes.

**Q.**   All right.  During your direct examination, you made a comment in response to a question that the refusal of Mr. Garcia to continue the statement that he was making, the portions of which -- or the portion that he did do we saw or heard -- you said that his not being willing to give you more information delayed obtaining evidence and videos.

Do you remember saying that?

**A.**   I remember saying he denied.

**Q.**   He denied the contact?

**A.**   Yes.

**Q.**   And somehow his refusal to do that caused you not to be able to get whatever evidence might have been available at the facility?

**A.**   Yes.

**Q.**   You couldn't have gone to them and said, "This is -- this is an investigation into the warden of this facility, the number one guy.  This is a major case.  This is very important. We want you to preserve any evidence that might exist that would either prove or disprove the allegations by these inmates"?

**A.** So a lot of the conduct that's alleged is in places where there are no cameras, such as being outside walking around the facility. There are no cameras out there. So it wouldn't make sense to ask for footage that we don't even have any allegations regarding.

**Q.** So it never occurred to you that some other inmates might come forward and make allegations as well?

**A.** Yeah, we can only go based off the information we have. And at that time, it was Melissa and Katrina.

**Q.** Well, at that time, as far as Mr. Garcia was concerned, it was those two, but there were other allegations about other correctional officers already coming forward, weren't there?

**A.** Yes, and there was -- those were in areas also where there were no cameras.

**Q.** But there are cameras that monitor all of the hallways and passageways through which these people would have been going to get to the locations where they're saying -- where these women were saying something happened, even though those locations themselves might not have been under surveillance; right?

**A.** Sometimes.

**Q.** Okay. So if, for example, the -- a witness says, "This happened to me at this time on this date in this place," and you know that in order to get to that place, someone is going to have to go down a particular hallway or through some passageway that is being monitored, and you get the video for

that day during that period of time leading up to that and it shows this person going right down that hallway where he'd have to go to get to this location that's not being monitored, wouldn't that be useful?

**A.** So every allegation is kind of its own allegation, right? So we have to take each allegation individually and consider it.

So in some instances, that is true and we do have footage, but that's not relevant to this case here.

**Q.** No, I understand, but --

**A.** So --

**Q.** But they could --

**A.** But you're asking me a general question, so --

**Q.** I'm asking you a general question that has application to this situation --

**A.** Uh-huh.

**Q.** -- correct?  Isn't that --

**MS. PRIEDEMAN:** Objection, Your Honor.  Argumentative.

**THE COURT:** He's not being argumentative.  He did cut her off in the middle of her answer, though.  One at a time.

**BY MR. REILLY:**

**Q.** We are kind of talking over each other, so let's try not to do that.  The poor court reporter has a hard time keeping up when we do.

The question is wouldn't it make sense from an

investigative point of view to apply that general principle that I just asked you about to each specific case that you're dealing with so that you would be sure that you had all of the evidence and all of the video that might have some bearing on this case?

**A.** So at the time we did the search warrants, that was the earliest we could have requested video. We had allegations about Melissa and possibly Katrina, and we had not even talked to Katrina at that point. So we requested video relating to those allegations, which was around their cells and the visitation area. But that did not exist anymore.

**Q.** Okay. This request that you're making to the BOP --

**A.** Yeah.

**Q.** -- is a rather informal request, in a sense. In other words, you didn't have to establish probable cause to ask the BOP to save video the way you would, for example, if you were trying to get a search warrant to look at something, you would have to show probable cause to the Court for the issuance of the search warrant.

There was no such requirement for you to ask BOP, "Save this stuff for us," was there?

**A.** Not on our part.

**Q.** Would there be on someone else's part?

**A.** Well, BOP resources, but I can't really attest to that. But that would be --

Q.   I don't understand what you mean by that.  What did BOP resources have to do with you asking BOP to keep the evidence?

A.   I guess nothing.

Q.   And you said that at least in July, you were not aware of Maria's complaints; is that right?

A.   Correct.

Q.   And what about Rachel?

A.   No.

Q.   Christina?

A.   No.

Q.   Aurelia?

A.   Aurelia's complaints?

Q.   Yes, or her --

A.   The information she provided?

Q.   Yes.

A.   No.

Q.   So you said that Mr. Garcia denying this contact was the cause of the delay in you obtaining evidence and videos.

A.   We at least -- yes.  In some part, yes.

Q.   Did he have some responsibility to help you out in this investigation?

A.   He had a responsibility to tell the truth.

Q.   Yes, or not answer your questions as he chose.

A.   Sure.

Q.   Okay.  He had no obligation to say to you, "Hey, go to the

BOP and make sure you get all of this evidence before it gets written over," did he?

A.   No.

Q.   That was your job.

A.   Yes.

Q.   Or your supervisor's job.

A.   Yeah.

Q.   All right.   The Dublin office, you got a search warrant for that also?

A.   Yes.

Q.   Mr. Garcia's office in Dublin?

A.   Yes.

Q.   Excuse me.

And were you able to recover from the office any electronic equipment?

A.   Yes.

Q.   Computer?

A.   Yes.

Q.   Laptop?

A.   I do not think there was a laptop taken --

Q.   Desktop?

A.   -- but there was a desktop taken.

Q.   And you seized that?

A.   Yes.

Q.   Did an analysis of that as well?

A.    Yes.

Q.    Cell phones?

A.    We -- from the office?

Q.    Yes.

A.    No.

Q.    No cell phones in the office?

Where did you get those?  Did you get those from his house?

A.    From his person and from his vehicle.

Q.    The computer on which Mr. Garcia engaged in the email exchange with Rachel on the email address rememberpockets, do you know what computer that was done on or what phone that was done on?

A.    I know his work phone had evidence indicating he had logged in to the rememberpockets email account.

Q.    Did you obtain a -- or did you do a forensic analysis of everything that was on that cell phone to see if you could recover anything that had been deleted?

A.    Yes.

Q.    And --

A.    Although the way the program works -- I can't remember if we were able to do a physical image of it, which would be like a byte-for-byte, all the data, or whether it was one of the options where it pulls slightly less than that.  I -- we would have the report, but I can't remember off the top of my head.

Q.   Do you know enough about how the computers and cell phones work in terms of deleting information to know that it doesn't actually get deleted when you say "Delete," that it stays on the -- on the drive or the cell phone until it's actually written over?

A.   I'm not a forensic person, so I don't think I could talk on that topic.

Q.   Okay.  Have you had a discussion with forensic people who have ever said to you, "Even though it's been deleted, sometimes we can get it back"?

