**Volume 6**

**Pages 912 - 1119**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

UNITED STATES OF AMERICA,  )
　　　　　　　　　　　　　　　 )
　　　　　　Plaintiff,　　　　 )
　　　　　　　　　　　　　　　 )
　VS.　　　　　　　　　　　　 )　　　**NO. CR 21-00429-YGR**
　　　　　　　　　　　　　　　 )
RAY J. GARCIA,　　　　　　　　)
　　　　　　　　　　　　　　　 )
　　　　　　Defendant.　　　　 )
_____)

　　　　　　　　　　　　　　Oakland, California
　　　　　　　　　　　　　　Friday, December 2, 2022

**TRANSCRIPT OF TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
　　　　　　　　　　　**STEPHANIE M. HINDS**
　　　　　　　　　　　United States Attorney
　　　　　　　　　　　1301 Clay Street, Suite 340S
　　　　　　　　　　　Oakland, CA  94612
　　　　　　　**BY:　MOLLY PRIEDEMAN**
　　　　　　　　　　**ANDREW PAULSON**
　　　　　　　　　　**ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:
　　　　　　　　　　　SUMMIT DEFENSE, APLC
　　　　　　　　　　　4040 Civic Center Drive, Suite 200
　　　　　　　　　　　San Rafael, CA  94903
　　　　　　　**BY:　JAMES T. REILLY, ESQUIRE**

Reported By:  Pamela Batalo-Hebel, CSR No. 3953, RMR, FCRR
　　　　　　　　Official Reporter

**I N D E X**

Friday, December 2, 2022 - Volume 6

| DEFENDANT'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **GARCIA, RAYMOND (RECALLED)** | | |
| (PREVIOUSLY SWORN) | 921 | 6 |
| Direct Examination resumed by Mr. Reilly | 921 | 6 |
| Cross-Examination by Ms. Priedeman | 1028 | 6 |

**E X H I B I T S**

| GOVERNMENT'S EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 164 | | 1102 | 6 |
| 179 | | 1039 | 6 |
| 191 | | 1041 | 6 |
| 194 | | 1050 | 6 |
| 203 | | 1046 | 6 |

**E X H I B I T S**

| DEFENDANT'S EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| A | | 972 | 6 |
| B | | 992 | 6 |

**Friday - December 2, 2022**                              **7:45 a.m.**

**P R O C E E D I N G S**

**---oOo---**

(Proceedings were heard out of presence of the jury and under seal:)

(Proceedings were heard out of presence of the jury:)

**THE CLERK:** Calling Criminal Case 21-0429-YGR, United States vs. Ray J. Garcia.

Counsel, please state your appearances.

**MS. PRIEDEMAN:** Good morning, Your Honor. Molly Priedeman for the United States.

**MR. REILLY:** Good morning, Your Honor. Jim Reilly of Summit Defense, appearing with Mr. Garcia, who is present in court.

**THE COURT:** All right. Good morning. So we'll proceed today. What, if anything, do you have to chat about today?

MS. PRIEDEMAN:  Just one thing from the Government, Your Honor.  I had spoken with Mr. Reilly, and we're requesting that when we show the naked photos today, if -- that Ms. Slattery be allowed to redact the genitals of some of the victims when we're showing it to the jury.

THE COURT:  Are these the same pictures that have already been admitted?

MS. PRIEDEMAN:  Yes, Your Honor.

THE COURT:  Okay.  We'll let them know that that's what we'll do, just for purposes of moving -- I assume, Mr. Reilly, is this a joint request?

MR. REILLY:  Yes.  That's fine.

THE COURT:  All right.

   Other issues?

MR. REILLY:  Your Honor, the Court indicated yesterday that you wanted Mr. Garcia to bring to court the computer on which he communicated with Rachel.

THE COURT:  I did.

MR. REILLY:  When he checked on that last night, what he realized was that of the computers that were seized by the Government under the search warrant, two of the three were returned.  The one that was not returned is the one that he had been using to correspond with Ms. Rachel, and so that is still in the possession of the Government at this time.

THE COURT:  Where were the pictures that you compiled?

You said they were on his computer.

**MR. REILLY:**  He had -- he had downloaded them from that conversation onto the computer that he still has, and that's where he sent them to me, from that computer.

**THE COURT:**  All right.  Have you all talked about those pictures?  Is there an objection to their admission?

**MS. PRIEDEMAN:**  Yes, Your Honor.  There is no evidence that those photographs were sent from the email address that the defendant --

**THE COURT:**  Well, I'm going to assume that he's testifying that they were sent to him.  So making that assumption, is there an objection?

**MS. PRIEDEMAN:**  Just that they were produced late, Your Honor.

**THE COURT:**  All right.  If that's the only objection, the objection will be overruled.

I don't know that we need as many as you've provided to me, Mr. Reilly, but we'll see what you're going to offer.

**MR. REILLY:**  Your Honor, I would only be anticipating introducing the one photograph in which she's topless.

**THE COURT:**  All right.  Anything else?

**MS. PRIEDEMAN:**  Your Honor, the Government would just ask that that photograph be sealed.

**THE COURT:**  That would be sealed, along with the others.

Okay.  Are there any other issues?

**MR. REILLY:**  Your Honor, just so that we're clear on it, I have a paper copy of that photo with me today that I can use as an exhibit.  I don't otherwise have it in the format that we've been using with the other exhibits.

**THE COURT:**  Okay.  I don't know what you mean by "the other format."

**MR. REILLY:**  The Government's been showing them on the computer and the screens.

**THE COURT:**  That's why we have an ELMO.

**MR. REILLY:**  Why we have a what?

**THE COURT:**  An ELMO.

**MR. REILLY:**  Oh, okay.

**THE COURT:**  It's the old-school approach, Mr. Reilly.

**MR. REILLY:**  That's -- that's pretty old-school, and I don't know how to use it, but --

**THE COURT:**  That's all right.  Someone will show you during the break.

**MR. REILLY:**  Okay.

**THE COURT:**  It's just like an overhead.  You put it on, it turns on, and --

**MR. REILLY:**  And then that shows on the screens for the jurors?

**THE COURT:**  Correct.

**MR. REILLY:**  Okay.  That's fine.  Thank you.

**THE COURT:** This is a great trial courtroom, not like some of my state court courtrooms where you couldn't see the screen. Like, I had one courtroom that was pie shaped. It was pie shaped, and we put up the screen to show overheads, and there was no one single location where everyone could see it at the same time. But here we are.

Okay. Other issues?

**MS. PRIEDEMAN:** Nothing from the Government, Your Honor.

**MR. REILLY:** No, Your Honor. Nothing else.

**THE COURT:** All right.

What do we -- we're in great shape, I think, in terms of having the trial finished in the length of time provided for by the jurors. I am concerned about what I told you this morning and, you know, what my status is going to look like, so I will take all necessary precautions.

But what are we looking at in terms of any other witnesses from the Defense? Any rebuttal case before we get to argument?

**MR. REILLY:** Your Honor, at this point, I don't anticipate offering any other witnesses.

**THE COURT:** Okay. And do you anticipate going all day today?

**MR. REILLY:** Perhaps, or close to it.

**THE COURT:** Okay. That means that he'll be on the stand again on Monday, right? And then are you anticipating

rebuttal witnesses?

**MS. PRIEDEMAN:**  Yes, Your Honor.  At most, two rebuttal witnesses.

**THE COURT:**  And who are you anticipating?

**MS. PRIEDEMAN:**  Michael Bettencourt and --

**MR. PAULSON:**  And Michael Kan, Your Honor.

**THE COURT:**  Who are they?

**MR. PAULSON:**  Michael Kan was on our original witness list.

**THE COURT:**  Who are they?

**MS. PRIEDEMAN:**  Michael Bettencourt is an FCI Dublin employee.  He's in the electronics department.  And TFO Kan is with FBI.

**MR. PAULSON:**  He's with the FBI.  He's the digital forensics expert.

**THE COURT:**  Okay.  Well, we'll have to take it day by day and see where we go.

Anything else for now?

**MR. REILLY:**  No, Your Honor.

**MS. PRIEDEMAN:**  No, Your Honor.  Thank you.

**THE COURT:**  All right.  We'll stand in recess until the jury arrives.

(Recess taken at 8:12 a.m.)

(Proceedings resumed at 8:37 a.m.)

(Proceedings were heard in the presence of the jury:)

**THE COURT:** Let's call the jury in.

(Proceedings were heard in the presence of the jury:)

**THE COURT:** Good morning, everyone. We are back on the record. Everyone can be seated. The record will reflect that the parties are present. The jury is back. Bright sunny day today because it's Friday? Yay for Fridays.

All right. Any questions before we get started?

No? All right. Then we still have Mr. Garcia on the stand.

Mr. Garcia, I will remind you, sir, you are still under oath. And as I mentioned to you yesterday, I do not want to interrupt your testimony, but you do have to slow down.

**THE WITNESS:** I understand, Your Honor.

**THE COURT:** All right. You may proceed, Mr. Reilly.

**RAYMOND GARCIA**,

called as a witness for the Defendant, having been previously duly sworn, testified further as follows:

**MR. REILLY:** Thank you, Your Honor.

**DIRECT EXAMINATION** (resumed)

BY MR. REILLY:

Q. Mr. Garcia, I want to try to pick up where we left off yesterday with some additional questions about Melissa.

During the time that she was housed there at Dublin and you were either the associate warden or the warden, did you ever exchange with her notes or letters of any kind?

**A.**    No, sir.  I did not exchange notes or letters with her. At times, she would provide documentation such as requests or documentation to justify her requests for removal of management variables, and those documents would be official documents like her sentence computation or what's called a cop-out.  That's what inmates call it.  It's basically requests.  The official is a BP8.  And then those would be forwarded to her unit team for distribution and answering.

**Q.**    All right.  But no personal letters or notes of any kind?

**A.**    No, sir.  No personal letters or notes of any kind.

**Q.**    At any time did you ever tell her in advance that you were going to be making your rounds at a specific time on a specific date and that you wanted her to be undressed so that you could see her at that time?

**A.**    No, sir.  I never told her that I would be making rounds at a specific time or date and to be undressed.  As a basic habit, I never made rounds before 8:00 a.m. because we typically had meetings in the mornings, and then there was an inmate movement at 8:00 a.m.  So I wouldn't make rounds until after that time.

**Q.**    And was there a facility rule, if you will, or requirement regarding when the inmates had to be dressed?

**A.**    Yes, sir.  In the admissions and orientation handbook that every inmate is given, it gives the basic rules of their activity and conduct while they're in the institution.  And

inmates were to be dressed prior to the morning breakfast meal and remained properly dressed all day long.

Q.    And what time was that morning breakfast meal served?

A.    The morning meal started between 5:30 and 6:00, depending on what the meal was and if the kitchen had time to prepare it.

Q.    All right.  Let's address specifically the four counts that you're charged with that relate to Melissa, starting with the first one.

Was there ever a time that you and she were in the visitation bathroom together?

A.    During the time we spoke of earlier that -- the remodeling of the visitation room, inmate Melissa discussed several things that were broken in a bathroom at a time when the construction crews were present doing work.

It was easy to find inmate Melissa because she was always on the weight pile during the day because her work hours were in the afternoon.  She was retrieved from the work pile, escorted to the visiting room where I met her and the work crew that were present doing the reconstruction of the visiting room.

Q.    Let me interrupt you for a second.  When you say "she was retrieved," you didn't go get her yourself?

A.    No, sir.  I just radioed the compound officer or radioed the recreation staff, and they would just send her.

Q.    Okay.  And then what happened on this particular occasion

when you were discussing the broken items in the bathroom?

A.    We entered the bathroom, myself, Melissa, and the CMS foreman so that she could point out what was broken and then they could subsequently make a work order and do the corrective actions.

Q.    How many people were present in that bathroom or in that immediate vicinity of the bathroom while this conversation was taking place?

A.    In the vicinity of the bathroom was the facilities foreman's work crew.  In the bathroom were just myself, the facilities foreman and Melissa.

Q.    And who was that foreman?

A.    It would -- it was one of two foremen that were doing construction.  It was either Mr. Gonzaga or -- it was Mr. Gonzaga or Mr. Heintz.

Q.    Was there a time while this was taking place that the foreman was out of the bathroom and left you and Melissa in there, just the two of you by yourselves?

A.    No, sir.  We walked in.  They showed us what was broken, and we walked out.

Q.    How long were you in that -- the bathroom then?

A.    Maybe a minute to two minutes.

Q.    How long before you went into the bathroom and spoke with the -- with that manager was it that Melissa arrived at that location -- I didn't ask that very well.  Let me reask it.

From the time that she arrived from the recreation area until you went into the bathroom, how long a period of time was that?

A.   She walked into the visiting room.  She had voiced a complaint earlier about something broken.  She walked into the visiting room.  We spoke to the foreman about what was broken. We walked to the visiting room, showed the foreman what was broken, and left.  So the entire time would be a couple of minutes.

Q.   After you left the bathroom, where did you go?

A.   I went back to my office, and the inmate was escorted back to the recreation yard.

Q.   And this was -- was this during the protocol, the COVID protocol period?

A.   No, sir.  This all occurred prior to the COVID lockdowns.

Q.   So when you say she was escorted back, who did that?

A.   It would be the compound officer.

Q.   The same person that brought her over?

A.   Yes, sir.

Q.   And other than on that occasion, was there ever a time that you and Melissa were in that visitation bathroom together and otherwise alone, that there was no other person there with you?

A.   No, sir.

Q.   How many bathrooms are there at that -- at that visiting

area?

**A.** There are two bathrooms, men and women, for inmate use, and two bathrooms, men and women, for inmate visitation use.

**Q.** Okay. So inmates have to use a different bathroom than the visitors do?

**A.** Yes, sir. And that's to avoid the transfer of contraband.

**Q.** Okay. And the bathroom that you went to look at with Melissa and this work foreman, do you remember which one it was?

**A.** The broken sink bathroom would have been the inmate visitation bathroom or the bathroom used by the inmate visitors, if that makes it more clear.

**Q.** Okay. And other than on that occasion, was there ever a time when you and Melissa were together in the other bathroom, not the one that you were dealing with, with the broken sink?

**A.** Yes, sir. Again, as the reconstruction was going on, the visiting inmate orderlies expressed everything that was broken in the visiting room. There were several inmates on the crew that were inaccessible during the daytime. The lead inmate orderly was also an education tutor, so she was not available during the day. The second was in a DAP program, not available during the day.

But inmate Melissa was on the weight pile every single day because she had no work assignment in the morning. She worked in the evening on the visiting crew.

So when they would tell me that things were broken, we would retrieve inmate Melissa through the compound officer to come show the staff what was broken during the working hours.

Q.    And just for clarity's sake, when you say "the weight pile," what is that?

A.    The weight pile is the area where the free weights are positioned on the recreation yard.  It's closest to the recreation entrance gate.

Q.    And so that's something the inmates can work out with, do weightlifting and squats --

A.    Yes, sir.

Q.    -- and things like that?

A.    Yes, sir.

Q.    On any of those occasions when you were in the visitation bathroom or in the immediate vicinity of that bathroom, did you ever have any kind of physical contact with Melissa?

A.    No, sir.

Q.    Even accidental?

A.    No, sir.

Q.    Maybe brush up against her, anything like that?

A.    No, sir.

Q.    And specifically on any of those occasions when you were in those bathrooms, did you engage in any kind of sexual contact?

A.    No, sir.

Q.    And specifically, did you ever penetrate her genital opening with your hand or finger or any other item?

A.    No, sir, I did not.

Q.    And during that time or any of those times, I should say, when you were in this visitation bathroom, did Melissa have any sexually related contact with you?

A.    No, sir, she did not.

Q.    And specifically, was there ever a time where she touched your penis, either through the clothes or under the clothes?

A.    No, sir.

Q.    Then the second count also addresses activity in the visitation bathroom, so it presumably would be the second time you were there.  On that occasion, were you ever in the bathroom alone together, the two of you?

A.    No, sir.  The second instance were the inmate-use bathrooms.  They're much smaller than the visitors' bathrooms.  In fact, it's just open the door, there's a toilet and a sink.

      The second instance was the toilet paper holder or something of that nature was broken and it was unsanitary for the inmates to have to put the toilet paper on the ground.  In that instance, again, it was either Mr. Heintz or Mr. Gonzaga still working on the podium for the visiting room.

      We walked back, and as you can see from the exhibits that the prosecution has shown, from the hallway, you could look directly in the door.  She pointed out those issues, and that

was it.

Q.   So you did not actually go into the room; is that what you're saying?

A.   No.  You could see the broken -- a fixture from the hallway looking into the bathroom.  It's a very small bathroom.

Q.   All right.  And she indicated in her testimony that you followed her into a closet and then the bathroom.  What is the arrangement that the closet comes into play?  How is that?

A.   As --

        MS. PRIEDEMAN:  Objection, Your Honor.  Misstates the witness' testimony.

        THE COURT:  Sustained.

    You should rephrase.

BY MR. REILLY:

Q.   All right.  Let me ask you this.  What is the closet with respect to this visiting bathroom?

A.   As you proceed down the hallway where the bathrooms are located, there are vending machines, then the visitors' bathrooms.  The hallway narrows.  There is the two inmate bathrooms, and there is a supply closet on the right as you're walking toward the bathrooms.

Q.   And was ever a time that you followed her into that supply closet?

A.   No, sir.  You could not follow somebody into the supply closet.  Its total dimensions are probably three by four feet.

It's literally a closet.

Q.   And on that second occasion, did you engage in any physical contact of any kind with Melissa?

A.   No, sir, I did not.

Q.   Specifically, did you kiss her at all?

A.   No, sir, I did not.

Q.   Touch her breasts?

A.   No, sir.

Q.   Touch her on the genitals or the vagina?

A.   No, sir.  I did not touch her.

Q.   All right.  Addressing Count III, which relates to the visitation room changing stall, can you tell us what that is, please.

A.   Again, this entire remodeling of the visiting room, the CMS foreman -- this would be Mr. Eddings -- created small dressing areas so that the inmates had more areas to get dressed before and after visits because the inmates are subsequent -- could be subject to a visual search or a partial search.  So to afford them privacy during the searches, there was an area past the closet in front of the inmate bathrooms that was open, and he basically installed partitions.

       Then they were going to install curtains in front of the partitions, and as a gauge to decide how high the curtains could be and how low they should go, inmate Melissa was escorted off the yard to the visiting area and used to stand

inside while they marked where the curtain rods were going to be screwed into the partition boards.

Q.   And were you present when that took place?

A.   Yes, sir.  As CMS is my department and these works were being done as part of a project, anything that was added to the project that was going to cost money, I would have to approve or disapprove.  So when they had these things that came up that were in addition to the original project, the CMS foreman would call me and then ask if that's okay, we'll proceed.  And if it's going to be too cost ineffective, then, we would not.  So, yes, I would be present for decisions on changing the project.

Q.   All right.  And did you again ask that Melissa be escorted to the facility for that purpose?

A.   Yes, sir.  Since my office is on one side of the visiting room and the rec yard is on the other side of the visiting room, it's easier just to use the radio to call the recreation staff and release the inmate or call the compound officer to escort the inmate, depending on the status of the compound at that time.

Q.   So I take it, then, the two of you did not arrive at the location together?

A.   No, sir.  We arrived relatively the same time.  It's approximately the same distance, or I would be there with a foreman, waiting for the inmate or vice versa.

Q.   Okay.  So you just basically walked there from your

office?

A.    Yes, sir.

Q.    And the -- what was the reason that she was selected for the purpose of determining the height of the curtains?

A.    She's the tallest inmate on the compound, so we could judge heighth-wise.  We couldn't go any higher.  The purpose of the curtains is to provide privacy, but we still need to be able to see the inmate's head and, more importantly, feet to make sure that there's no area, to include the showers or these dressings areas, where two inmates could be behind a concealed curtain and not be seen.

Q.    And so were these curtains then installed based on this approximation using her height?

A.    Well, it was done with the approximation of two inmates, one tall, one short.  So one of the foremen crew members who was of average height or smaller stature would also be put in there to make sure the curtain wasn't too high or too low.

Q.    All right.  And while this was taking place, were you and Melissa ever alone together in or near that changing stall?

A.    No, sir.

Q.    This foreman, was he there at all times when you were there?

A.    He and his crew, since they were taking the measurements and dimensions of what partitions and curtains would be put in.

Q.    And was there ever a time while you were in the vicinity

of the changing stall that you had any physical contact of any kind with Melissa?

A.   No, sir.

Q.   And in particular, did you have any sexual contact with her?

A.   No, sir.

Q.   Did you touch her in any way?

A.   No, sir.

Q.   All right.  And then with respect to Count IV, was there ever a time when you and Melissa were at the warehouse together?

A.   Yes, sir.

Q.   Do you recall when that was approximately?

A.   After she had shown the supply closet and it was in disarray, there was nothing there but a bookshelf, and the bookshelf was breaking down, so their supplies had nowhere to be.  They asked if they could get a better piece of furniture to store their cleaning supplies, the toilet paper, Lysol, things of that nature.

So they were advised -- I was advised through the compound officer that they wanted to seek furniture from the warehouse. And in the warehouse, we had used furniture and new furniture for staff use on the new furniture and general use on the used furniture.

There was a morning when the compound officer retrieved

inmate Melissa and her cellmate -- first names only, Your Honor?

BY MR. REILLY:

Q.   Yes.  First names only.

A.   They called her Kat.  I don't -- I don't know her first name.  Her nickname is Kat.

Q.   Kat as in C-A-T?

A.   That's her nickname.

Q.   Or K-A-T?

A.   Yes.  They were cellmates, and they were both on the visiting crew.  So the compound officer went and retrieved them and a large, flat cart.  The bookshelf was taken out of the visiting room.  Since the furniture was under my jurisdiction, he told me they were going back there.

I definitely didn't want them to take the brand-new furniture that was designated for staff, so we walked across the compound, the inmates pulling the cart, myself and the compound officer together.  We crossed through the security gate.  From the warehouse that you all saw in the overhead picture, the trash compactor is to the left.  The warehouse is to the right.  Kat and the officer went to the trash compactor. I entered the warehouse.

Inside the warehouse was Foreman Heintz.  He was teaching a welding class to his crew.  The -- there's two portions of the warehouse.  They're off-centered.  The first portion of the

warehouse has pallet racks on the wall, in the center and on the third wall, and you could see all the way back.

As you turn to the left is the second warehouse.  It is the size of this room.  Along that wall and this wall are individual offices.  They're individual storage for each department.  They're locked, and only the department head to that area has that key.  Used furniture is stored closest to the offices.  New furniture is stored closest to the wall.

I entered with inmate Melissa, engaged with my staff member here, entered the warehouse where the furniture was, engaged with an education staff member and her orderlies.  She was in her storage room, getting supplies for the new GED year.  We started to look at furniture, and shortly after that, the compound officer and Kat entered with the cart.

The furniture we're talking about is typical office furniture -- desks, chairs, wardrobe cabinets -- all made by UNICOR.  The one that they were interested in is about 40-inches wide.  It has a small door that opens to a wardrobe and a larger door that opens in the shelves.  And that would allow them to hang their mops and keep their supplies.  I approved them to have it.  I left, and the compound officer then carried on with that task.

Q.    All right.  And at any time while you were there in the warehouse that day, were you and Melissa ever alone by yourselves?

**A.**   No, sir.

**Q.**   Now, there is filing cabinets of some kind in this warehouse?

**A.**   Yes, sir.  Again, it's used furniture or new furniture and, it's stored in that warehouse.  There are filing cabinets like your office under-the-desk filing cabinet, two drawers.  There is filing cabinets like your standard office four-drawer file boxes.  And then there is furniture likes desks and wardrobe cabinets.

**Q.**   And where were these filing cabinets located in this room, warehouse room?

**A.**   So as the -- in the same direction as the pallet racks of the first building, as you went into the second building, they were in rows.  So this wall would have new desks and furniture still in the box, and then the center would have the metal furniture, and then against the wall were the used wood furniture.

**Q.**   And were they aligned in such a way, the filing cabinets, that the doors would open out into the passageway or the open area of the warehouse?

**A.**   They were not arranged that orderly, sir.  They were just all packed in.  If you saw something you liked, you would pull it out of the pile and then open it up.

**Q.**   Was there ever a time that you and Melissa went in the immediate vicinity of the filing cabinets, just the two of you?

A.    In the immediate vicinity, no.  They were interested in the cabinet boxes, not filing cabinets.

Q.    Okay.  But at any time, did you and Melissa go over to where the filing cabinets were rather than the cabinets they were interested in for the -- for the work purpose?

A.    We actually walked down both rows of used furniture for the inmate to make a selection of what piece of furniture she thought would best fit the closet.

Q.    When that took place, was there -- was there anyone else in the immediate vicinity while you were walking down that aisle?

A.    Yes, sir.  The education teacher was, again, in her room, would be on this wall with her crew of three to five inmate orderlies.

Q.    Were they all in her office or were --

A.    No, sir.  They were pulling out supplies, so the inmate orderlies were spread out on some of the used desks, collating lesson plans for the next GED year.

Q.    The way the filing cabinets were organized, was there a way that two people could go behind or next to or around them in such a way that they would be concealed from the view of other people in the warehouse?

A.    Only if you walked in and intentionally moved the cabinets out of the rows to create a blockade.

Q.    And did you do that that day?

A.   No, sir.

Q.   Did anyone else do that?

A.   No, sir.

Q.   At any time while you were in the warehouse looking at these cabinets, did you have physical contact with Melissa of any kind?

