**Volume 7**

**Pages 1120 - 1261**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

UNITED STATES OF AMERICA,           )
                                    )
          Plaintiff,                )
                                    )
   VS.                              )          **NO. CR 21-00429-YGR**
                                    )
RAY J. GARCIA,                      )
                                    )
          Defendant.                )
_____    )

                          Oakland, California
                          Monday, December 5, 2022

                **TRANSCRIPT OF TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                    **STEPHANIE M. HINDS**
                    United States Attorney
                    1301 Clay Street, Suite 340S
                    Oakland, CA  94612
               BY:  **MOLLY PRIEDEMAN**
                    **ANDREW PAULSON**
                    **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:
                    SUMMIT DEFENSE, APLC
                    4040 Civic Center Drive, Suite 200
                    San Rafael, CA  94903
               BY:  **JAMES T. REILLY, ESQUIRE**

Reported By:  Pamela Batalo-Hebel, CSR No. 3953, RMR, FCRR
              Official Reporter

y
y2
y3
y4
y5

# I N D E X

Monday, December 5, 2022 - Volume 7

|  | PAGE | VOL. |
|---|---|---|
| Defense Rests | 1215 | 7 |

**GOVERNMENT'S REBUTTAL WITNESSES**

|  | PAGE | VOL. |
|---|---|---|
| **BETTENCOURT, MICHAEL** |  |  |
| (SWORN) | 1215 | 7 |
| Direct Examination by Mr. Paulson | 1216 | 7 |
| Cross-Examination by Mr. Reilly | 1227 | 7 |
| **PUTNAM, STEPHEN** |  |  |
| (SWORN) | 1245 | 7 |
| Direct Examination by Mr. Paulson | 1246 | 7 |

**DEFENDANT'S WITNESSES**

|  | PAGE | VOL. |
|---|---|---|
| **GARCIA, RAYMOND (RECALLED)** |  |  |
| (PREVIOUSLY SWORN) | 1132 | 7 |
| Cross-Examination resumed by Ms. Priedeman | 1133 | 7 |
| Redirect Examination by Mr. Reilly | 1189 | 7 |

**Monday - December 5, 2022**                                    **8:00 a.m.**

                              **P R O C E E D I N G S**

                                   **---000---**

        **THE CLERK:**  Now calling Criminal Case 21-0429-YGR-1,
United States vs. Ray J. Garcia.

        Counsel, starting with the Government, please state your
appearance for the record.

        **MS. PRIEDEMAN:**  Good morning, Your Honor, Molly
Priedeman and Andrew Paulson for the United States.

        **MR. REILLY:**  Good morning, Your Honor.

        Jim Reilly of Summit Defense appearing on behalf
Mr. Garcia who is also present in court.

        **THE COURT:**  Okay.  So there was some communications
over the night.  I understand that things to discuss today are
the rebuttal testimony of Mr. Putnam.  And then we can quickly
review the jury instructions and the verdict form.

        Is there anything else?

        **MS. PRIEDEMAN:**  No, Your Honor.

        **MR. REILLY:**  No, Your Honor.

        **MR. PAULSON:**  Let's start with Putnam.

        Government?

        **MR. REILLY:**  Yes, Your Honor.  We intend to call
Lieutenant Putnam to talk about a couple discrete topics that
came up following Mr. Garcia's testimony on Friday.  We plan to
call him to talk about incident reports and the taking of

pictures and the taking of naked photos of inmates. We plan to call him to talk about confidential informants and this conversation that the defendant claims he had with Mr. Putnam regarding a confidential informant that he had cultivated.

And then we also plan to have Lieutenant Putnam talk about contacts with former inmates. This will all be directly in rebuttal to things that Mr. Garcia testified to on direct or cross.

In connection with this case, we produced all of the statements that involve Mr. Putnam that were relevant to this case. We did not plan to call him as a witness until Mr. Garcia took the stand and made statements that made his testimony relevant. And so out of an abundance of caution, we produced additional MOIs and 302s that are related to other investigations.

And so we produced -- just to give you a quick summary, we produced 65 files that were either MOIs or 302s or their attachments. Four of those we already produced. Fifteen of those, Mr. Putnam was just --

THE COURT: I know what 302s are. What are MOIs?

MR. PAULSON: I'm sorry. Memorandums of Interviews. So when DOJ OIG does an interview, they will write up a summary, and the 320 is the FBI's version of that. So when the FBI does an interview of, say, an inmate, they write up a summary.

So we produced everything where Lieutenant Putnam's name was mentioned, so that's, in total, 65 files.  Four were already produced in connection with this case.  Fifteen of them, Lieutenant Putnam was simply in the interview.  That's all.

We produced four additional interviews of Lieutenant Putnam, so the writeups for those interviews.

THE COURT:  Relative to this case or some other case?

MR. PAULSON:  Some other case.

Everything that we produced over the weekend minus two writeups were -- are relevant to other cases.  So his name was just mentioned in an interview.  And so we, out of an abundance of caution -- we don't think these are relevant.  We don't think they are *Brady* or *Giglio* or *Henthorn*.  But out of an abundance of caution, we produced them.  We did do *Henthorn* and *Giglio* requests for Lieutenant Putnam.  We already also produced those in connection with the normal discovery in this case.

THE COURT:  So that was all produced --

MR. PAULSON:  That was all produced, yes, your Honor.  And we did do at least one interview of Lieutenant Putnam that was relevant to this case, but we already produced that in discovery in the normal course of this case.

Now, the two MOIs or 302s that we produced this weekend were generated this weekend because we interviewed

Lieutenant Putnam in connection with his potential rebuttal testimony.

THE COURT:  Okay.

MR. PAULSON:  So we produced those as soon as they were prepared.

THE COURT:  How many pages were those two?

MR. PAULSON:  One of them was one page, and then the other was, I believe, four pages.

THE COURT:  Okay.

MR. PAULSON:  It may be five.

THE COURT:  Okay.

MR. PAULSON:  But his rebuttal testimony would be basically contained in those two summaries.

THE COURT:  Okay.  And when was this produced?

MR. PAULSON:  Those were produced -- the one page was produced earlier yesterday afternoon, and then the four to five-page writeup was produced yesterday evening.  Literally as soon as it was finalized, within minutes, we forwarded it to Mr. Reilly.

THE COURT:  Okay.  When did you let Mr. Reilly know that you were going to be calling Mr. Putnam?

MR. PAULSON:  Right after we conducted the interview with Mr. Putnam yesterday and made our formal decision, once we talked to him about the potential topics he could testify to.  So we got out of that interview.  We sent him an email, saying,

you know, "We're sharing this discovery with you, and we intend to call him as a rebuttal witness."

THE COURT:  Okay.  So Putnam is still in addition to the two other witnesses that the Government has?

MR. PAULSON:  Yes, Your Honor.  At this time, we may call the FBI digital forensics expert, Michael Kan, but I think it's more likely that we won't.  But we do plan to call Michael Bettencourt, so it would be Michael Bettencourt and Lieutenant Putnam as our two rebuttal witnesses.

THE COURT:  And, Bettencourt, remind me, where is he?

MR. PAULSON:  He's in charge of the cameras at FCI Dublin.

THE COURT:  All right.

MR. PAULSON:  So he will provide information regarding camera placements, blind spots.

THE COURT:  Is he still there?

MR. PAULSON:  He is still there, yes, Your Honor.

THE COURT:  And Putnam is as well?

MR. PAULSON:  Lieutenant Putnam is still employed at FCI Dublin, yes, Your Honor.

THE COURT:  Okay.  All right.  Mr. Reilly?

MR. REILLY:  Thank you, Your Honor.  As I indicated in my email to the Court, this new discovery was produced to me yesterday, starting -- the first batch at 2:57 in the afternoon, the second batch at 7:41 in the evening.  It totals

more than 1,300 pages.  And while I --

THE COURT:  Well, the difference -- so the first part is 1,300 pages.  The stuff produced at 751 is just six pages; right?

MR. REILLY:  Actually, the information produced at 741, I have 18 pages of materials.

MR. PAULSON:  Your Honor, if I could clarify, it included notes of from that interview as well, so it was the summary and the notes.

THE COURT:  I see.

MR. REILLY:  And the initial discovery at 2:57 p.m. was 1,284 pages.  Obviously, I have not had an opportunity to review all of that material.

THE COURT:  Did you provide an index of all of these 65 files?

MR. PAULSON:  No, Your Honor, but I am willing to provide the actual raw files to make it easier for Mr. Reilly to search for "Putnam."  I searched his name this morning and reviewed all of the references to Lieutenant Putnam in the files that we provided, so I'm more than willing to provide those raw files to Mr. Reilly.

THE COURT:  When you say, "raw files," what do you mean?

MR. PAULSON:  So what we produced to him was Bates stamped versions of these files.

**THE COURT:** Do you mean by "raw files," the physical copies?

**MR. PAULSON:** No, Your Honor.  I mean, the non-Bates Stamped versions.  I'm not sure if the Bates stamped versions are searchable, but I'm more than willing to produce the PDF files that were used to -- that were then Bates stamped and produced to him.

**THE COURT:** I see.  All right.  Keep going, Mr. --

**MR. PAULSON:** My paralegals are telling me that they are searchable, the Bates stamped versions.

**THE COURT:** I see.

Okay.  Go ahead, Mr. Reilly.

**MR. REILLY:** Thank you, Your Honor.

Separate and apart from the issue of the new discovery is the fact that because Mr. -- or Lieutenant Putnam was not on the witness list, I did not make any effort to extract from the 48,000 pages of discovery that had previously been provided anything that relates to Mr.-- to Lieutenant Putnam.

The Government did indicate that there were some documents in that discovery that relate to him.  I was able to locate three documents that relate to him, two of which turned out to be duplicates of each other, so there really were only two.

The problem with going through these thousands of pages of discovery is that for the most part, the documents themselves are identified only by generic -- either the Bates page numbers

or some indication like JPEG or something like that, and each one of them is a separate document, so there is probably --

THE COURT:  That's why I asked.  Is there an index?

MR. PAULSON:  No, Your Honor, but I can produce the documents with the file names in them so he can see exactly who the interview pertains to in the file name and the date.

MR. REILLY:  So I have no way of knowing how much material we are talking about there, but with 1,300 pages, there is no way I can prepare for that properly in one day.

MR. PAULSON:  We can also export an index and provide it to Mr. Reilly if you'd like.

THE COURT:  Well, you should definitely do that. Mr. Reilly is asking for one day to prepare, as I understand it.

MR. REILLY:  If Lieutenant Putnam is going to be permitted to testify, yes.

THE COURT:  I certainly am going to let him -- permit it.  It's the classic rebuttal testimony.  The Government didn't have a statement from your client.  Your client made all sorts of statements on the stand.  And the only way that they can impeach him is to now bring in the person who he claims to have had a conversation with.  It's classic rebuttal.  So it's absolutely admissible.

Let's see how many -- where we finish off today, and then I can make a decision later in the day.

You should also all know that, as I told you last week, I have been exposed. So far, I have tested every single day, and I am negative.

If I test positive, then we will have to shut down for five days under CDC guidelines. I will not be able to staff this courtroom. And while I might do it as an individual, there are other considerations.

So if I test positive, then we will stand in recess for five days. Hopefully, I'm working really hard -- I have zero interest. I have been sick for 12 days, and I feel great today, so happy to be feeling better, off antibiotics.

So the notion of getting COVID is the -- I'm doing everything I can not to -- not to be further exposed. But I've thought long and hard about what I would do if that happens, and that seems to be the -- that seems to be the proper course. So you are all on notice.

Okay. So I got your comments back on the jury instructions that I sent to you on Friday evening. So the -- the consent instruction is fine. I saw the -- the change on count -- the additional instruction with respect to Monica, that was deleted.

So you saw in there, that page that said "Stop"; right? That is the time at which I will stop instructing and you will all give your argument. After you give your argument, then I will give the instructions that follow that page that says

"Stop."  Okay?  Just so that you know.

And then the -- the reason that I changed the format of the verdict form is because my courtroom deputy doesn't make any editorial changes when he reads the verdict form.  So I structure it in a way that allows him to just read it straightforward into the record.  And that's why those changes were made.  Okay?

Each of the jurors will have a copy of that verdict form printed on blue paper in their notebooks so you will know that when -- and people sometimes use that when they're making their closing arguments.  I will send you the version that says, "Copy."  There will only be one original verdict form.

And on the Government's side, who is -- who's making the closings, or are you sharing?

MS. PRIEDEMAN:  I will be doing the closing, and Mr. Paulson will be doing the rebuttal, Your Honor.

THE COURT:  Okay.

All right.  Anything else you want to do before the jury arrives?  I do think whatever you have to make Mr. Reilly's job easier, you should do it, so indexes, file names, whatever.

MR. PAULSON:  Yes, Your Honor.

MS. PRIEDEMAN:  Yes, Your Honor.

THE COURT:  Okay.  Anything else you want to talk about?

MS. PRIEDEMAN:  No, Your Honor.

**MR. REILLY:** No, Your Honor. Thank you.

**THE COURT:** We'll stand in recess until the jury arrives.

(Recess taken at 8:13 a.m.)

(Proceedings resumed at 8:33 a.m.)

**THE COURT:** Okay. Let's call in the jury.

(Proceedings were heard in the presence of the jury:)

**THE COURT:** All right. We are back on the record. The record will reflect that the jury is back.

Good morning. Doesn't it sound like I feel better? Because I do feel better.

Anyway, I hope you had a wonderful weekend. It was very rainy, but my only solace means that we have extra snow up in Tahoe and building our reservoirs. And hopefully we'll continue to be able to do that and potentially get out of this drought.

Does anybody have any questions? No? All right.

Mr. Garcia is back on the stand.

Sir, I will remind you, you are still under oath.

**THE WITNESS:** Yes, Your Honor.

**THE COURT:** Good morning.

                    **RAYMOND GARCIA**,

called as a witness for the Defendant, having been previously duly sworn, testified further as follows:

**THE COURT:** Ms. Priedeman, you may begin.

MS. PRIEDEMAN:  Thank you, Your Honor.

**CROSS-EXAMINATION**   (resumed)

BY MS. PRIEDEMAN:

Q.   Good morning, Mr. Garcia.

A.   Good morning, Ms. Priedeman.

Q.   Mr. Garcia, on Friday, you testified that you drafted an incident report related to the pictures you took of Melissa; right?

A.   Correct.

Q.   But you shredded it once it was informally resolved?

A.   I shredded the incident report that I typed at home in the incorrect format and the pictures after the accuser, yes, agreed to provide information.

Q.   You didn't save that incident report anywhere?

A.   There was no reason to save the incident report.

Q.   You didn't upload it to the central system?

A.   No.  I did not retype it at work and load it into the central system.

Q.   That system is called SENTRY; right?

A.   Yes.

Q.   Under BOP policy, you were required to send the incident report to the appropriate lieutenant; correct?

A.   Under BOP policy, the lieutenant would have read the charges if I had submitted the report within 24 hours of the incident to the inmate.

Q.   And you were required to submit that incident report to the lieutenant; correct?

A.   I would have to review the policy again.  It's been several years now, but the lieutenant is the investigating portion of the incident report.

MS. PRIEDEMAN:  Your Honor, may I approach the witness?

THE COURT:  You may.

BY MS. PRIEDEMAN:

Q.   Mr. Garcia, this is policy 5270.09; right?

A.   Yes, it is.

Q.   That's the policy you were discussing on Friday?

A.   Yes.

Q.   Can you read --

THE COURT:  Ms. Priedeman, do you have something for me to look at?

MS. PRIEDEMAN:  Yes, Your Honor.

THE COURT:  And has this been marked?

MS. PRIEDEMAN:  I'm not planning on admitting it, Your Honor.

THE COURT:  All right.  Do you have a copy for me?

MS. PRIEDEMAN:  Yes, Your Honor.

THE COURT:  All right.  Proceed.

BY MS. PRIEDEMAN:

Q.   Mr. Reilly -- sorry -- Mr. Garcia, looking at page 18,

this outlines the discipline process; correct?

A.    Correct.

Q.    And the incident report process?

A.    Correct.

Q.    Can you please read the second paragraph starting at "When staff witness"?

A.    "When staff witness or reasonably believe that a violation of Bureau regulations has been committed, staff must prepare an incident report and forward it to the appropriate lieutenant. The lieutenant will enter the incident in SENTRY."

Q.    That was the policy, Mr. Garcia; correct?

A.    It is.

Q.    You didn't do that, did you, Mr. Garcia?

A.    Not in this incident report.

Q.    You also testified, Mr. Garcia, that sometimes incident reports are resolved informally; correct?

A.    There is a process for informal resolution, both in writing and over 30 years of experience.  Some were informally, not in writing.

Q.    The lieutenant is the one who would typically informally resolve an incident report; correct?

A.    No.  An incident report can be resolved by a staff member, UDC, which is the unit disciplinary committee, or the unit team.  And the lower severity incident reports, if the officer doesn't write it, then it would not -- or the officer could

informally resolve.

There are times when a minor infraction occurs, and the officer will give the inmate extra duty.  Sometimes they log it in for the extra duty, and sometimes they will informally just have the inmate clean the office or clean the common areas. And if that is accomplished, then they won't write the incident report.

