**Volume 8**

**Pages 1262 - 1413**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

UNITED STATES OF AMERICA,       )
                                )
          Plaintiff,            )
                                )
  VS.                           )          **NO. CR 21-00429-YGR**
                                )
RAY J. GARCIA,                  )
                                )
          Defendant.            )
_____ )

                         Oakland, California
                         Tuesday, December 6, 2022

                 **TRANSCRIPT OF TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                         **STEPHANIE M. HINDS**
                         United States Attorney
                         1301 Clay Street, Suite 340S
                         Oakland, CA  94612
                   BY:  **MOLLY PRIEDEMAN**
                        **ANDREW PAULSON**
                        **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:
                         SUMMIT DEFENSE, APLC
                         4040 Civic Center Drive, Suite 200
                         San Rafael, CA  94903
                   BY:  **JAMES T. REILLY, ESQUIRE**

Reported By:  Pamela Batalo-Hebel, CSR No. 3953, RMR, FCRR
              Official Reporter

# I N D E X

Tuesday, December 6, 2022 - Volume 8

|  | PAGE | VOL. |
|---|---|---|
| Closing Argument by Ms. Priedeman | 1302 | 8 |
| Closing Argument by Mr. Reilly | 1337 | 8 |
| Rebuttal Argument by Mr. Paulson | 1387 | 8 |

**GOVERNMENT'S REBUTTAL**

| WITNESSES | PAGE | VOL. |
|---|---|---|

**PUTNAM, STEPHEN (RECALLED)**

|  | PAGE | VOL. |
|---|---|---|
| (PREVIOUSLY SWORN) | 1267 | 8 |
| Cross-Examination by Mr. Reilly | 1267 | 8 |
| Redirect Examination by Mr. Paulson | 1285 | 8 |

**Tuesday - December 6, 2022**                                    **8:00 a.m.**

                          P R O C E E D I N G S

                               ---oOo---

     (Proceedings were heard out of presence of the jury:)

            THE COURT:  Okay.  Appearances.

            MS. PRIEDEMAN:  Good morning, Your --

            THE COURT:  This is U.S. vs. Garcia, 21-429-YGR.

            MS. PRIEDEMAN:  Good morning, Your Honor.  Molly

Priedeman and Andrew Paulson for the United States.

            THE COURT:  Good morning.

            MR. REILLY:  Good morning, Your Honor.  Jim Reilly of

Summit Defense appearing on behalf of Mr. Garcia, who is also

present in court.

            THE COURT:  Okay.  Good morning.

        Any issues this morning?  We will start with the

Government.

            MS. PRIEDEMAN:  Nothing from the Government,

Your Honor.

            MR. REILLY:  I have nothing, Your Honor.

            THE COURT:  All right.  Well, then if you all have

nothing, I will leave you to finish any last-minute

preparations.  The plan still is as we discussed yesterday?

Yes?

        And Mr. Bettencourt did return?

            MR. PAULSON:  Lieutenant Putnam, Your Honor.

THE COURT:  Oh, that's right, Lieutenant Putnam.

MS. PRIEDEMAN:  Yes.

MR. PAULSON:  He's in the witness room down the hall.

THE COURT:  Okay.

All right.  Well, the jurors are beginning to show up, so as soon as they're all here, we will get started.

MR. REILLY:  Thank you, Your Honor.

THE COURT:  Thank you.

(Recess taken at 8:04 a.m.)

(Proceedings resumed at 8:32 a.m.)

THE CLERK:  Come to order.  Court is in session and the Honorable Yvonne Gonzalez Rogers is presiding.

THE COURT:  Okay.  Lieutenant, welcome back.

Have a seat.

We are back on the record and the record will reflect that the witness is here, the parties are here.

Again, Lieutenant, if you are comfortable, you can take your -- oh, you did.

THE WITNESS:  Thank you.

THE COURT:  All right.  Let's call the jury in.

(Proceedings were heard in the presence of the jury:)

THE COURT:  The record will reflect the jury is here.

Good morning, everyone.  Good to see you.

So I didn't see it yet.  Any soccer aficionados?  Anybody watching -- all right.  So the World Cup is going on.

Unfortunately, U.S. was out. They're, you know, a young team, so we've got hope for the future.

But apparently yesterday when Brazil -- I think they got three or four goals -- they had a separate dance like for every goal. It's supposed to be great. My husband and sons are big into soccer. I've not yet seen them, but I am going to, like, find the YouTube or something, because they're supposed to be terrific dances. I did get to see one goal. Beautiful, beautiful goal. Gosh, those guys make it look so easy.

That's why I always get upset when the warriors or any national basketball team misses their free throws. I mean, it's free. You know where the line is. You know, I mean, they've been playing basketball since they were little. I can't understand why they can't make their free throws. Right? I mean, they're free. I mean, you can, like, lose games. I don't know. Anyway, I was good at free throws. That's about it, but -- kind of short.

Okay. Everybody ready? Anybody have any questions? No. Excellent -- or not excellent that you don't, but excellent, let's get going.

Okay. Mr. Reilly, your cross-examination.

Lieutenant, I will remind you, you're still under oath.

**THE WITNESS:** Yes, ma'am.

**MR. REILLY:** Thank you, Your Honor.

**STEPHEN PUTNAM**,

called as a witness for the Government, having been previously

duly sworn, testified further as follows:

**CROSS-EXAMINATION**

BY MR. REILLY:

Q.    Good morning, Lieutenant Putnam.

A.    Good morning.

Q.    Can you remind us what your current assignment is, please.

A.    Special investigative agent, FCI Dublin.

Q.    And specifically, what is the nature of your assignment or title?

A.    Conduct local investigations on staff, talk to inmates.  I supervise the SIS department and oversee investigations on inmate-on-inmate.

Q.    How long have you had that assignment?

A.    I've been at FCI Dublin since 2016, January, and have been SIS lieutenant from January 2016 until August of this year, when I was promoted to SIA, special investigative agent.

Q.    Okay.

      We had some -- or you had some conversation, actually, with the prosecutor about what should happen when someone sees a naked inmate.  And I think you indicated that that required that an IR be provided -- or prepared?

A.    Yes.

Q.    "IR" meaning incident report?

**A.**    Incident report, yes, sir.

**Q.**    Is it typically the case that every single transgression that could potentially generate an IR in fact does so?

**A.**    No, sir.  All staff are different and staff have different management tools, communication being one of the very first levels of communicating your expectations to the inmate population.  It does not have to go directly to incident report.

However, in the case of nudity and you feel like it is intentional nudity, then it would be best to write the incident report to send the inmate the message that they will be held accountable.  Anything otherwise will be taken as a green light by that inmate and they will continue to do so, and then they can, in turn, say that you were trying to watch them.  So there's a purpose for the inmate disciplinary process, to hold inmates accountable.

**Q.**    Clearly, the purpose of the disciplinary process throughout the system is to obtain compliance from the inmates; right?

**A.**    Yes.

**Q.**    And -- but it is a fact that it's actually fairly common for COs to see violations of one kind or another and not write incident reports, isn't it?

**A.**    On a day-to-day basis, I see things that I could write incident reports for, but --

**Q.** And don't.

**A.** -- I don't. I communicate and relay my expectations.

**Q.** Sort of like a traffic cop, not stopping every person who's --

**A.** Right.

**Q.** -- violating the traffic law; right?

**A.** Yes.

**Q.** Now, you used the phrase that when someone sees a naked inmate, that it would be best to generate an incident report.

**A.** Yes.

**Q.** That --

**MR. PAULSON:** Objection, Your Honor. Mischaracterizes the testimony.

**THE COURT:** Well, the jury can recall on its own the precise words. Overruled.

**BY MR. REILLY:**

**Q.** Weren't those your exact words, "would be best to write an incident report"?

**A.** For an inmate that is nude, yes, sir --

**Q.** Yes.

**A.** -- yes, sir.

And the reason it would definitely be best, that does not mean that every staff member would do so. I cannot say that. But in the environment that we are in and the PREA laws and the -- taking into consideration what would be the best thing

to effectively manage that particular situation, it would be best the incident report would be written for an inmate who is exposing herself.

Q.   The implication of that statement, "would be best" --

A.   Yes.

Q.   -- is that it's not mandatory; right?

A.   Well, as far as I'm concerned, yes.

Q.   Okay.  Your personal decision --

A.   Policy -- yes, sir.  Because if I personally am making rounds and I see an inmate -- regardless of what the situation is, if I see her nude, then I'm going to document it.  It will be documented.

Q.   Understood.  But --

A.   Because if it's not documented, then allegations could come up later.  So me, as the staff member, to protect my own career and my own integrity, I will write that incident report.

Q.   All right.

A.   That does not mean everyone would.

Q.   And the reason that not everyone would is because it's not mandatory, is it?  There is no -- there's no rule in the BOP policy that says if a correctional officer sees a naked inmate, that an incident report has to be written, is there?

A.   There's nothing that says it has to be, no, sir.

But for an inmate to be nude and your career -- just common sense would be to document that.  That's why I

personally would do that.

Q.   You also mentioned that any correctional officer can write an incident report if they see something that's -- that violates the rules?

A.   Yes.

Q.   And isn't it also true that it's very common for correctional officers who see, let's say, relatively minor violations to not write reports, but to use the knowledge that that was there as a way of gaining some leverage over the inmates, specifically to make them informants?

A.   No.

Q.   That never happens?

A.   No, sir, not -- not with me.  And since SIS is the only ones responsible for maintaining, establishing, and tracking CIs, nobody else can do it.  That is a responsibility of SIS.

Q.   Okay.  No one else can do it under the guidelines.  That doesn't mean that it doesn't happen, though, does it?

A.   No other staff have CIs.  Sir, everybody -- in the correctional environment, inmates can approach any staff any time and tell them anything.

Q.   Give them information --

A.   That's a given, that they can talk to them about whatever may be bothering that inmate at the time.  They can pass information on about somebody took the TV remote and changed the TV, but that does not -- that is not a CI.  That is not the

establishment of a CI.  That is not the tracking of a CI.

Q.   And what if that same inmate were to provide information, let's say, about drugs being brought into the institution?

A.   Then it would need to be forwarded to SIS so that we could do our due diligence.  Otherwise, that inmate is still not a CI.

Q.   Maybe not by strict definition, but, in fact, if an inmate regularly provides that kind of information to correctional officers, they're functioning, as a practical matter, as a confidential informant, aren't they?

A.   Well, I disagree, because the information would have to be verified.  It would have to be reported.  If it's never reported or verified, it still is not a CI.  It may be somebody that a particular individual is talking to.  They may be getting information from them.  But if it's never reported and dealt with, then it's not a CI.

Q.   All right.  So we're talking semantics here, aren't we?

A.   No.  We're talking facts.

Q.   If someone is providing information on a confidential basis, whether it's reported to SIS or not, that makes them a confidential informant, doesn't it?

A.   No, sir.

Q.   You also indicated that COs cannot, quote, informally resolve incidents by effectively making an inmate a confidential informant, that that's not permitted.

**A.**    No.

**Q.**    Okay.  But it happens, doesn't it?

**A.**    Not to my knowledge, no, sir.

**Q.**    Never in all the years you've been --

**A.**    Not to -- not to my knowledge, no, sir.

**Q.**    Never in all the years --

**A.**    Not --

**Q.**    Excuse me.  Let me ask the questions --

            **THE COURT:**  One at a time.

**BY MR. REILLY:**

**Q.**    -- and then you answer.  Okay?

**A.**    Yes, sir.

**Q.**    In all the years that you've been a correctional officer, you have never been aware of a CO receiving information from an inmate on a confidential basis without turning it in to SIS? Never happened?

**A.**    I'm not going to say it never happened, because if it never made it to SIS, I wouldn't know about it anyway, sir.

**Q.**    How about that.  You wouldn't know about it, would you?

**A.**    No.

**Q.**    Now, you said that in order for someone to informally resolve a -- an incident report, that that person has to be UDC certified; is that right?

**A.**    Yes, they have to be trained in conducting investigations.

**Q.**    And what does "UDC" stand for again?

A.   Unit disciplinary committee.

Q.   And if someone is trained and certified -- UDC certified, as you say, but is not on SIS at that time, has some other assignment, can that person still informally resolve IRs?

A.   SIS has nothing to do with informally resolved incident reports.  That is the responsibility of the investigating official, who is trained to do investigations on inmate disciplinary issues.

Q.   Okay.

You also testified that you've never seen an associate warden or a warden informally resolve an incident report; is that right?

A.   No, sir, not to my knowledge.

Q.   But that could happen, too, couldn't it?

A.   Well, I would assume if that was the case, it would be tracked in SENTRY and there would be a record of it and it would be tracked to their particular BOP number, and that way, it could be verified.  Otherwise, I've never seen it.

Q.   How many different institutions have you served at?

A.   Four -- four with the State of North Carolina and two with the BOP.

Q.   And how many BOP institutions are there altogether?  Do you know?

A.   A lot.

Q.   123 sound right?

**A.**   That's close.  I'm not sure.

**Q.**   And each of those institutions has a warden?

**A.**   Yes.

**Q.**   And two associate wardens?

**A.**   Yes.

**Q.**   So that's 246 plus 123 -- 369 of these individuals across the country; right?

**A.**   Right.

**Q.**   And you think out of all of those 369 individuals, none of them have ever informally resolved an IR?

**A.**   Sir, I'm not going to say they haven't; I'm saying I have never known it to happen.  I have never seen an AW or warden log in to the computer, call an inmate up, and do an investigation on their incident report and enter it as an informal resolution or anything.

**Q.**   And I think you also said that it would be a violation of BOP policy for someone in the position of that kind of responsibility to do that; is that right?

**A.**   No, sir, I didn't say it would be a violation of policy. They could do it as long as they were trained to do -- to conduct investigations.

   And I did say it was not in their scope of their duties as the associate warden or the warden.  Investigations are normally conducted by lieutenants.

**Q.**   Nevertheless, that could happen, couldn't it?

**A.**    Yes, sir, under the circumstances I've already explained.

**Q.**    You also told us that it's inappropriate to take a photograph of an inmate who is violating the policy against being undressed after a certain time of the day or in certain circumstances; is that right?

**A.**    Yes, sir.

**Q.**    Even if -- even if that status constitutes a violation that requires the initiation of an incident report?

**A.**    Sir, in my career, the only -- the -- all of the incident reports that I've seen for engaging in sexual acts inmate-on-inmate, indecent exposure, none have had -- had photos of the inmate involved.

In sexual abuse allegations, if an inmate has to go for an exam, then the SANE examiner will be the one that takes photos and they will be logged into evidence and handled appropriately through the evidence control system.

**Q.**    Now, you're talking about photos indicating injuries of some kind at that --

**A.**    Anything --

**Q.**    -- stage.

**A.**    Anything like that, like -- that is involved with a sexual abuse allegation, those are the only photos I've seen or heard of being taken for any inmate misconduct pertaining to indecent exposure.  I have never seen a photo of an inmate in their cell naked.

Q.    Okay.  So --

A.    BOP staff do not do that.  We do not do that.

Q.    "We" meaning you and the -- and the other people at the four institutions you've been at.

You have no way of knowing whether anyone at any other of the 119 institutions has ever done that, do you?

A.    No, sir.  I have not worked at all those institutions.

Q.    Do you remember the expression "a picture is worth a thousand words"?

A.    Yes, sir.

Q.    And isn't it true that when there is an incident like this, that it's very common for the inmate to deny it and leave the situation in a status of, "He said it happened, she said it didn't happen," and it's impossible to resolve.

Happens a lot, doesn't it?

A.    Happens all the time.

Q.    And it happens because no one has taken pictures to prove it; right?

A.    Not necessarily.

Q.    Well, there's no "she said" if someone's got a picture showing the violation taking place; right?

A.    Was -- was that incident report written and processed, sir?

Q.    Regardless of whether an incident report is written or not.

But if it is and --

A.   BOP staff do not --

Q.   Excuse me, sir.

A.   Okay.  Yes, sir.

Q.   Don't interrupt when I'm asking the question.

A.   Okay.

Q.   Okay?  Partly because it's impolite and partly because the court reporter has to take everything down, and she can't do it if we're both talking at the same time.

If someone writes a disciplin- -- an incident report in which the correctional officer asserts that something took place and the inmate says, "That never happened," that leaves you in a situation where you have no definitive proof one way or the other.

On the other hand, if that same correctional officer took a photograph to prove what happened, that would be definitive evidence, wouldn't it?

A.   Sure.  A photo is always definitive evidence.

However, the investigative process that is conducted when any incident report is written, even those who -- which do not contain photos, the -- that is why the -- there is an investigation, to -- to gather the facts and make the determination.  And -- which all situations, there is not going to be a photo available.  So...

Q.   You mentioned that Mr. Garcia never told you that he had

cultivated a confidential informant; is that right?

A.    That's correct.

Q.    Is it possible that he told you and you've just forgotten?

A.    No, sir.

Q.    You had a lot going on at that time, didn't you?

A.    I always do.

Q.    About 100 cases that were backlogged, way out of date, something of them?

A.    Yes, sir.  Yes, sir.

Q.    As far back as 2016 hadn't been resolved yet?

A.    Yes, sir.

Q.    You hadn't written your reports?

A.    That is correct.

Q.    You were actually removed from that function for that reason, weren't you?

A.    No.

Q.    Have -- have you personally ever witnessed a violation of a low-level incident, sort of like a -- making a right turn against a red light, and not written an incident report?

A.    Yes, sir.

Q.    Have you ever done that when you had a video showing the violation taking place?

A.    It depends on what the circumstances are and what the violation is.  I mean, if it's something that can be resolved by communication and explaining expectations, then that's what

I would do.

Q.   How about if it's a significant violation and you have a video?  Does that help prove it?

A.   It would help prove it.  And if it was a serious violation, I would save the video, I would write the incident report, and process it through normal channels.

Q.   In fact, that's the whole point, isn't it, of having 200 cameras in the facility at Dublin, isn't it?

A.   Yes, sir.

Q.   And every other BOP facility in the country also has cameras everywhere specifically for that purpose, don't they?

A.   Uh-huh.  Yes, sir.

Q.   And in particular, drugs in the institution are a significant issue, aren't they?

A.   Yes, sir.

Q.   So if a correctional officer came upon a situation in which he had reason to believe that there might be drug activity taking place, it would be entirely appropriate to take pictures of that, wouldn't it?

A.   Yes, sir.

Q.   You took a look at a number of the -- the Dublin institution videos for the time period June through the latter part of July of 2021?

A.   Yes, sir.

Q.   Did you look at every single video that was available for

that time period?

A.    For every single camera?

Q.    Yes.

A.    No, sir.

Q.    On what basis did you select the cameras that you did look at?

A.    Based on specific cells.

Q.    And what was the purpose in selecting those specific cells?

A.    That was what was requested.  I didn't -- that was to see when Mr. Garcia may have been in that vicinity.

Q.    And you found a fair number of -- in these videos, a fair number of times where he was in the videos; correct?

A.    Yes.

Q.    And you made a list documenting all of those?

A.    Yes.

Q.    And in that time period, can you describe for us what kind of activities you saw Mr. Garcia engaging in?

A.    It was when he was making rounds.

Q.    Walking up and down the halls?

A.    Yes.

Q.    Talking to people?

A.    Yes.

Q.    Did he typically have someone else with him while he was doing this?

**A.** No.

**Q.** Another correctional officer?

**A.** Most of the time not.

**Q.** In all of those videos that you looked at, did you see Mr. Garcia do one single thing that was not appropriate?

**A.** Not specifically that I can recall, no, sir.

**Q.** Do you, in your function, receive notification of directives that are issued by other BOP facilities?

**A.** Further explanation on that. What are you referring to?

**Q.** So let's say another institution in a different part of the country decides to change their procedures or policies in some way and they issue a formal notice to the correctional officers, "This is what we want you to do from now on in this circumstance."