A.   Sure.

Q.   Was any effort made to do that with respect to the rememberpockets email address?

A.   From the data from Google we got for them -- for that?

Q.   From anybody.  The cell phone itself.

A.   Yeah, so the data we pulled, if it still existed on there, would have been included, although not necessarily if it was deleted.

Q.   And -- right.  It could have been written over, in which case it would be permanently gone.

A.   There could be other reasons that I don't know.

Q.   And what did Google have to say about whether they were able to recover anything from the rememberpockets email address?

A.   I mean, they didn't say anything.  They provided data to

us.

Q.   That -- that -- that email address was a Google address --

A.   Yes.

Q.   -- right, a Gmail?

A.   Yes.

Q.   And did you ask Google to -- for everything that might have been on -- still available with respect to that email address?

A.   Yes.

Q.   And did they give you, for example, emails from -- to or from rememberpockets?

A.   Yes.

Q.   And how far back did those emails go?

A.   I don't remember --

Q.   I think --

A.   -- although --

Q.   -- you told us that that account was created February 16th of 2020?

A.   Yes, that's correct.

Q.   Did the email information that they provided to you go back as far as February 16th of 2020?

A.   I do not know.  I would have to go back and look.

Q.   Well, that would be of some interest in trying to determine whether you had emails between Mr. Garcia and Rachel, would it not?

**A.**    Oh, I understand your question.

So we requested the data going back to the beginning of when the account was created, but I can't recall specifically whether the email content they provided, like the first email in that, is -- like the date that first email is from, if that makes sense.

**Q.**    Okay.

**A.**    Yeah.

**Q.**    Did you -- did you locate emails from -- to or from Rachel --

**A.**    No.

**Q.**    -- in that material?

**A.**    No.

**Q.**    There were no emails to or from Rachel in the Google account?

**A.**    No, not that I found.

**Q.**    So there was -- there were a number of emails for the email address rememberpockets.com?

**A.**    Yes.

**Q.**    Or .gmail, I guess -- @gmail, but nothing to or from Rachel?

**A.**    No, not that I found.

**Q.**    Did you inquire of Google whether it was possible that emails to or from a specific other email address could have been deleted from the account in some way so that you were not

getting them?

**A.**    No, I did not do that.  There would be no reason to do that because the search warrant includes everything with -- that Google has, and so they provide everything they have.

**Q.**    And you're very confident that they fully understand that?

**A.**    Yes.

**Q.**    And that there's no possibility that they might not think, "Hmm, maybe we should give them the stuff that's been deleted, too"?

Did the search warrant specifically request deleted information?

**A.**    Yes, I believe it did.

**Q.**    So you -- or maybe not you personally, but in the execution of the warrant, some agent or officer found candy in the car?

**A.**    Yes.

**Q.**    Do you recall what that was, what kind of candy?

**A.**    In -- from the pictures, I remember it being like Zappos or something like that.  I don't know what that is.

**Q.**    And the quantity of candies that were found in the car were pretty much consistent with what an individual might have; right?

**A.**    I don't know if I could say that.

**Q.**    At least someone with a sweet tooth who likes to give it out?

**A.**    It was in some places I wouldn't normally expect to find candy, I guess, but...

**Q.**    Well, how much were we talking about altogether, do you know?

**A.**    I -- I can't estimate in total, but it was in the trunk. It was under the floorboard in the trunk, you know, where the spare tire is, and it was in the center console and whatnot.

**Q.**    So you didn't, let's say, cumulatively weigh it all to see how much the total quantity was?

**A.**    We did not weigh it.

**Q.**    Or count the individual pieces to say, hey, he's got 25 candy bars and 5 bags of Jelly Bellies and -- anything like that?

**A.**    That's correct.

**Q.**    All right.  The personal computer from his house, I think you said you did find the Melissa photos on that?

**A.**    Yes.

**Q.**    And the Rachel video?

**A.**    In --

**Q.**    And some --

**A.**    I did not find a video.

**Q.**    You didn't -- not -- the screenshots from the video, basically, is what they are, isn't it?

**A.**    Yes.

**Q.**    Kind of thing that if you took them all and went like this

(indicating), it would look like a movie; right?  Sort of like we used to do when I was a kid.

A.    I don't know.

Q.    Way before your time.

And you found penis photos on that as well; right?

A.    Yes.

Q.    And there were actually a lot of sexually related photos, weren't there?

A.    Yes.

Q.    How many, do you know?

A.    Thousands.

Q.    And they included photographs and/or videos of Mr. Garcia with women other than the complaining witnesses in this case or the -- or the three witnesses; right?

A.    Yes.

Q.    And were you able to, or did you even try to, identify who any of those people were?

A.    Yes.  Later, yes.

Q.    And were you able to do that?

A.    A few of them.

Q.    Were any of them prison inmates?

A.    Besides Rachel?

Q.    Yes.

A.    Of the ones we could identify?

Q.    Yes.

**A.**    No.

        **MR. REILLY:**  Ms. Slattery, could we have Exhibit 55, please.  And, again, this would be published only to the jury.

        **THE COURT:**  You're allowed.  Go ahead.

        **MR. REILLY:**  I mean not to the audience.

        **THE COURT:**  Correct.  You're allowed to do that.

**BY MR. REILLY:**

**Q.**    Okay.  So this is one of the photographs that has been identified as being of Melissa?

**A.**    Yes.

**Q.**    And there are --

        **MR. REILLY:**  You can take that one down, Ms. Slattery, and put on 52, please.

**Q.**    Now, that's another view of the same photograph, isn't it?

**A.**    I don't know.  It's another photograph.

**Q.**    Did you --

**A.**    It appears very similar.

**Q.**    It appears exact.  It's a blowup, a closeup of the same photograph, isn't it?

**A.**    Okay.

        **MR. REILLY:**  And if you could take down 52 and put up 53.

**Q.**    Same photograph again, isn't it?

**A.**    It appears the same.

**Q.**    It is the same.

**A.**    It appears the same.  I wasn't there.  I didn't take the picture, so...

**Q.**    But you can look at the picture and you can do an analysis of what -- everything that's showing in it and you can tell it's the same picture.

**A.**    It appears to be the same picture.

           **MR. REILLY:**  Can you take down 53 and put up 54, please, Ms. Slattery.

**Q.**    And there it is again.  Same photograph, isn't it?

**A.**    It appears to be a closeup.

**Q.**    Yes.

           So what we really have here, rather than four separate photographs, is cropped versions of a single photograph, the longer view being the actual photograph and the closer views simply being cropped versions of that same photograph; right?