A.   No, sir.  I did not.

Q.   And specifically, did you kiss her at all?

A.   No, I did not.

Q.   Or touch her in a sexual way?

A.   No, sir.  I did not touch her.

Q.   Specifically, did you put your finger in her vagina that day?

A.   No, sir, I did not put my finger in her vagina.

Q.   All right.  Let's talk about some other events that she described.

You're familiar with her friend Andrea?

A.   Yes, sir, I am.

Q.   Okay.  And where was Andrea's cell compared to Melissa's?

A.   On the opposite side of the unit in the wing.

Q.   About how far away from Melissa's cell would that be?

A.   A couple hundred feet.  I would say more than that.  It would be -- directly across, it would be a couple hundred feet, but they were both on the second tier.  So you would have to walk the entire circumference of the unit.

Q.   Okay.  Because the second tier doesn't have a floor, correct, in the middle?

A.   That's correct, sir.

Q.   And is there a disciplinary rule that relates to inmates being in the cells of other inmates?

A.   Yes, sir.  It's addressed in their A&O handbook, and it's also addressed in the bulletin boards and information of the unit.  Inmates are not allowed to be in another inmate's cell without the presence of the other inmate.  They're allowed one visitor, but both the owner of the cell and the visitor would be there.  They're never allowed in each other's cell without the other present.

Q.   All right.  And on one occasion that -- strike that.

Was there an occasion when you became aware that someone was in Andrea's cell that was not supposed to be there?

A.   Yes, sir.

Q.   Do you recall when that happened?

A.   Yes, sir.  It would have been early January of 2020.

Q.   And how was it that you became aware of this circumstance?

A.   As the associate warden of operations, I was in charge of our ACA accreditation.  We were scheduled for ACA accreditation in April of 2020 in conjunction with PREA accreditation.  So the PREA coordinator, Associate Warden Mischel, was doing her part, and I was doing mine.

With ACA, one of the biggest concerns is inmate safety and

living conditions.  So after Christmas vacation, we came back. It was time to make a concerted effort to address these issues. A way to address these issues was to seek out discrepancies, photograph them with the CMS camera, and then leave the camera with CMS.  And then the appropriate foreman would take those pictures, make a work order, and then when the work was completed, we would take a picture of the corrective action to show compliance to ACA.

On this day, I was making rounds.  It was approximately, to the best of my knowledge, 10:45 because the more -- the lunch meal should have begun.  But the lunch meal was late because it was fried chicken day, and that's the inmates' favorite meal.  They were short meals, and so we were kind of in a holding pattern.

I chose not to waste time, and I entered A-Unit, made my rounds, took pictures of broken items like lights and heater fixtures and things of that nature.  Officer let me in, waited for me at the door.  When I was done with A-Unit, the officer walked me over to B-Unit because there is one officer for the A and B side.  Opened the door.  I entered the unit, went to the top tier.

Q.   Let me interrupt you for just a second.

You mentioned that you were let into these units by a correctional officer?

A.   Yes, sir.  As associate warden, I don't have keys to these

areas.  I have keys to my office, my correctional complex, and that's it.  I don't have keys to housing units, warehouses, visiting rooms, chapel, education.  I don't have direct access to those areas.  I call the compound officer or the person in charge of that area to let me in or out.

Q.   And typically when you do that, does that officer stay with you while you're in the unit or the room that you've been let into?

A.   If I'm in a department, like education, yes, somebody will stay with me.  If I'm in CMS, it's always filled with foremen and inmates.  If I'm in a housing unit, it depends on the correctional officer.  If they're busy, then I'm not going to interfere with their duties, and I'll walk alone.  If they're not busy, I will walk alone.  But typically, I will see the case manager in their office, the unit manager in their office, the counselors.  And most occasions, those staff will walk with me for at least some distance.  They're not required to walk with me the entire round.

Q.   All right.  So on this particular date that we're talking about, what happened to bring your attention or to attract your attention?

A.   As I entered the wing, the cell to the right of the wing I know to be occupied by inmate Andrea and inmate Shindozjanae that testified earlier and inmate Morris.  They were all workers.  Inmate Shindozjanae was in CMS.  Inmate Morris and

inmate Andrea would be in commissary. So that cell is empty every day that I walk by. It's empty, and the door is closed.

On this day when I walked by, there's a heater vent on the ground. I took a picture of the heater vent that was broken, and then I noticed that the door was closed and the window was covered. Well, there would be no reason for that window to be covered if all the inmates are supposed to be at work.

Q. Let me interrupt you again for a minute.

Is there a disciplinary rule of any kind regarding covering the windows when inmates are present in the cell?

A. Yes. Inmates are not allowed to cover the windows completely. When an inmate is using the restroom or dressing out of the shower, they will cover it three quarters of the way. They typically all make signs that say "dressing" or "bathroom," and they cover the window three quarters of the way, but if you needed to, you could look up and see the top of an inmate's head. Or you knock on the door, and you tell them to take it down. And they will say "dressing" or whatever and proceed from there.

Q. All right. So on this particular day, what was it that you noticed about the door?

A. The window was covered.

Q. Completely?

A. Completely. Top to bottom.

Q. Okay. And what did you do at that point?

**A.**   Banged on the door and said, "take the cover down."  I heard a voice in there and began to walk away.  As I --

**Q.**   Let me interrupt you again.

What did you hear that voice say?

**A.**   Honestly, sir, I didn't pay much attention.  When I banged on the door, said "take the cover down," and I heard like, "okay," just -- just the response.

**Q.**   Okay.

**A.**   So I knew there was an inmate inside of the cell.

**Q.**   Did you recognize the voice?

**A.**   No, I did not.

**Q.**   Did you know who was in there at that point?

**A.**   No, and that's what grabbed my concern.  As I left to make the corner to leave the wing, it dawned on me that there shouldn't be anybody in that cell because this is a Thursday, and the inmates that live in that cell are at commissary, working.  So that cell should be empty.

**Q.**   All right.  And what did you do when you made that realization?

**A.**   Well, being that I know the history of the inmates that live in that cell, one of those inmates has $75,000 on their commissary account, and that inmate also works in the commissary.  The commissary is one of the only areas of a prison that has access to the outside.  So my mind immediately went to did somebody bring contraband and are they in there

with contraband that could have come from the commissary, outside in, and now they're inside the unit with that commissary.

Q.   All right.  Making that realization, what action, if any, did you take?

A.   I spun around, went right back to the cell, knocked on the door, said, "Coming in."  My impression was, from my background, when inmates have their doors closed and completely covered, they're probably in there separating their narcotics into what we call strips.  And this happens in every prison in America, that inmates can get narcotics in, and then they have to divide them up into small sections for sale.  So typically, inmates when they're caught, will try to flush the contraband down the toilet.

I was fortunate to have the CMS camera in my hand, and I swung the door open and took an immediate picture because even if the inmate were to have flushed the contraband, I would have a picture of their actions.

Q.   All right.  Let me interrupt you again for a minute.

You mentioned CMS camera.  What is that?

A.   CMS has a digital camera.  This particular camera is just a small Canon digital camera.  And because I was taking pictures of broken items for ACA, I could take pictures, and then CMS could download the pictures, tell me when the corrective action was complete.  I could take pictures of the

corrective action and put them in the ACA binder for compliance.

Q.    All right.  So these photos that you were taking on that particular day, you were not using a cell phone for that?

A.    No, sir.

Q.    All right.  And then you also mentioned that you opened the door.  Are the doors to the cells capable of being locked in any way from the inside?

A.    No, sir.  At that time, most of the doors were not capable of being locked at all.

Q.    Oh, not even from the outside?

A.    No, sir.

Q.    Okay.  And then when you opened the door, did something unusual happen?

A.    Yes, sir.  So I opened the door and took an immediate picture without even focusing on what I was taking a picture of because, again, I expected inmates to be flushing narcotics or distributing or sorting their contraband.  As I came into focus of the cell, an inmate was on all fours and completely naked.

Q.    And where in the cell was that person located?

A.    In the cell, there were three beds, a set of bunk beds on the right and a single bed on the left.  The inmate was on the single bed on the left.

Q.    When you first saw this inmate, did you recognize who it was?

**A.**   No, sir.  From the angle that she was on all fours, there was no ability to recognize who it was there.

**Q.**   All right.  And that photo that you took at that time with her on her all fours, that's one of the photos that we've already seen; correct?

**A.**   Yes, sir.

**Q.**   When she testified?

**A.**   Yes, sir.

**Q.**   And there are -- several versions of that photograph were put into evidence.  Do you recall that?

**A.**   Yes, sir.

**Q.**   I think there were four altogether.

Are they all the same photograph?

**A.**   Yes, sir.

**Q.**   How is it that there were four separate versions of that photograph?

**A.**   For that specific photograph, when I printed the copy that I was going to use to support the incident report, I could see my reflection in the glass behind it.  Since photographing all evidence that is associated with an incident report becomes part of the permanent central file, I chose to crop myself out of it.

**Q.**   And -- and where did you do that?

**A.**   I did that at home.

**Q.**   So let me divert here for just a minute.

You have a computer at home?

A.   Yes, sir.

Q.   And do you normally do work on that computer?

A.   Yes, sir.  I always do work on that computer.  The government has never provided me a computer for work, but the government has required me to travel to hundreds of locations to provide training and to deal with emergency situations.  And as such, I have a personal computer that I use primarily for work purposes.

Q.   And is this a laptop computer?

A.   Yes, sir.

Q.   All right.  So you open the door.  You took the picture. What happened then?

A.   So in corrections, we explain to our female staff that eventually someday, they're going to be exposed to, and it's going to be a shock, and the normal reaction will probably be freeze.  Well, I learned that day that's the same reaction if you are a male staff member and you open the door and somebody is doing something of that nature.  I took the picture, froze for a quick second, and then I began yelling at the inmate to get dressed.

Q.   What reaction, if any, did you get from her?

A.   She stood up, moved her left hand toward the bunk bed where her robe was.  I took a second picture, shut the door, told her to come see me after lunch.

**Q.** And at that point, did you recognize who it was?

**A.** Yes. And that's why I took the second picture. Because in the incident report, you would have to show a face picture to identify the inmate that has committed the incident.

**Q.** All right. Now, we heard some testimony that the Prison Rape Elimination Act has some requirements or restrictions in it regarding the taking of photographs of inmates in sexually explicit circumstances, naked or whatever.

Does that restriction apply to the situation that you're talking about?

**A.** No, sir. The PREA applies to sexual activity or sexual conduct, sexual misconduct, and there are privacy concerns as the doctor expressed in her testimony. Those privacy concerns can be addressed by blocking out the genitalia and still showing the action that was occurring. For instance, at the male prisons that are just down the road, when an inmate exposes himself and a photograph is taken, the genitalia will just be marked out with a marker.

**Q.** And is there a specific regulation that addresses this issue?

**A.** Addresses the privacy portion or the disciplinary portion?

**Q.** The disciplinary portion.

**A.** So program statement 59 -- 5270.09, inmate discipline, inmate discipline states that an inmate has the right to see all evidence used against them to support an incident report or

a finding that they have committed a prohibited act.

Q.    All right.  So what was your intention at the time that you took these photos regarding the possibility of filing some kind of disciplinary incident report?

A.    So I instructed the inmate to come see me after lunch because I was going to have her placed in the Special Housing Unit.  At the end of lunch because we were in ACA/PREA, we were gearing up for ACA and PREA, our warden advised myself and the other AW that he wanted to meet with us immediately after lunch.

Inmate Melissa did arrive to lunch and began to apologize profusely, saying she thought her friend was coming home for lunch.  And I told her I didn't want to speak to her at that time, and I went to my meeting with AW Mischel and Warden Jenkins.

Q.    Let me back up again to that second photo you took because we did see what appeared to be two versions of that photo in the exhibits that were introduced previously.

Were those two actually just different looking copies of the same photo?

A.    Same photo.  In the second photo, it was my attempt to crop in an effort to remove inmate Melissa's genitalia from below the waist.  However, because she's so tall, in order to get her head in the cell, it only cut her off at, like, belly or her pelvic area.  So I cropped it just to avoid the lower

half of her body.

Q.   Okay.  The cropping of these photos that you're talking about, how were you accomplishing that?

A.   Well, I ended up doing this at home because in the government computers, you can't download applications without computer services authorizing it.  The Canon camera belonged to CMS, and it could only be downloaded in CMS.  In order to get it downloaded in my office, I would have had to call computer service.  They would have to download the program.

As our meeting ended at about 1:40, it was late in the day, and so I took the camera home with me.  I did this because program statement 527.09 also says you have 24 hours to advise the inmate of the incident report and the prohibited act.  So I needed to get that done before midday the next day.

Unlike the government computer, I could go home, remove the SIM card, put it in my computer, download it to the desktop, just use the crop function to create the photo I needed, printed it, typed my incident report, put it all back in my briefcase, and waited to bring it to the inmate the next day.

Q.   All right.  And did you, in fact, do that, file an incident report of some kind over this?

A.   No, sir.  So when I gave it further thought, because I have a two-hour drive to work every day, I had to think of what charge would support the action.

So in our disciplinary, there are four levels of charges: Low level, which is a 400 series; moderate level, which is a 300 series; serious incidents, which are 200; and then greatest severity, which are 100.  And each of those levels of incidents come with a range of restrictions or disciplinary action that can be held against them, against the inmate or the perpetrator of the action.

My immediate inclination was to write the incident report for 205, engaging in a sexual act.  However, in the photograph, the inmate is not engaging in an act other than being nude. And just like we said here, I would be required to provide enough evidence to show that she was engaging in a sexual act.

The second charge is 206, which is engaging in a sexual proposal.  Well, the inmate made no gesture to me and spoke no words to me, so there was no proposal that I could justify.

So the only incident report that I could actually apply to her would be 306, which is indecent exposure, and that comes with a very minimal amount of restrictions.

**Q.**   And did you make a determination that you would file a 306?

**A.**   I did make that determination, that I would file the 306, which would not be grounds in and of itself to support placement in the Special Housing Unit.  I'm sure if I told the captain to do it, that he could place her there until her unit team or UDC, unit disciplinary committee, meeting.  And that

has to occur within three to five days of the incident.

That morning at the 9:00 movement, like clockwork, inmate Melissa was walking toward the recreation yard. And in an effort to get past the recreation yard, they walk past the lieutenant's office. I met her there in the middle of the compound with the incident report and pictures attached.

And she began to try to give an explanation. I told her I didn't want to hear her story, that she had -- she had better give me a reason why I shouldn't submit them. And I said that because during our meeting the previous day, AW Mischel had seen that inmate Melissa was distressed. AW Mischel is also a clinical psychologist. I told AW Mischel that I was probably going to place inmate Melissa in the Special Housing Unit.

Inmate -- I'm sorry -- Associate Warden Mischel advised me that Melissa had been, quote, helpful to staff in the past. In our world, that means she provides information.

Q.    Information about wrongdoing by other inmates?

A.    Yes, sir.

Q.    Or staff?

A.    Yes, sir.

Q.    Okay. So let me ask you this: You have discretion, I take it, to file or not file one of these incident reports?

A.    For the moderate and lower-level incident reports, yes. A 200 or a 100 series incident report has to be forwarded to the unit team and forwarded to the disciplinary hearing officer.

But 300 and 400-level incident reports can be informally resolved.

Q.   All right.   What ultimately did you decide to do with this 306 report that you had prepared?

A.   I asked Melissa for one good reason why I should not submit the report, and she responded, "I'll ensure that drugs never enter your visiting room."

I asked her, "How are you going to ensure that?"

And she said, "Because I run the whites on the yard."

Q.   What did she mean by she "runs the whites"?

A.   So in a prison system, prisoners are usually self-segregated by ethnicity.  She was stating that she was the head of all of the white inmates, that she had the most control of Caucasian inmates inside the institution by saying she ran the whites.

Q.   All right.  And how -- strike that.

What, if anything, did you do in response to that statement?

A.   I said there was no guarantee that -- I mean, there would be no guarantees that I knew drugs were coming in or out just because she said they weren't.  I told her that if drugs were entering the visiting room, I needed to get those drugs, and I needed to know what inmates were bringing them in.

And she said she doesn't snitch on inmates.  And so I told her that she was no help to me.  And she responded, "But I will

tell on your officers."

Q.   All right.  And what did you do in that regard at that point?

A.   I told her that if she was going to provide information on correctional staff and the information turned out to be valid, then we would never have to deal with this again as long as she maintained her composures and behaviors.

There is a rule about, again, I told you earlier the incident report having to be served within 24 hours.  I told her that rule wasn't going to work with her because I could then have the captain, Officer Putnam, just do a subsequent investigation into the actions because I maintained the evidence, which was the pictures.

Q.   So administratively, you could wait before filing that report?

A.   Administratively, I would not be able to file that exact incident report.  But administratively, we could have looked at an internal investigation into inmate Melissa being in inmate Andrea's cell, because that could have been reviewed on video, for being not properly dressed after the designated hours.  So there would have been other administrative actions we could have taken.

That was not necessary because inmate Melissa was quick to provide information on officers.  In her words -- and excuse my language -- she stated, "I hate all you fucking cops.  I have

no problem telling on you."

**Q.** All right. And did you then essentially enter into an agreement with her that you would not file this incident report if she would agree to provide that kind of information if it became available?

**A.** Yes, sir.

**Q.** Did anything ever come of that?

**A.** She provided lots of information regarding things that occurred in the institution.

**Q.** On that particular occasion while you were at Andrea's cell, did you have any contact with Melissa?

**A.** No, sir.

**Q.** Did you even speak to her other than to yell at her to get up and get dressed?

**A.** Just yell at her to get up and get dressed.

**Q.** Did you -- did she say anything to you while she was still in this -- excuse me -- while you were still in the cell?

**A.** I was never in the cell, sir. I swung the door open, stood in the door frame. The prosecution's exhibit shows me in the door frame. You can see the white wall behind me because the door is half open. I never entered the cell. She never spoke.

**Q.** How about -- oh, strike that.

I think you also said you immediately closed the door?

**A.** Yes, sir.

Q.   Did you remove the cover from the window?

A.   No, sir.  The cover is on the inside of the door.

Q.   During that incident, did you give her any candy?

A.   No, sir.

Q.   Specifically a candy cane?

A.   No, sir.

Q.   Or have any conversation about a candy cane?

A.   No, sir.

Q.   At any time, did you ever give Melissa a candy cane?

A.   No.  I never gave Melissa a candy cane.

Q.   And other than that occasion that you've described for us, did you ever see Melissa in Andrea's cell again a second time?

A.   No.  I never found inmate Melissa in Andrea's cell without inmate Andrea's presence.

Q.   And on any of those occasions when you saw her there with Andrea, did you ever give her any candy during one of those times?

A.   No, sir, I did not.

Q.   Do you typically carry candy around with you when you're making your rounds?

A.   Yes, sir.

Q.   And do you sometimes give it to inmates?

A.   Never.

Q.   Do you sometimes give it to staff?

A.   Yes, sir.

Q.    Do you ever give candy to inmates under other circumstances?

A.    Never.

Q.    Prior to that particular incident, how familiar were you with Melissa?

A.    That she was an inmate orderly in the visiting room.  No other real contact then.

Q.    So you had not had an occasion to have any extended conversation with her or anything like that?

A.    Not any serious conversation that I can -- other than her complaints regarding her unit manager.

Q.    All right.

      How about on Valentine's Day?  Do you give inmates candy on Valentine's Day?

A.    No, sir.

Q.    Did you ever give Melissa pink Hershey's Kisses on Valentine's day?

A.    No, I did not.

Q.    And, in fact, let me ask you this.  Where were you physically on Valentine's Day of 2020?

A.    On vacation.

Q.    Out of -- well, strike that.

      You were not at the facility?

A.    No, sir.

Q.    When was your vacation, then, started?

**A.**    I would have to see my T&A records, but on that year, Valentine's Day was the day before a federal holiday, so as federal employees, we enjoyed a Valentine's Day off.

**Q.**    So your vacation started on some day prior to Valentine's Day itself?

**A.**    Yes, sir.

**Q.**    So you were not in the facility at all on Valentine's Day?

**A.**    I was not in the facility.

**Q.**    Do you recall when you got back?

**A.**    I believe the 16th would have been the first day of that week that federal employees went back to work.

**Q.**    And without being necessarily specific, where did you go on vacation?  What city or location?

**A.**    On that weekend, I believe -- I can't recall where I would have been, sir.  I believe I was home.

**Q.**    All right.  And then you were aware that Melissa's mother had died at some point?

**A.**    Yes, sir.

**Q.**    How did you become aware of that?

**A.**    Making rounds in the units, the officer advised me that inmate Melissa was distraught, angry.  She was yelling and screaming, tearing apart her cell, very emotional.  We went to her cell.  She expressed that her mother had passed away.

        Myself and the officer escorted her from the B side to the A side of the unit where the counselor's office was.  We -- I

then told the officer that I would take care of it.  Entered the counselor's office.  The counselor said, "I'm aware of it. I'm working on a phone call for her."

And then inmate, first name Rebecca, was her friend, came around the corner and said, "We'll take care of her, boss." And I left.

Q.    And did you have any physical contact with her that day?

A.    No, sir.

Q.    Were you also aware that Melissa had requested a compassionate release?

A.    Yes, sir.

Q.    How did you become aware of that?

A.    Well, we advised all the inmates to apply for compassionate release during the COVID protocols.  During COVID, the CARES Act was passed, and it gave more advantage to inmates to apply due to the unforeseen conditions of COVID.  So all inmates were advised, if they felt they met the criteria, to apply for compassionate release.

Q.    So because of the CARES Act, it was more likely that someone was going to be released than had been the case previously?

A.    Yes, sir.

Q.    And did you have any specific conversations with Melissa about her filing a request for a compassionate release?

A.    Not specific other than I encouraged every inmate to take

advantage of that opportunity.

**Q.** And did Melissa, in fact, submit such a request?

**A.** Yes, sir.

**Q.** And how does that process work?

**A.** The process is that they submit a request to the warden for consideration. And in this case, it would have been conditions not foreseen at the time of sentencing. But the warden is at the end of the chain, so it then gets sent to the unit team, case manager, that reviews --

**Q.** Let me interrupt you for a second so that I make sure that I and the jurors understand the process.

Are you saying that it gets submitted to the warden at first rather than going to the unit manager first?

**A.** The inmate can submit it to any staff member they wish to. If they submit it to the warden's office, it would come by mail. It would be reviewed by the warden's secretary or associate warden's secretary, and then it would be immediately forwarded to the unit team. So regardless of where the inmate sends it, the process is going to be with the unit team.

**Q.** Okay. And so do you recall when it was that she submitted this?

**A.** No, sir.

**Q.** Did you have any conversation directly with her about that submission?

**A.** No, sir. Once COVID began, I was sent on three to

four-week rotations to Washington, D.C., so I was only in the institution one to two weeks out of every month -- I'm sorry -- one week out of every month, sometimes two.

Q.   And so was someone else performing your functions while you were gone?

A.   Yes, sir.

Q.   Was that a specific individual, or did it vary depending on who was available?

A.   Because all the department heads would be the person that would fill in, it was in a rotation, so no one department head was over burdened with running the department and fulfilling my duties.  So it went in a rotation.

Q.   When was it that you became aware that Melissa had submitted this request for compassionate release?

A.   She had stated it to me at some point.  I don't know exactly when I would have become aware of it.  As I said, I was in a pretty detailed rotation to Washington.

Q.   But this was sometime after her mother had died, I take it?  Or maybe not.

A.   Yes, sir.

Q.   It was after?

A.   Yes, sir.

Q.   And did you ever tell Melissa that essentially you would take care of it and make sure that she got the compassionate release?

**A.**   No, sir.

**Q.**   Is that something that you would have the authority to do if the inmate did not otherwise meet the requirements for a compassionate release?

**A.**   Absolutely not.  At the time that COVID and CARES Act was offering -- I'm sorry -- that the CARES Act was offering compassionate release in the time of COVID, I was an associate warden of operations, so I did not even review compassionate releases at that time, and I had no authority over them.  And as -- as the warden, I wouldn't have had the ability to -- strike that.

As the warden, if I chose to override a unit team's decision, I would have had to have sent them an email or documentation stating why, giving the reasons why that we would be overriding the recommendation of the unit team.

Or in the case if it was a medical request for compassionate release, why I would be overriding the decision of a medical doctor.

**Q.**   All right.  So I take it there were some specific guidelines about what criteria the inmate had to meet in order to qualify for a compassionate release?

**A.**   Yes, sir.

**Q.**   And were those spelled out in some detail somewhere?

**A.**   Yes, sir.  So the standard compassionate release is stated in policy.  But when the CARES came out, it expanded.  And we

were required as an agency to post the requirements for a CARES Act compassionate release in all languages on the electronic bulletin board, which is the inmate email accounts, and on physical bulletin boards in every housing unit.

Q.    Had you had -- had that been done at Dublin?

A.    I believe so, sir.  Again, that's a programs associate warden function, not an operations warden function.

Q.    Okay.  So if I understand what you're saying correctly, you would not have had any role in reviewing a request for compassionate release by Melissa during this time?

A.    Not while I was an associate warden.

Q.    But once you became warden, then you would have the final say on it?

A.    Yes, sir.

Q.    And did she -- well, strike that for the moment.

What requirement or criteria was it that would be decisive with respect to a request like this by Melissa, if any?