Q.   But, Mr. Garcia, even when an incident report is informally resolved, it has to be recorded; correct?

A.   As I stated, they have two ways to informally resolve it. One is the incident formal portion of it where it's logged into SENTRY.  An inmate at that point has, I think, 14 days to complete the task.

But there are many times when officers will just provide extra duty to inmates for the lower security -- lower severity incident reports, the 400s or the 300s, and just tell the inmate to clean up or provide this extra duty, clean the bathrooms.  And then the incident report won't even be written or logged into SENTRY.  It happens on a daily basis.

Q.   So it's your testimony, Mr. Garcia, that under BOP policy, a record of an informal resolution does not need to be maintained in SENTRY?

A.   My testimony is that over 30 years of service, I have witnessed on many occasions where incident reports are informally resolved and not logged into SENTRY for the lowest

severity incident reports.

Q.   Mr. Garcia, can you please take a look at page 21 of that same policy, please.  On the bottom half of the page, this discusses informally resolving incident reports; correct?

A.   Correct.

Q.   Can you please read into the record the -- for the second to the last paragraph, that second to the last sentence, please, starting with "A record."

THE COURT:  And when you read, don't speed read, please.

THE WITNESS:  Yes, ma'am.

THE COURT:  Go ahead.

THE WITNESS:  Starting with -- I'm sorry.   Starting with?

BY MS. PRIEDEMAN:

Q.   Starting with "A record of."

THE COURT:  I don't know where you, Ms. Priedeman.

THE WITNESS:  I don't know where you are.

THE COURT:  You said the second to the last paragraph?

BY MS. PRIEDEMAN

Q.   Do you see the second to last paragraph that starts with, "The Bureau encourages"?

A.   Yes, ma'am.

Q.   And the second to the last sentence in that paragraph starts with, "A record."

**A.**    Okay.    "A record of any informal resolution is maintained in SENTRY.    However, the incident report is not filed in the inmate's central file."

**Q.**    And, Mr. Garcia, in this case, you did not record the informal resolution in SENTRY; correct?

**A.**    No, I did not.

**Q.**    And then in the second paragraph, it says that, "Staff are required to write the incident report before starting informal resolution so the facts of the incident will be preserved if informal resolution is not successful."

Do you see that?

**A.**    Yes.

**Q.**    And that was BOP policy?

**A.**    It is.

**Q.**    And you didn't do that?

**A.**    I did not.

**Q.**    Other than the incident you've described with Melissa, how many other incident reports did you informally resolve as associate warden?

**A.**    I wouldn't be able to give you an exact number.    I've found inmates doing things incorrectly and given them extra duty.    I've also found that inmates who have committed prohibited acts, I can go to the officer and then have the officer take care of it because it helps them with their --both training and learning the types of things that inmates do

that they may not know when they're new officers.

For instance, while making rounds, I found intoxicants, but I didn't do the incident report.  I advise the officer of an area they can search and let them do it.  If they choose to write the incident report -- I'm sorry.  If they submit the incident report and find the intoxicants, then it helps them to learn the way things are hidden in a prison.

Q.   And in this incident you've described with Melissa, you didn't think it was appropriate to let another unit manager know what was going on?

A.   In this incident, my initial attempt was to write a 205 or 206, 205 being a sexual act, and 206 being a sexual proposal. However, as you saw in the picture, the inmate is not committing an act other than being nude, and the inmate made no statements or gestures that would be construed as proposal. Therefore, it fell from a severe shot to a moderate shot -- incident report.  Sorry.  Incident report.

Q.   And under BOP policy, you should have given that incident report to the lieutenant; correct?

A.   I should have, yes.

Q.   But you didn't?

A.   No.

Q.   Mr. Garcia, you testified that in exchange for not filing the incident report against Melissa, you cultivated her as an informant; correct?

**A.**   Yes.

**Q.**   SIS is the unit that's in charge of cultivating informants; correct?

**A.**   Yes.

**Q.**   You weren't in SIS?

**A.**   I wasn't in SIS at FCI Dublin.  However, I am SIS qualified trained.

**Q.**   But at Dublin, you were not in the SIS unit?

**A.**   At Dublin, I was not.

**Q.**   When SIS signs up a confidential informant, they create an informant file; correct?

**A.**   That is correct.

**Q.**   And that maintains a history of all the information that a particular informant has provided?

**A.**   That's correct.

**Q.**   And the purpose of that is so they can track the reliability of that informant; correct?

**A.**   That's one of the purposes, correct.

**Q.**   You never documented Melissa in the informant central file, did you?

**A.**   No, I did not.  I wasn't, as you stated, in the SIS shop to provide that documentation.

**Q.**   In fact, you weren't actually allowed to cultivate informants because you were outside of SIS; correct?

**A.**   I don't believe that is true.

Q.   You were permitted to have informants as the associate warden?

A.   I believe that most staff have informants.  The reason for the SIS file, as you said, is to track reliability.  In the event the information has to be used in prosecutions, the informant then is known to be reliable.  But most staff have an informant of some kind, whether it's in the housing unit or telling them things that are going on at night or a lieutenant.  But most staff look to have some kind of information provided to them through inmates.

Q.   That wouldn't be an official informant; correct?

A.   It would not be official, but effective.

Q.   You said Melissa provided you information about officers; correct?

A.   Among other things, yes.

Q.   What information did she provide to you?

A.   So most of her information was self-serving.  So in the event of her unit manager -- and as you saw, they had a troubled relationship -- she would provide information that there was inmates who were receiving a management variable V which is greater severity instead of a management variable E, which was a COVID hold.

So by creating those management variables, all of those inmates were excluded from transfer consideration.  She provided information to me that the -- an officer was -- needed

to be looked at.  And when I advised that to Mr. Putnam, Mr. Putnam confirmed that that officer was being looked at.

She provided information during COVID lockdown, that the vending machines in the staff lounge had been broken into.  And since she was the orderly there, found me at lunch when the inmates typically talked to me and said the vending machines had been broken into.  I reported that to SIS as well as the employees' club president since during COVID protocol, it leaned to be a staff act and not an inmate act because inmates weren't visiting.

She provided -- I could create a list of things she's provided.  In fact, I believe I have advised my attorney of the information she has provided.  Do you want more examples, ma'am?

Q.    Did you document the information she provided, Mr. Garcia?

A.    I did not document.  I advised Lieutenant Putnam of these instances and asked him if he wanted a memo.  But Lieutenant Putnam never accepted memorandums from me.  And I could prepare them if he wanted them.  But in most times, he would take the information, and then he would act on that information rather than I.

Q.    You didn't tell him that information was from Melissa, did you?

A.    I told him the information was from an informant.  I did not give the name of the informants on any of the information.

There were several inmates who provided me information and then I, in turn, provided that information to Mr. Putnam.

Q.   What was the name of the officer that Melissa provided information about?

A.   Officer Espinoza.  That would be the officer that she later spoke to to get information on another inmate.

Q.   I want to talk about Maria.  Maria was also an inmate at FCI Dublin when you were the associate warden; right?

A.   Yes.

Q.   Also the warden?

A.   Yes.

Q.   She was under your control?

A.   She was under the control of the Bureau of Prisons in the institution I supervised.  I don't control any one person.

Q.   Well, part of your role was to have custody and supervision over inmates; correct?

A.   Yes.

Q.   Including Maria?

A.   Yes.

Q.   Maria worked in the kitchen; right?

A.   I believe that was one of her working assignments, yes.

Q.   You would visit her in the kitchen?

A.   No.

Q.   Compliment her?

A.   No.

Q.    Tell her she was beautiful?

A.    Never.

Q.    Told her you wanted to have sex with her?

A.    Never.

Q.    Eventually you told her she should work in the laundry room; right?

A.    No.  I did not tell her she should work in the laundry room.  The kitchen was divided into two separate work crews -- I'm sorry -- was put into one housing unit during the COVID protocols.  She wasn't in that housing unit, so she wasn't working in food service during COVID protocol, to which her unit counselor would have given her a job in the housing unit.

Q.    It was easier to see her in the laundry room; right?

A.    It wouldn't be easier to anybody when they were in COVID protocol.  They were either in their cell or in the laundry area, which is visible by at least three inmate cells because there is no door in the door frame.

Q.    Maria lived in the F-Unit; right?

A.    Yes.

Q.    Maria requested compassionate release in April of 2021; right?

A.    According to the documentation we reviewed, yes.

Q.    Inmates want their compassionate release to be granted; right?

A.    Of course.

Q.   It's a big deal to get compassionate release granted, isn't it?

A.   It's freedom.

Q.   Maria wanted to get out so she could see her kids; right?

A.   Her compassionate release was based on childcare, I believe, according to the documents we looked at this week.

Q.   And she talked to you about wanting to go home?

A.   She spoke to her counselor, case manager, and unit manager.  And when she could not get an answer that was -- satisfied her, then she spoke to me on rounds.

The two issues that -- well, the one issue that I remember about Maria was that under the CARES Act, she did not qualify because she was a deportable alien.  Her other application for compassionate release was never brought to my attention.

During the CARES Act, Congress made a bunch of exceptions for compassionate release.  However, deportable alien was not on that exception list.  She took -- she wanted to know if there was ways around that, but I don't control that.  That was the CARES Act.  So she was eventually referenced back to her unit team for the proper procedures of compassionate release.

Q.   You denied Maria's request on June 21, 2021; right?

A.   I signed the denial based on the information provided by unit staff and the medical doctor, which stated that her request did not meet the criterias.

Q.   Mr. Garcia, that's not what I asked.  I just asked if you

denied it on June 21, 2021?

A.    Yes.

Q.    You didn't tell her that you denied her compassionate release at that point, did you?

A.    I don't tell any of the inmates when I approve or deny. They get informed through the proper channel, which would be unit team.

Q.    When Maria asked you the status of her request, you told her you hadn't received her paperwork yet; right?

A.    I received 25 to 30 requests a day.  I wasn't sure which [redacted] I signed or did not sign, so I could not give her an accurate date and time of when I received her information.

        MS. PRIEDEMAN:  Your Honor, I would ask that we strike the last name from the record, please.

        THE COURT:  It's stricken.  Just a reminder, we're not using last names, Mr. Garcia.

        THE WITNESS:  I'm sorry, Your Honor.  It just happened.

BY MS. PRIEDEMAN:

Q.    You didn't want Maria to know that you had denied her request, did you?

A.    I had no reason not to tell them that I denied if I knew that I had denied it.  I told plenty of inmates I denied their request.  It's not my final decision.  The recommendations and the documentation to support it is prepared by other people,

and I review it to make sure that that information is correct, properly documented, and it's then agreed with the recommendation to release or agreed with the recommendation to deny.

Q.   You liked having that power over Maria, didn't you?

A.   I didn't have that power.  The recommendations, again, were made by medical staff, unit management staff.  Mine was just that the documentation's prepared accurately, that the information was provided to support the institution's decision, and the inmate, if they chose to go further, had other avenues to pursue the compassionate release outside the application within the institution.

So there is no overall power that the warden has over compassionate release.

Q.   Mr. Garcia, it was your ultimate sign-off that was required to grant compassionate release; correct?

A.   Correct.  But that ultimate power of sign-off that you referred to is based on the recommendation of case manager, unit manager, psychology, medical staff, depending on what the grounds for the request are.  And the -- for me to grant a compassionate release when all of those other entities had said it's not appropriate would take written documentation and justification to do so.

Q.   But you could do so; correct, Mr. Garcia?

A.   If I found that there was a reason to, then I would

provide the documentation to which I don't believe there is any such documentation.

Q.   When you denied compassionate release, inmates would receive a copy of that denial; correct?

A.   Correct.

Q.   That would include your signature?

A.   Correct.

Q.   So the inmates knew that you had the ultimate sign-off; correct?

A.   The inmates knew that I signed it.

Q.   So they knew you had the power to deny their compassionate release?

A.   The inmates also knew the process of compassionate release, and that means the recommendation was not provided in their favor.

Q.   They knew that you could grant it if you wanted to; correct?

A.   No.   They believed that a warden can grant overall authority, but that is not the case.   And the policy that governs compassionate release clearly states that it's a recommendation that has to be reviewed by the persons that it's applied to.

     In the instance we're talking about in the compassionate release paperwork we discussed earlier this week, it was for care of a child because the present caretaker was medically

incapacitated or something of that nature.  There was medical documentation.  And the unit team in that case must have found that it was not sufficient for an immediate compassionate release.

Q.   Maria wasn't told that you denied her compassionate release motion until after you had left FCI Dublin; right?

A.   I don't know when Maria was told.  That would be the job of her unit team.

MS. PRIEDEMAN:  Ms. Slattery, can you please pull up Exhibit 273.

Your Honor, this was previously admitted, and we would ask to be published to the jury.

THE COURT:  You may.  273.

MS. PRIEDEMAN:  Ms. Slattery, can you zoom in on the disposition section, please, including the date at the bottom.

Q.   Mr. Garcia, this is -- this is Maria's request for compassionate release; correct?

A.   Correct.

Q.   Do you see where it says, "Inmate received compassionate release reduction in sentence response on August 10th, 2021"?

A.   Okay.

Q.   That was after you had left FCI Dublin; correct?

A.   That is correct.

MS. PRIEDEMAN:  Ms. Slattery, you can take that down.

Q.   Mr. Garcia, Rachel was also an inmate at FCI Dublin while

you were the associate warden; correct?

**A.**    Correct.

**Q.**    She was under your custody?

**A.**    She was under the custody of my institution, correct.

**Q.**    Including your custody?

**A.**    Yes, ma'am.

**Q.**    And your supervision?

**A.**    Not my direct supervision.  Under the supervision of my staff.

**Q.**    And you supervised your staff?

**A.**    Yes.

**Q.**    You knew Rachel had a son with special needs; correct?

**A.**    She mentioned it after a speech that was given in her drug treatment program.  She was a member of the DAP, Drug Awareness Program, and at the end of their program, there is a speech given by executive staff.  I drew the short straw for that speech, and in the speech, I mentioned to the inmates about priorities in life.  And that if you had family, that would be the priority, and that's when I mentioned my son with special needs.  At the end of that, she did mention she had a son with special needs, but that was the extent of the knowledge.

**Q.**    Rachel also talked about it on her phone calls that you had access to; correct?

**A.**    I don't know what Rachel spoke about on her phone calls. I never monitored a phone call at FCI Dublin, and that can be

shown in the database.

Q.   You also knew that Rachel had a friend at the prison named Bailey; correct?

A.   There was an inmate at the camp who asked me to say hi to her friend.  I don't know what the inmate at the camp's name was.

Q.   Was she referring to Rachel?

A.   She stated who she wanted me to give the message to, yes.

Q.   And you conveyed that message to Rachel, didn't you?

A.   I told her, "Your friend said hello."  That was the message I delivered.

Q.   So Bailey was transferred from the prison to the camp; correct?

A.   Apparently.  I believe that happened before my tenure started.

Q.   And Rachel was particularly sad when that happened?

A.   I don't know what Rachel's state of mind is.

Q.   You made her feel better?

A.   I don't know what Rachel's state of mind was.

Q.   You complimented her?

A.   Never.

Q.   You told her you wanted to be with her once you were released?

A.   I never told Rachel I wanted to be with her when she was released.

Q.   You made a comment about her back pocket being ripped?

A.   Rachel was walking around the compound with a back pocket that was ripped.  She was instructed to get it sewn up or go to laundry to exchange it for other pants.  She stated she didn't know how to sew but would get somebody in her unit to sew it up.

Q.   You made that comment because you were looking at her butt?

A.   I made that comment because Rachel was out of uniform, walking around the compound with a pocket dangling down.  So in order to get her back into uniform, I told her to go to laundry and exchange the clothing or get the pocket sewn up.

Q.   You made sexual comments to Rachel when she was a FCI Dublin; right?

A.   No, I did not.

Q.   You told her your tongue would touch her for hours before your penis ever did?

A.   No.  I never made that statement to Rachel or any other inmate.

Q.   You told her the things you wanted to do to her nipples?

A.   No.  I did not tell her what I was going to do to her nipples.

Q.   Rachel was released in September of 2020; right?

A.   I'm not sure of Rachel's release.  In September of 2020, I was on assignment in Brooklyn, New York.

Q.   And Rachel was released to a halfway house; correct?

A.   Correct.

Q.   You asked for her travel plans?

A.   No.

Q.   You told her you wanted to meet her at the airport?

A.   Not possible.  I was in Brooklyn.

Q.   You wanted to meet her at the airport; right?

A.   No.

Q.   So you could have sex with her?

A.   At the airport?  No.

Q.   Before she was released, you gave her an email address so she could contact you; right?

A.   Yes, I did.

Q.   You didn't give her your BOP email address, did you?

A.   No, I did not.

Q.   You didn't give her your personal email address?

A.   No way.

Q.   You gave her the "rememberpockets" email address; right?

A.   Yes, I did.

Q.   You testified that you gave her that email address because she wanted to express issues she had had at FCI Dublin; is that right?

A.   No.  I gave her that address because she was going to provide information on staff and possibly an inmate who was introducing narcotics into the institution.

**Q.** You testified that normally SIS was the one to do exit interviews?

**A.** Yes. And unfortunately at Dublin, the SIS department doesn't complete the exit interviews, so all the information that an inmate has leaves with them.