Do you receive copies of notices of that nature?

**A.** If it is changes to policy, yes.

**Q.** And is that the case if it changes the policy for the entire Bureau or if it just changes the policy at that specific institution?

**A.** If it's specific to that institution, then it would be issued at the institution level. It wouldn't come from central office.

**Q.** Does the central office distribute those kinds of notifications to other institutions so that they can see, "Hey, these guys over here are doing this; maybe we should do it,

too"?

A.   Yes.

Q.   Okay.  Are you familiar with the fact that the FCI in Thompson, Illinois, just about a week ago issued a memo encouraging staff to carry handheld cameras and to take pictures when they see transgressions?

A.   No, sir, I have not seen that.

Q.   Is that something you would support if it was instituted at Dublin?

A.   I think cameras -- I think a directive did come -- was put out that we were going to be issued body cameras at some point.

     And to answer your question, yes, I think cameras should be issued to BOP staff for the protection of staff and inmates alone.

Q.   I'm sorry.  Did you just say that it's under consideration now to have COs wear body cameras?

A.   That was my understanding a while back, that it was a recommendation for BOP to be issued body -- body cams.

Q.   There's been some discussion about the fact that you and Mr. Garcia were friends while you were working together previously at Atwater and then again at Dublin.

     Is that true?

A.   I have known Mr. Garcia since January of 2002.  We opened up Atwater together.

Q.   And did you have what you would consider a personal

relationship, in addition to your professional relationship?

A.   I have never been to his house; he has never been to my house.  There was one occasion he dropped something off at my house that was work related, and there was one occasion by which I picked him up and gave him a ride to work.  That is the only interaction outside work that we've had, other than functions that were directly related to correctional workers week events.  Went on a motorcycle ride with about 20 people that was also work related back in 2003, and went to a football game one time with a bunch of people.

So we were not close friends personally.  We did work together at Atwater for a number of years and worked together at Dublin.

Q.   You underwent an interview with the Office of the Inspector General on -- it would have been Sunday, I guess, December 4th.

A.   Okay.

Q.   And as part of that interview, you made the statement that if federal investigators were to ask for the footage of every camera at FCI Dublin that was functioning at some specific time, that it would not be possible for you to comply with that request; is that right?

A.   That -- that is correct.  I would have to seek assistance from computer services or the comm techs in order to find a way to store all of that information.  I do not have that

capability in my shop.

Q.   But there are resources that could be used in order to accomplish that objective; correct?

A.   If it had to be done, we would figure it out.

Q.   Did -- do you recall ever having a conversation with Mr. Garcia about inmate Melissa?

A.   No, sir.

Q.   Or inmate Rachel?

A.   No, sir.

Q.   Inmate Maria?

A.   No, sir.

        MR. REILLY:   Thank you, Your Honor.   That's all I have at this time.

        THE COURT:   Any redirect limited to the scope of cross?

        MR. PAULSON:   Yes, Your Honor.

                    **REDIRECT EXAMINATION**

BY MR. PAULSON:

Q.   Good morning, Lieutenant Putnam.

A.   Good morning.

Q.   You mentioned in your discussion with Mr. Reilly a "SANE." This was part of your discussion of taking photographs of a victim of sexual abuse.

A.   Yes.

Q.   What is a SANE?

A.    That is a sexual assault nurse examiner.

Q.    So a medical person who is --

A.    Yes.

Q.    -- doing the examination?

A.    Yes, sir.

Q.    If someone came to you and said they had a confidential informant, what would you do?

A.    I would get the information that they have regarding that person.  I would talk to that inmate myself and evaluate whether or not that inmate could be made a confidential informant by SIS.  I would also explain to that individual that they do -- they don't have confidential informants.

Q.    Why is that?

A.    Because they -- they do not know how to effectively manage confidential informants, nor do they have access to do such.

Q.    Are incident reports ever substantiated without photos?

A.    Yes.

Q.    How often does that happen?

A.    A lot.  Daily.

Q.    Once you -- once an incident report is drafted, is it appropriate to then shred it without telling anyone about it?

A.    No -- no, sir.  Unless you're -- unless you're just done with that incident -- not -- not trying to proceed with any kind of discipline or any kind of informal resolution, it would not be appropriate to shred it.

If you are going to proceed with any type of disciplinary informal resolution or anything else in the disciplinary process, then it would need to go through the process.

Q.    But if you -- if you did prepare an incident report, that would have to be filed in the central system; is that right?

A.    Yes.  It would have to go through SENTRY and DARTS.

MR. PAULSON:  Thank you, Your Honor.  No further questions.

THE COURT:  Any recross on those two topics?

MR. REILLY:  No, Your Honor.  Thank you.

THE COURT:  All right.  What I'm going to ask you to do, Lieutenant, is step down, but wait outside the courtroom for me first.  All right?

THE WITNESS:  Okay.

THE COURT:  All right.  Any other rebuttal witnesses?

MS. PRIEDEMAN:  No, Your Honor.

THE COURT:  Okay.  Any cross -- or any other rebuttal to the rebuttal?

MR. REILLY:  No, Your Honor.  Thank you.

THE COURT:  All right.  Then, Lieutenant, the evidence is now closed -- have him come back in.

You're excused.

Okay.  Members of the Jury, the evidentiary portion is completed.  My courtroom deputy is going to pass out some binders for you.  There is one for each of you.  And I'm going

to go ahead and start giving you legal instructions for this case.

Over the years of trying cases, I have found that there are what I call oral learners and visual learners, so these instructions are comprehensive and you'll each have a copy of them in that binder for you.  So you can read along with me if you'd like.  You don't have to.  You can just listen.  You can take notes on them, if you want.  But I do this to help you.  All right?

Does everybody have a new binder?  It says "Jury Instructions" on it.  Yes?  All right.  Let's get started then.

Members of the Jury, now that you have heard all of the evidence, it is my duty to instruct you on the law that applies to this case.  As I just noted, a copy of the instructions is being provided for you to consult.

**A JUROR:**  Can I write on it?

**THE COURT:**  You can.  You can write on it.  That's your copy.  Okay?

It is your duty to weigh and to evaluate all the evidence received in the case and, in that process, to decide the facts.  It is also your duty to apply the law as I give it to you to the facts as you find them, whether you agree with the law or not.

You must decide this case solely on the evidence and the law.  Do not allow personal likes or dislikes, sympathy,

prejudice, fear, or public opinion to influence you.  You should also not be influenced by any person's race, color, religious beliefs, national ancestry, social orientation, gender identity, gender, or economic circumstances.

Also, do not allow yourself to -- do not allow yourself to be influenced by personal likes or dislikes, sympathy, prejudice, fear, public opinion, or biases, including unconscious biases.

Unconscious biases are stereotypes, attitudes, or preferences that people may consciously reject but may be expressed without conscious awareness, control, or intention.

You may recall that you took an oath promising to do so at the beginning of the case.

You must follow all of these instructions and not single out some and ignore others.  They are all important.  Please do not read into these instructions or anything I may have said or done as any suggestion as to what verdict you should return.  That matter is entirely up to you.

The defendant has pleaded not guilty to the charges.  The defendant is presumed to be innocent unless and until the Government proves the defendant guilty beyond a reasonable doubt.

In addition, the defendant does not have to testify or present any evidence.  The defendant does not have to prove evidence.  The Government has the burden of proving each and

every element of the charges beyond a reasonable doubt.

The defendant has testified.  You should treat this testimony just as you would the testimony of any other witness.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced that the defendant is guilty.  It is not required that the Government prove guilt beyond all possible doubt.

A reasonable doubt is a doubt based upon reason and common sense and is not based purely on speculation.  It may arise from a careful and impartial consideration of all the evidence or from lack of evidence.

If, after careful and impartial consideration of all the evidence, you are not convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the defendant not guilty.  On the other hand, if, after a careful and impartial consideration of all the evidence, you are convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the defendant guilty.

The evidence from which you are to decide what the facts are consists of the sworn testimony of any witness, the exhibits that have been received in evidence, and any facts to which the parties have agreed.

In reaching your verdict, you may consider only the testimony and exhibits received in evidence.  The following things are not evidence, and you may not consider them in

deciding what the facts are:

Questions, statements, objections, and arguments by the lawyers are not evidence.  The witnesses -- the lawyers are not witnesses.  Although you must consider a lawyer's question to understand the answers of a witness, the lawyers' questions are not evidence.

Similarly, what the lawyers have said in their opening statements, will say in their closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence.  If the facts as you remember them differ from the way the lawyers' state them, your memory of them controls.

Two, any testimony that I have excluded, stricken, or instructed you to disregard is not evidence, nor is any refusal to testify, and you should make no inferences from that refusal.

Three, anything you may have seen or heard when court was not in session is not evidence.  You are to decide the case solely on the evidence received at the trial.

Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact, such as a -- testimony by a witness about what that witness personally saw or heard or did.  Circumstantial evidence is indirect evidence; that is, it is proof of one or more facts from which you could find another fact.

You are to consider both direct and circumstantial

evidence.  Either can be used to prove any law or -- I mean, to prove any fact.  The law makes no distinction as to the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give any evidence.

By way of example, again -- this may make more sense now that you've been through a trial -- but if you wake up in the morning and see that the sidewalk is wet, you may find from that fact that it rained during the night.  However, other evidence, such as a turned-on garden hose, may provide an explanation for the water on the sidewalk.  Therefore, before you decide that a fact was proven by circumstantial evidence, you must consider all the evidence in light of reason, experience, and common sense.

In deciding the facts of this case, you may have to -- you may have to decide which testimony to believe and which testimony not to believe.  You may believe anything a witness says, or part of it, or none of it.

In considering the witness' testimony, you may take into account the following:

One, the opportunity and the ability of the witness to see, hear, or know the things to which they testified;

Two, the witness' memory;

Three, the witness' manner while testifying;

Four, the witness' interest in the outcome of the case, if any;

Five, the witness' bias or prejudice, if any;

Six, whether other evidence contradicted the witness' testimony;

Seven, the reasonableness of the witness' testimony in light of all of the evidence; and

Eight, any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said.  Sometimes different witnesses will give different versions of what happened.  People often forget things or make mistakes in what they remember.  Also, two people may see the same event but remember it differently.

You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said.

On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify.  What is important is how believable the witnesses were and how much weight you think their testimony deserves.

You are here only to determine whether the defendant is guilty or not guilty of the charges in the indictment.  The defendant is not on trial for any conduct or offense not charged in the indictment.  And we'll review those charges shortly.

A separate crime is charged against the defendant in each count.  You must decide each count separately.  Your verdict on one count should not control your verdict on another.

As I explained before, you heard testimony of a witness who testified in the Spanish language.  Witnesses who do not speak English or are more proficient in another language testify through an official interpreter.

Although some of you may know the Spanish language, it is important that all jurors consider the same evidence.  Therefore, you must accept the interpreter's translation of the witness' testimony.  You must disregard any different meaning. You must not make any assumptions about a witness or a party solely on the fact that an interpreter was used.

An act is done knowingly if the defendant is aware of the act and does not act through ignorance, mistake, or accident.

The Government is not required to prove that the defendant knew that his acts or omissions were unlawful.  You may consider evidence of the defendant's words, acts, or omissions, along with all the other evidence, in deciding whether the defendant acted knowingly.

Some of you have taken notes during the trial.  Whether or not you took notes, you should rely on your memory of what was said.  Notes are only to assist your memory.  You should not be over-influenced by your notes or those of your fellow jurors.

The punishment provided by law for this crime is for the Court to decide.  You may not consider punishment in deciding whether the Government has proved its case against the defendant beyond a reasonable doubt.

All right.  Counts 1, 2, and 4.

The defendant is charged in Counts 1, 2, and 4 of the indictment with sexual abuse of a person in official detention, in violation of Section 2243, Subsection (b), of Title 18 of the United States Code.  These counts relate to defendant's alleged abuse involving sexual acts with Melissa while she was an inmate at FCI Dublin.  Specifically, the Government alleges that the defendant digitally penetrated Melissa's genital opening on three different occasions.

For the defendant to be found guilty of those charges, the Government must prove each of the following elements beyond a reasonable doubt:

First, the defendant knowingly engaged in a sexual act with Melissa;

Second, at the time, Melissa was in official detention at FCI Dublin; and

Third, at the time, Melissa was under the custodial,

supervisory, or disciplinary authority of the defendant.

In this case, "sexual act" means the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object with the intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person.

In this case, "official detention" means detention by a federal officer or employee or under the direction of a federal officer or employee following a charge or conviction of an offense.

Count 3.

The defendant is charged in Count 3 of the indictment with committing an abusive sexual contact with Melissa while she was in official detention, in violation of Section 2244, Subsection (a), Subsection (4), of Title 18 of the United States Code. Specifically, the Government alleges that the defendant touched Melissa's genitalia and breasts.

For defendant to be found guilty of Count 3, the Government must prove each of the following elements beyond a reasonable doubt:

First, the defendant knowingly engaged in sexual contact with Melissa;

Second, at the time, Melissa was in official detention at FCI Dublin; and

Third, at the time, Melissa was under the custodial,

supervisory, or disciplinary authority of the defendant.

Counts 5 and 6.

The defendant is charged in Counts 5 and 6 of the indictment with committing an abusive sexual contact with Maria while she was in official detention, in violation of Section 2244, Subsection (a), Subsection (4), of Title 18 of the United States Code.  Specifically, the Government alleges that the defendant caused Maria to touch defendant's penis and that defendant touched Maria's breasts.

For defendant to be found guilty of Counts 5 and 6, the Government must prove each of the following elements beyond a reasonable doubt:

First, the defendant knowingly engaged in sexual contact with Maria;

Second, at the time, Maria was in official detention at FCI Dublin; and

Third, at the time, Maria was under the custodial, supervisory, or disciplinary authority of the defendant.

Count 7.

The defendant is charged in Count 7 of the indictment with committing an abusive sexual contact with Rachel while she was in official detention, in violation of Section 2244, Subsection (a), Subsection (4), of Title 18 of the United States Code. Specifically, the Government alleges that defendant touched Rachel's buttocks.

For defendant to be found guilty of Count 7, the Government must prove each of the following elements beyond a reasonable doubt:

First, the defendant knowingly engaged in sexual contact with Rachel;

Second, at the time, Rachel was in official detention at FCI Dublin; and

Third, at the time, Rachel was under the custodial, supervisory, or disciplinary authority of defendant.

As used in Counts 3, 5, 6, and 7 in this case, "sexual contact" means the intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of any person with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person.

As used in Counts 3, 5, 6, and 7 in this case, "official detention" means detention by a federal officer or employee or under the direction of a federal officer or employee following a charge or conviction of an offense.

A person in official detention at FCI Dublin cannot legally consent to any sexual act or sexual conduct -- contact with an individual who has custodial, supervisory, or disciplinary authority over that person.  As a result, the Government does not need to prove that the sexual acts or sexual contacts charged in Counts 1 through 7 were

non-consensual.  In other words, consent is not a defense to Counts 1 through 7.

Count 8.

The defendant is charged in Count 8 with the indictment -- of the indictment with knowingly and willfully making a false statement in a matter within the jurisdiction of a governmental agency or department, in violation of Section 1001 of Title 18 of the United States Code.

For the defendant to be found guilty of that charge, the Government must prove each of the following elements beyond a reasonable doubt:

First, the defendant made a false statement;

Second, the statement was made in a matter within the jurisdiction of the Federal Bureau of Investigation or the FBI;

Third, the defendant acted willfully; that is, the defendant acted deliberately and with knowledge both that the statement was untrue and that his conduct was unlawful;

Fourth, the statement was material to the activities or decisions of the FBI; that is, it had a natural tendency to influence or was capable of influencing the agency's decisions or activities; and

Fifth, the statement involved offenses under Chapter 109A of Title 18 of the United States Code.

The crimes of sexual abuse of a person in official detention as charged in Counts 1, 2, and 4 and abusive sexual

contact as charged in Counts 3, 5, 6, and 7 are offenses under Chapter 109A of Title 18 of the United States Code.

As previously explained, you heard evidence that the defendant may have committed a similar offense of sexual assault toward FCI Dublin inmate Christina.  You may use this evidence to decide whether the defendant committed the acts charged in the indictment.  You may not convict the defendant simply because he may have committed other unlawful acts.  You may give this evidence such weight as you think it should receive or no weight.

You have also heard testimony about the defendant's alleged conduct towards FCI Dublin inmate Katrina.  This evidence of other acts was admitted only for a limited purpose or purposes.  You may use this evidence to decide whether the defendant made false statements as charged in Count 8 of the indictment.

You may also consider this evidence as to Counts 1 through 7 of the indictment only for the purpose of deciding whether the defendant had the state of mind, knowledge, or intent necessary to commit the crimes charged in the indictment, had a motive or an opportunity to commit the acts charged in the indictment, or acted with a method of operation as evidenced by a unique pattern, or did not commit the acts for which the defendant is on trial by accident or mistake.

Do not consider this evidence for any other purpose other

than the purposes specified in this instruction.  Of course, it is for you to determine whether you believe this evidence and, if you do believe it, whether you accept it for the purpose offered.

You may give it such weight as you feel it deserves, but only for the limited purposes that I described to you.

The defendant is not on trial for committing these other acts, and you may not consider the evidence of these other acts as substitute for proof that the defendant committed the crimes charged in Counts 1 through 7.

You may not consider this evidence as proof that the defendant has a bad character or any propensity to commit crimes.  Specifically, you may not use this evidence to conclude that because the defendant may have committed the other acts, he must have also committed the acts charged in the indictment.

Remember that the defendant is on trial here only for the crimes charged, not for these other acts.  Do not return a guilty verdict unless the Government proves the crimes charged in the indictment beyond a reasonable doubt.

A verdict form has been prepared for you.  I've placed a blue copy for your use in your pocket of your binder.  After you've reached a unanimous verdict on a -- unanimous agreement on a verdict, your presiding juror should sign the verdict form, the original of which will be given to you in a separate

folder, according to your deliberations.  The presiding juror signs it and dates it, and advises the clerk when you're ready to return to the courtroom.

We're going to stop here.  I have some more instructions for you, but I'm going to have the lawyers do their closing arguments now.

So given the time, why don't we go ahead and just take a 15-minute break.  Then you'll hear the arguments and I've got some more instructions for you after the arguments.  Okay?

Again, a reminder, no discussing anything.  You're not deliberating yet.

(Proceedings were heard out of presence of the jury:)

**THE COURT:**  Okay.  We'll stand in recess for 15 minutes.

(Recess taken at 9:39 a.m.)

(Proceedings resumed at 9:55 a.m.)

**THE CLERK:**  Come to order.  Court is back in session.  The Honorable Yvonne Gonzalez Rogers is presiding.

**THE COURT:**  Okay.  You may all be seated.  We are back on the record.  The record will reflect that the jury is back.

Everybody ready?

All right.  Ms. Priedeman, you may provide your closing argument.