**A.**    So these are four different photographs I found on Mr. Garcia's laptop.

**Q.**    They're different images.

**A.**    Yes, they're different images.

**Q.**    Not different photographs, though, are they?

**A.**    I don't feel comfortable saying that one way or another, really.

**Q.**    In essence, what it comes down to is there are actually only two photographs of Melissa on his computers, weren't there?

A.   No.

Q.   The one where he's -- she's on her hands and knees and the one where she is standing up and facing the camera.  And the different views of those two pictures are, in fact -- that's all they are, they're just either cropped or otherwise-modified versions of the same two photographs; right?

A.   That's a possibility.

Q.   That's what it looks like, doesn't it?  Even to you.

A.   That's what it looks like to me.

Q.   No other photographs of Melissa on any of Mr. Garcia's electronic devices; right?

A.   That's correct.

Q.   So thousands of pictures of him engaging in sexual conduct with different women and with himself, what one might call almost compulsive documentation of his sexual activity, and not one single photograph showing any of the four things that he's charged with doing to Melissa in this case; right?

A.   That's correct.

Q.   And then with respect to Rachel, a lot of photographs of Rachel in this -- in these materials; right?

A.   There were approximately 90 of them.

Q.   Okay.  And -- and, basically, as we talked about, I think, already, they all appeared to be either screenshots or excerpts from a video chat; right?

A.   Yes.  The ones we've talked about, yes.

Q.    Right.

Are there others that don't appear to be from that same video chat?

A.    There are others I thought might have been her, but I'm not sure.

Q.    Okay.  Is there any photograph of Rachel while she was at the Dublin facility?

A.    No.

Q.    So there's also, then, no photograph that supports Rachel's allegations that underlie Count 7 of this case; correct?

A.    Can you repeat that question for me?

Q.    Yes.  There is no photograph of Mr. Garcia engaged in any kind of sexual contact with Rachel, is there?

A.    That's correct.

Q.    In fact, these photographs clearly show they're not in the same place and there's no personal sexual contact taking place; right?

A.    That's correct.

Q.    And I think the same can be said about Maria, too, can't it?  There's not a single photograph of any sexual contact between Mr. Garcia and Maria in all of these photos.

A.    There is no photograph I was able to identify as Maria, that's correct.

Q.    In fact, there's not any photograph of Maria, is there?

**A.**   I don't know.

**Q.**   All right.  She says that he was taking these pictures of her while she's naked in her cell; right?

**A.**   Yes -- no.  Well, I can't remember if she testified to being sure of that or not.

**Q.**   Okay.  In any event, there aren't any, are there?

**A.**   There are none that I could identify as Maria.

**Q.**   And how about the -- Christina?  Any pictures of Christina?

**A.**   There were none that I could identify as Christina.

**Q.**   Aurelia?

**A.**   Aurelia?

**Q.**   Yes.

**A.**   There were none I was --

**Q.**   No photos of her at all?

**A.**   No.

**Q.**   In fact, out of all of these thousands of photographs, there are actually only two photographs of any woman that were taken in the Dublin facility, the two photographs of Melissa; isn't that right?

**A.**   I mean, I found different images.  I -- I can say they look to be as if they were from the same original picture, but I'm not sure if I'm confident saying that they definitely are.

**Q.**   Okay.

**A.**   So --

Q.    Put those aside --

A.    Okay.

Q.    -- those two and whatever variations of them that there are.

A.    Okay.

Q.    Other than those, there is not one single photograph that you can identify that shows any woman in the Dublin facility at all, not sexually related, not non-sexually related, nothing; right?

A.    That's correct.  There were photos of inmates' IDs on his work phone, but --

Q.    Okay.  That --

A.    That's it, yes.

Q.    -- administrative process, taking photos of their IDs, has nothing to do with what we're talking about, does it?

A.    Sure.

Q.    By the way, I meant to ask you this and I forgot.

      The Google subscriber account that was used for rememberpockets you said was created on February 16th?

A.    Yes.

Q.    Does the documentation that you received from Google show a termination date of that account?

A.    I do not remember.  We'd have to bring it up again.

      MR. REILLY:  All right.  Ms. Slattery, could you bring up Exhibit 115, please.

THE WITNESS:  Thank you.

MS. PRIEDEMAN:  116.

THE WITNESS:  Oh, that's right.  I believe it was October 25, 2021 -- 2020.  2020.

Oh, no.  That was for the phone.  Sorry.

So the email address, there's no end-of-service date.

BY MR. REILLY:

Q.   Were you able to determine an end-of-service date from any other source?

MR. REILLY:  You can turn that off now, Ms. Slattery.  Thank you.

THE WITNESS:  No.

BY MR. REILLY:

Q.   And this -- the records from Total Wireless for the TracFone cell phone, they don't have any photographs of any inmates at Dublin either, do they?

A.   Correct.  Those are just call detail records.

Q.   So even if one of them was used to make a photograph of some kind, it would not be included in those records?

A.   That's correct.  I believe there is a column for, like, data, like amount of data sent, that maybe could indicate something like that.  But that's not really something I -- I'm an expert on or really versed in.

Q.   Did you ask them to provide you with any photographs that might have been on that phone?

**A.**  No.

**Q.**  Because they do keep that; right?

**A.**  Some carriers -- some carriers do for -- I know of one carrier that keeps it for six days, but all other carriers I know of don't keep that data.

**Q.**  All right.  You mentioned that in the call details, there was one other Dublin inmate at the halfway house that Mr. Garcia had contact with.

**A.**  Yes.

**Q.**  Do you remember who that was?

**A.**  Yes.

**Q.**  Who was that?  Just the first name, please.

**A.**  Dorothy.

**Q.**  And is she otherwise in any way involved in this investigation?

**A.**  No.

**Q.**  Did you make contact with her?

**A.**  Yes.

**Q.**  Was she a friend of Rachel's?

**A.**  She was not a friend of Rachel's, no.

**Q.**  But they -- they had been inmates in Dublin at the same time?

**A.**  Yes.

**Q.**  And they were at the halfway house at the same time?

**A.**  Yes.

**Q.**   Maybe just a coincidence, then.

**A.**   We did interview Dorothy.

**Q.**   Did you learn from her any information as to why she would have been contacted by Mr. Garcia?

**A.**   She indicated that a few times while she was at the halfway house, she let a few of the girls use her phone.  And she named an inmate that she believed was -- whose name was Rachel, but she wasn't quite sure.