        THE COURT:  I don't understand that question.

        MR. REILLY:  Okay.

BY MR. REILLY:

Q.    You mentioned there are a number of criteria that the inmate would have to meet or at least one or more.

A.    When her initial request was put in, I didn't know what she had used.  But as we've reviewed discovery and other items, she used the criteria of a condition which could not be seen at

the -- a compelling condition, which could not be projected at the time of sentencing.  And that compelling issue was the death of her mother.

Q.   And is the nature of the underlying conviction a factor in determining the response to this kind of request?

A.   I believe unit management would use the nature of the conviction.

Q.   So if we're talking about a serious crime like murder, less likely to get a release than if you're in there for, say, selling drugs?

A.   Yes, sir.

Q.   And is that something that can be -- are any of these criteria that can be removed sort of like the variable on transfer requirements?

A.   So you're asking if the conditions can be removed?

Q.   Yes.

A.   The conditions can change -- I'm sorry.  The consideration can be changed based on the -- the inmate's performance and length in sentencing.  So you could have a serious crime of murder, but the person only has six months left on their sentence.  And the person with murder and six months would be considered higher than the person with murder and ten years.

Q.   Okay.  All right.

Did you have more frequent contact with Melissa after her mother died than you had had previously?

**A.**   No, sir.

**Q.**   Or more frequent contact with her after she submitted this request for compassionate release than you'd had before she submitted it?

**A.**   No, sir.

**Q.**   She testified that there were occasions when you told her that you were going to be coming by her cell at a certain time, and you wanted her to be undressed.  Do you recall that?

**A.**   I recall she testified to that.

**Q.**   Did that ever happen?

**A.**   No, sir.

**Q.**   Did you ever make such a request?

**A.**   No, sir.  My rounds were never scheduled.  I fit my rounds in between my normal daily duties.

**Q.**   So let's say today, if you were there and doing those normal duties, you would not know what time you were going to be going by any particular cell tomorrow?

**A.**   That is correct.

**Q.**   On the other hand, I suppose you could modify your schedule to be at a certain place at a certain time, could you not?

**A.**   Certainly, sir, but there would be other factors.  We had set meetings, but then there was always impromptu meetings.  As all of the inmates have testified, Dublin is held together by Super Glue and Gorilla tape.  And so being in charge of the

facilities department, there were always emergencies.

We, in our time, had hot waters heaters explode in every unit. We had two main water breaks. We had power outages. And each time those instances occurred, I would be present with my crews to, again, assess the damage, make the request for funds, make sure the work is being done.

So there are many criterias that judge how an associate warden day is going to occur. We have a schedule. That schedule is subject to change every minute.

Q. All right. But assuming, let's say, for example, that on any particular day, no emergency happens, no boiler blows up, nothing untoward takes place, and so you would be on just your regular schedule. On a day like that, could you make it a point to be at a specific place at a specific time if you wanted to?

A. A person could make that attempt, but the other factors could be my warden might say, "I'm going to walk the units today with you" or "I'm going to walk A wing; you walk B wing." So there are no factors that guarantee me the ability to say I'm going to be in a single place at a single time without the possibility of outside interference.

Q. All right. But did you, in fact, ever ask Melissa to be undressed for some particular time or some general time like, let's say, tomorrow sometime in the morning or something like that as opposed to a specific time?

**A.**   No, sir.

**Q.**   Other than the two photographs that we already discussed, did you ever take a photograph of Melissa when she was not dressed?

**A.**   No, sir.

**Q.**   And, in fact, did you ever take a photograph of any other inmate who was not dressed other than those two pictures that you took of Melissa?

**A.**   No, sir.  I never took any other pictures of inmates undressed.

**Q.**   Did you ever have any conversation with Melissa about having some kind of sexual contact with her?

**A.**   No, sir, I did not.

**Q.**   Did you ever show her pictures of your penis?

**A.**   No, sir, I did not.

**Q.**   All right.  Let move on to Maria.

You're charged in two counts with respect to Maria. Count V relates to the laundry room.  Was there ever a time that you and Maria were in the laundry room together with no other person present?

**A.**   Yes, sir.  At the laundry room, not necessarily in the laundry room.

**Q.**   All right.  Can you explain for us the circumstances that that happened?

**A.**   Yes, sir.  Inmate Maria was a laundry orderly or was a

washing machine -- was -- had a broken exit hose.  It was leaking water everywhere.  When I made my rounds, inmate Maria said, "Hey, I need you to come look at this."  And she said, "The washing machine is leaking back here."

The laundry room is a very small area.  It's probably six by ten.  It has two washers on the wall adjacent to the door and three dryers on the wall as you face the door, a very small area.

I told Maria to step out, and I stepped in so that I could actually pull the washer away from the wall and see where the water was coming from.  The washer wasn't just a hose.  It was -- actually the exit valve had been broken.  Pushed the washer back, exited, and advised my staff to fix it.

Q.   And when you say you asked her to leave, was there a point in time where you actually were both in the room at the same time?

A.   We passed each other as she exited and I entered.

Q.   At the doorway?

A.   At the doorway, sir.

Q.   And on this occasion, did you grab her hand and put it on your penis?

A.   No, sir, I did not.

Q.   Do you recall approximately the time frame when this took place?

A.   No, sir, I don't recall the time frame.  However, there is

records of when the washing machine was replaced because all maintenance records are maintained.

Q. Was this before or after the COVID protocols were put into play?

A. This was after COVID protocols.

Q. All right. So what would the -- what did the COVID protocol require you to do, if anything, with respect to this kind of meeting?

A. Which kind of meeting, sir?

Q. Meeting with her at this laundry room in order to look for damage.

A. So during the COVID protocols -- and our protocols mirrored the public. So at first, there were some restrictions, and then those restrictions became greater restrictions until we had an outbreak, which was a total lockdown. And then those restrictions lessened.

At this time, we were in a restricted but not lockdown state. So the only requirement was that I made rounds, and when I found the problem, then I advised my staff because, again, I was in charge of construction maintenances to go correct the problem.

Q. And was there an escort requirement at that point for inmates?

A. At that time, there was not a specific escort requirement. Inmates were still actually out in the units. They just

weren't out on the compound freely.  So the escort requirement would have been outside of the housing unit.

Q.   All right.  So if someone went outside of the housing unit, one individual inmate would have to have one individual staff member escorting them?

A.   It grew to that level as infection rates rose.  So initially, it was -- it was quarantined by unit.  And then as the infection rates rose in the public, the controls were tightened and restricted.  And after the outbreak in Dublin, then it was one foreman for one inmate so that we could, A, monitor what was going on, but more importantly, for contact tracing.

Q.   Okay.  On this particular date, then, was there ever a time when you and Maria were in a closed location of any kind where you could not be seen by other people?

A.   No, sir.  The laundry room sits in the hallway to the wing.  At the end of the wing is a shower.  Around the corner from the wing is the phone.  That area is typically where inmates wait to get on the phone, to afford the person on the phone some privacy.

     For the purpose of not allowing a secluded area, there is no door in the door frame.  So it's a six by ten room, no door in the door frame.

Q.   All right.  And then with respect to Count VI, it's with reference to something that she says happened in her cell.

Were you ever inside Maria's cell?

**A.** No, sir.

**Q.** At any time?

**A.** No, sir.

**Q.** Did you ever reach into her cell from the outside in order to touch her?

**A.** No, I did not.

**Q.** Did you ever touch her breasts while she was in her cell?

**A.** No.

**Q.** Now, we have testimony from Shindozjanae about observing you outside Maria's cell.  Do you recall that?

**A.** Yes, sir.

**Q.** Do you know where Shindozjanae's cell was compared to Maria's?

**A.** Shindozjanae did not live in the unit.  His testimony was that he was working in the unit and that he had placed his cart underneath the stairwell and that he was standing with his right shoulder on the wall.

The stairwell would be eight to ten cells away from Maria's cell.

**Q.** All right.

    **MR. REILLY:**  I'm going to ask at this time, Your Honor, to show Mr. Garcia what I have marked as Exhibit A, which is the schematic of that particular -- schematic of that particular --

THE COURT:  A was not on the exhibit list.  What are you talking about in particular?  And have you shown that to the Government?

MR. REILLY:  I have, Your Honor, and they have no objection.

THE COURT:  All right.

MS. PRIEDEMAN:  Your Honor, I would just ask that if it's going to be published to the jury -- or it should be sealed.  It's -- it contains sensitive information about -- and raises security issues at FCI Dublin.

MR. REILLY:  That's fine.

THE COURT:  All right.  It will be sealed.

She can publish it to -- and there is no objection to A?

MS. PRIEDEMAN:  No, Your Honor.

THE COURT:  All right.

MR. REILLY:  Ask that it be admitted at this time.

THE COURT:  It's admitted.

(Defense Exhibit A received in evidence)

BY MR. REILLY:

Q.   Mr. Garcia, can you see that diagram on your screen?

A.   Yes, sir.

Q.   I'm going to point to part of it.

THE COURT:  So you should not be directing, again, the testimony.  These are interactive.  He can touch that screen in response to your questions.

MR. REILLY:  Okay.

BY MR. REILLY:

Q.   Can you do that for us and show us where Maria's cell is in that diagram?

A.   (Indicating).

Q.   That is a little hard to see.

THE COURT:  And, Mr. Reilly, if you want to, after he identifies it, put something on the document, you can.  You can also magnify it by using the toggle switch on the top of that -- no.  At the very top --

THE CLERK:  I can zoom it in.

THE COURT:  Okay.  So let's get that erased.

MR. REILLY:  If you can --

THE COURT:  Hold on.  Erase the screen.

All right.  Now, start again.

BY MR. REILLY:

Q.   All right.  So mark again on there where Maria's cell is, please.

A.   (Indicating).

Q.   If you could just enlarge that somewhat.

The mark moves.  So now you're going to have to redo it.

And the door on that particular cell, it's a little hard to see, but can you tell what direction it opens?

A.   It opens out left.  Right to left.

Q.   Meaning -- I'm not sure what you mean by "right to left."

**A.**    So the door swing would go from your right hand to the left, according to this diagram.  So the door would be facing down the hallway.

**Q.**    Down the hallway, looking upwards --

**A.**    Yes, sir.

**Q.**    -- in the diagram?  Okay.

And the location that Mr.-- I guess it was Ms. at that point -- Shindozjanae was at, where is that on this diagram?

**A.**    This is the stairwell (indicating), and underneath those stairs is a small cubby where they could put their carts so they weren't in the open areas.

**Q.**    And approximately how far is it between where he was standing and Maria's cell door?

**A.**    It looks to be ten cells.  Cells are eight by twelve, so 80 feet, approximately.

**Q.**    All right.  And his view of the interior of the cell would also be blocked by the door; correct?

**A.**    Yes, sir.

**THE COURT:**  I'm sorry.  What was that?

**MR. REILLY:**  I asked if the view of Mr. Shindozjanae's -- of the cell would be blocked by the door having been opened into the hallway.

**THE COURT:**  And then for purposes, as yesterday, from the witness stand to the courtroom doors, that's 50 feet.  Okay?

MR. REILLY:  Thank you, Your Honor.

BY MR. REILLY:

Q.   Do you recall specifically an event at which you were at Maria's cell and Mr. Shindozjanae was in this little stairway?

A.   No, sir.

Q.   And was there ever a time when you specifically were at the door to her cell and were looking into it?

A.   There would be times when I would open cell doors to speak to inmates inside their cells, yes, sir.

Q.   So do you recall doing that with Maria?

A.   Yes.

Q.   And on any of those occasions when you spoke with her through the cell door, did you actually go into her cell?

A.   No, sir.

Q.   Did she have cellmates?

A.   Yes, sir.

Q.   When the -- when you had some conversation with her at her cell, were other inmates present in the cell?

A.   There would be times when her cellmate would be present and times when there would not.  Again, this was pre-COVID or pre-restriction, so inmates could come and go out of their cell still.

Q.   Was this a two-person cell or three?

A.   This was -- well, sir, all of the cells at Dublin were three to four persons, but as we were attempting to lower our

population and because of COVID, we were trying to have only two persons per cell.

Q.   And do you recall whether at that time her cell was a two or three?

A.   It was set up to house three.  I don't know how many inmates were in the cell, sir.  That's a programs issue.

Q.   Did you ever, while standing at her cell door, take pictures of her inside the cell?

A.   No, sir.

Q.   Did you ever ask her in advance to be undressed at a time when you were going to be making your rounds?

A.   No, sir.

Q.   Now, she testified that on one occasion, you told her at breakfast to go to her room and get naked.  Do you recall that?

A.   Yes, sir.  I recall she testified that.

Q.   Did that happen?

A.   No, sir.  That would not be possible.  When the inmates come to breakfast, they come as an entire unit, so 125 to 200 inmates are entering into a dining hall at a time.

Q.   And are individual inmates not permitted to leave the dining hall?

A.   She testified that it was during the breakfast meal. Pre-COVID, we would call all units in succession, so there was always a large group of inmates entering and exiting the dining hall.  Inmates could come and talk to you, but you were never

alone or private.

During COVID protocols, each unit was escorted to the dining hall and was escorted back to the unit.

**Q.** All right. And then I take it that -- strike that.

Did you also hear her testify that after you had told her to go to her room and get naked, that you took photographs of her in a naked state?

**A.** I heard -- I heard her testify something to the effect. I don't recall her exact testimony, sir.

**Q.** Did anything like that ever happen?

**A.** No, sir, never.

THE COURT: Is now a good time for a break?

MR. REILLY: Yes. That would be fine, Your Honor. Thank you.

(Proceedings were heard out of presence of the jury:)

THE COURT: The record will reflect that the jury has left.

Anything to discuss?

MS. PRIEDEMAN: Nothing from the Government, Your Honor.

MR. REILLY: Nothing, Your Honor. Thank you.

THE COURT: Then we will stand in recess for 20 minutes.

(Recess taken at 10:02 a.m.)

(Proceedings resumed at 10:21 a.m.)

THE COURT:  Let's call the jury back in.

(Proceedings were heard in the presence of the jury:)

THE COURT:  The record will reflect that the jury is back in the courtroom.  All the parties are present, and they are prepared to proceed.

Mr. Reilly, you may continue.

MR. REILLY:  Thank you, Your Honor.

BY MR. REILLY:

Q.  Mr. Garcia, before we go forward, there was something you wanted to correct from your testimony earlier today?

A.  Yes, sir.

Q.  And what subject is that about?

A.  You had asked a question regarding my status, work status on Valentine's Day, and you gave a specific year.  And I was incorrect in my information based on the year.

Q.  All right.  And based on the correct information for that year, were you present working on Valentine's Day?

A.  Yes, sir.  I was present on the 14th and left on vacation the following week.  So I was incorrect in my first response.

Q.  All right.

So let's go back to Maria.  Did you ever have occasion to exchange notes of any kind with her?

A.  There was not an exchanging of notes, sir.  As in all the inmates, they were allowed to give staff requests.  Those would be in the form of a BP8 administrative remedy or BP9.  They are

allowed to give staff information that they want to use to support their request, but there wasn't personal notes of any kind.

Q. So this BP8 and BP9, these are preprinted forms that they can fill out?

A. The BP8 is. It's commonly referred to by the inmates, as you heard them testify, as a cop-out. And that's just a nickname for the BP8 request to staff.

Q. Okay. Did you ever give her notes of any kind?

A. No, sir.

Q. Now, you saw her testify about having received a rose from you. Do you recall that?

A. Yes, sir. I recall that testimony.

Q. Did you give her a rose?

A. No, sir, I did not give her a rose. There is a rose garden outside of F-Unit between the unit and recreation that inmates often pick roses from.

Q. Do you have -- excuse me.

Do you have any idea or information about how that one specific rose got to her?

A. No, sir.

Q. And did you ever show Maria pictures of your penis?

A. No, sir.

Q. Let me ask you this. The cell phone that you would carry with you when you were on your rounds, was that a

government-issued cell phone?

A.    Yes, sir.

Q.    And how does it function?

A.    The previous version of government cell phones, they were in either Android or iPhone.  They are like any normal phone, except for they have two applications.  At the bottom of the screen, there was one application that said "Work."  And the "Work" access would grant you into the network so that you could do work while away from your desk.

And if you closed "Work," there was another application that was "Personal," and that was just personal phone.

Q.    So you could use it for anything that you would normally use a cell phone for?

A.    Yes, sir.

Q.    And you also had a personal cell phone; right?

A.    Yes, sir.

Q.    Did you ever carry your personal cell phone with you on your rounds?

A.    No, sir.

Q.    The photographs that were ultimately seized included a significant number of sexually related photographs of yourself.  Were any of those on that government-issued cell phone?

A.    Some were, yes, sir.

Q.    And how did they get on there?

A.    I took them, or they were texted to me.

**THE COURT:** Or what?

**THE WITNESS:** I either took the pictures myself, or they were texted by the other person to me.

**BY MR. REILLY:**

**Q.** And at any time, did you ever show those photographs on that particular cell phone, any of them, to any inmate?

**A.** Never.

**Q.** Did you ever show them to any other staff person?

**A.** None of the staff at Dublin. The pictures depict my relations with people outside of Dublin.

**Q.** The photos that you had on that cell phone, were they still there when the search took place?

**A.** No, sir.

**Q.** When were they removed?

**A.** If I had a conversation with a significant other or somebody I dated and we exchanged texts, I would remove them when convenient to do so. But I didn't store them. They would just be deleted, or in this case, removed and then retrieved through a data search.

**Q.** Okay. So if you -- are you saying that you could retrieve a photograph that you had previously removed from that phone?

**A.** No, sir. I'm not saying that I could retrieve it. I say I would delete it, but as you explained earlier, you never delete anything. It's just not retrievable by the person who owned it.

Q.    Okay.  All right.  So if you did one of these technological searches, some of these things could still be found, but you wouldn't be able to call it up on your phone; is that what you're saying?

A.    Yes, sir.

Q.    All right.  With respect to Maria again, did you consider yourself to be in a relationship of any kind with her?

A.    Absolutely not.

Q.    Did you ever tell her that you wanted to be in a relationship with her?

A.    No, sir.

Q.    Did she ever tell you that she wanted to be in a relationship with you?

A.    No, sir.

Q.    And as you got down close to July of 2021, did you ever have occasion to tell her to, quote, dispose of the evidence of a relationship between yourself and her?

A.    No, sir.

Q.    All right.  Let's move on to Rachel and Count VII.

      This incident is said to have happened in the electrical shop.  Are you familiar with that room?

A.    Yes, sir, I am.

Q.    Been in there?

A.    I've been through all the shops in CMS because that's my authority area.

Q.    Were you ever in the electrical shop at the same time that Rachel was in it?

A.    I've been in the electrical shop when the inmates who work in electrical are present, yes, sir.

Q.    That would include Rachel?

A.    Yes, sir.

Q.    Was there ever a time when it was just the two of you in that room by yourselves?

A.    No, sir.

Q.    At any time while you were in that electrical room, did you ever kiss her?

A.    No, sir.

Q.    Or did you ever touch her on her buttocks?

A.    No, sir.

Q.    Did you ever have any physical contact with her in that room at all?

A.    No, sir, I did not.

Q.    Did you ever have physical contact with her at any other location?

A.    No, sir, I did not.

Q.    Ever kiss her or touch her buttocks somewhere else?

A.    No, sir.

Q.    And when this -- when you had this contact with her at the electrical shop, were COVID protocols in effect then?

A.    In her testimony, she stated that this was during COVID,

and she was escorted one on one by her boss.  And that would be in conjunction with the protocols that were applied during COVID.

Q.   And as a requirement of those protocols, if her boss escorted her, say, from some other location into the electrical shop, would that person have to stay there with her?

A.   The foreman wouldn't necessarily stay in that electrical closet with the inmate.  His office was adjoining, had a window.  The other side of his office was also window, so from anywhere in the CMS area, you could see into the shop.

Also there was a door with the window, and across the hall was the facilities manager's.  It was all glass as well.  So he was in the shop if she was in the shop.  Otherwise, based on the protocols, she would have had to have been returned back to her unit.

Q.   And would her boss be the person that escorted her back?

A.   Yes.  As part of the protocols and specifically for contact tracing, it was a one-on-one protocol for all of the Grade 1s, as she had stated.  So we had an emergency electrician, emergency plumber, one of every branch and profession so that if something broke, they were available in the shops to go fix it.  But as far as contact, it was one on one, so that if either of the parties got sick, we would have contact tracing.

Q.   And when you were in this electrical shop and she was in

there as well, did you ever have any other people immediately in that room with you?

**A.** In the times that I was at the electrical shop and inmates were present, there would have been multiple inmates. In the instance that she speaks of, I don't have any recollection of being in the electrical shop with inmate Rachel ever by myself.

**Q.** Okay. Did you ever have occasion to ask her to undress for you?

**A.** As an inmate, no, sir.

**Q.** Okay. When you say "as an inmate," you're talking about when she was at FCI Dublin?

**A.** Yes, sir.

**Q.** Did -- while she was at FCI Dublin, did you ever have occasion to take photographs of her when she was undressed?

**A.** No, sir.

**Q.** Or did you ever, while she was an inmate at Dublin, show her photos of yourself in some sexually suggestive way?

**A.** No, I did not.

**Q.** Including showing her your penis?

**A.** No, I did not.

**Q.** Did you tell Rachel that you wanted to be in a relationship with her?

**A.** No, I did not.

**Q.** At the time that you had contact with Rachel there at Dublin, you were close to retirement; right?

A.    Yes, sir, I was.

Q.    And she was close to being released?

A.    That is correct.

Q.    Did you ever have any conversation with her about the possibility of the two of you getting together after you had retired and she had been released from custody?

A.    No, I did not.

Q.    Did you ever tell her that you wanted to do that?

A.    No, I did not.

Q.    Did she ever tell you that she wanted to do that?

A.    No, not while she was in custody.  She made references to visiting her in Alaska after her release.

Q.    Okay.  It's your understanding that when she was released from custody, she was -- she moved to Alaska?

A.    Yes, sir.

Q.    And timing-wise, was that before or after you had moved from being the associate warden to the warden?

A.    That was prior to my assignment as warden.

Q.    So you were still the AW at that point?

A.    Yes, sir.

Q.    And did you have some contact with Rachel while she was in Alaska?

A.    Yes, sir.

Q.    And how was that accomplished?

A.    Prior to her release, she had stated that the institution

had a lot of issues and that she wanted to have those issues brought forward. But she wouldn't express those issues while in prison because that would label her as a snitch.

I was, again, still traveling to Washington, D.C. I told her I would provide her a way to get that information to us. Because of COVID, the SIS department wasn't doing exit interviews. An exit interview is when an inmate is released. You give them the opportunity to express anything or tell anything that they want to tell, and those were not occurring.

Earlier in the year, I had a Google account for somebody that I was dating in Washington, D.C. And then I stopped dating that person because, again, it was just travel -- it was just a casual thing while I was there. I was being sent, after COVID, to New York to deal with a high security issue at MDC Brooklyn. And prior to me leaving, I told inmate Rachel that when she was out of custody, that she could send the information to that email address.

Q.   And what was that email address?

A.   Rememberpockets.

Q.   That's Gmail?

A.   Yes, sir.

Q.   What was that rememberpockets a reference to?

A.   Just one of those -- actually, it was mostly generated by Gmail. I was at a billiard hall, Pockets -- I'm sorry -- Pockets 8. It was not a billiard hall. It was a restaurant

that had the billiard thing on, "Pockets 8."  And the person I was seeing had also visited that restaurant while she was in Merced.  And we said, "Oh, you remember Pockets?"  I'm like, "Oh, yeah, I remember Pockets 8."

She had also visited that restaurant when she was in TDY at Atwater, and we had a conversation about Pockets 8.  I said, "Oh, you remember, Pockets."  She said, "Yeah, I remember Pockets 8."  And that was just the email that we then communicated on.

Q.   Okay.  And this was -- this was prior to the time that Rachel is saying that you wanted to have a relationship with her; is that right?

A.   I created this account with this other person months before Rachel's allegations.

Q.   All right.  Did you take any other steps in order to facilitate communications between Rachel and yourself?

A.   While she was in custody, sir, or upon her release?

Q.   Upon her release.

A.   Upon her release, yes.  After her release, she did make contact with me by email, and we exchanged a couple of emails. And, again, I was asking for information.  She stated that part of her conviction was information found on her email account. So she was never going to put anything in writing and suggested that I go get a -- what's referred to as a burner phone and that she could talk to me over the burner phone rather than

documenting the evidence that she was going to provide.

Q.   And did you do that?

A.   Yes, sir.

Q.   Did you get a burner phone for yourself?

A.   Yes, sir.

Q.   And did you get one for her also?

A.   No.  I did not get anything for her.

Q.   How about a digital camera?  Did you give her a digital camera?

A.   No, sir.  I -- are you referencing her testimony?

Q.   Yes.

A.   I never gave her a digital camera, sir.  I did have occasion when I put a camera down because I did, as she said, climb a scaffold to replace a light.  I was carrying the CMS camera, as I explained earlier.  The inmates could not reach the light.

     Their recourse was to take the entire scaffold down and go get another scaffold.  I'm not that type of person to sit around and wait.  I told the inmates, as a son of an electrician, I'm sure I could climb that scaffold and hook three wires together and I did.

     I took my radio off.  I took the camera off.  I set it on a table.  I climbed to the top of 15-foot scaffolding and changed a light bulb.