**Q.** But it's within SIS's role to collect that type of information; correct?

**A.** Actually, any staff member can conduct an exit interview. Some of the best exit interviews are conducted by unit management because they have a closer relationship with the inmates.

**Q.** If a unit manager conducts an exit interview, do they record that information somewhere?

**A.** They would either keep that information if it's useful for them, or they could write a memo and give it to a lieutenant or captain. That would be their choice. It's their interview.

**Q.** When Rachel told you she had information she wanted to convey, did you tell SIS about that?

**A.** Again, I left for temporary duty in Brooklyn for all of September.

**Q.** You had a way to contact SIS if you wanted to; right?

**A.** There was no need to contact SIS as I hadn't received any information.

**Q.** You didn't think it was appropriate to tell SIS that an inmate who was leaving had information they wanted to convey

about other inmates?

**A.**    I didn't think that SIS would effectively address the issues since the SIS department at that time was hundreds of investigations delinquent, and they were essentially ineffective in completing those investigations.  And so in an effort to gain the information regarding the narcotics that were being introduced into the institution, I made probably a judgmental error, probably a local policy error, and I chose to gather the information myself.

**Q.**    It wasn't within your role as associate warden to conduct investigations, was it, Mr. Garcia?

**A.**    Any staff member can conduct an investigation if it's -- if it's necessary.  We conduct investigations on a daily basis. An interaction with an inmate to gain information is an investigation.

**Q.**    Mr. Garcia, I believe you testified earlier that -- well, scratch that.

You were associate warden in the fall of -- of September 2022 still; right?

**A.**    Of 2022?

**Q.**    Sorry.  2020.

**A.**    Yes.

**Q.**    And you were still operations associate warden?

**A.**    Yes.

**Q.**    So you testified earlier, Mr. Garcia, that you actually

weren't really involved with inmates in your role as the operations associate warden; right?

A.   I said I wasn't involved with inmates as it pertained to their caseloads.  I saw inmates every day.

Q.   I think you said that the other associate warden was the associate warden in charge of inmates and programming and things like that; right?

A.   The programming portion of it, yes.  But, again, I saw inmates every day.

Q.   But you weren't in charge of investigating?

A.   I was in charge of correctional services, and under correctional services is all of the captains, lieutenants, to include the SIS lieutenant.

Q.   So when Rachel told you she had information, you didn't follow up with SIS whatsoever, did you?

A.   No, I did not.

Q.   You decided, instead, to give Rachel this rememberpockets email account?

A.   I did.

Q.   You didn't tell anyone at BOP that you had done this, did you?

A.   I don't recall.

Q.   You didn't document it anywhere?

A.   I was on TDY assignment.  I did not document anything at Dublin.

**Q.**   You didn't write a memo?

**A.**   No.

**Q.**   And according to you, you created this email account for someone you dated in Washington, D.C.; is that right?

**A.**   Somebody that I reconnected with in Washington, D.C. that I had met prior.

**Q.**   That you had a sexual relationship with?

**A.**   Yes.

**Q.**   What's the name of that individual?

**A.**   Excuse me?

**Q.**   What's the name of that individual, Mr. Garcia?

**A.**   Full names, Your Honor?

           **THE COURT:**   Full name.

           **THE WITNESS:**   Well, it could have been a couple.   It could have been Ms. Wolst, who is married, and we had -- not a sexual relationship.   We had basically a cyber relationship.

     Or it could be -- what was the other lady?   I forget some names.   However, we ended up texting rather than using the email address.   So I have texts and photos in the text that are in discovery from those persons.

**BY MS. PRIEDEMAN:**

**Q.**   What do you mean "it could be," Mr. Garcia?

**A.**   Well, again, I was in D.C., and I had created a user name because I was out.   And I was single and I was dating.   But nobody uses email anymore.   Everybody has their phones, so then

it just became texts and selfies.  And those texts and selfies were discovered by your forensics people.

Q.    Mr. Garcia, I believe you testified last week that the email name was a reference to a restaurant, Remember 8; is that right?

A.    No.  Pockets 8, a restaurant that used to exist in Merced.  And the person that I reconnected used to work at Atwater.  Her duty station is currently somewhere in Texas, and I was in D.C., flying through Texas, for -- coming and going.

Q.    And you can't remember the name of that individual?

A.    I gave you the name, ma'am.  I said there may have been others that I gave that email address to, but I can't be certain as we sit here.

Q.    Well, Mr. Garcia, you testified last week that you created that name specifically for one individual based on a restaurant name; correct?

A.    Pockets 8, a restaurant that used to exist in Merced on the corner of G and Victoria.  The restaurant does no longer exist there.  It was a hangout for staff at USP Atwater.

Q.    But now you're testifying that you could have created that email account for multiple women?

        MR. REILLY:  Objection.  Misstates the witness' testimony.

        THE COURT:  You can answer the question.

        THE WITNESS:  I'm stating I may have given the email

address to other women as well since I was on TDY and going to be on three-week assignments, rotating assignments, to Washington for the duration of the COVID protocols.

BY MS. PRIEDEMAN:

Q.   So what is the name of the woman, Mr. Garcia, who worked at Pockets 8?

A.   Ms. Priedeman, I never said the woman worked at Pockets 8. I said she worked in Merced, and we had hung out at Pockets 8. It was a local hangout place.  She has since transferred to a different duty station, I believe, in the south central region.

Q.   And what is her name, Mr. Garcia?

A.   I gave her name, Ms. Wolst.

Q.   You gave me multiple names, but thank you for clarifying, Mr. Garcia.

     What is her first name?

A.   Christine.

Q.   How long were you in a relationship with her?

A.   Again, it was just texts and cyber, and it went probably while I was on travel.  So from February of -- what was the protocols?  '21 -- I'm sorry.  February of '20 through December of '20.

Q.   How frequently did you email with her?

A.   We didn't use email.  I told you, we decided that nobody is going to get on their Gmail accounts.  It was a matter of texts, and we have texts, lots of texts.

Q.   So you went through the effort of creating this email account, but you never used it with her?

A.   I don't know if we ever text -- sorry -- emailed on it at all.  Again, I can't remember that far back.  But people don't use email, and creating it is not hard.  You just type a name in there, and it comes up.

I'm not a social media person.  I don't have any social media accounts.  So when the person I'm with goes through texts, then I go through texts.

Q.   Why did you create that email account to communicate with this woman?

A.   Again, because we were communicating through technology, not in person.

Q.   Why not use your BOP email?

A.   Because we were in a sexual or cyber sexual relationship, and you wouldn't use your BOP email.  Now, I didn't use my personal email because it's personal email.

Q.   Sorry.  I'm not understanding that.  Why would you not use your personal email?

A.   Again, it was a relationship that was just for the sake of the relationship, and I created that separate from my personal email that I do my business work on and my personal things on and separate from my BOP email.  It was just like a burner phone.  A burner email.

Q.   Why did you need a burner email separate from your

personal email account?

**A.**   Because I don't have cyber relationships on my personal email account.  In fact, I didn't have them on that account. We ended up using texts, as I've expressed.

**Q.**   Why don't you have cyber relationships on your personal email account?

**A.**   Because my son sometimes gets on my account, and that would not be appropriate for him to view.

**Q.**   All right.  So you gave this email address to Rachel while she was still at FCI Dublin; correct?

**A.**   Before I left on TDY, yes, since I would not be present for her release.

**Q.**   And then she emailed you after she was released?

**A.**   At some point after her release, yes.

**Q.**   How many times did you email with Rachel using that email account?

**A.**   A couple times before she stated she would not use an email.  She wanted conversations on texts over a burner phone.

**Q.**   At that point when you had emailed with Rachel after her release, did you report to anyone at BOP that you had been emailing with Rachel?

**A.**   No, I did not.

**Q.**   That was against policy; right?

**A.**   Against a local Bureau policy, yes.

**Q.**   You're not supposed to have any contact with former

inmates?

A.    You're not supposed to have contact with former inmates for two years.

Q.    And if a former inmate were to contact you, you were supposed to report that; correct?

A.    Or just not contact them, yes.

Q.    In those initial emails, did Rachel tell you information about FCI Dublin?

A.    She made suggestions about people to be looked at, and when I brought that up with my staff, they had already been looking at those people.  One was a tool room officer, and I don't know his name.  The other were food service foremen, and I believe those are currently under investigation.

Q.    Did you pass that information along to SIS?

A.    Yes.

Q.    Did you tell them it came from Rachel?

A.    No.

Q.    Did you record or document those complaints anywhere?

A.    No.

Q.    Did you save those emails?

A.    No.

Q.    Did you upload them to SENTRY?

A.    No.

Q.    So you didn't document anywhere what Rachel had told you?

A.    No.

**Q.** You heard Special Agent Barclay's testimony that the FBI requested records for the rememberpockets email account; right?

**A.** Yes.

**Q.** And that there were no emails between you and Rachel?

**A.** Oh, yes. I heard her say that.

**Q.** And that's because you deleted all those emails; right?

**A.** Yes. I deleted all the emails when I was no longer in contact with her. She was no longer providing information.

**Q.** Because you wanted to hide your communications with Rachel; right?

**A.** What was there to hide?

**Q.** You tell me, Mr. Garcia.

**A.** I don't know. The fact that the inmate sent pictures to me and wanted me to get a burner phone so she could communicate with me, I deleted the account when I was no longer using the account.

**Q.** You knew it was inappropriate to be speaking with Rachel; right?

**A.** It is a policy violation to which an investigation could have been conducted and I would have a due process.

**Q.** And that's why you deleted those emails?

**A.** Yes.

**Q.** Because you weren't actually corresponding with Rachel about her information she had about FCI Dublin; right?

**A.** Oh, actually I was initially, and then she took it to a

different level.

Q.   You were trying to continue the relationship with her that you had started at FCI Dublin?

A.   There was no relationship started at FCI Dublin.   There was emails and texts and selfies that Rachel began sending, as she stated in her testimony, because attention from a man after being incarcerated since 2000 -- whatever her incarceration was, was inviting to her.

Q.   All right.   And according to you, Rachel then told you that she wanted you to buy a burner phone?

A.   Yes.

Q.   Because --

A.   She had stated something to the fact that in her previous case, she got caught on email, so she would not continue on email.

Q.   And at that point, is it your testimony that she wanted to tell you information about FCI Dublin over the phone?

A.   Initially, yes.   But at that point when I received the burner phone, she began sending nude self pictures of her.

Q.   She didn't buy a burner phone, though, did she?

A.   I have no idea what she did.

Q.   She didn't ask you to buy her a burner phone?

A.   She didn't ask me to buy her anything.

Q.   She just wanted you to buy a burner phone?

A.   That is correct.

**Q.** Even though she was the one who was concerned about it?

**A.** That's correct. Because she said her last case, she got caught doing something on email.

**Q.** And you did buy a burner phone; right?

**A.** For one month, yes.

**Q.** And you called Rachel on that phone?

**A.** Yes.

**Q.** Texted her?

**A.** Yes.

**Q.** Video chatted?

**A.** Yes.

**Q.** You didn't tell anyone about that at that point, did you?

**A.** No. At that point, I was clearly out of pocket in Bureau policy, and I was out of pocket with the intent of being retired in less than a month.

**Q.** You didn't think it was appropriate to report that a former inmate had asked you to buy a burner phone to communicate with them?

**A.** It was inappropriate to communicate with a former inmate. As I stated, I was already set to retire in December of that year. So because I was intending to retire, I did not report my errors, and they were policy violations that I own up to.

**Q.** You bought that phone specifically to speak with Rachel; right?

**A.** That is correct.

Q.   And you used a burner phone because you thought it would be harder to track?

A.   I used a burner phone because Rachel suggested to buy a burner phone to provide information on.

Q.   All right.  So during the video chats with Rachel, you asked Rachel to undress; right?

A.   No.  During the video chats with Rachel, Rachel began to act out more sexually by appearing in less and less clothing.

Q.   You asked her to masturbate?

A.   No.  Rachel -- at one point, I told her these calls were not -- I couldn't do these calls that she wanted to do during the daytime.  I said, you know, if this is the kind of calls we are going to have, it should be at night.  She said she couldn't do it at night.  And she suggested that I just record her, and then I would be able to look at her at night, to which in the picture, you see she's setting the phone down so that she could lay back and then model.

Q.   I'm sorry.  She said that she wanted you to record it so you could watch it later at night?

A.   Yes.

Q.   But, Mr. Garcia, you're present in those video calls?

A.   Well, yes.  They're -- both people are present in the video calls.

Q.   And you were participating in those video calls?

A.   Yes.

Q.   So why would you need to watch it later at night?

A.   Again, she wanted to be watched.  She wanted the attention, and I obliged mistakenly.  And, again, my mindset was that I was retired.

Q.   You masturbated in those video calls, didn't you?

A.   Yes.

Q.   And you downloaded an application on your burner phone so you could record your conversations with Rachel; right?

A.   Yes.  Something she suggested I do.

Q.   And you did record your video chats?

A.   One or two.  I'm not sure anymore.  They're all deleted as well.

Q.   You didn't ask Rachel for permission to record those video chats, did you?

A.   Rachel asked -- or advised me to record her so that I could view her at a time that was more convenient for me.

Q.   You never told her that you recorded those conversations, did you?

A.   Again, Rachel told me to record her so that I could view them at a time later when it was convenient for me.

Q.   When Rachel was at FCI Dublin, you had asked her to take naked pictures of herself with a BOP camera; correct?

A.   No, I did not.  That is incorrect.

Q.   And she said no?

A.   Again, I never asked her.

Q.   So you knew she wouldn't have -- she wouldn't have agreed that you could record your video chats, would she have?

A.   You're making an assumption on a fact that I deny occurred.

Q.   You recorded those video chats because it aroused you; right?

A.   At the time that we were video chatting, we were both aroused.  That was the purpose of the video chats.

Q.   Did you watch those video chats later?

A.   I probably did before deleting them, yes.

Q.   Did you masturbate while watching them?

A.   Most likely, yes.

Q.   At that point, you didn't tell anyone you had video chatted with a former inmate; right?

A.   At that point, it was my intent to be retired by December 31, and I did not tell anybody about the video chats.

Q.   You didn't tell anyone that you had masturbated while video chatting with Rachel?

A.   Well, if I didn't tell them I video chatted, I wouldn't tell them those portions either.

Q.   You didn't tell because you knew it was wrong; right?

A.   Yes.  It was absolutely in violation of Bureau policy.  It violated the ethics and the code of conduct to which there is due process for discipline.

Q.   So you wanted to hide what had happened; right?

**A.**    I had made a mistake, and I owned up to it by retiring because that's the discipline that would have been suggested had I reported it.

**Q.**    I'm confused, Mr. Garcia.  You said you owned up to it by retiring.

**A.**    Once I was -- discovered that I had done something wrong -- and I admit that I had done something wrong -- I could have remained on admin leave with pay indefinitely or until the agency chose otherwise.  But through your discovery and the charges, I admit that I made a mistake in having contact with a former inmate.  And I admit that I made a mistake by not advising the agency that I had contact with a former inmate.

I also made other mistakes in my -- this instance for not informally resolving the incident report through proper channels.  But those were all Bureau of Prisons' policy mistakes, and as such, I chose to leave the agency on voluntarily retirement.

**Q.**    Mr. Garcia, you video chatted with Rachel in the fall of 2020; correct?

**A.**    Winter, yes.

**Q.**    It was the fall of 2020; right?

**A.**    Okay.  Fall.  It would have been October to November.  One month.

**Q.**    I believe it was late September, early October.  Do you want to look at the phone records, Mr. Garcia?

**A.**   Again, if you say it's on the records, then I'll agree with you.  We're just over what month -- the fall and the winter.  It was somewhere after her release in September until November.

**Q.**   And you retired in, was it, October of 2021?

**A.**   I retired the following year because I didn't retire in 2020 when I was offered the job.  I knew I had made mistakes. But I was offered a job, and I took it, which is why I broke off contact with Rachel.

**Q.**   So when you say you owned up to it, you mean you were caught; right?

**A.**   I was caught by discovery, and then I chose to retire rather than going through the due process portion of it.

**Q.**   Did you tell BOP that you were retiring because of these naked video chats?

**A.**   I'm not required to give a reason to BOP for retirement. I retired.

**Q.**   Now, in the fall of 2020, naked photographs of another former FCI Dublin correctional officer were found on a former inmate's phone; correct?

**A.**   I don't know what investigation you're talking about.

**Q.**   I'm referring to Mr. Klinger.

**A.**   Okay.

**Q.**   Do you recall that, Mr. Garcia?

**A.**   I recall Mr. Klinger has a case, correct.

Q.   And do you recall that in the fall of 2020, pictures of -- pictures of Mr. Klinger were found on a former inmate's phone?

A.   Yes.

Q.   And that inmate was in a halfway house?

A.   Yes.

Q.   And as warden, you were informed that that -- sorry; I guess associate warden -- you were informed that that occurred; correct?

A.   No, I wasn't directly informed.  I heard rumors through inmates about it.

Q.   You were made aware that that had occurred; correct?

A.   Formally, I don't know who made me aware of that.

Q.   That made you nervous, didn't it?

A.   No.

Q.   You had been engaged in naked video chats with Rachel around that time; correct?

A.   I believe after that time.

Q.   Which part was after, Mr. Garcia?

A.   I believe that -- well, again, I don't know the exact months.  You have the dates.  I don't.  But for the sake of your question, I had been informed.  I heard more through rumors than I did through formal communications.