### CLOSING ARGUMENT

**MS. PRIEDEMAN:**  Thank you, Your Honor.

As warden, the defendant had power and control over every aspect of the inmates' lives.  He controlled where they slept, where they worked, and who they could talk to.  He had the power to help them or punish them.  He could let them out of prison early or he could send them to the solitary housing unit.

The defendant knew the strength of that power, and he abused it over and over and over again.  The defendant's abuse followed a calculated and perverse pattern.  He approached the inmates when they were their most vulnerable.  He flattered them, complimented them, made them feel special.  He manipulated them, groomed them, and made them promises.  And then he instructed them to strip naked, showed them pictures of his penis, and he touched them.  He abused them.  He was a fox guarding a henhouse.

The defendant thought he had chosen the perfect targets and committed the perfect crime.  He targeted convicted felons who were under his complete control, stuck within the four walls of the prison that he controlled.

The defendant knew where all the cameras were and, more importantly, where they weren't, and as the warden, he was notified every time an inmate made an allegation against a staff member and he also had the ability to refer an allegation to federal agents or to not refer it.  He was the gatekeeper. He controlled what happened in the prison and he controlled

what went out.

The inmates felt like they had no one to report him to, and the defendant made sure of that. He told them he was friends with the investigator, and he told them they could get in trouble if anyone had found out what had happened.

You heard from inmates who believed what the defendant said. They didn't want to talk to law enforcement at first because they were terrified of getting in trouble.

The defendant counted on their silence, and he thought that even if they did come forward, no one would ever believe them because he was the warden and they were felons.

The defendant thought he was above the law. He thought he was the law. In a way, at FCI Dublin, he was. And it worked for a while.

But what the defendant didn't count on was the inmates he abused coming forward, calling his bluff, and testifying in court about the embarrassing and shameful ways that the defendant abused them, about how they fell for his act. They believed him when he made promises to them.

But the women did come forward, and you heard directly from the women that the defendant abused: Melissa, Maria, Rachel. And it wasn't just them. You heard from two other women that the defendant abused. You heard from Christina and Katrina.

And now you can tell the defendant that he's not above the

law, because what he did was a crime.  It's multiple crimes.

The defendant is charged with committing eight crimes: Three counts of sexual abuse of a person in official detention, four counts of abusive sexual contact, and one count of making false statements to a government agency.

Each crime is made up of elements or parts, and the Government has to prove each element beyond a reasonable doubt. That's our burden, and we embrace it.

I'm going to spend some time this morning going through each of the elements of each of the charges, what the Government is required to prove in this case, and then I'm going to give you an overview of the evidence that proves each count beyond a reasonable doubt.

One thing I want to flag before we get started is that it's really important to consider all the evidence in this case together.  Like the judge told you at the beginning of this case, this case is like a puzzle, and every piece counts.

I also want to flag for you that I might summarize some of the elements or speak in shorthand, and I want to remind you that what the judge instructed you controls.

I'm also going to reference some of the witness testimony in this case, and, as the judge instructed you, what I say is not evidence.  If your memory conflicts with something I say, you should go with your memory.

I'm also going to use a PowerPoint this morning to talk

about the evidence.  You won't have this PowerPoint when you go back to deliberate, so I would encourage you to take notes about the different evidence that supports each count.

I want to start with the first seven counts.  Four of those counts relate to the defendant's abuse of Melissa, two of those counts relate to the defendant's abuse of Maria, and one count relates to the defendant's abuse of Rachel.

Now, the first two elements of sexual abuse of a person in official detention and abusive sexual contact are exactly the same:  That the victim was in official detention at FCI Dublin and that the victim was under the custodial, supervisory, or disciplinary authority of the defendant.

Before I get to that third element, I want to point out these first two elements are not really contested for any of the first seven counts.  It's not contested that Melissa, Maria, and Rachel were inmates at FCI Dublin and, therefore, in official detention, nor is it contested that they were under the custodial, supervisory, or disciplinary authority of the defendant.

He was the associate warden or warden when he committed these crimes, and he had absolute power and control over all of the inmates.  So you can kind of cross off these first two elements for Counts 1 through 7.

That leaves us with the third element, and that's where there is a difference between the two charges, between sexual

abuse of a person in official detention and abusive sexual contact.

To prove sexual abuse of a person in official detention, the Government must prove that the defendant engaged in a sexual act.  To prove that the defendant engaged in abusive sexual contact, the Government must prove that the defendant engaged in sexual contact.

The judge provided you definitions of what constitutes a sexual act and what constitutes sexual contact.  For purposes of this case, the real difference is that "sexual act" requires penetration, whereas "sexual contact" does not.

A sexual act includes the penetration, however slight, of the genital opening of another by a finger, with the intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person.  So that would include when the defendant put his finger inside Melissa's vagina on multiple occasions.

Whereas sexual contact includes the intentional touching, either directly or through the clothing, of the genitalia, groin, breast, or buttocks of any person with the intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person.

So when the defendant rubbed Melissa's vagina and touched her breasts, that would be sexual contact.  Likewise, when the defendant touched Maria's breasts and when he put her hand on

his penis, that would constitute sexual contact, and so would the defendant's touching of Rachel's butt.

It's also clear that the defendant engaged in these acts and contact with a sexual intent or sexual purpose.  You know that because he made sexual comments to Melissa, Maria, and Rachel.  He told them he wanted to have sex with them and he showed them naked pictures of himself.  All of that evidence shows that the defendant touched the inmates for his own sexual gratification.

I also want to point out here that consent or lack of consent is not an element to these offenses.  Whether or not the victims consented to engaging in sexual acts or contact with the defendant is not something you need to decide.  The law says that if Melissa, Maria, and Rachel were incarcerated in federal prison and were under the custody and control of the defendant and he engaged in a sexual act or contact with them, that's against the law, period.

All right.  So now I want to spend some time going over the evidence that supports each of the counts.

Let's start with the counts that relate to Melissa.  As I mentioned, the first four counts relate to the defendant's abuse of Melissa.  Counts 1, 2, and 4 involve a sexual act -- in this case, it's when the defendant put his finger inside Melissa's vagina on three occasions -- and Count 3 involves sexual contact.  That's when the defendant grabbed Melissa's

vagina and her breasts.

Before I get into the specific acts that make up each of these counts, I want to take a step back and remind you how the defendant's abuse of Melissa started.

Melissa told you that the defendant started complimenting her, flattering her, making sexual remarks. He made her feel special and told her that she didn't belong in prison.

He became more aggressive when Melissa's mother died and Melissa was upset. That was his in with her. That was his opportunity.

He also made her promises, promising her that he could help her transfer to the camp, where she would have more freedom and he would have more access to her. He dangled that carrot in front of her. He had all the power, and he knew it.

You heard testimony that Melissa's feelings towards the defendant were complicated. She told you that she had feelings for him. He made her feel special, protected. But she also found the sexual interactions with him rough and uncomfortable. She described her interactions with him as vulgar and pornographic. That's how the defendant operated. He flattered and complimented his victims to try to mask his manipulation. He groomed them so he could abuse them.

Melissa testified to four different sexual incidents between herself and the defendant. Those incidents make up Counts 1 through 4.

Let's start with Count 1.  You heard testimony from Melissa that Melissa was working out in the rec in December of 2019 when the defendant brought her to the visitation room.  He then brought her into the bathroom, where he knew there were no cameras.  He kissed her while she was up against this sink, and then he grabbed her breasts roughly, jerked her towards him, and stuck his fingers inside of her.  She grabbed his hand and he put it on his penis.

When the defendant put his finger inside Melissa's vagina, that constituted a sexual act, and that satisfies that fourth element required to prove Count 1.

Count 2.  Melissa testified that on another occasion between December 2019 and March 2020, the defendant got Melissa from rec and again brought her to the visitation room.  Again, he took her to a bathroom where he knew there were no cameras.  They went into one of those bathrooms and the defendant kissed her.

They then went into another bathroom, and the defendant kissed Melissa and put his finger inside her vagina.  The defendant then walked out of the bathroom while the door was still open and said, "Show me."  Melissa pulled down her pants and bent over at the waist.

When the defendant put his finger inside Melissa's vagina, that constituted a sexual act, and it satisfies that third element for Count 2.

Count 3.  Melissa testified that on another occasion when there were outside individuals at FCI Dublin to assess Dublin's compliance with the Prison Rape Elimination Act, the defendant again brought Melissa to the visitation room.  He told her that he needed to touch her, and he brought her into a changing stall, a changing stall that he knew was outside the view of any camera.  He kissed Melissa while Melissa was back against the wall and he grabbed her breasts and her vagina.  Both of those actions constitute sexual contact, and they satisfy that third element of Count 3.

I've talked about the defendant's power, and it's hard to imagine what could be more brazen than the defendant's abuse of Melissa while there were outside auditors present to evaluate the prison's compliance with the very law that was supposed to protect Melissa.  How could Melissa possibly have felt like she could have reported what had happened?  The answer is she couldn't, and she didn't.

Count 4.  Melissa testified that the last physical sexual interaction with the defendant occurred in March of 2020, when the defendant took her to the UNICOR warehouse.  They walked to a part of the warehouse and they kissed, and the defendant put his fingers inside Melissa's vagina.  When the defendant put his fingers inside Melissa's vagina, that constituted a sexual act, and it satisfies that third element for Count 4.

Melissa told you that was the last physical sexual

interaction between the defendant and Melissa, but the sexual nature of their relationship continued for at least another year. The defendant instructed her to strip naked and he also showed her pictures of his penis. Melissa testified that he showed her pictures of his penis that looked like they were taken in the warden complex and he also showed her pictures of his penis with semen coming out.

Special Agent Barclay testified, and she told you that she found hundreds of pictures of the defendant's penis on his personal computer and his BOP phone, and she seized photographs that are similar to the descriptions provided by Melissa. You saw some of those pictures. Those pictures corroborate what Melissa told you.

Melissa testified that eventually she suspected that the defendant was in a relationship with another inmate, because she had seen that inmate passing notes to the defendant just like she had and she had seen the defendant standing outside that inmate's window. That was Maria. I'm going to turn to Maria in just a minute.

Melissa eventually reported what had happened with the defendant to her attorney, instead of reporting it to anyone at BOP. That's how FBI and DOJ OIG got wind of this case, and that's how we all ended up here today.

All right. Let's focus on the charges related to Maria. The defendant is charged with abusing Maria on two occasions.

Those two occasions form the basis for Counts 5 and 6.

The defendant's tactics towards Maria were similar to the tactics he used towards Melissa.  He knew it worked.  Maria testified that the defendant told her she was pretty, he complimented her, and he told her that they would be together when she was out of prison.  The defendant gave her a rose and made sure she was assigned to work in the laundry room so it would be easier to see her.

The defendant also made promises to Maria, promising he would sign her compassionate release motion.  Maria asked him repeatedly about it, and he said he was still working on it. Months later, she learned that he'd already denied her compassionate release motion.

The defendant lied to Maria when he said he was still working on her motion.  He never intended to approve it.  Maria applied for the compassionate release motion in April.  The defendant denied it in June, and she wasn't notified until August, after the defendant had left.

So why did he lie?  Why did he say he was still working on it?  Because he wanted Maria to keep stripping for him.  He wanted to touch her.  And he knew that if she thought he was going to sign her compassionate release motion, it would be easier to get her to comply.  He was stringing her along.

Maria wanted to get home to her kids.  The defendant knew that, and he took advantage of her and manipulated her and

abused her.

Maria told you that she had feelings for the defendant, but just like with Melissa, it was complicated.  Maria told you it was beautiful with the defendant in the beginning, but then it became more forceful.  She felt like she was against a wall.

The defendant asked for pictures of Maria and then he showed her naked photographs of himself, including of his penis, just like he had done with Melissa.  Like Melissa, the defendant started instructing Maria to be naked when he did his rounds.  He saw her from inside the prison, standing inside her doorway, and outside.  He would tell her to keep her window open so he could see her naked.  On one occasion, Maria testified that she believed the defendant took a picture of her.

Melissa testified that she saw the defendant standing outside Maria's window, and you heard testimony from Aurelia, another former inmate, who lived just a few cells away from Maria, that she saw the same thing.  So did Shindozjanae.

Maria was scared, but she was nervous about what would happen if she said no.  She was afraid the defendant wouldn't sign her compassionate release motion like he had promised.  She didn't want to make him angry.  He was the warden.

Eventually, the defendant's relationship with Maria became physical.  Count 5.  You heard Maria testify that the defendant came into the laundry room, where he knew there were no

cameras.  He took her hand and put it on his erect penis and said, "This is all yours."

When the defendant put Maria's hand on his penis, that constituted sexual contact and is the basis for Count -- is the basis for satisfying that third element of Count 5.

The defendant's interactions with Maria in the laundry room didn't go unnoticed.  Aurelia told you that she saw the defendant alone with Maria in the laundry room on two occasions.

Count 6.  Maria testified that on another occasion when the defendant had instructed Maria to strip naked, the defendant reached into Maria's cell, again where there were no cameras, and touched her bare breast and told her she was very beautiful.  When the defendant touched Maria's bare breast, that constituted sexual contact and satisfies that third element of Count 6.

Again, the defendant's conduct in Maria's cell didn't go unnoticed.  You heard testimony from Shindozjanae that he actually saw the defendant standing at Maria's cell and he saw that Maria was naked, just like Maria told you.

All right.  Now I want to focus on the count related to Rachel.  That's Count 7.

Like Melissa, Rachel testified that the defendant approached her when she was particularly vulnerable.  Her only friend had just transferred from the prison to the camp, and

she was lonely.  The defendant complimented her, flattered her. He groomed her.

His comments started to become more personal, more pointed.  He made comments about Rachel's special needs son, a detail she had not shared with him, which made her feel like she had a connection with him.

Like he did with Maria and Melissa, the defendant instructed Rachel to strip -- to take pictures of herself and instructed her to strip naked.  She didn't do either.

Eventually, as it had with Melissa and Maria, the relationship turned physical.  Rachel testified that after the COVID lockdown in March of 2020 and before she was released in September of 2020, while she was working in the electrical shop, where, again, the defendant knew there were no cameras, the defendant came in and kissed her while she was backed against the wall and grabbed her butt.  When the defendant grabbed Rachel's butt, that constituted sexual contact, and it satisfies that third element for Count 7.

Rachel testified that before she left FCI Dublin, the defendant gave her an email address, rememberpockets@gmail.com, and told Rachel to email him.  The email address was a reference to a comment the defendant had made about her ripped pocket when he was staring at her butt.  Now, we know the defendant has his own story about this email address, and I'll get to that when I address the defendant's other lies.

Rachel and the defendant video chatted.  He told her to touch herself, and you heard that the defendant recorded those entire interactions without Rachel's consent and you saw screenshots from that conversation.  The defendant is clearly visible in those pictures, and he doesn't dispute it's him.  He can't.

The photographs tell you what you already know.  The defendant pursued Rachel at FCI Dublin, he kissed her, he touched her butt, and then he pursued her after she left FCI Dublin as well.

He asked her to take naked pictures at FCI Dublin.  She refused.  And so once she was released, he asked her to video chat with him, and then he recorded that entire conversation without her permission.  He took what he wanted without asking.  The defendant was used to being in charge, and he got what he wanted.

You also heard from Christina.  You heard from Christina that she was working out at rec when the defendant came up to her and grabbed her butt and said, "Sorry, I couldn't help myself."

He later made sexual comments about her butt, he pointed at his crotch, and he instructed her to dance for him.  The defendant isn't charged with the conduct related to Christina, but the judge instructed you that you can use her testimony to determine whether you think it's more likely that the defendant

did commit the charged conduct.

You also heard from Katrina.  Katrina told you that the defendant asked her what her dressing time was and started instructing her when she needed to be undressed for him. Katrina felt uncomfortable with this request, but she thought she had no choice.  He was the warden and she was an inmate.

Now, the defendant isn't charged with asking Katrina to strip naked for him, but he is charged with lying about asking inmates to strip naked for him.  I'll get into that in just a minute.

The judge instructed you that you can use Katrina's testimony in relation to Count 8, which is the false statements charge, but you can also use it to decide whether the defendant had a sexual intent when he committed the crimes charged in Counts 1 through 7 or whether he acted in a way that was consistent with a unique pattern.

Now I want to talk about Count 8.  The defendant was interviewed by FBI and DOJ OIG agents in July of 2021.  You heard that entire interview.  It was recorded.  During that interview, the defendant lied to federal agents repeatedly. Those statements he made to federal agents in July of 2021 form the basis of Count 8, false statements to a government agency.

The elements are that the defendant made a false statement, the statement was made in a matter within the jurisdiction of the FBI, the defendant acted willfully, the

statement was material to the activities or decisions of the FBI, and the statement involved sexual abuse offenses.

You heard the recording of the defendant's interview with FBI and DOJ OIG agents. You know the defendant made a false statement because when he was asked if he had ever touched an inmate in an inappropriate way, he said, "No. We don't touch. The men don't touch the inmates here at all."

You know that's a false statement because, as I've outlined, the defendant did touch inmates inappropriately. He touched Melissa, Maria, Rachel, and Christina inappropriately.

The defendant was also asked if he had ever looked at a naked inmate, and unprompted, he said, "I don't, like, schedule a time, like you be undressed and I'll be there." You know that's also a false statement, because the defendant instructed Melissa, Maria, Rachel, Christina, and Katrina to be naked.

What's particularly telling about the defendant's statement that he doesn't schedule a time for the inmates to be undressed is that the agents never asked whether the defendant had instructed inmates to be naked at a particular time. In fact, that wasn't mentioned throughout the entire interview. It was the defendant who just brought it up on his own. He just blurted it out. Why did he do that? Because it was on the top of his mind. It was exactly what he had done, and he couldn't stop thinking about it.

It's kind of like if you walk into the kitchen and your

five-year-old has cookie crumbs all over their face, and they blurt out without you asking, "I didn't eat a cookie from the cookie jar."  Why would they say that?  Well, we all know it's because it's exactly what they did do, they ate that cookie.

The same is true for the defendant.  He blurted out that he didn't schedule a time for inmates to be undressed because it's exactly what he was doing.

So that's that first element, that the defendant made false statements.

The other elements are also easily met.  You heard testimony from Special Agent Barclay that at the time of the defendant's statements, the FBI was actively investigating sexual abuse allegations related to the defendant, so the statement was within a matter within the jurisdiction of the FBI.

You also know the defendant acted willfully when he made a false statement because he knew he was making a false statement.  He knew he had touched multiple inmates inappropriately, and he knew that he had instructed multiple inmates to strip naked.  In fact, you heard testimony from Katrina that he instructed her to strip naked the day before FBI and DOJ OIG agents interviewed him, the day before.

And you also know the statement was material to the activities or decisions of the FBI.  Special Agent Barclay testified that the defendant's statements about having not

touched inmates inappropriately and never asking inmates to strip affected the course of the FBI's investigation.  If the defendant had been forthcoming about what he had been doing, the FBI would have taken different steps.

And, finally, you know the statement involved sexual abuse offenses.  The judge instructed you that both sexual abuse of a person in official detention and abusive sexual contact, which are the crimes in Counts 1 through 7, are sexual abuse offenses, and the defendant's statements related to the investigation of those offenses.  So that's Count 8.

Now, the defendant's abuse of Melissa, Maria, and Rachel didn't happen in front of an audience.  No one saw the defendant touch Melissa, Maria, or Rachel.  The defendant committed these crimes while no one was around for a reason. He didn't want to get caught.