**Q.**   I want to clarify one thing that -- you said you determined that Melissa and Rachel and Maria had never lived in the same unit at the same time?

**A.**   Correct.

**Q.**   When you said that, were you referring to all three of them or any pair out of the three?

    In other words, was there ever a time that Melissa and Rachel were in the same unit or Melissa and Maria were or Rachel and Maria were?

**A.**   So it's the pair.  So none of them ever lived with each other --

**Q.**   Okay.

**A.**   -- or in the same housing unit as each other, regardless of the pair.

**Q.**   And the -- strike that.

        **MR. REILLY:**  Thank you.  That's all I have at this time, Your Honor.

THE COURT:  Redirect?

MS. PRIEDEMAN:  Yes, Your Honor.

**REDIRECT EXAMINATION**

BY MS. PRIEDEMAN:

Q.  Special Agent Barclay, you talked about how you were able to get a forensic image of the -- of Mr. Garcia's phones.

Does that image just pull what's accessible from the phone?

A.  Yes.

Q.  If the defendant deleted or hid photos, is it possible that you were not able to obtain that information with the forensic image?

A.  It's possible.

Q.  You also testified that agents first spoke with Maria in September of 2021.

Prior to that, did agents talk to a different inmate that you thought was the Maria the defendant had victimized?

A.  Yes.

Q.  Can you tell the jurors what -- how that happened.

A.  Starting with -- so Melissa gave us Maria's name because she had seen her from afar, and she had asked an officer to look that inmate up.  And the officer looked up an inmate and gave Melissa that inmate's register number, which is their BOP number, how they identify them in BOP.  And so that's what Melissa gave us, so we originally had the wrong name.

Q.   So if you had requested surveillance footage for that Maria's housing unit outside her cell, that would have not been the right footage; right?

A.   That's correct.

Q.   And you ultimately spoke with the correct Maria not until September 2021; right?

A.   That's correct.

MS. PRIEDEMAN:  No further questions, Your Honor.

MR. REILLY:  I have nothing further on that subject, Your Honor.

THE COURT:  All right.  He said he has nothing further.

Special Agent, you can step down.

Next witness.

MS. PRIEDEMAN:  The Government rests at this time, Your Honor.

(Government rests.)

THE COURT:  Okay.  Any motions?

MR. REILLY:  No, Your Honor.

THE COURT:  All right.  Does the defense have a case?

MR. REILLY:  We do intend to call Mr. Garcia.

THE COURT:  All right.

MR. REILLY:  Given the hour --

THE COURT:  Let's get going.  I'm not wasting time.

MR. REILLY:  I'm sorry?

THE COURT:  On the stand.

**RAY GARCIA**,

the defendant herein, called as a witness on his own behalf, having been duly sworn, testified as follows:

THE WITNESS:  Yes.

THE CLERK:  Thank you.  Please be seated.

Please speak clearly into the microphone and please state your full name and spell it for the record.

THE COURT:  All right, Mr. Garcia, take off that mask so the parties -- or the jury can see your face.  Good afternoon.  And go ahead and state your name for the record and spell it.

THE WITNESS:  Ray Garcia, R-A-Y, G-A-R-C-I-A.

**DIRECT EXAMINATION**

BY MR. REILLY:

Q.   All right.  Mr. Garcia, I want to start off by asking you whether or not on -- on or about or during the month of December of 2019, that you had contact with the individual named Melissa who has testified here and that you -- during that period of time, did you digitally penetrate her genital opening?

A.   No, sir.

Q.   That would have been in the bathroom attached to the visitation room.

A.   No, sir.

**Q.**   And on or about from December 2019 to March of 2020, was there ever an occasion while you were in the bathroom attached to the visitation room that you digitally penetrated Melissa's vagina?

**A.**   No, sir.

**Q.**   At any time during February of the year 2020, while in the inmate changing stall in the visitation room, did you ever touch Melissa's genitals and breasts?

**A.**   No, sir.

**Q.**   And between December of 2019 and March of 2020, did you ever in the warehouse digitally penetrate Melissa's genital opening?

**A.**   No, sir.

**Q.**   And just to be more general about it, at any time ever in any location, did you ever have any untoward sexual contact with Melissa?

**A.**   No, sir.

**Q.**   Or sexual contact of any kind?

**A.**   No, sir.

**Q.**   Physical contact of any kind?

**A.**   No, sir.

**Q.**   And between January of 2021 and July of 2021, did you ever ask Maria, while you were in the laundry room, to touch your penis?

**A.**   No, sir.

Q.   Or cause her in any way to touch your penis?

A.   No, sir.

Q.   And between January of 2021 and July of 2021, did you ever touch Maria's breasts while you were inside her cell?

A.   No, sir.

Q.   And, again, more generally, at any time, regardless of when or where, did you ever have sexual contact of any kind with Maria?

A.   No, sir.

Q.   And then between March 2020 and September 2020, did you touch Rachel's buttocks while you were in the electric shop?

A.   No, sir.

Q.   And, again, more generally, at any time have you ever had physical contact of any kind with Rachel?

A.   No, sir.

Q.   And when you, during the investigation into this case, told the authorities that you had never had such contact, were you telling the truth?

A.   Yes, sir.

Q.   Are you telling the truth now?

A.   Yes, sir.

Q.   And just in general, I'll ask you this right now.  Did you ever ask any inmate to be undressed at a time when you expected to be making rounds and to be at that inmate's cell location?

A.   No, sir, I did not.

Q.    Okay.  I think it's fair to say that you have a lot of sexually related photographs on your cell phone; correct?

A.    Correct.

Q.    Other than those two pictures of Melissa, which we're going to talk about in some detail, did you ever take a sexually explicit photograph of any Dublin -- FCI Dublin inmate?

A.    No, I did not.

Q.    All right.  As I said, we're going to spend some time going over some of these things in more detail, but I want to ask you a couple of other general questions first.

At any time, did you ever show Melissa any of the pictures that you have on the phone of your own penis?

A.    No, sir.

Q.    Whether it was taken at the Dublin facility or somewhere else.

A.    No, I did not show Melissa pictures of my penis.

Q.    Did you ever at any time show -- excuse me.

Did you ever at any time show Maria any pictures of your penis?

A.    No, sir, I did not.

Q.    And while she was still incarcerated in the Dublin facility, did you ever show Rachel any pictures of your penis?

A.    No, sir.

Q.    There are a number of photographs that have been put into

evidence that appear to show you and Rachel engaging in what we might call phone sex.