Q.   And did you -- as a result of that, did she have access to

that camera?

**A.**   Yes, sir.  They all did.  It was left on the table, and I climbed up the scaffolding.  It wasn't just a light bulb.  We were actually changing the incandescent fixtures to LED fixtures.

**Q.**   For how long a period of time was the phone sitting there on the table -- excuse me -- the camera?

**A.**   Fifteen minutes or so.

**Q.**   Did you notice whether or not any of the inmates actually picked it up and used it in any way?

**A.**   No, sir.  I was up on a scaffolding.

**Q.**   Was it still there when you came back down?

**A.**   Yes, sir.

**Q.**   And you retrieved it?

**A.**   Yes, sir.

**Q.**   To your knowledge, did Rachel ever have possession of it?

**A.**   Not to my knowledge.  I -- again, I was concentrating on being on the scaffolding, changing a light fixture.

**Q.**   All right.  By what means of contact did you have the occasion to have contact with her after she was released?

**A.**   After she was released, initially it was the Gmail account.  She said she wouldn't speak or document stuff on Gmail account.  She requested the burner phone.  And then it was through phone call and text.

**Q.**   You actually talked on the phone?

**A.**    Yes, sir.

**Q.**    Old style?

**A.**    Yes, sir.

**Q.**    Text messages?

**A.**    Yes, sir.

**Q.**    Video chat?

**A.**    Yes, sir.

**Q.**    And did you, in fact, engage in what you might call phone sex with Rachel using that video chat program --

**A.**    Yes, sir.

**Q.**    -- application?

When did that take place?

**A.**    Late October, early November.

**Q.**    Of 2020?  Are we talking 2020?

**A.**    Yes, sir.

**Q.**    And this was while she was where?

**A.**    Released, and as she stated, she was released at Alaska.

**Q.**    Was that something that you were able to confirm in any way through BOP records that she was actually in Alaska?

**A.**    No, sir.  I'm stating that based on her testimony here.

**Q.**    In addition to having these conversations, did Rachel send you some photographs after she was released?

**A.**    Yes, sir.  Upon her release and while still using the Google account, she sent several photographs, Facebook profile photograph, bathing suit photographs, things of that nature.

**Q.**    All right.  And was there one photograph which was sexually oriented?

**A.**    Not during the Gmail account use.  After the phones were purchased, she then began to send more explicit photographs.

**Q.**    All right.

I'm going to show you what I have marked as Defendant's Exhibit B.

        **THE COURT:**  Again, this is only for the jury.

**BY MR. REILLY:**

**Q.**    Do you recognize that photo?  Not showing up yet?

        **THE COURT:**  Isn't this the one we talked about?  Have you given that one to the prosecution?

        **MR. REILLY:**  Yes.

        **THE COURT:**  Any objection?

        **MS. PRIEDEMAN:**  Nothing beyond what we spoke about earlier, Your Honor.

        **THE COURT:**  All right.  B is admitted.  Only show it to the jury.

            (Defense Exhibit B received in evidence)

**BY MR. REILLY:**

**Q.**    Is this one of the photographs that you received from Rachel?

**A.**    Yes.  This is a photograph of her taking a self image and texting.

**Q.**    Do you recall approximately when that took place?

**A.**    Between late October and early November.

          **MR. REILLY:**  You can go ahead and turn that off.
Thank you.

**BY MR. REILLY:**

**Q.**   And did you have any conversation with her about why she was sending you that particular photograph?

**A.**   The conversation had begun to deteriorate from what my original purpose was into more flirtatious and obviously sexual in nature.  She, again, had said that she wouldn't post these types of things on Gmail, but on the telephone, she was not afraid to text them and that she was wanting to have video chats where she could speak in person or see each other in person.

**Q.**   All right.  And then the photographs that were introduced into evidence during her testimony of the two of you engaging in this phone sex, those are accurate depictions of your activity at that time?

**A.**   Yes, sir.

**Q.**   And how often did that happen?

**A.**   I don't know how often.  I can think of three video chats that occurred in the entire time that we spoke with each other.

**Q.**   And at some point, obviously, this came to an end?

**A.**   Yes.

**Q.**   How did that occur?

**A.**   My initial plan was to retire December 31st of 2020.  I

had submitted for my retirement calculations.  I told my boss that I would only work two days a week in all of December because I had an exorbitant amount of annual leave and sick leave, about 4,000 hours, and he abruptly told that to the regional office.

Upon his announcement of warden at Los Angeles, they immediately called me and asked me if I would be acting warden. That was kind of a wake-up call to me and kind of a slap in the face that I was an idiot for my actions.  And I ended the conversations with Rachel.

**Q.**    When you say you were an idiot for your actions, you are referring to being involved in this sexual phone relationship with Rachel?

**A.**    Yes.  It was inappropriate if I was not retired.  Had I waited until December 31st, then it would not have mattered, but because I was still an employee, it was inappropriate and against Bureau policy.

**Q.**    Did you express to her why it was that you wanted to end this relationship?

**A.**    Yes.  That it was inappropriate because I was a Bureau of Prisons employee.

**Q.**    Did you also have some concern about her future as well?

**A.**    My concern about her future was that she was suggesting that was going to be a relationship, that this was going to be ongoing, and that I was going to Alaska.  And that was never my

intent for contact with her, nor was it going to be my intent in the future.

Q.   After you told her that, did you have any further conversation or contact with her?

A.   No, sir.

Q.   Did she have any further contact with you?

A.   No, sir.  As the evidence showed, the account was closed. I never renewed the account.

Q.   All right.  At some point in July of 2021, search warrants were executed on your home, your office, and your car; correct?

A.   Yes, sir.

Q.   And at about the same time or maybe the same day, even, you were interviewed by OIG?

A.   Yes, sir.

Q.   And that interview is the interview that is the basis for the charge in Count VIII; correct?

A.   Yes, sir.

Q.   Did you agree to participate in that interview voluntarily?

A.   Yes, sir.

Q.   Did you have an attorney?

A.   No, sir.

Q.   When you agreed to do the interview, did you understand or know what the purpose of it was?

A.   Initially, no, but as a Bureau of Prisons employee, when

OIA gives you an interview, you are compelled to speak with OIA or be subject to removal.

Q.    Okay.  Is that a Bureau policy?

A.    That's a Bureau of Prisons policy.  It's in the inmate -- sorry -- in the Bureau of Prisons, and the restrictions are shown in the Leave and Benefits Program Statement.

Q.    And if you decline to participate in such an interview, what would the consequence be?

A.    First offense, removal.

Q.    Termination?

A.    Yes, sir.

Q.    All right.  During that interview, eventually you reached the point where you said you didn't want to talk to them anymore; right?

A.    Yes.

Q.    Prior to stopping the interview, did you ever tell the interviewers anything about asking inmates to undress for you?

A.    I don't understand your question.  Did I ask the interviewers?

Q.    No.  Did you give them information indicating that you had asked inmates to undress for you or not?

A.    I responded as it was stated in the transcript yesterday. I did not ask inmates to undress for me.

Q.    Okay.  So when they asked you about that, you said --

A.    No.

Q.   -- "I never did that"?

A.   Correct.

Q.   And was that statement true?

A.   Yes, sir.

Q.   And you also told them that you'd never touched inmates inappropriately; correct?

A.   That is correct, sir.

Q.   And was that statement also true?

A.   Yes, it is.

Q.   And while you were answering those questions, at that point, did you have an understanding or an appreciation of where this conversation was going?

A.   I grew to have an understanding of where they were leading the questions to as I read the warrant.  I was not given an opportunity to read the warrant prior to the interview starting.  So I was reading as I was being interviewed, and they began in the warrant suggesting my associations with other employees that are investigated for sexual abuse.  And so I saw that they were leading questions towards sexual abuse.

Q.   And prior to making that realization, from what perspective were you answering these questions?

A.   Again, I was answering the questions as it relates to sexual abuse of inmates, not discipline of inmates.

Q.   But you were -- strike that.

     Were you of the perspective that they were investigating

you at that point or someone else?

**A.**   They had stated that I was the subject of an investigation, but they did not state that I was correlated with Klinger and Bellhouse.  My concern became when I had the opportunity to read, as they were speaking to me, that the other staff members were being mentioned as I was involved with them.

**Q.**   All right.  So just to make this clear for the jury, who is Klinger?

**A.**   Klinger is a staff member that pled guilty to sexual misconduct.

**Q.**   And how about Bellhouse?

**A.**   It is a staff member that is subject to trial for sexual abuse of a ward.

**Q.**   And this was an investigation into these two people that was ongoing prior to your interview?

**A.**   Yes, sir.

**Q.**   Were you aware of that investigation prior?

**A.**   I was aware of the investigation as the agents had served the warrant to search their areas while I was acting warden at the institution.

**Q.**   And when approximately was that?

**A.**   I don't recall directly, sir.

**Q.**   All right.  Regarding the search warrants that were executed on your properties, one of them was for your home?

A.    Yes, sir.

Q.    Was anything seized by the investigators from your home?

A.    Yes, sir.  There were several items seized by the investigators.  There were three laptops, two tablets, various jump drives, CDs, VHS tapes, just a large amount of media.

Q.    What is a jump drive?

A.    The little drives you plug into the USB port that store data.

Q.    And did the investigators or the agents who executed the warrant take all of such items that were in your home?

A.    No, sir, they didn't.  They left two desktops, a couple of jump drives.  There was a variety of things that were left behind.

Q.    Was there anything that you considered significant that they did not take?

A.    Yes, sir.  There was a jump drive I used for sensitive information for government work that was an encrypted jump drive.  I have had it since I became a captain.  It was left behind.  It had some significantly sensitive information regarding an assignment that I was put on, and it was left.

Q.    Okay.  Did you make them aware that it contained this information?

A.    No, sir.  I was being interviewed at that time at Dublin.

Q.    Was there any identification on it that would tell them the nature of the information on the jump drive?

A.   No, sir.   It was just an external drive, jump drive.

Q.   Would anyone who plugged it into a computer have been able to access that information?

A.   It was password encrypted, so the -- not anybody, but I'm sure forensics could.

Q.   Ultimately get to it?

A.   Yes, sir.

Q.   All right.   Anything else seized from your home?

A.   Just electronic devices and media, sir.   I have receipts for them in my possession, if you'd like.

Q.   Don't need to do that.

How about your car?   What was seized from your car?

A.   My personal cell phone was seized from the car.

Q.   Anything else?

A.   Documents relating to my job at Dublin.   There were documents taken out of my briefcase in the car that were seized.

Q.   So you had -- your briefcase was in the car?

A.   My briefcase was taken from me when they took custody of me, but I also had, I believe, some folders in the car.

Q.   Okay.

A.   I do a lot of work at home, sir.

Q.   How about candy?

A.   Yes, sir.   There was candy in the car.

Q.   Where was that located?

**A.** Everywhere in the car. Center console, glove box, probably wrappers all over the floor.

**Q.** Was any of it hidden in some way?

**A.** Yes, there was.

**Q.** Where was that?

**A.** In the trunk under where the spare tire is.

**Q.** What was the reason that you had it hidden?

**A.** Because my son has a bigger sweet tooth than I, and I have to keep it out of the house.

**Q.** How old was your son at that time?

**A.** Twelve or 13.

**Q.** How about your office? What was seized from your office?

**A.** Sir, I don't know what was seized from my office because it was government items. I don't have a receipt for it, but I was approached by the agent. Because my office was under construction, my belongings were moved to a room, and they did ask if they could seize the items from the other room, which included a desktop computer and files.

**Q.** By "files," you mean electronic files or physical?

**A.** Physical files.

**Q.** All right. Let's talk briefly about the facilities at Dublin and how you access them.

When you -- you mentioned that when you went on your rounds, you would have to be led into certain places by duty officers?

**A.**    By the officers assigned to that area, sir.

**Q.**    Was there any areas to which you had access with your own key?

**A.**    Yes, sir.  I had access to the warden's complex and associate warden.  We were all in the same building.  I had access to the front door of the correctional services complex and the lieutenant's office.  I had the common key for the restrooms, and there were probably five keys that I'd never touched on that ring because I didn't have a need for them.  I could call the staff member and gain access.

**Q.**    The warden's complex, is that a location where inmates would ever be?

**A.**    The warden's complex has one, sometimes two permanent orderlies.  The warden's complex, as you enter, executive staff are on the left.  The business office is on the right.  So typically, there would be an orderly in those areas, one, sometimes two, but that's the only inmate that has constant access to the area.

Several work crews had been in the warden's complex at the end of 2021 because we changed the office configuration for the executive staff.  So they were tearing walls out, building new walls up, which is why I did not have an office in June and July of 2021.

**Q.**    And when the COVID protocols were in effect, did it require an escort for someone to go from anywhere else into the

warden's complex?

A.    Yes, it did.

Q.    There are surveillance cameras at this facility somewhere?

A.    Yes, sir.

Q.    Do you know how many of them there are?

A.    There are 198 listed cameras.

Q.    198 what?

A.    Listed cameras.  There's a list of all the cameras that we do a report on monthly that says operational, non-operational. It's just a list of numbers.  I believe it was 198.

Q.    And is that a report that was being submitted to you in your position as associate warden?

A.    In my position, I receive a copy of the report.  That report is managed by the facilities manager, so I could have a copy sent to me.  But in my job, I receive many reports that are just file reports.

Q.    How about when you were warden?

A.    Of the same.  The report of cameras, again, it goes to the operations AW and the warden.  It's just something that informs us here's the cameras.  It's working, not working.  It doesn't -- I don't recall if it gives the location of the cameras, just number, operational or non-operational.  It gives us then the ability, then, to ask the regional office for funding to fix or improve our camera network.

Q.    Do you have any recollection of out of that 198 cameras

that were there when you were there, how many of them were functional and how many were not?

A.   I don't have an exact recollection.  I know that the report was generated by the communications tech, and it would go to the facilities manager, myself, and the warden.  Myself and the warden would then task the facilities manager to either get them fixed, if possible, or advise us of what funding would be needed to correct the problems.  But myself and the warden didn't comprehensively go over the entire camera project.  We have a facilities manager for that purpose.

Q.   Did -- do you have any recollection as to what locations the non-functional cameras might have been at?

A.   No, sir.  Not without looking at the report.

Q.   There are some areas in the overall facility that have no cameras; right?

A.   That is correct.

Q.   Where -- where are those places where there are no cameras at all?

A.   Other than outside visiting, there are no outside cameras.  So there's no cameras looking at the recreation area.  There's no cameras looking at the main compound.  In the housing units, the cameras cover every tier and every hallway.  There are no cameras in CMS.  But there are cameras in -- again, sir, I didn't read the report every day comprehensively.  I know that the units have cameras.  I know that CMS, recreation, compound,

those large areas outside would not have cameras in them or did not have cameras at that time.

Q.    All right.  And I assume that there are no cameras in the bathroom, for example?

A.    No, sir.  There would be no cameras in the bathroom.

Q.    Are there any other rooms inside the units which are not subject to camera surveillance, at least to the entrance?

A.    The common area in the center of the unit just outside the officers' station I believe would be outside the view of some of the cameras.  Some of that area would probably be covered but not one hundred percent of that area.

I did very -- I had no access to the camera system, sir, until I became warden.  So I had very limited time to actually review cameras, nor did I have a reason to review those cameras.  I got the report.

Q.    How long a period of time were you actually the warden?

A.    From November 22nd, '21 -- I'm sorry -- '20 to July 21st, '21 when I was removed.

Q.    So just about eight months then?

A.    Yes, sir.

Q.    When you say you didn't have access to the cameras, do you mean physical access to the cameras themselves, or are you talking about access to the video records that are produced by the cameras or both?

A.    Physical access, obviously, I wouldn't have because you

have to climb ladders and everything to get to the cameras.

THE COURT:  You are going so fast, I could not understand you.

THE WITNESS:  Sorry, Your Honor.

THE COURT:  Try again.

THE WITNESS:  I would not have physical access because cameras are mounted in the ceilings and you would need ladders to get to the cameras.  I did not have access to the programming as the AW, as policy for correctional services requires the captain, SIS, warden to have access.  As the AW, I had a captain and SIS lieutenant to monitor cameras and deal with those cameras.

But when I became warden, in preparation for program review -- and that's our internal audit system -- by policy, I had to be given access.  So it wasn't until December or January that the communications technician emailed me with a password and account number.

BY MR. REILLY:

Q.  All right.  Once you had that, did you have occasion to review the records to see, for example, what percentage of the cameras were not functioning?

A.  No, sir.  Again, I just get the written report.  I didn't have time to sit down and review every single camera.  That's 198 cameras.  I had the communications tech give me a quick lesson on how to log in and how to open the cameras because

that would be required for program review.  And the system that's used at Dublin is not common to the systems I've used in my past facilities.

Q.   Are you talking about the system to access the videos?

A.   Yes, sir.  The camera and the software and the accessing applications, I was not familiar with.

Q.   Okay.  All right.  Let's talk about some of the other witnesses for a minute.

Are you familiar with Stephanie Millikin?

A.   Yes, sir.

Q.   How long have you known her?

A.   Only for the time that she was at Dublin.

Q.   Approximately how long was that?

A.   Approximately two years.

Q.   And what was her job there?

A.   Unit manager.

Q.   Was it your responsibility to write a review and evaluation of her performance?

A.   No, sir.

Q.   Who did that?

A.   The associate warden of programs.  Her initial evaluation would have been done by Dr. Mischel, associate warden of programs, and her second evaluation would have been done by associate warden Mary Lou Comer.

Q.   And once those evaluations are prepared when you were the

warden, would you receive a copy of those evaluations?

A.   As the warden, I certified the evaluation, sir.

Q.   And she actually did a good job, didn't she?

A.   She did a good job managing paperwork and case files.

Q.   Was there some part of the job that she did not do well?

A.   She had a lacking in interpersonal communication skills.

Q.   Did you ever personally do a review of her work?

A.   I didn't personally do the review.  I was the deciding factor when she objected, made an official objection to the review minute by Ms. Comer.

Q.   And what do you mean by you were the decisive factor?

A.   So there is ability to appeal your evaluation.  It goes the next level higher, and if she didn't like the evaluation of her manager, her supervisor, Ms. Comer, she has the right to appeal it to the next level up.  And at that time, I was the warden.

     So I reviewed the written documentation, written by Ms. Comer, and I reviewed the reasons why Ms. Comer had lowered the grade from outstanding to an exceeds.  And I agreed with those reasons.

Q.   So basically, you confirmed that evaluation?

A.   Yes, sir.

Q.   And what effect did that have on Ms. Millikin?

A.   She had stated at the time that she was going to take it to the next level, which is her right.  She was going to file

either an EEO or an MSPB in regard to her evaluation.  She felt the lowering of her evaluation was retaliatory offense.

Q.   What was the effect on her in terms of remuneration?

        A JUROR:  Your Honor, my pen just stopped.

        THE COURT:  Let's get you a new pen.  I've got some here, too, Kelly.  Anybody else running out while we're up?  No.  Okay.  Thank you for letting us know.

BY MR. REILLY:

Q.   What was the effect on her remuneration of getting that lower evaluation?

A.   I'm sorry, sir.  I didn't hear you.

Q.   What was the financial effect for her to have that lower evaluation?

A.   So if the evaluation would have been approved at the outstanding level, she would have got a quality step increase, and that's a pay increase.  That pay increase is compounding because it goes into your retirement as a high 3.  So the higher level you retire at, the more your retirement is.

     So it set her back financially both in the here-and-now pay and the retirement pay later.  It also made her unqualified for promotion, not by policy, but just by the fact that when the jobs are open, it's a curve.  And "outstandings" obviously get greater weight.  An "outstanding" is worth 10 points, and "exceeds" is only worth 5 points.

Q.   So this -- this reduction in her evaluation had

significant impact, I take it?

A.    Yes, sir.

Q.    After you had confirmed that evaluation, did you have a direct personal conversation with Ms. Millikin about it?

A.    After I confirmed the evaluation, other than her expressing anger -- she, as you see, doesn't hesitate to state her opinion.  I did not have much contact with her before I was removed.

Q.    All right.

How about Aurelia?  Did you know her as an inmate when you were there?

A.    No, sir.

Q.    You saw her here; correct?

A.    Yes, sir.

Q.    Did you recognize her even?

A.    No, sir.  She looked quite different from her booking picture.

Q.    To the best of your recollection, did you ever have any conversation with her about Maria?

A.    No, sir.

Q.    Did you ever see her or observe her to be watching while you were at Maria's cell?

A.    No, sir.

Q.    Was there ever an occasion where you put your body halfway into Maria's cell as Aurelia testified that you did?

**A.**    No, sir.

**Q.**    And were you the associate warden or the warden when this Aurelia stuff came up?  Do you recall?

**A.**    I was the associate warden until November 22nd of 2021, sir, so -- 2020.  Sorry.

**Q.**    Did you ever have occasion to either yourself or approve disciplinary action against Aurelia?

**A.**    No, sir.

**Q.**    All right.  And then Shindozjanae, I take it, was a female inmate when you were there at Dublin; is that right?

**A.**    Inmate Shindozjanae was a female in gender but in transition.  As such, she was referred to as "he," not "her."

**Q.**    Okay.  And that had already -- that transition had already started when you were there as either associate warden or warden?

**A.**    I believe so, sir.  I believe that he was on hormone therapy at that time.

**Q.**    Did you know him at all?

**A.**    I knew him as Andrea's cellmate.  And they would express that they were married, but they weren't legally married.  They were just living together as cellmates in custody.

**Q.**    Did have you occasion to have any conversations with him ever?

**A.**    Yes, sir.

**Q.**    At the cell?

**A.**    At the cell or on the worksite, yes, sir.

**Q.**    And do you recall an incident like the one he testified to where he could see you at a time when Maria was in a robe that exposed her breasts, torso and genitals?

**A.**    No, sir.  I don't recall any such incident.

**Q.**    All right.  And we talked about that schematic of the facility.

Did you ever have occasion to be at Maria's cell when he was somewhere else on that facility, in that room, other than that spot under the stairs?

**A.**    I don't recall specific incidents to that level.  My interaction with inmates, sir, is I saw inmates every day.  He did testify that he was working on high-mast light outside of Maria's cell.  And there is a high-mast light outside of that cell.  But I don't have exact recollection of that incident either.

**Q.**    What is a high-mast light?

**A.**    The high-mast lights are the lights that are way up on the poles, look like Christmas trees raining down.

**Q.**    And that's Unit F; correct?

**A.**    Yes, sir.

**Q.**    That Maria and Shindozjanae were in?

**A.**    Yes.  He actually lived in B-Unit, but he expressed he was working in F-Unit.

**Q.**    So he wasn't cellmates with Maria?

**A.**   No, sir.  He was not cellmates with Maria.

**Q.**   All right.  How about Cynthia Townsend?  You knew her?

**A.**   Yes.  I know Dr. Townsend.

**Q.**   Did you have a working relationship with her?

**A.**   Not a very good one, but, yes, I did have a working relationship with her.

**Q.**   You were both staff?

**A.**   Yes, sir.

**Q.**   And did you have occasion to have contact with her about issues related to the inmates?

**A.**   Yes, sir.

**Q.**   And what would be the nature of those kinds -- those kinds of contacts?

**A.**   Inmates would voice complaints or voice the need for mental health consideration, and I would forward those requests from inmates to the psychology department.

**Q.**   Was that a process that was structurally set up in the department's rules?

**A.**   For psychology services, sir?

**Q.**   Yes.

**A.**   No.  And I -- as I said, I made rounds.  So I would get BP8s requests from inmates, and as then I would get a pile of them, I would just get them to the right person.

     The method that Dr. Townsend preferred was that inmates write electronic requests through the mailbox so that way, she

could triage who she was going to see rather than me just giving her a written request.

Q.    And did the fact that you gave a written request generate some difficulty between the two of you?

A.    Some animosity.  That was one issue that created animosity.  The other was a staffing concern.

Q.    What was that concern?

A.    The psychology program statements states that psychology staff, like all staff, respond to Bureau of Emergencies.  But at the end of the significant incident, their staff are released while all other staff have to deal with the emergency.

During COVID, we wrote in the incident action plan that psychology staff would augment correctional services in the housing units.  A couple reasons for that was to, again, add additional staffing, but also to put more female staff in the units since all of psychology were female staff.

She felt that was a violation of her policy and created -- it created some tension.

Q.    A violation of what policy?

A.    Psychology services policy.

Q.    This is another written document by the department -- by the Bureau?

A.    Yes, sir.

Q.    And did you and Dr. Townsend have some conversation about that?

A.    Yes, sir.  I saw COVID as an ongoing emergency, and I felt that I was within my rights over correctional services who manages emergencies to continue using staff as needed within the institution.

She felt that the significance of the emergency was over when the infection was over in the institution and that all psychology services should be allowed to go back to their offices.  Based on our disagreement, she reported me to the regional office.

Q.    And I take it from what you just said that you actually had an outbreak of COVID at the facility?

A.    Yes, sir, we did.

Q.    When did that happen?

A.    That was probably sometime between -- again, I was back and forth to Washington, D.C.  I came back in June, and an inmate informed and advised me that there were inmates sick in the unit.  And when I brought the doctor to verify that, we started our outbreak protocol.  We had up to 200 inmates sick at our peak.

Q.    And for how long a period of time did that remain the case?

A.    6 to 8 weeks.

Q.    And you said that Dr. Townsend submitted a complaint of some kind?

A.    Yes, sir.  She reported to her administrator and the

regional office.