Q.   And it didn't make you nervous that you were also engaged in naked video chats with a former inmate?

A.   I had discontinued those conversations, and if I would

have been disciplined, then I would accept my discipline.

Q.   But you knew you had engaged in naked video chats with Rachel; right?

A.   Correct.

Q.   And naked photographs of another officer were found on a former inmate's phone; correct?

A.   Correct.  Two separate incidents.

Q.   You told Rachel about what happened with that other inmate, didn't you?

A.   No, I did not.

Q.   You told her that the other inmate was violated; right?

A.   No, I did not.

Q.   Which would mean that she was sent back to the prison?

A.   No.  All of that information was well known by the inmate population.  And Rachel has a very close friend in the F-Unit where the violated inmate was returned to.  Those inmates had all their conversations.  And Rachel most likely found out through inmate information since she was in contact with many inmates at the institution.  I never told her anything.

Q.   That inmate who had pictures of Mr. Klinger on her phone, she wasn't violated for that, was she?

A.   I have no idea why she was violated, nor do I have any idea what she told the inmate population.  The rumors that came out of the unit were those that she produced.

Q.   She was violated for an entirely different reason, wasn't

she?

**A.** Again, I have no idea why she was violated. I never gave information to Rachel. Inmates had many conversations in that unit to which Rachel is friends with inmates in that unit and has ongoing contact, which you guys could verify through her phone records.

**Q.** You told Rachel about the other inmate because you wanted Rachel to stay quiet, didn't you?

**A.** I did not tell Rachel anything about any other inmate.

**Q.** You wanted Rachel to think that she could get in trouble if anyone found out she had been video chatting with you; correct?

**A.** I did not want Rachel to think anything. I had already broken off communications with Rachel. These are your assumptions.

**Q.** That's because you didn't want to get in trouble; right?

**A.** Nobody wants to get in trouble. However, if I had been found to have broken a Bureau of Prisons' policy, there would be a due process for me.

**Q.** All right. I want to switch gears a little bit.

You testified that when agents executed a search warrant at your residence, they left several devices; right?

**A.** Yes.

**Q.** Two desktops?

**A.** Yes.

**Q.**   A jump drive?

**A.**   Several jump drives.

**Q.**   Did those devices have naked pictures of Maria on them?

**A.**   No, they did not.

**Q.**   Did they have naked pictures of Melissa?

**A.**   No, they did not.

        **MS. PRIEDEMAN:**  Ms. Slattery, can you please pull up Exhibit 288.

     Your Honor, this has been previously admitted, and I would ask that it be published just to the jury.

        **THE COURT:**  All right.

**BY MS. PRIEDEMAN:**

**Q.**   Mr. Garcia, this is a picture of your penis; right?

**A.**   Yes.

**Q.**   You took this picture?

**A.**   Yes.

**Q.**   You took this picture using your BOP phone?

**A.**   If that's where you found it.  I don't know which phone I used.

**Q.**   You took this in the bathroom at FCI Dublin; right?

**A.**   It could be at the bathroom at FCI Dublin, or it could be at the bathroom in the central office.  There is no way of knowing from this picture where it was taken, ma'am.

**Q.**   You recognize the floor in this picture; correct?

**A.**   The most common tile used in federal buildings with a wood

molding that you could find at any hardware store, ma'am.

Q.   It matches the floor in the bathroom in the warden's complex; correct?

A.   It's similar.

Q.   That white shirt you're wearing, that's the white shirt you would typically wear to work; right?

A.   I wear white shirts, colored shirts, just as I have every day in trial.

Q.   You took this picture while you were on duty; correct?

A.   Probably before I got into duty -- when I arrived at the institution.  But my duty hours were 6:00 to 2:00, and to avoid traffic over the Altamont, I would get there probably around 5:30.

Q.   You took this picture because you were turned on at work; correct?

A.   I took this picture probably to send to one of the women I may have been dating at the time.

Q.   You were turned on by Melissa?

A.   No, not at all.

Q.   By Maria?

A.   No.

Q.   By Rachel?

A.   No.

Q.   This isn't the only picture of your penis that you took at the warden's complex, is it?

**A.**    You found another one that you state is from the warden's complex, and, again, we can't identify it from the tile alone.

**Q.**    Mr. Garcia, is it your testimony that you didn't take pictures of your penis in the warden's complex?

**A.**    I said this picture, if it's the warden's complex, that I took it.  But you can't identify this is the warden's complex, and nor can I.

**Q.**    Well, my question, Mr. Garcia, is did you take pictures of your penis at the warden's complex?

**A.**    I may have taken a picture at the warden's complex, yes.

**Q.**    You actually took a lot of pictures at the warden's complex of your penis, didn't you?

**A.**    I wouldn't say a lot, no.

**Q.**    More than one?

**A.**    More than one.

**Q.**    You showed a picture of your penis like this to Melissa; right?

**A.**    No, I did not.

**Q.**    You told her, "This is what you do to me"?

**A.**    No, I did not tell Melissa that.

**Q.**    You showed her pictures of your penis on your phone; right?

**A.**    No, I did not.

**Q.**    You also printed out a picture of your penis on paper and showed it to her?

**A.**    No.    That never happened.

**Q.**    You showed a picture of your penis like this to Rachel, too; right?

**A.**    No, I did not.

**Q.**    You also told her, "This is what you do to me"; right?

**A.**    Absolutely did not.

**Q.**    You thought that was a good line, didn't you?

**A.**    No.

**Q.**    You showed a picture of your penis like this to Maria, too; right?

**A.**    No, I did not.

**Q.**    You heard Melissa's testimony that you showed her pictures of your penis that were taken in the warden's complex; correct?

**A.**    I heard her testimony to that, yes.

**Q.**    And you heard Rachel's testimony, saying the same thing?

**A.**    Yes.

**Q.**    If you didn't show them pictures of your penis from the warden's complex, how did they know that you did, in fact, have pictures of your penis from the warden's complex on your phone?

**A.**    So in my ignorance, I may have opened a picture where any person that is walking by you, or in the case of Melissa, who -- in her testimony and interviews with you, she states that she watched me closely.  And every move I made, she may have seen a picture, and then through her contacts on the compound, probably told everybody so that she could have a

story that could be corroborated.

For instance, she clearly told in her statement that -- or in one of her interviews that she sought out Maria and confronted her.  Also, they move in the institution all together.  They eat all together.  They go to recreation all together.  And as such, she could have seen something that she shouldn't have been looking at because that's considered stalking and then started creating her conspiracy to gain her compassionate release.

Q.   Did you regularly look at the pictures of your penis on your phone while you were around inmates?

A.   If I were to have taken a picture in the morning to send to somebody in D.C. or in another state with a different time zone, I would have deleted that picture before the end of the day.  So it could have been opened, yes.

Q.   So you let inmates see what was on your phone?

A.   No, I did not let inmates see what was on my phone.  Your accusers clearly stated that they watched me closely.

Q.   On June 25, 2021, Mr. Klinger was charged with sexual abuse of an inmate at FCI Dublin; correct?

A.   I don't know when he was charged.

Q.   You were made aware at some point in June of 2021 that Mr. Klinger had been charged; correct?

A.   I think human resources would have been made aware.  I would have heard it through them at some point.

Q. You were the warden at that point; right, Mr. Garcia?

A. Yes, I was.

Q. So you would be aware if a former correctional officer at FCI Dublin had been charged with sexual abuse?

A. I would have been made aware, yes.

Q. And you were made aware of those charges?

A. Yes.

Q. And, in fact, just a few months prior to him being charged, you had had that conversation with Special Agent Barclay about the search warrant related to Mr. Klinger; correct?

A. No. I don't recall direct conversation with Agent Barclay regarding the search warrant, but if you say that it occurred, then I would need to know the date and the substance of that conversation.

Q. Well, Mr. Garcia, you remember when a search warrant was executed at FCI Dublin related to the Klinger investigation?

A. Yes. The answer to your question, I did remember when a search warrant was executed.

Q. And Mr. Klinger's arrests made you even more nervous; right?

A. No.

Q. You knew you had naked pictures of Rachel on your personal computer, and you weren't nervous?

A. Again, I was set to retire. So my mindset was that I just

retire.  I was 31 years into service, and I was ready to go after being denied several promotions that were promised to me. So I was ready to leave.

Q.   So it was right around that time when you told Maria to destroy all evidence of your relationship; right?

A.   I had no relationship with Maria, and I made no statement to her to destroy any evidence that did not exist.

Q.   On July 2nd, 2021, you searched the Google Play Store for "hide photos" on your BOP phone; right?

A.   Yes.

Q.   You had an Android; right?

A.   Yes.

Q.   And the Google Play Store is where you can download applications; correct?

A.   Yes.

Q.   And you were trying to find an application that you could use to hide photos; right?

A.   Yes.

Q.   And you actually did find an application, and you downloaded it; right?

A.   Attempted to download it, but because of the agency protections, it was not operable.

Q.   And you downloaded that application because you were trying to hide pictures that you had on your BOP phone; right?

A.   I was trying to not have pictures of myself or those

sending me pictures easily exposed on the Bureau phone, yes.

Q.   And that was a week after Mr. Klinger was charged; right?

A.   If you say so.  I don't know exactly.

Q.   So is it your testimony that you weren't actually able to download that application?

A.   It's my testimony that I did not use the application because it would not function, I believe, on the phone because of the agency restrictions on the phones.

Q.   And you didn't -- you weren't able to successfully hide any photos with that application?

A.   I thought I was successful, but I wasn't able to recall them, so they just kind of disappeared.

Q.   How many photos did you try to hide?

A.   I don't know.  One or two.  I was testing the app.

Q.   You weren't trying to hide pictures of inmate IDs, were you?

A.   Of inmate IDs, no.

Q.   You weren't trying to hide pictures from your trips to Washington, D.C.?

A.   Of other staff members?  I could have been.

Q.   You were trying to hide the pictures you took of Melissa; right?

A.   No.

Q.   Of Maria?

A.   Again, no.

Q.   You were trying to hide the pictures of your penis that you had shown to the inmates; right?

A.   I was trying to hide personal pictures.  I never showed a picture of my personal genitalia to an inmate, ever.

Q.   You were trying to hide those pictures because you knew you had done something wrong; right?

A.   I had obviously done something wrong, but if I wanted to hide them, that would be ridiculous.  I would just delete them. There is no reason to hide pictures you don't want.  You delete them.

Q.   Well, you were nervous that if you deleted it, they could be recovered; correct?

A.   I was not nervous if they got recovered.  I didn't do anything with an inmate.  I didn't take pictures and show them to inmates.  If I violated my code of conduct, I was scheduled to retire, so I would retire.

Q.   You asked -- you instructed multiple inmates to strip naked for you, didn't you?

A.   No.

Q.   You instructed Melissa to strip naked?

A.   Never.

Q.   Maria?

A.   No.

Q.   Katrina?

A.   No.

**Q.**    Rachel?

**A.**    No.

**Q.**    Christina?

**A.**    No.

**Q.**    You grabbed Christina's butt at the rec without asking; right?

**A.**    That would be impossible without being seen by either one of the two recreation staff, the counselor's office that faces the white pile or the mobile patrol that is parked outside of the gate.  I never even knew Christina until she appeared here in this courtroom.

**Q.**    Now, earlier we talked about your interview with the FBI. In that same interview, agents asked if you had stopped and intentionally looked in an inmate's cell when they were dressing.

And you said, "If they're undressing, I've already looked."

And then you said, "I don't, like, schedule a time and you would be undressed and I'll be there."

Right?

**A.**    Something to that effect, yes.

**Q.**    You couldn't help but say that because that's exactly what you had done; right?

**A.**    No.  That's what I said because they were leading questions in the direction of whether or not I had seen inmates

in their cells.  And I said that if an inmate is dressing, that I would pass their cell.

That -- my schedule was subject to change every day.  I had several meetings every day.  Emergencies occurred every day.  There is no scheduling times with inmates.

Q.  In fact, you instructed Katrina to strip naked for you the day before the interview, didn't you?

A.  No.

Q.  Mr. Garcia, as the warden, you had the most power of anyone at FCI Dublin; correct?

A.  As the warden, I had signature authority for the recommendations and the actions of my staff.  No one person has ultimate authority.  Checks and balances are created within the system to prevent that.

Q.  Melissa was an inmate when you were the warden?

A.  Yes.

Q.  She had several years left on her sentence; right?

A.  I don't know exactly what her sentence is.

Q.  You complimented her?

A.  Never.

Q.  Showed her pictures of your penis?

A.  Did not.

Q.  Instructed her to strip naked?

A.  Did not.

Q.  Took pictures of her?

A.    Took pictures of a violation exposing herself while she was in another person's cell with the cell window closed.  She was advised to open the door, and when she didn't, I did the correctional thing and opened the door to catch a person in a prohibited act, which I thought would be narcotics.  And it turned out to be somebody exposing themselves.

Q.    You took those pictures because they aroused you, didn't you?

A.    No, they did not.  I have plenty of pictures to arouse myself.  I don't need pictures of an inmate.

Q.    You took Melissa into the visitation room bathroom on two occasions; correct?

A.    No.

Q.    You took her in there because you knew there weren't cameras there?

A.    No.

Q.    You put your fingers inside her vagina, didn't you?

A.    That never happened.

Q.    You also took her into a changing stall in the visitation room; right?

A.    No, I did not.

Q.    Where you knew it was outside the view of the cameras?

A.    No.  That never occurred.

Q.    You grabbed her breasts?

A.    No.

Q.   And her genitals?

A.   No.

Q.   And when you were in the UNICOR warehouse with Melissa where, again, you knew there were no cameras, you put your finger inside of her vagina, didn't you?

A.   Absolutely untrue.  And in all those instances, I did not have access without additional staff present, and additional staff were present.

Q.   Mr. Garcia, earlier you testified that you could check out keys for any of those areas; correct?

A.   You could check out keys.  And if it's a restricted key, you fill out a form that is signed by a lieutenant because some keys are only authorized to certain people that work in those areas.

Q.   Maria was also an inmate at FCI Dublin when you were the warden; correct?

A.   Correct.

Q.   You complimented her?

A.   No.

Q.   You told her you would sign her compassionate release paperwork?

A.   Never told her I would sign her compassionate release paperwork.  In fact, under the CARES Act, she was instructed that she did not meet the criteria for compassionate release.

Q.   You showed her pictures of your penis?

**A.**    Did not.

**Q.**    You instructed her to strip naked?

**A.**    Did not.

**Q.**    You took her hand and put it on your penis in the laundry room?

**A.**    Did not.

**Q.**    Where you knew there were no cameras?

**A.**    No cameras, but the laundry room is viewable by all the cells on the range, and it's where inmates wait to use the telephone.  So, no, I did not.

**Q.**    When you put her hand on your penis, you said, "this is all yours"; right?

**A.**    No, I did not.  I didn't have very much communication with Maria because she doesn't speak English, and I don't speak Spanish.

**Q.**    And you put your hand on her bare breasts while she was naked in her cell; right?

**A.**    No, I did not.

**Q.**    Rachel was an inmate at FCI Dublin when you were the associate warden; right?

**A.**    Yes.

**Q.**    You complimented her?

**A.**    No.

**Q.**    You bonded with her over her special needs son?

**A.**    I learned about her special needs son after the speech I

discussed to you, and that's the only discussion we ever had about her special needs son.  And that was because I was required to give a speech that motivated these people who have completed the drug program to continue pursuing their freedom.

**Q.**    You passed a message from her friend from the camp to Rachel; right?

**A.**    I told an inmate that a person had said hello.  I did that.

**Q.**    You showed her pictures of your penis?

**A.**    Never happened while she was incarcerated.

**Q.**    You instructed her to strip naked?

**A.**    Never happened while she was incarcerated.

**Q.**    You requested that she take naked photographs?

**A.**    No, I did not request that she take naked photographs on a government camera.

**Q.**    You kissed her and grabbed her butt in the electrical shop?

**A.**    Did not kiss her and grab her in the electrical shop. During the COVID protocol, she would have been on a one-on-one escort.

**Q.**    You knew there were no cameras in the electrical shop; right?

**A.**    The electrical shop is flanked on the right by a bay window, a window and a door.  And across from that door is the facility manager's office.  That electrical shop is the most

trafficked area in facilities because it's the hallway that leads to the only female bathroom in the entire building.

MS. PRIEDEMAN:  No further questions, Your Honor.

THE COURT:  Redirect?

**REDIRECT EXAMINATION**

BY MR. REILLY:

Q.   All right.  Mr. Garcia, I want to start by referring to a couple of questions that you answered early in your cross -- yes, in your cross-examination in which you referred to the date on which you were removed as being June 21st.  Do you recall that?

A.   Yes, sir.

Q.   Was that a correct date?

A.   No, sir.  I believe it would be July 21st, not June 21st.

Q.   Regarding the cameras in the facility, what was the detail of your knowledge about the cameras, their locations and whether they were working or not?

A.   Well, most of the cameras, you can see them as you walk by.  As to which ones were working or not, a quarterly report is provided by the facilities department, the COMM tech.  That quarterly report we are briefed on on the quarterly work programming meeting.