So how do you know what happened?  For one thing, because Melissa, Maria, and Rachel told you what happened.  The judge instructed you about the types of things you can consider when trying to determine whether you believe a witness, and she told you that you can believe everything a witness said, part of it, or nothing.  In other words, if you believe what Melissa, Maria, and Rachel told you, you can convict the defendant on that alone.  That's all you need.  But while any one witness can prove a fact, the collective evidence in this case is overwhelming.

The Government has to prove each count in this case beyond a reasonable doubt, and we embrace that burden.  Defense counsel in his opening statement characterized the evidence in this case as uncorroborated.  That could not be further from the truth.  We have shown you with witness after witness, photograph after photograph, that the defendant committed these crimes beyond a reasonable doubt.  The puzzle pieces fit together, and they show one thing:  The defendant is guilty.

I want to spend some time now going through all the reasons why you should believe the victims' testimony.

First, I want to talk about the corroborating witness testimony.  That's the testimony other than the victims.

Then I want to focus on how similar the defendant's actions were towards each of the victims.

Then I want to talk about the pictures that were found on the defendant's personal computer and his BOP phone.

Then I want to talk about the actions the defendant took to hide evidence, to cover his tracks.

Then I want to talk about the defendant's story in this case and all the ways he's lied to you.

And, finally, I want to talk about why the victims in this case have no motive to lie about what happened to them.

So let's start with the corroborating witness testimony.

It's not just what the victims told you in this case.  You heard from Correctional Officer Stephanie Millikin that she

observed the defendant frequently talking to Melissa at her cell and escorting her to the visitation room.

You also heard from Dr. Townsend, who told you that Melissa was scared when the defendant walked by.  That corroborates what Melissa told you.

You also heard from Aurelia.  Aurelia told you that Maria confided in her about her relationship with the defendant. Maria told Aurelia that the defendant had instructed Maria to strip naked, that he had showed her naked pictures, and that Maria had touched him.  Aurelia also testified that she saw the defendant standing outside Maria's window and she observed Maria and the defendant in the laundry room.

You also heard from Shindozjanae.  He told you that he saw the defendant outside Maria's window, and he also saw the defendant standing at her doorway when she was naked. Ms. Millikin, Aurelia, and Shindozjanae told you what you already know:  Melissa and Maria were telling the truth.

Another reason you should believe the victims' testimony is that the defendant acted in the same way towards each of the victims.  The defendant knew what worked to get what he wanted, and he did it again and again.

He called them beautiful.  He complimented them.  He made them feel special.  He exploited personal information that he knew about him -- about them because of his position, like the death of Melissa's mother and Rachel's special needs son.

He made promises to them.  He promised Melissa he would help her transfer to the camp and he promised Maria that he would sign her compassionate release.

And then he went further.  He instructed them to strip, he showed them pictures of his penis, and he touched them.

And he deterred them from coming forward by telling them he was friends with the investigator, telling them they could get in trouble, and sharing information about other investigators -- other investigations.

The fact that the victims' testimony about the defendant's actions are so similar is not a coincidence; it's because it's what happened.  It's because the victims are telling the truth.

Another thing that tells you the victims were telling the truth is the pictures that were found on the defendant's personal computer and on his work phone.  Those pictures are an important piece of the puzzle.  Those pictures are damning.

First, I want to talk about the pictures of Melissa.  And, again, I know the defendant had his own story about what happened, and I'm going to address that in just a bit.

In this picture, not only can you see Melissa naked on all fours in a sexual position for the --

THE COURT:  Hold on.

A JUROR:  Sorry.  Our screen is blank.

THE COURT:  Okay.  Publish just to the jury.

Has the PowerPoint, then, not been shown to everybody

else?  It has?

**THE CLERK:**  How about now?  Is it on now?

**THE COURT:**  All right.

**MS. PRIEDEMAN:**  In this picture, not only can you see Melissa naked on all fours in a sexual position for the defendant, but you can see the defendant's reflection in the window.  He admits he took this picture.  He's wearing his work uniform.  He was on duty at FCI Dublin when he took this picture.

You can also see the cell number, which belonged to Andrea, just like Melissa said.

Mr. Reilly mentioned earlier the expression "a picture is worth a thousand words."  In this case, it just screams one: Guilty.

You also know the defendant had multiple versions of this same photograph that he had cropped to focus on Melissa's genitals on his personal computer.  Why did he do that? Because he was aroused by this photograph.  He wanted to zoom in on Melissa's genitals.

And by cropping this photograph, it made it more difficult to tell the picture was taken at FCI Dublin.  You can no longer see his reflection and you can no longer see the cell number. Why would the defendant want it to be more difficult to determine where this picture was taken?  Because he knew what he was doing was wrong and he was trying to hide it.

The pictures of the defendant and Rachel are also incredibly important. They corroborate what Rachel told you. They corroborate that Rachel and the defendant were in a romantic relationship at FCI Dublin and the defendant kissed Rachel and grabbed her butt. After Rachel left, they stayed in touch, and they had a naked video chat.

You also saw pictures of the defendant's penis from the defendant's work phone. You saw two of those pictures that were taken in a bathroom right outside the defendant's office, just like Melissa and Rachel told you.

Special Agent Barclay told you that she seized hundreds of pictures of the defendant's penis.

The defendant's uniform is again visible in the background of these photographs. Why was the defendant taking pictures of his penis while he was on duty at work? The judge told you you can use your common sense to help you make sense of the evidence in this case, and what your common sense will tell you is that the defendant took these photographs because he was sexually aroused at work by Melissa, by Maria, by Rachel.

The naked photographs of Melissa, of Rachel, and of the defendant tell you what you already know: The victims are telling you the truth.

All right. Next, I want to talk about the actions that the defendant took to hide evidence, to cover his tracks.

You heard Special Agent Barclay's testimony that just

three weeks before his interview with the FBI and DOJ OIG and one week after another prison guard was charged with sexually abusing an inmate, the defendant downloaded an application to hide photos.  You know why he was trying to hide photos? Because he had something to hide -- a lot to hide, actually -- and he was terrified of getting caught for what he knew he had done at FCI Dublin.

He also knew the FBI was investigating other correctional officers at FCI Dublin and he knew it was a matter of time before he was investigated, so he tried to get ahead of it.

Around the same time, he told Maria to destroy all evidence of their relationship.  He was panicking.

And it's the same reason he used a burner phone to talk to Rachel.  He was trying to hide the fact that he was engaged in naked video chats with a former inmate.

When the defendant downloaded an application to hide photos, he was trying to get rid of evidence of his abuse.  He was hoping that this day would never come, that you would never see those photographs.

He was banking on the fact that it would just be his word against the inmates, and he thought that no one would ever believe them.  He thought the inmates' voices weren't strong enough, not powerful enough.

But the defendant's attempt to hide all this evidence from you failed.  You saw those photographs despite his best

efforts.  And he was wrong about the inmates' voices not being strong enough to speak out, too.  The inmates did speak up and they spoke out, and now you have all of the evidence before you that proves the defendant committed these crimes beyond a reasonable doubt.

The actions that the defendant took to hide his tracks are significant.  They tell you, again, what you already know, that the defendant did what the victims said he did.  That's the only logical explanation.

Now I want to talk about the defendant's lies.  We've already discussed how the defendant lied to federal agents, but he also lied to you.  He got up and, under oath, swore to tell the truth, and he lied through his teeth.

The defendant testified in this case, and he told you he didn't touch any of the inmates.  He also said he never instructed the inmates to strip.  The judge gave you an instruction about the credibility of witnesses, the types of things you can consider to determine whether someone is telling the truth, and she told you you can use those same tools to evaluate the defendant's testimony.

And one of the things that you can use is bias or motive, and there is no one in this case that has more of a stake in the outcome than the defendant.  The defendant lied to you, just like he lied to federal agents.

You should also think about the defendant's statements in

the context of the rest of the evidence, and when you do, you will see that the defendant's story doesn't make any sense. And why doesn't it make any sense?  Because it's just not true.

Now, the defendant told you a lot of lies and I don't have time this morning to go through every lie that he told you, but I do want to highlight a few.

First, I want to talk about the defendant's lie that he took pictures of Melissa to document her misconduct.

You heard testimony from Dr. Malespini that BOP has a protocol for reporting inmate conduct.  That protocol includes writing reports, documenting inmates' conduct.  That makes sense.  That protocol does not include taking photographs of naked inmates, because it would violate inmates' privacy.  That also makes sense.

And Lieutenant Putnam told you the same thing.  It's absolutely not okay for a correctional officer to take a naked picture of an inmate.  In fact, in his 20-year career at BOP, he's never seen naked photos of an inmate attached to an incident report.

The defendant told you that despite BOP's protocol, the defendant took two naked pictures of Melissa in Andrea's cell. He took the first picture of Melissa naked on all fours, and then he doubled down and took a second picture of her topless.

He told you that he was yelling at her when he took that second photo, screaming, actually.  You saw that picture.

Melissa is smiling in that picture.  She's smiling for the camera.  She's smiling for the defendant.  The defendant wasn't yelling at Melissa; he was aroused by her.

After taking the photographs to allegedly document Melissa's misconduct, the defendant didn't tell anyone.  He didn't tell Melissa's unit manager.  He didn't tell the captain.  He didn't tell the lieutenant.

Instead, the defendant admitted to you that he took those photographs of Melissa home without telling anyone at FCI Dublin and, while in the privacy of his own home, he downloaded them to his personal computer.

And then he admitted that he cropped the photographs.  You saw those pictures.  The defendant cropped them to focus on Melissa's vagina and her breasts.  The defendant told you that he cropped them for his report, but that makes no sense.  The way he cropped that first photo actually cuts out Andrea's cell number, so he cropped out the very evidence that supports his supposed allegation that Melissa was in the wrong cell.  None of that makes sense whatsoever.

The defendant also told you that he drafted an incident report, a report that he didn't save, that he didn't show to anyone, that he didn't email to himself, he didn't text it to himself.  He didn't report it to anyone.

Under BOP policy, he was required to submit that report to the lieutenant, but he didn't do that.  He didn't tell anyone

about the report because it did not exist.

You know the real reason he took those pictures of Melissa and cropped them to focus on her genitals and breasts was not to report her misconduct; it was to satisfy his own sexual desires.

And in May of 2021, the defendant approved a request to transfer Melissa to the camp that said there were no behavior or management concerns relevant to Melissa. So not only did he not report her, but he rewarded her by helping her transfer to the camp, and the defendant never once mentioned his alleged concerns about her inappropriate conduct. Again, the defendant's story just doesn't make any sense.

And in July of 2021, when the defendant was interviewed by federal agents and was asked if he could name a particular inmate who had been inappropriate towards him, that was his chance to say, "Oh, yes, I took a picture of Melissa when she was being inappropriate." But he did not say that. He couldn't say that, because it's not what he was doing.

He told you himself he didn't say anything about those pictures because he didn't want to incriminate himself. He said that on the stand. He knew that if he had told agents that he took that picture of Melissa, it would incriminate him. It would incriminate him because he took that picture of Melissa after he instructed her to strip for him, not because he was writing some report.

And in that same interview, the defendant was also explicitly asked if he'd ever taken a picture of an inmate. He said he had taken pictures of the inmates' IDs or to document a rash. You've seen that picture of Melissa. I'm not going to show it to you again -- I know you've probably seen it more times than you would like -- but it's certainly not a picture of an inmate's ID, nor is it a picture of a rash.

The bottom line is that the defendant's actions are not consistent with someone who was trying to report inmate misconduct; they are consistent with someone who was sexually aroused by the inmates that were supposed to be under his care and protection.

Next, I want to talk about the defendant's lies about Rachel. The defendant told you nothing inappropriate happened with Rachel at FCI Dublin. He said that he gave her the rememberpockets email because she wanted to convey information about people at the prison.

Conveniently, just like his story with Melissa, he didn't tell anyone he was doing this. He didn't report it. He didn't document it. And he didn't give her his BOP email address, he gave her an email address that he says was created for a different girlfriend.

And at first, he told you he communicated with that girlfriend on this email, and then later he changed his story and said it could have been one of two women, they actually

never used that email account.  Does that make any sense?  Does that sound plausible?  No.

If the defendant was actually trying to communicate with Rachel about information she had about FCI Dublin, he would have looped in SIS, and he certainly would have used his BOP email address.

And he also would have reported it somewhere, because, based on his own admission, the defendant was violating the two-year ban on communicating with former inmates when he was talking to Rachel.

The defendant next told you that it was Rachel that wanted him to use a burner phone so they could continue to discuss the information she had about FCI Dublin.  Again, that makes no sense.  The defendant was the associate warden, about to become the warden.  Why would he buy a burner phone to communicate with a former inmate about information she had at FCI Dublin?  None of that makes any sense because it's not what happened.

What happened is that the defendant created that email account to communicate with Rachel, and it was a reference to when he made a comment about her ripped pocket, about her butt, because they were already in a relationship at FCI Dublin, and he didn't want anyone to know.

The defendant lied to you under oath because he didn't want you to know what had really happened.  He lied because the victims are telling the truth and he doesn't want you to

believe them.

Another reason you should believe the victims is because they have no reason to lie.  I expect that the defense counsel will attempt to paint the victims in this case as liars, as criminals who were angry at him or who had other motives.

Each of the victims in this case committed serious crimes, felonies.  That's what led to their imprisonment at FCI Dublin, and we're not here to make excuses for the crimes that they committed.  Each of the inmates who testified before you were held accountable for the crimes that they committed.  That happened years ago in different courtrooms.

But inmates don't leave their rights at the door of the prison.  The consequence of committing a felony is not to be abused by the very person that was supposed to protect you.

The defendant has been banking on his ability to portray the victims as liars since before he was caught.  He targeted inmates for a reason.  He even told Melissa that he liked convicts.  He liked convicts because he never thought they would come forward, and he thought that if they did, no one would ever believe them.

The fact that the victims in this case committed felonies is not a problem with the Government's case; it's part of the defendant's plan.

You heard about the embarrassment and shame that the victims experienced at the hands of the defendant.  You saw the

pain on their faces when they testified.  None of them wanted to go through this.

You heard about the harassment that Melissa has had to endure.  She told you that getting sentenced to 15 years was nothing compared to what she's gone through.  She has anxiety.  She can't sleep.  She lives in fear.

And Rachel and Maria didn't even want to talk to law enforcement originally.  It was law enforcement that approached them, not the other way around.  Rachel told you herself that she told federal agents to leave her alone about half a dozen times.  Why would the victims put themselves through this for some ulterior motive?  It just doesn't make sense.  The victims testified not because they have some ulterior motive; it's because they were telling the truth.

When you go back and deliberate in just a bit, I want you to think about this:  The defendant thought that by choosing victims under his supervision, all of whom had felony convictions, he had committed the perfect crime.  He thought they would never come forward, no one would ever listen to them, no one would ever believe them.  He thought he could do whatever he wanted without ever getting caught.

We're asking you to prove him wrong.  When you go back to the jury room and deliberate, consider all the evidence in this case, the witness testimony, the naked pictures of Melissa, of Rachel, of the defendant, you will find the defendant guilty of

abusing Melissa, Maria, and Rachel and lying to federal agents.

Thank you.

THE COURT:  Mr. Reilly, do you need time to set up?

MR. REILLY:  A few minutes would be enough.

THE COURT:  Okay.  Let's go ahead and stand in recess for ten minutes.  Just everybody get a stretch, and then we'll come back in.

(Proceedings were heard out of presence of the jury:)

THE COURT:  All right.  The record will reflect that the jury has left.

Mr. Reilly, it is 11:00.  We will have lunch for the jury about 11:30, and I don't know how long your closing is.  So do you want -- do you want to do part of it and take a break, or do you want to go through the whole thing?

MR. REILLY:  I would prefer to do the entire presentation uninterrupted.

THE COURT:  Okay.  And how long do you think that will be?

MR. REILLY:  I -- as I said the other day, I think an hour and a half perhaps.  If I --

THE COURT:  All right.

MR. REILLY:  -- had my druthers, I would say let them have their lunch now and I'd do mine after.

THE COURT:  It's not here.  It's ordered; it's not been delivered yet.  It's only 11:00 a.m.

So all right, we will try to do that.  We'll stand in recess for 10 minutes.

(Recess taken at 10:59 a.m.)

(Proceedings resumed at 11:47 a.m.)

**THE CLERK:**  Come to order.  This Court is back in session.

**THE COURT:**  Okay.  I understand the jurors are ready.  They finished their early lunch, so let's bring them in.

(Proceedings were heard in the presence of the jury:)

**THE COURT:**  Okay.  Mr. Reilly, we are back in session.  The record will reflect all the jurors are back.  You may proceed with your closing.

**MR. REILLY:**  Thank you, Your Honor.

### CLOSING ARGUMENT

**MR. REILLY:**  May it please the Court, ladies and gentlemen.  Just a brief comment before I start.  Jury duty is perhaps the most important civic responsibility that many citizens in this country ever get to serve, and those of us who work in the system certainly appreciate people like yourselves taking the time and the effort to come in and sit as jurors in cases like this.  So Mr. Garcia and I both thank you.

Not guilty, Count 1, sexual abuse of a ward, Melissa.  Not guilty, Count 2, sexual abuse of a ward, Melissa.  Not guilty, Count 3, abusive sexual contact of Melissa.  Not guilty, Count 4, sexual abuse of a ward, Melissa.  Not guilty, Count 5,

abusive sexual contact, Maria.  Not guilty, Count 6, abusive sexual contact, Maria.  Not guilty, Count 7, abusive sexual contact, Rachel.  Not guilty, Count 8, false statements to a government agency.  That's the destination.  The question is how do we get there?

I'm not going to spend a lot of time talking about the elements of the crimes and the legal rules that apply to this case.  The Court has already read you the definition of the various crimes and what has to be proved in order to establish that each of those crimes was committed.  The U.S. Attorney's argued at some length about those elements, and I'm not -- I'm just not going to do it, because I have something more important to talk about.  And that is the heart of this case, what is this case really about?

What it's about is what actually happened in FCI Dublin between Mr. Garcia and each of these complaining witnesses.  And the most -- single most important thing that bears upon determining what happened in this case is the credibility of these witnesses.

Because what do we have?  We have statements by several of these women saying that certain things happened, and we have absolutely unequivocal, forceful even, denials by Mr. Garcia as to each and every one.  Perhaps you'll recall, that was the very first thing I asked him when he was on the witness stand, was whether or not he committed each of these crimes, and he

answered definitively no.

When you're faced with a situation like this where you have to determine something without -- and in this case you're going to have to -- without any corroborating evidence whatsoever of the actual crimes, credibility of the people who are testifying about what happened or what they say happened is without a doubt the single most important characteristic of the evidence that you have heard and that you're going to have to talk about when you go back to deliberate.

And what you're going to determine when all is said and done, when you've evaluated the evidence and you've evaluated the credibility of these witnesses, what you're going to find is that the evidence is insufficient to prove beyond a reasonable doubt that Mr. Garcia committed any of these crimes.

So what happened?  This is, at its heart, a very classic kind of a case -- I'm sure you've heard the phrase before -- he said/she said, or in this case she said/he said.  There is zero, not an iota, of corroborating evidence of the allegations underlying the charges.  There's some stuff that kind of bears upon the fringes of things, but when you get right down to it, the allegations that certain events took place -- and I'll mention them more specifically in a minute -- but the allegations that some specific events took place made by these women are not supported directly by any other evidence.

Each of these charges, proving it depends exclusively on

the claims of the inmates involved, which makes the credibility of the people who you heard testify not just crucial, absolutely, positively determinative of what you should do with this case.