A. Yes, sir, there are.

Q. Those are pictures of you; right?

A. Yes, sir, they are.

Q. And Rachel.

A. Yes, sir.

Q. And that video chat took place after Rachel had left the Dublin facility; is that right?

A. That is correct.

Q. And where was she at that time, do you know?

A. She was released. I don't know exactly where she released to.

Q. At any time, did you ever instruct Katrina to strip herself naked so that you could observe her in that state?

A. No, sir, I never instructed that person.

Q. Did you ever have occasion where you came upon her where she was undressed, Katrina?

A. I can't recall a specific incident where I came upon that specific inmate undressing. I make rounds. If inmates are undressing, they may be viewed in their cell, but I continued to walk.

Q. Was there ever a time that you were standing outside Maria's cell while she was wearing a robe that exposed her breasts, torso, and genitals?

A.   No, sir.

Q.   At any time, did you ever approach Christina from behind and grabbed her on her buttocks?

A.   No, sir, I did not.

Q.   Did you ever make sexual comments to her?

A.   No, sir.

Q.   Or tell her that you wanted her to dance for you?

A.   No, sir.

Q.   All right.  As I said, we'll go into some of that in more detail, but I want to ask you some background questions now.

How old are you, sir?

A.   Fifty-five years old.

Q.   And did you attend the normal school process while you were a kid?

A.   Yes, sir.  Public schools, graduated high school in 1985.

Q.   Did you go to college?

A.   I attended a community college, but I have no degree.

Q.   Did you ever serve in the military?

A.   No, sir.

Q.   Been a professional law enforcement officer for a long time, though; right?

A.   Since December 3rd of 1989 until October 30th, 2020.

Q.   And that entire experience was with the California Bureau of Prisons?

A.   With the Federal Bureau of Prisons, sir.

Q.    Excuse me.  The Federal Bureau of Prisons.

How many different facilities have you served at?

A.    I've had eight duty stations, but two of the duty stations were the same location at different times in my career.

Q.    Okay.  Were they all in the State of California?

A.    No, sir.  I served two years in Englewood, Colorado.

Q.    Other than that, the rest of them in California?

A.    Yes, sir.

Q.    And when you were -- well, strike that.

When was it that you were assigned to the FCI Dublin facility?

A.    I assumed duties at Dublin facility in December of 2018.

Q.    And was that the first time you'd ever been there?

A.    Yes.

Q.    So that was not the facility which you served at more than once?

A.    No, sir.

Q.    And going back to the start of your career, what kind of job function did you have when you first became a -- I'm assuming you were initially a correctional officer.

A.    Yes, sir.  I started at the United States Penitentiary Lompoc in 1989 as a correctional officer.

I in-house promoted to a lieutenant junior grade, at which time I transferred to FCI Englewood as a senior-grade lieutenant.  I was at FCI Englewood on a special assignment to

manage Mr. McVeigh and Nichols.

Upon their convictions, I laterally transferred back to California to activate the federal correctional complex at Victorville.

In 2000, I promoted to the emergency preparedness officer at the United States Penitentiary Atwater to activate that facility.

I then went to the regional office in 2008 as the regional emergency preparedness officer for the western region, which manages 18 facilities in the western portion of the United States.

I then returned to the United States Penitentiary in Atwater as a promotion to captain.  I served as captain until 2016, when I was promoted back to the federal correctional complex in Lompoc as an associate warden.

And then I was laterally transferred to Dublin in December of 2018.

Q.  All right.  So let's talk about Dublin for a minute.

When you were the associate warden, what was the nature of your day-to-day responsibilities?

A.  Dublin has two associate wardens.  One associate warden is over programs and the other associate warden is over operations.  It separates the responsibility of the institutions and, therefore, it separates the authority over these positions.

I was the associate warden over operations, which means I managed the departments that make the facilities function physically, so the construction/maintenance/services, CMS, computer services --

THE COURT:  Slow down, Mr. Garcia.

THE WITNESS:  Yes, ma'am.

THE COURT:  Go ahead.

BY MR. REILLY:

Q.   It's a little difficult for the court reporter to take everything down when you talk that fast.

A.   I apologize.

Q.   Excuse me.

A.   Repeating, I had CMS, computer services, human resources, health services, safety department, outside facilities, and all those functions that didn't deal with inmate care.

Q.   And what is CMS?

A.   Construction, maintenance, and services.

And then the only other department I had was correctional services, based on my background.

Q.   And so during that period of time when you were the associate warden, you did not have direct responsibility or supervision of individual inmates?

A.   No.  I supervised the correctional services department. The correctional services department has authority over the corrections portion of it.

But as far as inmate management, unit team, transfers, furloughs, things of that nature, I had no authority.

Q.   All right.  But as part of your duties when you were the associate warden, did you do rounds?

A.   Yes, sir.

Q.   How often did you do that?

A.   Well, I did rounds twice a day.

The morning rounds, I got to the institution, typically, between 5:00, 5:30, 5:45, all depending on the traffic of the Altamont, because I come from the Central Valley.  I would leave my house early to avoid getting caught in the traffic.

And since I was at the institution early, I would go greet all of the midnight shift officers.  They work from 10:00 p.m. to 6:00 a.m.  I would see each one of them and check on them, because I was over the correctional services department and wanted to make sure they had --

THE COURT:  Again, Mr. Garcia, slow down.

THE WITNESS:  Sorry.  I'm...

BY MR. REILLY:

Q.   I know you're anxious.  You just kind of have to speak a little more slowly.

A.   Okay.

As a former correctional officer, lieutenant, and a captain, I understand what the officers go through and what their needs are, so I would go to each unit and see the

correctional officers at their office.  But I didn't make unit rounds in the mornings because inmates were still in their cells.  I only saw the officers in the morning.

And then I would go -- at approximately 5:45, we begin the morning meal, and I would go to the kitchen, where I would meet with each of the food service foremen.  And I would stand in the kitchen or on the door in front of the kitchen in what we call main line, where management staff are present so that inmates can address their concerns.

Q.   Let me back up for a second.

What was the date on which you were assigned to the Dublin facility?

A.   To the best of my recollection, it was December 9th, 2018.

Q.   And did you report to the facility on that date?

A.   I had a meeting with the warden that date, but I did not start work that week.

Q.   When did you actually start working?

A.   The following week.

Q.   So that would have been around December 16th?

A.   Yes, sir.

Q.   And then -- so let's see.

By -- by that time, you'd been 28 years with the department --

A.   Yes, sir.

Q.   -- roughly?

**A.**    Yes.

**Q.**    And how -- what is the status with respect to your retiring?  How long do you have to be there in order to retire?