Q.   And what was the result of that?

A.   The regional office administrator spoke with the correctional services administrator.  The correctional services administrator sided with our staffing patterns, and there was no resolve -- the resolve was in our favor.  As such, she reported us to the central office.

Q.   What is the central office?  Is that something higher up?

A.   Yes, sir.  So the central office governs all of the Bureau of Prisons.  There were six regional offices, and we were in the western region, so --

Q.   What -- I'm sorry.  Go ahead.

A.   So when she did not get the response from the western regional office that she desired, she reported to the central office.

Q.   Is that somehow related to the Grand Prairie facility?

A.   No, sir.  The Grand Prairie facility is a separate facility.  It's still governed by the central office, but its sole purpose is for designation sentencing computation of inmates.

Q.   So it's run by the central office, but it's not physically located with the central offices?

A.   Correct, sir.

Q.   Where is the central office?

A.   The central office is in Washington, D.C.

Q.   What was the result of that complaint?

A.   I was ordered to release the psychology staff back to their duties.

Q.   Okay.  Let's talk about Dr. Meagan Malespini for a minute.

Did you have a working relationship with her?

A.   I never met Dr. Malespini.

Q.   You're familiar, though, with the PREA program?

A.   Yes, sir.  I'm familiar with PREA.

Q.   And that's her primary responsibility?

A.   Yes, sir.

Q.   Both training and the implementation?

A.   Yes, sir.

Q.   And what is the -- either the warden or the associate warden's part in either the training or the implementation of the program?

A.   Well, the warden's part is to ensure that all mandatory training is completed and complied to.  As far as the associate warden, as Dr. Malespini stated, there is typically two associate wardens, and one would be the PREA coordinator.

Q.   And that was a function that you did not have; correct?

A.   Not at Dublin, sir, no, I did not.

Q.   But once you were the warden, then you became overall responsible for that program?

A.   I had oversight over all programs, yes, sir.

Q.   And in your position as the warden, you did not have any

contact with Dr. Malespini?

A.   No, sir.

Q.   So there were no issues over PREA?

A.   No, sir.  We were gearing up for our PREA audit because it had been canceled during COVID.  So we were distributing flyers, educating inmates, putting poster boards up.  We were doing all the actions required to prepare for the PREA.

Q.   All right.  When you say the 2020 programming had been canceled, is that what you meant?  Was the entire program terminated for that year?

A.   No, sir.  I meant that the audit that was to occur in April of 2020, ACA accreditation and PREA audit, they were all canceled due to COVID.

Q.   So it was only the audit that was canceled, not the program?

A.   Correct, sir.

Q.   So the program itself remained in effect throughout the COVID --

A.   Yes, sir.

Q.   -- pandemic?

And I guess, maybe technically, is it still in effect, do you know?

A.   Yes, sir.  PREA, the program, is just the program that tells staff what to do to be in compliance with law, the PREA law.

Q.   All right.  And in that program, is there a specific guideline, restriction, permission or any reference to staff members taking photographs of inmate misconduct for disciplinary reasons?

A.   No, sir.  There's nothing that addresses inmate misconduct or discipline in the PREA program statement.

Q.   Is there any basis in that -- in the guidelines in that program that would prohibit a staff member from taking photos like the two that you took of Melissa?

A.   No, sir.  The program would say that we would have to respect the privacy.  And before those incident reports were entered into the electronic central file, they would have to be censored.

Q.   And what would that censoring consist of?

A.   Typically in corrections, we take a black marker and black out anything that is not appropriate.

Q.   So you are blacking out, say, sexual organs?

A.   Yes, sir.

Q.   How about the written reports?  Are they required to be censored in any way?

A.   No, sir.  The written report actually in Section 11 is stated to be explicit and complete description of the act or event that occurred.

Q.   All right.  How about Christina V.?  Did you know who she was when you were there?

A.   Yes, sir.

Q.   How often did you have contact with her?

A.   I saw her occasionally.  I believe for a short time, she was an orderly in the captain's office.

Q.   Would you see her there?

A.   When she was the orderly, yes, I would see her in that area.  It was the captain's office or something up there, she received an incident report and lost that job.  After that, I would see her occasionally on the compound or in her unit.

Q.   Or in the rec yard?

A.   Or in the rec yard, yes, sir.

Q.   Fair to say that the rec yard is a popular place?

A.   Yes, sir.  The rec yard in any prison is a popular place. It's a way to get outside.

Q.   Right.  Did you ever have occasion to make contact with her while she was on the rec yard?

A.   No, sir.

Q.   Ever have any conversation even with her?

A.   Not that I recall.

Q.   Was there a time that you came up behind her and grabbed her on the left buttock?

A.   No, sir.

Q.   And did you ever say to her, "Sorry, I couldn't help myself"?

A.   No, sir.

Q.   Or that you liked to watch her jiggle?

A.   No, sir.

Q.   How about the crocheted bikini?  Did you have anything to do with that?

A.   I had no knowledge of the crocheted bikini until it was presented in court, sir.

Q.   How about Katrina?  Did you know her when you were there?

A.   Yes, sir.

Q.   How often did you see her?

A.   Katrina made it a point that staff members saw her every day.

Q.   How did she accomplish that?

A.   She came to main line every day with her little list, and she would go down the line of staff, voicing her complaints to each department that she was dissatisfied with.

Q.   Every day?

A.   Every day.

Q.   Did she present some of those complaints directly to you personally?

A.   Yes, sir.

Q.   When you were the associate warden?

A.   Yes, sir.

Q.   When you were the warden?

A.   Yes, sir.

Q.   Were you ever flirtatious with her?

A.     No, sir.

Q.     Ever comment on her breasts?

A.     No, sir.

Q.     Or ask to be able to see them?

A.     No, sir.

Q.     Did you ever tell her that you wanted her to strip naked when you were going to be making your rounds?

A.     No, I did not.

Q.     Did you ever actually see her naked?

A.     No, I did not.

Q.     Do you recall having a conversation with her about the subject of dressing?

A.     That she needed to be appropriately dressed, yes, sir.

Q.     When did that conversation take place?

A.     One of the main issues that inmate Katrina would bring up on a daily basis was that she wanted permission to special order bras.  That is not permitted in the institution.  So in protest, she refused to wear a bra and so she would be in the housing without, and we would have to find a female staff to confront her and tell her to dress appropriately.

Q.     So is a bra required clothing?

A.     Yes, sir.

Q.     And I take it that inmates can't order their own perhaps because of the underwire?

A.     Underwire and the fact that we can't guarantee contraband

wouldn't be sewn into the bra.

Q.    Okay.  Did you ever have a confrontation with Katrina's cellmate about blocking your access to her, to Katrina, that is?

A.    I never had a conflict with the inmate that lived with inmate Katrina.

Q.    Do you recall now who any of them were?

A.    Yes.  I know her -- exactly who her roommate was.  I don't know her first name, but I know exactly who she was.  Her major complaint was she feels she is being unlawfully detained by ICE, and she liked to express that every day because if ICE released the hold, she could go home.

Q.    This was the cellmate that is expressing this?

A.    Yes.  This is the cellmate of Katrina that she spoke of being -- of medical aid, which she was not.

Q.    And what about the issue of the transfer variables with regard to Katrina?  Were you involved in that in any way?

A.    No, sir.  Again, as the AW, I would not have been involved with the management variable and the transfer request other than she voiced concern and discontent toward her unit manager.

The management variables that she spoke of when I was the warden was our attempt to reduce our population, so we ordered a review of management variables and those that were no longer pertinent to be lifted.

Hers were lifted for a short time.  However, because she

was found to have compromised a staff member, the management variable was placed back on.

Q.    What do you mean by "compromised"?

A.    Word was received by the SIS department that inmate Katrina was having an inappropriate contact with a staff member.

        MS. PRIEDEMAN:  Objection, Your Honor.  412.

        THE COURT:  Any response on the objection, Mr. Reilly? If not, it's sustained.

        MR. REILLY:  I'll withdraw it.

BY MR. REILLY:

Q.    All right.  Did you feel as though your relationship with Katrina was contentious?

A.    No, sir.

Q.    Did you ever have any personal conversation with her of any kind --

A.    No, sir.

Q.    -- other than her complaints about staff and other facility issues?

A.    No, sir.

Q.    Briefly, other than during the OIG interview, did you ever have contact of any kind with FBI Special Agent Katherine Barclay?

A.    Yes, sir.

Q.    When did that take place?

A.    She was the investigating agent on the other staff cases, and she entered our facility on occasions.

Q.    While she was conducting those investigations?

A.    Yes, sir.

Q.    Did you ever have any conversation with her about those investigations?

A.    No, sir.  No detailed conversations.

Q.    Was this when you were the warden or the associate warden or both?

A.    Probably both.

Q.    All right.  I've got a few kind of follow up to some things that we talked about already.

      You had quite a number of photographs on your personal computer?

A.    Yes, sir.

Q.    And at some point, you deleted all of them; is that right?

A.    Well, I would delete photographs of personal pictures when I was no longer involved with the person in the pictures, yes, sir.

Q.    And was there a time when all of the photos on that computer had been deleted?

A.    As I was getting close to retirement, yes, there was a lot of photos -- all of the photos and all of the information I was attempting to delete because as I stated, there was more government photos and documentation on that computer than

personal.  And so I was trying to clean the computer before I recycled the computer, so there should not have been any photos in the active memory.  I believe the photos were recovered through forensics.

Q.   And that -- as you were approaching retirement, you said that was before you found out that you were going to be offered the warden position; correct?

A.   Yes, sir.

Q.   So maybe November or thereabouts of 2020?

THE COURT:  Again, I need to hear it from him.

An open-ended question, Mr. Reilly.

MR. REILLY:  I think his microphone had a problem.  Is it working now?

THE WITNESS:  Yes, sir.

BY MR. REILLY:

Q.   So when was that that you were doing this cleaning up?

A.   I was cleaning the computer from the time I made the decision to retire, which would have actually been in August of 2021.

I made that decision as I was disgruntled with the agency because I was promised the associate warden job in Mendota by the assistant director of Bureau of Prisons.  But when I returned from my TDY assignment, they had given the job to another person, and that's when I decided to get my computations and call it quits.

**Q.** Let me clarify something. You just said this was happening in August of 2021?

**A.** I'm sorry. 2020.

**Q.** And how about the photos on your cell phone? When were those deleted, if at all?

**A.** Work cell phone or personal cell phone, sir?

**Q.** Well, let's talk about your personal first.

**A.** My personal cell phone had intimate photos of myself and my current significant other.

**Q.** How about prior significant others?

**A.** Those were deleted at the time we stopped dating.

**Q.** And how about your work phone?

**A.** Those photographs and videos would be deleted as soon as practical.

**Q.** And what did that mean in terms of timing?

**A.** There were times, as I was dating people in other time zones, that I would have the pictures on my phone during working hours and have to delete them during working hours.

**Q.** I guess I didn't make myself clear. I meant how quickly after they were on there were they being removed?

**A.** Within 24 hours.

**Q.** And when the COVID restrictions went into effect, did that have some impact on the ability of inmates to get together and mix around with other inmates?

**A.** There were stages of the COVID protocols, and they

mirrored the community.  So from January until sometime in mid March or April, there were no COVID protocols, and inmates could congregate on the compound, recreation yard and food service on a daily basis.

During the lockdown of COVID, there were restrictions on those movements.  But as COVID subsided and the infection was done at the institution, privileges were given back to inmates. So by the time I came home from TDY assignment in September, inmates were fully interactive, congregating on the recreation yards, compounds and food service/kitchen area.

Q.   And that would have been after this outbreak of COVID at the facility?

A.   Yes, sir.

MR. REILLY:  Thank you.  I have nothing further of Mr. Garcia, Your Honor.

THE COURT:  Cross?

MS. PRIEDEMAN:  Yes, Your Honor.

#### CROSS-EXAMINATION

BY MS. PRIEDEMAN:

Q.   Good morning, Mr. Garcia.

A.   Good morning, ma'am.

Q.   As warden of FCI Dublin, you had the most power of anyone at the facility; right?

A.   As warden at FCI Dublin, I had a signature authority for the operations that were conducted and certified by the staff

and the associate warden.

Q.   It was more than signature authority, wasn't it, Mr. Garcia?  You had the most power of anyone at FCI Dublin?

A.   Your perception is I had the most power, but there is a system in place and checks and balances of that power.

Q.   Who had more power than you at FCI Dublin, the actual facility?

A.   At the actual facility, any staff member had the ability, as Dr. Townsend did, to reach out to the regional office.

Q.   All of the correctional officers reported to you; right?

A.   No, ma'am.  All of the correctional officers report to the lieutenants and the captain.

Q.   You had ultimate supervisory authority over all the correctional officers; right?

A.   Again, ma'am, I have ultimate authority over the institution operations, but the officers are governed and were supervised by lieutenants and the captain and an associate warden.  Those are the checks and balances.

Q.   You had input into discipline over correctional officers?

A.   I did have input into discipline.

Q.   All of the inmates at FCI Dublin were under your custody; right?

A.   Yes.

Q.   Your supervision?

A.   Supervision of the staff.  The staff are under my

supervision.

Q. The inmates were under your supervision as well as the warden; right?

A. The inmates are under direct supervision of staff, and my staff were under my supervision.

Q. There were hundreds of inmates at FCI Dublin; right?

A. Upon my arrival at Dublin, there was around 1,200, and I believe that based on the measures I took, we reduced it to 600.

Q. All of them are women?

A. No. Two in the time I was there were men through transition.

Q. As the warden, you had the power to sign compassionate release motions; right?

A. Yes. After they had been presented and reviewed by the staff.

Q. You had the ultimate sign-off?

A. Yes. Myself and the associate wardens in my absence.

Q. And that means an inmate would be released early from prison; right?

A. That means that they would be considered for release. It still has to go through a legislative process.

Q. And at the end of the day, if that legislative process was approved, they would be released from prison; right?

A. Yes.

**Q.** They could go home?

**A.** Yes.

**Q.** Be with their families?

**A.** Yes.

**Q.** You also had the power to deny compassionate release motions; right?

**A.** Based on the probation recommendations provided through the process, yes.

**Q.** And that means that inmates would stay in prison?

**A.** Yes.

**Q.** You had the power to recommend inmates for a transfer to a camp facility; right?

**A.** I didn't make recommendations for camp transfers. The unit team made recommendations for camp transfers. I approved the recommendation to be sent to Grand Prairie, and Grand Prairie designates and approves transfers.

**Q.** Ultimately, you had to have a final sign-off before it was sent to Grand Prairie; right?

**A.** Yes.

**Q.** Not every prisoner is eligible for camp; is that right?

**A.** No.

**Q.** They have to meet certain criteria?

**A.** Yes.

**Q.** If a prisoner had behavioral issues, for example, they might not be eligible for camp?

**A.**    Behavioral as in mental behavioral issues or disruptive behavioral issues?

**Q.**    Disruptive behavior.

**A.**    They may not be eligible for camp; correct.

**Q.**    If they had a lot of discipline, they might not be eligible?

**A.**    Correct.

**Q.**    If they had been inappropriate in some way?

**A.**    Correct.

**Q.**    You could also recommend that a particular inmate be transferred to a different facility; right?

**A.**    No, ma'am.  The unit team would make the recommendation. It would be viewed by the CMC and then the associate warden. And if all the protocols and criterias were met by policy, then the request would be forwarded to me and signed and sent to DSEC.

**Q.**    If you disagreed with the recommendation, you wouldn't sign off; right?

**A.**    I would not sign off, and I would have to provide a reason why.

**Q.**    And if you agreed, you could sign off?

**A.**    Correct.

**Q.**    You could also write up inmates for misconduct; right?

**A.**    Any staff member can write up an inmate for misconduct, correct.

Q.   You could send an inmate to the Special Housing Unit?

A.   I could send the inmate to the Special Housing Unit, but it would have to be approved by the captain as he is the governing body of the Special Housing Unit.  And a weekly review is conducted with unit management, psychology, medical, and the captain.  And reasons for the placement of the inmate in the Special Housing Unit would have to be agreed by all parties.

Q.   But ultimately, you had to sign a form approving for an inmate to go to SHU; right?  You were part of that reporting process?

A.   No, ma'am.  The captain signs the form, putting inmates in Special Housing Unit.

Q.   And when inmates were in the Special Housing Unit, they lost certain privileges; right?

A.   Yes, ma'am.

Q.   They were in lockup 23 hours a day?

A.   Yes, ma'am.

Q.   They couldn't go to commissary?

A.   They could go to commissary, weekly.

Q.   Limited commissary if they were in SHU?

A.   Limited commissary in SHU.

Q.   And commissary is where inmates can go to buy things; right?

A.   Yes.  Commissary is like the store.

Q.    Inmates couldn't have visitors in the SHU?

A.    Inmates could have visitors in SHU, depending on the inmate and inmate's classification status.  It could be done video, or it could be authorized in person.

Q.    It was more limited when they were in SHU; right?

A.    It was more limited.

Q.    You could listen to inmates' phones calls as the warden; right?

A.    Any staff member has the ability to listen to inmate phone calls; correct.

Q.    You could watch their video calls?

A.    I did not have access to their video calls.  I did not ever install it.

Q.    You could request access to watch inmates' video calls; right?

A.    I could request access, yes.

Q.    You could do all that from your office; right?

A.    Yes.

Q.    On your computer?

A.    Yes.

Q.    You could search inmates' cells?

A.    No.  I never searched inmates' cells.  I searched the common area of the units.

Q.    You had the authority to search inmate cells, though?

A.    Yes.

Q.   You could reassign inmates to different housing units?

A.   No.   The unit team reassigns inmates to different housing units.

Q.   You could give input about where an inmate should be housed?

A.   I could give input.

Q.   You could give input into where inmates worked too; right?

A.   The work programming committee did the work assignments, and that was managed by the unit team counselors and the CMC.

Q.   And as warden, you could give input into that process; correct?

A.   Warden -- as warden, I never sat a work committee meeting. As AW, I never sat a work committee meeting.   So I never gave input into job assignments.

Q.   You had ability to do so, didn't you?

A.   I had the policy authority to do so, yes.

Q.   You had access to inmates' presentence reports; right?

A.   No.

Q.   That's something you could request access to?

A.   I could request access, yes.   So in order to get an inmate's presentence report, I would either have to go to the unit and check out a central file and fill out the form to check it out, or I would have to request from the case management coordinator access to the program that gives me the review of that.

Q.    But that's something you could do if you wanted to; right?

A.    If I wanted to, yes.

Q.    And a presentence report includes information about the details of an inmate's crimes; right?

A.    Yes.

Q.    It also includes personal information?

A.    I believe so.  I have not read any presentence report in my career.  I have been correctional services, so I have never had a need to.

Q.    As warden, you had access to any building at FCI Dublin; right?

A.    No.

Q.    You could ask -- you could ask your staff members for keys for any building that wanted to access?

A.    I could ask a staff member to escort me to any area of the institution who had keys, yes.

Q.    But you didn't need them to escort you?

A.    I needed access, and they had the keys.  I did not.

Q.    Right.  But you could ask for the key, couldn't you, Mr. Garcia?

A.    I could go to control and check out a key, correct.  Any staff member can.

Q.    As the warden, you were required to comply with BOP's policies; right?

A.    Yes.

**Q.** Under BOP policy, employees are prohibited from becoming emotionally involved with inmates; right?

**A.** Yes.

**Q.** Or former inmates?

**A.** BOP policy has a two-year ban on former inmates, yes.

**Q.** BOP employees are also prohibited from becoming sexually involved with inmates?

**A.** Yes.

**Q.** Or former inmates?

**A.** Two-year ban on contact with former inmates, yes.

**Q.** You knew that under BOP policy, sex between staff and inmates can never be considered consensual; right?

**A.** Yes.

**Q.** And that's because staff are in a position of authority over the inmates?

**A.** Yes.

**Q.** You testified yesterday, I believe, that you joined BOP in 1989; is that right?

**A.** Correct.

**Q.** And you received training every year on BOP's standards of conduct; right?

**A.** No.

**Q.** By policy, you were supposed to receive training every year on BOP's standards of conduct; right?

**A.** Yes. By policy, you are supposed to receive training

every year.  However, due to a TDY assignment, I think I missed a year.  And during COVID, training was ceased.

Q.   When you joined BOP in 1989, between 1989 and July of 2021, you received training almost every year on BOP standards of conduct; right?

A.   Yes.

Q.   And that training involved an annual reminder that you can't engage sexually or emotionally with inmates or former inmates; right?

A.   Yes.

Q.   And the last time you received that training was in June of 2021; right?

A.   No.

     MS. PRIEDEMAN:  Ms. Slattery, can you please pull up Exhibit 179 for the witness.

Q.   Mr. Garcia, do you recognize -- this document is a sign-in sheet from BOP's annual correctional training; right?

A.   Yes.

Q.   And that's your name on line 2?

A.   Yes.

Q.   And your signature, saying you attended each day?

A.    It's similar to my initials, but I don't believe it's my signature.

Q.    Are you testifying that someone else signed in for you at the annual training?

**A.**   I'm testifying that I don't recognize signing this form.

**MS. PRIEDEMAN:**   Your Honor, at this time, the Government would move to admit Exhibit 179.

**MR. REILLY:**   No objection.

**THE COURT:**   It's admitted.

(Government's Exhibit 179 received in evidence)

**MS. PRIEDEMAN:**   May we publish to the jury?

**THE COURT:**   You may.

BY MS. PRIEDEMAN:

**Q.**   Mr. Garcia, do you see this says, "The annual correctional training," and then the middle paragraph in the middle, it says, "In accordance with PREA, I acknowledge I have received training and understand the agency's current sexual abuse and sexual harassment policies and procedures."

Do you see that?

**A.**   I do.

**Q.**   And you see your name on line two?

**A.**   I do.

**Q.**   And a signature for each day?

**A.**   Yes.

**Q.**   And the completion date is June 2nd, 2021.  Do you see that?

**A.**   Yes.

**Q.**   So do you remember now attending this annual training?

**A.**   No, because training was web-based.  And I never logged

into the web system because I was on TDY assignments.  So, again, the signature looks familiar.  It may be signed.  I may have been asked to sign it later, but if you check the database at the agency, I never logged into the web-based because I was on TDY assignments.

Q.   So you're testifying that you signed saying you had attended this training, but you actually hadn't attended the training?

A.   I'm saying I don't recall signing this form, and it looks like my signature.  But because I was on TDY, I did not attend that year's training, yes.

        **MS. PRIEDEMAN:**  Ms. Slattery, you can take that down, please.

Q.   You're also familiar with BOP's PREA policies; right?

A.   Yes.

Q.   You had to be familiar with them in your role as associate warden and warden; right?

A.   Correct.

Q.   One of the purposes of PREA is to prevent the sexual abuse of inmates by staff members; right?

A.   That is correct.

Q.   As warden, under BOP's policy, if there was an allegation that a staff member had abused an inmate, you would be notified of that; right?

A.   Yes.  I would be notified by the PREA coordinator.

**Q.**  You were in the reporting chain?

**A.**  Only the time that I was the warden, from November through June 21st of my removal.

**Q.**  And as warden, it was up to you to decide whether or not to put an inmate in SHU for making allegations about sexual abuse by a staff member; right?

**A.**  No.  As warden -- as the PREA coordinator, the PREA coordinator would make the recommendations whether an inmate should be placed in SHU.  Part of PREA says that you can't subject the inmate to more trauma based on their complaint.

So the PREA coordinator would make the decision whether the inmate should go to SHU for their protection or if we should call a regional office and put the staff member on home-duty status.

In my time at Dublin, only one occurrence, an inmate was placed in SHU.  On the other occurrences, the staff were placed on home-duty status.

**MS. PRIEDEMAN:**  Ms. Slattery, can you please pull up Exhibit 191.

Your Honor, I believe there is a stipulation to admit this exhibit, and I would move to admit it at this time.

**MR. REILLY:**  That's correct, Your Honor.

**THE COURT:**  All right.  It's admitted.

(Government's Exhibit 191 received in evidence)

**MS. PRIEDEMAN:**  May we publish to the jury?

Ms. Slattery --

Q.   Well, first, Mr. Garcia, do you recognize this?  This is FCI Dublin's PREA standards?

A.   It says, "FCI Dublin PREA Standards," yes.

MS. PRIEDEMAN:  Ms. Slattery, if you can go to the second page, please.

Q.   This is a memorandum that you prepared in preparation for a PREA audit; correct?

A.   Correct.

Q.   That's your signature right there?

A.   That is my signature.

MS. PRIEDEMAN:  Ms. Slattery, can you please go to page 7.

Q.   Mr. Garcia, this is the steps that need to be taken under PREA if there is an allegation against a staff member; right?

A.   Yes.

Q.   And do you see the last step it says, "Never place the victim in SHU without consulting the PREA compliance manager and the captain has reviewed and completed the warden's approval form?"

Do you see that?

A.   Correct.

Q.   That approval form is something that you had to sign off on?

A.   As it states there, after the captain has completed the

approval form and it's been signed by the compliance manager, yes.

Q.   So you did need to sign off on whether a victim was put in SHU; correct?

A.   Yes.

THE COURT:  Is now a good time for a break, or do you need to finish up something?

MS. PRIEDEMAN:  This is fine, Your Honor.

THE COURT:  Okay.  We will go ahead and take our second break.