When I first arrived to Dublin, the facilities manager retired, so I believe I was probably shown one or two reports prior to them being sent to the regional office because there

was no facility manager present to do the review and send them up.  So I think I may have seen those, approved for them to be sent to the regional office because somebody has to approve them before you send stuff to the region.

Q.   But you were aware, were you not, that there were a number of cameras that were not working?

A.   Yes, sir.  It's an old facility.  Cameras go offline. Work orders are done and they're repaired.  That changes on a weekly to monthly basis.  A camera that's working today may fail tomorrow, and that's why that report is generated quarterly to see which repairs are done and which still need to be repaired.

Q.   And when you were the associate warden, was it part of your responsibility to oversee the repair of these cameras that were not working?

A.   I didn't oversee the actual repair.  I would oversee funding.  We, like I said, had a quarterly work programming meeting, and that's where the facilities department looks at their funds and what projects are priority.  So things change because it's an old facility.  And we may have projects that are listed one, two, three, and then a hot water heater blows and there is no hot water in the housing unit.  Well, then we have to stop what we are doing in one, two, three and fix the hot water.  So quarterly, we have these meetings to readjust priorities and funding.

Q.   And did you make it a priority to secure funding to repair the cameras?

A.   We did make a priority for camera work.  In fact, I think while I was there, we did -- I know of one major upgrade and probably some others, some minor upgrades to the camera system while I was there.

Q.   With respect to those cameras, the -- they made recordings of what they were seeing; correct?

A.   Correct.

Q.   At the time that you became the associate warden and during the -- strike that.

During the time that you were associate warden, were you aware of how long these videos were preserved, depending on what camera was involved?

A.   No, sir.  Each camera is connected to a server, and I believe some of them are based on motion.  So it would vary.  I was never given any exact time frames that cameras recorded information.

Q.   And the -- these quarterly reports that you received, how many of those did you see?

A.   The only two of the cameras that I directly received was when I had no facilities manager.  It would have been early '19 to probably spring of '19.

Q.   All right.  And who was preparing these reports?

A.   I don't actually know who prepares them.  I know that the

COMM tech has a part of it, but I think also the control room officers, whoever does the review of the cameras.

Q.   Who presented the reports to you?

A.   For the two that I could recall seeing, it would have been the communications tech.

Q.   Who was that?

A.   Mr. Bettencourt.

Q.   When you received those reports, was there an indication in the reports themselves as to how long each camera's videos were being maintained?

A.   No, sir.

Q.   Or preserved?

A.   No, sir.

Q.   And at the time that you were receiving these reports, did you have any reason to rely on them to hide inappropriate conduct?

A.   No, sir.

Q.   Now, you were asked on cross that when you were warden, you could watch the surveillance footage from the computers? Do you remember that?

A.   Yes, sir.

Q.   And did you ever do that?

A.   Yes, sir.

Q.   How often?

A.   Sir, I can't tell you how often I viewed them.  I'm sure

that the database will show every time my user name was logged into it.  I know that there are times when we, meaning my staff, would review information or the SIS department would come show us information.  And we'd log in, and then they would control it because they are much more familiar with the system and the cameras.

Q.   And when you did look at the surveillance videos, what was the purpose of your doing so?

A.   Usually, it was in an instance to -- to immediately address allegations of misconduct.  If an allegation came forward and through correctional services there was something that the executive staff needed to view, like I said, they could come in the office.  I could log into the program, and then they could direct the search.

Q.   Did you ever review these surveillance videos for the purpose of determining what angles the cameras were able to review -- or to view -- excuse me.

A.   No, sir.  I never reviewed the angles of the cameras.  We reviewed basically the allegations.

Q.   And if you looked at the surveillance video, you could tell what angles it would not capture; correct?

A.   It could tell us that there was a blind spot, at which point we could instruct the communications department in charge of the cameras to correct those blind spots.

Q.   Did you ever view videos for that specific purpose, to

determine what angles were not being viewable?

A.    No, sir.   That would be through the intel department, and the correctional services, its supervisor, would do those type of reviews.

Q.    Now, these -- the F-Unit laundry room, you said it did not have a camera itself?

A.    There's a camera on the door, but it looks -- it doesn't look directly into the laundry room.

Q.    But would it show, for example, people walking down the hallway to go into that room?

A.    It would show people walking up and down that hallway.  I would -- yes.  It would definitely look at people walking up and down the hallway because it's set to look at that corridor. So it would probably look all the way down the hallway and see the cells and the laundry room down that corridor.

Q.    Did you ever review the videos from that particular camera that was in the hallway of the F-Unit where the laundry room was?

A.    There was an instance on a staff member that was alleged to have assaulted an inmate in F-Unit to which all of the F-Unit cameras were reviewed to track the staff member and his actions.  And those actions were captured on camera, so, again, it was tracked all the way around the unit to see where it was coming from and where it was going from.

Q.    And did you do that review personally, or did someone else

do it?

A.   I believe it was originally brought to me by the investigative staff, and then it was later reviewed by me and the PREA coordinator as we made a determination for PREA protocols.

Q.   By "review," do you mean you reviewed all of those videos?

A.   No.  They -- the SIS department can either cut media for us or bookmark a set of videos -- a section of video.  But I don't recall how we looked at that again.  We may have even called the SIS lieutenant back to do it.  I don't recall specifically.

Q.   All right.  Let's talk about the visitation room for a minute.

That large apparent camera dome that's on the ceiling in the hallway outside the visitation room, apparently there is not really a camera in it; correct?

A.   That's what testimony here has suggested.  I was always under the impression there's a camera in there.  It's a giant bubble that houses a camera or designed to house a camera.

Q.   When you got these reports, was there an indication in them as to exactly where every camera was located?

A.   So the report is pretty generic in that it lists camera numbers and general locations.  So, like, there's a section for visit camera, but it doesn't say dome camera, ceiling camera.  It just says "visit."

There are cameras in every housing unit, but the only cameras that are labeled are, like, ones to a specific area that wouldn't be normal.

Q. All right. So it was your belief, at least, that there was a camera in that dome?

A. Absolutely.

Q. And that -- the camera that's on the ceiling of the visitation room, would that, to your perception, capture movement of people from the visitation room toward that hallway where the big dome is?

A. Yes. To my perception in the institutions I've worked, a camera in the visiting room is usually a pan tilt zoom. But that camera should concentrate on the main focus of traffic, which would have been in and out the main entrances.

Q. And that was in the opposite direction from this hallway that we're talking about?

A. Yes. The centered camera is directly center of the visiting room, so it could see the front door, the stage, would be my understanding of it from in my experience in other institutions. And then the dome camera was down the hall, leading toward the visitation bathrooms and changing areas.

Q. All right. You were asked on cross-examination if you had access to Melissa's phone calls. Do you recall that?

A. Every employee can access inmate phone calls, sir.

Q. Did you ever access phone calls by Melissa?

**A.**    I've never accessed any inmate phone call at FCI Dublin.

**Q.**    You also had access to the computer data system regarding video conferences between inmates and guests or visitors; correct?

**A.**    That's correct.

**Q.**    Did you ever monitor any of those?

**A.**    No, sir.

**Q.**    Or review them after the fact?

**A.**    No, sir, unless they would have been presented through an investigation.  I never reviewed them on the video visit system.

**Q.**    Right.

Specifically with respect to Melissa, did you ever view any video visit that she had?

**A.**    No, sir.

**Q.**    With respect to Melissa's mother, were you aware prior to her death that she was dying?

**A.**    No, sir.

**Q.**    When did you first become aware of the fact that she had a terminal illness?

**A.**    I didn't know about the illness, sir.  I became aware of her passing when I entered the unit, and the officer said the inmate was distraught and somewhat hostile.  And so myself and the officer escorted her to the other side of the unit -- she needs an escort to go from B to A -- and brought her to her

counselor's office where her coworker in the visiting room said she would wait with her until the counselor had time to see her.

Q.   Regarding preparation of the incident report on Melissa's conduct in Andrea's cell, once you had realized what was going on, you said you took the photograph of her after she stood up so that you would have her face in the photo; right?

A.   Yes, sir.

Q.   Why did you think that was necessary?

A.   Because you would not be able to identify the inmate from the first view.  And as we discussed, once that was submitted, an incident report, that would have been redacted anyway.  The facial view was so that we could positively identify the inmate.

Q.   Have you, as either associate warden or warden, been aware of other allegations of inappropriate sexual conduct by inmates?

A.   Yes, sir.

Q.   And incident reports written about those incidents?

A.   Unfortunately, there weren't incident reports written on those incidents.

Q.   None of them?

A.   There may have been some.  We, in our system, have the ability to run that PD15 or PD14 that shows all of the incident reports.  We could show the number 205, 206 or 306.

Unfortunately, there were several instances when staff reported sexual misconduct, specifically nudity, when incident reports were not written.

Q.   When they were written, what typically was the result?

A.   So the result for the incident report would be based on the severities, as we discussed.  The 200 series would be greater restrictions and even placement in the Special Housing Unit.

For the 300 series incident report, it would range from no action to suspension of a privilege, such as commissary, use of telephone, use of video visits.

Based -- those recommendations for sanctions are based on inmate conduct.  So if an inmate is in trouble repeatedly, then the sanctions would increase.  If an inmate had never been in trouble, then the system, as we talked about in this policy, encourages informal resolution for lower severity incident reports.

Q.   All right.  You testified that you cropped the one photograph to remove your image?

A.   Yes, sir.

Q.   And you said the reason was that you don't put staff images in the central files?

A.   No, sir, we don't.

Q.   Why is that?

A.   Again, those central files are a permanent record, and we

don't use staff images in them.  It's just a privacy thing.

Q.    What was the reason that you did not, in fact, prepare an incident report regarding Melissa?

A.    There were a lot of things going on in SI -- sorry -- a lot of things going on at Dublin that were not being captured by the SIS department.  The department was ineffective as the staff did not come out of their offices and make rounds and leads were not followed up on.

The office was 120 or more cases delinquent, five years delinquent on cases.  And the opportunity to have an informant that could give you realtime information that could be passed to officers to go act on was something that I thought would be useful in curtailing some of the behaviors that were going on.

Q.    Now, you testified earlier that this was actually not in accordance with the normal protocol; correct?

A.    No, sir, it was not.

Q.    Did you, at that time as an associate warden, have the authority to do things that were outside the normal protocol?

A.    Nobody should have the opportunity to violate policy.  I acted in error.  I acted in poor judgment, but I acted in a manner to gain correctional advantage over the actions that were being done by inmates on a regular basis that were not being discovered by staff.

Q.    The PREA guidelines require you to write an incident report if there is a violation of that act; correct?

**A.**    Correct, sir.

**Q.**    Do you know off the top of your head what the definition of a violation of that act is?

**A.**    Not off the top of my head, sir.

**Q.**    All right.  Is it your understanding that the mere act of exposing -- an inmate exposing herself at a time when she is supposed to be dressed is, in and of itself, a violation of PREA?

**A.**    I don't know, in and of itself, if it is a violation of PREA.  It's a moderate severity incident report, not a greater severity incident report.

**Q.**    That's something totally separate from PREA; correct?

**A.**    Yes, sir.  That's the discipline policy that we reviewed earlier.

**Q.**    Right.  And those two things are -- while they overlap to some extent, they are, in fact, independent procedures?

**A.**    Yes, sir.

        **THE COURT:**  Is this a good time for a break, Mr. Reilly?

        **MR. REILLY:**  Yes, Your Honor.  That's fine.

        **THE COURT:**  All right.  Members of the Jury, we will take our first break for the morning.

    (Proceedings were heard out of presence of the jury:)

        **THE COURT:**  The record will reflect the jury has left the courtroom.  If there is nothing that we need to talk about,

we will stand in recess.

Mr. Reilly?

**MR. REILLY:**  No nothing, Your Honor.  Thank you.

**THE COURT:**  The Government?

**MS. PRIEDEMAN:**  Just that the indexes should be done after this break, and we will get it to Mr. Reilly.

**THE COURT:**  All right.  We will stand in recess for 20 minutes.

(Recess taken at 10:01 a.m.)

(Proceedings resumed at 10:20 a.m.)

**THE CLERK:**  Come to order.  Court is back in session, and the Honorable Judge Yvonne Gonzalez Rogers presiding.

**THE COURT:**  During the break, I received a note from one of the jurors.  It is one of their birthdays, just an FYI, so they wanted me to know they had birthday cake in there. Let's bring them in.

(Proceedings were heard in the presence of the jury:)

**THE COURT:**  We are back on the record.  The record will reflect that the jury is back.

So, Juror No. 13, happy, happy birthday.  I got the note. I hope it was a delicious cake.  Sometimes I check, but I didn't have your birthdays with me on my information.  Anybody else planning a birthday here?  Well, okay.

Anyway, did you have enough plates and knives and everything to get that cut up?  Terrific.  Well, happy

birthday.  I'd sing for you, but I'm really bad.

Let's go back with the examination.  The redirect can resume.

MR. REILLY:  Thank you, Your Honor.

BY MR. REILLY:

Q.   All right.  Mr. Garcia, I want to see if we can bring some clarity here to your understanding of the difference between an incident report and a PREA report.

You were present when Dr. Malespini testified; correct?

A.   Yes, sir.

Q.   And you heard him say that under PREA, that you have a duty to report any incidents of sexually abusive behavior that you become aware of.  Do you recall that?

A.   Yes, sir.

Q.   And with respect to what you saw happening with Melissa, to your understanding, did that constitute sexually abusive behavior within the meaning of PREA?

A.   No.  She was exposing herself in what officers would describe as a bait and hook, and that is to expose herself and then apologize for whatever reason, say she was in her friend's cell, as she attempted.

And then if you don't do something about it, that's step one.  And then they would continue that type of behavior until it continued into something more inappropriate.

My resolution to her attempt to bait and hook was to give

her an option to provide information or present the incident report, which would damage her perfect disciplinary record and prolong her stay at a low-security institution rather than a minimum-security camp.

Q.   So based on your understanding, then, did you believe that you had a policy obligation to make a PREA report?

A.   No.  As, again, she did not make a sexual advance and she was not committing a sexual act.  She was just indecently exposing herself.

Q.   All right.  So that did, however, require, under normal circumstances, that an incident report be prepared?

A.   Yes, sir.

Q.   And was it your belief that in your position as associate warden, you had the authority to not do that?

A.   It was an error in judgment to not do that.  As the associate warden, I should set the example.  But it is within my authority to expunge or informally resolve lower and moderate severity incident reports.

Q.   If you -- you testified yesterday on cross-examination that when you saw an inmate acting inappropriately or naked, that there might be different circumstances, I guess is the way to put it, about what you thought about that; is that right?

A.   Yes, sir.

Q.   Could you tell us which circumstances would you consider inappropriate and therefore requiring an incident report as

opposed to something that you would, as you put it, just walk by?

A.    So if an inmate had come back from recreation, which is the 10:15 movement per se -- we close the yard at 10:15.  It's the largest population of inmates on the recreation yard.  They all come back to the housing unit at once.

Somewhere in the next half hour, they are going to be called to lunch.  So they may be running to the shower, shower, get dressed, and then go to lunch to change from their gym clothes, which they were authorized at the yard, into their uniform, which is mandatory to go to chow.

In that respect if you were walking the range and walking by the cell and there was a woman dressing or undressing, she would be doing so in her, quote, home or her cell, and she wouldn't be acting out adversely in an attempt to expose herself or create a sexual advance towards somebody.

Q.    All right.  And that would be a situation that you would just walk by, as you put it?

A.    Yes, sir.  Just keep walking.

Q.    The occasion on which these two photographs of Melissa were taken, can you estimate for us how long a period of time elapsed between the time that you took the first photo and the time that you took the second photo?

A.    It would have been a matter of seconds, three to four seconds.  The initial photo is as I opened the door, stepped in

the doorway, took the photo.  And then the second was as I told her to get up and get dressed.  It would be a matter of seconds.

Q.   And the incident report that you drafted with respect to this occasion with Melissa, based on policy, was it your obligation to report that to the lieutenant or submit an incident report to the lieutenant?

A.   It would have been best judgment to submit the incident report to the lieutenant and allow them to carry on the disciplinary acts.  Again, through ignorance and arrogance, I thought that cultivating an informant would be beneficial in searching down other actions that were occurring in the institution.

Q.   And then -- and that's consistent with the language in the policy manual on disciplinary process; right?

A.   Yes, sir.

Q.   It says you must prepare a report?

A.   It says "ordinary," yes, sir.

Q.   Have there been other occasions -- well, strike that.

You testified that officers sometimes don't write reports. Has there ever been an occasion before where you did not write a report in a circumstance in which policy required it?

A.   Yes, sir.  Many times.

Q.   And for the reasons that you described earlier?

A.   For various reasons.  If -- and, again, I have been at

eight duty stations over 30 years.  If you could gain more information than the incident report is worth in the disciplinary process, then information is always beneficial for the orderly running of the institution.

In other facilities, specifically male facilities, male sexual behavior toward female staff is -- is rampant to the point that there are times when we would move cameras to catch inmates in sexual acts and then cut stills of those videos so that we could support the incident reports.

Or if we could not identify them positively, then take the inmate and give them some kind of category in the -- in the institution where they would be more closely monitored.

Q.   And then after this -- you'd reached this informal agreement with Melissa, you indicated on cross that you did, in fact, receive information from her about inappropriate conduct by a correctional officer?