So what do we have in that regard?  Mr. Garcia -- and this will apply, obviously, to all of the seven counts involving the inmates -- 32 years as a correctional officer with the Federal Bureau of Prisons, an absolutely impeccable career.  He testified that early in his career, he had a couple, three relatively lesser evaluations, but after those three, every one since, he was evaluated as an outstanding corrections officer.

He rose through the ranks, ultimately became an associate warden and a warden; was assigned with a myriad, as he told us, of special assignments where he went out and did projects for the Bureau of Prisons.  Even at one point he mentioned he was managing Timothy McVeigh and Terry Nichols, the Oklahoma City bombers, as a senior lieutenant.

This is a man who knew how to do his job, knew how to do it well, did it well, and was recognized by not only his superiors, but his contemporaries, as well, as an absolutely outstanding correctional officer.

No one gets to have that kind of success and that kind of reputation by fiddling around on the side with inmates, especially male-on-female inmates.

So what do we have on the other side?  Let's start with

Melissa.  What we have is a convicted felon, someone who was convicted of conspiracy to commit murder.  I think most of us would agree that murder is the most serious of all criminal offenses, and conspiracy to commit a murder is right up there.

So which of these two people would you believe, this correctional officer with 32 years of absolutely outstanding performance or this young woman who was convicted of a conspiracy to commit murder?

So what is the evidence regarding this reaction or interaction between Mr. Garcia and Melissa?

Let me start off by acknowledging something.  You've heard a lot of evidence about Mr. Garcia's predilection for having sexually related photographs on his cell phone and his computer Pams.  Probably fair to call him a sexual documentarian.

But even though many people would find this unusual, probably some or more of you, that's his business, and -- his business and the business of the women with whom he was having these encounters that were -- that he photographed when there were other -- when there were women in the pictures.

The important thing about those images, all of these -- I think they were described as thousands of pictures of his penis and women and sexual things going on -- not one of those thousands of pictures supports any of the allegations in this case.  There's not one single picture of Mr. Garcia having any kind of physical contact whatsoever with Melissa.  Nothing.

Not one picture.

Now, we do have two pictures of Melissa, which I'll talk about in a minute, but as far as the four counts that were charged, out of all of these pictures that Mr. Garcia apparently compulsively takes of his sexual activities, not one picture involving Melissa.

The two that we do have that took place in the -- in the cell of the inmate Andrea, there's no contact between Mr. Garcia and Melissa in either of those pictures, and he explained how they came to be.

He was going by this door, this Andrea's door.  There was a curtain or some kind of blockage on the window, which was not permitted at that time of the day.  Inmates were not allowed to have their windows completely blocked.  He told you they could cover up like three-quarters of it if they were in a situation that required some privacy, going to the bathroom, taking a shower, getting changed, whatever, after, say, going out on the rec yard, taking a shower, having to change into clean clothes. They were not allowed -- the inmates were not allowed to completely cover that window.

So he saw the window was completely covered.  He called out to her -- called out to whoever might be in there.  He didn't know it was Melissa at that point.  Getting no response, no reaction, he thought there was a possibility that some kind of criminal activity was taking place in the cell involving

drugs, most likely, which sometimes you have to wonder how these people do this, but they get drugs into the prisons all the time and so it's a problem that correctional officers have to deal with on a regular basis.  So in his mind, he's thinking, "This may be what's going on; I better check into it."

Actually, if you recall, he said he had started to walk past after just yelling at the door, but then went back, opened the door very quickly, turned his hand with this camera that he had in his hand, and took a picture, not even knowing what he was taking a picture of yet at that point, just hoping that if there was contraband or some kind of illegal activity taking place, that by doing that with no warning and not giving the individual or individuals inside the cell an opportunity to try to hide whatever they were doing, that he might be able to catch them doing something they were not supposed to be doing.

And he did.  Not what he expected, but he did catch Melissa in a situation that she was not supposed to be in at that time of the day.  Inmates were supposed to be dressed. She was not dressed.  She was on all fours.  Not any clear indication why, but she was on all fours and was naked.

She then -- he yelled at her.  I'm not going to repeat what he said, but he yelled at her to get up, basically, get dressed.  She got up, turned and faced him, and that's when he realized who it was.  Up to that point, he didn't even know who

he was dealing with.  So he took one more picture to document who it was that he was dealing with, because she was now facing him face to face.

So those two pictures are the only pictures of Melissa on any of Mr. Garcia's devices.  Now, I say those two.  There were two versions of one and four versions of the other, but they're clearly all variations of the same two photographs.

And Mr. Garcia explained why it was that he cropped up, for example, the one picture to take his -- himself, his reflection in the mirror -- in the window, out of the picture if he was going to use it for an IR, because he didn't want his picture becoming part of that permanent record that filing an incident report creates.  And so he did some juggling around with cropping the pictures in order to accomplish that.

And I'll detour for just a second to comment about something that the prosecutor mentioned, that he was doing this in order to hide what he had done, in order to hide that it was in -- what cell it was in or to hide that he was involved somehow.  Well, there is no question that he was involved.  He admitted taking the picture.

But more importantly than that, what did he do?  He made these crops, but he left the original pictures there.  If he was trying to hide something, what would he have done?  He'd have cropped himself out of the picture and gotten rid of the one that had him in it, or he would have cropped the cell

number out of the picture and gotten rid of the one that had the cell number in it.  But he didn't do that, did he?  All of the pictures were there.  All the versions of the picture were there when they were recovered.

The other one he did crop in an effort to somewhat preserve the privacy for Melissa by cutting it off about -- just a little above -- a little below the waist.  Probably when you look at it, you'll see it's not quite cut off as far as it can have been, but that's -- that was the reason he did that, all in anticipation of perhaps at some point filing an incident report about that situation, which, as you know, it turned out he did not do.

Counts 1 and 2 involve claims by Ms. -- Melissa that Mr. Garcia somehow got her to the visitation room, perhaps -- probably by having someone escort her.  Anyway, she got to the visitation room, and then supposedly he took her to a visitation bathroom and engaged in this physical contact that she claims included digital penetration of her vagina.

No photos of that, and we know from all the photos that we have that Mr. Garcia's very compulsive about these things, so it seems extraordinarily unlikely that he would get her into this position where supposedly no one was going to be able to see them and not take some pictures.

The whole idea that this was a place where they wouldn't be seen is kind of -- I wouldn't quite call it ludicrous, but

it's almost laughable, because these bathrooms are right along that hallway just outside the visitation room.  Now, we know now that the camera in that hallway, in that big dome, there wasn't one, but we also know that there was a camera in the visitation room, which would have shown, for example, Mr. Garcia and Melissa going into that hallway and then partway down that hall.  I think Mr. Bettencourt said you could see to the second set of candy machines.  But no pictures inside there.

So this -- Count 1 -- and she kind of got those occasions sort of amorphically mixed up, if you will.  It's not real clear which one was what or what happened in any particular incident.  But one thing is clear, there is no corroboration for her claim that Mr. Garcia digitally penetrated her on that first occasion -- what she described as the first occasion in that bathroom off the visitation room.

So, similarly, with respect to Count 2, the -- another incident in a bathroom, maybe the same one, maybe a different one, not entirely clear, again, no photographic evidence of it, no -- again, in a place where at any minute, a -- an inmate, another inmate, another correctional officer, even another visitor could have been down the hallway.  Not in that particular bathroom, because they have separate bathrooms for visitors, but could very easily have been going down that hallway.  And, certainly, a correctional officer or other

inmate could have walked into that room at any time.

So the likelihood that Mr. Garcia, with, at that point, 30 years of service under his belt, close to being able to retire, he's going to run the risk of losing everything he's worked for 30 years for in order to digitally penetrate this woman once or twice in the bathroom?  That is extraordinarily unlikely and unbelievable.  Why would that guy do that?  Simple answer is he wouldn't.

Why would Melissa, though, come forward -- and -- and keeping in mind that we're talking about coming forward pretty much a full two years after these things -- the first of these incidents supposedly happened -- why would she do that?  What would be the motivation for her to do that?  Separate and apart from the fact that she's a convicted felon and a manipulative individual anyway, there are several possible reasons, which we can see in the evidence.

She wanted to get out of Dublin and go to Victorville.  Just before she came forward, there was this investigation going on with other correctional officers, Klinger and perhaps Bellhouse and a few others.  Basically, this was a jump on the bandwagon thing, right?  These allegations are being made.  "Wow, this is a good opportunity for me to go in here and say, 'This happened to me,' and I can gain some benefit by making these allegations against the warden to my -- to my own benefit.  One would be to move to Victorville.  Another would

be maybe even get a compassionate release.  Another might be, Hey, I can file a civil suit for 25 million bucks because I was abused while I was in the prison."  Wouldn't be the first one to make up a story about that in order to gain that benefit.

We do know, because it was brought out in the testimony, that she has what's called a Rule 35 motion pending.  That's a motion for reduction in sentence in exchange for -- guess what? -- cooperation and assistance in a criminal prosecution of someone else.  So that's an extremely good motivation for someone like Melissa to make these allegations against someone like Mr. Garcia.

There is one other, which is sort of a negative motivation, if you will.  They had had some conversation, apparently, about the possibility of her having a compassionate release.  She submitted it.  He determined -- ultimately, he agreed that she didn't qualify for it, so he signed off on a denial of that compassionate release.

And she testified that that was okay with her, it didn't bother her, but you and I and everyone else knows that's not the case.  She was very likely angry about the fact that he had not done anything to help her get that compassionate release, and this would be a good way to get back at him.

So that's Melissa, just in general terms.

What about Maria?  So we have Mr. Garcia over here, same characteristics that I've already described, and then we have

Maria, a convicted felon, unlawful use of a communications facility. Which of them would you believe, this 32-year law enforcement veteran with an impeccable record or a convicted felon?

Once again, thousands of pictures, sexually explicit photographs. Not one picture of any sexual contact with Maria. In fact, not a single picture of Maria, period, was discovered, or at least none was put into evidence, and it doesn't appear that they found any.

So she made two claims, Count 5 that there was this incident in the laundry room and then Count 6, where she -- where this supposedly happened in her cell, which I'll discuss in some detail more about both of those in a bit. But the point being there is no photograph showing him having any contact with Maria. Nothing.

Now, why would Maria jump on this bandwagon, along with all these other inmates that are making these allegations? Well, she had two particular -- excuse me -- she had two particular motivations. You may recall she doesn't -- she's a Spanish speaker. She's in the country illegally. She got a U visa certification, which enabled her to stay for some period of time, and she got a stay of a deportation while this case is pending.

And one of the things that could potentially happen as a result of her cooperation in this case is that she wouldn't be

deported, she'd be allowed to stay.  And apparently, for her, that would be a significant motivation.

Then there's Rachel.  We again have Mr. Garcia over here. We have Rachel, who is a convicted felon, conspiracy to distribute heroin.  Which of them would you believe?

Again, same as I've already said with respect to Melissa and Maria.  I should preface this by saying there are some photographs of Rachel, okay, which you've seen some of them and I'll talk about more, but there's not a single photograph of Rachel taken in FCI Dublin, no photograph of physical contact between Mr. Garcia and Rachel, no pictures of her while she's doing anything there at the facility.

The photographs that we do have of Rachel are all from the video chats, with the exception of the one that she sent to him, Exhibit B.  So you can look at that -- maybe it's Exhibit A.  I think the photo is Exhibit A.  Excuse me -- which she sent to him after she had been released from Dublin.

It's worth mentioning that the contact between Mr. Garcia and Rachel after she was released is a violation of BOP policy for which Mr. Garcia could have been disciplined, potentially even, I suppose, terminated.  But it's not a crime for a law enforcement correctional officer to have contact with an inmate after that inmate has been released from the penitentiary.

And as with each of the other incidents, there's no corroboration whatsoever for Rachel's claim that any -- that he

touched her butt.  And, again, what we have is just her word that this took place.

Why?  Why would she do this?  And it does appear that there was some kind of emotional involvement between the two of them, doesn't it, after she got released.  And the thing that ended up happening was, if you recall, Mr. Garcia, when he was having this contact with her, was expecting to retire practically momentarily, and then this opportunity came up where the then warden, Jenkins, at Dublin was going to move on to another assignment and there was going to be an opening for a warden at Dublin.  And Mr. Garcia was offered the opportunity to fill that role, kind of a high point to end off his career, and he decided, "I'm going to take advantage of that.  I'm going to become the warden, and I'm going to retire with a higher retirement pay and one more thing under my belt for when I go out into the rest of the world or the rest of my life, to be able to say, 'I rose all the way up to be the warden of a federal correctional institute.'"  That's quite an accomplishment for a correctional officer.

We heard there are 123 federal prisons, so one -- one of 123 people out of 30,000 or whatever it is employees in the Bureau of Prisons.  Very, very small percentage ever get that high.  So he decided to take it.

And when he made that decision, it occurred to him, "Hmm, I screwed up here.  I'm having this inappropriate, albeit long

distance at the moment, relationship with this former inmate, and that's a violation of BOP policy. And I sure don't want to have that come up while I'm being considered as the possible next warden at Dublin or even after I get to be the warden at Dublin." So what did he do? He broke it off.

He broke it off, and she was not happy about that. And that would be a motivation for her to come forward with this really kind of minor, actually, complaint about sexual abuse, of -- of touching her on the rear end.

And I'm going to mention right now this email, rememberpockets. And I'll talk about that a little more later, too, but the prosecutor would have you believe that that name was derived from Mr. Garcia having seen Rachel walking around in the yard with a torn pocket on her pants, with the pocket hanging down, because it was torn off on both edges, if you recall, and that this was a way of saying, "Hey, remember that time that you were walking around the yard with your pocket hanging down," when, in fact, that email account was created under that name on February 16th of 2020, well before any of this interaction between Mr. Garcia and Rachel took place.

So this -- this was not a remembrance of this uniform disparity; it was, as Mr. Garcia said, a remembrance of a location where he had had some contact, and it was a restaurant with a billiard place that was a -- and billiards have pockets, and that was kind of the name of this place, right? And so

that's why he named the email address rememberpockets.

And, ultimately, after he either used it a little bit or didn't use it at all for whatever his original purpose was, he decided to give it to Rachel for her to use to send him information.

Now, yes, he gave her something rather than his BOP address because he wanted to hide it.  No doubt about that.  He did not want to use his BOP address -- email address for a former inmate who was still within the two-year window of him not being allowed to have contact with her, he didn't want her using his BOP email address to contact him because that BOP email address could be monitored and someone could figure out, "Hey, Ray, you're -- you're having contact with this inmate and you're violating BOP policy.  We're going to do something to you.  We're going to suspend you.  We're going to fine you.  We're going to," in the worst-case scenario, "terminate you."

Not likely with his record that it would get that bad, but, nevertheless, if he was going to have this contact that he was not supposed to be having -- and he readily admitted when he testified that he shouldn't have been doing it, it was a mistake -- if he was going to be having this kind of contact, he wanted to do it in a way that BOP wouldn't find out about it.  Again, though, keep in mind, not a crime.  Violation of policy, yes; criminal, no.

All right.  Other inmate witnesses.  We heard from a few

of them.  Let's start with Aurelia.

Again, here we have Mr. Garcia, here we have Aurelia, who was a convicted felon, had been convicted of illegal reentry, immigration fraud, and distribution of methamphetamine.  Who would you believe if you had to choose between the two of them?

Not much there, actually, with respect to Aurelia anyway. She said she saw Mr. Garcia outside Maria's cell with his cell phone.  Yeah.  Okay.  No dispute about that.  He readily admits that he made his rounds all the time, stopped and talked to inmates at their cells, Maria being one of them, so the fact that Aurelia saw him standing outside Maria's cell really is not very notable for any reason.

She says that Maria made some claims to her about Mr. Garcia, but she did not testify to seeing anything untoward herself.  Basically, what she saw was him just standing there, right?

And she did say he had his cell phone with him.  Okay.  He had his cell phone with him most of the time, and when he didn't, he had that BOP camera, right?  So nothing unusual about that and, again, nothing illegal about it either.

The motivation for Aurelia?  Again, the Government has already paused deportation proceedings pending her testimony in this case, and the end result could very well be that the American government decides, yeah, we're going to let her stay because she tried to help out here in this criminal case.  She

testified.  We paused the deportation, so now we're going to not deport her, and she would like very much to stay in the United States.

Shindozjanae.  Interesting character for a couple of reasons, not the least of which is that he's a convicted felon who has been convicted of conspiracy to commit mail robbery, carrying a loaded firearm in public, robbery, an accessory to some felony -- we don't know what it was, but in and of itself, accessory in California is a felony, Penal Code 32.  So he has four felony convictions.

So who are you going to believe, Mr. Garcia over here, with his 32 years of impeccable service, or Mr. -- or I guess she was Miss when some of this stuff came up, but now Mr. Shindozjanae, a four-time convicted felon.

And actually didn't have much to tell us either, did he, in any event.  He said he saw Mr. Garcia speaking with women on many occasions.  Yeah.  Everyone in the prison is a woman, right, except for the staff, so if he is going to be walking around talking to people, most of the time he's going to be talking to women.

He said that he saw Mr. Garcia by Maria's cell.  And if you recall, he described that he was on this little stairway doing some work, and I did put the schematic into evidence that shows the area where this took place.  You can see that the place that he was standing was about eight cells down the row,

so 80 feet plus a little bit because he's up on the stairs, so maybe 80, 90 feet from where Maria's cell was located. He's slightly elevated in the position he was in, I think he said 2 or 3 feet.

But what else do we know? We know that the door to Maria's cell opens like this (indicating), and he's up here (indicating). So if Mr. Garcia is standing right in the doorway of Maria's cell, Mr. Shindozjanae's view of Mr. Garcia is going to be blocked by the cell door. And maybe from his higher angle he could see his head, possibly, but he sure wasn't going to see anything else and, in fact, didn't testify to anything in particular happening, even when he claimed that he could see it. He said he didn't see Mr. Garcia lift up his cell phone and he never saw anything inappropriate. So even if you want to believe him, what does he prove? Nothing as far as the charges in this case are concerned.

Then we have Christina, again a convicted felon, in this case conspiracy to commit theft of government property. Again, who are you going to believe, this law enforcement officer who's dedicated his life to protecting the public or this convicted felon?

Now, she says that he made sexual comments to her and, on one occasion, grabbed her on the buttocks and supposedly said, "Couldn't help myself." Just had to do it, I guess. But unlike some other people, Mr. Garcia does not think it's okay

to grab women in a sexual way and, again, emphatically denied that any such thing took place.

And this supposedly happened where other inmates could have been easily watching.  Did we hear from any of them?  Nope.  Other correctional officers could have seen it happen easily.  Hear from any of them?  Nope.

Photographs of Christina?  Not one.  Nothing.  Not even a non-sexual -- and I should have mentioned that about Mr. Shindozjanae and Aurelia as well.  No pictures of any kind of those people on Mr. Garcia's phone.

As a matter of fact, we didn't see or hear evidence of any other inmate's photograph being on any of Mr. Garcia's devices except for those two pictures of Melissa and the video chat with -- and the screenshots from the video chat with Rachel.  So no other pictures of any inmate taken at the FCI Dublin except for those two pictures of Melissa, and no pictures of any other inmate other than Melissa and Rachel.

So some odd stuff about this particular potential witness, Christina.  The crocheted bikini, okay, which is in evidence and a photo of it.  Mr. Garcia said he has no idea what that's about, wasn't him that did it or bought it or arranged for it to be delivered to her.  She said it was, but he says no.