**A.**    To retire from the federal law enforcement, there is a mandatory retirement age of 57.  But you can retire with 25 years of service at any age.

**Q.**    So at some point while you were at Lompoc -- excuse me.

At some point while you were at Lompoc, had you considered retiring?

**A.**    Yes, sir.

**Q.**    When did you start thinking about that?

**A.**    About a year into my commute back and forth from Merced, California, to Lompoc, I decided I had enough of the drive.

**Q.**    That would be enough to make you want to retire.

But, obviously, you didn't.  Why was that?

**A.**    I did not retire because I have certain skill sets that the Bureau uses in major emergencies and crises, and so I was assigned to some special assignments that allowed me to not be at Lompoc and be closer to home at times or be on TDY status, where in the summer I could take my son with me wherever I was assigned.

**Q.**    All right.  And at some point between December 9th of 2018 and today, you became the warden at Lompoc; correct?

**A.**    No, sir.  I was associate warden at Lompoc and associate warden at Dublin.

**Q.**   Oh, I'm sorry.  I meant Dublin, not Lompoc?

**A.**   I became the warden -- I was assigned the acting warden responsibilities in October of 2020 because Warden Jenkins had been promoted to Los Angeles.  And then the position was made -- or offered to me permanently on December 22nd.

**Q.**   Of 2020?

**A.**   Yes, sir.

**Q.**   And did -- I take it that being promoted to warden was sufficient to encourage you to stay on rather than retiring at that point?

**A.**   The promotion was one of the factors.

The other factor was an assignment that was being brought to me.  That assignment -- we will need to discuss how much I can speak of that assignment, as I spoke to you before.

**Q.**   Okay.

But in any event, you continued to serve in the position of warden at the Dublin facility up until July of 2021?

**A.**   Yes, sir.

**Q.**   Excuse me.

In general terms, can you just tell us a little bit about your performance evaluations throughout your career?

**A.**   Our performance evaluations are five tier, the lowest being unsatisfactory, minimally satisfactory, satisfactory, exceeds, or outstanding.

In my 32 years, I had two satisfactories, three exceeds,

and then all the rest were outstandings.

Q. And how many such evaluations were done during that time?

MS. PRIEDEMAN: Objection, Your Honor. Relevance.

THE COURT: What's the relevance?

MR. REILLY: Just providing background information about Mr. Garcia, Your Honor.

THE COURT: I'll allow this question, but let's move on.

You can answer that one.

BY MR. REILLY:

Q. Go ahead.

A. Can you repeat the question, sir?

Q. Yes. How many of those evaluations were done altogether? How often is that done?

A. The evaluations are annually. They occur in March for line staff and in October for executive staff.

Q. Have you ever been subjected to disciplinary proceedings by the Bureau?

A. No, sir.

Q. I assume that at some point in your career, someone made a complaint against you; is that true?

A. I've had several complaints filed against me, both by inmates and staff.

Q. And were those complaints investigated?

A. Yes, sir. All complaints are investigated, regardless of

if they are staff or inmate complaints against a staff member.

Q. And was any such investigation which respect to you ever sustained?

A. No. There has been --

MS. PRIEDEMAN: Objection, Your Honor. Relevance.

THE COURT: He has already said no. But, again, none of this is directly relevant, Mr. Reilly; right?

MR. REILLY: Just to provide his background information, Your Honor.

THE COURT: Again, I asked you to move on.

BY MR. REILLY:

Q. All right. So your retirement got delayed.

Did you end up at some point retiring?

A. Yes, sir. I did retire from the Bureau October 30th, 2021.

Q. And was that while you were on -- well, strike that.

That was after these allegations had been brought forth in July of 2021; correct?

A. That is correct, sir.

Q. When they were first brought forward, were you placed on suspension or leave of some kind?

A. Yes, sir. I was placed on administrative leave, which is a form of suspension.

Q. And so several months later, you made the decision to go ahead and retire?

A.    Yes, sir.

Q.    And is that your status right now, that you're retired?

A.    Yes, sir.

Q.    All right.  Let's talk about Melissa for a minute.

When did you first come in contact with her?

A.    I wouldn't be able to tell you an exact date that I came in contact with Melissa.  I know that the contact was initiated because she was one of five visiting room orderlies.  The visiting room is part of correctional services; therefore, it fell underneath my supervision.

When I arrived at Dublin, the visiting room was in such disarray that it was shameful for families to have to go visit their incarcerated loved ones inside there.  So I gave direction to my staff to have that visiting room crew strip and wax the floor, and at that time, the crew, all of them, were introduced to me.

Q.    And this is while you were the associate warden; correct?

A.    Yes, sir, this is associate warden, sometime in spring of 2019.

Q.    And Melissa was a member of that group that you were introduced to?

A.    Yes, sir.

Q.    And did you have some interaction with her thereafter?

A.    The interaction that I had with the visiting room crew as an entire crew was that none of them knew how to strip or wax a

floor.  And growing up, I did some janitorial work, so I gave them explanation and direction, and then I left and the officers then took over after that.

After that, interaction was just I recognized Melissa while making rounds.

Q.  All right.  And when you made your rounds, did you cover the entire facility, all of the units, A through F, as well as the rec area and the dining room and all of that?

A.  I gave the illusion to my staff that I covered every square inch of the institution by making rounds to the areas where all staff can be observed or observed me.  But I don't -- I cannot say that I completed every square inch of that institution on a daily basis.

Q.  And when you make those rounds, does it give you the opportunity to pass by the cells of every single one of the however many were there at that time inmates in the facility?

A.  Again, I did not make rounds of every single unit, every single cell, on a daily basis.  I made rounds of all the areas where staff were present, so I would walk to every unit, see the officer.  I may walk one range with the officer; I may walk one range by myself.  But by doing that, I give the illusion that I'm in every unit every day.

So to the extent of your question, I didn't cover every area of the institution daily.

Q.  Okay.  And these -- the inmate units, they are two-tiered;

correct?

A.    Yes, sir.

Q.    So each unit has cells on the first floor and cells on the second floor?

A.    Yes, sir.

Q.    And would you typically include both floors, let's say, maybe not on a daily basis, but did you make it a point --

THE COURT:  Mr. Reilly, this isn't cross.  You need to ask open-ended questions.

BY MR. REILLY:

Q.    Did you daily cover each of those floors?

A.    I cannot say that I daily covered both floors of every single unit every single day.  I covered a portion of every unit on a daily basis.

Q.    And going back to Melissa again now, were you aware of the cell that she was in when she was under your supervision as a visiting room attendant or orderly?