(Proceedings were heard out of presence of the jury:)

THE COURT:  All right.  The record will reflect the jury has left.

Mr. Garcia, you are under cross-examination.  You are ordered not to talk to your lawyer about your testimony.  Do you understand?

THE WITNESS:  Yes, ma'am.

THE COURT:  Do you understand, Mr. Reilly?

MR. REILLY:  Yes, Your Honor.

THE COURT:  I do have -- you can step down.

I have just a couple of questions for you all if you will come to the mics.

I'm trying to put together jury instructions for you so you'll have ample time to review them and we can review them early next week.

Some questions:  Do you want an explicit instruction on consent?

MS. PRIEDEMAN:  Yes, Your Honor.  I believe there should be an instruction that consent is not a defense.

THE COURT:  Okay.  You didn't provide one.  That's why I'm asking.

MS. PRIEDEMAN:  We can provide Your Honor with a draft instruction.

THE COURT:  And I take it no one is going to argue consent; right?  Mr. Reilly, this is not your theory?

MR. REILLY:  I'm sorry, Your Honor.  I couldn't hear what you said.

THE COURT:  I said you're not going to argue consent?

MR. REILLY:  No, no, of course not.

THE COURT:  Second, do you want me to repeat the instructions that I gave for Christina and Monica and was it Katrina?

MS. PRIEDEMAN:  Yes, Your Honor.

THE COURT:  You want me to repeat them in the final instructions?

MS. PRIEDEMAN:  Yes, Your Honor.  I think that would be helpful.

THE COURT:  And the last question is do you want me to put anything in there about Monica?

MS. PRIEDEMAN:  I would -- I think it would be

appropriate just to say that the jury should not consider anything either way about the fact that she did not testify.

**MR. REILLY:**  I do not intend to make any reference to her in my argument, but I don't have any problem with including an instruction of the kind that Ms. Priedeman has suggested.

**MS. PRIEDEMAN:**  I would also note, Your Honor, that Mr. Paulson did mention her name in opening statement, but it was very brief.  Obviously, we thought she was going to testify.

**THE COURT:**  Okay.  Well, I'll just make some small remark then.

**MS. PRIEDEMAN:**  Okay.

**THE COURT:**  Okay.  I don't know that I will have it for you when we close up here today, but certainly be looking for it, if not the end of today, over the weekend.  All right.

**MR. REILLY:**  Thank you, Your Honor.

**THE COURT:**  We will stand in recess.

(Recess taken at 11:52 a.m.)

(Proceedings resumed at 12:11 p.m.)

**THE COURT:**  All right.  Let's call the jury back in.

(Proceedings were heard in the presence of the jury:)

**THE COURT:**  The record will reflect that the jury is back.  The witness is on the stand.

Ms. Priedeman, you may continue your cross-examination.

**MS. PRIEDEMAN:**  Thank you, Your Honor.

Q.   Mr. Garcia, we were discussing your authority to put inmates in the Special Housing Unit.  In 2020, two inmates were placed in the Special Housing Unit based on allegations related to staff misconduct; right?

A.   I'm not sure.  I would have to see those records.

Q.   Okay.

        MS. PRIEDEMAN:  Ms. Slattery, can you please pull up Exhibit 203.

        THE COURT:  Just to the witness.

BY MS. PRIEDEMAN:

Q.   Mr. Garcia, this is one of the forms we were just discussing that you had to sign off on to put an inmate in the Special Housing Unit; right?

A.   Yes.

Q.   And that's your signature in the bottom left?

A.   Correct.  This is the form that's completed by the captain and reviewed by the PREA coordinator.

Q.   Signed off on by you?

A.   Yes.

        MS. PRIEDEMAN:  Your Honor, at this time, the Government moves to admit Exhibit 203.

        MR. REILLY:  No objection.

        THE COURT:  203 is admitted.

        (Government's Exhibit 203 received in evidence)

        MS. PRIEDEMAN:  May we publish to the jury?

THE COURT:  You may.

MS. PRIEDEMAN:  Ms. Slattery, can you go to the second page, please.  Sorry.  The third page, Ms. Slattery.

Q.   This is the form that you signed off on for an inmate named Michelle; correct?

A.   Yes.

Q.   And the date of the incident was June 18th, 2020?

A.   Yes, but my signature says April 14, 2021.

Q.   And it says that "The inmate was placed in the Special Housing Unit based on the nature of the allegations against two staff"; correct?

A.   Correct.

Q.   And it also says, "Insufficient evidence to place staff on leave at the time allegations were reported"; correct?

A.   That is correct.

Q.   And this inmate was placed in SHU for approximately 11 months; is that correct, Mr. Garcia?

A.   I'm not sure.  I'd have to see the 292s to know the extent of the placement.  I don't know this inmate by first name.

Q.   You don't know an inmate named Michelle that was put in SHU for approximately 11 months?

A.   Ma'am, I don't know inmate first names.  We use last names.

Q.   Well, this is your signature on the bottom, isn't it, Mr. Garcia?

**A.**    It's my signature on April 14th, 2021, yes.

**MS. PRIEDEMAN:**  Ms. Slattery, you can take that down.

**Q.**    Under BOP's PREA protocol, it was up to you to decide whether to refer allegations related to staff members for criminal prosecution; right?

**A.**    It would be up to me from November 22nd of 2021 until my removal -- I'm sorry -- 2020 until my removal in June of 2021. Prior to that, as associate warden, I had no ability to remove staff.

**Q.**    When you were the warden, it was your responsibility to refer allegations related to staff misconduct to -- for criminal prosecution; right?

**A.**    Yes, when I was the warden.

**Q.**    And if you thought an allegation didn't rise to a level that was necessary to refer to the FBI, you could decide not to refer it to the FBI; right?

**A.**    If the recommendations from the SIS and captain and myself, meeting as a committee, didn't see that it made a threshold to refer, we could decide not to refer, yes.  And that would have been my signature on the referral or not the referral.

**Q.**    And the SIS and captain reported to you as warden; correct?

**A.**    Yes.

**Q.**    When inmates arrived at FCI Dublin, they were supposed to

be given a handbook that told them how they could report sexual abuse by staff members; right?

A.   Yes.

Q.   And in that handbook, they were told they could report sexual abuse to staff; right?

A.   Yes.

Q.   To SIS?

A.   Yes.

Q.   Or to the warden?

A.   I would have to see the handbook, but I would assume yes.

Q.   The head of SIS at the time was Lieutenant Putnam; correct?

A.   Correct.

Q.   You worked with him for years at a prior prison; right?

A.   I worked with him for probably two years at the United States Penitentiary in Atwater.

Q.   He is the person that you told inmates you were buddies with; right?

A.   No.   Inmates assumed we were buddies because we spoke together.   I never told inmates I was buddies with Lieutenant Putnam.

Q.   The inmates weren't told anywhere in the handbook how they could report sexual abuse by you; right?

A.   I don't know.   I don't have the handbook, nor have I ever reviewed the inmates' handbook.   That would be an associate

warden of program's duties.

MS. PRIEDEMAN:  Ms. Slattery, can you pull up Exhibit 194, please.

Your Honor, this is a stipulated exhibit.  We would move to admit it at this point.

THE COURT:  It's admitted.

(Government's Exhibit 194 received in evidence)

MS. PRIEDEMAN:  May we publish to the jury?

THE COURT:  You may.

MS. PRIEDEMAN:  Ms. Slattery, can you please go to page 4.  Actually, sorry.  Can you go to page 2.

Q.   Mr. Garcia, you just testified that you were not familiar with the handbook; correct?

A.   I said I was familiar with the handbook, but I did not read the handbook.  I don't know the handbook verbatim.

Q.   This is a memorandum that you prepared in preparation for the PREA audit; correct?

A.   Negative.  This was prepared by the PREA coordinator and prepared for my signature.  The PREA coordinator's job was to ensure these steps were completed, and as the warden, I signed.

Q.   That's your name on the memo, isn't it, Mr. Garcia?

A.   As I said, once it's prepared by the PREA coordinator, all of these memorandums are brought to me and then signed by me. And as you can see once again, that's April 14th, 2021.  As documents were being prepared, they were brought to me in bulk

for my signature to be put in the binder.

Q.    Do you frequently sign things without reviewing what you're signing?

A.    I signed after reviewing, trusting that the AW in charge of PREA had completed the jobs that she stated she had.

Q.    As warden, wasn't it your ultimate responsibility to make sure that FCI Dublin was in compliance with PREA?

A.    Yes.  And that's done through the various stages, unit management, psychology, medical, and then verified by the PREA coordinator and signed by the warden.  It is not possible for a warden to complete all of their duties and examine every one of these elements by him or herself.  That's why we have staff.

Q.    In your role as warden, one of your responsibilities was preparing for this PREA audit; correct?

A.    In my role as warden, it was my responsibility to assure the staff did their job in preparation for the PREA audit.

Q.    And --

A.    That was more correct.

Q.    And one of your responsibilities, Mr. Garcia, was to submit a series of memos to the auditors in preparation for that audit; correct?

A.    My job was to sign the memos that the staff had completed their jobs, that is correct.

Q.    And at the end of the day, it was your role to make sure that what you were submitting for the audit was accurate;

correct?

**A.**   At the end of the day, I'm held accountable for what was submitted.

          **MS. PRIEDEMAN:**  Ms. Slattery, can you please go to page 3.

**Q.**   Mr. Garcia, this is the Inmate Admission and Orientation Handbook we were just discussing; correct?

**A.**   Correct.

          **MS. PRIEDEMAN:**  Ms. Slattery, can you please go to page 4.

**Q.**   This is the page that details to the inmates what they can do to report sexual abuse; correct?

**A.**   It appears to be the page that describes inmates' ability to report PREA; correct.

**Q.**   And there's nothing on this page that tells inmates how they can report sexual abuse by you; correct?

**A.**   It says, "You can tell a case manager, chaplain, SIS, warden or any other staff member you trust.  BOP staff members are instructed to keep reported information confidential and only discuss with the appropriate officials on a need-to-know concerning the inmate's victim welfare and for enforcement of the investigation purposes."

          So it does tell them.

**Q.**   It doesn't tell them anywhere what they can do if they were being abused by you, does it, Mr. Garcia?

**A.**    It says you could report to any staff member.

**Q.**    Including you; right?

**A.**    Including me.  Any staff member.

**Q.**    But there is not a specific protocol, a different protocol, that they can use if they were being abused by the warden, by you, is there?

**A.**    This is the protocol.  It says they can advise any staff member.  It doesn't say if you are being abused by a correctional officer or a warden or a facilities foreman.  It says, "Any abuse can be reported to any staff member."

**Q.**    Right.  And as we discussed earlier, Mr. Garcia, any time an inmate made an allegation against a staff member, you would be notified; correct?

**A.**    Unless the allegation was against me.  The allegation would -- as Dr.-- from the southeast region said, she would report to that to the regional office, in her direct testimony.

**Q.**    Mr. Garcia, I think she said there was no policy for that. She said if she, Dr. Malespini, herself received a request, that's what she would do.

**A.**    That is correct.

**Q.**    But there is nothing documented in FCI Dublin's PREA policy that would allow for a different reporting pathway if the abuse was done by you, is there?

**A.**    If the abuse was done by a warden, nothing on this page says a specific avenue for an inmate to report it other than

all staff.

Q.    And that's because there is no different policy?

A.    No.  There is no different policy.  There is one PREA policy.

Q.    Have -- when you were employed as an associate warden and warden at BOP, you were given a BOP work phone; correct?

A.    Correct.

Q.    Most staff members don't have phones -- work phones; right?

A.    Most staff don't.

Q.    Is it just the AW and the warden at FCI Dublin?

A.    No.  Associate wardens, warden, computer specialist, computer manager.  I believe the doctor does, too, but I'm not sure.  It's not my department.

Q.    But most correctional officers don't have a phone?

A.    Correctional officers do not have phones, government phones.

Q.    You also had a personal phone; right?

A.    Yes.

Q.    But you weren't permitted to bring that phone into FCI Dublin; right?

A.    Policy doesn't permit personal phones to be brought into an institution.

Q.    And you didn't bring it in, did you?

A.    I mistakenly brought my phone in before, yes.  They are

the exact same type of phone, Samsung S8.

Q.    You also had a BOP computer at FCI Dublin; right?

A.    There was a desktop in the office that I was assigned to; correct.

Q.    And that was for your work at FCI Dublin?

A.    Correct.

Q.    And you had a BOP email account?

A.    Correct.

Q.    You also had a personal computer for use at home; right?

A.    Yes.

Q.    You weren't permitted to bring that personal computer to FCI Dublin; right?

A.    That is correct.

Q.    Now, as the warden, you knew where all the surveillance cameras were at FCI Dublin; right?

A.    As the warden, I received a report that listed the cameras.  I never physically went and checked every camera.

Q.    And you testified yesterday that when you were associate warden, you were in charge of operations; right?

A.    That is correct.

Q.    And that would cover the functioning of their surveillance cameras; right?

A.    That covers the department that controls the functioning of the surveillance cameras, yes.

Q.    And so in both roles, you knew which cameras worked and

which didn't; right?

A.    In both roles, a quarterly report was generated for our review, but I did not spend time to review every single camera. I have a facilities manager who directs a COM tech manager and two COM technicians to fix the cameras.

We count cameras working versus cameras not working. We had a percentage that we had to report to the regional office, and if we were below our percentage, then we were required to invest the funding to fix those.

Later, the institution, the agency, upgraded cameras, and it was -- new DVRs and NVRs were placed in every facility in the Bureau of Prisons.

Q.    So by virtue of getting these reports you just referenced, you knew which cameras worked and which didn't?

A.    No.  I did not review it to the extent that I knew which cameras worked and which didn't.  I knew the number of cameras working versus the number of cameras not working.

Q.    But you were also provided information telling you which of the cameras worked and which didn't; correct?

A.    If a specific camera was not working and it was something that was being alerted to at the regional office because they also reviewed the cameras, they would call us and advise us if a specific camera needed immediate repair.  Our cameras can be reviewed by the region as well as our own institution.

Q.    And there were a number of cameras at FCI Dublin that

didn't work; right?

A.    There were some cameras that were not working prior to the agency mandate to repair all cameras, and I can't give you the exact date because I don't have access to the reports any longer.

Q.    When you were the associate warden and the warden, the surveillance cameras were not monitored 24/7 a day; right?

A.    Surveillance cameras were not monitored 24 hours a day.

      Correction.  Not all surveillance cameras are monitored 24 hours a day.  Some are.  Some aren't.  There are several access points that people can monitor them, but by policy, there is not someone sitting in front of 198 cameras.

Q.    That just wouldn't be practical?

A.    It wouldn't be cost effective.

Q.    So staff typically looked at the surveillance camera footage for a specific reason; right?

A.    Yes.

Q.    If there was an allegation of some kind?

A.    That could be a reason, yes.

Q.    Like if an inmate was alleged to have contraband, someone might go back and review the footage?

A.    Yes.

Q.    Or if there was an allegation of staff misconduct?

A.    Yes.

Q.    But absent a specific reason, there is no guarantee that

all of the surveillance footage at FCI Dublin was reviewed by anyone; right?

**A.**    There's no guarantee that all of the surveillance footage would have been reviewed.

**Q.**    You also knew that the surveillance footage was not preserved for very long; right, Mr. Garcia?

**A.**    No.  I have no idea what the memory capacity of the NVRs are.  It's above my knowledge of computers.

**Q.**    That wasn't something you learned in your role of operations overseeing that department?

**A.**    No.  It wasn't my role to know how much memory was available.  It's my role to know if cameras were working or not working and invest the funds and to make sure they were working.  I don't know what the capacity of a DVR or NVR is.

**Q.**    Well, you knew, Mr. Garcia, that there was limited memory on the servers for the computer surveillance, and so at some point, it would be overwritten; right?

**A.**    I know that there's a set memory on computers, yes.  As far as overwritten or deleted, that's up to the SIS office.

**Q.**    Well, you knew in some circumstances, Mr. Garcia, if there was an investigation, for example, if they wanted to go back and look at footage, that footage was not always available; right?

**A.**    No.  You're assuming I knew these things.  I know that when we run investigations and footage is going to be

preserved, that it's actually taken off the NVR and put in some other form of media so that it can be preserved for longevity. They don't keep footage for investigation on the network.

Q.   Well, they preserve it for longevity because it is not preserved on the server forever; correct?

A.   Correct.

Q.   But if there was no knowledge of that allegation, then it would not be preserved; correct?

A.   Correct.

Q.   You also had access to the surveillance footage; correct?

A.   I was given access when I became warden as a part of a program review requirement.  I had no access to the surveillance footage at any time during my tenure as associate warden.

Q.   When you were warden, you could watch the surveillance footage from your computer; correct?

A.   If I logged in, yes.

Q.   You could check whether something was captured on surveillance footage or not?

A.   No.  I could check the live feed only, and all my logins would be documented on the system.

Q.   You couldn't go back and look at something that had been recorded previously?

A.   Not to my knowledge.  Those were SIS functions, not -- mine was a viewing function.

**Q.** You knew what each surveillance camera could capture; correct?

**A.** No.

**Q.** Well, Mr. Garcia, you had access to the surveillance footage, so you could go in and look and see what angles a different camera could capture; correct?

**A.** I had access to video cameras, and I learned the viewing properties of the cameras. And I would say if you checked the computer log on the times that I've logged in, my logins would be less than a handful and for maybe five minutes. I never spent any time looking at every angle of every camera in the institution.

**Q.** That's something you had the ability to do if you wanted to, isn't it, Mr. Garcia?

**A.** Yes.

**Q.** You also could check and see what angles a camera wouldn't capture, for example; right?

**A.** If I wanted to look at an angle of camera, I could log in and look at that camera.

**Q.** There were a number of areas at FCI Dublin that didn't have surveillance cameras; right?

**A.** There are areas that are not covered, correct.

**Q.** In fact, there were major blind spots in camera coverage at FCI Dublin, weren't there?

**A.** I don't know if there were major blind spots. As I just

testified, I did not look at every angle of every camera.

Q. There were no cameras in the inmates' cells, for example?

A. No, there were no cameras in inmate cells.

Q. There was no cameras in the F-Unit laundry room?

A. The F-Unit laundry does not have a camera. There is a camera directly outside, looking into the door.

Q. But it wouldn't capture everything that is inside that laundry room; right?

A. It would not capture everything in that six by ten room, no.

Q. For example, it wouldn't capture if someone was standing against the washer or dryers, would it?

A. It would not capture that angle.

Q. There's no cameras in the UNICOR warehouse either, are there?

A. There are no cameras in the UNICOR warehouse, correct.

Q. There is no cameras in CMS?

A. There are no cameras in CMS that I'm aware of.

Q. And that would include the electrical shop; right?

A. The electrical area, no, there is no camera there.

Q. There is no cameras in the visitation bathrooms either; right?

A. There is no cameras in the visitation bathrooms. There are cameras in the visitation room.

Q. You said there was a camera in the visitation room, but

there were major blind spots with that camera, weren't there?

A.    I don't know.  I did not review the cameras.  I've stated that.

Q.    You had the ability to do so, didn't you, Mr. Garcia?

A.    Had the ability and did not.

        MS. PRIEDEMAN:  Ms. Slattery, could you please pull up Exhibit 39.

        Your Honor, this has been previously admitted.  May we publish to the jury, please?

        MR. REILLY:  No objection.

        THE COURT:  It can be published.  There we go.  Go ahead.

BY MS. PRIEDEMAN:

Q.    Mr. Garcia, do you see that big black dome on the middle of the ceiling?

A.    Yes.

Q.    That's not actually a camera, is it?

A.    Don't know.

Q.    Well, Mr. Garcia, you were -- you were aware of where all the cameras were at FCI Dublin; right?

A.    I was aware of the locations noted on the report.  I did not, as I previously stated, go inspect every camera.

Q.    You had discussions about where the different cameras were as part of your role in operations; correct?

A.    We had discussions about requesting funding from the

region to add additional cameras.

Q.    And to do that, you had to have a working knowledge of where the cameras were; correct?

A.    No.    I have a COM tech and facilities managers that have that knowledge.    They will tell me what we need.    As the associate warden, I will request those fundings through the warden.    The warden will request those fundings through the regional office.    I'm not the person looking at the camera, fixing the camera or setting the angle of the camera.    That's the job of the COM tech.

        MS. PRIEDEMAN:    Ms. Slattery, can you please pull up Exhibit 50.

        Again, Your Honor, this has been previously admitted, and we would request that we publish it to the jury, please.

        THE COURT:    You may.

BY MS. PRIEDEMAN:

Q.    Mr. Garcia, this is the visitation room; correct?

A.    Correct.

Q.    Do you see that little black dot in the middle of the ceiling?

A.    Yes.

Q.    That's the actual camera; right?

A.    That is a camera.

Q.    That's the camera in the visitation room?

A.    There are several cameras in the visitation room.

Q.    Where are the other cameras, Mr. Garcia?

A.    I believe there is some outside cameras.  The bubble --
because I believe there's more than one camera -- there has to
be more than one camera in the visiting room.

Q.    So you actually do have an understanding of where the
cameras are, don't you, Mr. Garcia?

A.    I have an understanding of correctional surveillance of
visiting rooms over 30 years and eight duty locations.  And
there is typically -- in all of my duty stations and all the
institutions I visited for security assessments, which is one
of my responsibilities, there is always more than one camera in
the visiting room.  As an emergency preparedness officer, I
actually traveled to institutions to review their security
procedures.

Q.    Can you tell the jury where the other cameras were?

A.    I know there's cameras outside.  It was testified in court
and, I know there is outside cameras because there is an
outside area.

Q.    Was this the only camera within the visitation room?

A.    Again, I believe there is a camera in the bubble, but
you're telling me there's not.

Q.    I'm not telling you anything, Mr. Garcia.  I was -- I'm
asking you questions.

A.    Okay.

        MS. PRIEDEMAN:  Ms. Slattery, can you please go back

to Exhibit 39.

I ask that it be published to the jury.  Thank you.

Q.   So that camera we just looked at in the last exhibit, that camera doesn't capture anything past the vending machines; right?

A.   I don't know.

Q.   Do you see those steps in the picture?

A.   Yes.

Q.   Those lead to an entrance to the visiting room; right?

A.   They lead to a door with a window, correct.

Q.   So if the camera only goes to the vending machine, it wouldn't capture if someone was coming in the visiting room through that entrance; right?

A.   The camera in the main visiting room would not capture that door, correct.

Q.   And it wouldn't capture if someone exited through that door either, would it?

A.   Correct.

Q.   It wouldn't capture if someone went into the changing stalls down that hallway either, would it?

A.   Correct.

Q.   Or if they were going into the bathrooms?

A.   That is correct.

Q.   And you knew that, didn't you, Mr. Garcia?

A.   No, ma'am.  That is a video camera bubble, and in

assessments of visiting rooms, visiting room areas are covered. It is part of what we do. So, no, I did not know that. You are trying to tell the jury I knew that, but I had no knowledge that there was not a camera in that bubble.

MS. PRIEDEMAN: Ms. Slattery, you can take that down. Thank you.

Q. I want to talk about Melissa now. She was an inmate at FCI Dublin while you were the associate warden; right?

A. Correct.

Q. Also while you were the warden?

A. Correct.

Q. She was under your custody and your supervision?

A. She was under the supervision of FCI Dublin correctional services unit management and the previous warden, correct.

Q. I don't think that answered my question, Mr. Garcia.

A. I'm sorry. Your question leads people to believe that I was solely responsible for her custody, and I was not. There is an entire institution responsible for their custody. I was the associate warden of operations.

Q. But part of that duty included being -- taking custody over and supervising the inmates; correct?

A. No. Part of that custody required me to supervise correctional services who was in direct supervision of inmates. I supervised staff.

Q. Isn't it true, Mr. Garcia, that any correctional officer

at FCI Dublin had custody and supervision over the inmates?

**A.**   Certainly, overall, you can look at that picture, but if you are talking about direct supervision, I don't have it.

**Q.**   Okay.  As the warden, you were responsible for the safety, and you were required to protect the inmates; correct?

**A.**   As the warden, through my staff, yes.

**Q.**   And also as the associate warden?

**A.**   Correct.

**Q.**   You had access to Melissa's phone calls; correct?

**A.**   I could request access to listen to inmate phone calls, and if you checked all the databases in FCI Dublin, I never listened to any inmate phone calls.

**Q.**   You could watch her conversations with family members if you wanted to?

**A.**   Once again, I could request permission for video visit monitoring access, and if you checked the computer data system, I never watched any video conference between an inmate and their visitor.

**Q.**   You talked to Melissa frequently while she was at FCI Dublin; right?

**A.**   I talked to Melissa and many inmates frequently, daily.

**Q.**   You would escort her to the visitation room?

**A.**   No.

**Q.**   Is it your testimony that you never escorted her to the visitation room?

**A.**    My testimony is that I didn't escort her in a -- as you're saying, like I did it every day.  There are times when she was walking across the compound, and if I was on the compound, I would go -- I got her, and I would take her the rest of the way so the compound officer could go on with other duties.  That's called helping my staff.

**Q.**    You would sometimes take her from her housing unit.  You would go pick her up and bring her to the visitation room; right?

**A.**    No.  Generally, that would be the compound officer.  And in her interview with you, she stated Mr. Bellhouse did it during COVID protocols.  I can recall maybe two occasions when I was in the compound, and she was -- she and the rest of the visiting crew, Ms. Wells, Kat -- I'm sorry, Your Honor -- Rebecca, Kat, Melissa, all visiting -- all living in the A and B-Unit would be escorted by me, yes.