A.   Yes, sir.

Q.   And did you pass that on to Lieutenant Putnam?

A.   Yes, sir.  To which he advised that they were already working on an investigation.  But to my knowledge, that investigation never came to a conclusion, even though inmate Melissa named him in her testimony as somebody that she had gained information off of, which is unauthorized.

Q.   And I take it that was based -- this investigation that was already ongoing was based on information received from

someone other than Melissa?

**A.**    Yes, sir.  The investigative department was acting on information from another source.  My information added to their source, and they began looking more thoroughly.  But, again, they did not conclude anything at that time, and nor do I know if that officer has been dealt with since this second violation has occurred.

**Q.**    All right.  I'd like to clarify something about the compassionate releases as well.

You indicated that you received quite a large number of those, as many as 25 a day?

**A.**    Yes, sir.

**Q.**    And you said that it was not your final decision to make regarding whether that release would be granted or not; is that right?

**A.**    Yes, sir.

**Q.**    Did you have the authority to override a recommendation by the individuals who had prepared the report, whether it was yes, it should be granted?  Could you turn it down?

**A.**    So the reports generated by unit management -- and as I explained, if it was a request for medical conditions, then the doctor would review the medical reasons to support it.  If it was for other programming units, then the unit team would look at that.

And then the unit managers would prepare the actual

request form, and then that form would be reviewed by the associate warden to confirm whether the recommendation was appropriate based on the information provided.

And then it would be provided to me as the signature authority. And -- at which time I believe that if we approved it, it would go to the next level, basically the judicial system, to release the inmate because the prisons doesn't release them. It has to be a court order to release. If it was denied, then the inmate would be denied.

If at any time I disagreed with the recommendation, then I would have to provide written information or support to justify why I was disagreeing with it, and that would have to go back to the unit manager because they're the ones that prepared the documentation, not my office.

Q. All right. And what would happen if, for example, the recommendation was to deny a compassionate release and you decided that it should be granted? Was there a way you could do that?

A. Well, yes. I would have to write the reasons why I felt it needed to be granted in a formal memorandum to the unit managers, and then they would have to prepare new documentation with my information in it, supporting the release.

Q. All right. And what if the end result of that was that they still chose to deny it?

A. If the compassionate release was denied at the institution

level, the inmates had another avenue through the administrative remedy process. They could file a BP10, which goes to the region, and according to the CARES Act, that would be the final step for them.

Q. All right. Short of that, if you had gone through that process where you disagreed, you sent them your reasons why, they came back with the same recommendation, was there anything else you could do to change that result?

A. No, sir. Their recommendations are what my signature authority is based on, and their recommendations are a matter of record in the central file. So if I were to change their recommendation solely on my desire to change it, it would be documented.

Q. And what would happen?

A. Most likely, the unit team would have to speak with their regional counterparts, which is the next level up from the institution so that the region can get involved as to whether or not I had the authority to override the recommendations provided by them.

Q. At any time in your tenure as the associate warden or warden, did that ever happen?

A. Not with compassionate release, but, yes, with Dr. Townsend. When she was not happy with my decision to continue to use psychology services staff during COVID protocol, she had the ability and did contact the region. And

when not satisfied with the region, she had the means and ability to contact the central office.

Q.   And that's when you told us previously that they ordered you to release the psychologists from the day-to-day routines?

A.   Yes, sir.  And that all happens in writing.

Q.   All right.  Regarding the monitoring of phone calls, at any time during your tenure as the associate warden or the warden, did you ever monitor inmate phone calls?

A.   No, sir.

Q.   For any inmate?

A.   No, sir.  I never monitored an inmate phone call.

Q.   The incident where you saw Rachel with a ripped pocket, I think you described that as being essentially out of uniform; is that right?

A.   Yes, sir.

Q.   With the pocket dangling down?

A.   Yes, sir.

Q.   Was that something that was readily apparent when you looked at her?

A.   Yes, sir.  The pocket was torn on both sides and only stitched at the bottom of the pocket, so it was flapping around.  To my recollection, the reason it became obvious is because the inmate did not have her shirt tucked in.  And it's policy that inmates have their shirt tucked in when they're on the compound.  So when she tucked in her shirt, then the pocket

became visible.  And that's when she was ordered to go to laundry.

Q.   And when you created the rememberpockets email address, do you recall on what date that happened?

A.   No, sir.  Again, it's something I created.  But, again, I'm behind the times in social media and that type of thing. None of the people that I was involved with ever wanted to use a Gmail account.  They were all more comfortable texting.

Q.   All right.  Would sometime in February of 2020 be a likely date?

A.   Yes, sir.  I believe that is what the date was on the report that we looked at.

Q.   Are you talking about Dr. Kan's report?

A.   Yes, sir.

Q.   And when was -- when was it that you gave that email address to Rachel?

A.   It would have had to have been at the end of August because in September-- August 31st, I was ordered to go to Brooklyn for a full month, and I was not back until, I think, September 29th or September 30th.

Q.   And she was released in September 2020; correct?

A.   Sometime, yes, sir.

Q.   So did the email address rememberpockets have any connection or correlation with your having viewed Rachel walking around with a ripped pocket in the Dublin facility?

**A.**    No, sir.

**Q.**    And then you had this arrangement with her where she was going to provide you with some information?

**A.**    She stated that if I allowed her to make contact with me, she would provide information regarding several issues at the institution.

**Q.**    And I think you testified on cross-examination that you did not tell SIS that she had said she had information; is that right?

**A.**    No, I did not.

**Q.**    And that you chose to gather that info yourself?

**A.**    Yes, sir.

**Q.**    Is that also a violation of policy?

**A.**    There were many people who cultivated information from people -- inmates.  I think the violation of my policy was to have the contact with the inmate.

**Q.**    And then when you deleted emails regarding any of these inmates, was that in and of itself a violation of policy of some kind?

**A.**    The violation of policy that I committed was having contact with the inmate, sir.

**Q.**    All right.  But the deletion of the emails in and of itself was not a separate violation?

**A.**    No, sir.

**Q.**    Now, you indicated that part of the thought process

regarding Rachel was that you were close to retiring; is that right?

A.   The thought process that led me to act inappropriately on the phone with Rachel was because I intended to retire December 31st of that year, yes, sir.

Q.   And in the end, you did not retire on that date; correct?

A.   No, sir.  When I told my warden that I would not be at work after December 1st, he advised the regional office.  And as such, they offered me a job to stay.

Q.   And that job was to become the warden?

A.   Yes, sir.  Initially, I had intended to use the remaining of my sick leave and just not come to work after December 1st, but when they offered me the job, I chose to stay.

Q.   And as a result of that decision, what did you decide to do about Rachel?

A.   Immediately stopped contact with her.

        MR. REILLY:  Thank you.  That's all I have at this time, Your Honor.

        THE COURT:  Recross, limited to the scope of redirect.

        MS. PRIEDEMAN:  No questions, Your Honor.  No recross.

        THE COURT:  All right.  Any need for recall?

        MS. PRIEDEMAN:  No, Your Honor.

        MR. REILLY:  No, Your Honor.  Thank you.

        THE COURT:  All right.  You're excused.  You may step down.

Any more witnesses for the defense?

MR. REILLY:  No, Your Honor.  Defense rests.

THE COURT:  The defense rests.

(Defense rests.)

THE COURT:  Any rebuttal witnesses for the prosecution?

MR. PAULSON:  Yes, Your Honor.  The Government calls Michael Bettencourt.

THE CLERK:  Mr. Bettencourt, would you please raise your right hand.

**MICHAEL BETTENCOURT**,

called as a witness for the Government, having been duly sworn, testified as follows:

THE WITNESS:  Yes.

THE CLERK:  Thank you.  You may be seated.  Please speak clearly into the microphone.  State your full name, spell your last name.

THE WITNESS:  My name is Michael Bettencourt. M-I-C-H-A-E-L, B-E-T-T-E-N-C-O-U-R-T.

THE COURT:  Good morning, sir.

THE WITNESS:  Good morning.

THE COURT:  You may proceed.

**REBUTTAL EXAMINATION**

**DIRECT EXAMINATION**

**BY MR. PAULSON:**

Q.  Mr. Bettencourt, where do you currently work?

A.  FCI Dublin in Dublin, California.

Q.  How long have you worked there?

A.  I've worked there since May, 2013.

Q.  How long have you worked at the Bureau of Prisons?

A.  Since September 11th, 2011.

Q.  Where did you work prior to FCI Dublin?

A.  USP Atwater.

Q.  What's your position at FCI Dublin?

A.  I'm the electronics technician.

Q.  What does that job entail?

A.  I am responsible for the cameras, the network infrastructure structure, the radios, phones, and fence detections systems.

Q.  Sort of all the electronics at FCI Dublin?

A.  Yes.

Q.  What are your responsibilities with respect to the cameras at FCI Dublin?

A.  Operating and maintaining them and installing them as needed.

Q.  How long have you served as the electronics technician at FCI Dublin?

A.  Since January 2019.

Q.    Since you began working at FCI Dublin, have there been significant blind spots in the camera coverage at the prison?

A.    Yes.

Q.    What are some of those areas that have blind spots?

A.    Blind spots would be, like, TV rooms in the housing units. And we have entire buildings without cameras, and we do not have anything on the compound.

Q.    What do you mean "anything on the compound"?

A.    Just outside the buildings, showing the center of the compound.

Q.    Initially when FCI was designed, was the camera coverage designed to cover all of the areas of FCI Dublin?

A.    No, it was not.  It was more for monitoring the comings and goings of, like, inside the housing unit rooms.

Q.    Who knows where the cameras are placed at FCI Dublin besides you, of course?

A.    They could be seen anywhere, and -- or they can be seen. They're out in plain sight, and anybody that does the -- like the daily audits of them and anybody that has computer rights to the cameras.

Q.    Who would some of those people be?

A.    Myself, the lieutenant, captain, associate warden, warden.

Q.    Are there different rights of access to these cameras based on a person's position?

A.    Yes.

Q.    What rights does an associate warden have to the cameras?

A.    I believe they can play back.

Q.    What does that mean?

A.    They can kind of go back and kind of see what goes on at certain times.

Q.    What about the warden?  What type of rights does the warden have to view these cameras?

A.    He is also able to play back.

Q.    Did you ever speak with the defendant about areas of FCI Dublin that had blind spots in the camera coverage?

A.    Yes.

Q.    Tell the jury about that.

A.    Back when -- before I got the position, it was something that -- I've always been coming from a USP where there are very few blind spots.  When I came to FCI Dublin, it concerned me a lot that there was a lot of blind spots.  And once I was eligible for the position to actually -- to make a difference with it, he was in a position that was able to help me get rid of those blind spots.  And we had a lot of cameras that were not functioning at the time, and he helped me get the funding to replace all the cameras.

Q.    Did you tell him about specific places at FCI Dublin where there were blind spots?

A.    Yes.  He -- he was aware also, but, like, I was very concerned about, like, the food service areas and just outside

the buildings and just warehouses that just people can come and go and not even be seen.

Q. You mentioned that a number of the cameras weren't working when you first started. Can you tell the jury about that?

A. Yes. There was -- there was difficulty, like, with the position of replacing the cameras because of all the job duties. And there were 60 cameras that were down when I started. And we were able to get the funding to -- I think it was along the lines of $17,000 to replace every single one of the cameras.

Q. Did you keep the defendant apprised of the status of your efforts to fix those cameras?

A. Yes. I informally kept him apprised just because -- just as things went on, it wasn't something -- he wasn't requesting, like, daily checks or anything like that. But just as I saw him in passing, I would tell him if I replaced like five, ten cameras.

Q. Based on your interactions with him, was that something that you understood that he liked to know?

A. Yeah. He seemed to like to know pretty much a lot of the inner workings of how things go.

Q. Including the cameras?

A. Yeah.

Q. At FCI Dublin, who knew which cameras were working and which cameras were broken?

**A.**    The control center officer.  They do daily checks of the cameras three times a day, and they send it up to lieutenants. And I don't recall exactly how often the SIS, but they typically check also.

**Q.**    How about the associate warden and the warden?

**A.**    The associate warden would know.

**Q.**    Had the lack of working cameras at FCI Dublin been a consistent problem?

**A.**    For -- from what I have heard, yes.

**Q.**    Based on your experience there?

**A.**    Yes.  And then once we got them all up and running, it was more along the lines of trying to get new ones in place.

**Q.**    Are the cameras that are in place now and then have been over time, are those -- were those placed in an effort to deter or detect staff misconduct?

**A.**    No.

**Q.**    What were they designed to monitor?

**A.**    Just when -- like, there was a time when inmates had the keys to their own doors.  And when they removed those keys from them, they put the cameras up in place to monitor who goes in and out of their own doors.

**Q.**    If the warden or associate warden wanted to view camera footage from one of the cameras that was working, how would they go about doing that?

**A.**    They have the program installed on their computer, and

they're able to pull it up and just kind of pick and choose which cameras they want to look at.  Or they can keep them up on a separate monitor.

Q.   All right.  For the cameras that are working, is there someone at FCI Dublin who is watching all of the cameras 24/7?

A.   They have them in the control center, but it's more of something that just goes on in the background.  It doesn't necessarily get watched.  If -- like, they're kind of in front of them, but if something big is going on, it's something that can kind of come to your attention.  But it's not typically monitored like that.

Q.   So when would someone go back and review specific camera footage?

A.   During investigations, like, if something's brought to SIS's or a lieutenant's attention, they usually go back and look at it.

Q.   How long is the footage maintained?

A.   For the housing unit, it's approximately 50 days.

Q.   What about for other cameras at the prison?

A.   They are roughly about the same, depending on the recorder that they're on, because we're in the process of changing.  We received new equipment, so some of our recorders that have less cameras have more days of recording time on them.

Q.   Now, that 50-day retention period, has that always been the case since you started working in your position in

January 2019?

**A.**    I don't exactly recall because it's more of a -- depending on how many cameras we have in place.  Back when we didn't have cameras recording at the time, the ones that were recording could have potentially recorded longer.

**Q.**    What happens to the footage once it hits that expiration date?

**A.**    It's not so much an expiration date.  That's just the end of the memory of that, and it just -- it's kind of a rolling recording where once it gets to the end, it will start over at the beginning and just record over the earliest footage.

**Q.**    So once -- once the recording records over earlier footage, can you recover that earlier footage?

**A.**    Not that I'm aware of.

**Q.**    Who would know how long the footage is maintained?

**A.**    Anybody that can -- that has access to look at the computer -- at the server for the cameras.

**Q.**    Would that include the associate warden and the warden?

**A.**    Yes.

**Q.**    How long is footage maintained in the F housing unit?

**A.**    Approximately 50 days.

**Q.**    Would the warden know that?

**A.**    Yes.

**Q.**    How about AB housing unit?

**A.**    It's the same, 50 days.

Q.   How long is the footage currently maintained in the visiting room?

A.   Visiting room is on a new recorder, so as of right now, it's like 594 days.

Q.   What about in July 2021, how far back would the footage from the visitation room have gone?

A.   I did not check it at the time, so I wouldn't know because we placed the new equipment.

Q.   Would the warden at that time know how long the camera footage --

A.   Yes.

        MR. REILLY:  Excuse me, Your Honor.  I'm going to object to that as calling for speculation and ask that the answer be stricken.

        THE COURT:  Sustained.  It's stricken.

BY MR. PAULSON:

Q.   Are there cameras in the visiting room?

A.   Yes, there are.

Q.   How many?

A.   There is one in the center and two in the children's room.

        MR. PAULSON:  Ms. Slattery, if you could please pull up Exhibit 39.

        And, Your Honor, this has already been admitted, so I would ask that we be able to publish this to the jury.

        THE COURT:  You may.

**BY MR. PAULSON:**

Q.   Mr. Bettencourt, do you recognize this?

A.   Yes.

Q.   What is this?

A.   So that is the hallway.  There is a big dome right there that does not have a functioning camera because when they switched over from analogue to digital, that was never replaced.

Q.   So since you started in January of 2019, was there ever a camera in that big dome?

A.   No.

Q.   Are there any cameras down that hall?

A.   No.

        MR. PAULSON:  Ms. Slattery, can you please pull up Exhibit 50.

    And, again, Your Honor, this has already been admitted, and we would ask to publish it.

        THE COURT:  You may.

**BY MR. PAULSON:**

Q.   Mr. Bettencourt, do you recognize this?

A.   Yes.

Q.   What is this?

A.   This is the visiting room area.

Q.   Is there a camera in this picture?

A.   Yes.

Q.    Where is it?

A.    There is a camera at the top in the center.  There is like a circle with a black dome near it.  Yes.

Q.    Is it a 360 camera?

A.    It is a pan tilt zoom.

Q.    What does that mean?

A.    So it kind of points wherever you tell it to point, and you can zoom in and out on certain objects.

MR. PAULSON:  Ms. Slattery, if we could go back to Exhibit 39.

Q.    So let's say that that camera was pointed towards this hallway.  What would be visible from the camera footage from the camera that we just saw in the prior exhibit?

A.    Because of the angle of where it's placed and where the hallway is, it will get some of the vending machines.

Q.    Would it see anything past the vending machines?

A.    No.

Q.    Do you see the stairs on the right side of the frame here?

A.    Yes.

Q.    What's to the right of those stairs?

A.    There is a doorway.

Q.    So if someone entered the visiting room through that door, would the camera capture that?

A.    No.

Q.    Is there anywhere in the prison a camera that would

capture someone entering the visitation room through that window?