And in any event, even if that were the case -- let's assume that, yeah, he gave her this crocheted bikini -- so what?  That's not a crime.  That's not sexually abusive.

Probably a violation of BOP policy for him to be giving a gift to an inmate, but certainly not anything that would rise to the level of corroboration of sexual abuse.

One more inmate, Katrina, again a convicted felon, in her case use of an interstate commerce facility in the commission of murder for hire.  And there's that word again, murder.  Now, she didn't do the murder herself, obviously, but she was involved in an attempt to commit a murder and used some kind of interstate commerce facility to do that.  So, again, who are we going to believe, Mr. Garcia or this convicted person who helped someone else commit a murder for hire, or tried to?

She says that she stripped naked for him when he did his rounds, presumably at his request.  He denied that emphatically also.

Interestingly, Special Agent Barclay did manage to obtain, finally, some of these videos from these 198, I think it was, cameras in the facility, albeit way late in the game for -- she would like to blame Mr. Garcia for that, but I blame the FBI and law enforcement, because that's their job.  It's not his job, right?

In any event, she did get some footage from June and July of 2021, and guess what?  There's pictures.  There's video of Mr. Garcia and Katrina walking around, but nothing untoward happens.  They don't go running off to someplace that you can't see anymore.  They're not trying to hide.  She's not doing

anything sexual; he's not doing anything sexual.  They're just walking around and apparently talking.

And pretty much the entirety of those videos that -- that Special Agent Barclay reviewed, which is about -- I think about six weeks' worth, that pretty much describes everything that she saw, even though some of these allegations, the time period during which they are alleged to have occurred overlaps with that time period in which that video was taken.

So, again, no corroboration whatsoever from Katrina for anything of any particular value, at least not as far as trying to determine whether these crimes were committed.

So at least three of these witnesses that the prosecution put on told us absolutely nothing of any use in evaluating whether we should believe any of these complaining witnesses.

And I would caution you that sometimes when a lot of people say something, that has a tendency to make it feel like it has more weight, if you will.  But the number of witnesses in a case like this is not a determinative factor.

Now, if we had three people saying, "I saw Mr. Garcia digitally penetrate Melissa," that would mean something, and then you could say, "Yeah, the number of witnesses there is significant.  We need to take that into consideration."  That's not what we have.  So the number of witnesses who testified here is not particularly determinative of anything, and in particular, it's not determinative of evidence that would show

Mr. Garcia should be convicted.

Now, we also heard from a few BOP witnesses, an interesting selection of those as well.  Stephanie Millikin, correctional officer, obviously angry with Mr. Garcia and -- because he signed off on a reduced work evaluation for her that is going to cost her money, may cost her promotions, and she's not happy about it.  And she's more than happy to come in here and try to torpedo him as a way of saying, "Thanks for nothing, pal."

She also did something else that I thought was very interesting, straight out on her direct testimony said Exhibit 60, which you can look at when you have the opportunity, "Mr. Garcia signed off on Exhibit 60," except when I asked her about it on cross-examination and we looked at the picture, what happened?  It wasn't Mr. Garcia's signature at all.  Nothing like it.  Had the letter "M" in it.  Not even entirely clear who signed, but maybe Marilyn [sic] Comer, but certainly not, as this witness had testified unequivocally on direct, Mr. Garcia's signature.

We also heard from Dr. Cynthia Townsend, the clinical psychologist.  Less than not much in her testimony that's of any value.  Here we are -- she's talking about July of 2021 and saying that she noticed that -- Melissa came up to her because they were at this graduation from this apprenticeship program -- education apprenticeship program, and apparently

Melissa saw Mr. Garcia coming, and so she went up to Ms. Townsend -- or Dr. Townsend and said, "I don't want him to -- I'd like to be near you, I don't want -- I don't want anything to do with him," and Dr. Townsend told us she looked anxious around Mr. Garcia.  That's it.  She looked anxious just because he happened to be coming along.

And this was more than a year after the last alleged contact between Melissa and Mr. Garcia, so she had -- she had testified that that last contact, I think, happened somewhere in the time frame -- maybe as late as March of 2020 would be the latest date, and here we are in mid 2021.

And the fact that this psychologist saw that she was anxious to be in the neighborhood with Mr. Garcia really doesn't tell us a heck of a lot of anything, and it certainly doesn't tell us anything definitive about whether Mr. Garcia committed any of those offenses against Melissa.

We heard from Dr. Megan Malespini, the PREA expert. Basically, told us that they did PREA training.  Mr. Garcia participated in some of it, although he did say on -- Mr. Garcia, that is, did say in his own testimony that 2020 he didn't.

But the inmates get information and training on PREA, the staff gets training on PREA, and the fact that they're both getting it and that Mr. Garcia got it at some point is not really much of an issue.  He's not saying, "I didn't know what

PREA is or what it's intended to accomplish."  He understands that.  It's a very meaningful, useful prison program, because sad fact is in the United States, we've had a long history of abuse of women in prisons, and California's made a significant effort to try to reverse that.  And Mr. Garcia would be first on the list to say that's a good idea.  Let's do what we can to eliminate sexual abuse of female inmates.

So her testimony really wasn't particularly useful.

And then the last witness we heard from was Dr. Stephen -- or Lieutenant Stephen Putnam regarding -- he testified mostly about rules and BOP policy and would like you to believe that he lives in an isolation booth at Dublin and is totally unaware of anything that goes on in any other federal penitentiary anywhere in the country, such that he just can't believe that a correctional officer would have a CI that he didn't turn over to the SIS program or that the warden or an associate warden might have a sub rosa CI that they rely on to get information of certain kinds in exchange for some beneficial treatment.  It happens all the time, all the time and everywhere, prisons, jails, schools, courtrooms.  You name any place in the world and there will be people would want to help out and get some benefit for it, and Lieutenant Putnam is in a serious state of denial when he thinks that that's not taking place in Dublin.

And we -- we learned some other things about Lieutenant Putnam, too, like he wasn't doing his job very well.  So his

criticism of the possibility that Mr. Garcia may have been trying to cultivate a confidential informant without making that known to SIS rings a little hollow when he's got a hundred of his own cases that he hasn't processed, some of them going as far back as 2016, and, as a result of that, has to get replaced.  So I don't know what he's been up to, but, obviously, it was not doing the job he was supposed to be doing.

All right.  So I want to mention a couple of other things before I get into more detail on some of these charges.

You probably in your lifetime have heard some conversation among people about direct and circumstantial evidence, and you always hear, "Oh, that's just circumstantial evidence."

Unfortunately for the prosecution in this case, there is no circumstantial evidence that any of these crimes were ever committed.  They have direct evidence.  Statements by the witness, "This happened," that's direct evidence, probably the worst kind of direct evidence there ever is.  I've been doing this 47 years, more than 200 trials.  Without a doubt, direct evidence is the weakest thing you ever have to deal with, because people's memories differ.  Two people can see the exact same event, even from standing side by side, and when you listen to them describe it, they describe it differently.  You'd think they saw two different things happen.

Some circumstantial evidence, on the other hand, can be

very persuasive, like DNA.  So if Melissa [redacted] had gone to the medical office and had her vagina swabbed and they found Mr. Garcia's DNA there, that pretty much cinches the deal, doesn't it, even though it's circumstantial evidence, way better than direct statements by her that this thing happened. But we don't have any of that in this case.  We have direct evidence, and that's it.

The videos, cameras.  Interesting testimony from Bettencourt, who I forgot to mention, didn't I?  How did I manage to do that?  I did.  Sorry about that, folks, I forgot to mention Mr. Bettencourt.

He said something -- several things, actually, very interesting, but one in particular was when he arrived, there were a lot of cameras that were not functioning at all or properly.  And he went to Mr. Garcia, who was renowned for being able to find funding for things like that, and said, "Hey, we need funds to get these cameras working."

And guess what?  In two months, between January and March of 2019, before all of these allegations came up, by the way, or maybe coincidentally with the very earliest ones, Mr. Garcia arranged the financing and Mr. Bettencourt did the work, and at the end of 60 days, all the cameras were working.

Now, if Mr. Garcia was planning to commit some sexual offenses that he would like to hide and/or was already doing it and relying on the fact, as the prosecution has claimed, that

he knew where all the cameras were that weren't working and he knew where everyone showed what -- whatever was on the camera and he knew where he could go where he wouldn't be seen, why in the world would he go and do all of that work to get all of those cameras back up and running again, all 198 of them working?  That just defies logic.

If that's what he was doing, I would think he would be delaying any of this repair work, doing everything he could to make sure that if he wanted to rely on these weaknesses in the video system, that he'd be able to continue to do so, as opposed to having all of these cameras all of a sudden online and watching everything that's going on, which, by the way, they did.  And when, as I mentioned before, Special Agent Barclay finally got some videos, it showed that Mr. Garcia was just walking around doing his rounds, just like he said he was.

And that failure to obtain the videos is significant for another reason.  These other defendants, other cases that had already come up involving sexual abuse of inmates, should have triggered an immediate effort to corral all of those videos, everything, immediately, however far back the retention period is.  Doesn't matter if it's 30 days, if it's 50 days, if it's 575 days, doesn't matter.  If you're doing a criminal investigation of events at least the precursors to which, the walking down the hallways and entering into some room or something like that that could conceivably show that the

witness who's claiming that these events took place is telling the truth, you want to corral that evidence right now, not three months from now and not failing to do it because the defendant suddenly decided he didn't want to tell you any more about what was going on and invoked his rights, so you just throw up your hands and say, "Okay, you don't want to tell me, that will delay my investigation a couple of months, but no big deal."  I'm sorry.  That -- that just does not make much sense.

I was a prosecutor myself for ten years.  I would not have put up with that for one minute, not for one minute.

All right.  Let's talk about a few other things.

We had sort of a mini big deal, I guess, made about candy. A bunch of candy was found when the search warrants were executed in his car, some of it hidden in the wheel well.  He readily admits carrying candy around with him all the time, giving it to other correctional officers.  He said he never gave it to inmates.

Melissa claimed that he did give her a candy cane on one occasion when -- I think she said in her own cell, although she has these supposed incidents so mixed up it's hard to tell what any of them really were or if any of them really happened.  But she said he gave her a candy cane and she put it in her vagina and then she gave it back to him and he was sucking on it later.

Interesting thing about the candy.  No one else but

Melissa got candy from Mr. Garcia.  So if he's using this as one more trick and device to win these women over so that he can take advantage of them, he wasn't doing a very good job of it, was he?  He was doing a good job of hiding it from his son in the wheel well of the car.  Most kids wouldn't think to look there.

The reporting of sexual abuse by inmates.  Mr. -- or Lieutenant Putnam told us that there is no procedure for inmates to report sexual abuse by the warden.  There is procedures that generally apply, but nothing special for the warden.

And yet Megan Malespini, in her testimony -- and this was a question by Mr. Paulson, by the way, not by me -- "If a prisoner wanted to report being sexually abused by the warden, how would they do that?"  Right to the point.  Excellent question.  Answer, the same reporting methods are available regardless of the assailant.

So the expert on PREA had the right answer.  Same rules apply to the warden as apply to the associate warden and the captains and the lieutenants and the correctional officers, and presumably any other staff that happens to be there.

Lieutenant Putnam said the inmates -- no.  Excuse me.  The question was:  "The inmates weren't told anywhere in the handbook how they could report sexual abuse?"

"I don't know.  I don't have the handbook, nor have I ever

reviewed the inmates' handbook."

So he hadn't even looked at it, but he was trying to tell us rather emphatically that there was no procedure for this to have been done with the warden being the accused party.

The prosecutor asked Mr. Garcia, essentially, "You told Melissa to go to Andrea's cell to strip because you knew -- you thought it was safer; right?"  He said, "No."

"You told her you'd checked the cameras and you couldn't see anything."

"No.  Once again, as an associate warden, I did not have access to the cameras."

So what's the deal with the cameras here?  We know that Mr. Bettencourt said, ultimately, yeah, there was a way that the associate warden and the warden could go, and he set up this program and they could look at the -- at the video cameras.  That was -- hard to tell with a hundred percent certainty, but based on the testimony, it seemed to be that that program was set up after these initial contacts with Melissa had taken place.

But, in any event, again, nothing in any of the videos or pictures that tends to support any of these allegations against Mr. Garcia.

So let's reverse things here for a second and think about this.  If an inmate committed a crime against a correctional officer, do you think the BOP would want to have a photograph

of that crime being committed, rather than having to rely on -- solely on the testimony of the individual or individuals who may have seen it happen?  Or would they rather have a photograph of the crime being committed or a movie, a video?

Or an investigating law enforcement agency, any local police agency, the FBI, the U.S. Marshals.  You name any law enforcement agency in the world probably these days, and they will all tell you they would rather have video.  They're called body cameras.

Even the poorest law enforcement agencies equip their officers with body cameras.  And the obvious reason is if you have video evidence of a crime being committed, it's a heck of a lot easier to prove that it happened than if you have to rely on the uncorroborated testimony of eyewitnesses.

They -- Mr. Garcia was asked on cross-examination about taking that photograph of Melissa.  Well, Mr. Garcia, you were the associate warden at that time.  Wouldn't it have been appropriate just to write a report and write what had happened?  And the answer is no.

A picture, again, is worth a thousand words.  Classic saying.  These days, video is probably worth ten thousand.  And you can joke about that analogy all you like, but it's true.  If we had photographs of Mr. Garcia sexually assaulting Melissa or Maria or Rachel, we wouldn't be here, would we?  Or if we were, you folks would have a real easy job, because you could

just look at the video and say, "Yep, he did it.  He's guilty," as opposed to, "She says it happened; he says it didn't happen.  These circumstances are all very hard to put together.  I'm just not sure."  Okay?

And that's ultimately the decisive point in this case, because in a criminal case, unlike civil cases, for example, the burden of proof is beyond a reasonable doubt.  The Court is going to read you an instruction that tells you what that is, or perhaps already has.  I forget.

In any event, it's a very high burden.  We don't put a number on it.  In civil cases we can sort of put a number on it.  We can say it's 50 percent plus a little bit.  It's called preponderance of the evidence.  So it means just half plus some little dollop in favor of one side or the other, they win.

The criminal requirement is proof beyond a reasonable doubt, which we don't have a number to assign to it.  So I can't tell you that; the judge won't tell you that; the prosecutor won't tell you that.  But the judge will read you an instruction that tells you how to determine it based on what the law is.  That's a lot easier to do if you have a photograph that unequivocally shows the crime being committed or a video showing the crime being committed.

We've seen several examples of that over the last few years, haven't we, videos of crimes being committed, unfortunately occasionally by police officers, but also

frequently by others.  And the end result is that convictions are much more -- much more easily come by if you have those pictures.

Probably true also that with respect to correctional officers writing up infractions by inmates, that they are less likely to write an IR if they have to rely solely on eyewitness identification, as opposed to any other evidence.  So just in the practical sense, the ability to have other evidence, including photographs, makes either prosecution or disciplinary proceedings much more likely to succeed.

During cross-examination, Mr. Garcia was asked whether Melissa was posing for him when he took that first picture of her on her hands and knees, and he responded, "Not that I'm aware of."

And the question -- follow-up question was, "You told her not to move."

Answer, "That's an assumption on your part.  I never made that statement."

"You told her you were taking a picture?"

"Absolutely never told her I was taking a picture."

And, interestingly, the implication there is that there was some prearrangement; right?  If she's posing under circumstances where he's come up to a door that's closed and the window is blocked off and he has no idea who's inside, if she's posing for him, that implies that, yeah, he did know who

was inside.  He knew she was in there and he was expecting her to be in there and he's making this all up.

Interestingly, though, even Melissa never testified that she was posing for Mr. Garcia when he opened that door and took that picture, did she?  Didn't say that.  No claim that she was posing for him.

Now, she did say that he sometimes told her to be undressed and he was going to come around, and we've heard a number of claims that he did that with several people and took pictures.  Hey, more pictures.  Great.  Except where are they?  Didn't find any of them, did we?  Not one single picture of any other inmate posing for Mr. Garcia.

Now, yes, you can delete photographs, just like any other file, from a computer or a cell phone or a digital camera, but just like all such things, just because you delete it doesn't mean it isn't there.

And the digital analysis of Mr. Garcia's stuff proved that in this case, because they found them, even though a lot of them had been deleted or all of them.  Because when the computer deletes something, it doesn't actually take it off, right?  It marks it for deletion and it doesn't show up in the normal way anymore, but until something else comes along that needs that space and overwrites it, it's still there and it can be recovered.

Again, this -- this idea that somehow it was inappropriate

for Mr. Garcia to take this -- the facial photograph of Melissa to document who it was that he'd come across, turn that one around again.  If Mr. Garcia was committing some crime and Melissa had happened upon it and was taking a picture, don't you think law enforcement and the prosecution would prefer to have a picture showing his face so that they could readily identify who committed the crime?

We go through a lot of hassle sometimes trying to identify who committed certain crimes.  I'm sure you've all seen movies or TV shows where they do line-ups, right?  Classic way of trying to identify who committed a crime.  You get six guys, six women, more or less similar in appearance, put them up there in front of the witnesses, and have them say, "Can you pick out the guy that did this?"  "Yeah, Number 3, he's the guy that did it."

If you had a photograph of them committing the crime, you wouldn't need the line-up.  Probably wouldn't need any other evidence.  The likelihood is quite high that a good defense lawyer would arrange some kind of plea bargain in a case where the defendant is that readily identified and pinned to the commission of the crime.

The prosecutor also asked him if he couldn't have taken a fully clothed picture of her face after letting her get dressed.  He made the point, and it's probably at least fairly well taken, that, number one, that wouldn't show her in the

condition she was in when she was violating the rules, and, number two, that was a snap decision, right?  I mean, he came around the corner, took one picture, she stood up, two seconds later he took another picture to document the event.

Maybe if he'd had 10 seconds or 15 seconds to think about it, he would have gotten closer, tried to get just her face and maybe the upper part of her chest or something like that, but on the spur of the moment, you know, you do what you do.  And in this case, he took pictures, which demonstrated that she was violating the rules.

PREA, the PREA act, is the Prevention of Rape -- I forget what the "E" is for.  Anyway, it's to reduce sexual assaults in prison.  And Dr. Malespini testified about that, indicating that despite what some people would think, that if an inmate is acting inappropriately in a sexual way, that correctional officers are supposed to write an incident report.

Now, maybe if the inappropriate behavior is just an indecent exposure, which is a relatively low-level offense, right, probably would be resolved informally, ultimately, could be dealt with that way or perhaps even not writing one.

But a significant -- significant sexual offense, and in particular based on the PREA, which Dr. Malespini said addresses -- sexually abusive behavior was the exact term he used in his testimony -- sexually abusive behavior.  Sounds like some of our charges, doesn't it?  Because that's -- that's

what Mr. Garcia is charged with doing, sexually abusive behavior.

And if the conduct involved rises to that level, then an IR should be written, even though it's a PREA-controlled situation.  Okay?  So you've got these two tracks, and to try to say, as I think it was Ms. Townsend did, that if you have a PRE violation, you're not supposed to do an IR, you are supposed to just do the PREA, well, no, it doesn't work that way.

If you commit a crime and you also commit a civil wrong in the process, you know, you don't get to just do the civil wrong and ignore the crime, right?  O.J. Simpson found that out, to his disadvantage.  They can do both, and that would be entirely appropriate in the situation like the one that Melissa was in.