A.    I was not aware of her cell when I first interacted -- interacted with her as an inmate orderly.  I became aware of her cell while making rounds due to her making contact with me or complaints or concerns.

Q.    Do you remember when it was that she first did that, made contact with you while you were making rounds?

A.    No, sir, I don't know.

Q.    How often did that happen?

**A.** If I were making rounds and she saw me, she would initiate contact.

**Q.** Every time?

**A.** Any time she saw me in the unit, she would attempt to make contact, yes.

**Q.** And what was the nature or purpose of that attempted contact?

**A.** Most of the contact with Melissa in the unit was to complain about her unit manager, who the jury met earlier this week.

**Q.** And is the unit manager someone that was under your supervision?

**A.** No, sir.

**Q.** This would have been someone under the supervision of the other associate warden?

**A.** Yes, sir.

**Q.** And you are referring to Millikin?

**A.** Yes, sir.

      **THE COURT:** Mr. Reilly, we need to hear it from him. I know you've got a plan in place, but I want the words from him, not you.

      **MR. REILLY:** That's fine, Your Honor. I apologize.

**Q.** That individual that you were referring to, who was that?

**A.** The unit manager in A-Unit, B-Unit was Ms. Millikin, and the inmates lodged several complaints against Ms. Millikin.

And Melissa was a voice for the unit Caucasian inmates, and so she would make contact to make complaints regarding Ms. Millikin, her actions, and her treatment toward inmates.

Q.    And were you the appropriate person for those complaints to be brought to?

A.    No, sir, I was not the appropriate person.  I was not the associate warden over programs and I could not -- it was not my position to intervene with Ms. Millikin's duties.  And she's not required to be friendly, she's required to be efficient, and she was efficient with her job.

Q.    And when you received these complaints from Melissa, did you pass them on to someone else?

A.    Yes, sir.  If the complaints were verbal, then I would just pass the verbal information to Associate Warden Mischel.

If the complaints were written, which quite often they were, they would give me the written document and I would take those written documents to Ms. Mischel or whoever the complaint was about.

Q.    Okay.  So the other associate warden at that time was Associate Warden Mischel?  Is that what the name was?

A.    Yes.  Dr. Tamara Mischel, associate warden.

Q.    And for how long a period of time did you have these kinds of contacts with Melissa in your role as the associate warden?

A.    Again, if I was making rounds and she was in the unit and had a complaint, she would make contact with me to voice that

complaint or to pass that complaint on.

I was more visible in the unit because I was over operations, which means I walked and saw the operations. Ms. Mischel was over programs, which means she spent more time behind a computer working on things like furloughs, transfers, management variables, and all of the paperwork that's involved from programming.

Q.   And while you were doing this, the warden was Jenkins, Warden Jenkins?

A.   Yes, sir.

Q.   Did Warden Jenkins make rounds through the facility like you did?

A.   Yes, sir.  He made rounds daily.

Q.   Did you ever go the two of you together?

A.   Typically, we would start at the opposite ends of the institution and meet in the middle and then decide if there was enough time to complete it.  But if we didn't, then we could say executive rounds were done because he had done half and I had done half.

Q.   Did you always do that in such a way that you were passing Melissa's cell?

A.   No --

     MS. PRIEDEMAN:  Objection, Your Honor.  Leading.

     THE COURT:  Sustained.

**BY MR. REILLY:**

**Q.**  Did you always take a route -- the same route when you did your rounds?

**A.**  No, sir.  We varied our routes based on what we were looking for.  And there would be times when I did outside rounds and he did inside rounds, because there's a facilities department inside of the institution, as well as a facilities department and transportation outside of the institution.  Also, human resources was outside of the institution, and those were both my areas of responsibilities.

So there were times I would only make outside rounds and maybe touch on a unit, but Mr. Jenkins would make the rest of the rounds.

**Q.**  All right.  And was there ever a time at which your contacts with Melissa, to your perception, became more personal than her just making complaints about things that were going on?

**A.**  There was not a personal contact for me.  She exhibited a lot of emotion and distress, and there were times when we would have to recommend her to go see her counselor or her case manager.  But I had no other contact with -- of that nature.

**Q.**  All right.  And while you were the associate warden, I take it you would not have been involved in, say, review of a possible early release or transfer to another facility?

**MS. PRIEDEMAN:**  Objection, Your Honor.  Leading.

THE COURT:  Sustained.  Sustained.

MR. REILLY:  I'm not suggesting the answer, Your Honor.  It's a yes-or-no question.

THE COURT:  You are giving him plenty of information in your question.  You can ask him what he does, you can ask him his responsibilities, and we can hear from him.

BY MR. REILLY:

Q.   Did you have any responsibility with respect to those kinds of activities on the part of Ms. -- Melissa?

A.   As the associate warden of operations, I was not involved in programming, transfer, compassionate release, early release, management variables.  That falls under the jurisdiction or the authority of the associate warden of programs.  There is a clear separation.  I'm operations; Dr. Mischel was programs.

Q.   Did -- while you were in the associate warden position, did you ever -- were you ever assigned to that alternative responsibility?

A.   There may have been an occasion when Ms. Mischel would be gone for a period of time and there may have been some transfer packets that would need to be reviewed.  My review would be to the extent that the package was complete and then forward it to the warden.

The program that was mentioned by Ms. Millikin, Insight, is based on permissions, and those permissions are granted through a process.  So in order to have access to things like

central files, management variables, transfers, compassionate release, those permissions have to be given to you.

I had a log-on authority that I could log on and see inmates, but I didn't have access to those portions of their central file unless for some reason I had to fill in for Ms. Mischel. All of that is done, again, by permission, so if it was requested, then the warden would have to make the request to the CMC, who would concur, and then that permission would have to be given to the computer services manager, who would then have to grant access to those -- sorry.

Q. Slow down a little.

A. Would then have to grant me access to that program.

I apologize, Reporter.

Q. Okay. And then at some point, though, when you were -- became the warden, did your responsibilities and contact with Melissa change in some way?

A. The only change with my contact to inmates when I became warden is I was less accessible because I had more responsibilities.

Q. All right. And when you -- when you were -- after you were promoted to warden, did you continue to do the rounds the same way that you had done them when you were the associate warden?

A. I continued to do rounds, but they were less frequent and less complete.

**Q.**    Less what?

**A.**    Less complete.  Less access to the units, more just seeing the staff members.

**Q.**    Did you also have a -- an arrangement with one of the associate wardens similar to the one that you had with Warden Jenkins?