**Q.**    You would get Melissa different supplies if she needed them?

**A.**    I would authorize safety to give supplies to the visiting crew.  Safety supplies are a valuable commodity in a prison, and the visiting crew did not have a counselor, which is typically the person that gets the supplies to get it for them.  When they would complain about needing supplies, I would tell safety to get it for them.

Again, my goal was to make the area where inmates stay

with their families to look pleasant.

Q.   I think you testified earlier that Melissa was frequently at the weight pile; is that right?

A.   That is correct.

Q.   You would watch her at the weight pile, wouldn't you?

A.   No.

Q.   You also testified that you were aware that Melissa's mother was sick and dying; correct?

A.   I became aware of Melissa's mother passing when I entered the unit.  She was distraught, and the officer advised me of it.

Q.   You were sympathetic to her?

A.   I was humane to her and showed concern for her.

Q.   You were nice to her?

A.   I was pleasant.

Q.   Did you compliment her?

A.   No.

Q.   Call her beautiful?

A.   Never.

Q.   Sexy?

A.   Never.

Q.   You told her you wanted to drink wine with her in Napa Valley; right?

A.   I'm not a wine drinker.  I don't drink wine ever.  I never said I would go to Napa Valley with anybody.

Q.   You made her feel special, didn't you?

A.   Whatever she perceived in her mind is her feeling, and I don't control that.

Q.   Well, you had a lot of control over her, didn't you, Mr. Garcia?

A.   No.  I don't have control over her as a person.  I have control of her custody through the staff at the institution.

Q.   The staff that reported to you; correct?

A.   The staff that report to their managers, their associate wardens, to me, to the regional office, to OIA and varied other forms of it.  You are trying to convince the jury that I'm solely responsible for what goes on in the prison.  And a prison is designed by policy to have checks and balances.

Q.   You told Melissa you wanted to have sex with her, didn't you?

A.   Never happened.

Q.   She wrote you notes?

A.   She wrote plenty of cop-outs, and she also wrote notes because she provided information, which was part of the deal for her not receiving the incident report.

Q.   She wrote you sexual notes?

A.   No.

Q.   You masturbated when you read her notes?

A.   Never.

Q.   You told Melissa you would help her transfer to the camp;

right?

A.   It was not even in my authority to accomplish, and I did not tell her that.

Q.   But you told her you could do it; right?

A.   No, I did not.

Q.   You wanted her to transfer to the camp because you would have more access to her; right?

A.   No.  I had more access inside than outside because my primary duty station is inside of the institution.  I never promised her anything of that sort, nor did I say I wanted access to her.

Q.   Inmates at camp can sometimes leave the compound; right?

A.   If they have a job assignment and then they leave under escort.

Q.   They have more freedom?

A.   They have freedom within the confines of the institution.

Q.   Their activities aren't as closely monitored as the prisoners?

A.   There is less staffing at the camp by design; correct.

Q.   So less people around?

A.   Yes.

Q.   You would stop at Melissa's cell when you did your rounds?

A.   I stopped at many cells when I did my rounds if inmates had questions.

Q.   And you instructed Melissa to be naked when you did your

rounds; right?

**A.**   No.

**Q.**   You told her to be in her cell or Andrea's cell?

**A.**   No.  I did not tell her to be in her cell, and I would never advise an inmate to break policy and be in somebody else's cell.

        **MS. PRIEDEMAN:**  Ms. Slattery, can you please pull up Exhibit 55 and redact it appropriately.

        Your Honor, may we publish Exhibit 55 to the jury?

        **THE COURT:**  You can publish it to the jury.

        At this point, Members of the Jury, one, you will have this evidence with you in the jury room.  But we've seen it multiple times, so I have allowed them to just redact at this point.

        Go ahead, Ms. Priedeman.

**BY MS. PRIEDEMAN:**

**Q.**   This is a picture that you had on your personal computer; right, Mr. Garcia?

**A.**   That is correct.

**Q.**   That's Melissa on her hands and knees in the picture?

**A.**   That is correct.

**Q.**   You took this picture?

**A.**   That is correct.

**Q.**   You said you took it with a CMS camera; is that right?

**A.**   Correct.

Q.   Is that the same camera you gave to Rachel and asked her to take naked pictures of herself?

A.   I never gave a camera to Rachel.  As I stated in my testimony, I put it down on a table when I was working with the electrical crew.

Q.   Did you put your own SIM card in this camera just like you told Rachel you had done?

A.   I didn't put a SIM card in the camera.  If I had, it would have been tracked when the camera was plugged into the computer system because any item that is plugged into a Bureau of Prisons prison system would be logged.  And if I put my own SIM card or own USB into the computer, it would be tracked by computer services.

Q.   That's you in the reflection; right?

A.   Yes.

Q.   You're wearing your uniform?

A.   No.  I'm wearing a shirt and tie and a jacket.

Q.   That's what you typically wore at FCI Dublin?

A.   If I wasn't in a suit, yes, I wore just a regular coat.

Q.   You were on duty when this picture was taken?

A.   Yes.

Q.   And this was taken when Melissa was an inmate at FCI Dublin; right?

A.   Correct.

Q.   I believe you testified this picture was taken in

January of 2020; is that right?

A.   To the best of my recollection, January of 2020.

Q.   And that's when you were still the associate warden; right?

A.   Yes.

Q.   On the left, on that furniture, there's a cell number; right?

A.   Correct.

Q.   And that's Andrea's cell?

A.   Yes.

Q.   Andrea's cell was at the end of a wing; right?

A.   Correct.

Q.   It was kind of more out of the way than some of the other inmates' cells?

A.   It was in a wing with five cells rather than 20.

Q.   It was more secluded?

A.   Yes.

Q.   And we saw the pictures earlier.  There's a window that was tinted out right next to the cell; correct?

A.   Correct.

Q.   You knew that Andrea and her cellmates were frequently out of their cells working; correct?

A.   Andrea and her cellmates worked in commissary and should not have been in the cell during working hours; correct.

Q.   So the room was often empty when Melissa wasn't working;

right?

A.    Melissa's hours were in the afternoon, so her work hours were, pre-COVID, only after lunch.

Q.    So -- and you said this photograph was taken in the morning; right?

A.    It was taken just prior to the running of the breakfast -- the lunch meal, so somewhere between 10:45 and noon or 11:30 because it was running late that day.

Q.    So Andrea's cell is basically always empty in the mornings when she and her cellmates were working; right?

A.    Yes.

Q.    You told Melissa to go to Andrea's cell to strip naked because you knew -- you thought it was safer; right?

A.    No.

Q.    You told her you'd checked the cameras and you couldn't see anything?

A.    No.  And once again, as an AW, I did not have access to the cameras.

Q.    You testified that you took this picture when you were doing rounds, and you thought you heard someone who wasn't supposed to be in that cell; right?

A.    I heard someone in the cell and based on the hour, nobody should have been in that cell.

Q.    And you thought maybe they were hiding contraband?

A.    Correct.

**Q.** Where did you think they would be hiding contraband?

**A.** So because, again, inmate Andrea had $75,000 on her commissary account, it raises suspicion as to how to -- she keep that much money in her commissary account. Yet, as you can see by her cell, she has everything an inmate can possibly buy from the commissary.

So the contraband that could be coming in, because they have access to the camp through the shipments, could be drugs, could be devices. They sneak devices in. It could be anything that's not authorized or purchased in the commissary. Contraband.

My biggest concern was the drugs because there was a drug issue in the institution during this time.

**Q.** We talked earlier about how correctional officers don't have phones with them; right?

**A.** Correct.

**Q.** And they don't carry cameras around usually?

**A.** The correctional officers, no. CMS staff typically do -- log what their work is. They will carry the camera around when they need it. That's why the camera was in CMS.

**Q.** Those cameras are to document problems with facilities; right?

**A.** As I stated, I was documenting issues that needed corrective action, and then we go back and document when the corrective action was completed.

Q.    And when you knocked on the door, you just happened to have your camera with you?

A.    As I stated in my testimony, as we were preparing for the ACA and PREA compliance audits, one of my jobs was top find the discrepancies and document them.  So it wasn't that I happened. It was my assignment to find the discrepancies, document the discrepancies, and return when the corrective action was complete.

Q.    And you have received training on how to document inmate misconduct; right?

A.    Correct.

Q.    And that does not include taking pictures of naked inmates, does it?

A.    Your perception of taking pictures of naked inmates in a sexual manner is not permitted.  But taking pictures of an inmate exhibiting misconduct is.  And I can give you examples from all of my institutions when documentation of inmates committing sexual acts was required and accomplished.

For instance, we've moved cameras to view inmates who masturbate toward female staff so that the image can be captured and then redacted as you have done and added to the incident report.  It's done at institutions frequently.

Q.    That's not part of BOP policy, is it?

A.    It's gaining evidence to support a prohibited act.  It's covered in 5270.09 that an inmate has the right to see the

evidence used against them to prove that they've committed the prohibited act.

So for -- in example, for an inmate to say that, "I didn't do that," what does the staff have to say, "Yes, you did"?

Q.   Well, Mr. Garcia, you were the associate warden at that time.  Wouldn't it have been appropriate just to write a report and write what had happened?

A.   And if you have no evidence, then is it not just the person's word against your word?

Q.   Isn't that what happens when any other correctional officer without a phone documents misconduct?

A.   Which is why there are so few sexual misconduct incident reports written at Dublin because the officers have no way to support what they've seen.

Q.   You're saying -- your testimony is that a correctional officer, if they see inappropriate sexual misconduct, can't write up that report unless they take a picture?

A.   I'm saying that there is less reports written because they have no way of proving it.  And when the reports are written, they're typically expunged because the inmate's first excuse in their cell would be, "This is where I live.  So I change.  I am naked.  I'm in a robe."

And the unit team or the disciplinary hearing officer has to give that weight, the fact that they are in their home, they are dressing, and that's where they do it.

In this case, Melissa's first response was, "I was waiting for my friend to come home."  That would have been her defense before the UDC.

Q.   She was waiting, naked on all fours, for her friend to come home?

A.   That's her statement, not mine.

Q.   Isn't it sufficient -- you were the associate warden. Wouldn't it have been sufficient just to be your word in the incident report?

A.   So my word is sufficient to say somebody is guilty of a prohibited act?  In your same example, though, could I walk up and say that "this inmate needs to go to SHU because they assaulted another person" without any evidence to support that?

Q.   Mr. Garcia, aren't you trained specifically on addressing inmate sexual misconduct?

A.   Yes.

Q.   And that training does not include anywhere that you should take a photograph of an inmate; correct?

          MR. REILLY:  Objection.  Argumentive.

          THE COURT:  Overruled.

     You can answer it, and then we'll move on.

          THE WITNESS:  The PREA program statement does not state that a photograph can be taken.  The disciplinary program statement states that evidence used to support the incident to include video, stills, copies, can be presented.

BY MS. PRIEDEMAN:

Q.   But that doesn't apply when it's an incident related to sexual misconduct; correct?

A.   Where does the policy say that sexual misconduct evidence doesn't apply?

Q.   You heard Dr. Malespini's testimony that it would violate an inmate's privacy to take pictures of an inmate naked?

A.   And as Dr. Malespini said, whether or not it applies to discipline was not her area of expertise.  And by redacting it before submitting it to the central file, you've protected the inmate's privacy.

Q.   When you were the warden at FCI Dublin, you never saw a single incident report with naked pictures of an inmate attached, did you?

A.   When I was the warden, I didn't see any incident reports. I would not review incident reports as the warden or the associate warden.

Q.   Did you ever writer a single incident report as the associate warden?

A.   As the associate warden, no, I did not write an incident report.

Q.   Did you write a single incident report as the warden?

A.   No, I did not write an incident report as the warden.

Q.   So this would have been the first incident report that you had ever written at FCI Dublin?

**A.**    Yes.

**Q.**    Mr. Garcia, you testified that when you opened the door, you were surprised to see Melissa; right?

**A.**    Correct.  I was surprised to see the inmate on all four. I did not know who the inmate is as you cannot identify her from this picture.

**Q.**    Did you purposely at that point take a picture of Melissa?

**A.**    As I stated in my testimony, I thought inmates would be sorting drugs.  And so I opened the door and took a picture so that I would have evidence of drugs before they destroyed it in the toilet.

**Q.**    So it is it your testimony that you just took a picture quickly before you knew what was happening?

**A.**    Correct.

        **MS. PRIEDEMAN:**  Ms. Slattery, can you please zoom in on Mr. Garcia's reflection in the window.

**Q.**    You don't look surprised in this picture, do you?

        **MR. REILLY:**  Objection.  Argumentive.  Also calls for conclusion.

        **THE COURT:**  I don't know that you can answer it, but you can try if you can.  You can try if you can.

        **THE WITNESS:**  You cannot see my expression at all in this picture.

        **MS. PRIEDEMAN:**  Can you zoom out, Ms. Slattery.

**Q.**    This photograph isn't blurry, is it, Mr. Garcia?

A.    The photograph of the inmate portion is not blurry.

Q.    Melissa is posed on her -- on all fours; right?

        MR. REILLY:  Objection.  Assumes a fact not in evidence.

        THE COURT:  Overruled.

        THE WITNESS:  It appears that Melissa is posing.

BY MS. PRIEDEMAN:

Q.    And that's because Melissa was posing for you; right?

A.    Not that I'm aware of.

Q.    You told her not to move?

A.    That is an assumption on your part.  I never made that statement.

Q.    You told her you were taking a picture?

A.    Absolutely never told her I was taking a picture.

        MS. PRIEDEMAN:  All right.  Ms. Slattery, you can take that down, please.

Q.    All right.  Mr. Garcia, then, I believe you testified that you took another picture of Melissa; correct?

A.    That is correct.

Q.    And you were trying to document her face; is that right?

A.    That is correct.

Q.    You didn't tell her to get dressed before taking that picture?

A.    My exact words were something to the effect, "What the fuck are you doing?  Get your ass up.  Get dressed."

She stood up.  I took the picture of her face, slammed the door and said, "Pack your shit.  You're going to the hole."

Q.    Wouldn't the appropriate thing to have done was to ask her to get dressed, maybe close the door, come back and take a picture when she was dressed?

A.    How would I document that that is the same inmate that was posing naked if she was dressed?

Q.    Mr. Garcia, you'd already taken a picture of her on all fours, naked on the bed; right?

A.    Without the view of her face, how do you identify that that's inmate Melissa?

Q.    You could have gone back and taken a picture of her face, fully clothed.

A.    A fully-clothed picture of her face doesn't show a violation of a prohibited act.

Q.    At that point, Mr. Garcia, you knew who she was.  You knew she was naked, and you could have written up a report; right?

A.    When she stood up, I knew who she was because I could see her face.  In order to document that the same person that was standing up was the person that was on all four, I took a second picture because you can clearly see from those two pictures, it's the same cell and that's -- the person that was on all four was now standing, and we could see her face.

Q.    And at that point, you didn't think that was a violation of her privacy?

**A.**   She violated Bureau of Prisons regulations.  I documented that violation, and in documenting it, she could have seen the UDC or DHO.  But because the incident report would only have leveled up to a moderate 306 series, I could formally resolve it, to which I cultivated an informant, which is also permissible in the Bureau of Prisons.

**Q.**   Couldn't you have just taken the first picture and then just taken a picture of her fully-clothed with her face and put that in your incident report?

**MR. REILLY:**  Argumentive, Your Honor.  Also been asked and answered about five times already.

**THE COURT:**  I agree.  Sustained.

**BY MS. PRIEDEMAN:**

**Q.**   You said you yelled at Melissa and told her to put clothes on; correct?

**A.**   Correct.

**Q.**   Was she upset?

**A.**   She didn't make any comment.  She did not speak.  She did not make any motion.  And I believe that's because she understands that making the comment would be a proposal, and making a motion would be action, making her prohibited act violation either a 205 or 206, which would then would be required to be seen by unit management and the UDC and not allow for informal resolution.

**MS. PRIEDEMAN:**  Ms. Slattery, can you please pull up

Exhibit 56.

Can you please redact this picture.

Your Honor, may we publish to the jury, please?

THE COURT:  You may.

MR. REILLY:  No objection.

BY MS. PRIEDEMAN:

Q.  This is the second picture you took, correct, Mr. Garcia?

A.  Correct.

Q.  After you yelled at Melissa?

A.  Correct.  To get up, and she did.

Q.  She is smiling in this picture, isn't she?

A.  She is.

Q.  She doesn't look upset?

A.  She doesn't.  Which lends to her knowledge that she was doing something prohibited.

Q.  You were doing something prohibited, too, weren't you, Mr. Garcia?

A.  Negative.  I'm documenting a prohibited act as allowed in policy.

MS. PRIEDEMAN:  Ms. Slattery, you can take that down, please.

Q.  All right.  Mr. Garcia, you testified that you took this picture between 10:40 and 12:00.

A.  I said I recall it being sometime in that time frame.  I don't know exactly for sure.  We're talking about something

that occurred several years ago.  I know it was before the lunch meal.

Q.    What time would you usually leave FCI Dublin?

A.    As close to 2:00 p.m. as possible.  Early, if possible.

Q.    So you had several hours that you could have gone back to your desk and written up an incident report?

A.    No.  So after the meal, which was running probably 30 minutes late, the warden called myself, as the ACA coordinator and the PREA coordinator, to a meeting to discuss our upcoming audit.  And then I went back to my office.

        As I spoke to you earlier and told you, you cannot plug items into your computer without computer services first installing that program.  If you do, it will shut your computer down and kill it, and it will alert the computer services.

        So as our meeting -- as lunch was, like I said, late -- so I'm just using assumed times.  If lunch was a half hour late, then it wouldn't be over until 12:30, quarter to 1:00.  We had our meeting with the warden.  There would not have been enough time to have computer services come to my office, install the program, download the information and be on the road before 2:00 p.m.

Q.    So you didn't tell anyone that you had taken this picture at that point?

A.    No, I did not.

Q.    You didn't say, "Hey, can someone come to my office

tomorrow and help me upload this picture I took on the CMS computer" -- I mean "camera"?

A.    On that day, no.  I took the camera with me so that the item was not left in the institution.

Q.    Was Ms. Millikin Melissa's unit manager at that time?

A.    I don't know.  I'd have to see her assignments.  She could have been.

Q.    Did you tell Melissa's unit manager about what had happened at that time?

A.    No.

Q.    Did you ever tell her unit manager?

A.    Why would I tell a unit manager about a discipline issue?

Q.    Mr. Garcia, I thought earlier you testified that discipline was within the scope of the unit manager; correct?

A.    The UDC, if it would have been processed, would have been chaired by somebody in the team to include the counselor, case manager, or in this case, what you are referencing is Ms. Millikin.  If I had processed the incident report to be UDC'd, which is unit disciplinary committee.  I didn't.  I cultivated an informant by informally resolving the institution -- the incident report.

Q.    Well, at that point, you hadn't decided what you were going to do with the incident report; right?

A.    If we are talking about the day it occurred, yes, I had not decided what I was going to do with the incident report.

Q.   You didn't think it was appropriate to let Melissa's unit manager know that one of his or her inmates was acting inappropriately?

A.   It would not have been Melissa -- it would not have been the unit manager that would have been notified.  If I wanted corrective action, as far as you're leading toward placement in the SHU, it would have been the captain.

Q.   You didn't tell the captain at that point, did you?

A.   No.  I did not tell the captain.

Q.   Did you ever tell the captain?

A.   No.  I never told the captain.

Q.   So you didn't report it to anyone.  Instead, you took home the CMS camera and downloaded the photograph to your personal computer; right?

A.   I took the CMS camera home, as I have testified, and because I had the ability to then download it and crop it, I did the work from home as I often do work from home.

Q.   And you testified that you cropped both photographs; right?

A.   I believe I had cropped both photographs.  The second cropping was to remove Melissa's vagina from the full-size picture, and just give her upper body with her face.

Q.   Let's talk about that.

        MS. PRIEDEMAN:  Ms. Slattery, can you please pull up Exhibit 52 and redact it appropriately.

Your Honor, may we publish this exhibit to the jury?

THE COURT:  You may.

BY MS. PRIEDEMAN:

Q.   This is one of the photographs that you cropped, Mr. Garcia; right?

A.   Yes.

Q.   You didn't crop out Melissa's genitals from this picture, did you?

A.   No.  I would have redacted it if it was going to go into the incident report, but I don't have the skill that you have there.  All I did was shrink or expand the picture by dragging and pulling.

Q.   You didn't redact it at that point?

A.   No, I did not.

Q.   You didn't crop the photo so that you could still see the top half of Melissa's body, but that it would protect her privacy and exclude her genitals, did you?

A.   As I testified, I cropped this picture to remove myself from it.  The first crop was a very large picture of Melissa and her genitalia.  And so then I took a second crop to back it out, which showed the cell area so that I could show that the two pictures were in the same cell.  I did not do what you're doing here as I don't have that skill set.

Q.   Sorry, Mr. Garcia.  I'm having a hard time understanding.

Were you planning on attaching both versions of the

photograph to the incident report?

A.    I was planning on attaching both photos to the incident report.

Q.    But you wanted to not attach the version that you were included in?

A.    Correct.

Q.    But the incident report would have had your name on it; right?

A.    Certainly.

Q.    There would have been no question that you were the one who took this photograph?

A.    It wasn't a matter of me taking the photograph.  It was a matter of me being scanned into her permanent central file.  I didn't want -- need my image in her central file.  We don't put staff images in central files.

Q.    Mr. Garcia, you also testified that you were concerned about Melissa being in another inmate's cell; right?

A.    She was in another inmate's cell, yes, and that is a prohibited act as well, also a moderate prohibited act, 300 series.

Q.    You would have included that in the incident; report?

A.    Could have included it, but the unit team doesn't look at stacking.  If they are all the same incident and they are all in the same code, then you don't just compound discipline on those codes.  It would be stacking the charges.  She would get

UDC'd or committeed [sic] on a charge.

Q.   But that was one of the violations you were considering?

A.   Yes.

Q.   In this picture that we're looking at that you cropped, you can't see Andrea's cell number anywhere, can you?

A.   No.

Q.   That information would have been important for your incident report; right?

A.   It wouldn't be relevant.  She's naked in a cell.  It would only be relevant if I was charging her with the out of bounds.

Q.   Which you just said you were considering that violation?

A.   Considering.  If we are using the word "considering,"  I did not write the incident report for out of bounds.  An out of bounds is 310, a sexual exposure -- I'm sorry -- an indecent exposure is 306.  The higher incident report carries the weight.  The rest fall off.

Q.   Wouldn't you want to include as much information as possible in the incident report, Mr. Garcia?

A.   The information in regards that supports the charge, yes. If I'm not charging with being out of bounds, there is no reason to annotate the out of bounds.

Q.   Didn't cropping this photograph to focus on Melissa's vagina violate her privacy even further?

A.   Cropping it showed Melissa as a person, posing.  It's not specifically cropped to her vagina.  If it was cropping her

vagina, I could have expanded the picture to be nothing more than her vagina.  Cropping the picture was to remove my image from the photo so that it would not be scanned and become part of the central file.

Q.   And because you didn't want anyone to know that you had taken this picture; right?

A.   No.  Because I didn't want to be scanned into the central file.  We don't put images of staff in inmate central files.

Q.   You wanted to keep this photograph on your computer, but you were concerned that you might get in trouble; right?

A.   No.  This is an inmate doing something prohibited.  I documented that.  I wrote an incident report.  I gave the inmate an opportunity to informally resolve to which she agreed to be an informant.

        MS. PRIEDEMAN:  Ms. Slattery, can you please pull up Exhibit 51.  Can you redact this photograph as well, Ms. Slattery.

    May we publish to the jury, Your Honor?

        THE COURT:  You may.

BY MS. PRIEDEMAN:

Q.   Mr. Garcia, this is a photograph -- this is the cropped -- second cropped photograph; right?

A.   It appears to be the second cropped photograph, yes.  It's the second photograph.  I don't know which is the cropped and which is not.

**Q.**   You testified that you cropped this to try to exclude Melissa's vagina; right?

**A.**   Correct.

**Q.**   But you left her breasts in the photo; right?

**A.**   It shows the prohibited act with her face attached.

**Q.**   You couldn't have cropped it head up to show that she was not wearing any clothes but protect her privacy at the same time?

**A.**   Privacy is protected by redacting as you just did.

**Q.**   Which you didn't do, Mr. Garcia?

**A.**   Which I didn't do on my computer because I don't know how to do what you just did, other than taking a marker and blacking it out, which is how we redacted -- which is how I redacted genitalia of male inmates when I caught them doing prohibited acts as well.

        **MS. PRIEDEMAN:**   You can take that down, Ms. Slattery. Thank you.

**Q.**   Mr. Garcia, you testified that you drafted an incident report; correct?

**A.**   I typed an incident report, yes.

**Q.**   But you never actually submitted it?

**A.**   No, I did not.

**Q.**   You never showed it to anyone?

**A.**   No, I did not.

**Q.**   Where is that draft report, Mr. Garcia?

**A.**    It was just typed, printed and shredded with the printed pictures when we came to an agreement that she was an informant.

**Q.**    Did you save it on your computer?

**A.**    No.  Because the format that I have in my home computer is very old.  The institution, the agency, has gone to a new format, so I drafted the information that I needed, looked at the incident report codes to determine where it was going to fall.