A.    No.

Q.    If someone entered the visitation room through that door and then went down that hall, would the camera capture it?

A.    If they're going down the hall towards the restrooms, no.

Q.    What about if they went into one of the restrooms or the changing stalls, would the camera capture that?

A.    No.

        MR. PAULSON:    Okay.  You can take that down, Ms. Slattery.

Q.    Are there cameras in the CMS building?

A.    No.

Q.    So I take it there is also no cameras in the electrical building that is within the CMS building; is that right?

A.    No, there is not.

Q.    Is it common knowledge that there are no cameras in the CMS building?

A.    Yes.

Q.    Is there a camera in the laundry room in F-Unit?

A.    There is not a camera in the laundry room, but there's a camera down the hall that catches a little bit of who would go in and out of that laundry room.

Q.    Does that camera capture anything about what's going on inside the laundry room?

**A.**    No.    Normally, if they have like a chair placed like just inside the door, and then like you can kind of see them, but that's about it.

**Q.**    Were there any cameras in the UNICOR warehouse?

**A.**    No.

**Q.**    Was that general knowledge as well?

**A.**    Yes.

MR. PAULSON:    That's all I have, Your Honor.

THE COURT:    Cross?

**CROSS-EXAMINATION**

BY MR. REILLY:

**Q.**    All right.    Good morning, Mr. Bettencourt.

**A.**    Good morning.

**Q.**    When you had your conversations with Mr. Garcia about these cameras, when did that first take place?

**A.**    I don't exactly recall.    It might have been towards -- like after I got selected for the job.

**Q.**    Which was when?

**A.**    October of 2018, and then I started in January 2019.

**Q.**    And, in fact, you provided to Mr. Garcia a camera report in January of 2019, did you not?

**A.**    I believe so.    I don't recall exactly when it was, but I do remember that I took notes for him as far as what was down and then what we required fixing.

**Q.**    And what was the reason that you were giving him that

particular report?

A.    He's pretty well-known for being able to get stuff, like if I require funding for it and it's a safety and security thing, he's kind of a go-to for being able to get things done.

Q.    And after you showed him that initial report, was he able to get you the funding that you needed to replace the cameras that were not working?

A.    Yes.

Q.    How long did that take?

A.    I don't recall exactly.  I just know last I looked over my email -- I think it was March of 2019 -- we significantly reduced the number of cameras that required fixing, and I believe it was approximately June where I had all 60 cameras replaced.

Q.    So by June of 2019, all of the cameras in the facility were functioning?

A.    Yes.  That's approximate.

Q.    And subsequent to that date, I take it normal maintenance meant that sometimes cameras would go down?

A.    Yeah.  If they go down, then it was a lot easier -- like they were all replaced, and as one went down, it was easier for me to just -- I had some in stock that I was just able to replace.

Q.    All right.  Typically, then, throughout the rest of 2019, if a camera went down, you were able to fix it?

A.    Yes.

Q.    How about 2020?

A.    Yes.

Q.    2021?

A.    Yes.  2021 was a little more difficult because I had a couple more projects, but -- it took longer than a day, but, yes, they were able to get replaced or fixed.

Q.    When you say "longer than a day," what are you referring to?  How long?

A.    It would be approximately like three, four days.

Q.    All right.

A.    Depending on if I can get --

Q.    All right.  So from June of 2019 through July of 2021, I take it it would be fair to say that there was never a time that there was a significant number of these cameras that were not working?

A.    Can you say those dates again?

Q.    Yes.  From June of 2019, when you said they were all up, until July of 2021 --

A.    Yes.

Q.    -- fair to say that during that period of time, pretty much all the cameras were working all the time?

A.    Yes.

Q.    And if one went down, it only took you a day or maybe a few days to get it fixed?

**A.**    Yes.

**Q.**    And during that period of time if a camera went down, did you report that to Mr. Garcia?

**A.**    No.  Because it was more of -- like, once we got everything taken care of, it was kind of -- it wasn't an issue anymore.  And it was something that -- it went through the proper channels of when they do their daily checks.  And then they would report it to the lieutenants and then they would let me know.

**Q.**    And that was not -- strike that.

You say you reported to the lieutenant?

**A.**    The control officer would report it to the lieutenants if there was any issues with the cameras.

**Q.**    And that was not something that typically you would get an associate warden involved in?

**A.**    No.

**Q.**    And then once all of those cameras were fixed, you said you started concentrating on getting new ones?

**A.**    There -- I did want to get new ones.  There was a lot of -- there's -- there used to be a lot of red tape when it came to getting new cameras installed.  Like as far as new locations, it would have to go up to, like, the region, and then they have to approve it.  And then it has to go into prints.  And I didn't have -- with all of my other job duties, I didn't have the time or energy to focus on that, so it kind

of was something that was placed on the back burner.

Q.   So from June of 2019 until July of 2021, were there any new cameras installed?

A.   There were new cameras put onto the network that were already like just -- they were already in place.

Q.   Okay.  What I meant was this expansion of the cameras that you were interested in having accomplished, did any part of that take place during that period of time?

A.   No.

Q.   Actually, there was a plan to add quite a few, wasn't there, at one point?

A.   Yes.  We wanted to, but it was something that I wasn't able to focus on.

Q.   Specifically, the plan was to add 140 new cameras; right?

A.   Oh, that came significantly later.

Q.   About when?

A.   It was beginning of this year.

Q.   2022?

A.   Yes.

Q.   Okay.

     You mentioned that the associate warden would know which cameras were broken?

A.   Just based on if -- because they have a significant amount of duties, too, that they're not going to be checking the cameras.  But if they were to be in the program, looking for a

specific camera, they would know.

Q.   Okay.  And then I take it that in January and March of 2019 when you were making these reports to Mr. Garcia, he would know at that period of time which cameras were broken and which ones were working based on your reports?

A.   Yes.

Q.   Those reports specified exactly the cameras; right?  Which ones were functioning and which ones weren't?

A.   I just gave like extra -- like of the audit forms, like I would just kind of show which ones were functioning and it had a lot less red on them.

Q.   Did you ever take Mr. Garcia around the facility to show him which cameras were working and which ones weren't?

A.   I don't really recall.

Q.   Did you ever have any -- strike that.

Is there a way to tell from looking at the records, not the videos themselves, but just the paperwork records, which direction any particular camera is facing?

A.   Not the way they're facing, no.

Q.   So -- so to know exactly what any particular camera was seeing, would someone have to go and actually sit down and monitor that specific camera?

A.   You would have to check, yes.

Q.   And how many of them were there at that time?

A.   I don't recall the specific number.  I think it was about

198, but I don't know for sure.

**Q.** If I told you your report shows 193, does that sound about right?

**A.** Yes, that sounds about right.

**Q.** And then did these reports indicate for how long the videos were retained for any particular cameras?

**A.** Those reports do not.

**Q.** Is there some other report that tells that?

**A.** If there is, I'm not aware of it.

**Q.** All right. You said that the -- the associate warden and the warden could both view these video records; correct?

**A.** Yes. They can play back.

**Q.** And does the playback show how long the retention period is?

**A.** If you were to go past the retention period, it will stop you at the latest moment that it can record.

**Q.** And you mentioned that the warden would know the retention period was 50 days. How he would know that?

**A.** If that was something he was specifically looking for and tried to go beyond that day.

**Q.** Other than that, just let's say he is not looking at the videos, would there be any way for the warden to know what the specific retention period was for any camera?

**A.** I don't believe so.

**Q.** Is there any way you can tell that without actually

looking at the monitors?

A.    Without looking at the monitor, I would have to go on my AMS server and then I would be able to see.  It will give me which -- which areas have -- like, how much recording time they have.  I have different rights than others.

Q.    I'm a little confused.  I thought you said these were basically loop videos.

A.    They are loop.

Q.    So there would be no, quote, recording time available.  It would just go and write over whatever was there before; right?

A.    It will give you an estimated retention.  Like, when I say 50 days, it will say you have approximately 50 days of actual recording time.

Q.    Oh, okay.

A.    According to which cameras are on the network at that moment.

Q.    Okay.  And what report is that in?

A.    That would be on the NICE system.

Q.    Is that something that the warden and the associate warden have access to?

A.    They have limited access to play back and they can view live feeds.

Q.    Okay.  I got that.

But specifically this information that you were talking about that shows how long your loop period is, is that

something that shows up on the part of the program that they would look at?

A.    No.

Q.    Does that require some special access then?

A.    Yes.

Q.    And who can provide the warden, for example, that access?

A.    I would be able to.

Q.    Did Mr. Garcia ever come to you at any point and ask for access to those records?

A.    No.

Q.    You mentioned that the visitation room retention period is 594 days?

A.    Yes.

Q.    So that's roughly a year and a half?

A.    Yes.

Q.    And has that been the case since you began working at Dublin?

A.    No.  Because we installed the visiting room camera on a separate recorder.  They upgraded our storage.  I don't recall exactly when.  I haven't had a chance to go back and check, but approximately 2019, they gave us three new recorders to add.

Q.    So sometime in 2019, the visitation retention period bumped up to 594 days?  Is that what you're saying?

A.    It would just say -- it wouldn't say like it bumped up to 594 days.  It will show -- like, if we added the recorder, and

then the next day, it would say it has one day of retention. And then as it goes on, it will tell you how much retention it has or how many days it's retained.

Q.   Okay.  So starting in 2019, at some point in 2019, that visitation retention period became 594 days; is that right?

A.   No.  Not -- it's -- it just shows how much it's actually retaining at that moment.  So if I were to add six new cameras, it would -- like as the days went on, that number will go down for that specific camera, and then it will even it out amongst the cameras.

Q.   Okay.  But in the visitation room, there is only one camera, right, or are there more now?

A.   No.  There is two cameras in the visiting room, and then there is two placed outside, towards the -- there's two outside towards the playground.

Q.   And are all four of those cameras on that circuit that you were just talking about where they even out among the cameras?

A.   Yes.

Q.   And is that -- is the retention period for those four cameras currently 594 days?

A.   They are -- they are most likely different.

Q.   And when was the last time you checked to see what the difference was, if any?

A.   I just recently -- I would say last week I saw.

Q.   All right.  And last week when you looked at it, what was

it showing?

A.    I only looked at the middle one.  I didn't see -- I didn't really pay attention to the rest of the visiting room cameras.

Q.    What did the middle one show?

A.    594, approximately.  594, 596, somewhere in there.

Q.    And in, say, the second half of 2019, would that have been about the same retention period?

A.    No.  Because we just installed those cameras -- we just installed that recorder.

Q.    Okay.  I thought you said you did that in 2019.

A.    It wouldn't have -- it wouldn't have data from the previous recorders.

Q.    Okay.  I understand that.

A.    Yeah.

Q.    But going forward from sometime in the middle of 2019, it would have enough storage to keep 594 days' worth of video?

A.    Yes.

Q.    So let's say from June of 2019, the end of June, halfway through the year, it would record -- everything that happened between then and roughly the end of 2020 would be retained?

A.    Yes.

Q.    And then as you got past the end of 2020, it would start to drop off --

A.    Yes.

Q.    -- the 2019 stuff?

A.    Yes.

Q.    So as of today, for example, which is -- we are 11 months into 2022, so you're still retaining information back to roughly halfway into 2021; is that right?

A.    Yes.

Q.    When did you become aware that there was no camera in the dome in the hallway outside the visitation area?

A.    Back when I worked in the visiting room when I first started at FCI Dublin.

Q.    That was before you were electronics technician?

A.    Yes.  I was a correctional officer.

Q.    And at any point after you became responsible as the electronics technician, did you ever have any conversation with Mr. Garcia in which you discussed the fact that there was no camera in that large dome in that hallway?

A.    Not regarding that specific camera.

Q.    Or did Mr. Garcia ever indicate to you that he knew there was no camera there?

A.    No.  Or not that I recall.

Q.    With respect to the laundry room in Unit F, you said there's no camera that, like, looks directly into that room; right?

A.    No.

Q.    But there is a camera in the hallway; correct?

A.    Yes.

Q.   And that camera in the hallway would pick up anyone who walked down the hallway and went into the room?

A.   Yes.

Q.   And conversely, when they came out, the camera would pick that up as well?

A.   Yes.

Q.   Is it possible to get into that laundry room without being picked up by that camera in the hallway?

A.   No.

Q.   The -- when was it exactly that Mr. Garcia was given rights to view these camera recordings?  Do you know?

A.   I don't recall exactly.

Q.   Was it sometime after you became the electronics technician?

A.   He was an associate warden when I became an electronics technician so he most likely already had rights.  But when he became warden, he received the rights for the warden access.

Q.   And that's somewhat more extensive than the associate warden?

A.   No.

Q.   No?  The same?

A.   Yes.

Q.   So your understanding is that he had those rights throughout the entire time that you've been the electronics technician?

**A.**    I believe so, yes.

**Q.**    Prior to -- strike that.

In January of 2019, did you have information about what blind spots there might be in the system?

**A.**    Just from what I observed as a correctional officer working the control center, and just walking around, you can kind of tell.

**Q.**    All right.  And you mentioned, of course, that there are a number of buildings that don't have cameras at all.  And essentially the -- like the rec area, does it have a camera?

**A.**    No.

**Q.**    And so pretty much, perhaps other than the entrance to the visitation room, which you said has two outside cameras -- pretty much everywhere else, there is no outside cameras; is that right?

**A.**    Those two outside cameras are in a fenced-in area that faces towards the children's play area and there is some benches outside.  So there is no enter and exit at that point.

**Q.**    So those cameras are not designed to record people coming into the visitation room?

**A.**    No.

**Q.**    They're just designed to monitor the kids, basically?

**A.**    Yes.  And the outside visitation area.

**Q.**    And are those monitored on a regular basis?  In other words, is someone sitting there looking at that --

**A.**    Nobody -- I don't think anybody is really actively staring at them.  I know if there's something of interest, you can go check the control center to see what's going on, but that's during visitation hours.

**Q.**    Other than your having submitted these reports in roughly January and March of 2019, did Mr. Garcia ever specifically ask you for information about any of these cameras?

**A.**    I don't recall.  I think it was just me more trying to be helpful and just kind of bring up the security of the institution.

**Q.**    And those conversations were, shall we say, somewhat generic, just "How many cameras are working?"  "how many are not working?"

**A.**    Uh-huh.

**Q.**    "What do we need to do to fix this?"

**A.**    Yes.

**Q.**    Never "Is this specific camera working?"

**A.**    No.

**Q.**    Or "Does this specific camera show this specific place?"

**A.**    No.

**Q.**    And then once -- well, strike that.

Do you have access to the login records of the warden and the associate warden when they go to look at anything on these cameras?

**A.**    Yes.

**Q.** And do your records show that Mr. Garcia ever logged in to view any of these videos?

**A.** I've kind of passively looked at them, and I'm able to see -- I have seen when certain user names logged in.

**Q.** Did you ever see Mr. Garcia log in?

**A.** Just from the warden's work station.

**Q.** How often did that happen?

**A.** I don't recall exactly. It was just something I was checking to see the capability of it.

**Q.** Are we talking every day, once a week, once a month?

**A.** Oh, I don't recall.

**Q.** And is it -- what is your understanding of the purpose of the cameras inside the units?

**A.** It all depends -- like, when they were initially set up, they were designed to just look down the hallways towards the unit rooms to see who's coming in and out. But as I replaced some of them, I was able to widen the field of view so that you could see some of the lobby and try to eliminate some of the blind spots.

**Q.** All right. But the purpose is to monitor the inmates, I take it?

**A.** Yes.

**Q.** And perhaps find misconduct if it takes place?

**A.** Yes. But because of their original intent, it doesn't quite capture -- it's not -- it's not efficient.

Q.    It's not very good at it?

A.    No, it's not very good at it.

Q.    Better at other institutions?

A.    Yes.

Q.    Do you have any understanding why that's the case, why Dublin is not as efficient about that as other places?

A.    Just from -- just from what I was told about when they implemented it, it was just more of a see who's coming and going.  And as the scope of, like, just kind of what Dublin, the change in -- not so much security levels, but what's going on with the institution, the camera system didn't really evolve with it.

Q.    Okay.  When -- that hallway off of the visitation room has these changing stalls?

A.    Yes.

Q.    None of -- the cameras that are in that visitation room now, neither of them can see down that hallway; is that right?

A.    No.

Q.    And was that true in 2019 and 2020?

A.    Yes, that is true.

Q.    Do you recall when it was that the program by which the warden and the associate wardens could access these videos was created?

A.    I don't recall.

Q.    Was that before or after you became the electronics

technician?

**A.**    That was before me.

**Q.**    Do you personally have keys to the visitation room?

**A.**    I do not, but they can be checked out.

**Q.**    And otherwise, you could have the CO let you in?

**A.**    Yes.

**Q.**    And the checkout keys, where are they located?

**A.**    At the control center.

**Q.**    So I take it that's not something you can just walk in and grab?

**A.**    No.

**Q.**    You have to get probably whoever is in charge of the control center at that time to get them for you?

**A.**    Yes.  I usually request them at the door and give them a little accountability chip.

        **MR. REILLY:**  Thank you.  That's all I have, Your Honor.

        **THE COURT:**  Redirect?

        **MR. PAULSON:**  No, Your Honor.

        **THE COURT:**  Any need for recall?

        **MR. REILLY:**  Not for my part, Your Honor.

        **MR. PAULSON:**  No, Your Honor.

        **THE COURT:**  Okay.  Mr. Bettencourt, you're excused, sir.  Thank you.

        **THE WITNESS:**  Thank you.

THE COURT:  Next witness.