The -- in discussing that incident with Melissa, the prosecutor also asked Mr. Garcia, who had said normally he keeps moving when he sees inmates who are undressed in what he later described as normal situation, maybe they just got out of the shower and they're getting dressed and he just goes on by, no big deal.

She asked him, "You didn't keep moving."  He said, "I did not keep moving.  I took a picture of a prohibited act."

"You stopped."

"I did stop."

"You looked."

"I took a picture."

"You got out your phone and you took a picture; right?"

"Wrong.  That isn't what happened."

He had the camera out, or the phone, and immediately when he opened the door, took the picture.  It wasn't like he saw that she was naked and all of a sudden decided, "Wow, that's a sexually suggestive pose.  I should get my camera out and take a picture so I can keep it for posterity."  That isn't what happened.

In her argument, the prosecutor also made the point that Mr. Garcia has control over the inmates' lives and that he abused his power over and over again.  Well, the fact of the matter is, as you've heard, he doesn't really have control over the inmates' lives.  There's a chain of command.  He's ultimately responsible, yes.  The buck stops at the warden's desk.  But beneath him, there are two associate wardens, several captains, a bunch of lieutenants, and a whole raft of correctional officers.  And it's those guys who actually have the most control over the inmates' lives, because they're the ones that see them every day, all day long, right?  Mr. Garcia might see a particular inmate for a minute or two minutes once every day or once every couple of days.

Now, it's true if an IR recommends some significant punishment, it may end up having to go up to him for approval. And in that respect, he does have the final say, although the

likelihood is probably quite high that he's going to, most of the time, go along with whatever was recommended in the normal process.

And to say that he abused his power over and over again, even if you believe everything these people said, you have a single incident with one touching the butt, you have a single incident with one touching the butt and maybe undressing a few times, and then you have a little more contact with some of the others, up to the most, the very most, being Melissa, hardly what I would characterize as abusing his power over and over again, even if it was true, which it's not. Okay? The evidence is pretty clear that none of this stuff happened the way these witnesses have described it.

He flattered them, manipulated them, he groomed them. No, I don't think so. What -- what circumstance do we have here that helps us understand what was going on?

We have an investigation is already underway into other inmates -- excuse me, into other correctional officers. Significant allegations have been made. These inmates, even when they don't live in the same unit at the same time -- which some of them did, right? -- even when they don't, they get to socialize in all these other areas where all the inmates can go. They can go to the visitation room, they can go to the rec center, they can go to the weight pile.

Those who are appropriate for it and when COVID

restrictions weren't in effect could go and do some of the work situations in like the electrical room or some of the other -- the warehouse.

And so they can meet and talk, and they can get together and say, "Hmm, you know, this guy -- this guy's in trouble, serious trouble, Klinger, Bellhouse.  They -- they're -- they're in trouble, and we could take advantage of this by making some accusations of our own."

And the one thing that the prosecutor would like you to believe is the defining characteristic of this case that shows that Mr. Garcia is guilty is the similarity in the claims by the victims as to what happened, and I would suggest to you that that's another one you should turn around.

Similarity in the claims of what happened could just as easily -- and, in fact, more likely, given the nature of the individuals involved -- be a result of these women coordinating their claims so as to be mutually supportive.  "If we say -- if we all get together and say this happened, they're more likely to believe us."  And that's probably true, right?  If more people say it, it is more likely that others are going to believe it.

The -- did Melissa not want to talk at first because she was scared?  Not if you believe what she was saying.  Okay?  If -- if you believe that she was participating in these incidents, she didn't describe herself as being scared in the

first incident in the bathroom.  She didn't describe herself as being scared in the second incident in the bathroom.  In fact, she never described herself as being scared at all at any time in her supposed contacts with Mr. Garcia.

And then what happened?  About a year goes by after the last supposed incident before she finally comes forward.  And what motivated that revelation?  After someone else had already come forward and made a claim.  Now, "Hey, I can jump on the bandwagon.  I'll make a claim, too."

And all of the other allegations against Mr. Garcia, including Maria's, Rachel's, the non-complaining witness people who say these single incidents or limited incidents happen, all came forward after all of this stuff had started to snowball, Christina, Katrina, Maria, Rachel.

Jigsaw puzzles, great stuff.  I have about 250 of them.  I love putting them together.  Criminal cases can be very much like a jigsaw puzzle, and sometimes the key piece is missing, and that's the -- you just can't solve the case without that key piece.

But we don't have that here.  We have all the evidence we need to resolve this case without any problem at all.  The pieces fit together very nicely.  And what they show is that several of these inmates, for various motivational reasons, are making claims against Mr. Garcia that are simply not true.  Not true.

And when you look at his background and his history and their background and their history and the details that don't match up, like where are all these pictures he supposedly took? Where are the videos that show him going to these places that he supposedly went to? Where are the other people who could have, and most likely would have, seen some of these things taking place if they had actually taken place, like the laundry room or the bathrooms? Where is all that stuff? It's not there. But the pieces all fit together very nicely, don't they, to say this stuff never happened.

The prosecutor characterized the death of Melissa's mother as Mr. Garcia's in. That was the thing that enabled him to get to her. He was sympathetic to her, yes. She'd just lost her mother in a situation where it was not possible for her to be with her mother, and that's a terribly devastating thing, I'm sure, for someone to have to go through. But that -- that was not his in to get to her. That wasn't what he used it for. That wasn't what she understood what he was doing at that time for.

She also said he dangled camp. She -- she had the right to submit a request to go to camp, yes, and ultimately that decision would be made, and perhaps he would make it.

The visitation room has staff, so if there was something untoward going on from the visitation room, staff would be right there and could easily see it. And most likely, if the

warden is up to no good, staff's really going to be paying attention, because what do they do when the warden is around, right?  They do their jobs, they get right on top of things, instead of goofing off the way they might if he wasn't there. So they're really going to be paying attention when the warden is in the room, right?  King's on his throne.  Subjects got to pay attention and do what they're supposed to be doing.

The prosecutor conceded that the Count 3 charge involving Melissa with the PREA presentation taking place, that that was bold, I think was the word she used, to do this with all of those people there.  Yeah, that would be pretty bold, no doubt about it.  It would be downright reckless and extraordinarily unlikely that a man of Mr. Garcia's character and resolve and reserve, really, would have taken that kind of chance even if he wanted to, which he didn't.

The hundreds of penis photos do not corroborate what Melissa had to say.  The description of the one or two pictures as having been taken in the warden's bathroom sounds very interesting, doesn't it, until you realize that she never made that claim until after she'd been shown those photos by Special Agent Barclay.

So when she first said, "He showed me photos," she never said they were taken in the warden's complex.  She just said, "He showed me pictures of his penis."  In fact, she wasn't even sure they were the same pictures.  She couldn't identify any of

them.

Maria said she believed he took a photo.  Didn't find that either, did we?  She said she had feelings for Mr. Garcia. That may very well be true if he was the kind of pleasant, caring, compassionate man that he appears to be, it would be likely that someone who is in an extremely stressful situation, like an inmate in a prison, is going to respond to that kind of human treatment.

There's no doubt that it's a tough life in a prison, and depending on how the guards and the staff treat inmates in a prison, it can be downright hellacious.  So when someone treats them with respect and humanity, yeah, they're going to respond in kind, aren't they?  That's the human way to do things.  Not everyone will, but a lot of people will.

Regarding Maria in the laundry room, where she said he put his hand on her -- put her hand on his penis, he said that did not happen.

Aurelia said she saw them in the laundry room, but she did not say that she saw any kind of sexual contact take place.  So you need to draw that distinction and keep that in mind.

So rememberpockets I talked about already, but I just want to reiterate, that had nothing to do with Rachel, the name, rememberpockets, and actually it turned out they didn't use it very much anyway.  They did do the video chat, no doubt about that.  Mr. Garcia's right up front.  "Yep, I did that video

chat with her.  We were being sexual, had our clothes off, masturbating."  Not a crime.  It's that simple.  Not a crime, and doesn't prove that he committed any other crime with respect to Rachel.

Okay.  Count 8, the lying to the authorities.  Pretty simple count, really.  If he committed these crimes, then he lied to the authorities and he committed Count 8; if he didn't commit these crimes, then he didn't lie to the authorities and he's innocent of Count 8 also, or at least not guilty.  And there is a difference, which I'll explain in a minute.

The prosecutor made a point if the defendant had been more forthcoming, the FBI would have acted differently.  That -- that just baffles me.  That's their job.  Do the investigation. Do your job.  Don't change what you're doing because of what the defendant did.

The fact that the victim testimony is somewhat similar is also a reflection of the fact that these women are very sophisticated in terms of what's likely to get them what they want in the institution, and they know what they should say, how they should say it, in order to get what they want.  They knew what worked, and they used it.

The fact that Mr. Garcia admits taking those pictures of Melissa, yeah, no doubt about that.  He's in the background. But that doesn't make him guilty of anything.  Taking those pictures was not a crime.

And, again, the cropping may have made it more difficult to try to hide it, but if that was what he was doing, why did he keep them all, all right there, right together?

What is the -- oh, I got to go back to something else for a minute.

Rachel made a point of telling us that Mr. Garcia told her about the Klinger investigation, so the fact that this other thing was going on is not a surprise to anyone.

And the -- the idea that Mr. Garcia downloaded this app, whatever it was, to try to hide photos because he knew that the FBI was investigating, tried to get ahead of it, obviously, that didn't work, did it?  Couldn't get the app to work on the phone, and when he couldn't, didn't do anything else than he -- than -- different than he did with all the rest of his photos.

The difference between not guilty and innocent is a somewhat esoteric concept, if you will, that's unique to criminal law, obviously.  "Innocent" means you just flat-out didn't do it, right?  "Not guilty" means that the prosecution has failed to meet its burden of proving beyond a reasonable doubt that the defendant committed the charged offense.

So in this case, there are several possibilities of interpretation that you could give to the evidence.  One would be -- and I think this is the strongest one -- that these events did not happen at all, Mr. Garcia's truly innocent of these crimes, and you should find him not guilty.

Another alternative would be to say, "Yeah, I have some thought that maybe -- maybe he did this.  Maybe he did one or more of them, but I'm just -- I'm not real sure about it.  It's -- it's iffy."  Not guilty.

Even if you believe, for example, that -- if this was a civil case, you would say, "Yep, going to give the victims damages for the harm that they suffered because they have proved to a preponderance of the evidence that these events took place," that's great.  If you were a civil jury, you could do that.  You're not.  You're a criminal jury, and you have to find beyond a reasonable doubt, which is way higher than preponderance of the evidence.

So that's the difference between innocent and not guilty.  You sometimes hear people say -- someone goes to trial, they get found not guilty, and just in casual conversation, people will say, "Well, the jury found him innocent."  Typically, that's not the case.  In fact, legally, that's never the case, because that's not even one of the choices.  When you look at your verdict form, you will see that the alternatives are guilty, not guilty.  Innocent is not even in the picture.

So when you go back there to deliberate and make a decision in this case, you can keep that in mind.  And I suggest to you that, given the nature of all of the evidence in this case, properly considered, and giving due weight to each item of evidence that you've heard, the only appropriate

verdict in this case is the one that I introduced this conversation with, not guilty eight times.  Counts 1 through 8, Mr. Garcia is not guilty.

Thank you.

THE COURT:  Okay.  Why don't we go ahead and just take a quick ten-minute break.  We'll get the rebuttal from the Government, and then I'll give you your final instructions.  Okay?  So we'll stand in recess for ten minutes.

(Proceedings were heard out of presence of the jury:)

THE COURT:  All right.  The record will reflect the jury has left.  Recess for ten minutes.

(Recess taken at 1:39 p.m.)

(Proceedings resumed at 1:52 p.m.)

(Proceedings were heard out of presence of the jury:)

THE COURT:  All right.  We are back on the record. The record will reflect that the jury is not back.

Mr. Reilly, you used a last name during your closing, one of the victims.  That last name is stricken.

MR. REILLY:  Sorry, Your Honor.  I didn't realize I'd done that.

THE COURT:  Okay.  Let's call the jury back in.

(Proceedings were heard in the presence of the jury:)

THE COURT:  Please be seated.  The record will reflect that the jury has returned.

And at this point, you will hear the rebuttal before my

final instructions.

Mr. Paulson, you may proceed.

**MR. PAULSON:**  Thank you, Your Honor.

### REBUTTAL ARGUMENT

**MR. PAULSON:**  I'd like to start with a common argument that the defense made in his closing argument, that there are no pictures of the actual abuse.  I think he said, "Not one picture."  The argument there is that you should find the defendant not guilty because he did not photograph himself abusing Melissa, abusing Maria, abusing Rachel.

Of course he didn't do that.  Of course he didn't take a picture of himself sticking his finger in Melissa's vagina.  Of course he didn't take a picture of himself grabbing Maria's breasts or taking her hands and putting them on his penis.  Of course he didn't take a picture of himself grabbing Rachel's butt.  Why?  Because it was a crime, and he knew that.  And it's not the Government's burden to prove these counts with photographic evidence, even though you do have photographic evidence that corroborates the counts.

And that leads me into something else that the defense brought up, the lack of surveillance camera footage.  Well, ask yourself, why is there no surveillance camera footage?  Who knew where the cameras were?  He did.  Who knew where the cameras weren't?  He did.  Who knew which cameras were working? He did.  Who knew which cameras weren't working?  He did.  Who

knew where the blind spots were?  He did.

You heard from Michael Bettencourt, who is in charge of the surveillance cameras at FCI Dublin, and he told you that it's been a constant problem.  There's major blind spots at FCI Dublin that he's been concerned with for a long time.

One of those is in the visiting room.  He talked about one camera that was in the visiting room, in the center of the visiting room, and it didn't see anything past those vending machines, no one coming in, no one coming out, no one going down those hallways, no one going into those bathrooms, no one going into the changing stalls.

There were no cameras on the installation that covered anybody going in and out of that entrance and exit of the visiting room, down that hall, which is where multiple counts occurred with Melissa.  It's not a coincidence.  He knew that.

There is no cameras in the UNICOR warehouse.  He knew that.  There's no cameras in the F-Unit laundry room, or at least the one that shows down the hall doesn't show what's going on inside the laundry room.  He knew that.

CMS, in the electrical room, where he came in and kissed Rachel and grabbed her butt, there's no cameras in there.  He knew that.

You also heard from Michael Bettencourt about how these cameras are written over, the surveillance footage is written over periodically, 50 days in the units.  Fifty days.

And the FBI, when they got word of an allegation, they went to FCI Dublin and got the relevant footage from the areas that they knew about at that time, which was Melissa and Katrina's, by their rooms.

And the footage they did get actually corroborates what Katrina said on the stand. She told you about a circumstance where she was naked inside her cell, and her roommate ran interference with the defendant. That was on camera.

It's also consistent with what the defendant told the victims. Here's what Melissa testified to: Quote, He said that he knew that there were -- there was four places in the visiting room that didn't have cameras, and they were the bathrooms.

With respect to the incident regarding the candy cane in Andrea's cell, this is what Melissa said: Quote, He said that he already went to control and checked to make sure that nobody could see anything, that we were safe, that everything was good.

Here's what Rachel told you. She said that he wanted to take her to the visiting room so that he could, quote, be alone and off camera.

The fact is, Ladies and Gentlemen, there are no pictures and there are no security camera footage because he ensured there wasn't.

Another common thing -- common theme that the defense

brought up in his closing was that all of these women are felons, brought it up with basically every witness you heard from.  He wants you to treat these women like he does, just throwaways, as felons who can't be trusted categorically.

That was a feature of his plan.  He chose the most vulnerable women he could get.  He was counting on them keeping quiet and not coming forward.  He was counting on this day never coming, and if it did, he was counting on you not trusting them.

But they did come forward.  You heard from each of his prisoners.  You heard them and you saw them look you in the eye and tell you what he did to them, what they witnessed.

Melissa, Maria, Rachel told you about the abuse they suffered at the hands of the defendant.  Katrina told you about the repeat orders for her to strip naked in her room given by the defendant.  Christina told you about the defendant coming up behind her and grabbing her butt at the rec yard and then telling her to dance for him.

You also heard from other witnesses that just were bystanders that saw things going on that corroborate what Melissa, Maria, and Rachel told you.

You heard from Shindozjanae.  He said he saw the defendant out in front of Maria's room, Maria's cell, with her naked inside.

You heard from Aurelia.  She told you about the abuse she

witnessed Maria suffer at the hands of the defendant and how distraught she was that she couldn't stop it.

And they all did this at great personal cost to themselves.  You heard them testify about the retaliation and fear that they suffer.  A number of them were getting thrown in the SHU, what Melissa called little dungeons, for reporting sexual abuse at FCI Dublin.

Maria herself, you heard her testify about how she got thrown in the SHU when her roommate made an allegation against another officer.

They weren't jumping on a bandwagon; they were coming forward with the truth.

I want to go back to *voir dire*, the very first day we were all in this room and you were probably hoping you wouldn't make it on this jury.  One of the questions that the Court asked you was if you could give all witnesses who came in here a fair shot, to evaluate their testimony fairly, and every single one of you said you could.

And now the Court has instructed you on how to evaluate witness credibility, which include things like the witness' memory, the manner while testifying, the reasonableness of their testimony in light of all the evidence.

And I think when you apply these principles to the women who came in here and testified, you'll find that they're not throwaways, they're victims.  They're victims who sat on that

stand and looked you in the eye and told you what the defendant had done to them.

Now, along the same lines of attacking them as felons, the defense also suggested that they were somehow coordinating their stories or making up these stories for personal gain. Again, does that make sense?  Does it make sense that all these women would put themselves at great personal risk, upend their lives, to get back at the defendant?  For what?

Defense counsel mentioned one of the things that Melissa was supposedly motivated by was a Rule 35 motion.  I'll remind you what she testified to was that she didn't even know what that was.

And other than a brief conversation between Melissa and Rachel about the unique names of their sons, there is no evidence that any of these witnesses, besides Aurelia and Maria, but Melissa, Maria, and Rachel ever spoke with one another.  Agent Barclay testified that Melissa, Maria, and Rachel never lived in the same housing unit at the same time.

Maria doesn't even speak English and she didn't want to come forward.  You heard her testify to that on the stand.  And in her first two interviews with law enforcement, she denied anything ever happening.  Does that sound like someone who is trying to get back at the defendant?

Neither did Rachel.  She made it very clear that she was not cooperating with us, she was not here voluntarily, she was

here under subpoena.  Does that sound like someone who is trying to get back at the defendant?

Melissa originally, when she spoke with the FBI, gave them the wrong name for Maria.  She didn't even know her.  Rachel, on the stand, didn't even recognize a picture of Maria.  Somehow they're all coordinating their stories?

What about the other witnesses?  Shindozjanae.  He's got no dog in this fight.  He was just a witness, a witness who came forward and told you what he saw.  That's it.  He, too, didn't even know Maria.

Aurelia, there is no evidence that she knew anyone other than Maria.  She, too, came forward and told you what she saw.

That's setting aside all of the corroborating evidence, the naked pictures of Melissa and Rachel found on the defendant's personal computer.  Don't worry, I'm not going to show you again.  You've seen those enough.  I think you understand it.  I think you understand how damning those pictures are.

What about the photos of the defendant's penis, some taken from within the warden's complex?  How would Melissa and Rachel have known that the defendant had pictures of his penis from the warden complex unless he showed them?