**A.**    With the associate wardens, I would ask -- and the associate wardens had changed.  They were Associate Warden Latanya Williams and --

**THE COURT REPORTER:**  I'm sorry?

**BY MR. REILLY:**

**Q.**    You have to slow down and give the name again.

**A.**    I'm sorry.

Our first associate warden over programs was Latanya Williams.

**Q.**    Is that L-A-T-A-N-Y-A?

**A.**    I believe so, sir.

And my second associate warden was Mary Lou Comer.

**Q.**    That's C-O-M-E-R?

**A.**    Yes, sir.

**Q.**    All right.  And during the time that you were the warden and you were making rounds, did you continue to have some conversations with Melissa?

**A.**    Yes, sir.  I continued to have conversations with any inmate that makes contact with me.  It's part of my

responsibility to address their concerns.

Q.   And did Melissa continue to express concerns to you?

A.   Yes, sir.  Her concerns were solely a transfer to Victorville at any cost.

Q.   All right.  So did she make that request to you, as the warden, for a transfer?

A.   She had made the request continuously in my presence there.  She did ask if I was going to do anything to transfer her to Victorville, to which I advised her that's her unit team's job.

Q.   That was what?

A.   The job of her unit team, her case manager, unit manager, and associate warden.

Q.   There was a process.

A.   Yes, sir.

Q.   And that requires her to go through the unit team first and then it gets passed up the line ultimately to you?

A.   Absolutely.

        MS. PRIEDEMAN:  Objection, Your Honor.  Leading.

        THE COURT:  All right.  That one is going to go.  We are going to finish up today, and we will talk about this again more.  Try to keep them open-ended.  Let's go.

BY MR. REILLY:

Q.   All right.  So did you receive, through that process, a request -- a formal request from Melissa of some kind?

**A.** The unit management completed a request for transfer for inmate Melissa, and it was forwarded through the case manager, unit manager, associate warden. But that occurred when I was on assignment in Washington, D.C.

**Q.** And when, approximately, was that?

**A.** I was in D.C. for three-week rotations from the first week of March through the end of July. I can't remember the date on the transfer order that we all saw earlier this week.

**Q.** And did you ultimately act on that request or not?

**A.** No, sir, I did not act on the request, as I was not present.

**Q.** When you had someone else filling in for you, did they have final authority to make that decision?

**A.** Yes, sir.

**Q.** And at some point, were you made aware of what the decision was with respect to her request?

**A.** No, sir. I didn't pay much attention to that at all. As I said, I was on rotation to Washington, D.C., for COVID response. I did not become aware of her transfer requests until after I was returned back to duty in Dublin, which would have been six weeks between July and August before I was sent back on TDY in September.

**Q.** All right. And did Melissa ever address that with you again?

**A.** She did upon my return. In that six-week period between

July and August, she expressed anger and frustration with not being transferred to Victorville.

Q.   And did she ever give you any reason why she was angry or who she was angry with?

A.   Well, she was angry with everybody in the -- in the process, and she felt that she was segregated against or not given fair treatment for her transfer and that other inmates of ethnic backgrounds were given transfer preference over her.

Q.   In that process generally, is there a hierarchy of who gets transferred?

A.   No, sir.  Transfer decisions -- even though the request for transfer is made at the unit team and approved at the institution level, the transfer request's final approval and the decision where an inmate is transferred to occurs at the Designation Computation Sentencing Center in Grand Prairie, Texas.  The institution has nothing to do with that transfer approval, denial, or location.

Q.   All right.  So when you get a request like that in your position as the warden and you sign off on it, "Yes, I agree that this should be granted," you send it off to Grand Prairie and someone else makes the final decision; is that what you're saying?

A.   Yes, sir.

Q.   And are the inmates aware of that?

A.   Yes, sir, they're all aware of it.

Q.   And did you have any conversation with Melissa about that with respect to her application and apparent denial?

A.   Yes, sir.  She wasn't denied; she just wasn't given the location she wanted.  She was granted a transfer to the Dublin camp, but she only wanted to go to Victorville.

Q.   And when -- when was she granted transfer to the Dublin camp?

A.   I don't know, sir.  I wasn't involved in the process.

Q.   Was she -- at some point, did she actually go to the Dublin camp?

A.   Yes, sir.

Q.   Do you remember when that was?

A.   To the best of my recollection, it was between September and -- I think it happened while I was on TDY in New York because I -- she was at Dublin before I went on TDY; she was at the camp when I came back.  But I don't know when in September.

Q.   Okay.  And as the warden of FCI Dublin, do you also have supervisory responsibility over the camp?

A.   As the warden, yes, sir.  You have supervisory of the entire complex.

Q.   Okay.  So that picture we saw, the aerial photograph of the facility, the warden has responsibility for that entire process --

A.   Yes, sir.

**Q.** -- is that right?

**A.** Yes, sir.

**Q.** The housing units, the warehouse, the camp --

**A.** Yes, sir.

**Q.** -- the rec center?

**A.** Can I make a correction to my statement, sir?

**Q.** Yes.

**A.** It wouldn't have been September. I'm getting my TDY assignments messed up.

I was in Washington, D.C., in June of 2021. That was my last TDY assignment. I believe she was at the camp before I went -- I'm sorry, at the FCI before I went on TDY assignment and at the camp when I returned from TDY assignment.

**Q.** All right. So you came back from that TDY assignment, then, fairly close to the time that you ended up being suspended?

**A.** Yes, sir.

**Q.** Is that what you're saying?

**A.** Yes, sir.

    **THE COURT:** All right, Mr. Reilly. Is this a good transition point?

    **MR. REILLY:** Yes. Thank you.

    **THE COURT:** Members of the Jury, we will go ahead and recess for the day. Again, thanks for braving the storm, and we will see you -- any questions before I let you go? No?

Okay.  Then we will see you tomorrow and start again with you at 8:30 in the morning.

THE CLERK:  All rise for the jury.

(Proceedings were heard out of presence of the jury:)

THE COURT:  The record will reflect the jury has left.  Mr. Garcia, you can step down.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Anything to discuss?

MR. REILLY:  Not on my part, Your Honor.

MS. PRIEDEMAN:  No, Your Honor.

THE COURT:  All right.  We will stand in recess until 8:00 a.m.  I would ask that everybody clean up everything.  My criminal calendar starts in 20 minutes.

(Proceedings adjourned at 1:39 p.m.)

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Thursday, December 1, 2022

*Pamela Batalo Hebel*

_____
Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
U.S. Court Reporter