I had 24 hours by policy to serve an inmate so I had to get this done first thing in the morning, which I did in the first movement.  There was no saving it.  I would have had to have retyped it at work and put it into the electronic portion of the computer system for discipline.

**Q.**    And you didn't retype it when you got to work?

**A.**    Again, I met the inmate.  I gave her an opportunity.  She took the opportunity to be an informant, and I did not retype the incident report.

**Q.**    Did you give a copy of the incident report to the captain?

**A.**    No.

**Q.**    To the lieutenant?

**A.**    No.

**Q.**    To the other associate warden?

**A.**    No.

**Q.**    You didn't give it to anyone?

**A.**    No.   There was no reason to.

**Q.**    You didn't tell any of them about the report either, did you?

**A.**    I didn't tell anybody about the report.  I did tell SIS Lieutenant Putnam that I had cultivated a snitch, and I asked him if he wanted a memorandum, to which he said, "No, boss. You do you."

**Q.**    But you didn't tell him that you had caught Melissa naked and written up an incident report?

**A.**    Again, I told him I cultivated a snitch and asked him if he wanted a memorandum detailing it, to which he said no.

**Q.**    Did you print the incident report at home?

**A.**    Yes.

**Q.**    And you just didn't save it on your computer?

**A.**    There would be no reason to a save it on my computer.  I had to retype it into the new format once I got to the institution if it was going to be processed.

**Q.**    So you didn't tell AW Mischel about finding Melissa naked; right?

**A.**    I told AW Mischel that I had a problem with inmate Melissa.  And AW Mischel and I had a conversation about her mental health concerns and the fact that she had counseled or provided counseling to Melissa before.  And AW Mischel told me that would have been useful in the past to provide information.

**Q.**    What type much information, Mr. Garcia?

**A.**    I didn't ask Ms. Mischel what information she had gained from her confidential informant as she doesn't ask me of mine.

**Q.**    Information about other inmates?

**A.**    Again, I did not ask Ms. Mischel as to the contents of the information that inmate Melissa provided to her.

**Q.**    So, Mr. Garcia, you testified that you wrote this incident report, that you didn't show it to anyone; right?

**A.**    Correct.

**Q.**    You didn't save it anywhere?

**A.**    No.  There was no reason to save it.  It had to be retyped in the new format. I testified to that.

**Q.**    You didn't upload it to the central database?

**A.**    No.  I would have had to have retyped it at work for it to be uploaded in the central database.

**Q.**    So you didn't show it to anyone?

**A.**    Again, I did not show it to anyone.

**Q.**    And then you shredded it?

**A.**    Once Melissa agreed to the terms of providing information and began providing information, yes, I shredded it.

**Q.**    Who else did you tell that Melissa was going to provide information to you?

**A.**    I just told you that I told Mr. Putnam I had cultivated an informant.  He did not want a memorandum, and so I just provided him information without the identity of the informant.

**Q.**    Is it BOP policy to document who inmate informants are?

**A.**   It is BOP policy for the SIS department to document informants as to which I asked him if he wanted a memo of my informant.  And I asked him each time I gave him information if he wanted the memo of the informants.

**Q.**   At that time, you were still the associate warden; right?

**A.**   That is correct.

**Q.**   You didn't think it would be appropriate that maybe even if Lieutenant Putnam didn't want a memo, that you should probably document it?

**A.**   At the time, Mr. Putnam was seeking to have an extension of his mandatory retirement.  By giving him information that led him to solve problems, it helped in his bid for that request to extend his employment.  Myself and the other correctional staff supported his requests, and so we lend him aid.  And I did not report memos.

**Q.**   You didn't think it might be a good idea that you should document this deal you had brokered between yourself and Melissa?

**A.**   I've had many informants in my 30 years in the Bureau of Prisons, and not all of that information is officially documented.  Some of the information provided is just personal complaints.  Some of it led to investigations.  Some of it, actually, she reported the COVID outbreak to myself and medical staff.  So some of it was very useful to maintain the safety of the institution.  In each of those cases, I provided the

information to the SIS lieutenant and asked him if they wanted a memorandum. And if they did not, I didn't provide it. It was maybe a mistake in judgment, but it wasn't a violation of policy.

Q. How did you provide that information to Lieutenant Putnam?

A. Either a phone call. Or if I saw him -- he didn't make rounds very often, but if I saw him, I could tell him or just give him a phone call and tell him what was going on.

Q. Did you ever email it?

A. Don't recall. I don't have access to my email accounts. That was two years ago.

Q. You didn't think it would be a good idea to document somewhere that you had taken naked photographs of an inmate and then in exchange for not writing an incident report, she had agreed to cooperate?

A. We just answered that question, Ms. Priedeman. I took the photographs. I made the deal with the inmate. I advised the lieutenant that I had an informant. He not did request a memorandum. I did not provide a memorandum.

Q. But you didn't tell him that you had taken naked photographs of the inmate; right?

A. No.

Q. Are you trained -- if you see misconduct, you're supposed to write an incident report; right?

A. There is a level of incident reports that can be formally

resolved.  That's level 300s and 400s.  I don't know that the policy says that you are absolutely mandatory to write an incident report for every infraction that you see.

Q.   You heard Dr. Malespini's testimony, though, that when you see an inmate who is naked or acting inappropriately, by policy, you are supposed to write an incident report; right?

A.   I heard Dr. Malespini say that if you see an inmate committing a PREA act, that you're supposed to write an incident report; correct.

Q.   And those reports are saved in a central system?

A.   Incident reports or PREA reports?

Q.   Incident reports.

A.   Yes.

Q.   So if you had written an incident report for Melissa, it would have been saved in the central system?

A.   Yes.

Q.   But you didn't, so it's not saved in the central system?

A.   Correct.

Q.   In fact, you heard testimony that Melissa was actually never disciplined; right?

A.   Correct.

Q.   She didn't get a single shot?

A.   Correct.

Q.   She never went to SHU?

A.   Correct.

Q.   So this incident report, that would have been the first incident report you had ever written.  It also would have been the first incident report that Melissa ever would have received; right?

MR. REILLY:  Objection, Your Honor.  Assumes facts not in evidence and misstates the witness' testimony.

THE COURT:  Well, it's compound.  I don't know that I agree with the other.

Rephrase.

BY MS. PRIEDEMAN:

Q.   Mr. Garcia, you previously testified that, as associate warden, you never submitted an incident report; right?

A.   Correct.

Q.   As warden, you never submitted an incident report?

A.   Correct.

Q.   So this would have been your first incident report?

A.   It would have --

MR. REILLY:  Objection.  Misstates the witness' testimony.

THE COURT:  Overruled.  He can answer.

THE WITNESS:  I did not write an incident report as associate warden while at Dublin.  I did not write an incident report as warden at Dublin.  I've written many incident reports as associate warden in another facility and in all of my other levels in corrections.

BY MS. PRIEDEMAN:

Q.   And Melissa never received an incident report; right?

A.   That is her testimony.  Without running a PD15, which is a SENTRY transaction to look at her disciplinary report, I don't know.

Q.   We saw those documents previously.  You would like me to show them to you?

A.   If they were admitted, then they must be true.

Q.   So this would have been Melissa's first incident report too; right?

A.   Yes.  But I would not have known that until you showed her the reports.

Q.   Yesterday you testified that if you saw an inmate acting inappropriate or naked, you would just walk by; right?

A.   No.  You are taking that out of context, Ms. Priedeman.  I said that if I was making rounds and an inmate was naked in her cell, that is the cell where they change after showering, coming back from recreation, getting up in the morning, that I would walk by.

Q.   You were interviewed by federal agents on July 22, 2021.  Do you remember that?

A.   Yes.

Q.   Now, earlier today, you testified that you believed that interview was not voluntary; is that right?

A.   I said that the interview is stated as voluntary.  Refusal

to comply to it is grounds for dismissal.

Q.   So you thought you would be disciplined if you didn't talk to the agents?

A.   Not thought.  It's in the policy that if you refuse to comply with an OIG interview, you are subject to removal.  The form can say what it wants.  The policy for discipline says something else.

Q.   During the interview, you were told up front that no disciplinary action would be taken against you; right?

A.   That's what the agents said.

        MS. PRIEDEMAN:  Ms. Slattery, can you pull up Exhibit 164, please.

Q.   Mr. Garcia, this is the form that you signed as part of that interview with federal agents; right?

A.   Yes.

        MS. PRIEDEMAN:  Your Honor, the Government would move to admit Exhibit 164.

        MR. REILLY:  No objection.

        THE COURT:  164 is admitted.  It can be published.

        (Government's Exhibit 164 received in evidence)

BY MS. PRIEDEMAN:

Q.   Mr. Garcia, do you see the text in the middle, it says, "This is a voluntary interview.  Accordingly, you do not have to answer questions.  No disciplinary actions will be taken against you if you choose not to answer questions."

Do you see that in?

A.    I see it now.

Q.    And do you see your signature and your name?

A.    Yes.

Q.    And right above that, it says, "I understand the warning and assurances stated above, and I'm willing to make a statement and answer questions"?

A.    I see it now, but I was not provided the opportunity to read these documents at the time of the interview.

        **MS. PRIEDEMAN:**  You can take that down, Ms. Slattery.

Q.    Mr. Garcia, during the interview, you were essentially read those same words; correct?

A.    Yes.

Q.    And you were told it's a voluntary interview, and no disciplinary actions will be taken against you?

A.    Yes.

Q.    And then you were asked if you had any questions about the form?

A.    I was asked this, but to put it in context, I was taken from my car at 5:30, driven up a mile to human resources, strip searched and discussing this interview with the agents within 10 minutes.  They put seven or eight forms in front of me that I had to sign.  I was not provided an opportunity to read the forms or the search warrant before questions were started, and that's evident on your timestamp of the interview.

Yes.  I was read the warning at that point, but in my mind frame, I was more paying attention to trying to read the warrant and understand what was going on.

Q.  During that interview, Mr. Garcia, you were asked if you ever noticed inmates acting inappropriately or trying to be sexual; right?

A.  Yes.  If it's in the transcript, that's what I was asked.

Q.  And you said, "They will probably attempt that, but I mean, I'm making rounds.  I just keep moving."

Right?

A.  Correct.

Q.  During that interview, you were also asked whether you had seen inmates undressing; right?

A.  Yes.

Q.  And you said, "There will times when you're walking, and women will be undressing and you just keep walking."

A.  Yes.

Q.  And then later you said, "I've seen the women as I'm walking if they're dressing.  Yes.  It happens."

And then Special Agent Barclay asked if you stopped and look; right?

A.  Yes.

Q.  And you said no?

A.  Yes.

Q.  But that wasn't true; right?

**A.**    In the instance of assuming or presuming that people are cutting up narcotics or doing contraband, I acted on the discipline rather than the -- what you're discussing.  What we were discussing was making rounds and seeing inmates as I pass through a three-inch window.

We weren't talking about an inmate being in a cell that was -- I know to be empty Monday through Friday -- sorry -- Monday through Thursday and that cell then being occupied, which leads a correctional mind to believe that a prohibited act is being committed in that cell.

**MS. PRIEDEMAN:**  Ms. Slattery, can you please pull up Exhibit 55 again and redact it appropriately.

Your Honor, may we publish to the jury?

**THE COURT:**  You may.

BY MS. PRIEDEMAN:

**Q.**    You had to stop and take this picture of Melissa; right?

**A.**    I stopped, swung the door open and took a picture in a pretty much single motion, yes.  After -- after I had knocked on the door, told the occupant to take the covering down to which they did not.

**Q.**    When you saw her naked, you didn't just walk by?

**A.**    The difference between seeing an inmate naked as you're doing rounds in their three-inch window as they're dressing innocently or doing what they do and a person covering up a cell and posing on all four is normal life versus prohibited

act.

**Q.**    You didn't keep moving?

**A.**    Again, the difference between moving and making rounds and glancing in and seeing a cell, doing -- an inmate in a cell, dressing in their cell versus an inmate who was told to take the covering down, does not take the covering down and when you open the door, they are posed, is a disciplinary prohibited act.  You are trying to make them the same.  Yet they are not.

**Q.**    You're not answering my question.

**A.**    I am answering your question.

        **THE COURT:**  Answer the question.  Say it again.

        **THE WITNESS:**  Rephrase your question or ask again, please.

**BY MS. PRIEDEMAN:**

**Q.**    You didn't keep moving?

**A.**    I did not keep moving.  I took a picture of a prohibited act.

**Q.**    You stopped?

**A.**    I did stop.

**Q.**    You looked?

**A.**    I took a picture.

**Q.**    You got out your phone, and you took a picture; right?

**A.**    I did not get out my phone and take a picture.  We have already established that I did not take a picture on my government or personal phone.

**Q.**    During that same interview, you were asked if you ever took pictures of inmates; right?

**A.**    Yes.

**Q.**    And you said that you take pictures of their IDs?

**A.**    I said that I took pictures of inmates to include their IDs.

**Q.**    "And if they're trying to show me something, like an inmate has a rash"?

**A.**    There is one inmate in particular, it's the inmate Katrina we're speaking of that constantly wants to show us her rash, seeking medical attention, yes.

**Q.**    I want you to take a look again at Exhibit 55.  This isn't a picture of an inmate's ID, is it?

**A.**    No.  It's a picture of an inmate committing a prohibited act.

**Q.**    There is not a rash that you were documenting?

**A.**    Prohibited act.

        **MS. PRIEDEMAN:**  Ms. Slattery, can you please pull up Exhibit 52.  Please redact it, Ms. Slattery.

**Q.**    Mr. Garcia, this also isn't a picture of an inmate's ID, is it?

**A.**    It is a cropped copy, removing my image from an inmate committing a prohibited act.

**Q.**    There's no rash?

**A.**    Again, it is a cropped copy of a picture of an inmate

committing a prohibited act.

MS. PRIEDEMAN: Ms. Slattery, can you please take that down.

Q. Mr. Garcia, when you were asked by the federal agents about taking photographs of inmates, you didn't mention this picture of Melissa, did you?

A. No.

Q. In fact, you didn't mention Melissa during this entire interview?

A. I wasn't asked about Melissa in the interview.

Q. You were asked if you had ever taken a picture of an inmate, weren't you, Mr. Garcia?

A. And I answered that I had taken pictures of inmates.

Q. You didn't say that you had taken naked pictures of Melissa to document misconduct, did you?

A. I didn't get specific. I gave general occasions when I take pictures of inmates as the questioning was leading to try to get me to say something to incriminate myself.

Q. Because if you had answered honestly and told the agents that you had taken a naked picture of Melissa, that might have incriminated you; right?

MR. REILLY: Objection. Argumentive.

THE COURT: Not the way it was phrased and given his prior answer.

Go ahead and answer the question.

THE WITNESS:  I was not asked about that type of picture.  I was asked if I took pictures.  I responded that I had took pictures.  I did not specify any inmate in the picture.  And as far as incriminating myself, I chose not to answer questions that would lead people to believe that I had done a criminal act without representation, which is my legal right.

BY MS. PRIEDEMAN:

Q.   Because you knew you had taken that picture of Melissa, not to document misconduct; right?

A.   Incorrect.

Q.   You took that picture because it aroused you, didn't you?

A.   No, it did not.  I have plenty of pictures that I can use for arousal with free woman that I could see any day of the week.  I do not need a picture of an inmate to arouse me.

Q.   One of the agents also asked you if you could think of a particular inmate who had intentionally undressed when you were walking by; right?

A.   I would have to see the transcript.  If you are saying so, yes.

Q.   Do you want me to show it to you, Mr. Garcia?

A.   Yes, please.

        MS. PRIEDEMAN:  Your Honor, may I approach?

        THE COURT:  You may.  Let Mr. Reilly know what you're doing.

BY MS. PRIEDEMAN:

Q. Mr. Garcia, Special Agent Crowe asked you, "So nothing comes to mind as to, like, specific inmates who might, you know, intentionally undress, knowing that a particular CO or AW or you are walking through?"

And you said, "I'm sure there are."

And then Special Agent Crowe said, "But I'm just asking to your knowledge."   And she said, "Do you know any, in particular?"

And you said, "Hmm"; right?

A. Correct.

Q. You didn't say Melissa?

A. Oh, there are many, and I didn't discuss any of them at all.  But there are many.  If you would like, I can name them to you now.

Q. You didn't think it was appropriate to name Melissa at that point?

A. He asked a general question.  I gave a general answer.  He did not ask a specific question and did not seek a specific answer.  He said, "Do you have anyone in mind generally."

There are 1,200 inmates at that institution, and several were under investigation for inappropriate acts.  We had just finished an investigation on the previous inmate that testified here for compromising an officer.

MS. PRIEDEMAN:  Objection, Your Honor.

THE COURT: That's enough.

Keep going. Next question.

BY MS. PRIEDEMAN:

Q. You didn't name Melissa, did you?

A. I did not name any inmate.

Q. You didn't name Maria?

A. I did not name any inmate.

Q. You didn't name Katrina?

A. I did not name any inmate.

Q. In May of 2021, Melissa's request to be moved to a camp facility was approved; right?

A. Yes.

Q. You testified that someone else signed that document because you were out; is that right?

A. Yes.

Q. But you are aware that Melissa was requesting a transfer to the camp?

A. She made it aware to everybody that she wanted to go to camp. I did not know there was an act of transfer routing. Again, during those months, I was spending three weeks at a time in Washington, D.C.

Q. You testified yesterday that she had been asking you about Victorville for a while; right?

A. She had been asking myself and her unit team about transferring to Victorville; correct.

Q.   And that was -- that started when you were an associate warden?

A.   It started when I was associate warden.

Q.   So even though you didn't sign that approval paperwork, you were aware of her request; right?

A.   I was aware of an ongoing request by Melissa to be transferred to Victorville.  It was an ongoing request to have her management variable removed so that she would be eligible for camp and she preferred to go to Victorville, yes.

Q.   You told her you would sign off on it, didn't you?

A.   No.

     **MS. PRIEDEMAN:**  Ms. Slattery, can you please pull up Exhibit 60.

     **THE COURT:**  Previously admitted.  You can publish.

     **MS. PRIEDEMAN:**  Thank you, Your Honor.

**BY MS. PRIEDEMAN:**

Q.   Mr. Garcia, that's your name in the upper left-hand corner; right?

A.   Correct.

     **MS. PRIEDEMAN:**  Ms. Slattery, can you zoom in on section 5, please.

Q.   That says, "Note any past or present behavior and/or management/inmate concerns."  Right, Mr. Garcia?

A.   Correct.

Q.   And it says, "No behavior or management concerns."

**A.**    That's what's typed there.

**Q.**    This form doesn't say anything about the fact that Melissa had been naked in her cell?

**A.**    The form was not completed by me, nor did I tell somebody that I had cultivated an informant.

**Q.**    You never saw this form, Mr. Garcia?

**A.**    No.

**Q.**    When you -- when you came back from your trip, you said Melissa was already in the camp; is that right?

**A.**    That's what I said, but I can't be one hundred percent sure as this was a long time ago, and, again, I didn't seek out specific inmates.  So it's not like I came home and went to see anybody.

**Q.**    At some point, you were made aware that Melissa had been transferred to the camp?

**A.**    Yes.

**Q.**    And you were onboard with that transfer?

**A.**    Again, it was routed by the team in the proper format requested by the case manager, approved by the unit manager, certified by the associate warden and signed by the acting warden.  I had no say here or there about it.

**Q.**    You didn't disagree that she shouldn't be transferred to camp; right?

**A.**    If her management variable was removed and her points allowed for her placement in a camp, then I have no opinion one

way or the other if she goes to a camp.  The form was completed appropriately.  It was signed.  It was sent to the designation computation center.  They approved the transfer, and they designated her to the appropriate facility.

Q.    When you learned that she had been transferred to the camp, you didn't try to reverse the transfer; right?

A.    No.  I would have no reason to do anything with the transfer.  Again, I have no concern on what the unit management does as long it's done correctly, formatted, signed appropriately and approved by the DSCC.  You keep acting like it's the warden's job.  It is not.  The Designation Computation Center in Grand Prairie, Texas, approves and designates inmates.

Q.    But the warden first has to approve of a request; right?

A.    The warden approves that the request was completed appropriately and that it's been reviewed appropriately, yes.

Q.    And if the warden disagrees with the transfer request, the warden can say that; right?

A.    Then the warden documents why they disagree, and it's routed back to the other team for corrections or cancellation.

Q.    Earlier, Mr. Garcia, you testified that if an inmate had disciplinary concerns or behavior concerns, they might not be appropriate for camp; right?

A.    I testified that, yes, if they had disciplinary concerns or even custody concerns, again, that's a unit management

function.

Q. And you didn't think it would be appropriate to raise to the unit managers that you had seen Melissa being allegedly inappropriate?

A. Melissa was inappropriate. It was documented, and she was cultivated into an informant. I was not aware that the unit management was even doing this. As we've already stated, this was done while I was gone, and I did not sign it. I do not keep track of every transfer in progress at FCI Dublin.

Q. Mr. Garcia, you said Melissa's inappropriate conduct was documented. Are you referring to the fact that you took photographs and never showed them to anyone?

A. I said that it was documented?

Q. I believe that's what you just said, Mr. Garcia?

A. I said if -- I'm sorry. Let me restate my answer.

If it was documented in the proper format, I would -- the unit management would have put it here. I did not tell them anything. I documented the incident report, shred it as I cultivated an informant. This form, again, was completed in my absence and signed by somebody acting in my capacity. I had no knowledge of this.

Q. When you got back, you didn't say, "Whoa, whoa, whoa, Melissa has been inappropriate. Let's get her back to prison."

A. Okay. I understand what you're saying now.

One 300 series shot at the moderate level would not have

been enough to stop the transfer if it had been past 12 months.

**Q.**   But you never told the unit manager about this conduct whatsoever; right?

**A.**   No.   The transfer had already been effectuated, and the 300 series shot would not have stopped the transfer.   So there was no reason to tell the unit manager.

           **THE COURT:**  All right.

           **MS. PRIEDEMAN:**  This is a good time stop.

           **THE COURT:**  We will end the proceedings today. Members of the jury, I know you know this, but I still -- it's the weekend.  So I'm going to go ahead and give you the formal reminder not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in trial or anyone.

      And do not let anyone speak to you about this case.  That involves discussing the case on Internet chat rooms or through blogs, Internet billboards, emails, text messaging.  If anyone tries to communicate with you, please contact the Court and let me know.

      Do not read or listen or watch any news reports or any accounts of the trial, including any online information.  As I've mentioned to you before, you've heard it all.  You're the ones who are listening.  You have the best seats in the house so you don't need to have anybody else's opinion.

      Do not do any research such as consulting dictionaries,

using the Internet or researching materials.  Do not make any investigation about the case or any of the people mentioned or any of the places mentioned.  Keep an open mind until all the evidence has been presented and you have heard the arguments of counsel, my final instructions on the law, and the views of your fellow jurors.

Now, we are progressing more quickly, which is always a good -- well, not necessarily a good thing.  It's just a fact.  So I anticipate that evidence will close the beginning or no later than midweek, and then we'll go into closing arguments.

During closing arguments, I don't like to just stop at 1:40, and I don't like to do that because it breaks up the argument.  So my preference is to do, kind of like we did jury selection, we'll go all day.  We'll bring in lunch.

Does anybody have -- and I think argument, you know, between the two sides might take a day, maybe two.  I don't know.  And then you'll go straight into deliberations.

Does anybody have problems with that schedule?

**A JUROR:**  Not a problem.  Just want to know what day specifically, so I can just set up my calendar for work.

**THE COURT:**  Okay.  I should be able to know by --

**A JUROR:**  I just need to know if I need to block out the whole day for work Thursday and Friday.

**THE COURT:**  I'm hopeful I will know by Monday.  Okay.  Anybody else?  Okay.  Yes.

A JUROR: So by Monday, we should be out in the afternoon? I asked again --

THE COURT: So on Monday, we'll finish at the normal time. But by Monday, I should have a better sense of where we are and when -- you know, if it's going to be Tuesday or Wednesday or Thursday when we're going to go all day. Okay?

All right. Any other questions?

A JUROR: That goes until 4:30?

THE COURT: Right. 4:30. Okay. Anything else? Great.

Is anybody going to try to go to Tahoe and ski? I heard like three feet at the summit and about a foot and a half in Truckee or so. So for skiers, it's a great weekend. Just don't get stuck in the snow coming back if you head up there. Okay? All right.

Everybody have a great weekend. We'll see you on Monday.

(Proceedings were heard out of presence of the jury:)

THE COURT: All right, Mr. Garcia. You may step down.

As I mentioned, I should have a draft of jury instructions to you. There will be placeholders for the consent instruction. I am not giving the jury a copy of the indictment, so you'll see some minor modifications.

There are some explicit strikeouts so that you can see where you asked me to include language and where I just don't think it's appropriate given where we are so that it's very

transparent.

But I should have those to you, you know, like I said, pretty quickly so that you have time over the weekend to review them.

Any questions?

**MS. PRIEDEMAN:**  No.  Thank you, Your Honor.

**MR. REILLY:**  No, Your Honor.  Thank you.

**THE COURT:**  All right.  Then we will stand in recess until 8:00 a.m. on Monday morning.

(Proceedings adjourned at 1:45 p.m.)

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Friday, December 2, 2022

*Pamela Batalo Hebel*
_____
Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
U.S. Court Reporter