MR. PAULSON:  Your Honor, at this time, we would call Lieutenant Putnam.

THE COURT:  Okay.  Do you have one witness or two?

MR. PAULSON:  We have one witness, Your Honor.

THE COURT:  All right.  Let's call him in.

MR. PAULSON:  Your Honor, this is the witness we discussed about before.

THE COURT:  I understand.  We can get the direct.

MR. PAULSON:  Yes, Your Honor.

THE CLERK:  Lieutenant Putnam, would you please raise your right hand.

**STEPHEN PUTNAM**,

called as a witness for the Government, having been duly sworn, testified as follows:

THE WITNESS:  Yes.

THE CLERK:  Thank you.  You may put your hand down and be seated.  Please state your full name and spell your last name.

THE WITNESS:  Full name, Stephen C. Putnam, P-U-T-N-A-M.

THE COURT:  Good morning.

THE WITNESS:  How are you doing, ma'am?

THE COURT:  Good.  Are you comfortable taking that mask off so we can see your face?

THE WITNESS:  Yes.

THE COURT:  Thank you.  You may proceed.

MR. PAULSON:  Thank you, Your Honor.

### DIRECT EXAMINATION

BY MR. PAULSON:

Q.  Lieutenant Putnam, where do you currently work?

A.  FCI Dublin.

Q.  How long have you worked there?

A.  Since January 2016.

Q.  How long have you worked for the Bureau of Prisons?

A.  Since January, 2002.

Q.  Where did you work prior to FCI Dublin?

A.  USP Atwater.

Q.  Prior to working at the Bureau of Prisons, what did you do?

A.  Worked with the North Carolina prison department for 14 and a half years.

Q.  The North Carolina what?  I'm sorry?

A.  Department of Corrections.

Q.  What is your current position at FCI Dublin?

A.  Special investigative agent.

Q.  How long have you held that position?

A.  Since August.

Q.  August of this year?

A.  Yes.

Q.   What was your position prior to that?

A.   Lieutenant in special investigative services.

Q.   How long did you serve as a lieutenant at FCI Dublin?

A.   Since January 2016.

Q.   So let's focus on your current duties in SIS.  What are your current duties at FCI Dublin?

A.   Conduct investigations on local authorized staff cases and oversee the overall operations of the SIS department.

Q.   How about prior to that?  What did your job duties entail at FCI Dublin?

A.   As SIS lieutenant special investigative supervisor, I was also responsible for conducting staff investigations and supervising the SIS techs and providing guidance and direction to them.

Q.   So, Lieutenant Putnam, I will ask you to slow down a little bit so the court reporter can more easily take down what you are saying.

A.   Okay.

Q.   So you mentioned SIS.  What is SIS?

A.   Special Investigative Services.

Q.   What do they do?

A.   We investigate the -- all the inmate incidents, any inmate altercation incidents.  We do reviews for SDG assignments, the intake screening.

Q.   In your roles at FCI Dublin, are you familiar with BOP's

policies regarding documenting inmate misconduct?

A.   Yes.

Q.   If a guard found an inmate naked and alone in another inmate's cell, is the guard required to prepare an incident report for that?

A.   Yes.

Q.   What happens to that incident report once it's written?

A.   Once an incident report is written, it goes to the lieutenant's office for investigation.

Q.   What happens after that?

A.   The lieutenant's office -- once the investigation is complete, it is forwarded to the unit disciplinary committee for their disposition.  And depending on the severity of the incident report, that would determine whether it will be resolved at the UDC level or forwarded to the DHO.

Q.   Is there only certain staff that can write incident reports, or can anyone?

A.   All BOP staff.

Q.   Once an incident report is given to the lieutenant, is there a way to informally resolve that incident report?

A.   Yes.  Once the incident report is entered into the SENTRY or now DARTS, then the incident report -- during the course of the lieutenant investigating that incident report, it can be informally resolved.

Q.   You mentioned SENTRY and DARTS.  Just briefly, what are

those?

A.    SENTRY is what tracks all the histories for inmate discipline, inmate work assignments, bed assignments, things of that nature.

DARTS is specific to the disciplinary process.

Q.    If something is informally resolved, what happens?

A.    The investigating lieutenant will put it into SENTRY -- into SENTRY or DARTS as pending informal resolution.  If the inmate is given extra duty of among -- use eight hours to sweep floors or pick up trash, then it will be tracked.  And when the inmate completes that eight hours of assigned duties, then the lieutenant would go in and update the status of the incident report to informally resolved.

Q.    Is there a way to resolve an incident report by making an inmate a confidential informant?

A.    No.

Q.    Why not?

A.    You cannot -- there's -- that is not an option.  If -- you can't informally resolve an incident report by making an inmate a confidential informant because SIS is the only people who manage confidential informants.  And if there's no incident report, it can't be informally resolved anyway.

Q.    If there is an incident report, would resolving it in this manner by making the inmate into a confidential informant -- would that present any risks to the inmate?

**A.**   Yes.   If an inmate gets an incident report and they go and they just do away with an incident report, the other inmates that know the inmate got the incident report would question what was going on and how they got the incident report dropped.

**Q.**   Can anyone other than the lieutenant informally resolve an incident report?

**A.**   Only people who are UDC certified, that are certified to conduct the investigations.

**Q.**   Does it have to be the person who's actually investigating that incident report?

**A.**   They would be the one to enter the information and update the status of that incident report, yes.

**Q.**   Have you ever seen an associate warden or warden informally resolve an incident report?

**A.**   No.

**Q.**   Have you ever seen an associate warden or warden conduct an investigation of an incident report?

**A.**   No.

**Q.**   Why not?

**A.**   That is not within their scope of responsibilities.   The lieutenant's office is normally charged with that responsibility under the direction of the captain.

**Q.**   So are these informal resolutions required to be entered into some sort of BOP system?

**A.**   Yes.

Q.    What is that?

A.    SENTRY, now DARTS.  And it all is -- all communication with each other.

Q.    I suppose those are acronyms for some BOP system?

A.    Yes.

Q.    Would it be a violation of BOP policy for an associate warden or warden to informally resolve an incident report without filing an incident report or documenting it in SENTRY?

A.    If there's no incident report, you can't -- there is no informal resolution to be done.  It has to be loaded into SENTRY in order for an informal resolution to be completed.

Q.    Would it be appropriate for an associate warden or warden to informally resolve an incident report by making the inmate into a confidential informant?

A.    No, absolutely not.

Q.    If a guard found an inmate naked and alone in another inmate's cell, is the guard required to take a picture of the naked inmate in order to include the picture in an incident report?

A.    No, sir.

Q.    If a guard found an inmate naked and alone in another inmate's cell, is the guard supposed to take a picture of the naked inmate in order to include that picture in the incident report?

A.    No, sir.

Q.   Why not?

A.   We don't take pictures of naked inmates.

Q.   Why not?

A.   That -- that's a total -- that -- I've never seen, in my career, photos of naked inmates go along with any incident report written for indecent exposure or engaging in sex acts. We do not take pictures of naked inmates.

Q.   So I take it you have never taken a photo of a naked inmate who has engaged in indecent exposure, have you?

A.   No.

Q.   Let's assume the guard did take a picture of the naked inmate, but the picture didn't show the inmate's face.  Does the policy then require that the guard take a second picture of the naked inmate to document the inmate's face?

A.   The policy does not require a photo of a naked inmate to process an indecent exposure incident report.

Q.   Would there ever be any reason why a guard should have photos of a naked inmate on their personal computer?

A.   No.

Q.   What about if the guard didn't have time to write the incident report at work and had to work on it at home that night?

A.   Absolutely not.

Q.   Is there a situation when a guard should take pictures of a naked inmate who is alone in another inmate's cell and then

crop them to focus on the inmate's genitals and exclude other identifying information in the photo?

**A.** No, sir.

**Q.** Based on your positions in SIS and SIA at FCI Dublin, are you familiar with how confidential informants are cultivated and managed?

**A.** Yes.

**Q.** How is that done?

**A.** SIS maintains all confidential informants as -- as authorized by policy and stated by policy. We -- in the process of obtaining information from inmates that we do load as CIs, we maintain statements of reliability based on information that they provide. We load them into the TrueAccess and TrueIntel, and they are assigned a CI number. And we maintain any additional information that we may get from that individual.

**Q.** Why is that done? Why is that documented that way?

**A.** For the safety of the confidential informant.

**Q.** How are confidential informants recruited?

**A.** Various -- various methods. Some inmates will come to you, and they volunteer information. And we will talk to them, and if we validate that the information is accurate and it is legitimate, then we will maintain the information statements of reliability on it. And those inmates normally come to us and let us know that they will give us information.

Sometimes through the course of investigating incidents, some of the inmates that we interview, though, give us good information. And then, we'll, you know, talk to them and ask them if they will be willing to provide any additional information in the future. And that's how we establish them.

Q. Who manages confidential informants?

A. SIS.

Q. Anyone else?

A. No.

Q. Do associate wardens and wardens work with confidential informants?

A. No.

Q. Why not?

A. They don't have any confidential informants.

Q. Why not?

A. SIS is the only people that have confidential informants.

Q. If someone does have a confidential informant, is there requirements that that be documented?

A. SIS maintains all the documentation for legitimate CIs.

Q. Are you familiar with a former FCI Dublin prisoner named Melissa?

A. Yes.

Q. Prior to your testimony here today, did you check SENTRY and DARTS to see if she was ever registered as a confidential informant?

**A.**    Yes.

**Q.**    What did you find?

**A.**    She's not.

**Q.**    Did the defendant ever tell you that he had cultivated a confidential informant or snitch?

**A.**    No.

**Q.**    Did the defendant ever ask you about writing a memorandum for a confidential informant he had cultivated?

**A.**    No.

**Q.**    Did you ever tell the defendant, "No, boss, you do you," in response to a question about writing a memorandum regarding a confidential informant he had cultivated?

**A.**    No.

**Q.**    Did the defendant ever tell you that Melissa had given him information?

**A.**    No.

**Q.**    Did the defendant ever tell you about any information he obtained from any confidential informant?

**A.**    No.

**Q.**    Do you normally conduct exit interviews prior to a prisoner being released from FCI Dublin?

**A.**    I try hard to do exit interviews on inmates released. However, I am -- I do not do everybody.

**Q.**    If an inmate wanted to express concerns or discuss matters about which they had knowledge of from their time at FCI Dublin

prior to their release, how would they go about doing that?

A.   They could let R&D staff know when they got to R&D.  They could send an email to SIS, inmate SIS, that goes straight to our office or let us know by relaying a message to us in -- by any other person.

Q.   If an inmate came to an associate warden with concerns or information about things going on at FCI Dublin prior to their release, what is the associate warden supposed to do with that?

A.   The normal procedure would be they would notify SIS and make sure somebody was delegated to go and conduct an exit interview with that individual who had requested it.

Q.   Did the defendant ever tell you that a former inmate named Rachel had expressed concerns or had information related to things going on at FCI Dublin?

A.   No.

Q.   Did the defendant ever tell you that he was in contact with a former inmate named Rachel after she was released from FCI Dublin?

A.   No.

Q.   If he had told you that, what would you have done?

A.   Reported it.

Q.   Reported it where?

A.   To OIE, OIG.

Q.   Why?

A.   Because BOP staff are not supposed to maintain

communication with an inmate once they release from prison and they're still in custody.

MR. PAULSON:  Thank you, Your Honor.  That's all I have.

THE COURT:  All right.  Let's go ahead and take our second break.

(Proceedings were heard out of presence of the jury:)

THE COURT:  All right.  Have a seat.  The record will reflect that the jury is gone.

In light of the relative generic nature of the direct examination, are you going to be prepared to cross, Mr. Reilly?

MR. REILLY:  Your Honor, until I see what the other documentation is, I have no way of being able to answer that question.

THE COURT:  All right.

Well, we haven't even finished our trial day, so how long -- what I'm prepared to do is end today early and then have you do your cross and move straight into closings.

How long do you anticipate your closing to be?  I mean, I'm not going to hold you to it.  Just trying to manage time.

MS. PRIEDEMAN:  I anticipate the Government's --

THE COURT:  At the mic.

MS. PRIEDEMAN:  I anticipate the Government's closing will be about an hour.

THE COURT:  Okay.

Mr. Reilly?

MR. REILLY:  Probably somewhat longer than that. Maybe an hour and a half.

THE COURT:  All right.  Then I think we can get all of this in tomorrow.

So I will recess to give Mr. Reilly some time to prepare his cross-examination.

I take it you've got no other witnesses?

MS. PRIEDEMAN:  No, Your Honor.

THE COURT:  Okay.  Then we'll finish up the examination tomorrow of Mr. Putnam.  Then I will instruct the jury, and we'll go straight into closings.  It will be a full day.  All right?

And during this interim, Lieutenant, you're instructed not to have any communications with any party whatsoever.  You're in the middle of examination.  All right?

Let's bring the jury back in.

MR. PAULSON:  Your Honor, can we just make clear to Lieutenant Putnam that he needs to be here tomorrow at 8:00 a.m.?

THE COURT:  You are ordered to return tomorrow at 8:00 a.m.

THE WITNESS:  Yes, ma'am.

THE COURT:  Mr. Paulson, have those indexes been provided?

**MR. PAULSON:**  Yes, Your Honor.  Those indexes have been provided to Mr. Reilly.

**THE COURT:**  Okay.  Thank you.

(Proceedings were heard in the presence of the jury:)

**THE COURT:**  Members of the Jury, we are going to have a small change in schedule.  So we are going to go ahead and recess for the day.

Tomorrow we'll finish up the examination of Lieutenant Putnam and then go straight into closing arguments, and you'll have my instructions in there as well.

So I've asked my CRD, Mr. Garcia, to give you lunch forms.  Like I said, we will take a lunch, probably on the shorter -- it will be like 45 minutes.  Not a long period of time.  But what I'm hoping is by the end of the day, you will have all of the closings and then be sent on in to begin deliberations.

Does anybody have any questions?

**A JUROR:**  Will there be a small break as well or no?

**THE COURT:**  I think what I tend to do is do small breaks in between each side's presentation.  So that way, they can get set up.  You can stretch your legs, get a small break.  But they will be like 15-minutes kind of thing.  All right.

Other questions?  And I have noticed, by the way, that you are now coming into the courtroom in order.  You're not jumping over each other anymore.  It always happens.  That's great.  That's great.

Other questions?  No?  Okay.  So you remember my daily admonishments, and they're there again to remind you in your book.  Especially at this point when we are getting to the end, please do not communicate with anybody about anything related to this trial.  Do not do any research.  Do not expose yourself in any way to any news reports about this trial.

It's important to both sides that everyone make decisions based upon the same set of information that we've all heard together in this courtroom.  Okay?

So we will stand in recess with you until 8:30 tomorrow morning when we will resume and move forward on a longer day tomorrow.  Okay?  All right.  Great.  Thank you.

(Proceedings were heard out of presence of the jury:)

THE COURT:  Okay.  Lieutenant, you may step down until tomorrow at 8:00 a.m.  Thank you.

All right.  The record will reflect the jury has left the courtroom.

Two things that I want you all to be working on and maybe it's the extended trial team.

We will send to you the list of admitted exhibits that I have with my CRD so that you can crosscheck your records.  That's one.

Two, you will both be required, both sides, to certify in writing that you have reviewed the exhibits that are going into evidence so that we are only sending exhibits that have been

admitted into evidence.

And, three, I do require the Government to provide a short index of the documents -- of the admitted exhibits.  The jury always asks for that.  Okay?

I saw -- I just wanted to note in the email that the defense was objecting to a standard Model Instruction 3.2 now or a portion of it.  The objection -- Mr. Reilly, I'm not exactly sure why you're objecting to 3.2, which says that the defendant does not have to testify or present any evidence to prove innocence.

**MR. REILLY:**  Yes, Your Honor.  I originally had put that in there because, obviously, Mr. Garcia did testify.  So the -- his right to not testify, if he chose to do so, is really not an issue.  If the Court is inclined to give the instruction anyway, I don't have any problem with that.

**THE COURT:**  Yes.  I think it's important.  I say it every time I take a plea.  It's important for the jury to understand the defendant doesn't have a burden.  So the normal instruction will be given.

Okay.  Any -- yes, Mr. Paulson?  Did you want to say something?

**MR. PAULSON:**  Oh, no, Your Honor.

**THE COURT:**  Okay.  Ms. Priedeman?

**MS. PRIEDEMAN:**  Nothing from the Government, Your Honor.

**MR. REILLY:**  Nothing, Your Honor.  Thank you.

**THE COURT:**  All right.  Then we will stand in recess until 8:00 a.m. tomorrow.

**MS. PRIEDEMAN:**  Thank you, Your Honor.

(Proceedings adjourned at 12:06 p.m.)

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Monday, December 5, 2022

_____
Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
U.S. Court Reporter