Here is Agent Barclay's testimony:  "Because Melissa and Rachel both told us that in some or at least one of the penis pictures that he showed him, that they recognized the flooring

from the warden's complex."  That's before they were ever shown the photos.

That's not to mention all the other testimony from all the other witnesses corroborating this, Dr. Townsend, Correctional Officer Millikin.

The reason their testimony is so similar is because the defendant had a clear MO, tried and true.  It worked for a long time until he got caught, until these women had the courage to come forward and tell you what he did.

Now, the defense also made the argument that there is no corroboration in this case.  I think that's readily apparent that that's not correct.  He said this is just a he said/she said.  It's not.  It's a he said/she said/she said/she said/she said/she said/she said.  I might be leaving out a she or two here or there.

But setting that aside, as the judge instructed you, you can convict the defendant just on the testimony of Melissa, Maria, and Rachel alone.  But there is so much more than that.

I won't go through everything in the detail that my colleague did, but you've got naked pictures of Melissa and Rachel on his personal computer, cropped to focus on Melissa's genitals.  You've got screenshots of the naked video chat with Rachel.

You've got the rememberpockets email address.  You've got the call logs.  You've got the rose that the defendant gave to

Maria. You've got the daily planner with the pages ripped out of it, the pages that the defendant told Maria to get rid of to cover his tracks.

You've got the crocheted bikini. You've got the pictures of the defendant, the defendant's penis, found on his work phone.

And you've got the testimony of other witnesses, Shindozjanae, Aurelia, Dr. Townsend. And the witnesses also corroborate one another, like I just mentioned. The defendant had a clear MO. He flattered, he groomed, he showed them pictures of his penis, and then he abused them. Far from being uncorroborated, the evidence in this case is undeniable and points in one direction: The defendant's guilt.

Now, I want to take one moment to clarify something that the defense counsel said on -- in his closing argument. He said that Shindozjanae was, you know, so far away, up on a stair, he couldn't see what was going on in Maria's cell. He referred you to this diagram that they admitted, and if you go back to the defendant's testimony, he circled a room on the right side of the diagram. There's just one problem with this argument. That wasn't Maria's cell.

Ms. Slattery, if you could pull up Exhibit 327.

As you'll see, Maria testified that her cell is the last door on the left, right across from the showers and the laundry rooms.

Can you please pull up Exhibit 321.

Multiple people, including Maria and Aurelia, identified Maria's cell as on the bottom left of this frame, the two windows on the bottom left.  That was Maria's cell.

And if you go back to Exhibit 327, Shindozjanae testified that he was about 6 feet away when he saw what was going on, essentially -- and he was looking to his right -- essentially from this view right here.  And as you can see, the door opens in such a way that someone standing right here would be able to see right into that cell.

I've got to spend just --

You can take that down, Ms. Slattery.

I've got to spend just a couple minutes talking about the rememberpockets Gmail account.  Like so much of the defendant's testimony, this story was just made up out of thin air.  He wants you to believe that Rachel came to him before she got out of prison and told him that she had concerns about what was going on at the prison, that she had information to give him.

Did he give her his official BOP email?  Did he give her his BOP phone number?  Did he tell SIS, the people who are in charge of doing these exit interviews, "Hey, there's someone here who's got some concerns about things that are going on here."  No.

Instead, he gave her an email address.  But not just any email address, it's the same email address that he supposedly

used for his sexual escapades with other women, probably one of the so-called, quote -- this is from his testimony -- "free women that I could see any day of the week."

And by the way, I want to correct something that the defense counsel said in closing here, too.  He gave that email address to Rachel in the heart of his grooming of her, in February of 2020, and right after that they began talking.

And in his telling, he's the true victim here.  It was Rachel who made him get a burner phone.  It was Rachel that turned things sexual.  It was Rachel that wanted him to record her masturbating.  Why?  As the defendant testified, quote, She suggested that I just record her and then I would be able to look at her at night.

You heard from Rachel.  Did it sound like she wanted him to record her?

And after their sexual relationship ended, the defendant claims to have owned up to it.  Owned up to it by doing what? Did he come forward and admit he'd been in an inappropriate relationship?  Did he give the photos to SIS?  Once again, no. He, quote, owned up to it by retiring.  In what world is that owning up to it?  Getting caught is not the same thing as owning up.  Hoping to get away with it is not the same thing as owning up.  It's consciousness of guilt.

What really happened?  What's the truth about the rememberpockets email address?  Well, the truth is what Rachel

testified on the stand.  The defendant flattered her, he groomed her, and, in the course of that, gave her a personal email address, the rememberpockets email address, so that they could stay in touch after she got out of prison.

And they began a physical relationship at FCI Dublin that continued after she was released, and without her knowledge, on one of these video chats, he recorded her, and then he tried to delete those photos to avoid getting caught.  And when he got caught, he concocted the story that you heard him tell on the stand.  That's the truth.

Now, I want to spend just a couple minutes talking about the photos of Melissa that the defendant took in the cell.  He argued that he was taking photos to document misconduct, and he was, his own.  The story he made up defies common sense and is inconsistent with so much in the record.

He wants you to believe that one morning, he was walking around the prison and just so happened to have a camera in his hands.  And at some point, he came upon Andrea's cell and knocked on the door and was very concerned that someone in there may be getting rid of drugs.

So what did he do?  He opened the door, which, by the way, opens into the hallway, stepped into the cell, and without thinking at all, somehow got two hands on the camera and took a photo of Melissa naked on all fours with her genitals squarely in the middle of the frame.

Then what did he do after that?  Well, he yelled at her.  You actually heard him yell it on the stand.  He told her, "What the fuck are you doing?  Get your ass up.  Get dressed."

And what did she do in response?  What did she do in response when having just been surprised and yelled at by the associate warden?  Apparently, she turns toward the camera and smiles.  And that's when he takes another photo of her to document her face.

Then, as he slams the door, with Melissa still in a cell she's not supposed to be in, he again yells at her, quote, Pack your shit.  You're going to the hole.

Then what did he do?  Did he go back to his office right away to write a report about what had just happened?  Did he put her in the hole?  Did he go to the captain, the lieutenant, the other AW, the warden, the head of CMS, whose camera he had in his hands?  Did he go to the unit manager or literally anybody else on FCI Dublin and tell them what had just happened?  No.  He worked the rest of that morning, the rest of that afternoon.

He took the SIM card out of the camera, drove it all the way home, pulled out his personal computer in the privacy of his own home, stuck that SIM card in his personal computer, downloaded the naked photos of Melissa to his personal computer, and then began cropping them, cropping them to focus on her genitals.

Why?  Why did he crop them to focus on her genitals?  Why did he crop them to remove his own image from the reflection behind Melissa?  Why did he crop them to remove the cell number?  Pretty important information if you're concerned about someone being in someone else's cell.  Well, what he testified to was "to remove myself from it" and to protect his own privacy.

And what did he do next?  He wrote a report, a report that he didn't email to himself, he didn't text to himself, he didn't send to himself, he didn't send to anyone else, he didn't save on his personal computer.  No, it was a report that he printed out and then shredded.

Really?  In the 498 days between when the FBI spoke with the defendant and when he took the stand, that's the best story he could come up with?  It's just what it is, a story.  Setting aside all of the other evidence in this case that contradicts that, your common sense alone tells you that that is fabricated.

What really happened?  What really happened is what Melissa testified to.  The defendant instructed her to be naked in Andrea's cell one day while he was doing his rounds.  And as he was doing his rounds, he came in, came into the cell, and he told her -- I'll quote from her testimony -- "Don't move.  Stay like this.  Don't move.  Don't move."  And then he took naked pictures of her.

And in a raw power move, he handed her a candy cane and instructed her to put it in her vagina, and she did, because he was the associate warden, and then she gave it back to him. And then when he was done getting from her what he wanted, he told her, "Get dressed," and he left.

And then he took those pictures home and he put them on his personal computer and cropped them to focus on her genitals. Why? To create a report that he was writing? No. Because it sexually aroused him. That's what really happened.

For his 30-year career in the Bureau of Prisons, the defendant had a lot of power, and as the associate warden and then warden at FCI Dublin, he had near total power. Regardless of how much he tries to dress that up in bureaucracy, he had the final signature authority. He had the power.

And you heard what he did with that power. He flattered, he groomed, he sexually abused multiple women who he was in charge of protecting, and then he used that power to try and keep them quiet, because he thought he could get away with it.

And you saw the effect his power had on his prisoners. You saw them take the stand and tell you how terrified they were of the defendant and his power. You heard it in their cracking voices and you saw it in their tears.

And their fears were justified. You saw it when he took the stand. You saw the anger in his eyes and heard the anger in his voice when my colleague, Ms. Priedeman, dared to

question his lies.

But in this courtroom, he has no power.  He could not use his power to silence his prisoners any longer.  He could not use his power to cover up his crimes.

And in just a moment, I'm going to sit down and the judge is going to give you some final instructions.  And when you go back in that deliberation room, you have the power.  You have the power to review all the evidence in this case.  You have the power to do justice.  The only verdict in this case that is supported by the evidence is guilty.

**THE COURT:**  All right.  Members of the Jury, when you begin your deliberations, elect one member of the jury to serve as your presiding juror.  That person will preside over your deliberations and speak for you here in court.

You will then discuss the case with your fellow jurors to reach agreement, if you can do so.

Your verdict, whether guilty or not guilty, must be unanimous.  Each of you must decide this case for yourself, but you should only do so after you have considered all of the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.

Do not be afraid to change your opinion if the discussion persuades you to do so, but do not come to a decision simply because other jurors think it is right.

It is important that you attempt to reach a unanimous

verdict, but, of course, only if each of you can do so after having made your own conscientious decision.  Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.

After your verdict is read in open court, you may be asked individually to indicate whether that verdict expresses your personal view.  This is referred to as polling the jury and is done to ensure that each juror has agreed to each decision.

The verdict forms that you receive will ask you to answer several questions.  You must vote separately on each question.  As I noted before, each of you has been provided a copy of the verdict forms in your notebook for your use and to keep track of your own votes.

Perform your duties fairly and impartially.  As I mentioned before, do not allow personal likes or dislikes, sympathy, prejudice, fear, or public opinion to influence you.  You should also not be influenced by any person's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender, or economic circumstance.  Also, do not allow yourself to be influenced by personal likes or dislikes, sympathy, prejudice, fear, public opinion, or biases, including unconscious biases.

Unconscious biases are stereotypes, attitudes, and preferences that people may consciously reject but may be expressed without conscious awareness, control, or intention.

It is your duty as jurors to consult with one other and to deliberate with one another with a view towards reaching an agreement, if you can do so.

During your deliberations, you should not hesitate to reexamine your own views and change your opinion if you become persuaded that it was wrong.

Because you must base your verdict only on the evidence received in this case and on these instructions, I remind you that you must not be exposed to any information about the case or the issues involved in it.

Except for discussing this case with your fellow jurors during your deliberations, do not communicate with anyone in any way, and do not let anyone communicate with you in any way about the merits of this case or anything to do with it.  As I've mentioned before, this restriction includes discussing the case in person; in writing; by phone, tablet, computer, or other means; via email, text messaging, or Internet chat room, blog, website, or any other social media.  This restriction applies to communicating with your family members, your employers, the media or press, or any people involved in the trial.  That includes any alternate juror who has not been seated.

If you are asked or approached in any way about your jury service or anything in this case, you must respond that you have been ordered not to discuss the matter and report the

contact to the Court.

Do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it.  Do not do any research, such as consulting dictionaries, searching the Internet, or using other reference materials.  Do not make any investigation on your own or in any way try to learn anything else about the case.

The law requires these restrictions to ensure parties have a fair trial based on the same evidence that each party has had an opportunity to address.  A juror who violates these restrictions jeopardizes the fairness of these proceedings and a mistrial could result, which would require the entire trial process to start over.

If any juror is exposed to outside information, please notify me immediately.

If it becomes necessary during your deliberations to communicate with me, you may send a note through the courtroom deputy signed by any one or more of you.  No member of the jury should ever attempt to communicate with me except by signed writing, and I will respond to the jury concerning the case only in writing or here in open court.

If you send out a question, I will need to consult with the lawyers before answering it, and that sometimes requires time.  They don't sit in the courtroom waiting.  Okay?  You may continue your deliberations while waiting for the answer to any

question.  Remember that you are never to tell me or anyone how the jury stands numerically or otherwise on any question submitted to you, including the question of guilt of the defendant, until after you have reached a unanimous verdict or you have been discharged.

All right.  Are there any -- so I'm going to ask the alternate jurors to stay in here.  Are there any questions from the other jurors?

Yes, sir?

**A JUROR:**  As far as the process of the court trial goes, is there some kind of --

**THE COURT:**  Do you mind taking off your mask.

**A JUROR:**  As far as the process of the court trial goes, is there some kind of, like, rule or protection against witnesses knowing who the other witnesses are in a case?

**THE COURT:**  So I have ordered that we only use first names for the privacy of the witnesses.  We don't always do that, but I ordered it in this particular case.

Does that answer your question?

**A JUROR:**  But, like, does each witness know who each of the other witnesses -- or at least those first names are going to be?

**THE COURT:**  Do --

**A JUROR:**  Like do witnesses have any idea how many other witnesses or who the other witnesses might be in a case?

**THE COURT:**  I can't answer that question one way or the other.  Okay?

Other questions?  Yeah, go ahead.

**A JUROR:**  For the polling after the fact, is the purpose of that polling, to like -- because I can see, for example, in a situation where --

**THE COURT:**  So let me explain the polling again.

Your verdict must be unanimous.  And so you all have a copy of the verdict form, right?  If you take a look at that verdict form, for each count, it says "guilty" or "not guilty," and it's ultimately signed by the presiding juror.

So I will get a white -- the original version of that back from the jury.  That's -- and it says at the beginning, "We unanimously agree...."

So sometimes parties ask me to poll, and what we will do is if we poll, we will say, "Do -- Juror No. 1, did you unanimously agree to what's in the verdict form?"  And then we'll ask -- and Juror No. 1 will say, presumably, "Yes," right?  And then we'll go down all 12 jurors to make sure that it was unanimous.  That's all it is.

Does that answer your question or do you want to ask a follow-up?

**A JUROR:**  I think that answers my question.

**THE COURT:**  You can ask a follow-up if you have a follow-up.  That's how the process works, just so that you

know.

A JUROR:  Okay.  So if on the poll you say you didn't agree or you had some -- some differences with the final decision, you're effectively saying, like, I didn't agree to be a part of whatever that final -- final decision was.

THE COURT:  Right.  And I would expect not to receive the verdict form, which says you do unanimously agree.  I would expect to receive something else from you.  Okay?

A JUROR:  Yes.

THE COURT:  Okay.  Yes?

A JUROR:  In the jury instructions, its says the punishment provided by law for this crime is for the Court to decide.

THE COURT:  Correct.

A JUROR:  So there is, like, a different punishment for each count and depending on --

THE COURT:  The point is that's -- nothing respecting punishment is for you to consider.  So the verdict is a reflection of what the jury believes the facts are and whether or not the Government has proved each and every element of each and every crime beyond a reasonable doubt.  Punishment is not the purview of the jury, so it cannot be considered in any way, shape, or form.  Punishment, to the extent there's a verdict of guilty, is for the Court to decide.

Okay.  Other questions?  No.

Go ahead.

**A JUROR:** Just to clarify, earlier when the case first started, I thought that the alternates would be deliberating with us at the same time, but you asked them to stay behind. I'm just trying to clarify --

**THE COURT:** They will not be deliberating with you.

So what happens with the alternates -- anything could have happened in this trial. I've tried cases where on day one, I had to excuse a juror and I had to seat an alternate.

So the alternates will be given some different instructions. If something happens to your deliberations, then I will -- I randomly select a juror who's an alternate and they get called in, and then I'll have -- you'll have to restart the deliberations with the alternate juror.

**A JUROR:** Thank you.

**THE COURT:** Okay. Other questions?

All right. Then the jury can retire to the jury room and the alternate jurors should stay here.

(Proceedings were heard out of presence of the jury:)

**THE COURT:** Okay. So for the alternate jurors, the jury is now deliberating, but you are still alternate jurors and you are still bound by my early instructions -- earlier instructions about your conduct. You still cannot talk about this case or any of the people or subjects involved in it with anyone, not your family, not your friends, and not each other.

Do not have any contact with the deliberating jurors. Do not decide how you would vote if you were deliberating. Do not form or express an opinion about the issues in this case unless you are substituted for one of the deliberating jurors.

I give you these instructions because if you are substituted, the entire deliberation process must begin again with you as part of the deliberating body.

As I just mentioned, if something happens to one of those jurors and I have to seat you, I will literally put each of your names in a cup and I'll pull one out, and you're -- whoever I pick out will be the person who gets called.

My courtroom deputy will contact you when the jury has finished deliberating. At that time, you will be discharged, and at that time, then you can discuss the case with anyone that you wish.

In the event that I do not see you again, please accept my thanks on behalf of the judges in this district, on behalf of the parties to the case. I thank you in advance for your service.

And happy birthday again.

Do any of you have any questions? Yes.

**A JUROR:** So you might call us at home and tell us we have to come in for this?

**THE COURT:** Correct.

**A JUROR:** All right.

**THE COURT:**  That's what would happen.

**A JUROR:**  Okay.

**THE COURT:**  But we will call you, you know, under all events, because we need to release you so that you can feel free to talk if you want to.

And I'm going to let you go back in there to collect your things and say your goodbyes.

**A JUROR:**  So when will we know that we are being released?

**THE COURT:**  Once we have a verdict, then Mr. Garcia will call you.  Until --

**A JUROR:**  We'll get a call.

**THE COURT:**  You'll get a phone call.

Until you receive the phone call from Mr. Garcia, you're not released, because you may have to come -- if something happens to one of them, you may have to be called to come in and deliberate.  That's why you listen to everything, in case something happened and you needed to be seated.

**A JUROR:**  Okay.

**THE COURT:**  Okay.  Yes?

**A JUROR:**  Are we giving these --

**THE COURT:**  Leave your binders in the jury room.  Do not take them with you.

And Mr. Garcia will take your badges, and if you get reseated, he'll give them back to you.  And we'll keep those

binders for you in case you get reseated.  Okay?

All right.  Well, thank you again.  Much, much appreciated.  You have all been very attentive and I have noticed.  Thank you so much.

All right.  Everyone will rise for those jurors.

And if you will allow them to go back, please, and collect their things.

(Alternate jurors leave the courtroom.)

**THE COURT:**  Okay.  The record will reflect that the jurors have left the courtroom.

I believe that Mr. Garcia has your contact information.  My rule is that you need to be 10 minutes, 15 minutes at most, from the courtroom.  You can wait in the attorney lounge or the coffee shop across the street, but that's my rule.  I don't like to have jurors waiting.

Usually, the first note I receive is their schedule.  If that's the case, we'll just call you up and let you know and send you an email PDF.  But at this hour, I'm not sure they're going to deliberate that long.  But as soon as we have information, we'll let you know.

All right.  Any questions?

**MR. REILLY:**  No, Your Honor.

**MS. PRIEDEMAN:**  No, Your Honor.  Thank you.

**THE COURT:**  All right.  We'll stand in recess until I hear from the jury.

(Recess taken at 2:39 p.m.)

(Proceedings adjourned at 3:57 p.m.)

CERTIFICATE OF REPORTER

        I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter.


DATE:    Tuesday, December 6, 2022


*Pamela Batalo Hebel*

_____

Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
U.S. Court Reporter